IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JEFFREY NUZIARD, et al.,

       Plaintiffs,

   v.                                   Case No. 4:23-cv-00278-P

MINORITY BUSINESS
DEVELOPMENT AGENCY, et al.

       Defendants.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ......................................................................................................................... 1

   I.   The Minority Business Development Agency. .................................................... 1

   II.  Plaintiffs and this Lawsuit. .............................................................................. 4

ARGUMENT AND AUTHORITIES ................................................................................. 8

   I.   Plaintiffs are likely to succeed on their claims of race and ethnicity discrimination in violation of the Constitution. ..................................................... 8

       A.  There is no compelling interest to justify racial and ethnic discrimination in the MBDA Business Center Program and other MBDA programs. ............................... 10

       B.  The racial and ethnic classifications imposed for the MBDA Business Center Program and other MBDA programs are not narrowly tailored. ............................... 16

   II.  Plaintiffs are likely to succeed on their Administrative Procedure Act claim. ................. 22

   III. The race and ethnicity eligibility requirements for the MBDA Business Center Program and other MBDA programs irreparably harm Plaintiffs. ................... 23

   IV. The public interest and balance of harms favor an injunction. ......................................... 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995) ................................................................................. 9, 10, 13

*Arnold v. Barbers Hill Indep. Sch. Dist.,*
    479 F. Supp. 3d 511 (S.D. Tex. 2020) ........................................................... 24

*Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.,*
    19 F.3d 992 (5th Cir. 1994) .......................................................................... 18

*Builders Ass'n of Greater Chicago v. Cnty. of Cook,*
    256 F.3d 642 (7th Cir. 2001) ........................................................... 12, 13, 14

*CASA de Maryland, Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) ............................................................... 22

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) ............................................................................. passim

*Dean v. City of Shreveport,*
    438 F.3d 448 (5th Cir. 2006) ................................................................... 20, 22

*Diaz-Rivas v. U.S. Att'y Gen.,*
    769 F. App'x 748 (11th Cir. 2019) ................................................................ 23

*Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.,*
    943 F. Supp. 1546 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997) ................. 9, 11

*Ensley Branch, N.A.A.C.P. v. Seibels,*
    31 F.3d 1548 (11th Cir. 1994) ....................................................................... 12

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) ...................................................................................... 9, 18

*Greer's Ranch Cafe v. Guzman,*
    540 F. Supp. 3d 638 (N.D. Tex. 2021) ................................................. 8, 15, 23, 24

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) ............................................................................ 16, 20, 24

*Jackson Women's Health Org. v. Currier,*
    760 F.3d 448 (5th Cir. 2014) ......................................................................... 24

*Johnson v. California,*
    543 U.S. 499 (2005) ........................................................................................ 9

*Latif v. Holder,*
    28 F. Supp. 3d 1134 (D. Or. 2014) ................................................................ 22

*League of United Latin Am. Citizens v. Abbott,*
    601 F. Supp. 3d 147 (W.D. Tex.) ............................................................. 23, 24

*McNamara v. City of Chicago,*
    138 F.3d 1219 (7th Cir. 1998) ....................................................................... 11

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
  508 U.S. 656 (1993) ............................................................................... 23, 24

*O'Donnell Const. Co. v. D.C.*,
  963 F.2d 420 (D.C. Cir. 1992) ...................................................................... 17

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ........................................................................ 24

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) ............................................................................... passim

*Porter v. Califano*,
  592 F.2d 770 (5th Cir. 1979) ........................................................................ 22

*Regents of Univ. of California v. Bakke*,
  438 U.S. 265 (1978) ......................................................................... 9, 11, 14

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*,
  6 F.4th 633 (5th Cir. 2021) .......................................................................... 12

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ......................................................................... 10, 13, 23

*Shaw v. Reno*,
  509 U.S. 630 (1993) ..................................................................................... 9

*Vitolo v. Guzman*,
  999 F.3d 353 (6th Cir. 2021) ................................................................... passim

*W.H. Scott Const. Co. v. City of Jackson, Miss.*,
  199 F.3d 206 (5th Cir. 1999) ........................................................................ 12

*Walker v. City of Mesquite*,
  169 F.3d 973 (5th Cir. 1999) .................................................................... 16, 17

*Washington v. Davis*,
  426 U.S. 229 (1976) .................................................................................... 12

*Wygant v. Jackson Bd. of Educ.*,
  476 U.S. 267 (1986) ............................................................................... 10, 21

**Statutes**

15 U.S.C. § 9501 .................................................................................... passim

15 U.S.C. § 9502 ......................................................................................... 3

15 U.S.C. § 9511 ......................................................................................... 3

15 U.S.C. § 9512 ...................................................................................... 3, 13

15 U.S.C. § 9522 ......................................................................................... 3

15 U.S.C. § 9523 ......................................................................................... 3

15 U.S.C. § 9524 ...................................................................................... 3, 8

15 U.S.C. § 9598 ...................................................................................... 2, 21

iv

5 U.S.C. § 551 ................................................................................................ 22

5 U.S.C. § 704 ................................................................................................ 22

5 U.S.C. § 706 ........................................................................................... 22, 23

**Other Authorities**

David E. Bernstein, *Classified: The Untold Story of Racial Classification in America*
(Bombardier Books 2022) ......................................................................... 20

Forbes, *A Conversation with the first Under Secretary of Commerce for Minority*
*Business Development, Donald "Don" R. Cravins, Jr.* (Feb. 6, 2023) .......................... 2

George R. LaNoue & John C. Sullivan, *Presumptions for Preferences: The Small*
*Business Administration's Decisions on Groups Entitled to Affirmative Action*, 6 J.
Pol'y Hist. 439 (Oct. 1994) ...................................................................... 20

MBDA, *The History of MBDA*, https://www.mbda.gov/about/history ........................... 2

MGT Consulting Group, *2019 Disparity Study* 1 (2019),
https://www.mbda.gov/minority-women-and-small-business-enterprise-disparity-
study-city-tallahassee-leon-county-florida ......................................................... 15

