## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JEFFREY NUZIARD, *et al.*, | Case No. 4:23-cv-00278-P |
| Plaintiff, | District Judge Mark T. Pittman |
| v. | |
| MINORITY BUSINESS DEVELOPMENT AGENCY, *et al.*, | |
| Defendants. | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.     BACKGROUND ....................................................................................................... 2

     A.    The Minority Business Development Act .................................................... 2

     B.    The Minority Business Development Agency and Business Centers ............................ 4

     C.    Plaintiffs .................................................................................................... 6

     D.    Procedural Posture .................................................................................... 7

II.    LEGAL STANDARD ............................................................................................. 8

III.   ARGUMENT ......................................................................................................... 9

     A.    Each Plaintiff Lacks Standing .................................................................. 9

         1.    Plaintiffs Have Not Suffered an Injury-in-Fact ...................................... 10

         2.    Plaintiffs Have Not Met Article III Standards for Causation and  Redressability ... 14

     B.    Plaintiffs' Claims are Unlikely to Succeed on the Merits Because the MBDA Statute and Regulations Readily Satisfy Strict Scrutiny ................................................ 16

         1.    A Strong Basis in Evidence Supports the MBDA's Compelling Interest Claim ..... 17

         2.    The MBDA Act is Narrowly Tailored ................................................... 21

     C.    Plaintiffs Will Not Suffer Irreparable Harm .............................................. 23

     D.    The Balance of the Equities and Interest of the Public Weigh in Favor of Defendants ................................................................................................ 25

IV.   CONCLUSION ................................................................................................... 25

TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) ........................................ 20

*Adarand*, 515 U.S. 200 (1995) ..................................................................................................... 16

*Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187 (9th Cir. 2013) ..................................................................................................................... 20

*Bennett v. Spear*, 520 U.S. 154, (1997) ...................................................................................... 14

*Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63 (5th Cir. 1990) ..................................... 9

*Bruckner v. Biden*, _ F. Supp. 3d __, 2023 WL 2744026 (M.D. Fla. Mar. 31, 2023) ................. 11

*Carney v. Adams*, 141 S. Ct. 493 (2020) .................................................................................... 13

*Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003) ..................................................................... 11

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ............................................. 16, 17, 21

*Contractors Ass'n v. City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993) ......................................... 20

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) ............................................................ 17

*Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262 (5th Cir. 2012) ............................ 23

*DynaLantic Corp. v. U.S. Dep't of, Def.*, 885 F. Supp. 2d 237 (D.D.C. 2012) ............... 18, 20, 21

*Ensley Branch N.A.A.C.P. v Seibels*, 31 F.3d 1548 (11th Cir. 1994) ......................................... 20

*Fortec Constructors v. Kleppe*, 350 F. Supp. 171 (D.D.C.1972) ................................................ 13

*Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011) ................................................................... 13

*Gbalazeh v. City of Dallas*, 394 F. Supp. 3d 666 (N.D. Tex. 2019) ........................................... 24

*H.B. Rowe Co. v. Tippett*, 615 F. 3d 233 (4th Cir. 2010) ...................................................... 17, 20

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ..................................................................................... 17

*Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649 (5th Cir. 2019) ............ 14

*Jacobson v. Florida Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)............................................ 15

*Kossman Contracting, Co. V City of Houston*, 2016 WL 11473826
(S.D. Tex. Feb. 17, 2016)......................................................................................... 17, 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 10

*McLemore v. Hosemann*, 414 F. Supp. 3d 876 (S.D. Miss. 2019) ................................................ 14

*Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C, 5627, 2011 WL 2551179
(N.D. Ill. June 27, 2011)............................................................................................ 19

*Midwest Fence*, 84 F. Supp. 3d 705 (N.D. Ill. 2015).................................................................... 20

*Midwest Fence*, 840 F. 3d 932 (7th Cir. 2016) ........................................................................... 17

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir. 1985) ................. 9

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
508 U.S. 656 (1993) ........................................................................................... 10, 24

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 9

*Northern Contracting, Inc. v. State of Illinois*, 2004 WL 422704 (N.D. Ill. Mar. 3, 2004) ......... 19

*Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012) .............. 23, 24

*Ray Baillie Trash Hauling, Inc. v. Keppe*, 477 F.2d 696 (5th Cir. 1973) ........................ 10, 11, 13

*Ridgely v. FEMA*, 512 F.3d 727 (5th Cir. 2008)......................................................................... 9

*Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183 (D.D.C. 2015) .................................. 20, 21

*Shaw v. Hunt*, 517 U.S. 899 (1996) .......................................................................................... 21

*Speed v. America's Wholesale Lender*, 2014 WL 4755485 (N.D. Tex. 2014).............................. 9

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................................................. 10

*SRS Technologies, Inc. v. Department of Defense*, 1997 WL 225979 (4th Cir. 1997).......... 14, 15

*Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019) ..................................................................... 10

*Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437 (E.D. Tex. 2006)...................................... 23

*Tex. Health & Human Servs Comm'n v. United States*, 166 F. Supp. 3d 706
  (N.D. Tex. 2016) ............................................................................................ 23, 24

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021).................................... 25

*Texas Voters All v. Dallas Cty.*, 495 F. Supp. 3d 441 (E.D. Tex. 2020) ...................... 23

*United States v. Hays*, 515 U.S. 737 (1995) ................................................................ 13

*United States v. Paradise*, 480 U.S. 149 (1987) .......................................................... 22

*United States v. Richardson*, 418 U.S. 166 (1974) ...................................................... 13

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................ 16

*United States v. SCRAP*, 412 U.S. 669 (1973).............................................................. 10

*Village of Arlington Heights v. Metro. House. Dev. Corp.*, 429 U.S. 252 (1977)......... 18

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021)......................................................... 16

*W.H. Scott Const. Co.* v. *City of Jackson, Miss.*, 199 F.3d 206 (5th Cir. 1999) .......... 16

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ................................................ 16

## Federal Statutes

5 U.S.C. § 705............................................................................................................... 9
5 U.S.C. § 706(2)(B)...................................................................................................... 8
15 U.S.C. § 9501 ................................................................................................... 1, 2, 8
15 U.S.C. § 9501(9)(A).................................................................................................. 1
15 U.S.C. § 9501(15)(A)............................................................................................ 2, 3
15 U.S.C. § 9501(15)(B)................................................................................................ 3
15 U.S.C. § 9501(15)(B)(vi).............................................................................. 4, 8, 23
15 U.S.C. § 9513............................................................................................................ 5
15 U.S.C. § 9522.......................................................................................................... 22
15 U.S.C. § 9524............................................................................................................ 5
15 U.S.C. § 9524(a)(1)................................................................................................. 22
15 U.S.C. § 9598(1) ...................................................................................................... 5

