UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**JEFFREY NUZIARD ET AL.,**

 Plaintiffs,

v.             No. 4:23-CV-0278-P

**MINORITY BUSINESS DEVELOPMENT AGENCY ET AL.,**

 Defendants.

## ORDER AND OPINION

 The Constitution demands equal treatment under the law. Any racial classification subjecting a person to unequal treatment is subject to strict scrutiny. To withstand such scrutiny, the government must show that the racial classification is narrowly tailored to a compelling government interest. In this case, the Minority Business Development Agency's business center program provides services to certain races and ethnicities but not to others. Because the Government has not shown that doing so is narrowly tailored to a compelling government interest, it is preliminary enjoined from providing unequal treatment to Plaintiffs.

## BACKGROUND

### A. Minority Business Development Agency

 In November 2021, President Biden signed into law the Infrastructure Act, creating the Minority Business Development Agency ("MBDA"). *See* 15 U.S.C. 9502(a). The Act directs the MBDA to establish a Business Center Program ("the Program"). § 9598. Under the Program, the MBDA must provide federal assistance to eligible entities to operate its business centers. § 9523. These centers offer technical assistance, business development services, and specialty services to only minority business enterprises. *Id.*

To qualify as a "minority business enterprise," a "socially or economically disadvantaged individual" must manage the business's operations and own at least 51% of it. § 9501(9)(A). An individual is presumed to be a "socially or economically disadvantaged individual" if they are Black, African American, Hispanic, Latino, American Indian, Alaska Native, Asian, Native Hawaiian, Pacific Islander, Puerto-Rican, Eskimo, Hasidic Jew, Asian Indian, or a Spanish-speaking American. § 9501(15). But any other race or ethnicity is not considered "socially or economically disadvantaged" and thus ineligible for the center's services. *Id.*

## B. Plaintiffs and this Lawsuit

Plaintiffs are three small business owners who seek the business center's services to grow their businesses. But due to their race and ethnicity, they are ineligible for those services. As a result, they contend that the Program's race-and-ethnicity requirement violates the Fifth Amendment's equal-protection guarantee and seek to enjoin the use of that requirement.

### 1. Dr. Nuziard

Dr. Jeffrey Nuziard is a veteran who owns and operates his own business—Sexual Wellness Centers of Texas. He has sought federal assistance for his business before but was denied. This time he sought assistance from the MBDA because it offers grants, training, contracts, financial sourcing assistance, business consulting, and other business resources. But after visiting the MBDA's Dallas/Fort Worth Center's website, he learned that he is ineligible for assistance because he is white. Nuziard's business, however, meets all other requirements for the Center's services.

### 2. Matthew Piper

Matthew Piper owns and operates his own business—Piper Architects—in Wisconsin. To help benefit his business, he sought assistance from the Wisconsin MBDA Business Center. Piper, however, learned that—despite growing up in extreme financial property—the

Center does not consider him "socially or economically" disadvantaged because he is white. So he is also ineligible for the Center's services.

### 3. Christian Bruckner

Christian Bruckner is a Romanian immigrant who operates his own business—Project Management Corporation—in Florida. Bruckner seeks support to strengthen his business and is interested in the MBDA's services for its assistance and resources in contracting opportunities. So he visited the Orlando MBDA Business Center website and chose the "access to contracts" option. This led him to the intake form. While completing the form, he noticed the "Ethnicity" question but didn't find an option for his ethnicity. So he contacted the Center to ask about it. In response, he was informed that the Center would not help his business due to his race and ethnicity.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movants carry their burden on four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The movants must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *City of Dall. v. Delta Air lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (cleaned up). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## ANALYSIS

### A. Likelihood of Success on the Merits

Plaintiffs contend they are likely to succeed on the merits of their equal protection claims. But Defendants disagree and contend that Plaintiffs (1) lack standing and (2) fail to show a substantial likelihood of success on those claims. The Court addresses both arguments in turn.

1. **Standing**

For the Court to reach the merits, Plaintiffs must first establish the Court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies." U.S. CONST. art. III, § 2. To satisfy this requirement, a plaintiff must establish that he has standing—a "personal stake" in the lawsuit. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732–33 (2008).

