IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JEFFREY NUZIARD, et al.,

        Plaintiffs,

    v.                                    Case No. 4:23-cv-00278-P

MINORITY BUSINESS
DEVELOPMENT AGENCY, et al.,

        Defendants.

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................... 2

   I.   The Minority Business Development Act ............................................... 2

   II.  Plaintiffs and this Lawsuit ................................................................. 5

ARGUMENT AND AUTHORITIES ..................................................................... 9

   III.  Standard of Review ........................................................................... 9

   IV.  Plaintiffs are entitled to Summary Judgment on their Equal Protection claim because the MBDA Statute violates the Constitution. ...................................................... 10

       A.  There is no compelling governmental interest justifying the exclusive racial and ethnic eligibility requirements imposed by the MBDA Statute. ................................. 12

          1.  *SFFA* reinforces the three-part test, requiring specific instances of intentional discrimination by the federal government, to establish a compelling governmental interest in remedying race discrimination. .................. 12

          2.  Congress did not provide a compelling governmental interest for the racial and ethnic classifications designated by the MBDA Statute. ............................... 16

          3.  Defendants' disparity studies do not identify specific instances of intentional discrimination by the federal government to establish a compelling governmental interest. ....................................................... 18

          4.  Defendants' evidence further fails to address the MBDA Statute's benefitted racial groups and nationwide scope. .................................... 24

       B.  The racial and ethnic eligibility requirements imposed by the MBDA Statute abjectly fail narrow tailoring. .................................. 29

       C.  The MBDA Statute employs race as a "negative" and furthers illegitimate stereotyping in violation of the Fifth Amendment. .................................... 35

   V.  Plaintiffs are entitled to Summary Judgment on their Administrative Procedure Act claim because the MBDA implementing regulations violate the Fifth Amendment. ........ 38

   VI.  The MBDA Statute is unconstitutional on its face, and the APA and principles of equitable relief empower this Court to award Plaintiffs complete relief. ........................ 39

       A.  If this Court again determines that the MBDA Statute is unconstitutional, there is nothing left to do but to declare it so .................................... 42

       B.  A permanent injunction enjoining enforcement of the MBDA Statute is warranted. .................................... 42

       C.  The APA authorizes this Court to vacate the unconstitutional MBDA implementing regulations. .................................... 47

CONCLUSION..................................................................................................................... 49

CERTIFICATE OF SERVICE ............................................................................................ 49

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)...................................................... passim

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 9

*Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.*, 19 F.3d 992 (5th Cir. 1994)........... 30

*Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642 (7th Cir. 2001).............. 15, 23

*Butts v. Martin*, 877 F.3d 571 (5th Cir. 2017) ...................................................................... 10

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ..................................................................... 44, 46

*Calmes v. United States*, 926 F. Supp. 582 (N.D. Tex. 1996) ...................................................... 42

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................... 9

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ........................................... 44, 46

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .................................................. passim

*ContiCommodity Servs., Inc. v. Ragan*, 63 F.3d 438 (5th Cir. 1995) ........................................... 9

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006)...................................................... passim

*Dimension Fin. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*,

744 F.2d 1402 (10th Cir. 1984) ....................................................................................... 48

*Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831 (5th Cir. 2004) ............................. 42

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ........................................... 48

*Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*,

122 F.3d 895 (11th Cir. 1997) ....................................................................... 13, 20, 21, 22

*Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*,

943 F. Supp. 1546 (S.D. Fla. 1996) ................................................................................ 13

*Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021) .......................................................... 15

*Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765 (5th Cir. 1978)................................. 42

*Gratz v. Bollinger*, 539 U.S. 244 (2003).............................................................................. 28

*Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638 (N.D. Tex. 2021) ............................... 25, 46

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..................................................................... 20, 33, 34

*Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377 (M.D.N.C. 2019)......................................... 48

*Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962 (S.D. Ill. 1999) ................................. 48

*Heckler v. Mathews*, 465 U.S. 728 (1984).............................................................................. 45

*Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty., Fla.*,

455 F.2d 818 (5th Cir. 1972) .................................................................................... 43, 46

*Holman v. Vilsack*, No. 21-1085-STA-JAY, WL 2877915 (W.D. Tenn. July 8, 2021) .............. 16

*Johnson v. California*, 543 U.S. 499 (2005) ................................................................... 11

*League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex. 2022) ............ 46

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) ............................................................... 43, 46

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,

    140 S. Ct. 2367 (2020) ...................................................................................... 48

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021) ............................................... 43, 44, 46

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ..................................................... 47

*McLaughlin v. State of Fla.*, 379 U.S. 184 (1964) ........................................................ 1

*McNamara v. City of Chicago*, 138 F.3d 1219 (7th Cir. 1998) ........................................... 22

*Michigan Road Builders v. Milliken*, 834 F.2d 583 (6th Cir. 1987) ...................................... 20

*Miller v. Johnson*, 515 U.S. 900 (1995) ................................................................ 1, 35

*Miller v. Vilsack*, No. 4:21-CV-0595-O, WL 11115194 (N.D. Tex. July 1, 2021) .................... 16

*Milliken v. Bradley*, 433 U.S. 267 (1977) ................................................................. 46

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982) .......................................... 18, 27

*Mitchell v. Pidcock*, 299 F.2d 281 (5th Cir. 1962) ................................................... 43, 46

*Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*,

    993 F.2d 1222 (5th Cir. 1993) .............................................................................. 45

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998) ................. 47

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, Fla.,

    508 U.S. 656 (1993) ........................................................................................ 36

*Palmore v. Sidoti*, 466 U.S. 429 (1984) ................................................................... 35

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,

    551 U.S. 701 (2007) ................................................................. 13, 20, 24, 27

*Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019) ................................ 48

*Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979) ........................................................ 47

*Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978) ...................................... 13, 15

*Rice v. Cayetano*, 528 U.S. 495 (2000) .................................................................... 35

*Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023 (Fed. Cir. 2008) ....................... 21

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................................... passim

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ................................................................... 35

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,

    143 S. Ct. 2141 (2023) ............................................................................. passim

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ................................................... 46

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) .......................................... 43, 48

*Texas v. United States*, No. 7:16-CV-00054-O, WL 7852330 (N.D. Tex. Nov. 20, 2016).......... 47

*Thomasville Branch of Nat. Ass'n for Advancement of Colored People v. Thomas Cnty., Ga.*, 571 F.2d 257 (5th Cir. 1978) ....................................................................... 36

*Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 220CV00041DCLCCRW, WL 4633481 (E.D. Tenn. July 19, 2023) ................................. 15, 16, 31, 44

*United States v. Virginia*, 518 U.S. 515 (1996) ............................................... 18, 27

*Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021) ....................................................... 42

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) ............................................ passim

*Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999) ................. 29, 32, 33, 34

*Washington v. Davis*, 426 U.S. 229 (1976) ...................................................... 14

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) .................................... 13, 14, 20

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .................................................. 10

**Statutes**

15 U.S.C. § 636 ............................................................................................. 31

15 U.S.C. § 637 ............................................................................................. 31

15 U.S.C. § 9501 ...................................................................................... passim

15 U.S.C. § 9502 ...................................................................................... passim

15 U.S.C. § 9511 ...................................................................................... passim

15 U.S.C. § 9512 ...................................................................................... passim

15 U.S.C. § 9522 .............................................................................. 2, 3, 25

15 U.S.C. § 9523 ........................................................................ 3, 33, 39, 45

15 U.S.C. § 9524 .............................................................................. 2, 3, 25

15 U.S.C. § 9526 ...................................................................... 33, 39, 45

15 U.S.C. § 9551 ............................................................................................. 3

15 U.S.C. § 9552 ...................................................................................... passim

15 U.S.C. § 9598 ............................................................................................. 2

Infrastructure Act, § 11101 .................................................................... 18

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................ 9

MBDA website ..................................................................................................... 2

U.S. Dep't of Commerce, Minority Business Development Agency, Contracting Barriers and Factors Affecting Minority Business Enterprises (Dec. 2016) ................................ 22

U.S. Dept. of Commerce website .......................................................................... 5

U.S. Small Business Admin., 8(a) Business Development program website ..................... 16, 31

**Regulations**

13 C.F.R. § 124.101 ............................................................................................ 31

13 C.F.R. § 124.103 ............................................................................................ 31

13 C.F.R. § 124.104 ............................................................................................ 31

15 C.F.R. § 1400.1 ....................................................................................... passim

15 C.F.R. §§ 1400.1–.6 ................................................................................. 37, 38

49 Fed. Reg. 42,698 (Oct. 24, 1984) ................................................................. 17

5 U.S.C. § 551 ................................................................................................... 39

5 U.S.C. § 704 ................................................................................................... 39

5 U.S.C. § 706 ............................................................................................. 39, 42

**Executive Orders**

Exec. Order No. 11,458 (Mar. 5, 1969) ............................................................... 2

Exec. Order No. 11,625 (Oct. 13, 1971) ............................................................. 17

Exec. Order No. 13,985 (Jan. 20, 2021) ............................................................... 5

Exec. Order No. 14,091 (Feb. 16, 2023) .............................................................. 5

## INTRODUCTION

"At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial [] class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation and internal quotation marks omitted). Indeed, this basic principle dates back to the founding: "We hold these truths to be self-evident, that all men are created equal." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 240 (1995) (Thomas, J., concurring in part) (citing The Declaration of Independence (U.S. 1776)). But the federal government has failed to live up to these foundational decrees.

For nearly one-quarter of our nation's history, the government has created and maintained programs enshrining race-based preferences into law to provide business programs, services, and assistance. *E.g.*, U.S. Department of Transportation Disadvantaged Business Enterprise Program; U.S. Small Business Administration Section 8(a) Business Development Program. The new programming offered pursuant to the Minority Business Development Act—a component of the 2021 Infrastructure Investment and Jobs Act ("Infrastructure Act")—is only the latest of such efforts by the federal government to accord preferential treatment to certain racial and ethnic minorities in the awarding of business-related benefits and services.

Yet, as the Supreme Court recently reconfirmed, race-based remedies "must comply with strict scrutiny, they may never use race as a stereotype or negative, and—at some point—they must end." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2166 (2023). Without these limitations, racial classifications are "reduced to an invidious discrimination forbidden by the [Constitution]." *McLaughlin v. State of Fla.*, 379 U.S. 184, 192–93 (1964). The Minority Business Development Act flouts these constitutional directives in rather exceptional form. This our Constitution does not tolerate.

1

# FACTS

## I.      The Minority Business Development Act

As its name indicates, the Minority Development Business Act, codified at 15 U.S.C. §§ 9501–9598 (the "MBDA Statute"), creates the Minority Business Development Agency (the "MBDA") within the Department of Commerce to provide business assistance to minority businesses. *See generally* MBDA Statute; 15 U.S.C. § 9502(a). Although statutorily created in 2021, this was not the MBDA's first debut. From 1969, when the first permutation of the agency was established under claimed executive prerogative, to today's MBDA as a creature of statute, the MBDA has grown steadily in scope over the last 54 years. *See* Exec. Order No. 11,458, 34 Fed. Reg. 4937 (Mar. 5, 1969) (establishing the Office of Minority Business Enterprise ("OMBE")). *See also* MBDA website, *The History of MBDA*, (last accessed Oct. 19, 2023) (indicating OMBE name change in 1979 and highlighting the agency's growth and expansion in scope from past to present).[1] Now, having been officially stamped into law, the MBDA enjoys an appreciable $550 million funding appropriation, equipping the agency to greatly expand all prior reach through a fully integrated nationwide network of offices. *See id.*; 15 U.S.C. §§ 9522, 9524(a)(1)(B), 9598.