Wright & Miller, 11A *Fed. Prac. & Proc.* § 2948.1 Irreparable Harm (3d ed. 2022) ................ 23

**Federal Regulations**

13 C.F.R. § 124.103 ......................................................................................... 19

15 C.F.R. § 1400.1 .................................................................................... passim

15 C.F.R. § 1400.3 ......................................................................................... 20

28 C.F.R. § 42.402 ......................................................................................... 19

32 C.F.R. § 191.3 ......................................................................................... 19

34 Fed. Reg. 4937 (Mar. 5, 1969) ................................................................... 1, 21

86 Fed. Reg. 7009 (Jan. 20, 2021) ....................................................................... 2

88 Fed. Reg. 10825 (Feb. 16, 2023) ...................................................................... 2

# INTRODUCTION

For more than half a century, this nation has awarded preferential treatment to certain minority-owned businesses on the basis of race or ethnicity. Upon an unlawful and unfair presumption of societal discrimination, business programs, services and assistance have remained otherwise unavailable to this nation's disadvantaged. It is wholly repugnant to human dignity to presume a diminished ability or inability to succeed based on race. Indeed, as the Supreme Court aptly warned, "preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989) (quoting *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 298 (1978) (brackets omitted).

Now, under the Infrastructure Investment and Jobs Act ("Infrastructure Act"), the Biden Administration is set to spend $550 million to implement the new Minority Business Development Agency in an effort to engrain a system of intentional and persistent race discrimination into government for all time. This ill-conceived concept is fatally flawed and cannot withstand constitutional scrutiny under the equal-protection doctrine. As this case once again highlights, the only "way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007).

# FACTS

## I.    The Minority Business Development Agency.

On March 5, 1969, President Nixon created the Office of Minority Business Enterprise (OMBE) and the Advisory Council for Minority Business Enterprise, establishing the first permutation of what would later be termed the Minority Business Development Agency (MBDA). Exec. Order No. 11458, 34 Fed. Reg. 4937 (Mar. 5, 1969); MBDA, *The History of MBDA*,

https://www.mbda.gov/about/history (last accessed Feb. 27, 2023) (indicating OMBE name change in 1979). Throughout the years leading up to 2021, this office remained dedicated to providing minority business assistance, growing steadily in scope and authorized solely under claimed executive prerogative. *See e.g.*, *id.*

On November 15, 2021, President Biden signed into law the Infrastructure Act, transforming the MBDA into a creature of statute, housed within the Department of Commerce. App. 7 ¶ 17;[1] 15 U.S.C. § 9598. Under the Infrastructure Act, this new agency receives a $550 million appropriation through fiscal year 2025 for its operations, programs and new offices. *Id.*

Through Executive Orders initiated both before and after the law's passage, Defendant Biden ordered Defendants Raimondo and Cravins to advance a racial equity agenda addressing "historic failures" through resource allocation for certain non-white racial groups. App. 7 ¶ 16; App. 8 ¶ 19; *see* Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021); Exec. Order No. 14091, 88 Fed. Reg. 10825 (Feb. 16, 2023). Under the MBDA's mission to "promote the growth of minority owned businesses," both Defendants Raimondo and Cravins have described the agency as dedicated *solely* to assisting and supporting minority-owned businesses. App. 7 ¶ 18; App. ¶ 8 20–21. As Defendant Cravins expressed: "If you are a minority entrepreneur, MBDA is your agency." App. 8 ¶ 21; Forbes, *A Conversation with the first Under Secretary of Commerce for Minority Business Development, Donald "Don" R. Cravins, Jr.* (Feb. 6, 2023).

Federal law imposes several responsibilities upon the MBDA to assist minority businesses. For example, through "regional offices" and other MBDA offices, the MBDA must provide federal

---

[1] These facts are presented in the Verified Complaint, as confirmed through the verifications attached thereto.

assistance to minority businesses through "resources relating to management," "technological and technical assistance," "financial, legal, and marketing services," and "services relating to workforce development." App. 7 ¶ 18; App. 8 ¶ 23; *see* 15 U.S.C. §§ 9502(e)(2)(A), 9511(1). The MBDA must also "promote the position of minority business enterprises in [] local economies" through programs for minority businesses related to procurement, management, technology, law, financing, marketing, and workforce development. App. 9 ¶ 24; *see* 15 U.S.C. § 9512(1). Beyond these general mandates, the MBDA must establish a "Business Center Program" to (1) assist minority business enterprises in accessing capital, contracts, and grants, and creating and maintaining jobs; (2) "provide counseling and mentoring to minority business enterprises"; and (3) "facilitate the growth of minority businesses by promoting trade." App. 9 ¶ 25; 15 U.S.C. § 9522(1)-(3).

Under the Business Center Program, the MBDA must "make Federal assistance awards to eligible entities to operate MBDA Business Centers," which must then "provide technical assistance and business development services, or specialty services, to minority business enterprises." App. 9 ¶ 26; 15 U.S.C. § 9523. MBDA Business Centers may offer a variety of services to minority businesses under the law, including "referral services" and any "programs and services" necessary to accomplish the goals of MBDA to support minority businesses. App. 9 ¶ 27; 15 U.S.C. § 9524(a)(1). MBDA Business Centers must be operated in accordance with the requirements imposed by the MBDA through written agreements in which MBDA is "substantially involved." App. 9 ¶ 28; *see* 15 U.S.C. §§ 9501(8), 9524.