## Federal Regulations

Exec. Order 11458, 3 C.F.R. 779 (1969) ...................................................................... 2

Exec. Order 11625, 3 C.F.R. 616 (1971) ............................................................ 1, 2, 5
15 C.F.R. § 1400.1 ...................................................................................................... 8
15 C.F.R. § 1400.1(B) ...................................................................................... 1, 3, 4, 23
49 Fed. Reg. 207 (Oct. 24, 1984) ............................................................................. 23


Other Authorities

H.R. Rep. No. 94-468 (1975) ..................................................................................... 18

H.R. Rep. No. 97-956 (1982) ..................................................................................... 18

H.R. Rep. No. 100-460 (1987) ................................................................................... 18

Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed.
   Reg. 4955 (Jan. 31, 2022) ................................................................................... 18, 20

The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary
   Survey, 61 Fed. Reg. 26042-01 (May 23, 1996) ................................................. 18, 19

*Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's
   Capital Markets*, Hearing on S.H. Before the Comm. On Small Bus. And Entrepreneurship,
   111th Cong. (2010). ................................................................................................. 18

Establishment of a Minority Business Development Administration in the Department of
   Commerce, Congr. Hearing before Subcomm. Small Business (96th Cong.) 1980. ............... 25

*How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and
   Its Long-term Economic Impacts on Borrowers of Color*, Hearing before Subcomm. On
   Oversight and Investigations of the H. Comm. On Financial Services, 117th Cong. (2021). .. 21

*Minority Business Development Act of 1988*: Hearing on H.R. 1769 Before the H. Sub. Comm.
   On Procurement, Innovation, and Minority Enterprise Development of the Comm.
   On Small Bus., 100th Cong. (1988). ......................................................................... 18

CRS Rep. 46816, The Minority Business Development Agency: An Overview of Its History
   and Programs, Tab. A-1 (Nov. 9, 2017) ................................................................... 25

CRS Rep. 46816, The Minority Business Development Agency: An Overview of Its History
   and Programs, Tab. A-1 (Nov. 30, 2021) ..................................................................... 1

Minority Bus. Development Agency, Notice of Federal Funding Opportunity: MBDA
   Business Center Program (2022) .................................................................................. 5

Minority Business Development Agency, U.S. Dep't of Commerce Fiscal Year 2023
   Congressional Submission, pp. 11-12 ........................................................................... 4

U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016)............................................................................................................... 18, 20, 22

Congressional Research Service, The Minority Business Development Agency:  An Overview of Its History and Programs 9 (2022), *citing* MBDA, "The Minority Business Development Agency—Vital to Making America Great," available at https://www.mbda.gov/sites/default/files/migrated/files-attachments/MBDAVitaltoMakingAmericaGreat_170330.pdf (last visited Apr. 23, 2023)....... 3

Cardin Lauds Final Passage of Legislation to Expand and Make Permanent Minority Business Development Agency, Press Releases (2021), https://www.sbc.senate.gov/public/index.cfm/2021/11/cardin-lauds-final-passage-of-legislation-to-expand-make-permanent-minority-business-development-agency (last visited Apr 21, 2023) ...................................................................................................................... 17

Fl. Sec. of State, Articles of Incorporation, available at https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2021%5C0402%5C90741589.tif&documentNumber=P21000029584 (last visited April 19, 2023)........................................................................................................................... 7, 13

Orlando Business Center Services, https://orlandombdacenter.com/services/ (last visited Apr. 19, 2023)........................................................................................................ 7

The Minority Business Development Agency ("MBDA") through its Business Center Program provides grants, oversight, and guidance to MBDA Business Centers, which offer technical and management assistance to Minority Business Enterprises,[1] also known as "MBEs."[2] Decades-long bipartisan support[3] for the MBDA in both houses of Congress[4] ultimately led to the bipartisan sponsorship and passage of the Minority Business Development Act ("Act") on November 15, 2021.[5]

In this action, Plaintiffs seek a judgment declaring the MBDA unconstitutional and in violation of the Administrative Procedure Act ("APA") to the extent that the MBDA limits Business Center Program services or other benefits to "minority business enterprises." Compl., ECF 1 at ¶ A. Plaintiffs now move for a preliminary injunction to prohibit the MBDA from using the racial or ethnic presumptions defined in 15 U.S.C. § 9501 in operating its programs and services. Pls.' Mot. For Prelim. Inj., ECF 14. Plaintiffs also ask that the Court enjoin Defendants from using the term "minority" to "advertise or reference their statutorily authorized programs and services." *Id.*

---

[1] *See* Exec. Order 11625, 3 C.F.R. 616 (1971).

[2] Minority business enterprises are those owned and operated by socially or economically disadvantaged individuals. 15 U.S.C. § 9501(9)(A).

[3] *Minority Business Development Act of 1988*: Hearing on H.R. 1769 Before the H. Sub. Comm. On Procurement, Innovation, and Minority Enterprise Development of the Comm. On Small Bus., 100th Cong. (1988) (statement of Nicholas Mavroules, Congressman).

[4] CRS Rep. 46816, The Minority Business Development Agency: An Overview of Its History and Programs, Tab. A-1 (Nov. 30, 2021).

[5] S. 2068, 117th Cong. (2021) (co-sponsored by Senators John Cornyn (TX), Tim Scott (SC), Roger Wicker (MS), Tammy Baldwin (WI), Maria Cantwell (WA), and Benjamin L. Cardin (MD)). Prior to the Act's passage, the parameters of the MBDA program, as established by executive orders, were codified in regulations at 15 C.F.R. § 1400.1(B).

Plaintiffs' motion should be denied because they lack standing, have not demonstrated that they are likely to succeed on the merits, and have failed to demonstrate how they would face irreparable harm absent an injunction.

## I.      BACKGROUND

For more than 50 years, the MBDA, through its Business Center Program, has given grants, oversight, and guidance to MBDA Business Centers ("Business Centers"), which provide technical and management assistance to MBEs.[6] Originally established by President Nixon through Executive Order 11458,[7] strengthened by Executive Order 11625, and eventually statutorily codified in 2021, the MBDA has been a linchpin to the economic progress of minority business owners.