Standing has three requirements.[1] *Lujan*, 504 U.S. at 560. *First*, there must be a concrete injury-in-fact that is not conjectural or hypothetical. *Whitmore v. Arkansas*, 495 U.S. 149, 149 (1990). *Second*, there must be causation—a fairly traceable connection between a plaintiff's injury and the complained-of conduct of the defendant. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). *Third*, there must be redressability—a likelihood that the requested relief will redress the alleged injury. *Lujan*, 504 U.S. at 562.

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad.*

---

[1] The Supreme Court's standing precedent is like a game of telephone. The first whisper was the text—"case or controversy." This whisper was then interpreted. *See Muskrat v. United States*, 219 U.S. 346, 356 (1911) ("A 'case' was defined by Mr. Chief Justice Marshall as early as . . . *Marbury v. Madison* to be a suit instituted according to the regular course of judicial procedure."); *Kundolf v. Thalheimer*, 12 N.Y. 593, 596 (1855) ("The primary meaning of the word case, according to lexicographers, is *cause*."). But through subtle changes and interpretations over time, those whispers began to bear little resemblance to the first and were eventually distilled into three requirements. *See Lujan*, 504 U.S. at 560–61 (establishing three requirements for standing: (1) injury in fact, (2) causation, and (3) redressability). As a result, modern standing case law is based on recent whispers rather than the first—the text. So perhaps, rather than continuing the whispers, the Supreme Court will return to interpreting whether there is a "case or controversy" based on its original meaning rather than create new case law to determine whether the *Lujan* requirements are met. *See Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1126 (11th Cir. 2021) (Newsom, J., concurrence) (quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 957 (11th Cir. 2020) (Jordan, J., dissenting)) ("[B]ecause current standing doctrine lacks any solid anchor in text and history, it has devolved into 'essentially a policy question.'"). If not, standing case law will continue to bear "an all-too-close resemblance to the doctrine of substantive due process . . . ." *Sierra*, 996 F.3d at 1126.

*& Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). As a result, the Court first considers whether Nuziard has standing.

### *a. Injury-in-fact*

Nuziard contends that his injury is the denial of equal treatment resulting from the Program's race-and-ethnicity requirement. When the government denies equal protection, the plaintiff's injury is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Ch. of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).

Defendants contend that Nuziard has not been denied equal treatment because he has not applied for the services of any MBDA business center. ECF No. 20 at 17–18. In support, Defendants rely on *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir. 1973). In that case, the Fifth Circuit held that the plaintiffs lacked standing because they did not apply or allege they were eligible for the program. *Id.* at 709–10. The court applied the general rule that a plaintiff must submit to the challenged policy before pursuing an action to dispute it. *Id.* But "strict adherence to this general rule may be excused when a policy's flat prohibition would render submission futile." *Davis v. Tarrant Cnty.*, 565 F.3d 214, 220 (5th Cir. 2009); *see Turner v. Fouche*, 396 U.S. 346, 361–362 n.23 (1970) (plaintiff who did not own property had standing to challenge property ownership requirement for school board membership despite no evidence that the plaintiff had applied).

For example, an application for a benefit is futile if the government has "specifically stated" that it would not consider a plaintiff due to their race. *See Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993). So—even though Nuziard did not apply after learning he was ineligible for the business center's services due to his race—he "is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977). As a result, a plaintiff only needs to show that "he is likely to apply . . . in the reasonably foreseeable future" if the government were not unconstitutionally barring him from the fruits of the application

5

process. *Carney v. Adams*, 141 S. Ct. 493, 499–500. A plaintiff "can show this only if he is 'able and ready' to apply." *Id.* at 500.

As for ability, it is undisputed that Nuziard's business meets all the race-neutral requirements of his local MBDA center and would thus be eligible for the Center's services if there were no race and ethnicity requirement. So he is "able" to apply. *See Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638, 646 (N.D. Tex. 2021) (O'Connor, J.) (holding that the plaintiff was able to apply because he satisfied the race-neutral requirements). As for readiness, Defendants also do not dispute Nuziard's allegations that he has applied for federal assistance for his business before, sought out the business center for its benefits, visited the center's website as a result, observed that the agency would not help him due to his race, and still tried to contact MBDA about assistance. These allegations—accepted as true—show that Nuziard is "able and ready" to apply. *See Clements v. Fashing*, 457 U.S. 957 (1982) (holding that uncontested allegations that the plaintiff would have announced their candidacy but for the denial of equal treatment is sufficient to confer standing).