The MBDA Statute imposes various responsibilities upon the MBDA to assist minority businesses. For example, through "regional offices" and other MBDA offices, the MBDA must provide federal assistance to minority businesses through "resources relating to management," "technological and technical assistance," "financial, legal, and marketing services," and "services

---

[1] Available here: https://www.mbda.gov/about/history.

relating to workforce development." 15 U.S.C. §§ 9502(e), 9511(1); ECF 1: ¶¶ 18, 23. Likewise, the MBDA must also "promote the position of minority business enterprises in [] local economies" through programs for minority businesses related to procurement, management, technology, law, financing, marketing, and workforce development. 15 U.S.C. § 9512(1); ECF 1: ¶ 24.

Beyond these general mandates, the MBDA Statute further directs MBDA to establish a "Business Center Program" for "all regions of the United States," including "rural areas," in order to: (1) assist minority business enterprises in accessing capital, contracts, and grants, and creating and maintaining jobs; (2) "provide counseling and mentoring to minority business enterprises"; and (3) "facilitate the growth of minority business enterprises by promoting trade." *See* 15 U.S.C. §§ 9522, 9523(b), 9551(3), 9552(c); ECF 1: ¶ 25. Under the Business Center Program, the MBDA must "make Federal assistance awards to eligible entities to operate MBDA Business Centers," which must then "provide technical assistance and business development services, or specialty services, to minority business enterprises." 15 U.S.C. §§ 9523(a)(3), 9552(b)(1); ECF 1: ¶ 26. These MBDA business centers may offer a variety of services to minority businesses, including "referral services" and any "programs and services" necessary to accomplish the goals of MBDA to support minority businesses. 15 U.S.C. § 9524(a)(1); 9552(c)(2)–(3); ECF 1: ¶ 27. MBDA business centers must be operated under the "oversight" of the MBDA, in accordance with the requirements imposed by MBDA through written agreements in which MBDA is "substantially involved." *See* 15 U.S.C. §§ 9501(8), 9524; 9552(b)(2)(A)(ii); ECF 1: ¶ 28.

Pursuant to the MBDA Statute, MBDA assistance—including those services and benefits provided through the Business Center Program and otherwise through the statute's more general mandates (the "Programming" or "Program")—must be provided under a presumption of disadvantage to minority business enterprises owned by individuals of certain racial or ethnic

backgrounds. To qualify as a "minority business enterprise," a business enterprise must be "not less than 51 percent-owned by 1 or more socially or economically disadvantaged individuals" and its management and daily business operations must be "controlled by 1 or more socially or economically disadvantaged individuals." 15 U.S.C. § 9501(9)(A); ECF 1: ¶ 29. The MBDA Statute adopts similar provisions under the regulations at 15 C.F.R. pt. 1400: "In order to be eligible to receive assistance from MBDA funded organizations, a concern must be a minority business enterprise. A minority business enterprise is a business enterprise that is owned or controlled by one or more socially or economically disadvantaged persons." 15 C.F.R. § 1400.1(b); 15 U.S.C. § 9501(15)(B); ECF 1: ¶ 29. Only individuals belonging to the following racial or ethnic groups are presumed to be "socially or economically disadvantaged individuals": "Black or African American," "Hispanic or Latino," "American Indian or Alaska Native," "Asian," "Native Hawaiian or Pacific Islander"; and pursuant to 15 C.F.R. pt. 1400, other racial or ethnic groups (potentially overlapping) to include "Puerto-Ricans," "Spanish-speaking Americans," "Eskimos," "Hasidic Jews," and "Asian Indians." 15 U.S.C. § 9501(15)(B); 15 C.F.R. § 1400.1; ECF 1: ¶ 30.

Any individual who does not belong to a racial or ethnic group designated under the MBDA Statute and 15 C.F.R. § 1400.1 must make some further showing, acceptable to the federal government, to demonstrate membership in a "group" having "social or economic disadvantage" before qualifying as an eligible "socially or economically disadvantaged individual." 15 U.S.C. § 9501(15); 15 C.F.R. § 1400.1 ("Upon adequate showing by representatives of the group that the group is, as a whole, socially or economically disadvantaged the group will be so designated and its members will be eligible for MBDA assistance."). Accordingly, business owners, including minorities, who are not members of the government's preferred racial or ethnic groups, are

ineligible for the race-based presumption and denied equal access to the Programming based on their disfavored racial status. ECF 1: ¶ 31.

Consistent with the MBDA Statute's directives and Defendant Biden's racial equity agenda, ordering Defendants Raimondo and Cravins to address alleged "historic failures," the MBDA's mission is to "promote the growth of minority owned businesses." Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 20, 2021); Exec. Order No. 14,091, 88 Fed. Reg. 10825 (Feb. 16, 2023); U.S. Dept. of Commerce website, *Minority Business Development Agency* (last accessed Oct. 19, 2023).[2] Likewise, both Defendants Raimondo and Cravins have described the agency as dedicated "solely" to assisting and supporting minority-owned businesses. ECF 1: ¶¶ 20–21 (quoting Defendants' statements). And for years, Defendants have made clear that "minority business enterprises" are those that are owned and operated by members of certain racial groups. Indeed, such statements of "who [MBDA] serve[s]" are reflected on MBDA's numerous websites nationwide from its central office in Washington D.C. to its state and regional locations. *See, e.g.*, App. 5: ¶ 21; App. 15: ¶ 24.[3]

## II.      Plaintiffs and this Lawsuit

Plaintiff Dr. Jeffrey Nuziard is a white male who lives and works in Tarrant County, Texas. App. 2: ¶ 1. He is a United States Army veteran and spent the first part of his private career in investment management and mortgage lending. *Id.* at ¶¶ 2–4. Dr. Nuziard now owns and operates Sexual Wellness Centers of Texas, a state-of-the-art medical clinic dedicated to sexual and

---

[2] Available here: https://www.commerce.gov/bureaus-and-offices/mbda.

[3] *E.g.*, Central MBDA website, available here, https://www.mbda.gov/who-we-are/overview; Dallas Fort Worth MBDA website, available here, https://www.mbdadfw.com/services; and Orlando MBDA website, available here, https://orlandombdacenter.com/services/ (last visited Oct. 22, 2023).

reproductive health (the "Clinic"). App. 3: ¶ 10. Through a patented, multi-modality protocol that Dr. Nuziard developed, the Clinic has successfully treated various conditions causing sexual dysfunction. App. 2: ¶¶ 5–12. With two Texas locations currently, Dr. Nuziard has plans to expand the Clinic, including pending expansions to Arizona and Florida. App. 3: ¶¶ 13–14.

Although the Clinic produces revenues, expansion poses substantial costs and challenges. App. 4: ¶ 15. In addition to existing hurdles and issues obtaining private and government loan assistance, the Clinic was adversely impacted by the COVID-19 pandemic, requiring Dr. Nuziard to delay the Clinic's grand opening by several months, navigate staffing and operational issues, and rework his initial business and expansion plans. *Id.* at ¶¶ 16–18. Given the serious challenges he was facing, Dr. Nuziard became interested in the MBDA because it offers access to grant opportunities, financial sourcing assistance, strategic business consulting, and other free and low-cost business resources helpful to maintaining and growing a business. *Id.* at ¶ 19.

Unfortunately, when Dr. Nuziard reviewed the MBDA's business assistance program online, he was shocked and disheartened to find that the MBDA only serves "ethnic minority-owned businesses" owned and controlled by "African Americans, Hispanic, Asian, or Native American entrepreneurs." *Id.* at ¶ 20. Because he is white, Dr. Nuziard does not meet the MBDA's requirements for "who [it] serve[s]." App. 5: ¶¶ 21–22. Dr. Nuziard also contacted the MBDA at its Dallas Fort Worth office to inquire further about his candidacy for assistance. *Id.* at ¶ 23. But conversations with the Dallas Fort Worth MBDA were brief, and Dr. Nuziard was quickly told he was not qualified for business assistance because he was not a member of a designated racial "minority" group. *Id.* at ¶ 24. He encountered no option that would enable him to scale the racial barrier and become eligible for MBDA assistance. App. 6: ¶ 28; App. 10: ¶ 48. Dr. Nuziard's candidacy for MBDA assistance was rejected multiple times because he is white, and the MBDA

6

imposes a racial access barrier upon him that is not imposed for business owners of other, preferred races. App. 5: ¶¶ 23–51. Beyond the Dallas Fort Worth MBDA, Dr. Nuziard continues to face this same racial discrimination at the MBDA offices in Arizona, New Mexico, Florida, and across the nation. App. 7: ¶¶ 32–51.

Plaintiff Matthew Piper is a white male living and working in northeast Wisconsin. App. 12: ¶ 1. Although he grew up in extreme financial poverty, through much hard work and persistence, he was able to attend college, graduate with honors, and become a licensed architect. *Id.* at ¶¶ 2–3. Today, he owns and operates PIPER Architects. *Id.* at ¶¶ 4–6. From design development and specification through contract administration and construction, PIPER Architects provides home and commercial services to individuals and entities and has worked on projects for local groups and public authorities. App. 13: ¶¶ 7–9. Given Mr. Piper's goals and PIPER Architects' capacity to increase its workload, Mr. Piper became interested in the MBDA because it offers access to contracts, capital, training, and other assistance helpful for sustaining and growing his business. *Id.* at ¶¶ 10–16. After reading an article in which Senator Tammy Baldwin and Defendant Cravins announced the opening of a new MBDA office in Wisconsin, Mr. Piper attempted to confirm his eligibility and apply for business assistance, given his interest in some of the mentioned services. App. 14: ¶¶ 17–23. However, in reviewing various MBDA websites, including MBDA's central website and those for the Wisconsin, Illinois, and Minnesota offices, Mr. Piper quickly learned that MBDA assistance was only for particularly listed racial minority groups. App. 15: ¶¶ 24–25; App. 16: ¶¶ 27–32. Because he is white, Mr. Piper realized that he will never meet the MBDA's racial requirements for assistance and was discouraged from applying or making further inquiries. App. 16: ¶¶ 26–44.

Plaintiff Christian Bruckner is a permanently disabled, white male living and working in Tampa, Florida. App. 20: ¶¶ 1–2. In the 1970s, he immigrated to America to escape the communist regime in Romania. *Id.* at ¶¶ 3–4. He has over 20 years of experience in federal contracting and is certified as a federal contractor. *Id.* at ¶ 5. In addition, Mr. Bruckner has owned and managed his own public contracting businesses for over six years, including his current company, Project Management Corporation ("PMC"). *Id.* at ¶¶ 5–11. Despite his many and varied efforts to obtain business assistance, Mr. Bruckner has repeatedly hit the same walls—barriers based on his race and gender, which have substantially stymied his ability to obtain government contracting work. App. 21: ¶¶ 11–20. He is interested in the MBDA because it offers access to contracting opportunities, business development services, training, and other free and low-cost services that would be helpful to maintaining and growing his contracting business. App. 23: ¶ 21.