MBDA assistance is available only for select minority business enterprises owned by individuals of certain racial or ethnic backgrounds. To qualify as a "minority business enterprise," a business enterprise must be "not less than 51 percent-owned by 1 or more socially or

economically disadvantaged individuals" and its management and daily business operations must be "controlled by 1 or more socially or economically disadvantaged individuals." App. 10 ¶ 29; 15 U.S.C. § 9501(9)(A). The Infrastructure Act adopts similar provisions under the rules at 15 C.F.R. pt. 1400: "In order to be eligible to receive assistance from MBDA funded organizations, a concern must be a minority business enterprise. A minority business enterprise is a business enterprise that is owned or controlled by one or more socially or economically disadvantaged persons." App. 10 ¶ 29; 15 C.F.R. § 1400.1(b); 15 U.S.C. § 9501(15)(B). Only individuals belonging to the following racial or ethnic groups are presumed to be "socially or economically disadvantaged individuals": Black or African American, Hispanic or Latino, American Indian or Alaska Native, Asian, Native Hawaiian or Pacific Islander; and pursuant to 15 C.F.R. pt. 1400, other racial or ethnic groups (potentially overlapping) to include "Puerto-Ricans," "Spanish-speaking Americans," "Eskimos," "Hasidic Jews," and "Asian Indians." App. 10 ¶ 30; 15 U.S.C. § 9501(15); 15 C.F.R. § 1400.1. Any other group wishing to obtain status as "socially or economically disadvantaged," must make an "adequate showing by representatives of the group" to the federal government. *Id.* Consequently, business owners, including minorities, who are not members of the government's preferred racial or ethnic groups, are presumed ineligible for MBDA Business Center Program services and other MBDA programs and denied equal access to these services based on their disfavored race or ethnicity. App. 11 ¶ 31.

## II.     Plaintiffs and this Lawsuit.

Plaintiff Jeffrey Nuziard is a white male who lives in Tarrant County, Texas. App. 3 ¶ 6. He is a U.S. Armed Forces veteran, and after a 20-year career in investment banking, he went back to school and earned a PhD. *Id.* Dr. Nuziard now owns and operates his own business, Sexual Wellness Centers of Texas, currently at two locations and expanding to others in the future. *Id.*

The COVID-19 pandemic had a sizeable impact on Dr. Nuziard's business, delaying his grand opening in 2020 and causing staffing problems. *Id.* Dr. Nuziard has sought federal assistance in the past but has been denied grants. *Id.* He is interested in the MBDA because it offers grants, training, access to contracts and networks, financial sourcing assistance, strategic business consulting, and other business resources; however, Dr. Nuziard is not eligible for MBDA assistance because he is white. *Id.*

In or about March 2023, Plaintiff Nuziard visited his local MBDA website for Dallas/Fort Worth and observed that the agency only serves "ethnic minority-owned businesses" owned and controlled by "African Americans, Hispanic, Asian, or Native American entrepreneurs." App. 11 ¶ 32. Dr. Nuziard is otherwise eligible for assistance, except that he is white. *Id. See also* App. 12 ¶ 33 (containing screenshot on assistance requirements). On its "Contact Us" page, the Dallas/Fort Worth MBDA further discriminates, demanding interested businesses that "did not check all the required boxes" to "explain" why they are not "51% owned and controlled by African Americans, Hispanic, Asian, or Native American entrepreneurs." *Id.* at ¶ 34 (containing website screen shot).

Plaintiff Matthew Piper is a white male who lives and works in northeast Wisconsin. App. 4 ¶ 7. Mr. Piper grew up in extreme financial poverty in Denver, Colorado, but through hard work and persistence, he eventually earned his degree in Environmental Design and Planning, graduating with honors. *Id.* After college, Mr. Piper became a licensed architect and worked with distinguished design firms on Chicago's "Magnificent Mile" for 12 years. *Id.* He also founded Piper Zenk Architecture in Denver, which he worked at for about a decade. *Id.* In 2016, Mr. Piper moved to Wisconsin, where he now owns and operates PIPER Architects. *Id.* As a small business owner, Mr. Piper could benefit from various MBDA services, such as counseling and mentoring, access to capital and contracts, and support for job creation and retention. *Id.*; App. 13 ¶ 35.

5

However, following the January 20, 2023 ribbon cutting ceremony for the new Wisconsin MBDA Business Center celebrated by United States Senator Baldwin and Defendant Cravins, Mr. Piper read about the office and learned that his business is not eligible for MBDA assistance because of his race. *Id*. The Wisconsin MBDA office, like all the others, is focused on "access" for "minority-owned businesses," as Defendant Cravins declared. App. 13 ¶ 35.

Plaintiff Christian Bruckner is a white male who lives and works in Tampa, Florida. App. 4–5 ¶ 8. He is an immigrant who came to America in the 1970s to escape the communist regime in Romania. *Id*. His parents wanted a better life for him in a country that values constitutional rights and the principle of equality under the law. *Id*. In 1989, Mr. Bruckner was seriously injured in a car wreck and became permanently disabled. *Id*. Mr. Bruckner has over 20 years of experience in contracting and owns his own business, Project Management Corporation. *Id*. Mr. Bruckner is seeking support to sustain and strengthen this business and is interested in the MBDA because it offers assistance and resources to businesses that seek contracting opportunities. *Id*.

On or about January 18, 2023, Plaintiff Bruckner accessed the Orlando MBDA Business Center website, where he learned that the MBDA provides businesses with access to capital, contracts and markets. App. 14 ¶ 36. Given his business in government contracting, Mr. Bruckner was particularly interested in, and selected, the "access to contracts" option. *Id*. He then encountered the message prompt, "see if you qualify for no-cost business development services and trainings from the Orlando MBDA Business Center," and he clicked on the link to "complete the intake form." App. 14 ¶ 37. In reviewing the MBDA client intake form, Mr. Bruckner observed a required question for "Ethnicity." App. 14 ¶ 38. Not seeing an option for "white" or "Caucasian," and otherwise finding that none of the "ethnicity" options were applicable to him, Mr. Bruckner placed an email inquiry to the MBDA on January 18, 2023: "Hello . . . I have a question. I do not

6

see a box for disability, and I don't meet the other boxes on the intake form. What do I need to do?" App. 15 ¶ 39. In response, Kristi Jones, Office Manager for the Orlando MBDA Business Center wrote, "If you do not identify as one of the 'Ethnicity' dropdown options, we can refer you to one of our Strategic Partners for assistance with growing your business." App. 15 ¶ 40. Ms. Jones also sent a follow up email clarifying that "[t]he MBDA's focus is to help grow businesses owned by people of ethnic minorities," and that "[i]f none of the options in the "Ethnicity" dropdown on the MBDA Intake Form apply, [MBDA] can refer" Mr. Bruckner to a "strategic partner" for assistance. *Id.* Ms. Jones's email signature line included a graphic referencing the MBDA and the Department of Commerce. App. 15-16 ¶ 41 (containing signature line image).