### A.   The Minority Business Development Act

Relevant to this litigation, the Act recognized the MBDA as a statutorily authorized federal agency housed in the Department of Commerce and directed it to establish and maintain certain programs, including the MBDA Business Center Program. 15 U.S.C. §§ 9501, *et seq.* Business Centers are entities that receive funding from the MBDA to support their efforts to offer technical assistance for the development of MBEs, which are businesses owned by one or more socially or economically disadvantaged individuals. *Id.* The statute defines socially disadvantaged as "an individual who has been subjected to racial or ethnic prejudice or cultural bias, because of the identity of the individual as a member of a group, without regard to any individual quality of the individual." 15 U.S.C. § 9501(15)(A). The statute further defines economically disadvantaged as an individual whose "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and

---

[6] *See* Exec. Order 11625, 3 C.F.R. 616 (1971).
[7] Exec. Order No. 11458, 3 C.F.R. 779 (1969)

competitive market area, because of the identity of the individual as a member of a group, without regard to any individual quality of the individual." *Id*.

By statutory mandate, certain racial and ethnic groups are presumed socially or economically disadvantaged and therefore may access MBDA benefits without further determination. 15 U.S.C. § 9501(15)(B); 15 C.F.R. § 1400.1(B). These presumptions track MBDA findings about the "unique challenges" that minority business enterprises continue to face "in accessing capital, contracts, and other areas of business development."[8] According to the Congressional Research Service, these challenges include the following:

- Minority businesses are generally "smaller in size and scale than their nonminority counterparts . . . with only 2% of minority firms generating gross receipts of more than $1 million and only 11% of minority-owned firms having paid employees;"

- Minority businesses have less access to capital as a result of (1) being "denied loans at a rate nearly three times higher than nonminority firms;" (2) being "likely to pay higher interest rates of, on average 7.8%, while nonminority firms pay an average of 6.4%;" and (3) being "less likely to receive loans, and when approved, [to] receive lower loan amounts;"

---

[8] Congressional Research Service, The Minority Business Development Agency:  An Overview of Its History and Programs 9 (2022), *citing* MBDA, "The Minority Business Development Agency—Vital to Making America Great," available at https://www.mbda.gov/sites/default/files/migrated/files-attachments/MBDAVitaltoMakingAmericaGreat_170330.pdf (last visited Apr. 23, 2023).

- "[M]inority firms secure a lower number . . . of contracts in proportion to the number of available minority firms in the relevant market" because of "market and other barriers [that] impact [their] access to contracts."[9]

The regulations also provide a process for the Under Secretary of Commerce to designate other groups as presumptively socially or economically disadvantaged. *See* 15 U.S.C. § 9501(15)(B)(vi); *see also* 15 C.F.R. § 1400.1(b), § 1400.3-5. The Under Secretary can make a determination of social or economic disadvantage for any business owner of any race who applies for MBDA benefits and is not included in the racial or ethnic groups presumed to be socially or economically disadvantaged. *Id.* After a positive determination, all business owners who identify similarly to that successful applicant are also presumptively considered to be socially or economically disadvantaged for purposes of MBDA benefits, such as access to Business Centers. *See* 15 U.S.C. § 9501(15)(B)(vi).

## B.  <u>The Minority Business Development Agency and Business Centers</u>

The MBDA's mission is to expand the growth and global competitiveness of MBEs to ensure that socially or economically disadvantaged persons can fully participate in our free

---

[9] Negative impacts on minority businesses were recently exacerbated by the COVID-19 pandemic according to the MBDA:

> The Covid-19 Pandemic has had a disproportionate effect on minority businesses nationwide. Research indicates at the onset of the Pandemic (February through April 2020) the number of active African-American-owned businesses dropped 41 percent, Latino business ownership fell by 32 percent, and Asian business ownership dropped by 26 percent, compared to a 17 percent decline for white business owners (citing Rob Fairlie, PhD, available at https://news.ucsc.edu/2021/02/fairlie-house-testimony.html.) Subsequently, MBDA's focus shifted to assisting minority firms to survive, thrive, and grow.

Minority Business Development Agency, U.S. Dep't of Commerce Fiscal Year 2023 Congressional Submission, pp. 11-12.

enterprise system. The MBDA engages in significant research and collection of data on issues critical to MBEs to support more guided policymaking and legislation. *See* 15 U.S.C. § 9513. While the Agency hosts several programs to achieve its mission, chief among them is the MBDA Business Center Program. *See* 15 U.S.C. § 9598(1).

The Business Centers are not owned or operated by the MBDA. *See* 15 U.S.C. § 9524; Exec. Order 11625, 3 C.F.R. 616 (1971). The MBDA also does not provide direct financial or technical assistance to individual business owners. Rather, they are public and private entities that have received grant awards through cooperative agreements from the MBDA. 15 U.S.C. § 9524. Through these agreements, the MBDA grants funding awards to a network of nonprofit organizations, for-profit businesses, state and local governments, institutions of higher learning, and tribal entities, and then designates the organization as a Business Center. *Id.* It is these Business Center, not the MBDA, that provide direct financial and technical assistance to individual business owners.

Specifically, Business Centers provide assistance related to management, accessing new supply chains for greater scale, technology, law, financing and accounting, contracts and grants, procurement processes, marketing, and workforce development.[10] These efforts help MBEs to improve operational efficiencies, manage risk and liability thresholds, access capital, and increase profits for owners. Business Centers are authorized to collect fees from their clients for services rendered. *Id.* The MBDA's funding initiatives have resulted in hundreds of thousands of new jobs

---

[10] Minority Bus. Development Agency, Notice of Federal Funding Opportunity: MBDA Business Center Program (2022).

in disadvantaged regions of the United States, and billions of dollars of new capital investment in MBEs.[11]

### C. **Plaintiffs**

Plaintiffs are three small-business owners who reside in Texas, Wisconsin, and Florida. Plaintiff Jeffrey Nuziard, who identifies as white, lives in Tarrant County and owns and operates the Sexual Wellness Centers of Texas. Nuziard's suit against the MBDA stems from a visit he made to the website of the Dallas-Fort Worth Business Center in or around March 2023. Nuziard states that, during that visit, he observed that a page on the Business Center's website stated that it assists ethnic minority owned businesses that (1) have been in business for at least 2 years; (2) represent high-growth industries; (3) have sustainable revenue; and (4) are 51% owned and controlled by African American, Hispanic, Asian, or Native American entrepreneurs. Compl., ECF 1 at ¶ 33. When he clicked on the "contact us" tab, a dialogue box appeared listing the four requirements and asking him to check off all boxes that apply.[12] The dialogue box requested an explanation if the business owner failed to check any of the boxes. *Id*. at ¶ 34. Nuziard does not allege that he checked any boxes, wrote anything in the dialogue box, submitted the form, or took any further action to apply for assistance from the Business Center.