The Ninth Circuit's holding in *Carroll v. Nakatani* is not to the contrary. 342 F.3d 934 (9th Cir. 2003). In that case, the plaintiff lacked standing because he did not meet the race-neutral requirements for applying and couldn't show that he would benefit from the business program because he did not own a business. *Id.* at 942–43. Here, Defendants do not dispute that Nuziard's business satisfies the race-neutral requirements and would benefit from the Program.

The first requirement of Article III standing is thus met.

### b. Traceability

Nuziard argues that his injury—denial of equal treatment—is traceable to the race and ethnicity-based program. The Court agrees.

A plaintiff only has standing if he can assert a "personal injury fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Defendants contend that Nuziard's alleged injury is not traceable to the MBDA. Rather, it is traceable to

6

the MBDA's Dallas-Fort Worth Business Center—an entity separate from the MBDA and not a party to the suit—because it provides the services Nuziard seeks. But Defendants "wrongly equate injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

The MBDA dictates what races and ethnicities the Center can help and is "substantially involved" in its activities. 15 U.S.C. §§ 9523, 9524. So the Center may be the last step in the chain of causation. But Nuziard's injury is still "fairly traceable to some of the Federal Defendants given their responsibility for the burdens imposed by [the Program]." *Brackeen v. Haaland*, 994 F.3d 249, 295 (5th Cir. 2021).

The second requirement of Article III standing is thus met.

### *c. Redressability*

Nuziard contends that an injunction preventing enforcement of the Program's race-and ethnicity-requirement would redress his injury. For redressability, a plaintiff must "show that it is likely, not merely speculative, that a favorable decision will redress the injury-in-fact." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012).

Defendants contend that enjoining the Program's race requirements would not entitle Nuziard to the Center's service and thus would not redress his injury. But Defendants misunderstand Nuziard's injury. His injury is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Associated Gen. Contractors*, 508 U.S. at 666. And in an application context, his injury is the MBDA denying him an opportunity to apply for the Program because of his race. *See Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding that the plaintiff's injury was the inability to apply due to his race). Enjoining the Center from considering Nuziard's race and ethnicity when he applies will likely redress his injury. *See Associated Gen. Contractors*, 508 U.S. at 666 n.5 ("[A] judicial decree directing the city to discontinue its program would 'redress' the injury.").

7

The third requirement of Article III standing is thus met.

* * *

In sum, Nuziard has suffered an injury-in-fact because he is able and ready to apply for the Center's benefits in the absence of the race-and-ethnicity requirement. That injury is fairly traceable to Defendants because they impose that requirement on the Center. And an injunction preventing the Center from enforcing that requirement would redress Nuziard's injury. Thus, he has standing to bring an equal protection claim. *See Walker v. City of Mesquite*, 169 F.3d 973, 979 (5th Cir. 1999) (holding that the explicit racial classification alone is sufficient to confer standing). So the Court need "not analyze whether any other Individual Plaintiff has standing to raise it." *Brackeen*, 994 F.3d at 294 (citing *Rumsfeld*, 547 U.S. at 52).

## 2. Equal Protection Claims

The Court next turns to Plaintiffs' equal protection claims. The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. 14, § 1. This clause is incorporated into the Fifth Amendment's guarantee of due process. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). So "Fifth Amendment equal protection claims against federal actors are analyzed under the same standards as Fourteenth Amendment equal protection claims against state actors." *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)). "Any race-conscious remedial measure receives strict scrutiny under the Equal Protection Clause." *Walker*, 169 F.3d at 982.

Plaintiffs contend they will likely succeed on their equal protection claim because the Program's race-and-ethnicity requirement fails strict scrutiny. Defendants disagree as to Plaintiffs' likelihood of success but concede that the Program is race-based and thus subject to strict scrutiny. "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543

U.S. 499, 505 (2005) (citation omitted). The Court first addresses whether the Government has a compelling interest.

### *a. Defendants Lack a Compelling Interest*

Defendants contend that it has a compelling interest in remedying the effects of past discrimination faced by minority-owned businesses. ECF No. 20 at 17.