After reviewing the MBDA website and finding that he did not meet MBDA's indicated eligibility criterion for "ethnicity," on January 18, 2023, Mr. Bruckner emailed the Orlando MBDA office to inquire further about assistance. *Id.* at ¶¶ 22–27. Unfortunately, the Orlando MBDA informed Mr. Bruckner in multiple emails that he was ineligible for MBDA assistance because he did not meet any of the "'Ethnicity' dropdown options" and offered to refer him to some other group for assistance. App. 24: ¶¶ 28–33; App. 33–36.[4] Mr. Bruckner also attempted to seek assistance from the Miami MBDA and has further taken notice of other MBDA offices in Virginia, Alabama, and Georgia, from which he would like to receive services. App. 26: ¶¶ 34–38; App. 30: ¶¶ 53–57. But Mr. Bruckner's race continues to pose an overwhelming barrier to MBDA assistance

---

[4] A copy of the January 18–19, 2023 exchanges between Mr. Bruckner and the Orlando MBDA is attached to Plaintiffs' Motion for Summary Judgment as the Declaration of Christian Bruckner, Exhibit A.

from any MBDA office in America; and the exclusion of his race from the MBDA's listing of eligible racial groups is a clear and offensive reminder that the MBDA discriminates based on race. App. 27: ¶¶ 39–52; App. 31: ¶¶ 58–63.

The MBDA must carry out the dictates of federal law; and it is incontestable that no MBDA office in America may provide Programming to business owners without imposing race-based access requirements. Plaintiffs encounter barriers to equal treatment because of their race pursuant to a nationwide policy commanded by the MBDA Statute. *E.g.*, ECF 1: ¶¶ 43–44, 51, 63.

## ARGUMENT AND AUTHORITIES

### III.    Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may meet its burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact, or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *ContiCommodity Servs., Inc. v. Ragan*, 63 F.3d 438, 441 (5th Cir. 1995) (citing cases). Once this showing is made, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Dean v. City of Shreveport*, 438 F.3d 448, 453–54 (5th Cir. 2006) (citation omitted). If a reasonable jury could *not* return a verdict in favor of the non-movant based on the record, the court must grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).

Here, the MBDA Statute imposes a race-based preference against Plaintiffs' eligibility for Programming in violation of the Constitution's equal protection guarantee. Defendants do not dispute that the race-based preference exists or take issue with Plaintiffs' description of how it is

implemented. Instead, Defendants assert that the Programming is constitutionally-justified. There are no material facts in dispute, and Defendants cannot meet their burden to establish a constitutional justification for the MBDA Statute. Accordingly, Plaintiffs are entitled to a judgment as a matter of law on their equal protection and Administrative Procedure Act claims.

## IV.   Plaintiffs are entitled to Summary Judgment on their Equal Protection claim because the MBDA Statute violates the Constitution.

As the Supreme Court has long held and again recently proclaimed, "'the Constitution . . . forbids . . . discrimination by the General Government [] against any citizen because of his race.'" *SFFA*, 143 S. Ct. 2141, 2161 (2023) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (quoting *Gibson v. Mississippi*, 162 U.S. 565, 591 (1896)). Like the Fourteenth Amendment's Equal Protection Clause, the Fifth Amendment's Due Process Clause confers "a pledge of the protection of equal laws" in recognition of the "odious" and "pernicious" nature of such classifications. *E.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886); *SFFA*, 143 S. Ct. at 2162, 2168 (citing cases). *See also, e.g.*, *Adarand*, 515 U.S. at 224, 227 and *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017) (Fourteenth and Fifth Amendment equal protection claims are analyzed under the same standards). This promise is "universal in [its] application," applying to all persons "without regard to any differences of race, of color, or of nationality," because "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *SFFA*, 143 S. Ct. at 2161–62 (quoting cases).

As a result, "[r]acial and ethnic distinctions of any sort are inherently suspect," *id.* at 2163 (quoting *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 291 (1978)), and "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment." *Adarand*, 515 U.S. at

10

224. Such a retreat from the Constitution's demand for equal protection must survive a "daunting" examination under the standards of strict scrutiny, in which "the government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand*, 515 U.S. at 227); *SFFA*, 143 S. Ct. at 2162 (citing cases). This test is designed to "'smoke out' illegitimate uses of race" to ensure that any racial classifications imposed by the government are not "motivated by illegitimate notions of racial inferiority or simple racial politics" or "illegitimate racial prejudice or stereotype." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion). *See also, e.g.*, *SFFA*, 143 S. Ct. at 2165. Indeed, the government "may never use race as a stereotype or negative" "to discriminate against those racial groups that were not the beneficiaries of the race-based preference." *Id.* at 2165–66, 2168. Race-conscious government action that violates these "twin commands of the Equal Protection Clause" "cannot be reconciled with the guarantees of the [Constitution]." *Id.* at 2166, 2168, 2175.

Here, the MBDA Statute imposes racial and ethnic eligibility criteria for the Programming; and the parties and this Court agree that strict scrutiny applies to these racial and ethnic classifications. ECF 15:14, 20:23, 27:8. However, as this Court rightly concluded in granting Plaintiffs' Preliminary Injunction and enjoining Defendants' imposition of the race-based classifications, "the Government has not shown a compelling interest or a narrowly tailored remedy under strict scrutiny." ECF 27:12, 14. Nor could Defendants *ever hope* to satisfy the demands of equal protection doctrine, where, as here, the government uses race to generally accord a benefit for certain, preferred groups while erecting an automatic bar against individuals of "racial groups that were not the beneficiaries of the race-based preference." *SFFA*, 143 S. Ct. at 2166. In addition to various other independently sufficient reasons for unconstitutionality under strict

11

scrutiny, such a scheme is doomed from the start, revealing the government's sweeping implementation of "illegitimate racial prejudice and stereotyping" in violation of the equal protection guarantee's "twin commands" against using race as a stereotype or negative. *Id.* at 2165–66, 2168; *Croson*, 488 U.S. at 493 (plurality opinion).

There are no reasons to disturb the Court's previous conclusions, as recently bolstered by *SFFA*. In fact, Defendants only continue to rely on the same failing arguments they advanced in support of a compelling interest and narrowly tailored remedy during the preliminary stages of this case. *See* App. 50–51, 56 (Defs.' Interrogatory Responses #1–3 (citing ECF 20 and Response to Production Request #1)).[5] Consequently, the MBDA Statute—which creates, names, and entirely dedicates, the MBDA to providing Programming on the basis of race—is unjustified, unconstitutional, and invalid; and summary judgment on Plaintiffs' equal protection claim is, accordingly, warranted.

### A. There is no compelling governmental interest justifying the exclusive racial and ethnic eligibility requirements imposed by the MBDA Statute.

#### 1. *SFFA* reinforces the three-part test, requiring specific instances of intentional discrimination by the federal government, to establish a compelling governmental interest in remedying race discrimination.

Outside of avoiding imminent and serious safety risks in the prison context (and the now-defunct diversity objective in the higher education context), the Supreme Court has identified only one other governmental interest that may rise to the standard of "compelling" to permit race-based

---

[5] A copy of Defendants' Responses to Plaintiffs' First Discovery Requests, including Defendants' verified interrogatory responses, is attached to Plaintiffs' Motion for Summary Judgment as the Declaration of Cara Tolliver, Exhibit A.

government action: remediating past race discrimination.[6] *SFFA*, 143 S. Ct. at 2162. Yet the remediation of race discrimination requires far more than the government's mere assertions of such an interest. As this Court recently affirmed in its preliminary ruling, the government establishes a compelling interest in remedying race discrimination only if three criteria are met: the policy must target (1) specifically identified instances of past discrimination, for which there is evidence of (2) intentional discrimination, and (3) government participation. ECF 27:9–10; 15:15–20; 24:7–9. *See also, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720–21, 730 (2007); *Shaw v. Hunt*, 517 U.S. 899, 910 (1996); *Croson*, 488 U.S. at 492, 498–500; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986); *Bakke*, 438 U.S. at 307–310. Rooted in longstanding Supreme Court precedents, this three-part showing provides the "strong basis in evidence" required to establish a compelling governmental interest for any racial or ethnic classification used in remediating discrimination. *See id.*

As the *SFFA* Court recounted, to establish this compelling interest, the government must identify "specific [] instances of past discrimination that violated the Constitution or a statute." 143 S. Ct. at 2162 (citations omitted). After all, a wrong-to-be-righted must provide sufficient "guidance for a legislative body to determine the precise scope of the injury it seeks to remedy," and the specificity of such constitutional or statutory violations accordingly satisfies this inquiry. *Croson*, 488 U.S. at 498. Thus, generalized assertions of discrimination are not enough, and the

---

[6] While race and ethnicity are "analytically distinct, both [] characteristics are subject to the same constitutional protection." *E.g, Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1551 fn. 2 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997) (citations omitted); *Adarand*, 515 U.S. at 223–224. Plaintiffs will refer to them as a single concept for purposes of equal protection review.

Court again denounced them: "this Court has long rejected the[] core thesis" that the Constitution permits "[government] actors to remedy the effects of societal discrimination through explicitly race-based measures." *SFFA*, 143 S. Ct. at 2173–74 (citing *Bakke*, 438 U.S. at 307–310; *Shaw*, 517 U.S. at 909–10; *Croson*, 488 U.S. 469, 505–06 (1989)). Far from identifying specific instances of past discrimination, "such an interest [in remediating societal discrimination] presents 'an amorphous concept of injury that may be ageless in its reach into the past," *id.* at 2173 (quoting *Bakke*, 438 U.S. at 307), permitting a court to uphold remedies that are "timeless in their ability to affect the future." *Wygant*, 476 U.S. at 276.

Likewise, *SFFA*'s emphasis on the specificity of a "constitutional violation" also underscores the intentionality and government participation requirements of the three-part compelling interest test, since racial discrimination that is in violation of the Constitution, of course, constitutes *intentional* discrimination *by the government*. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229 (1976). In addition, the *SFFA* Court specifically pointed to cases recognizing past intentional discrimination as a compelling interest, along with portions of Justice Thomas's concurring opinion, explaining that the injury to be remedied must be concrete and traceable to "de jure" segregation. *SFFA*, 143 S. Ct. at 2162 (citing *Parents Involved*, 551 U.S. at 720; *Shaw*, 517 U.S. at 909–10; 143 S. Ct. at 2186–87, 2192–93 (Thomas, J., concurring)). For example, as the Court recognized:

> The government can plainly remedy a race-based injury that it has inflicted—
> though such remedies must be meant to further a colorblind government, not
> perpetuate racial consciousness . . . . [O]ur precedents explicitly require that any
> attempt to compensate victims of past governmental discrimination must be
> concrete and traceable to the *de jure* segregated system, which must have some
> discrete and continuing discriminatory effect that warrants a present remedy. []
> Without such guardrails, the [equal protection guarantee] would become self-
> defeating, promising a Nation based on the equality ideal but yielding a quota- and
> caste-ridden society steeped in race-based discrimination.

*Id.* (citing at 2186, 2192 (Thomas, J., concurring)). These observations thus reinforce existing precedent as to the interlinking requirements that such past instances of discrimination also must involve *intentional* discrimination and *government participation* to constitute a compelling interest in remedying race discrimination. *See also, e.g.*, *Bakke*, 438 U.S. at 308–09 (constitutional violations provide a basis for the government's "greater interest in helping one individual than in refraining from harming another."); *Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642, 645–46 (7th Cir. 2001) (private discrimination must be attributed to the government such that the government "knowingly perpetuated the discrimination," and therefore became "a kind of joint tortfeasor, coconspirator, or aider and abettor.").