A second MBDA Business Center is in Miami. App. 16 ¶ 42. Like the Orlando office, the Miami office also restricts its assistance to business owners of certain races. *Id.*

These MBDA offices are not the only MBDA Business Centers with racial qualifications: all MBDA Business Centers must provide resources and other benefits only to minority-owned businesses in accordance with federal law. App. 16 ¶ 43. For example, the New Mexico MBDA Business Center claims that it will help businesses "across the United States," but not those businesses belonging to certain races. App. 17 ¶ 45 (containing website screenshot detailing racial criteria for business owners). Likewise, the Arizona and Georgia MBDA Business Centers explain that they only serve members of certain racial minorities. App. 19 ¶ 48; App. 20 ¶ 50 (containing website screenshots regarding "Who We Serve"). At the Denver MBDA, to even obtain a consult, a business owner must check one of the boxes on the required intake form to specify his applicable "MBE Eligibility Group." App. 20 ¶ 49 (containing website screenshot on eligible groups). Similarly, the Sacramento MBDA Business Center requires business owners to "certify" that their business is minority-owned before even receiving any information from the MBDA. App. 18 ¶ 46

7

(containing website screenshot of the applicable "Client Interest Form"). These certification criteria are consistent with 15 U.S.C. § 9524(i), requiring the Under Secretary to "establish minimum standards regarding verification of minority business enterprise status" for the MBDA Business Center Program. App. 19 ¶ 47. Further, most, if not all, MBDA regional centers advertise that they will help businesses across the United States, focusing attention on minority-owned businesses. App. 16 ¶ 44.

While the list could go on, it is incontestable that the MBDA does not assist business owners falling outside the government's preferred racial and ethnic classifications. *E.g.,* App. 21 ¶ 51. Plaintiffs encounter barriers to equal treatment nationwide because of their race. *Id.*; *e.g.,* App. 16–17 ¶ 44; App. 23 ¶ 63. Accordingly, this is a nationwide injury, stretching beyond the MBDA offices in Texas, Wisconsin and Florida, and stemming from the MBDA authorizing statutes and Defendants' implementation thereof. App. 21 ¶ 51; App. 16–17 ¶ 44.

## ARGUMENT AND AUTHORITIES

To obtain a preliminary injunction, Plaintiffs must establish: a substantial likelihood of success on the merits, a substantial threat of irreparable harm, a balance of hardships in their favor, and no disservice to the public interest. *Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638, 645 (N.D. Tex. 2021) (citing *Daniels Health Scis., LLC v. Vascular Health Scis., LLC,* 710 F.3d 579, 582 (5th Cir. 2013); *Janvey v. Alguire,* 647 F.3d 585, 595 (5th Cir. 2011)). Each of these requirements is met.

**I.    Plaintiffs are likely to succeed on their claims of race and ethnicity discrimination in violation of the Constitution.**

The Fifth Amendment's equal protection guarantee forbids discrimination by the federal government against any citizen because of his race or ethnicity. *E.g., Regents of Univ. of California*

8

*v. Bakke*, 438 U.S. 265, 307 (1978) (citations omitted).[2] Such government classifications of persons "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Consequently, "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Bakke*, 438 U.S. at 291. "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted). Because "[r]acial classifications are simply too pernicious," only "the most exact connection between justification and classification" can redeem them. *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (citation omitted).

Here, Defendants have indisputably imposed racial and ethnic classifications through eligibility requirements for MBDA programs, automatically disqualifying Plaintiffs from consideration on equal footing for MBDA Business Center Program services and other MBDA services. App. 11 ¶ 31; App. 21 ¶ 54. Strict scrutiny review accordingly applies. But Defendants cannot meet this "most searching examination." *Gratz*, 539 U.S. at 270. Simply put, there is no such "exact connection" between any justification and the racial and ethnic classifications that Defendants impose. *Id.* Defendants cannot provide specific and concrete evidence supporting a compelling government interest, nor can they meet any of the settled standards of narrow tailoring.

---

[2] While race and ethnicity are "analytically distinct, both [] characteristics are subject to the same constitutional protection." *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1551 fn. 2 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997) (citations omitted); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223-224 (1995).  Plaintiffs, accordingly, will refer to them as a single concept for purposes of equal protection review.

In fact, the statutes governing the MBDA offer no justification whatsoever for the race and ethnicity discrimination applied to the MBDA Business Center Program and other MBDA programs, much less for the creation of the MBDA as an agency purely devoted to this "odious" and "pernicious" mission.

> **A.     There is no compelling interest to justify racial and ethnic discrimination in the MBDA Business Center Program and other MBDA programs.**

A governmental interest in remedying the effects of past or present racial or ethnic discrimination rises to the level of "compelling" only where the discrimination has been "identified" with "specificity" and the imposed racial and ethnic classifications are backed by a "strong basis in evidence." *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) (citation omitted). Said differently, the government establishes a compelling interest in remedying race discrimination only when three criteria are met. *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (summarizing U.S. Supreme Court precedents).

First, in establishing a compelling governmental interest in a race-based remedy, a policy must target a "specific episode" of discrimination rather than generalized discrimination throughout society or within an industry. *Id.*; *Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 498; *Adarand*, 515 U.S. at 225. "Societal discrimination" in an industry or region cannot establish a compelling interest because as a "generalized assertion" of discrimination, it provides "no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Shaw*, 517 U.S. at 909-10 (citation omitted). In the absence of a particular, identified discrimination injury, "a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986). Accordingly, over several decades, the Supreme Court has repeatedly and frequently

reaffirmed this basic principle that generalized claims of societal discrimination do not justify race-conscious government action. *See, e.g., Parents Involved*, 551 U.S. at 731; *Bakke*, 438 U.S. at 310.