Plaintiff Matthew Piper, who identifies as white, resides and works in Manitowoc County, Wisconsin. He is a licensed architect who owns and operates a business known as Piper Architects, LLC, which, since 2015, has provided architectural services to clients. Piper's current lawsuit does not stem from any attempt to visit his local MBDA Business Center.[13] He does not allege that he

---

[11] CRS Rep. 46816, The Minority Business Development Agency: An Overview of Its History and Programs, Tab. A-1 (Nov. 9, 2017).

[12] In the dialogue box, requirement 3 is expanded to say "Have sustainable, stable, & consistent revenue." Compl. ECF 1 at ¶ 34.

[13] The Milwaukee MBDA business center is approximately 85 miles from Manitowoc County.

tried to contact (and was refused access to) any particular Business Center or services. Nor does he identify any MBDA services for which he is otherwise eligible. Instead, Piper claims to have "read about the [Milwaukee] office." Compl., ECF 1 at ¶ 35. Piper alleges that he feels excluded by the MBDA because it is aimed at assisting minorities and brings this suit as a "concerned" citizen. *Id.* at ¶ 7.

Plaintiff Christian Bruckner, who identifies as white, lives in Tampa, Florida. He has owned and operated Project Management Corporation, a government contracting company, since 2021.[14] Bruckner alleges that as a small business owner he is "interested" in the MBDA. *Id.* at ¶ 8. In or around January 2023, Bruckner accessed the Orlando Business Center website. *Id.* at ¶ 36. Bruckner claims that the website required him to complete a client intake form to access services and trainings. *Id.* at ¶ 36-39. The intake form required him to choose a race or ethnicity from a set of options, none of which matched his race or ethnicity. *Id.* Bruckner then sought assistance from an Orlando Business Center representative, who referred his application to its parent company and advised Bruckner that he should expect to hear directly from that company to further assist him. *Id.* at ¶ 40. The Orlando Business Center advertises that it serves business that have existed for at least three years.[15]

### D. <u>Procedural Posture</u>

On March 20, 2023, Plaintiffs filed suit against the MBDA as well as President Biden, Secretary of Commerce Raimondo, and Under Secretary of Commerce for Minority Business

---

[14] Fl. Sec. of State, ARTICLES OF INCORPORATION, available at
https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2021%5C0402%5C90741589.tif&documentNumber=P21000029584 (last visited April 19, 2023).
[15] Orlando Business Center Services, https://orlandombdacenter.com/services/ (last visited Apr. 19, 2023).

Development Cravins in their official capacities. *See* Compl., ECF 1. In the complaint, Plaintiffs challenge the general statutory mandate of the MBDA that requires it to provide assistance to and promote "minority business enterprises." *See, e.g., Id.* at ¶¶ 23-25. Plaintiffs also claim that they have been denied equal access to MBDA Business Centers because they are not "minority business enterprises." *Id.* at ¶¶ 25-31. They claim that these racial and ethnic eligibility requirements deprive them, as white business owners, of equal access to the benefits of the MBDA's general assistance and promotion efforts and access to the services of MBDA business centers.[16]

Plaintiffs seek a judgment declaring the MBDA unconstitutional and in violation of the APA to the extent that the MBDA limits Business Center Program services or other benefits to "minority business enterprises." *Id.* at ¶ A. On April 3, 2023, Plaintiffs filed a motion for preliminary injunction to enjoin the MBDA from using the racial or ethnic presumptions defined in 15 U.S.C. § 9501 in operating its programs and services. Pls.' Mot. For Prelim. Inj., ECF 14. Plaintiffs also ask that the Court enjoin Defendants from using the term "minority" to "advertise or reference their statutorily authorized programs and services." *Id.*

## II.   **<u>LEGAL STANDARD</u>**

A preliminary injunction is an "extraordinary remedy" that "should only issue if the movant shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) [that] the threatened injury will outweigh any harm that

---

[16] Plaintiffs also bring a claim under the APA, 5 U.S.C. § 706(2)(B), asserting that because the alleged racial and ethnic presumptions in the statute are "contrary to a constitutional right," the Court should set aside the MBDA's implementing regulations found at 15 C.F.R. § 1400.1. Doc. #1, Compl. at ¶¶ 65-70. Plaintiffs' APA claim is consequently subsumed by their Constitutional claim. Further, Plaintiffs have not alleged any additional injuries or irreparable harms flowing distinctly from their APA claim. Doc. #15. Pl. Brief at 22-23. For these reasons, to the extent this Court finds that Plaintiffs have failed to meet their burden for an injunction under their Constitutional claims, they have similarly failed to adequately plead the requirements for an injunction under their APA claim.

will result to [the defendant] if the injunction is granted; and (4) [that] the injunction will not disserve the public interest." *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008).[17] Such a remedy is "not to be granted routinely, but only when the movant, by a clear showing, carries [the] burden of persuasion" on all four requirements. *Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990). If the moving party "fails to meet *any* of the four requirements, the court cannot grant the . . . preliminary injunction." *Speed v. America's Wholesale Lender*, 2014 WL 4755485 (N.D. Tex. 2014) (emphasis in original). The issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## III.  <u>ARGUMENT</u>

Because Plaintiffs lack standing to bring this suit, the Court should deny the motion for a preliminary injunction without reaching the merits. If the Court does reach the merits, however, Plaintiffs have not shown, and cannot show, that the "extraordinary remedy" they seek is appropriate. Plaintiffs cannot meet their burden to demonstrate a likelihood of success on the merits because the presumptions articulated in the MBDA statute and regulations serve a compelling interest and are narrowly tailored. Furthermore, Plaintiffs have not demonstrated irreparable harm, and the balance of the equities and interest of the public fall squarely in favor of Defendants.[18]

### A.  <u>Each Plaintiff Lacks Standing</u>

To meet the "irreducible constitutional minimum" for Article III standing, plaintiffs bear the burden of showing that they have (1) suffered an injury-in-fact (2) that is caused by the

---

[17] The last two factors are typically combined when claims are brought against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[18] For the foregoing reasons, Plaintiffs fail under 5 U.S.C. § 705.

challenged conduct of the defendants and (3) that is likely to be redressed by a favorable judicial

decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The standing requirements serve to

ensure that parties do not use federal courts as a "vehicle for the vindication of the value interests

of concerned bystanders." *United States v. SCRAP*, 412 U.S. 669, 687 (1973); *see also Lujan v.

Defenders of Wildlife*, 504 U.S. 555 (1992).