The government may establish a compelling interest in remedying racial discrimination if three criteria are met: "(1) the policy must target a specific episode of past discrimination, not simply relying on generalized assertions of past discrimination in an industry; (2) there must be evidence of past intentional discrimination, not simply statistical disparities; and (3) the government must have participated in the past discrimination it now seeks to remedy." *Miller v. Vilsack*, No. 4:21-CV-0595-O, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (O'Connor, J.) (citing *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021) (summarizing U.S. Supreme Court precedents)). The Government's asserted compelling interest meets none of these requirements.

*First*, the Government "points generally to societal discrimination against minority business owners." *Vitolo*, 999 F.3d at 361. Defendants point to congressional testimony on the effects of redlining, the G.I. Bill, and Jim Crow laws on black wealth accumulation as evidence of a specific episode of discrimination. But the Program does not target black wealth accumulation. It targets some minority business owners. Defendants also identify no specific episode of discrimination for any of the other preferred races or ethnicities. Instead, they point to the effects of societal discrimination on minority business owners. But "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996).

*Second*, the Government fails to offer evidence of past intentional discrimination. The Government offers no evidence of discrimination faced by some preferred races and ethnicities. And for those it does, the Government relies on studies showing broad statistical disparities with business loans, supply chain networks, and contracting among some minorities. These studies do not involve all of Defendants' preferred

9

minorities or every type of business. But even if they did, "statistical disparities don't cut it." *Vitolo*, 999 F.3d at 361. Because "when it comes to general social disparities, there are simply too many variables to support inferences of intentional discrimination." *Id.* at 362. "While the Court is mindful of these statistical disparities and expert conclusions based on those disparities, '[d]efining these sorts of injuries as 'identified discrimination' would give . . . governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.'" *Greer's Ranch Cafe*, 540 F. Supp. 3d at 650 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499 (1989)).

*Third*, the Government "has not shown that it participated in the discrimination it seeks to remedy." *Vitolo*, 999 F.3d at 361. The government can show that it participated in the discrimination it seeks to remedy either actively or passively. *See Croson*, 488 U.S. at 492; *Vitolo*, 999 F.3d at 361.

Defendants, however, provide no argument on how they participated in the discrimination it seeks to remedy. Perhaps the argument could be made that the Government passively discriminated by failing to address the economic inequities among minority business owners. But to be a passive participant, it must be a participant. *See Croson*, 488 U.S. at 492 (government awarding contracts to those who engaged in private discrimination). And there's no evidence that the Government passively participated by "financ[ing] the evil of private prejudice" faced by minority-owned businesses. *Id.*

In sum, the Government has failed to show that the Program targets a specific episode of discrimination, offer evidence of past intentional discrimination, or explain how it participated in discrimination against minority business owners. The Government thus lacks a compelling interest in remedying the effects of past discrimination faced by some minority-owned businesses.

### *b. The Program is not Narrowly Tailored*

Even if the Government had shown a compelling state interest in remedying some specific episode of discrimination, the Program is not narrowly tailored to further that interest for at least two reasons.

*First*, the Government has not shown that "less sweeping alternatives—particularly race neutral-ones—have been considered and tried." *Walker*, 169 F.3d at 983 (cleaned up). This requires the government to show that "no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

Defendants contend that "absent race-based remedies, 'the needle did not move' in efforts to remedy the effects of discrimination on the success outcomes of minority business owners." ECF No. 20 at 22. To support this statement, Defendants rely on a single review of various disparity studies. *See* U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016).

But this review cuts against the Government. It "emphasize[s] the need for both race-neutral and race-conscious remedial efforts" to move the needle and states that the disparity studies "fail to detail the extent to which agencies have actually implemented and measured the success or failure of these recommendations." *Id.* at 70. Thus, the review of contracting disparities Defendants rely on does not show that race-neutral alternatives "have been considered and tried." *See Walker*, 169 F.3d at 983. Nor has the Government shown a "serious, good faith consideration of workable race-neutral alternatives" in any other business context. *See Grutter v. Bollinger*, 539 U.S. 306, 339 (2003).