In short, requiring the government to identify specific instances of past intentional discrimination that the government "had a hand in," *Vitolo*, 999 F.3d at 361, ensures that any proffered governmental interest in remediating racial discrimination will be, in fact, "compelling" and not in defeat of "the 'core purpose' of the Equal Protection Clause" to "do[] away with all governmentally imposed discrimination based on race." *SFFA*, 143 S. Ct. at 2147 (citation and internal quotation marks omitted). *See also* ECF 15:17 ("[In evaluating race-conscious action with these parameters in place], the government brings itself back into compliance with the Constitution and does not transgress the equal protection guarantee anew."). Accordingly, *SFFA* affirms the three-part compelling interest test for government remediation of race discrimination as based in long-established Supreme Court precedent and effectuated throughout the country. *See, e.g.*, *Vitolo*, 999 F.3d 353; *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 220CV00041DCLCCRW, WL 4633481, at 11–14 (E.D. Tenn. July 19, 2023); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 475 (E.D. Wis. 2021); *Holman v. Vilsack*, No. 21-1085-STA-JAY, WL 2877915, at 6 (W.D. Tenn.

15

July 8, 2021); *Miller v. Vilsack*, No. 4:21-CV-0595-O, WL 11115194, at 8 (N.D. Tex. July 1, 2021).

Applying these principles to this case, this Court previously concluded that "the government has failed to show [any of the three criteria]" required to establish a compelling interest for the racial and ethnic eligibility criteria imposed by the MBDA Statute. ECF 27:10. There are no countervailing reasons to disrupt this conclusion or its well-grounded basis, as recently bolstered by *SFFA*.[7] As this Court explained, the government may not "simply rely[] on generalized assertions of past discrimination [and] statistical disparities" to establish a compelling interest in remedying racial discrimination. ECF 27:9–10. Yet, instead of pointing to "specific, identified instances" of intentional, governmental discrimination "that violated the Constitution or a statute," *e.g.*, *SFFA*, 143 S. Ct. at 2162, Defendants resort to cobbled-together observations of broad and muddled racial disparities in society. They use these generalized assertions in an attempt to claim a compelling governmental interest for according an exclusive preference to a dozen-plus racial and ethnic minorities—a claim that Congress itself did not articulate.

        **2.**      **Congress did not provide a compelling governmental interest for the racial and ethnic classifications designated by the MBDA Statute.**

As an initial matter, Defendants' asserted justifications for the MBDA Statute do *not* automatically reflect Congress's basis for dedicating the MBDA to preferences for only certain

---

[7] Indeed, in accordance with constitutional principles and following a federal court's July ruling in *Ultima*, enjoining the Small Business Administration from applying a race-based presumption of disadvantaged in its provision of business programming, the agency immediately rescinded this policy for new program applications. *See* No. 220CV00041DCLCCRW, WL 4633481; U.S. Small Business Admin., 8(a) Business Development program website, https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program (last accessed Aug. 22, 2023).

racial groups. On its face, the MBDA Statute directs the MBDA to provide Programming entirely on the basis of race without explanation. Programming is provided under a presumption of disadvantage to minority business enterprises owned by individuals of certain racial or ethnic backgrounds. 15 U.S.C. §§ 9501(9), (15). Any individual who does not belong to a designated racial or ethnic group enumerated by the MBDA Statute must come forward with a showing, acceptable to the federal government, to demonstrate membership in a "group" having "social or economic disadvantage" before qualifying as a "socially or economically disadvantaged individual." 15 U.S.C. § 9501(15); 15 C.F.R. § 1400.1.

However, Congress did not offer even the slightest hint of justification or explanation for limiting this race-based presumption of eligibility to the listing of designated racial and ethnic minorities at the expense of other races. Indeed, no specific congressional findings appear to speak to this listing at all. The racial and ethnic classifications specified under 15 C.F.R. pt. 1400 were incorporated into the MBDA Statute without any further comment regarding the inclusion of each such group, and despite the fact that these designations were made more than 30 years ago, during the timeframe spanning 1971 to 1984. *See* Exec. Order No. 11,625 (Oct. 13, 1971), 3 C.F.R. § 616 (1971–75); 49 Fed. Reg. 42,698 (Oct. 24, 1984).

In place of this silence, Defendants endeavor to claim for Congress, what Congress did not—that a patchwork of broad racial disparities among *some* races in *limited* business contexts can somehow constitute a specific instance of intentional discrimination by the federal government so as to justify an unprecedented, racially exclusive agency and its provision of Programming for *numerous other* racial minorities across *endless* business contexts, nationwide. *Compare* ECF 20:25–28 *with e.g.*, *SFFA*, 143 S. Ct. at 2162; *Shaw*, 517 U.S. at 909; *Vitolo*, 999 F.3d at 361. However, as the Supreme Court has repeatedly explained:

> [A] racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature. To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification [] and the legislature must have had a strong basis in evidence to support that justification before it implements the classification.

*Shaw*, 517 U.S. at 908 n. 4. *See also, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations . . . ."); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 730 n. 16 (1982) ("The State has provided no evidence whatever that the Mississippi Legislature has ever attempted to justify its differing treatment of men and women seeking nurses' training. Indeed, [the legislature's purpose] relies upon the very sort of archaic and overbroad generalizations about women [insufficient to justify a classification.]"). Congress certainly knows how to include justifications for its actions when it wants to.[8] However, Defendants may *not* simply invent or assume any post hoc basis for legislative action, and certainly not one of this magnitude, in which Congress has, for the first time, purportedly authorized an entire federal agency to commit taxpayer dollars to exclusive, race-based Programming.

### 3. Defendants' disparity studies do not identify specific instances of intentional discrimination by the federal government to establish a compelling governmental interest.

Even assuming *arguendo* that Defendants' post hoc rationalizations were, in fact, Congress's basis for enacting the MBDA Statute's explicit racial preferences, Defendants'

---

[8] For example, Congress included findings purportedly justifying race-based preferences for the Department of Transportation's disadvantaged business enterprise program. *See* Infrastructure Act, § 11101(e)(1).

evidence consists only of broad observations of racial disparities in society, insufficient for establishing a compelling governmental interest in a race-based classification. For example, Defendants submit the Expert Report of Colette Holt, observing certain racial disparities in government contracting in certain areas of Texas and featuring "a compendium of results from [that firm's] work for several Texas agencies." *See* App. 68–69, 74.[9] Likewise, Defendants have produced over 100 documents, totaling over 22,000 pages regarding observations about racial disparities and argue that this establishes a compelling interest, just as they did at the preliminary injunction stage. *See* App. 50–51, 56 (Defs.' Interrogatory Responses #1–3 (citing ECF 20 and Response to Production Request #1)). *See also* App. 120–24.[10] But the fundamental problem with all of this remains: "statistical disparities don't cut it" when establishing a compelling governmental interest for a racial classification. ECF 27:10 (citing *Vitolo*, 999 F.3d at 361). That is because racial disparities in society are generalized assertions about race and do not identify any specific instances of intentional discrimination by the federal government in violation of the Constitution or a statute as required by governing case law. *Id. See also, e.g.*, *SFFA*, 143 S. Ct. at 2162; *Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 498.

At most, generalized racial disparities may point to societal discrimination. But the Supreme Court has made it abundantly clear that remedying the effects of societal discrimination is not a compelling interest for race-conscious government action. *E.g.*, *SFFA*, 143 S. Ct. at 2173–

---

[9] A copy of Defendants' expert report submission is attached to Plaintiffs' Motion for Summary Judgment as the Declaration of Cara Tolliver, Exhibit B.

[10] A copy of the Document Index for Defendants' Responses to Plaintiffs' First Set of Discovery Requests is attached to Plaintiffs' Motion for Summary Judgment as the Declaration of Cara Tolliver, Exhibit C.

74; *Shaw*, 517 U.S. at 909–10; *Wygant*, 476 U.S. at 276. Indeed, to define injury in a broad and obscure manner would be "to open the door" to "'a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs'" in defeat of the "'dream of a Nation of equal citizens'" and in contravention of the equal protection guarantee itself. *SFFA*, 143 S. Ct. at 2173–74 (quoting *Croson*, 488 U.S. at 505–06). In addition, this sort of statistical profiling only accomplishes the "fatal flaw" of "working backward to achieve a particular type of racial balance." *Parents Involved*, 551 U.S. at 729. *See also Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("outright racial balancing [] is patently unconstitutional").

Beyond the failure to establish specific instances of discrimination, Defendants' broad purported disparities also fail to point to intentional discrimination. As Plaintiffs previously noted, appropriate statistical evidence may be used to establish an inference of discrimination when the disparity falls at the feet of a single decision-maker. ECF 15:16. *See also Croson*, 488 U.S. at 503; *Vitolo*, 999 F.3d at 362. However, as this Court explained, "when it comes to general social disparities, there are simply too many variables to support inferences of intentional discrimination." ECF 27:10 (citing *Vitolo*, 999 F.3d at 362). For example, myriad factors—relating to business structure, size, number of employees, expertise, location, years in business, licensing, bonding, insurance, certifications, and local regulatory frameworks—can impact a business's ability to compete. That is, larger businesses having more employees, more experience, and more resources, can usually perform more work, cheaper, faster, and better than small, inexperienced businesses. Statistical studies that do not control for these variables—typically called "capacity" factors—do not prove discrimination. *See, e.g.*, *Eng'g Contractors*, 122 F.3d at 917, 922 (describing the importance of accounting for all non-discriminatory factors in proving intentional discrimination); *Michigan Road Builders v. Milliken*, 834 F.2d 583, 592 (6th Cir. 1987) ("Small

businesses, as a result of their size, were unable to effectively compete."); *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1042–43 (Fed. Cir. 2008) ("We are even more troubled, however by the failure of five of the studies to account sufficiently for potential differences in size, or *relative capacity*, of the businesses included in those studies.") (emphasis in original). Of course, beyond such factors are those relating to community relationships, group values or traditions, and voluntary choices, among other non-discriminatory factors or circumstances—any of which, alone or in varied combinations, may explain a "dearth of minority participation." *Croson*, 488 U.S. at 503; *Eng'g Contractors*, 122 F.3d at 922.

Yet, here, the government's answer to the impacts of voluntary choices, values, and traditions, among the "possibly dozens of factors [that] might influence the ability of any individual to succeed," is to dismiss them as "subjection descriptions" that are irrelevant and cannot be controlled for. *See* App. 74. In similar fashion, the government contends that "capacity factors"—such as a contracting firm's age, size, revenues, bonding limits, and expertise—should not be controlled, because they, themselves "are not race-neutral variables." App. 72. According to Defendants' expert, "controlling for those variables will mask the phenomenon of discrimination that is being studied." App. 72–73. Thus, to summarize that assertion, we must categorically assume that such "capacity factors" are always infected by discrimination when studying racial disparities, the existence of which, the government says, proves discrimination in public contracting. In other words, the government would have us assume discrimination to show discrimination—an obviously and deeply flawed notion. Nevertheless, *none of this matters* because Defendants' expert report *still does not identify specific incidents of intentional discrimination that violated the Constitution or a statute*; it speaks only to broad disparities in public contracting in specified areas of Texas—disparities that neither consider the "possibly

21

dozens" of *other* (non-capacity) factors, nor rely upon any one decision-maker or individual decision.

Further, Defendants' arguments are undermined by their own sources. While they claim that the MBDA's review of 100-plus disparity studies in government contracting demonstrates "disparities, which could not be explained by factors outside of discriminatory behaviors towards racial and ethnic minorities," ECF 20:27, that study actually states the following: "The disparity study review indicated that *both discriminatory and non-discriminatory actions* lead to contracting disparities for MBEs. *Additional research is needed . . . .*" U.S. Dep't of Commerce, Minority Business Development Agency, Contracting Barriers and Factors Affecting Minority Business Enterprises (Dec. 2016), at ix (emphasis added).[11] This review, like all of Defendants' studies, delivers only generalized and uncertain statements about racial disparities, proving only that "[t]here are numerous explanations for [a] dearth of minority participation." *Croson*, 488 U.S. at 503. A disproportionate attraction of a minority group to an industry does not mean that intentional discrimination explains the disparity. *See Eng'g Contractors*, 122 F.3d at 922. *See also McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir. 1998) ("Raw statistical disparities prove little; they certainly do not prove intentional discrimination."). Indeed, Defendants' expert report does not use the term "intentional discrimination" even once; and Defendants' so-called "compelling interest" report, surveying "more than 200 disparity reports and summaries," employs the term

---

[11] Identified in Exhibit C to the Declaration of Cara Tolliver as document no. MBDA0000373–480 (and duplicated again as document no. MBDA0006412–6519), available at: https://www.mbda.gov/sites/default/files/migrated/files-attachments/ContractingBarriers_AReviewofExistingDisparityStudies.pdf.

"intentional discrimination" a single time—and only to summarize the Sixth Circuit's decision in *Vitolo*. *See* ECF 20:27 (discussing Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022)).[12]

In addition, Defendants' disparity studies do not point to active or passive government participation in discrimination—the third requirement for remediating past discrimination. *See* ECF 27:10 (noting that "to be a passive participant, [the government] must be a participant."). *See also Builders Ass'n*, 256 F.3d at 645 (requiring that the government "knowingly perpetuated the discrimination") and ECF 15:16–17, 19–20. In fact, Defendants' expert specifically asserts that "private discrimination,"—*not* particular actors within the federal government—is to blame for "discriminatory barriers" in government contracting. *See* App. 73–74. Even, this claim of "private discrimination" (which would not suffice in any event) is not supported by any further specificity or detail.

Likewise, what Defendants classify as "anecdotal evidence" provides no evidence of intentional governmental discrimination. Consisting of a mishmash of anonymous statements from participant interviews or surveys, these anecdotes pertain largely to unspecified private conduct in government contracting in certain areas of Texas and frequently reflect broad assertions and opinions about race with no further context or correlation whatsoever. *See* App. 85–102 ("I believe Black businesses are stereotyped as less than equipped for major projects."); ("[I have experienced] every systematic racial barrier that all minorities endure.") (brackets in original); ("Based on the racial climate in our country I am sure I have been judged and excluded from

---

[12] Identified in Exhibit C to the Declaration of Cara Tolliver as documents no. MBDA000023 and MBDA000024–82, report available at: https://www.justice.gov/crt/page/file/1463921/download.

opportunities because of my sex and race."); ("Stereotyping is a norm for Hispanic women . . . .");

("[We have had difficulty in obtaining] fair and equal bonding, I believe because I am a Hispanic

female.") (brackets in original). Beyond their generic nature, this "anecdotal evidence" raises more

questions than it answers. For instance, it is wholly unclear as to who the participants are and how

they were selected in relation to the rest of the disparity study, what inquiries are being asked of

the participants, and what processes, if any, were used to verify participant responses.

In short, a gestalt view about race, comprised of broad observations and generalizations of

disparities in society, does not identify specific instances of intentional discrimination by the

federal government in violation of the Constitution or a statute as required to support a compelling

governmental interest for race-based action. *E.g.*, *SFFA*, 143 S. Ct. at 2162; *Shaw*, 517 U.S. at

909; *Croson*, 488 U.S. at 498; *Parents Involved*, 551 U.S. at 720; *Vitolo*, 999 F.3d at 361.

Defendants have no evidence relevant to establishing a compelling interest under the three-part

test evinced by *SFFA*, *Vitolo*, and similar cases. They present only generalized studies and

observations of racial disparities in society that do not justify the MBDA Statute's preferences for

people based on race. Accordingly, the MBDA Statute is unjustified, unconstitutional, and invalid.

### 4.    Defendants' evidence further fails to address the MBDA Statute's benefitted racial groups and nationwide scope.

Even if Defendants' disparity studies had detailed specific instances of intentional

discrimination by the government, (and even if Congress had evinced such observations as its basis

for the MBDA Statute's race-based Programming), these findings still would not justify the

Program in its current form because they do not address the actual scope of the MBDA Statute.

The MBDA Statute purports to authorize a wide range of business assistance through a racial

preference for certain, preferred minority business owners in unlimited industries nationwide. *See*

24

15 U.S.C. §§ 9522, 9524(a), 9552(c), 9511(1) and 9512(1). Between the MBDA Statute and its implementing regulations, some dozen-plus racial and ethnic minorities are selected for preferential treatment. 15 U.S.C. § 9501(15)(B); 15 C.F.R. §§ 1400.1(b)–(c).

Yet, as this Court recognized previously, Defendants have not provided evidence of discrimination faced by each preferred race and ethnicity to justify their presumption of disadvantage. ECF 27:9–10. "And for those it does [address], the Government relies on studies showing broad statistical disparities with business loans, supply chain networks, and contracting among some minorities." *Id*. That is, not only do "[t]hese studies [fail to] involve all of Defendants' preferred minorities," but in addition, there is no evidence that the particular types of businesses served involve a history of intentional government discrimination against these particular groups either. *See id. See also Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638, 650 (N.D. Tex. 2021) ("industry-specific inquiry needed to support a compelling interest for a government-imposed racial classification."). However, despite this fatal lack of basis, the MBDA is chartered to provide a wide array of Program benefits to a dozen-plus designated racial minorities across unlimited industries. *See* 15 U.S.C. §§ 9511(1), 9512(1), 9524(a), 9552(c).

In contrast to the required context-specific inquiry, Defendants rely on studies, reviews, and observations of broad racial disparities, focused primarily on government contracting. *See* App. 120–24 (referencing dozens of disparity studies from the government contracting context). Indeed, Defendants' expert report remains limited to government contracting in certain areas of Texas. *See* App. 68–69, 74. Thus, businesses outside of the "government contracting" context are simply not addressed—nor are *any* businesses outside of limited localities of Texas, in the case of Defendants' expert report. But countless business entities, including minority-owned businesses that are the beneficiaries of broad MBDA Programming, do not aspire to contract with the federal

government or any government—to name a few, a local bakery, a pet store, a hair salon, or a small medical clinic (like Plaintiff Nuziard's).

Likewise, as this Court explained, testimony on racial disparities, focusing on black wealth accumulation and considering "redlining," "the G.I. Bill," and "Jim Crow" laws, is of no help in identifying specific instances of discrimination because wealth accumulation for black Americans is not the objective of the MBDA Statute. *See* ECF 27:9 (discussing ECF 20:28). Rather, *business owners* of certain minority groups (including, but certainly not limited to, Black Americans) are the focus of the MBDA Statute. *Id.* In addition, Defendants' relied upon testimony on this point further occurs *not* in the context of the MBDA Statute, but rather in the context of a House Committee hearing on legislative considerations relating to the Equal Credit Opportunity Act, including a 2021 bill for fair lending (H.R. 166).[13]

Further, any reliance on various decades-old sources or rationale for supporting a compelling interest *today* is similarly misplaced. *See* App. 56 (Defs.' Response to Production Request #1) (suggesting that federally sanctioned redlining in the 1960s and 70s supports a compelling interest for the 2021 MBDA Statute).[14] *See also* ECF 20:25 (arguing that a 1975 congressional report purportedly finding discrimination supports today's sweeping race-based remedy under the MBDA Statute). Past governmental interests, even if once compelling, do not equate to compelling interests today. *Dean*, 438 F.3d at 456–57 (race-based remedy from 1980s

---

[13] Identified in Exhibit C to the Declaration of Cara Tolliver as document no. MBDA0003213–3435, available at: https://www.govinfo.gov/content/pkg/CHRG-117hhrg43992/html/CHRG-117hhrg43992.htm (opening statements of Chairman Al Green regarding H.R. 166).

[14] Identified in Exhibit C to the Declaration of Cara Tolliver as document no. MBDA0022170–22174, available at: https://www.federalreservehistory.org/essays/redlining.

does not automatically justify the same remedy in 2000 without a new inquiry). Thus, even if there could have been compelling governmental interests supporting those racial and ethnic classifications listed under 15 C.F.R. pt. 1400 at the time they were designated between 1971 and 1984, *see supra* p. 17, the government may not incorporate these groups into today's MBDA Statute without a sufficient constitutional justification relevant to *this* decade.

Simply put, Defendants may not take patchwork findings and conclusions, spanning across decades and addressing only a few racial minorities in limited business contexts, and intuit or otherwise extrapolate such data to today's MBDA Statute, which covers *limitless* business contexts and *numerous*, *additional* racial and ethnic groups. *See* ECF 15:20. Even if Defendants' broad and generalized disparity studies were not incapable of establishing a compelling interest, *see supra* Section IV.A.3, these additional deficiencies with Defendants' studies reveal that such findings do not address the actual scope of the MBDA Statute, rendering the alleged governmental interest in racial classifications under the MBDA Statute a far cry from "compelling."

\* \* \*

In sum, the MBDA Statute creates and entirely dedicates the MBDA to providing Programming on the basis of race. However, the government may establish a compelling interest in remedying race discrimination only when it responds to specifically identified instances of intentional discrimination by the federal government in violation of the Constitution or a statute. *E.g.*, *SFFA*, 143 S. Ct. at 2162; *Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 498; *Parents Involved*, 551 U.S. at 720; *Vitolo*, 999 F.3d at 361. Here, there is no compelling governmental interest for the MBDA Statute's racial classifications: Congress did not, in any way, provide one; and Defendants cannot simply assemble or assume one from out of the ether. *E.g.*, *Shaw*, 517 U.S. at 908 n. 4.; *Virginia*, 518 U.S. at 533; *Mississippi Univ.*, 458 U.S. at 730 n. 16.

Nevertheless, even when considering Defendants' evidence, there is no showing of a compelling interest for the MBDA Statute's racial classifications. In place of specifically identified instances of intentional governmental discrimination, Defendants rely only on generalized studies and observations of racial disparities in society. But just as societal discrimination is not a compelling governmental interest for a race-based classification, "statistical disparities don't cut it" "when it comes to general social disparities." *E.g.*, ECF 27:9–10 (quoting *Vitolo*, 999 F.3d at 361–62 and citing *Shaw*, 517 U.S. at 909–10). Not only do Defendants' broad observations reflect "simply too many variables to support inferences of intentional discrimination," but in addition, these disparities neither identify participation by the federal government, nor control for a multitude of non-discriminatory factors. *Id.*

Moreover, Defendants' present patchwork evidence that fails to address the actual scope of the MBDA Statute. Instead of conducting a context-specific inquiry for each business type serviced and those MBDA Program benefits provided for each of the dozen-plus designated racial and ethnic minorities, Defendants fall astonishingly short, addressing only a few racial minorities and limiting their purview primarily to the government contracting context only. Apparently Defendants hope to justify the MBDA's vast statutory charter by extrapolating broad disparities across time as to a few racial minorities, and as to a single industry, to all of the MBDA Statute's designated racial groups and across unlimited business contexts—a notion that is surely light years away from "the most exact connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003).

Because Defendants' disparity studies and other broad observations of racial disparities are not responsive to, and do not satisfy, the compelling interest inquiry required to justify the government's racial classifications, the MBDA Statute—which creates, names, and entirely

dedicates, the MBDA to providing Programming on the basis of race—is unjustified, unconstitutional, and invalid. Accordingly, summary judgment for Plaintiffs on their Equal Protection claim should be awarded.

> **B.     The racial and ethnic eligibility requirements imposed by the MBDA Statute abjectly fail narrow tailoring.**

As this Court previously determined, "[e]ven if the Government had shown a compelling state interest in remedying some specific episode of discrimination, the Program is not narrowly tailored to further that interest." ECF 27:11. Indeed, for all the reasons explained in Plaintiffs' preliminary briefing,[15] and for all the reasons that follow, the Program's racial and ethnic classifications are *not tailored at all,* and the MBDA Statute, accordingly fails strict scrutiny on this additional, independent basis.

First, while race-based government action must only ever be used as a necessary "last resort," "the Government has not shown that "less sweeping alternatives—particularly race neutral-ones—have been considered and tried" as required for narrow tailoring. ECF 27:11 (quoting *Walker v. City of Mesquite*, 169 F.3d 973, 983 (5th Cir. 1999)). Nor are the enumerated racial and ethnic classifications themselves "framed to address the exact effects and harms of the discrimination at issue." *Walker*, 169 F.3d at 982. Instead, the MBDA Statute takes a "scattershot approach," ECF 27:12, employing numerous racial classifications that are "imprecise," "arbitrary," "undefined," "overbroad," and "underinclusive." *SFFA*, 143 S. Ct. at 2167–68.

---

[15] In their preliminary briefs, Plaintiffs also address five discrete narrow tailoring factors for race-based remedies. *See* ECF 15:21–27; 24:10.

Taking just one example from the dozen-plus racial and ethnic classifications designated by the MBDA Statute, the government's interpretation of who qualifies as "Asian" is uncertain. *See* 15 U.S.C. § 9501(15)(B)(iv). And indeed, Defendants have no answer to this question. *See* App. 54 (Defs.' Interrogatory Response #8) ("Defendants object to [Plaintiffs' request to describe how Defendants discern who is 'Asian'] because it is argumentative and requires the adoption of an assumption that is improper."). *See also* App. 41–42 (Defs.' Responses to Request for Admission #5–6) (acknowledging that heritage from Asian countries is a "vague, ambiguous, and undefined" concept). However, if taken at face value, the "Asian" classification could extend to some indeterminate number of business owners who trace their ancestry to a continent encompassing approximately 50 countries over an area of more than 17 million square miles that is home to 60% of the world's population at greater than 4.7 billion people.[16] If this classification for "Asians" is not "imprecise," "arbitrary," and "undefined," nothing is.

As this Court further explained, "[t]he Program is also overinclusive" because "it helps individuals who may have never been discriminated against." ECF 27:12. *See also* ECF 15:23 ("[I]n spite of their tendered justification to address racial and ethnic discrimination, Defendants make no effort to tailor MBDA [P]rogramming requirements to the victims of actual discrimination."); *Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.*, 19 F.3d 992, 995 (5th Cir. 1994) (race-based promotions that did not consider whether the individual was a victim of past discrimination failed narrow tailoring). Likewise, the Court denounced the Program as underinclusive—both because it excludes non-designated racial and ethnic groups without

---

[16] *See* https://worldpopulationreview.com/continents/asia-population; https://www.cia.gov/the-world-factbook/countries/world/; https://education.nationalgeographic.org/resource/asia/ (Oct. 21, 2023).

justification, and "because it excludes every minority business owner who owns less than 51% of their business." ECF 27:11–12 ("[T]he Program is not narrowly tailored because it is underinclusive[,]" "arbitrarily exclud[ing]" "those who trace their ancestry to Afghanistan, Iran, Iraq, and Libya. But it includes those from China, Japan, Pakistan, and India."). *See also* ECF 15:24.

In similar form, while "Hasidic Jews" are considered "socially or economically disadvantaged individuals" for purposes of the MBDA Statute, they were *not* eligible for a presumption of "social and economic disadvantage" for purposes of the Small Business Administration ("SBA") Section 8(a) business development program ("SBA program").[17] *Compare* 15 C.F.R. § 1400.1(c) *with* 15 U.S.C. §§ 636(j)(10), 637(a); 13 C.F.R. §§ 124.101, 124.103, 124.104(a). Yet, like the MBDA's Program, the SBA program provides "training" and "various forms of management, technical, financial, and procurement assistance" to small business owners who are "socially and economically disadvantaged individuals." *See supra* n. 7 (U.S. Small Business Admin. website). And like the MBDA Statute, the SBA regulations imposed a nearly identical presumption for individuals belonging to a similar laundry-list of racial and ethnic groups. *Compare* 15 U.S.C. § 9501(15) *with* 13 C.F.R. §§ 124.101, 124.103, 124.104(a). Yet despite the obvious similarities between the MBDA Program and SBA program, Defendants offer no explanation for the over-inclusivity revealed by the government's selection of "Hasidic Jews"

---

[17] Although the court for the Eastern District of Tennessee recently determined that the SBA presumption failed strict scrutiny and enjoined the agency from applying this race-based remedy, for purposes of argument here, the SBA presumption remains a useful point of comparison against the MBDA Statute. *See Ultima*, No. 220CV00041DCLCCRW, WL 4633481. *See also supra* n. 7.

for presumed disadvantage in the MBDA context, while the same presumption was withheld in the SBA context. *See* App. 50–51, 54, 56 (Defs.' Interrogatory Responses #1–3, 7 (citing ECF 20 and Response to Production Request #1)). *See also Ultima*, No. 220CV00041DCLCCRW, Dkt. 64-9, SBA decision (determining that Hasidic Jews are ineligible for the SBA presumption of disadvantage).[18] Likewise, Defendants still offer no basis for the MBDA Statute's under-inclusion of various, other non-Hasidic Jewish minorities. *See* App. 54 (Defs.' Interrogatory Response #7). *See also* ECF 15:24. Of course, these examples—highlighting the MBDA Statute's "imprecise," "arbitrary," "undefined," "overbroad," and "underinclusive" racial classifications—are few of many, demonstrating the infirmity of the MBDA Statute under narrow tailoring.

But the infirmity does not end here: the MBDA Statute also defies the narrow tailoring requirement that "[a]t some point, [race-conscious programs] must end." *SFFA*, 143 S. Ct. at 2165 (citing *Grutter*, 539 U.S. at 342). *See also Walker*, 169 F.3d at 982 (narrow tailoring requires evaluation of the flexibility and duration of relief). In *SFFA*, the Supreme Court particularly recognized that "this requirement [is] crucial," as reflected by its repeated demand in the case law: Race-conscious programs must "'have a termination point'; they 'must have reasonable durational limits'; they 'must be limited in time'; they must have 'sunset provisions'; they 'must have a logical end point'; and their 'deviation from the norm of equal treatment' must be 'a temporary matter.'" *E.g.*, *SFFA*, 143 S. Ct. at 2165 (quoting *Grutter*, 539 U.S. at 342). *See also Dean*, 438 F.3d at 460 (the longer the life-span of the remedy, the less likely it is narrowly tailored). Here,

---

[18] Identified in Exhibit C to the Declaration of Cara Tolliver as document no. MBDA0022433–MBDA0022458.

the MBDA Statute sets forth a race-based bar with no timeframe for sunsetting or reevaluating the racial and ethnic groups subject to the presumption.

Nor do Defendants provide any indication that the MBDA and its Programming will terminate or otherwise discontinue upon the achievement of some specified and legitimate goal. *See Walker*, 169 F.3d at 982 (evaluating the relationship of a race-based remedy's numerical goals to the relevant markets under narrow tailoring). Even if a race-based remedy could legitimately set some sort of numerical goal (without transgressing constitutional prohibitions against racial balancing and racial quotas, *e.g.*, *Grutter*, 539 U.S. at 330, 334), "[t]he long-term numerical goal of a race-conscious remedy must be closely tied to the relevant labor market. To weigh this factor, common sense demands we first know the remedy's numerical goal and the relevant labor market. [However, as] discussed above, we know neither"—nothing about goals and nothing about each of the relevant business industries. *Dean*, 438 F.3d at 462.

Moreover, although the MBDA Statute gave the MBDA legislative imprimatur, the federal government has been steadily expanding its prioritization of minority businesses owned by certain racial groups through executive action since at least 1969. *See supra* p. 2 and n. 1. At 54 years and running, narrow tailoring dictates that the government should be attempting to scale back at this point. But instead, the MBDA Statute expands government-sponsored discrimination through a fully integrated nationwide network of "widely publicize[d]" offices. *See* 15 U.S.C. §§ 9502(d)–(e), 9511, 9512, 9523(b), 9526, 9552(b)(1). Certainly, a racially exclusive agency that has existed and expanded in scope for more than a half century, is the antithesis of race-conscious action that is, in any way, "a temporary matter," having "a termination point," a "reasonable durational limit," and "a logical end point." *E.g.*, *SFFA*, 143 S. Ct. at 2165. Far from any ending, the MBDA Statute

serves to "[e]nshrin[e] a permanent justification for racial preferences [in contravention of the] fundamental equal protection principle." *Grutter*, 539 U.S. at 342.

As a final point, the MBDA Statute further runs afoul of the narrow tailoring requirement that "all race-based governmental action" must "work the least harm possible to other innocent persons competing for the benefit." *SFFA*, 143 S. Ct. at 2165 (quoting *Grutter*, 539 U.S. at 341). *See also Walker*, 169 F.3d at 982 (narrow tailoring requires evaluating the impacts of the relief to third parties). While "it is not even theoretically possible to 'help' a certain racial group without causing harm to members of other racial groups," *SFFA*, 143 S. Ct. at 2199 (Thomas, J., concurring), it should be obvious that "remedies . . . permanently denying a benefit [to third parties]" impose significant burdens. *Dean*, 438 F.3d at 462. Yet, here, the MBDA Statute, *by design*, imposes an outright racial barrier for Program eligibility. A presumption of eligibility extends only to business owners of "minority business enterprises" who are members of certain, designated racial and ethnic minorities—meaning Programming is contingent on race and race alone. 15 U.S.C. §§ 9501(9), (15); 15 C.F.R. § 1400.1. Because members of other groups are not accorded this presumption of disadvantage, they remain in a *permanently* disfavored status, and even face permanent disqualification. Such widespread harm does not reflect narrow tailoring.

The MBDA Statute's racial remedy outright fails both prongs of strict scrutiny. These failures mean that the MBDA Statute does not enact legitimate uses of race, but is instead the product of "illegitimate notions of racial inferiority," "illegitimate racial prejudice or stereotype," and even "racial politics." *Croson*, 488 U.S. at 493 (plurality opinion) (strict scrutiny is designed to "'smoke out' illegitimate uses of race"). Accordingly, the MBDA Statute is unjustified, unconstitutional and invalid; and summary judgment for Plaintiffs on their Equal Protection claim should be awarded.

**C.     The MBDA Statute employs race as a "negative" and furthers illegitimate stereotyping in violation of the Fifth Amendment.**

As if all that were not enough, the MBDA Statute is unconstitutional for yet another independently sufficient reason: the MBDA Statute employs race as a "negative" and furthers illegitimate stereotyping in violation of the equal protection guarantee. *See SFFA*, 143 S. Ct. at 2168.

As the *SFFA* Court explained, the government impermissibly employs race in a negative manner when it uses an individual's race "against him." *Id.* A policy that considers race to result in fewer members of certain racial groups receiving a benefit is the quintessence of this prohibition. *See id.* at 2168–69 ("How else but "negative" can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?"). Further, a program that operates on the basis that members of certain racial or ethnic minorities "always (or even consistently)" express some fixed minority image rest on, and only further, pernicious stereotyping, thus "demean[ing] the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 2169–70.

The Supreme Court has *never* sanctioned governmental authority to draw and impose racial and ethnic distinctions in this manner. Where race is determinative, equal protection falters. *See Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ("Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."). And "time and again, [the Court has] forcefully rejected the notion that government actors may intentionally allocate preference to those "'who may have little in common with one another but the color of their skin.'" *SFFA*, 143 S. Ct. at 2170 (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). *See also, e.g.*, *Miller*, 515 U.S. at 911–12; *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984); *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Instead,

the role that race may play in government decision-making has been firmly and repeatedly cabined to conform to the equal protection guarantee.

Indeed, the cardinal rules against stereotyping and employing race as a "negative" form "the twin commands of the Equal Protection [Guarantee]" and are the very basis for the constitutional prohibitions against the use of racial quotas, "reserving a specified number of seats" for individuals of preferred racial groups; multitrack programs, having "a prescribed number of seats set aside for each identifiable category of applicants"; and absolute race-based bars that "foreclose an individual from all consideration . . . simply because he was not the right color." *See SFFA*, 143 S. Ct. at 2168, 2163–65 (quoting *Bakke*, 438 U.S. at 315, 318 and *Grutter*, 539 U.S. at 334, 329–330) (internal quotation marks omitted). And these several constraints on race-conscious governmental action exist for good reason: the "central purpose" of the equal protection guarantee is to prevent and eliminate government imposed race discrimination, not create more of it. *See, e.g.*, *Adarand*, 515 U.S. at 216; *Thomasville Branch of Nat. Ass'n for Advancement of Colored People v. Thomas Cnty., Ga.*, 571 F.2d 257, 260 (5th Cir. 1978) (citing *Bolling*, 347 U.S. at 499). Yet far from the aims of equal protection, racial quotas and multitrack programs institute preferences for certain races over others by removing proportions of available opportunities from which individuals can all "compete on an equal footing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, Fla., 508 U.S. 656, 666 (1993). In so doing, such racial quota and multitrack systems erect that detestable and long-forsaken notion of "separate but equal," reverting this country right back to the dark ages of the *Plessy* regime. *See SFFA*, 143 S. Ct. at 2159–61.

Even worse yet, is the government's use of race to "insulate applicants who belong to certain racial or ethnic groups from the competition" resulting in an absolute barrier that blocks

candidacy *entirely* based on nothing more than race. But that is exactly what the MBDA Statute sets out to do. Pursuant to the statute's presumption, certain, designated racial and ethnic groups are always and forever accorded an offensive and demeaning status of "disadvantaged," while other groups are excluded on the basis of race and told to make an "adequate showing" to prove themselves worthy of help. 15 U.S.C §§ 9501(9), (15); 15 C.F.R. §§ 1400.1–.6. Thus, the MBDA Statute employs race as a "negative" to exclude individuals of disfavored races and engages in a host of pernicious stereotyping against favored and disfavored groups alike. In essence, the MBDA Statute asserts that business owners who are of an included race are automatically eligible for help simply because they "always (or even consistently)" require it for success, as opposed to, and at the expense of, all other races, who "always (or even consistently)" do not require such assistance for success. *See SFFA*, 143 S. Ct. at 2169–70.

In addition, the government turns away business owners of disfavored races before they can even get a foot through the door, given Defendants' implementation of the term "minority" to define Program eligibility on the basis of race, and the designation of the agency as the "Minority Business Development Agency," which is based in the MBDA Statute's implementation of specified preferences for certain, "minority business enterprises" owing to racial classifications. *See infra* Section VI. The result is the creation of a *100% racial quota* in which favored races are ushered in for MBDA Programming, while disfavored races must toil against additional burdens or seek assistance from some separate track of *other* programs.

However, "the Government must treat citizens as individuals, not as simply components of a racial [] or national class." *SFFA*, 143 S. Ct. at 2172 (quoting *Miller*, 515 U.S. at 911) (internal quotation marks omitted). The Constitution simply does not permit this sort of "indiscriminate

37

imposition[ing] of inequalities," and truly, "[s]uch stereotyping can only cause continued hurt and injury." *SFFA*, 143 S. Ct. at 2169–70 (citations and internal quotation marks and brackets omitted).

It does not matter how many disparity studies Defendants attempt to pile on in support of the MBDA Statute. The fact of the matter is that the MBDA Statute operates upon an "offensive and demeaning assumption" that "foreclose[s] an individual from all consideration . . . simply because he was not the right color." *See id.* at 2164, 2170 (citations omitted). And there is simply *no amount or type of evidence* that rights the wrongs committed by the fundamental operation of the MBDA Statute to employ race in a negative manner in furtherance of pernicious stereotypes and in violation of the "twin commands of the Equal Protection Clause." *Id.* at 2168. Such a scheme is the ultimate form of *de jure* racial discrimination by the federal government, and it has *no plac*e under our Constitution. *See id.* at 2196 (Thomas, J., concurring) ("'What was wrong' when the Court decided *Brown* 'in 1954 cannot be right today.'") (citation omitted).

**V.   Plaintiffs are entitled to Summary Judgment on their Administrative Procedure Act claim because the MBDA implementing regulations violate the Fifth Amendment.**

The MBDA implementing regulations at 15 C.F.R. pt. 1400 also violate the Administrative Procedure Act ("APA"). As explained in the preceding sections, these regulations are specifically incorporated by the MBDA Statute and designate other, (potentially overlapping) racial and ethnic classifications as criteria for Program eligibility, in addition to, a separate process of approval in which "groups not previously designated as eligible" must make an "adequate showing" to prove their disadvantage, in direct contravention of the Fifth Amendment's equal protection guarantee. *See* 15 U.S.C. § 9501(15)(B)(vi); 15 C.F.R. §§ 1400.1–.6. *See also supra* Part IV.

The APA requires courts to "hold unlawful and set aside" final "agency action," including "the whole or part of an agency rule," "found to be contrary to constitutional right, power, [or]

privilege." 5 U.S.C. §§ 706(2)(B), 704, 551(13). *See also* ECF 15:27–28. Defendants concede that this Court's determination of a constitutional violation would result in a finding that Defendants violated the APA. *See* ECF 20:15, n.16. Thus, if this Court again concludes that the MBDA Statute fails strict scrutiny and/or otherwise impermissibly uses race as a stereotype or negative, it should, accordingly, "hold unlawful and set aside" the MBDA implementing regulations as unconstitutional. 5 U.S.C. § 706(2)(B). *See infra* Section VI.C.

## VI.    The MBDA Statute is unconstitutional on its face, and the APA and principles of equitable relief empower this Court to award Plaintiffs complete relief.

The MBDA Statute's racial eligibility requirements for "minority business enterprises" are implemented through the agency's designation as the "Minority Business Development Agency," 15 U.S.C. §§ 9501(1), 9502(a), and permeate the entirety of available Programming under the statute without constitutional justification. Thus, the term "minority," as used in the designation of the agency as the "Minority Business Development Agency," is based in the MBDA Statute's definitions and structure and directly implements the statute's preference for the designated racial minority groups. *See generally* MBDA Statute (employing the term "minority" countless times).

In turn, Defendants have, for years, taken these statutory cues to focus the MBDA entirely on the designated racial minorities according to the MBDA Statute's command for a fully integrated nationwide network of offices in which Programming is "widely publicize[d]." *See* 15 U.S.C. §§ 9502(d)–(e), 9511, 9512, 9523(b), 9526, 9552(b)(1). *See also* App. 53–54 (Defs.' Interrogatory Responses #6) (Defendants disseminate Programming information using a variety of methods from targeted efforts to broadcasting through various social media).

In satisfaction of the "publicity" requirement, MBDA offices providing services nationwide from Texas to Wisconsin to Florida and beyond undeniably advertise that the MBDA

will not provide Programming to business owners falling outside the government's preferred racial minorities. *E.g.*, App. 4: ¶¶ 20–24; App. 6: ¶ 28; App. 15: ¶¶ 24–33; App. 24: ¶¶ 27–38; App. 30: ¶¶ 53–61. Indeed, as confirmed by MBDA's numerous websites across America, Defendants explain that only certain racial groups constitute "minority owned businesses" that MBDA serves. *See, e.g.*, *supra* n. 3; App. 5: ¶ 21; App. 15: ¶ 24. Defendants have not "widely publicize[d]" or marketed Program eligibility for others who do not belong to the designated racial groups.

Only now—at two years post-enactment of the MBDA Statute, following this lawsuit challenging the statute's racial classifications, and days before dispositive motions are due—have Defendants come forward with a "guidance" memo issued by Defendant Cravins, informing MBDA offices that: "An individual does not [necessarily] need to identify as a member of [a minority group under the MBDA Statute] to be a socially or economically disadvantaged individual eligible to receive [Programming]." *See* App. 130.[19] In other words, after years of disregarding and rejecting business owners who do not meet the MBDA Statute's preferred racial classifications, Defendants are now saying that individuals who do not meet the racial presumption for "a socially or economically disadvantaged individual" may otherwise meet this definition and qualify as a "minority business enterprise" eligible for Programming, *if* they *prove* their disadvantage. *See* App. 129–30. *See also* ECF 1: ¶ 31, 54.

But Defendants' guidance solves nothing. Indeed, it only proves Plaintiffs' point that the MBDA Statute is rooted in inequality, requiring not only a separate and inherently unequal process

---

[19] A copy of Defendants' Supplemental Disclosures, dated Oct. 24, 2023, including Defendant Cravins' guidance memorandum to MBDA Business Centers, dated Oct. 23, 2023, is attached to Plaintiffs' Motion for Summary Judgment as the Declaration of Cara Tolliver, Exhibit D.

on the basis of race, but also a process that imposes additional burdens of "proof" on the basis of race. "Separate cannot be equal." *E.g.*, *SFFA*, 143 S. Ct. at 2160 (citations omitted).

Because of their race, Plaintiffs have encountered barriers to equal treatment at MBDA offices throughout the nation. There is *no* MBDA office from which Plaintiffs can seek Programming that is not infected by this inequality because the MBDA Statute mandates a national policy of intentional race discrimination.

And, even upon implementation of the Court's order, in which Defendants might open the Programming to Plaintiffs without regard to their race, as previously explained, the MBDA Statute designates the agency as the "Minority Business Development Agency" in implementation of the MBDA Statute's unconstitutional racial classifications. In so naming the agency and listing the eligible racial minorities, the federal government has effectively hung a sign for the MBDA: *Whites and other disfavored races, not welcomed*—thus imposing a "badge of servitude" upon them. *See SFFA*, 143 S. Ct. at 2184–85 (Thomas, J., concurring) (citation omitted). *See also, e.g.*, App. 10: ¶ 47; App. 32: ¶ 61 ("The name of the MBDA means what it says: the agency is for racial "minorities" that the agency prefers and serves."). As a result, Defendants' continued efforts to "widely publicize" the MBDA and its Programming eligibility for particularly preferred racial minorities, likewise continues to reflect the federal government's commitment to race-based preferences that exclude Plaintiffs. These actions only further the very constitutional injuries at play here—a rejection made solely on the basis of race that denies Plaintiffs equal treatment and harms their dignity as human beings. *See, e.g.*, App. 6: ¶¶ 27–30; App. 10: ¶¶ 46–51; App. 27: ¶¶ 39–42; App. 29: ¶¶ 51–52; App. 31: ¶¶ 58–63.

A.      **If this Court again determines that the MBDA Statute is unconstitutional, there is nothing left to do but to declare it so.**

The MBDA Statute directs the MBDA to provide Programming entirely on the basis of race without justification, further employing race as a "negative" to exclude individuals of disfavored races and engaging in a host of pernicious stereotyping against favored and disfavored groups alike. *See supra* Part IV. The MBDA Statute is unconstitutional and unlawful on its face; and Plaintiffs have, accordingly, asked this Court to declare the MBDA Statute unconstitutional in violation of the Fifth Amendment's equal protection guarantee and 5 U.S.C. § 706(2)(B). *See Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765, 776 (5th Cir. 1978) (it is "the power and the duty of federal courts to declare federal statutes unconstitutional") (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

B.      **A permanent injunction enjoining enforcement of the MBDA Statute is warranted.**

Plaintiffs have asked this Court to issue injunctive relief. A "court may grant a permanent injunction without a trial on the merits if there are no material issues of fact and the issues of law have been correctly resolved." *Calmes v. United States*, 926 F. Supp. 582, 591 (N.D. Tex. 1996) (citing, *e.g.*, *Standard Oil Co. v. Lopeno Gas Co.*, 240 F.2d 504, 509–10 (5th Cir.1957)). "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004). Thus, a permanent injunction is proper where a plaintiff shows: (1) success on the merits; (2) irreparable injury; (3) balancing of harm outweighing that of the opposing party; and (4) no disserve to the public interest. *See Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021).

"In shaping equity decrees, the trial court is vested with broad discretionary power." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (citation omitted). *See also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[A district court's] power is not limited to the district wherein the court sits but extends across the country."). As the Supreme Court has explained, "equitable remedies are a special blend of what is necessary, what is fair, and what is workable [and] courts eschew rigid absolutes." *Lemon*, 411 U.S. at 200–01.

Further, this case goes beyond "a suit in equity for an injunction to protect interests jeopardized in a private controversy. The public interest is jeopardized here." *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962). That is because "[t]he Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, *it demeans us all*." *SFFA*, 143 S. Ct. at 2193 (Thomas, J., concurring) (citation omitted) (emphasis added). "When confronted by a situation such as this courts should not be loathe to issue injunctions of general applicability." *Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty., Fla.*, 455 F.2d 818, 826 (5th Cir. 1972). Indeed, "[t]he injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out—actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium." *Id.* (quoting *Mitchell*, 299 F.2d at 287). In such a public interest case, as in others, "the scope of the injunction must be justified based on the 'circumstances,'" and "is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Louisiana v. Becerra*, 20 F.4th 260, 263–64 (5th Cir. 2021) (nationwide injunction justified by a constitutional command for uniformity or

where "a geographically-limited injunction would be ineffective"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (an injunction must "provide complete relief to the plaintiffs").

Broad injunctive relief is appropriate in this case. First, while *Plaintiffs* have sustained injuries flowing from the government's denial of equal treatment, "[a court] cannot easily address that issue without assuming a premise—the permissibility of [the MBDA Statute's imposed racial classifications]—that is itself in doubt." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). To be sure, Plaintiffs' case is premised entirely upon the broader unconstitutionality of the MBDA Statute, and the extent of the statute's invalidity has been established *in toto*: The MBDA Statute discriminates entirely on the basis of race—down to the very naming of the agency and Defendants' advertising of Program eligibility—whether an individual is a member of a favored or disfavored racial or ethnic group. Thus, this Court may properly enjoin Defendants' implementation of the MBDA Statute because under the "circumstances," that remedy is "necessary to resolve a claim" in service of "provid[ing] complete relief" to Plaintiffs. *Id.*; *Califano*, 442 U.S. at 702; *Louisiana*, 20 F.4th at 263. *See also Ultima*, No. 220CV00041DCLCCRW, WL 4633481 (broadly enjoining the government's use of the rebuttable presumption of social disadvantage in administering the SBA program).

Moreover, absent broader relief, Plaintiffs remain harmed. Indeed, Defendants are unable to fully implement the Court's preliminary order, preventing Defendants from "imposing the racial and ethnic classifications" against Plaintiffs. ECF 27:14. To the contrary, Defendants have remained obedient to their statutorily-required duties to implement the MBDA Statute's race-based eligibility requirements, including "widely publiciz[ing]" Program eligibility for preferred minorities. As explained previously, the MBDA Statute commits the MBDA to race-based Programming for certain minorities: the very designation of the agency as the "Minority Business

Development Agency" along with Defendants' explanations as to which racial minorities the agency serves (or prefers to serve), implement the MBDA Statute's unconstitutional racial classifications. This sustained unconstitutional use of race likewise continues to subject Plaintiffs to the same stigmatizing harms. *See, e.g.*, App. 6: ¶¶ 32–34 and App. 10: ¶¶ 49–51 (since the Court's preliminary injunction, "the exact same racial eligibility requirements remain posted [by MBDA]," reminding me that I "remain inferior in the eyes of the federal government on the basis of my race"). *See also Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) (discussing the "badge of inequality and stigmatization" caused by racial discrimination); *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (same).

The fundamental problem with Defendants' ability to comply with an order to stop discriminating is that the MBDA Statute enacts a race-based scheme that is so firmly fixed and deeply rooted therein that it would seem *impossible* to implement a constitutional process for Plaintiffs, while otherwise remaining bound to the unconstitutional instruction mandated by the MBDA Statute. Defendants are powerless to refrain from statutory commands to "widely publicize" MBDA Programming and eligibility for certain, preferred minorities. *See* 15 U.S.C. §§ 9502(d)–(e), 9511, 9512, 9523(b), 9526, 9552(b)(1). As a result, absent broad relief, the operation of the MBDA Statute continues to harm Plaintiffs.

Other practical problems further demonstrate that a narrower injunction is unworkable. For example, must Plaintiffs go back to court after being denied Programming from another MBDA office, not previously specified in an injunction? Similarly, what if a Plaintiff relocates? Plaintiff Nuziard has already encountered the same race-based eligibility barriers for MBDAs in Arizona and Florida in connection with his pending expansions to these states. App. 9: ¶¶ 41–45. Similarly, as a federal contractor, Plaintiff Bruckner provides services across states and would like to be able

to obtain MBDA assistance from other locations. App. 30: ¶¶ 53; App. 31: ¶¶ 57, 60. Thus, the Fifth Circuit's recognition that a constitutional command for a consistent national policy may be an appropriate consideration in crafting injunctive relief seems particularly appropriate. *See, e.g.*, *Mitchell*, 299 F.2d at 287; *Hodgson*, 455 F.2d at 826; *Louisiana*, 20 F.4th at 264. Here, it is difficult to imagine a more important constitutional command for a consistent national policy than individuals' and Plaintiffs' Fifth Amendment rights to be treated equally, without regard to their race, no matter where they might seek services offered in a nationwide Program.

In sum, Plaintiffs have, again, satisfied all four injunction factors, demonstrating, now, *actual* success on the merits. The constitutional injuries flowing from the government's denial of equal treatment are irreparable, and Defendants do not contend otherwise. *See* ECF 24:10–11; 20:30–31. Moreover, "the public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law." *Texas v. United States*, 50 F.4th 498, 530–31 (5th Cir. 2022).[20] For all the reasons explained herein, a narrower injunction is unable "to cure the condition that offends the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977). Plaintiffs, therefore, request a broad injunction to remedy "the extent of the violation established," consistent with what is "necessary," "fair," and "workable" to resolve the entirety of their claims. *Califano*, 442 U.S. at 702; *Lemon*, 411 U.S. at 200–01; *Citizens United*, 558 U.S. at 331.

---

[20] The third and fourth injunction factors "overlap considerably" and "merge when the Government is the opposing party." *Greer's Ranch*, 540 F. Supp. 3d at 651 n. 10 (citing *Texas*, 809 F.3d at 187). *See also League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 183 (W.D. Tex. 2022); ECF 15:29.

**C.**      **The APA authorizes this Court to vacate the unconstitutional MBDA implementing regulations.**

As a separate but additional tool for addressing the unconstitutional MBDA implementing regulations at 15 C.F.R. pt. 1400, the APA contemplates nationwide relief from invalid agency action. *See Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979) ("[S]ection 706(2)(B) explicitly authorizes the court to set aside any agency action 'contrary to constitutional right.'"). As expressed by Justice Blackmun, writing in dissent, but reflecting the view of all nine Justices:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court. On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting); *id.* at 890 n. 2 (majority opinion) (recognizing that successful challenge of an agency regulation by an aggrieved individual would affect the entire agency program). Consequently, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

And courts across the country apply the APA to vacate unlawful administrative rules in just this way—often, in combination with the issuance of a nationwide injunction as necessary to afford plaintiffs "complete relief." *See, e.g.*, *Texas v. United States*, No. 7:16-CV-00054-O, WL 7852330, at 3 (N.D. Tex. Nov. 20, 2016) (nationwide injunction appropriate given "strong facial challenge" that agency action violated the APA); *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d

377, 397 (M.D.N.C. 2019) (same) (quoting *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, WL 3766121, at 46 (N.D. Tex. June 27, 2016)); *Texas*, 809 F.3d at 178, 188 n. 211 (nationwide injunction compelled by the text of section 706 of the APA) (citing *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir.2006), *aff'd in part & rev'd in part on other grounds by Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2412 n. 28 (2020) (Ginsburg, J., dissenting) ("Although the Court does not reach the issue, the District Court did not abuse its discretion in issuing a nationwide injunction.") (quoting 5 U.S.C. § 706(2)(B)); *Pennsylvania v. President United States*, 930 F.3d 543, 575 (3d Cir. 2019) ("[A]t the merits stage, courts invalidate—without qualification—unlawful administrative rules as a matter of course.") (affirming district court's order granting nationwide preliminary injunction), *rev'd and remanded on other grounds sub nom. Little Sisters*, 140 S. Ct. 2367; *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 977 (S.D. Ill. 1999) ("[B]ecause the [U.S. Forest Service ("FS") regulations] at issue in this suit implicates nationwide, not just local, FS policy, any remedy ordered also must be national in scope."), *aff'd*, 230 F.3d 947 (7th Cir. 2000); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) ("Singular equitable relief is 'commonplace' in APA cases, and is often 'necessary to provide the plaintiffs' with 'complete redress.'") (nationwide injunction not an abuse of discretion); *Dimension Fin. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 744 F.2d 1402, 1410–11 (10th Cir. 1984) (setting aside the at-issue amendments to Regulation Y and enjoining the Board from enforcing or implementing the invalid regulations), *aff'd*, 474 U.S. 361 (1986).

## CONCLUSION

For the foregoing reasons as well as those stated in Plaintiffs' opening briefs, Plaintiffs respectfully request this Court to grant their motion for summary judgment in the form of the proposed order attached to the motion.

Dated October 27, 2023

<div style="margin-left:40%">

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Cara Tolliver*

Richard M. Esenberg (WI Bar No. 1005622)
Cara M. Tolliver (WI Bar No. 1112818)
Daniel P. Lennington (WI Bar No. 1088694)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Cara@will-law.org
Dan@will-law.org

THE LAW OFFICE OF
JASON NASH, P.L.L.C.
Jason C. Nash (Bar No. 24032894)
601 Jameson Street
Weatherford, TX 76086
Telephone: (817) 757-7062
jnash@jasonnashlaw.com

*Attorneys for Plaintiffs*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, sending notice to all attorneys of record.

<div style="margin-left:40%">

*s/ Cara Tolliver*

Cara Tolliver

</div>