Next, there must be strong evidence of "intentional discrimination" to, in turn, justify the government's imposition of an intentional race-based remedy. *Vitolo*, 999 F.3d at 361; *Parents Involved*, 551 U.S. at 702; ("remedying the effects of past intentional discrimination is a compelling interest."); *Eng'g Contractors*, 122 F.3d at 907 ("A 'strong basis in evidence' *cannot* rest on 'an amorphous claim of societal discrimination, on simple legislative assurances of good intention, or on congressional findings of discrimination in the national economy.'") (citations omitted) (emphasis in original); *Croson*, 488 U.S. at 503 (an "inference of discriminatory exclusion" may establish a compelling interest). While appropriate statistical evidence may be used to establish intentional discrimination when there is a single decision-maker behind a disparity, "[t]here are numerous explanations for [a] dearth of minority participation." *Croson*, 488 U.S. at 503; *Vitolo*, 999 F.3d at 362. For example, "'[s]imilarly situated' [individuals of any given] group . . . all bring their own values and traditions to the socio-economic table, and may reasonably be expected to make voluntary choices that give effect to those values and traditions." *Eng'g Contractors*, 122 F.3d at 922. A disproportionate attraction of a minority group to an industry does not mean that discrimination is the reason. *Id.*; *accord McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir. 1998) ("Raw statistical disparities prove little; they certainly do not prove intentional discrimination."). Further, statistical data aimed at "racial balancing" can never be a "compelling end in itself [because it] would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved." *Parents Involved*, 551 U.S. at 730 (citation omitted).

11

Third, where the government has "actively discriminated" or "show[s] that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of [a] local . . . industry," then it may act to undo the discrimination. *Croson*, 488 U.S. at 492 (plurality opinion); *W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999). But it is not enough for the government to show that it was, or is, simply existent in an environment where there is discrimination. To the contrary, the government must prove that it "knowingly perpetuated the discrimination," and therefore became "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642, 645 (7th Cir. 2001).

Moreover, the central purpose of the equal protection guarantee is to prevent the government from purposefully discriminating between individuals on the basis of race. *Washington v. Davis*, 426 U.S. 229, 239 (1976). It therefore follows that the appropriate scope of government redress for racial and ethnic discrimination be limited to intentional discrimination that the government "had a hand in." *See Vitolo*, 999 F.3d at 361. In this way, the government brings itself back into compliance with the Constitution and does not transgress the equal protection guarantee anew. *See Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1570 (11th Cir. 1994) ("By striving for racial parity rather than an end to racial discrimination, these decrees actually promote racial discrimination in contravention of the Constitution."); *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 648 (5th Cir. 2021) ("racial balancing is, of course, 'patently unconstitutional.'") (citing *Parents Involved*, 551 U.S. at 723). Here, Defendants cannot meet any of the above three required elements to establish a compelling interest for the racial and ethnic eligibility criteria they impose for MBDA programs.

First, Defendants, in implementing their business assistance programs through an agency devoted entirely to a mission of intentional race discrimination, do not attempt to redress any "specific episode" of discrimination. *See Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 498; *Vitolo*, 999 F.3d at 361; *Adarand*, 515 U.S. at 225. As an agency dedicated "solely to supporting minority-owned businesses, enterprises, and entrepreneurs," App. 8 ¶¶ 20–21, the MBDA indicates no particular preference for assisting any one business industry over another, so long as the business enterprise is owned and controlled by one or more individuals belonging to a favored race or ethnicity group. *See* 15 U.S.C. § 9501(15); 15 C.F.R. § 1400.1. While Defendant Biden relies on his generalized assertion that "historic failures" warrant MBDA and other federal agency investment in such favored groups, the statutes governing the MBDA provide no further indication of any "specific episode" of past discrimination (or discrimination otherwise) as to any particular minority-owned businesses in any particular industry or geographic area, let alone particular minority-owned businesses in all industries across the nation. And the statutes certainly do not specify those services for which any such discriminated-against minority businesses have been unequally denied, so as to require redress.

Likewise, the second and third requirements crystalized in *Vitolo* are not met: the statutes governing the MBDA are simply silent as to any "intentional discrimination" that Defendants may remedy, *see Parents Involved*, 551 U.S. at 702, nor do they provide any indication that the federal government knowingly participated in any discrimination. *Croson*, 488 U.S. at 492; *Builders Ass'n*, 256 F.3d at 645. In all of its novelty as the only federal agency devoted entirely to intentional race discrimination, we are told nothing in the MBDA's governing statutes as to the justification concerning the agency's exclusive provision of a broad swath of business-related services and programming—touching nearly all aspects of business, 15 U.S.C. § 9512(1)—for a limitless

13

number of business enterprises, belonging to a broad number of covered minority groups. This fatal lack of basis required to establish a compelling interest for the government's racially exclusive agency and programs renders Defendants' implementation efforts constitutionally unjustified and unacceptable.

Defendants will likely argue that certain so-called "disparity studies" justify their interest in imposing race-based eligibility requirements for the MBDA Business Center Program and other MBDA programs.[3] But "[s]tatistical disparities don't cut it." *Vitolo*, 999 F.3d at 361. At most, Defendants may point to general market studies; however, none of these studies will identify any "specific episode" of discrimination. Indeed, Defendants' studies will likely present only broad statistical observations of racial disparities in government contracting—just one sector of the economy targeted by the MBDA. But "generalized assertions" of "societal discrimination" are not enough to warrant race-conscious government action. *See, e.g., Parents Involved*, 551 U.S. at 731; *Bakke*, 438 U.S. at 310. Such statistical observations simply do not identify any "specific episodes" of racial discrimination, "historic" or otherwise, required to satisfy strict scrutiny.

Nor do such studies point to any "intentional discrimination" that the government "knowingly perpetuated" as required to establish a compelling governmental interest for a race-based remedy. *See Vitolo*, 999 F.3d at 361; *Parents Involved*, 551 U.S. at 702; *Croson*, 488 U.S. at 492, 503; *Builders Ass'n*, 256 F.3d at 645. For example, as with nearly all disparity studies, the data, while replete with all sorts of assumptions about business firm availability, is not controlled for the universe of other non-discriminatory factors—such as myriad considerations related to

---

[3] The MBDA's website contains published disparity studies for Florida but not Texas; and a 2015 Wisconsin disparity study focuses on City of Madison contracting.

business structure, size, number of employees, expertise, location, years in business, licensing, bonding, insurance, certifications, access to capital, local regulatory frameworks, and community relationships; minority or other group values and traditions or other voluntary choices; and other non-discriminatory factors or circumstances—any and all of which may impact study findings and conclusions. Likewise, given recognized "economic and programmatic improvements," *see* MGT Consulting Group, *2019 Disparity Study* 1 (2019), available at https://www.mbda.gov/minority-women-and-small-business-enterprise-disparity-study-city-tallahassee-leon-county-florida (last accessed Feb. 24, 2023), and the federal government's prioritization of certain minority businesses since President Nixon's 1969 executive order, it is simply inconceivable that after 54 years, the federal government still knowingly participates in intentional race discrimination across all things concerning businesses.

In short, neither Congress nor Defendants have provided a justification for the race and ethnicity discrimination that Defendants impose for the MBDA Business Center Program and other MBDA programs; and Defendants cannot rely upon ambiguous claims of societal discrimination through dated and geographically-limited studies, involving only a few racial minorities in the limited context of government contracting, to intuit or otherwise extrapolate the purported findings and conclusions as to *limitless business contexts* and *numerous, additional racial and ethnic groups*. *See Greer's Ranch Cafe*, 540 F. Supp. 3d at 650 ("industry-specific inquiry needed to support a compelling interest for a [] racial classification"). Even when considering the singular contracting context, there are "simply too many variables," *e.g., Vitolo*, 999 F.3d at 362, to support evidence of unlawful discrimination against the few referenced racial minorities, let alone "intentional discrimination" by the federal government. Because Defendants

cannot satisfy all three above-discussed requirements, they cannot demonstrate a compelling governmental interest, and their race-based remedy must be struck down.

**B.    The racial and ethnic classifications imposed for the MBDA Business Center Program and other MBDA programs are not narrowly tailored.**

"[A] race-conscious remedy must be framed to address the exact effects and harms of the discrimination at issue" and must be used only as a "last resort." *Walker v. City of Mesquite*, 169 F.3d 973, 982-83 (5th Cir. 1999). This narrow tailoring requirement ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. In the Fifth Circuit, courts consider the following factors: (1) the necessity for the relief; (2) the efficacy of alternative remedies; (3) the flexibility and duration of the relief; (4) the relationship of numerical goals to the relevant labor market; and (5) the impact of the relief on the rights of third parties. *Walker*, 169 F.3d at 982. Even if Defendants could establish a compelling interest for their race-based remedy, they certainly cannot satisfy any of these criteria for narrow tailoring.

Under the first two factors, the government must show "serious, good faith consideration of workable race-neutral alternatives." *E.g., Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). "[L]ess sweeping alternatives—particularly race neutral ones—[must] have been considered and tried." *Walker*, 169 F.3d at 983. The Supreme Court has identified various alternatives to raced-based programming. For example, in the context of a local set-aside plan reserving contracts for minority businesses, the Court has advised that the "simplification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect." *Croson*, 488 U.S. at 509–10. Simply put, the government could just

make it easier to do business. As the Court explained, many regulatory barriers "may be the product of bureaucratic inertia more than actual necessity, and may have a disproportionate effect on the opportunities open to new minority firms." *Id.*; *see also Walker*, 169 F.3d at 983-84 (finding non-race-based assistance programs superior to a race-conscious remedy). But here, neither Congress nor Defendants considered similar alternatives, such as reducing or streamlining "red tape" or simply helping all disadvantaged businesses regardless of race.

Likewise, Defendants do not explain why existing remedies—like the various longstanding strata of criminal and civil laws prohibiting racial discrimination as well as private legal and administrative remedies—do not suffice to address racial discrimination in business-related contexts. *See Croson*, 488 U.S. at 509–10. Indeed, Defendants could simply step up their enforcement efforts against race discrimination in such business-related contexts, which is a logical alternative to Defendants' explicit race discrimination under MBDA programming. *Id.* ("Nor is [ ] government powerless" to take appropriate measures against those who discriminate on the basis of race or other illegitimate criteria). No obvious reasons for Defendants' inaction on this front present themselves. It is Defendants' burden to provide this explanation, not Plaintiffs'.

Moreover, a race-based program is not "necessary" if it is either overinclusive or underinclusive in its use of racial classifications. *E.g., id.* at 506-08. "Overinclusiveness of [the government's] racial preference strongly impugns [its] claim of remedial motivation." *Id.* at 506. As the Supreme Court explained, if a law were narrowly tailored "to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this 'remedial relief' with an Aleut citizen who [relocates] tomorrow?" *Id. See also O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 427 (D.C. Cir. 1992) (citation omitted) ("the 'random inclusion of racial groups' for which there is no evidence of past discrimination in the construction industry raises doubts about

17

the remedial nature of the Act's program."). Posing, then, the same legitimate question here: Assuming for a moment that Defendants could establish a compelling interest for the vast array of business contexts they service and for each preferred minority group, if the MBDA and its programs are meant to remedy the "historic failures" of past discrimination in America, as Defendant Biden contends, then why would those minorities having roots in America for generations be forced to share remedial relief with those who relocate to our country tomorrow? In the same way, why do Defendants commit to a near-limitless expanse of business-related assistance and services for preferred minority-owned businesses spanning unlimited industries across the nation, instead of particularized services for particular businesses in which discrimination was problematic?

If the government truly sought to remedy discrimination, it would focus its remedial efforts for individuals *who have actually been discriminated against*. *Croson*, 488 U.S. at 508; *Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.*, 19 F.3d 992, 995 (5th Cir. 1994) (race-based promotions that did not consider whether the individual was a victim of past discrimination failed narrow tailoring); *Gratz*, 539 U.S. at 246-47 (race-based admissions policy failing to "consider[] each particular applicant as an individual" not narrowly tailored). Yet in spite of their tendered justification to address racial and ethnic discrimination, Defendants make no effort to tailor MBDA programming requirements to the victims of actual discrimination. Instead, through an offensive "presumption" of "disadvantage," a large swath of benefits is generally available to every individual having membership in a preferred racial or ethnic group, *see* 15 U.S.C. § 9501(15); 15 C.F.R. § 1400.1, regardless of whether the individual is a victim of discrimination and whether the particular business-related service of interest has any connection to intentional discrimination at all. Defendants' overinclusive remedy simply will not do.

18

Equally problematic, Defendants' racial classifications are also underinclusive because certain other racial or ethnic groups are excluded without justification. Although Defendants provide little guidance on how they intend to interpret the racial classifications under 15 U.S.C. § 9501(15), various reasonable inferences of under-inclusivity are present. For example, depending upon Defendants' uncertain interpretation of the term "Asian," east Russians and other north Asian communities may be deemed eligible minorities from Asia, while west Russians from Europe may not be; and Middle Eastern populations from Turkey to Afghanistan may, or may not, be entitled to a "presumption" of "disadvantage," while Mediterranean populations across the sea may be excluded. Federal regulations defining minority groups in other contexts present similar problems: individuals with ancestors from the "Asian Pacific" and "Subcontinent Asian" regions are deemed Asians worthy of assistance, while Middle Eastern and Mediterranean regions are excluded without any justification. *See* 13 C.F.R. § 124.103. Likewise, given the MBDA's preference for "Black or African American" minorities, 15 U.S.C. § 9501(15), 15 C.F.R. § 1400.1, individuals with ancestors in Africa may be divided up without explanation: north Africans (Egypt, Libya, Tunisia, Algeria, and Morocco) may not count, while sub-Saharan populations are included. *See* 32 C.F.R. § 191.3 ("A [white] person [has] origins in any of the original peoples of . . . North Africa."); 28 C.F.R. § 42.402 (same). Further, the MBDA's governing statutes do not explain why Hasidic Jews are included minorities, but various other non-Hasidic Jewish minorities remain disfavored. If Defendants' goal is to end racial and ethnic discrimination, then why do Defendants inexplicably pick and choose some groups and not others? Defendants' race-based remedy is both

19

overinclusive and underinclusive, failing to demonstrate the "necessity" required for narrow tailoring.[4]

Under the third factor, "flexibility and duration," Defendants' imposition of race-based classifications for MBDA programming again fails narrow tailoring. Pursuant to the MBDA's governing statutes, program eligibility is contingent on an individual's membership in a preferred racial or ethnic minority group, which is, in turn, based upon a presumption of "social or economic disadvantage" applicable to those groups set forth in the statute, *see* 15 U.S.C. § 9501(15), or as determined by the MBDA, upon an "adequate showing." *See* 15 C.F.R. §§ 1400.1, 1400.3. The law contains no provisions allowing flexibility for the MBDA to remove statutorily designated racial or ethnic groups, or to limit, in any way, these groups' eligibility for programs and services, even after any purported goals have been accomplished.

Concerning duration, a "deviation from the norm of equal treatment of all racial and ethnic groups" should be "a temporary matter." *Croson*, 488 U.S. at 510; *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006) (the longer the life-span of the remedy, the less likely it is narrowly tailored). As the Court expressed in *Grutter*, "[we] expect[] that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today." 539 U.S. at 343. Yet, as previously pointed out, the federal government has been singling out certain minority businesses for preferential treatment for *over five decades*. *See* Exec. Order No. 11458, 34 Fed.

---

[4] The government's historic policies and practices to include some races while excluding others is undeniably arbitrary, capricious, irrational and indefensible, as thoroughly documented in David E. Bernstein, *Classified: The Untold Story of Racial Classification in America* (Bombardier Books 2022). *See also* George R. LaNoue & John C. Sullivan, *Presumptions for Preferences: The Small Business Administration's Decisions on Groups Entitled to Affirmative Action*, 6 J. Pol'y Hist. 439 (Oct. 1994).

Reg. 4937 (Mar. 5, 1969) (establishing the OMBE as the predecessor of the MBDA). At over twice as long as the Supreme Court's limit in *Grutter*, it would defy all logic to contend that MBDA programs and services are, or have been, in any way "temporary" or limited. Moreover, the MBDA is funded through at least fiscal year 2025, and there is no indication that Congress intends to declare "mission accomplished" at that time. 15 U.S.C. § 9598. Accordingly, the race-based remedy is both inflexible, and, with 54 years in running, added to another five years guaranteed by statute, it will have existed for nearly one-quarter of our nation's history, making it entirely unlimited in duration. This is not narrow tailoring and is precisely why the Supreme Court has warned against "amorphous" claims of discrimination in which "a court could uphold remedies that are timeless in their ability to affect the future." *Wygant*, 476 U.S. at 276. Were there ever an effort to ensure that "the ultimate goal of eliminating [race] entirely from governmental decisionmaking . . . will never be achieved," *Parents Involved*, 551 U.S. at 730 (citation omitted), the "MBDA is your agency" for cementing systemic and persistent race discrimination into the federal government for all time. App. 8 ¶ 21 (quoting Defendant Cravins).

Under the fourth factor, courts consider "the relationship of numerical goals to the relevant labor market." Here, there is no "numerical goal"—only statutorily designated racial and ethnic preferences. *See* 15 U.S.C. § 9501(15). What's more, no "relevant labor markets" are actually specified. Instead, a limitless number of business enterprises belonging to the preferred racial groups are eligible for any number of the wide-ranging MBDA business-related services and programming. Defendants must explain how the narrow tailoring requirement is met in their inclusion of a dozen-plus racial and ethnic minorities for business assistance, unlimited to any particular industry, through a wide-ranging variety of programs and services, touching nearly all aspects of business. *See* 15 U.S.C. § 9512(1).

21

Finally, under factor five considering the "impact" to others, the race-based eligibility requirements for MBDA programming necessarily harms innocent third parties. Plaintiffs are small business owners seeking support to sustain and strengthen their respective businesses. But through no fault of their own, Plaintiffs are not in the preferred racial class and are therefore excluded from equal consideration for MBDA assistance. *See Dean*, 438 F.3d at 462 (remedies that "permanently deny[] a benefit" to third parties impose significant burdens).

For these reasons, the race and ethnicity eligibility requirements for MBDA programs imposed by Defendants are not narrowly tailored and therefore fail strict scrutiny review.

## II.    Plaintiffs are likely to succeed on their Administrative Procedure Act claim.

Defendants' actions also violate the Administrative Procedure Act (APA). Under the APA, courts must "hold unlawful and set aside" final "agency action," including "the whole or part of an agency rule," "found to be contrary to constitutional right, power, [or] privilege." 5 U.S.C. §§ 706(2)(B), 704, 551(13). When reviewing agency decision-making, courts are to make an independent assessment of a citizen's claim of constitutional right. *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979). In general, a violation under the Constitution constitutes a violation of the APA, 5 U.S.C. § 706(2)(B). *See, e.g.*, *id.* at 781 ("Whether [a plaintiff] sues directly under the constitution to enjoin agency action, or instead asks a federal court to 'set aside' the agency actions as 'contrary to [a] constitutional right[]' under s 706(2)(B), the role of the district court is the same."); *Latif v. Holder*, 28 F. Supp. 3d 1134, 1163 (D. Or. 2014) ("Because the Court has already concluded the [Department of Homeland Security Traveler Redress Inquiry Program - DHS TRIP] process violates Plaintiffs' procedural due-process rights, the Court also concludes the DHS TRIP process violates § 706(2)(B) of the APA."); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 328 (D. Md. 2018) (Fifth Amendment claims of government's discriminatory termination of

Temporary Protected Status designations "coextensive with" the APA); *Diaz-Rivas v. U.S. Att'y Gen.*, 769 F. App'x 748, 766 fn. 2 (11th Cir. 2019) (collecting cases).

Here, Plaintiffs have alleged that Defendants' imposition of the racial and ethnic eligibility requirements for the MBDA Business Center Program and other MBDA programs through the rule at 15 C.F.R. § 1400.1 violates the equal protection guarantee of the Fifth Amendment's Due Process Clause. App. 23–24 ¶¶ 65–69. For the reasons already explained in the previous section, these race-based classifications are unlawful because they are not narrowly tailored measures that support a compelling government interest. Accordingly, the rule is "contrary to constitutional right" in violation of 5 U.S.C. § 706(2)(B).

### III.    The race and ethnicity eligibility requirements for the MBDA Business Center Program and other MBDA programs irreparably harm Plaintiffs.

In examining preliminary injunction requests, courts must also consider whether a movant is likely to suffer irreparable harm in the absence of preliminary relief. *Greer's Ranch Cafe*, 540 F. Supp. 3d at 651. Here, Plaintiffs clearly satisfy the standard for irreparable harm.

As the Supreme Court has recognized, "a racial classification causes 'fundamental injury' to the 'individual rights of a person.'" *Shaw*, 517 U.S. at 908. Indeed, the primary injury "in an equal protection case of this variety is the denial of equal treatment" itself. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (the injury is "the inability to compete on equal footing"). When a "deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, *Fed. Prac. & Proc.* § 2948.1 Irreparable Harm (3d ed. 2022); *e.g., League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 182 (W.D. Tex.) ("Violations of [Fifth Amendment equal protection] inflict irreparable injuries because the loss of constitutional

23

freedoms for even minimal periods of time unquestionably constitutes irreparable injury.") (citing 5th Circuit and Supreme Court cases) (internal quotations omitted); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

Here, Plaintiffs are being treated differently by the government and denied equal access to MBDA programs and services based on race in violation of the Constitution. *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 666. This unequal treatment is irreparable and "demeans us all." *E.g.*, *Grutter*, 539 U.S. at 353 (Thomas, J., concurring in part and dissenting in part).

## IV. The public interest and balance of harms favor an injunction.

Finally, the remaining third and fourth preliminary injunction factors are often addressed together, "as they overlap considerably" and "merge when the Government is the opposing party." *Greer's Ranch Cafe*, 540 F. Supp. 3d at 651 fn. 10 (citing *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015)); *see also League of United Latin Am. Citizens*, 601 F. Supp. 3d at 183 (explaining that when a law is enjoined, the government suffers the harm of denying the public interest in the enforcement of its laws, and the government's "interest and harm" thus "merge with that of the public."). Therefore, in this case, granting Plaintiffs' request for preliminary relief is proper, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 fn. 9 (5th Cir. 2014); *e.g.*, *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 531 (S.D. Tex. 2020) (preliminary injunction granted since plaintiff showed likelihood to succeed on equal protection claim and the "public interest is never served by a state's depriving an individual of a constitutional right.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to grant their motion

for preliminary relief in the form of the proposed order attached to the motion.

Dated: April 3, 2023

Respectfully submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

s/ *Cara M. Tolliver*

Richard M. Esenberg *(admitted pro hac vice)*
Daniel P. Lennington *(admitted pro hac vice)*
Cara M. Tolliver *(admitted pro hac vice)*
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Cara@will-law.org

THE LAW OFFICE OF
JASON NASH, P.L.L.C.

Jason C. Nash (Bar No. 24032894)
601 Jameson Street
Weatherford, TX 76086
Telephone: (817) 757-7062
jnash@jasonnashlaw.com

*Attorneys for Plaintiffs*

25