Plaintiffs fail on each of the Article III requirements. With respect to injury-in-fact, they

have not shown a sufficiently concrete or particularized harm because they have not demonstrated

that they were "ready and able" or actually planning or in a position to access the services provided

by the relevant Business Centers. Moreover, the general "dignity" harms that Plaintiffs claim result

from the statutory definitions at issue in this case are far too remote, speculative, and unsupported

by record evidence to establish concrete injury. With respect to causation and redressability,

Plaintiffs have not demonstrated a sufficient causal connection between their alleged injuries and

the MBDA's programs and services, or that the relief they seek will likely redress those alleged

injuries. First, Plaintiffs have failed to pursue claims against the Business Centers that allegedly

caused their harm. Second, Plaintiffs have failed to sufficiently allege that they meet the race-

neutral criteria set by the Business Centers.

### 1.   Plaintiffs Have Not Suffered an Injury-in-Fact

An injury-in-fact is a "concrete and particularized" harm that is "actual or imminent, not

conjectural or hypothetical." *Stringer v. Whitley*, 942 F.3d 715, 720-721 (5th Cir. 2019). To

establish a legally cognizable injury in the context of an equal protection challenge to racial

classifications, a plaintiff must be "able and ready" to participate in the program or benefit at issue.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S.

656, 666 (1993). In *Ray Baillie Trash Hauling, Inc. v. Keppe*, 477 F.2d 696 (5th Cir. 1973), the

Fifth Circuit held that plaintiffs cannot meet the able and ready standard where they have not

applied to the challenged program. *Keppe* involved a claim that the Small Business Association's ("SBA") Section 8(a) program, a federal contracting program that includes certain race- and gender-related provisions, is unconstitutional because "the primary criterion for eligibility is race, color, or ethnic origin" and that the "[p]laintiffs have been excluded from consideration because of their race." *Id*. at 709-10. The court found that the plaintiffs had failed to meet their burden to show that they had "incurred or [were] in immediate danger of incurring some direct and personal injury" resulting from the SBA's alleged discrimination in administering the Section 8(a) program because the plaintiffs had never applied for participation in the program nor had they sufficiently alleged that they met the program's eligibility criteria. *Id.* Thus, the court concluded, "whatever the outcome of the litigation, the plaintiffs will not be directly affected." *Id*.  Similarly, a district court recently held that Christian Bruckner, one of the plaintiffs in *this* case, lacks standing to challenge the Small Business Administration's Section 8(a) program because he failed to demonstrate that his company was "ready and able" to bid on the types of contracts that are available to program participants. *Bruckner v. Biden*, _ F. Supp. 3d __, 2023 WL 2744026, at *4-5 (M.D. Fla. Mar. 31, 2023) (observing that the complaint lacks "any detail regarding the kinds of contracts that the [p]laintiffs would like to pursue").

And in *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), the Ninth Circuit held that the plaintiff lacked standing to bring an equal protection challenge to an Office of Hawaiian Affairs loan program because he had not shown an injury-in-fact.  *Id*. at 942-43 ("[Plaintiff's] declaration of 'interest' in starting a copy shop, and submission of a meritless application, falls short of being 'able and ready' to compete."). The plaintiff was not "able and ready" to apply for the program because he had failed to seek out alternative sources of financing, which was a race-neutral requirement for eligibility. *Id.* (explaining that the plaintiff's "[s]ubmission of a symbolic,

incomplete application demonstrate[d] neither readiness nor ability to compete for an [Office of Hawaiian Affairs] small business loan").

Following the principles underlying *Keppe* and *Nakatani*, Plaintiffs have not demonstrated, and cannot demonstrate, that they were "ready and able" to access the Business Center services that they allege they were denied due to their race. Plaintiff Nuziard alleges, for example, that he visited the Dallas Business Center website once, clicked on the "contact us" section, and was presented with a dialogue box asking him to check off a series of questions about his business. Compl., ECF 1 at ¶ 34. Those questions asked whether his business had existed for at least two years; represented a high growth industry; had sustainable, stable and consistent revenue; and was 51% owned and controlled by African Americans, Hispanic, Asian or Native American entrepreneurs. *Id.* The dialogue box requested that Nuziard either check the box after each question or explain why he had not checked each box. *Id.* In response, Nuziard abandoned any attempt to pursue the matter and did not contact the Business Center. *Id.* Thus, at bottom, the apparent harm alleged by Nuziard is that the Dallas Business Center website asked, but did not necessarily require, him to explain any boxes that he did not check on a form that he did not submit. That is not sufficient to establish an injury under *Keppe* and *Nakatani* or other relevant case law.

Plaintiff Piper's injury showing is even weaker. Piper does not allege that he contacted anyone at any Business Center. Compl. ECF 1 at ¶ 35. Instead, his alleged injury consists of learning about the MBDA and coming to his own conclusion about his lack of eligibility for Business Center services. The complaint states that after "read[ing] about the [MBDA] office," Mr. Piper "is concerned for himself and the millions of other small business owners in America who are excluded from MBDA services because of the color of their skin." *Id.* However, courts have long held that such generalized "concern," untethered to any other facts showing a plaintiff's

particular stake in the outcome, does not amount to an injury-in-fact and therefore cannot confer Article III standing. *See United States v. Richardson*, 418 U.S. 166, 171, 176-177 (1974); s*ee also United States v. Hays*, 515 U.S. 737, 743 (1995). *See also Keppe*, 477 F.2d at 710 ("Solely on the basis of some generalized interest in the fair administration of a program, plaintiffs cannot attack the award as racially discriminatory.") (quoting *Fortec Constructors v. Kleppe*, 350 F. Supp. 171, 172-173 (D.D.C.1972)). Further, Piper's claim that he is "interested" in the services of the MBDA Business Centers, unanchored to any specific services that he is seeking is the sort of general, speculative, and unrealized future plan that cannot serve as the predicate for "concrete" or "imminent" harm. *Carney v. Adams*, 141 S. Ct. 493, 502 (2020) (noting the insufficiency of a bare statement of intent in establishing the concreteness and imminence required for an injury-in-fact).

Finally, although Plaintiff Bruckner alleges that he sought and was denied access to the Orlando Business Center through email, he cannot show that he was "ready and able" to access services because he does not meet that Business Center's race-neutral requirements. Compl. ECF 1 at ¶¶ 39-40. The Orlando Business Center website states that it provides services at no cost to entities that have been in business for at least three years.[19] Nowhere in the complaint does Bruckner allege that his company, Project Management Corporation, has been in business for three years. And records from the Florida Secretary of State show that the entity has only existed for two years, since 2021.[20] Judicial notice of relevant documents in the public record is proper, *see Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); pursuant to these records, Bruckner does not fall within the expressed guidelines for assistance from this Business Center and thus cannot

---

[19] Services, https://orlandombdacenter.com/services/ (last visited Apr. 19, 2023)
[20] Fl. Sec. of State, ARTICLES OF INCORPORATION, available at
https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C 2021%5C0402%5C90741589.tif&documentNumber=P21000029584 (last visited April 19, 2023).

demonstrate injury-in-fact. *See also SRS Technologies, Inc. v. Department of Defense*, 1997 WL 225979, at *1 (4th Cir. 1997) (holding that plaintiffs in a challenge to a race-conscious program lacked standing because the company could not participate in the program for race-neutral reasons).

Because none of the Plaintiffs sufficiently pled a concrete and particularized injury-in-fact, their complaint, at bottom, alleges only a generalized grievance with the minority entity presumptions defined in the Act and applied to MBDA programs, including as described on Business Center websites.  As such, Plaintiffs failed to meet their burden, and standing should be denied.

### 2. Plaintiffs Have Not Met Article III Standards for Causation and Redressability

To satisfy the causation prong of Article III standing, a plaintiff must show a causal connection between the alleged injury and the defendant's challenged conduct. *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). While a plaintiff need not show that "the defendant's actions are the very last step in the chain of causation," *Bennett v. Spear*, 520 U.S. 154, 169, (1997), a plaintiff's injuries cannot be "the result of the independent action of some third party not before the court." *Id.* at 167. To satisfy the redressability prong, a plaintiff must show that "it is likely, as opposed to merely speculative," that a favorable court decision will remedy its injury. *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). "Though distinct elements, causation and redressability overlap and are often considered in tandem." *McLemore v. Hosemann*, 414 F. Supp. 3d 876, 883 (S.D. Miss. 2019).

Plaintiffs have not met their burden on causation or redressability. Rather than pursue claims against the Business Centers that caused the alleged harm, Plaintiffs chose to sue the

MBDA. Because the individual Business Centers are not party to the suit and are independent entities separate and apart from the MBDA, any ruling against the MBDA does not mean that Plaintiffs will be entitled to Business Center services. While Business Centers must comply with MBDA regulations, they can and do impose their own additional race neutral eligibility criteria for receipt of services. *See*, e.g., Compl. ECF 11-12 at ¶¶ 33-34 (applicant "must have been in business for at least 2 years"). Here, as discussed *supra*, none of the Plaintiffs actually submitted an application and thus they cannot show that the MBDA's race conscious criteria, as opposed to race neutral criteria imposed by the MBDA or the Business Center, caused their alleged injuries. Ultimately, only the Business Centers can give Plaintiffs the relief they seek—access to the program benefits. The Business Centers retain the authority and discretion to determine eligibility for benefits "until they are made parties to a judicial proceeding that determines otherwise." *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020).

Plaintiff Bruckner's claim also fails both the causation and redressability prongs for the independent reason that because he has been in business less than three years—an eligibility criterion advertised on the website of the Orlando Business Center and not required by the MBDA—he has not shown that the MBDA caused his alleged harm. Even if the Court were to grant the relief that he seeks—removing the racial presumptions from the MBDA statute and implementing regulations—he would fail to qualify under the Orlando Business Center's race-neutral age-of-business criterion. *See SRS Techs.*, 1997 WL 225979, at *1 ("SBA's requirement of economic disadvantage for entry into the 8(a) Program is a race-neutral criterion. It was by virtue of this race-neutral criterion that plaintiff failed to qualify for a contract award, and its standing to challenge the race-conscious criteria is therefore lacking.").

**B. Plaintiffs' Claims are Unlikely to Succeed on the Merits Because the MBDA Statute and Regulations Readily Satisfy Strict Scrutiny**

To the extent that the MBDA's statute and regulations include race conscious criteria, they are subject to strict scrutiny. *Adarand*, 515 U.S. 200, 227 (1995). Although strict scrutiny is a demanding standard, it is not fatal. *Id.* at 237. Courts have recognized that in "order to remedy the effects of prior discrimination, it may be necessary to take race into account." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986). There is no question that remedying the effects of past discrimination constitutes a compelling governmental interest. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (a government "has a compelling interest in assuring that public dollars…do not serve private prejudice.); s*ee also W.H. Scott Const. Co*. v. *City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999) (noting that the government may enact race-conscious remedies where the remedy is factually tied to a past injury). *"*A facial challenge to [the MBDA Act] is of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987).

Plaintiffs assert that a compelling interest can arise only from intentional governmental action that is discriminatory, and that the remedy by MBDA must address a "specific episode" of discrimination. Pls. Br. at 11-13 (ECF No. 15) (citing *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). Plaintiffs' proposed standard should fail for reasons explained by a plurality in *Croson*: "[I]f the city could show that it had essentially become a passive participant in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city

could take affirmative steps to dismantle such a system."[21] *See Croson Co.*, 488 U.S. at 492 (internal quotations omitted).

The Minority Business Development Act was enacted to remedy specific and well-documented discriminatory practices that have prevented minority business owners from accessing credit and capital and competing equally in the free market of America.[22]

### 1.  A Strong Basis in Evidence Supports the MBDA's Compelling Interest Claim

In response to Plaintiffs' Constitutional challenge, Defendants must show that the Government had a strong basis in evidence to conclude that race-based action was necessary to remedy the discrimination that has stunted the success of minority owned businesses. *Croson,* 488 U.S. at 500. However, courts do not require Defendants to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co. v. Tippett*, 615 F. 3d 233, 241 (4th Cir. 2010); *see also Midwest Fence,* 840 F. 3d 932, 945 (7th Cir. 2016). Defendants are permitted to provide either direct or circumstantial evidence to satisfy the strong basis in evidence standard. *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999). And it is well settled that statistical evidence is one type of circumstantial evidence that may be used. *See Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) ("[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination'") (quoting *Croson*, 488 U.S. at 501); *see also Kossman Contracting, Co. V City of Houston*, 2016 WL 11473826 (S.D. Tex. Feb. 17, 2016). Furthermore,

---

[21]  The Government may correctly remedy passive participation (incorporation, regulation, and insurance of banks) in private discrimination.

[22] Cardin Lauds Final Passage of Legislation to Expand and Make Permanent Minority Business Development Agency, Press Releases (2021), https://www.sbc.senate.gov/public/index.cfm/2021/11/cardin-lauds-final-passage-of-legislation-to-expand-make-permanent-minority-business-development-agency (last visited Apr 21, 2023).

"[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that [a practice] bears more heavily on one race than another." *Village of Arlington Heights v. Metro. House. Dev. Corp.*, 429 U.S. 252, 266 (1977).

The legislative history demonstrates that Congress had a strong basis in evidence to support passage of the Minority Business Development Act.[23]  In the time since Executive Order 11625 took effect in 1971, Congress has amassed a significant body of evidence related to the economic consequences of discrimination on minority business owners. A 1975 congressional report found: "[t]he effects of past inequities stemming from racial prejudice ha[d] not remained in the past . . . The presumption must be made that past discriminatory systems have resulted in present economic inequities." H.R. Rep. No. 94-468 (1975). Congressional evidence from 1982[24], 1987[25], 1988[26], 1996[27], 2010[28], 2016[29], and most recently 2022[30], demonstrate that, unfortunately, discrimination

---

[23] "Congress' fact-finding process is generally entitled to a presumption of regularity and deferential review." *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 251 (D.D.C. 2012).

[24] H.R. Rep. No. 97-956 (1982).

[25] H.R. Rep. No. 100-460 (1987).

[26] *Minority Business Development Act of 1988*: Hearing on H.R. 1769 Before the H. Sub. Comm. On Procurement, Innovation, and Minority Enterprise Development of the Comm. On Small Bus., 100th Cong. (1988).

[27] *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey,* 61 Fed. Reg. 26042-01 (May 23, 1996).

[28] *Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's Capital Markets*, Hearing on S.H. Before the Comm. On Small Bus. And Entrepreneurship, 111th Cong. (2010).

[29] U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016).

[30] Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022).

and its lingering effects persist and continue to have a negative impact on aspiring minority business owners.[31]

In 1996, the Department of Justice ("DOJ") produced an overview of Congressional hearings, disparity studies, reports and evidence from 1980 to 1995.[32] *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey,* 61 Fed. Reg. 26042 (May 23, 1996). DOJ found "over and over again, that minority applicants for business loans are more likely to be rejected, and when accepted, receive smaller loan amounts than nonminority applicants with identical collateral and borrowing credentials." *Id.* Specifically, the report found that Black applicants were three times more likely to be rejected for business loans than whites, and that disparities remained statistically significant after controlling for other factors. Statistical analysis also supported the contention that minorities were shut out of business networks, which denied them the benefit of competitive supply chain pricing. *Id.* Courts have relied upon the DOJ report to find a compelling interest. *See Northern Contracting, Inc. v. State of Illinois*, 2004 WL 422704, at *27-34 (N.D. Ill. Mar. 3, 2004).

Recent reports and disparity studies demonstrate that the economic inequities rooted in discrimination persist for socially and economically disadvantaged people. In 2016, the MBDA produced an overview of nationwide disparity studies to demonstrate the ongoing effects of discrimination on minority business owners. Courts have generally accepted disparity studies as

---

[31] The 2022 Compelling Interest Report has been considered by Congress. *See* 158 Cong. Rec. E619-20 (statement of Rep. Carolyn Maloney). The 2022 report updated and expanded upon a 2010 DOJ Report on the same topic, which also was considered by Congress and cited in federal court as evidence of a compelling government interest in the use of race-conscious measures to support the ability of people of color to compete on an equal basis. *See Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011).
[32] *See* 61 Fed. Reg. 26042-01 (May 23, 1996), 1996 WL 271176 n. 12.

persuasive evidence of discrimination and its continuing effects. *See Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1196 (9th Cir. 2013); *H.B. Rowe Co.*, 615 F.3d at 257; *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1174 (10th Cir. 2000); *Midwest Fence*, 84 F. Supp. 3d 705, 727 (N.D. Ill. 2015); *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 209-10 (D.D.C. 2015); *DynaLantic*, 885 F. Supp. 2d 237, 267 (D.D.C. 2012). MBDA's review of more than 100 disparity studies found that minority businesses in every major industry sector throughout the Country experienced substantial contracting disparities, which could not be explained by factors outside of discriminatory behaviors towards racial and ethnic minorities.[33] Specifically, courts have found that a disparity study of Texas, which was included in the MBDA overview, provided clear evidence to support the government's compelling interest. *See Kossman Contracting, Co.*, 2016 WL 11473826 at *21-22.

Finally, in 2022, DOJ produced a follow-up report for Congress that surveyed more than 200 disparity studies and summaries. The report was entered into the Federal Register on January 31, 2022.[34] In detail, the report describes the common race-based barriers to free enterprise expressed above and the negative effects they have on minority groups presumed to be socially or economically disadvantaged by the MBDA. The report reemphasized that the lack of capital among minority business owners is directly traceable to intentional governmental action.[35]

---

[33] U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016).

[34] Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022).

[35] Courts routinely consider evidence submitted to Congress following the enactment of the affirmative action policies like the MBDA Act. "[F]ormal findings by a government entity "need neither precede nor accompany the adoption of affirmative action." *Ensley Branch N.A.A.C.P. v Seibels*, 31 F.3d 1548, 1565 (11th Cir. 1994); s*ee also 'Contractors Ass'n v. City of Philadelphia*, 6 F.3d 990, 1004 (3d Cir. 1993) (observing that "[b]ecause injunctions are

Furthermore, with respect to the arguments made by Plaintiffs relying on *Vitolo*—that Defendants must demonstrate a "specific episode" of discrimination—Congress in 2021 received testimony that Black wealth accumulation had undergone a sustained process of asset underdevelopment due to federally sanctioned redlining, which reduced the credit available to Black households, denial of benefits from the G.I. Bill, and the long-term effects of Jim Crow era state tax policies.[36]

Defendants have overwhelmingly demonstrated a strong basis in evidence for the compelling interest served by the race-conscious presumptions of the Minority Business Development Act and the challenged regulations.[37]

### 2. The MBDA Act is Narrowly Tailored

"[T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (internal quotation marks and citation omitted). This narrow tailoring requirement ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Richmond v. J.A. Croson Co.*, 488 U.S., at 493 (plurality opinion). To assess narrow tailoring, courts consider several factors: (1) the necessity for the relief and the efficacy of alternative remedies; (2) the

---

prospective only, it makes sense to consider all available evidence…including prospective evidence.").

[36] *See How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color*, Hearing before Subcomm. On Oversight and Investigations of the H. Comm. On Financial Services, 117th Cong. (2021) (testimony of Willian Darity Jr., Samuel DuBois Cook Professor of Public Policy, Duke University)(citations omitted).

[37] Courts reviewing similar programs with similar race-conscious presumptions have routinely found them to be constitutional. *See, e.g., Rothe Dev., Inc. v. Dep't of Def.* (Rothe IV), 107 F. Supp. 3d 183 (D.D.C. 2015), aff'd on other grounds, 836 F.3d 57 (D.C. Cir. 2016); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237 (D.D.C. 2012).

flexibility and duration of the relief; (3) the relationship of the numerical goals to the relevant labor market (which is not relevant to the statute or regulations in question), and (4) the impact of the relief on third parties. *United States v. Paradise*, 480 U.S. 149, 171, 187 (1987).

Here, the MBDA Business Center Program is narrowly tailored because the means chosen and the Agency goals are closely aligned, and absent race-based remedies, the "needle [did] not move[]" in efforts to remedy the effects of discrimination on the success outcomes of minority owned businesses.[38] Specifically, the goals of the MBDA Business Center program are to: (1) assist minority business enterprises in accessing capital, contracts, and grants, and creating and maintaining jobs; (2) provide counseling and mentoring to minority business enterprises; and (3) facilitate the growth of minority business enterprises by promoting trade. 15 U.S.C. § 9522. These goals are synchronized to current MBEs, as illustrated from the following findings from MBDA studies. *See, supra,* n.8. To address these issues, the MBDA Business Center program is limited and targeted. The MBDA does not provide grants or government contracts directly to MBEs. Instead, the MBDA provides grants and guidance to Business Centers, which in turn are directed to assist MBEs. Specifically, MBDA Business Centers are required to provide "referral services" to MBEs and to "develop, cultivate, and maintain a network of strategic partnerships with organizations that foster access by minority business enterprises to economic markets, capital, or contracts." 15 U.S.C. § 9524(a)(1). MBDA Business Centers are also allowed the independence to develop their own programs and services to achieve the aforementioned goals. *Id.* at . § 9524(a)(1)(A)(ii). Because the MDBA Business Center Program is limited in scope and

---

[38] U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016).

targeted to address the specific needs of the MBE community, it aligns squarely with the identified and well-documented need and is thus narrowly tailored.

Furthermore, the Act's presumption of social or economic disadvantage for particular racial or ethnic groups is flexible; the list of those who may qualify for the presumption under the MBDA statute and regulations is not static. 15 U.S.C. § 9501(15)(B)(vi); 15 C.F.R. § 1400.1(b), §1400.3-5. For instance, Asian Indians were determined to be socially and economically disadvantaged in October of 1984[39] and granted a presumption under the current statute. Plaintiffs have not alleged any facts demonstrating that the statute or regulations limit the ability to be presumed socially or economically disadvantaged based exclusively on race. Because the regulations require any presumption to be based in strong evidence, the statute is appropriately tailored.   It is not over-inclusive, because it provides a remedy for groups only where discrimination has been shown through evidence. Nor is it under-inclusive, because any group may apply to make that showing. 15 C.F.R. §§ 1400.1(b) & 1400.3-5.

C. **Plaintiffs Will Not Suffer Irreparable Harm**

Plaintiffs' motion should also be denied because they have not shown a "substantial threat of irreparable harm" absent a preliminary injunction. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 441 (E.D. Tex. 2006). To do so, they must demonstrate that the alleged harm is "real, imminent, and significant—not merely speculative or potential." *Tex. Health & Human Servs Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016) (internal quotation omitted). An injury is "irreparable only if it cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (citation omitted).

---

[39] 49 Fed. Reg. 207 (Oct. 24, 1984).

Plaintiffs' failure to allege facts sufficient to show an injury-in-fact for standing purposes dooms any irreparable harm claim they may pose here. *See Texas Voters All v. Dallas Cty*., 495 F. Supp. 3d 441, 472 (E.D. Tex. 2020) (denying TRO where plaintiff "failed to meet the harm standard for standing" and "for the same reasons" concluding "the irreparable harm standard is not met under the preliminary injunction analysis"); *Gbalazeh v. City of Dallas*, 394 F. Supp. 3d 666, 672 (N.D. Tex. 2019) (noting that establishing that there is a substantial threat of irreparable injury on a motion for preliminary injunction is a much taller task than showing injury-in-fact to survive a motion to dismiss.).

Plaintiffs are wrong to suggest that they have been denied equal treatment, *see* ECF 15 at 23 (citing *City of Jacksonville*, 508 U.S. 656, 666 (1993)), because, as explained *supra*, Plaintiffs Nuziard and Piper failed to apply to or seek benefits from the MBDA or any Business Centers, and Plaintiff Bruckner appears ineligible because his company has not been in business long enough to meet the Orlando Business Center's threshold requirement. Given these deficiencies on Plaintiffs' part, any claims of irreparable harm from the MBDA or its regulations are at best "speculative or potential," *see Tex. Health & Human Servs. Comm'n*, 166 F.3d at 710, and fall far short on Plaintiffs' burden to establish that, absent a preliminary injunction, they would suffer a "substantial threat of irreparable harm." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012).

D. **The Balance of the Equities and Interest of the Public Weigh in Favor of Defendants**

Given that Plaintiffs have not demonstrated that they are likely to succeed on the merits, and have not demonstrated any irreparable harm to their businesses, this Court need not address the balance of the equities and the public interest prongs, which merge when, as here, the Government is party to the litigation. *See Texas v. United States*, 524 F. Supp. 3d 598, 663 (S.D. Tex. 2021). But those prongs, too, strongly weigh against a preliminary injunction in this instance.

To succeed in securing a preliminary injunction from the Court, Plaintiffs must demonstrate that the threatened injury to them outweighs any harm that may result from the injunction to the public. *Id.* Plaintiffs have failed to plead any imminent injury-in-fact, but even assuming for purpose of argument that they have, it is negligible compared to the impact on and harm caused to the public if the injunction were granted. If the operations of the MBDA were to be enjoined or halted because of this litigation, socially and economically disadvantaged business owners may lose out on guidance and assistance in securing contracts and capital investment,[40] and the public interest would be harmed by the suspension of the significant job creation that the MBDA has provided to disadvantaged areas.[41]

IV. **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction. Plaintiffs' have not made the extraordinary showing on any of the four elements necessary to secure the sweeping relief they seek in this case.

---

[40] CRS Rep. 46816, The Minority Business Development Agency: An Overview of Its History and Programs, Tab. A-1 (Nov. 9, 2017).
[41] Establishment of a Minority Business Development Administration in the Department of Commerce, Congr. Hearing before Subcomm. Small Business (96th Cong.) 1980.

Dated: April 24, 2023

Respectfully submitted,

KAREN WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

*/s/      Vendarryl Jenkins*
VENDARRYL JENKINS (DC Bar No. 1724928)
CHRISTOPHER WOOLLEY (CA Bar No. 241888)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street NE, 9th Floor
Washington, DC  20530
(202) 598-1671
vendarryl.jenkins@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice to all attorneys of record.

<u>*/s/ Vendarryl Jenkins*</u>
Vendarryl Jenkins