*Second*, the Program is not narrowly tailored because it is underinclusive and overinclusive in its use of racial and ethnic classification. *See Croson*, 488 U.S. at 507–08; *Gratz*, 539 U.S. at 273–75. It is underinclusive because it arbitrarily excludes many minority-owned business owners—such as those from the Middle East, North Africa, and North Asia. For example, it excludes those who trace their ancestry to Afghanistan, Iran, Iraq, and Libya. But it includes those

11

from China, Japan, Pakistan, and India.[2] The Program is also underinclusive because it excludes every minority business owner who owns less than 51% of their business. "This scattershot approach does not conform to the narrow tailoring strict scrutiny requires." *Vitolo*, 999 F.3d at 364.

The Program is also overinclusive. It helps individuals who may have never been discriminated against. *See Croson*, 488 U.S. at 506–08 (holding that a minority business plan is overinclusive because it includes ethnicities in which there is no evidence of discrimination). It also helps all business owners, not just those in which disparities have been shown.

The Program is thus not narrowly tailored to the Government's asserted interest.

*       *       *

Because the Government has not shown a compelling interest or a narrowly tailored remedy under strict scrutiny, Plaintiffs are likely to succeed on the merits.

### B. Substantial Threat of Irreparable Harm

Plaintiffs contend that they have suffered and will continue to suffer irreparable harm by denying equal treatment. To show immediate and irreparable harm, a plaintiff must demonstrate he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

A finding of irreparable injury is mandated if a constitutional right is threatened or impaired. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, an equal protection violation "for even minimal periods of time unquestionably constitutes irreparable injury." *League of United Latin*

---

[2] Fashioning a racial or ethnicity-based policy that is not underinclusive or overinclusive is extremely difficult and almost impossible in a multiethnic country like the United States. *See* Joseph D. G. Castro, *Not White Enough, Not Black Enough: Reimagining Affirmative Action Jurisprudence in Law School Admissions Through A Filipino-American Paradigm*, 49 PEPP. L. REV. 195, 226–27 (2022).

*Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 182 (W.D. Tex. 2022) (citing 5th Circuit and Supreme Court cases).

Because Plaintiffs allege that Defendants have infringed their rights under the Fifth Amendment, "violations of those rights inflict irreparable injuries." *Id.* And those injuries will likely remain absent an injunction that prevents Defendants from denying Plaintiffs equal access to the Program because of their race and ethnicity.

Plaintiffs are thus likely to suffer irreparable harm absent a preliminary injunction.

### C. Balance of Harm and Public Interest

The third and fourth preliminary injunction factors—balance of harm and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This is because when a statute is enjoined, the government "suffers the irreparable harm of denying the public interest in the enforcement of its laws," causing the government's "interest and harm" to "merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 458 n.9 (5th Cir. 2014) (cleaned up).

Thus, the balance of harm and public interest favor Plaintiffs.

*  *  *

Having determined that a preliminary injunction is appropriate, the Court turns to the proper scope of such relief.

The prevailing wisdom when determining the scope of an injunction is that such relief must be narrowly tailored to the injury it is remedying. *O'Donnell v. Harris Cnty.*, 892 F.3d 147, 155 (5th Cir. 2018). Plaintiffs seek the injunction scope to be nationwide. While far from "the norm," nationwide injunctions are sometimes appropriate. *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). They are appropriate if there's a (1) concern that a geographically limited injunction would fail to prevent a plaintiff's harm or (2) a constitutional command for a consistent national policy. *Id.* at 263–64.

13

Neither circumstance is present in this case. Plaintiffs' injuries can be remedied by an injunction tailored to the three MBDA Centers. And there's no constitutional command for a policy on minority-owned businesses. *Id.* (holding that there's a constitutional command for uniform immigration laws but not for a federal vaccination mandate).

## CONCLUSION

The Court thus **GRANTS** Plaintiffs' Motion for Preliminary Injunction (ECF No. 14) and **ENJOINS** Defendants, the Wisconsin MDBA Business Center, the Orlando MBDA Business Center, the Dallas-Fort Worth MBDA Business Center, and the officers, agents, servants, and employees, and anyone acting in active concert or participation with them from imposing the racial and ethnic classifications defined in 15 U.S.C. § 9501 and implemented in 15 U.S.C. §§ 9511, 9512, 9522, 9523, 9524, and 15 C.F.R. § 1400.1 against Plaintiffs or otherwise considering or using Plaintiffs' race or ethnicity in determining whether they can receive access to the Center's services and benefits.

**SO ORDERED** on this **5th day of June 2023.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE