## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JEFFREY NUZIARD, *et al.*, | Case No. 4:23-cv-00278-P |
| Plaintiff, | District Judge Mark T. Pittman |
| v. | |
| MINORITY BUSINESS DEVELOPMENT AGENCY, *et al.*, | |
| Defendants. | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56(a))

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................... 1

    A.    The Minority Business Development Act .............................................. 1

    B.    The Minority Business Development Agency and Business Centers .... 4

III.   STATEMENT OF THE CASE ............................................................................. 6

IV.   LEGAL STANDARDS FOR SUMMARY JUDGMENT ................................... 8

V.    PLAINTIFFS LACK STANDING TO CHALLENGE THE MBDA .............. 9

    A.    Relevant Legal Principles—Article III Standing ................................. 9

    B.    Plaintiff Piper Does Not Have Article III Standing ........................... 12

        1.    Statement of Undisputed Facts as to Plaintiff Piper and the Wisconsin Business Center ................................................................. 12

        2.    Piper Has Suffered No Injury-in-Fact Because the Wisconsin BC Was Not Accepting or Rejecting Clients Until Well After Piper Filed His Complaint ................................................................. 14

        3.    Piper Has Never Applied to the Wisconsin BC and Cannot Invoke the Futility Exception ................................................................. 15

        4.    Piper Has Suffered No Injury-in-Fact Because He Had a Policy Grievance and No Genuine Interest in Wisconsin BC Services .............. 16

        5.    Piper Cannot Establish that His Claim Meets Article III Redressability .. 18

    C.    Plaintiff Bruckner Does Not Have Article III Standing ....................... 21

        1.    Statement of Undisputed Facts as to Plaintiff Bruckner and the Orlando Business Center ................................................................. 21

        2.    Bruckner Cannot Establish Injury-in-Fact Because He is Not "Able and Ready" To Obtain a Benefit From the Orlando BC ...................... 23

        3.    Bruckner Cannot Establish Redressability To Maintain Article III Standing ................................................................. 25

    D.    Plaintiff Nuziard Does Not Have Article III Standing ......................... 25

        1.    Statement of Undisputed Facts as to Plaintiff Nuziard and The Dallas-Fort Worth Business Center ........................................................ 25

        2.    Nuziard Cannot Establish Injury-in-Fact Because He Was Not "Able and Ready" to Obtain a Benefit From the Dallas-Fort Worth BC ............ 29

        3.    Nuziard Cannot Establish That His Claim Meets Article III Redressability ................................................................. 30

VI.   THE MBDA ACT IS CONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE ............................................................................................................ 31

    A.    The MBDA Act and Regulations Are Supported by a Compelling Interest ........ 33

i

1. The MBDA Act Remedies Discrimination That Affects Minority Business Formation, Growth, and Competition ........................ 36

a. Minority Business Owners Face Discrimination in Access to Credit ....... 40

b. Minority Businesses Face Discrimination in Private Contracting Markets ................................................................. 43

c. The Federal Government Is a Passive Participant in this Discrimination ............................................................ 46

d. Disparity Studies Document the Extent of the Government's Passive Participation in Discrimination .................................. 48

    i. Wainwright Report on Disparity Studies Demonstrates Evidence of Discrimination ...................................... 50

    ii. Findings of Disparity Studies Conducted in Texas ..................... 52

2. The MBDA Act Remedies Instances of Discrimination by the Federal Government ............................................................. 54

B. The MBDA Act and Regulations Are Narrowly Tailored .................................. 58

1. The Presumptions in the Business Center Program Are Necessary and Despite Alternative Remedies Disparities Persist .................................. 59

2. The Business Center Program Is Flexible and of Limited Duration ......... 66

3. The MBDA Act Is Neither Overinclusive nor Underinclusive ............... 68

4. The Business Center Program Has Minimal Impact on Third Parties ...... 70

VII. THE MBDA STATUTE AND REGULATIONS DO NOT VIOLATE THE ADMINISTRATIVE PROCEDURES ACT .................................................. 71

VIII. CONCLUSION ......................................................................... 72

**Federal Cases:**

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) ........................................................................... 32, 33

*Adarand Constructors, Inc. v. Slater*,
  228 F.3d 1147 (10th Cir. 2000) ................................................................ 38

*Allen v. Wright*,
  468 U.S. 737 (1984) .................................................................................... 17

*Asante v. Azar*,
  No. 20-CV-601 (TSC), 2023 WL 1991642 (D.D.C. Feb. 14, 2023) ........................ 72

*Assoc. Builders and Contractors of Texas, Inc. v. National Labor Relations Board*,
  826 F.3d 215 (5th Cir. 2016) .................................................................... 32

*Black v. Pension Ben. Guar. Corp.*,
  2011 WL 3875055 (E.D. Mich. 2011) ......................................................... 20

*Bruckner v. Biden*,
  2023 WL 2744026 (M.D. Fla. Mar. 31, 2023) ........................................ 15, 23

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*,
  482 F.3d 408 (5th Cir. 2007) ...................................................................... 8

*Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*,
  149 F.3d 1119 (10th Cir. 1998) ................................................................ 19

*Carney v. Adams*,
  141 S. Ct. 493 (2020) ............................................................................... 17

*Carr v. Alta Verde Indus., Inc.*,
  931 F.2d 1055 (5th Cir. 1991) .................................................................. 14

*Carrizales v. State Farm Lloyds*,
  518 F.3d 343 (5th Cir. 2008) ...................................................................... 8

*Carroll v. Nakatani*,
  342 F.3d 934 (9th Cir. 2003) ............................................................... 16, 23

*Cavalier ex rel. Cavalier v. Caddo Parish Sch. Bd.*,
  403 F.3d 246 (5th Cir. 2005) .................................................................... 59

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................... 8

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ........................................................................... passim

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .............................................................................................. 10

*Connecticut v. Teal*,
   457 U.S. 440 (1982) .............................................................................................. 48

*Contracting, Inc. v. State of Illinois*,
   2004 WL 422704 (N.D. Ill. Mar. 3, 2004) .......................................................... 38

*Contractors Ass'n v. City of Philadelphia*,
   6 F.3d 990 (3d Cir. 1993) ..................................................................................... 40

*Day v. Bond*,
   500 F.3d 1127 (10th Cir. 2007) ....................................................... 11, 20, 25, 31

*Dean v. City of Shreveport*,
   438 F.3d 448 (5th Cir. 2006) ........................................................................ passim

*DynaLantic Corp. v. U.S. Dep't of,*
   *Def.*, 885 F. Supp. 2d 237 (D.D.C. 2012) ...................................................... 36, 60

*Ensley Branch, NAACP v. Seibels*,
   31 F.3d 1548 (11th Cir. 1994) ............................................................................. 40

*Fisher v. Univ. of Tex. At Austin*,
   570 U.S. 297 (2013) .............................................................................................. 58

*Greer's Ranch Café v. Guzman*,
   540 F. Supp. 3d 638 (N.D. Tex. 2021) ............................................................... 30

*H.B. Rowe Co. v. Tippett*,
   615 F.3d 233 (4th Cir. 2010) ............................................................................... 34

*Hardre v. Markey*,
   No. 20-CV-03594-PAB-KMT, 2021 WL 1541714 (D. Colo. Apr. 19, 2021) ......... 11

*Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*,
   981 F.2d 50 (2d Cir. 1992) ................................................................................... 40

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) .............................................................................................. 35

*Inclusive Communities Project, Inc. v. Dep't of Treasury*,
   946 F.3d 649 (5th Cir. 2019) ............................................................................... 10

*Klaver Const. Co. v. Kansas Dep't of Transp.*,
   211 F. Supp. 2d 1296 (D. Kan. 2002) ................................................................. 19

*Kossman Contracting, Co. v. City of Houston*,
    2016 WL 11473826 (S.D. Tex. Feb. 17, 2016)......................................... 35, 39, 48, 49

*Lewis v. Ascension Parish School Bd.*,
    806 F.3d 344 (5th Cir. 2015)............................................................................. 18, 32

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................. 14

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................... 8

*McLemore v. Hosemann*,
    414 F. Supp. 3d 876 (S.D. Miss. 2019)..................................................................... 9

*Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C,
    5627, 2011 WL 2551179 (N.D. Ill. June 27, 2011) ........................................... 35, 37

*Midwest Fence v. United States Dep't of Transp.*,
    840 F.3d 932 (7th Cir. 2016)................................................................................... 34

*Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*,
    993 F.2d 1222 (5th Cir. 1993)................................................................................ 15

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
    508 U.S. 656 (1993) ..................................................................................... 10, 15, 29

*Nuziard v. Minority Bus. Dev. Agency*,
    No. 4:23-CV-0278-P, 2023 WL 3869323 (N.D. Tex. June 5, 2023).................. 15, 33

*Park v. Forest Serv. of U.S.*,
    205 F.3d 1034 (8th Cir. 2000)................................................................................ 14

*Perry v. Arlington Heights*,
    186 F.3d 826 (7th Cir.1999)................................................................................... 14

*Petit v. City of Chicago*,
    352 F.3d 1111 (7th Cir.2003).................................................................................. 24

*Pucket v. Hot Springs Sch. Dist. No. 23-2*,
    526 F.3d 1151 (8th Cir. 2008)................................................................................ 11

*Ray Baillie Trash Hauling, Inc. v. Kleppe*,
    477 F.2d 696 (5th Cir. 1973)................................................................................. 15

*Rothe Dev., Inc. v. United States Dep't of Def.*,
    836 F.3d 57 (D.C. Cir. 2016) ................................................................................ 19

v

*Rothe Dev. Inc. v. Dep't of Def.*,
   107 F.Supp.3d 183 (D.D.C. 2015) ................................................. 32

*SFFA v. President and Fellows of Harvard Coll.*,
   143 S.Ct. 2141 (2023) ............................................ 33, 58, 70

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ...................................................... 58

*Sherbrooke Turf, Inc. v. Minnesota Dept. of Transp.*,
   345 F.3d 964 (8th Cir. 2003) .......................................... 38

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .................................................... 9

*SRS Technologies, Inc. v. U.S. Dept. of Defense*,
   No. 96–1484, 1997 WL 225979, 112 F.3d 510 (4th Cir.1997), *cert. denied* 522 U.S. 1046
   (1998) ................................................................... 11, 30

*Stringer v. Whitley*,
   942 F.3d 715 (5th Cir. 2019) .......................................... 10

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .......................................... 10

*TIG Ins. Co. v. Sedgwick James of Wash.*,
   276 F.3d 754 (5th Cir. 2009) ............................................ 8

*Transamerica Ins. Co. v. Avenell*,
   66 F.3d 715 (5th Cir. 1995) ............................................. 8

*Ultima Servs. Corp. v. U.S. Dep't of Agric.*,
   2023 WL 4633481 (E.D. Tenn. 2023) .......................... 19, 20, 33, 34

*United States v. Hays*,
   515 U.S. 737 (1995) .................................................. 16, 17

*United States v. Paradise*,
   480 U.S. 149 (1987) .............................................. 58, 66, 67

*United States v. Salerno*,
   481 U.S. 739 (1987) .................................................... 32

*Vill. of Arlington Heights v. Metro. House. Dev. Corp.*,
   429 U.S. 252 (1977) .................................................... 35

*Vitolo v. Guzman*,
   999 F.3d 353 (6th Cir. 2021) .................................... 33, 34, 69

*W.H. Scott Constr. Co. v. City of Jackson*,
   199 F.3d 206 (5th Cir. 1999)..................................................................... 34, 35

*Walker v. City of Mesquite*,
   169 F.3d 973 (5th Cir. 1999)................................................................. 58, 59, 66

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ................................................................................... 32

*Wygant v. Jackson Bd. of Educ.*,
   476 U.S. 267 (1986) ........................................................................ 33, 40, 59


**Federal Statutes:**

5 U.S.C. § 706(2)(B)..................................................................................... 71

15 U.S.C. § 637(a) ................................................................................... 19, 20

15 U.S.C. § 637(a)(5) ................................................................................... 19

15 U.S.C. § 637(a)(6)(A) .............................................................................. 19

15 U.S.C. §§ 681 *et seq*............................................................................... 63

15 U.S.C. § 694a ......................................................................................... 60

15 U.S.C. § 9501 ........................................................................................... 1

15 U.S.C. § 9501(9) .............................................................................. passim

15 U.S.C. § 9501(9)(A)............................................................................. 2, 18

15 U.S.C. § 9501(14) ................................................................................... 18

15 U.S.C. § 9501(15)(A) ........................................................................ passim

15 U.S.C. § 9501(15)(B) ........................................................... 3, 31, 67, 70

15 U.S.C. § 9501(15)(B)(vi) ............................................................... 4, 68, 69

15 U.S.C. § 9522 ........................................................................ 4, 5, 18, 62

15 U.S.C. § 9524 ....................................................................................... 2, 18

15 U.S.C. § 9541 ......................................................................................... 67

15 U.S.C. § 9581 ......................................................................................... 67

15 U.S.C. § 9582 ........................................................................................................ 67

15 U.S.C. § 9594 ........................................................................................................ 67

15 U.S.C. § 9595 ........................................................................................................ 67

15 U.S.C. § 9596 ........................................................................................................ 20

15 U.S.C. § 9598 ........................................................................................................ 67

15 U.S.C. § 9598(1) ..................................................................................................... 4

Pub. L. No. 83-163 ..................................................................................................... 60

Pub. L. No. 91-609 ..................................................................................................... 60

Pub. L. No. 92-595 ..................................................................................................... 60

Pub. L. No. 96-302 ..................................................................................................... 61

Pub. L. No. 117-58 ..................................................................................................... 67

Pub. L. No. 93-386 ..................................................................................................... 60

Pub. L. No. 94-305 ..................................................................................................... 60

Pub. L. No. 95-507 ................................................................................................. 60, 68

Pub. L. No. 95-89 ....................................................................................................... 60

## Federal Rules:

Fed. R. Civ. P. 56(a) .................................................................................................... 8

## Federal Regulations:

3 C.F.R. § 616 (1971) .................................................................................................. 1

3 C.F.R. § 779 (1969) .................................................................................................. 1

15 C.F.R. § 1400 ......................................................................................................... 2

15 C.F.R. § 1400.1 ............................................................................................... passim

15 C.F.R. § 1400.1(B) .......................................................................................... passim

15 C.F.R. § 1400.1(b) ............................................................................ 4, 68, 69

15 C.F.R. § 1400.1(c) ............................................................................... 3, 68

15 C.F.R. § 1400.3 ........................................................................... 4, 68, 69, 70

15 C.F.R. § 1400.4 ........................................................................... 4, 68, 69, 70

15 C.F.R. § 1400.5 .............................................................................. 4, 68, 69

29 C.F.R. § 1607.4 ..................................................................................... 48

61 Fed. Reg. 26042-01 (May 23, 1996) .................................................. 37, 38

87 Fed. Reg. 4955 (Jan. 31, 2022) ......................................................... 37, 39

**Legislative Materials:**

S. 2068, 117th Cong. (2021) ......................................................................... 1

H.R. Rep. No. 94-468 (1975) ...................................................................... 36

H.R. Rep. No. 97-956 (1982) ...................................................................... 36

H.R. Rep. No. 100-460 (1987) .................................................................... 36

H.R. Rep. No. 117-70 (2021) ...................................................................... 50

167 CONG. REC. S5898-99 ......................................................................... 49

167 CONG. REC. H3505-07 ......................................................................... 49

**Congressional Hearings:**

*Minority Business Development Act of 1988: Hearing on H.R. 1769 Before the H. Sub.
Comm. on Procurement, Innovation, and Minority Enterprise Development of the Comm.
on Small Bus.*, 100th Cong. (1988) ............................................................. 37

*Hurdles for Business Start-Ups: Hearing Before the S. Comm. on Small Bus. and
Entrepreneurship*, 110th Cong. 4 (2008) ............................................... 41, 42

*Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's
Capital Markets: Hearing before S. Comm. on Small Bus. and Entrepreneurship*, 111th Cong.
170-71 (2010) ......................................................................................... 37, 40

ix

*Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities*, Hearing Before the Senate Committee on Small Business and Entrepreneurship, 112th Cong., 22 (2011) ............................................................................... 40, 41, 57, 58

*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 42 (2013)........................................................... 46, 49, 52, 56, 57

*Accessing Capital in Indian Country: Hearing Before the Senate Committee on Indian Affairs*, 114th Cong. 5 (2015) ............................................................................... 42

*Minority Access to Capital: Field Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 114th Cong. 32 (2015) ................................................................. 42

*Disparities in Access to Capital: What the Federal Government is Doing to Increase Support for Minority Owned Firms: Field Hearing Before the H. Comm. on Small Bus.*, 115th Cong. 2 (2018) ............................................................................................................... 41

*Strengthening Access to Capital for Minority-Owned Small Business: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 115th Cong. 4 (2018) ...................................43, 54

*Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Services*, 116th Cong. 5 (2019) S. 2068, 117th Cong. (2021) ................................................................... 41, 54, 56, 57

*Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Fin. Servs.*, 116th Cong. 2 (2020) ...............................................................................41

*Capital Access for Minority Small Businesses: Covid-19 Resources For an Equitable and Sustainable Recovery: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 116th Cong. 4 (2020) .................................................................................42, 54

*How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-Term Economic Impacts on Borrowers of Color: Hearing Before the Subcomm. on Oversight and Investigations of H. Comm. on Financial Services*, 117th Cong. 7 (2021) ...................................................................................... 37, 41, 57

*Supporting Small and Minority-Owned Businesses Throughout the Pandemic: Virtual Hearing Before the Subcomm. on National Security, Int'l Dev. and Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 70 (2021) .............................................................................42

*Oversight of the Small Business Administration: Hearing Before S. Comm. on Small Bus. and Entrepreneurship*, 118th Cong. 5 (2023)................................................................. 47, 50

**Miscellaneous:**

13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3531.5 (2d ed. 1984) ............................................................................................ 11

Daniel Chow, *Update to the Assessment of Contracting Outcomes for Small Disadvantaged Businesses*, MBDA (2022) ....................................................................................................48

The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey, 61 Fed. Reg. 26042-01 (May 23, 1996) ........................................................................38

Robert Jay Dilger, Anthony A. Cilluffo, R. Corrine Blackford, Cong. Research Serv., RL33243, *Small Business Administration: A Primer on Programs and Funding* (2022)............................. 64

Robert Jay Dilger, Anthony A. Cilluffo, R. Corrine Blackford, Cong. Research Serv., R43846, *Small Business Administration Funding: Overview and Recent Trends* (2022)......................... 63

Robert Jay Dilger, Anthony A. Cilluffo, Cong. Research Serv., R41456, *SBA Small Business Investment Company Program* (2022) ....................................................................................... 64

Robert Jay Dilger, Adam G. Levin, R. Corrine Blackford, Cong. Research Serv., R41352, *Small Business Management and Technical Assistance Training Programs* (2022).................62, 63, 64

Robert W. Fairlie, *Latino Business Ownership: Contributions and Barriers for U.S.-born and Immigrant Latino Entrepreneurs*, Prepared for the Office of Advocacy, U.S. Small Business Administration (2018) ............................................................................................................43, 58

Colette Holt, Report of Defendants' Expert, submitted in *Nuziard v. Minority Business Development Agency*, No. 4:23-cv-00278-P (N.D. Tex. August 25, 2023) ...............48, 49, 52, 53

Julie M. Lawhorn, Cong. Research Serv., R46816, The Minority Business Development Agency: An Overview of its History and Programs (January 11, 2023) .................................................4, 5

Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022) ...................................................................................................38, 40

Carolyn Schulman, *The Partnership for Lending in Underserved Markets: Increasing Minority Entrepreneurs Access to Capital*, Milken Institute (Nov. 2018) ............................................58

U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016) ..........................................................................................................38, 40, 44, 46, 52

U.S. Dep't of Justice, *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (2022) ................................................................................................................................46

U.S. Small Business Administration, *FY2023 Congressional Budget Justification FY2021 Annual Performance Report*........................................................................................................................ 64

Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v. U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11.......................................... .........................................................................51, 52, 53, 65

I.     __INTRODUCTION__

For more than a half-century, the Minority Business Development Agency ("MBDA") has dedicated itself to supporting socially and economically disadvantaged business owners across America. Established in 1969 by President Nixon,[1] the MBDA has worked to open the doors to full participation in American enterprise often closed to disadvantaged individuals by discrimination and its long-lasting effects.

That important goal has been affirmed by generations of lawmakers in both houses of Congress,[2] who have repeatedly given bipartisan support to, and appropriated funding for,[3] the MBDA and its mission. And on November 15, 2021, bipartisan legislators, recognizing that the work of the MBDA remains vital to the Nation's promise of economic opportunity for all citizens, enacted the Minority Business Development Act ("Act").[4]

II.    __BACKGROUND__

A.     __The Minority Business Development Act__

Relevant to this litigation, the Act recognized the MBDA as a statutorily authorized federal agency housed in the Department of Commerce and directed it to establish and maintain certain programs, including the MBDA Business Center Program. 15 U.S.C. §§ 9501, *et seq.* MBDA

---

[1] MBDA MSJ App. 00001-2 (Exec. Order No. 11458, 3 C.F.R. § 779 (1969)); *see also* MBDA MSJ App. 00003-6 (Exec. Order 11625, 3 C.F.R. § 616 (1971)). "MBDA MSJ App. __" citations refer by page number to the materials in the supporting appendix.

[2] MBDA MSJ App. 00007-15, 11-13 (Julie M. Lawhorn, Cong. Research Serv., R46816, The Minority Business Development Agency: An Overview of its History and Programs 20 (January 11, 2023)).

[3] MBDA MSJ App. 00016-18 (*Minority Business Development Act of 1988: Hearing on H.R. 1769 Before the H. Sub. Comm. on Procurement, Innovation, and Minority Enterprise Development of the Comm. on Small Bus.*, 100th Cong. (1988) (statement of Nicholas Mavroules, Congressman)).

[4] S. 2068, 117th Cong. (2021) (co-sponsored by Senators John Cornyn (TX), Tim Scott (SC), Roger Wicker (MS), Tammy Baldwin (WI), Maria Cantwell (WA), and Benjamin L. Cardin (MD)). Prior to the Act's passage, the parameters of the MBDA program, as established by executive orders, were codified in regulations at 15 C.F.R. § 1400.1(B).

implements the Business Center Program by providing grant funding through cooperative agreements to entities such as nonprofit organizations, for-profit businesses, state, and local governments, institutions of higher learning, and tribal entities. Those entities then use that funding to operate the MBDA Business Centers ("Business Centers"). The Business Centers are not owned or operated by the MBDA, and the MBDA does not apply race-conscious factors in selecting Business Centers for funding awards. *See* 15 U.S.C. § 9524. Once those entities are awarded MBDA funding, they set up their Business Center and–once operational–provide technical and management assistance to Minority Business Enterprises, also known as "MBEs," which must be 51% owned and operated by a socially or economically disadvantaged person. *See* 15 U.S.C. §§ 9501(9)(A), 9524. MBDA services at Business Centers are restricted to individuals that are socially or economically disadvantaged but are not limited to a particular number of participants. *Id.*; *see also* 15 C.F.R. § 1400.

The MBDA statute defines "socially disadvantaged" as "an individual who has been subjected to racial or ethnic prejudice or cultural bias, because of the identity of the individual as a member of a group, without regard to any individual quality of the individual." 15 U.S.C. § 9501(15)(A). The statute further defines "economically disadvantaged" as an individual whose "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area, because of the identity of the individual as a member of a group, without regard to any individual quality of the individual." *Id*.

Under this definition, the statute permits the MBDA Business Center to provide services to any individual of any race or ethnicity who qualifies as socially or economically disadvantaged. 15 U.S.C. § 9501(15)(A). An individual may qualify as socially or economically disadvantaged if

their membership in a group has resulted in their subjection to racial or ethnic prejudice or cultural bias, or impaired their ability to compete in the free enterprise system. *Id.* A "member of a group" may include, but is not limited to, a member of a religious group, a geographically defined group, or some other group sharing a common characteristic.[5]

By statutory mandate, members of certain racial and ethnic groups are presumed to meet the definition of socially or economically disadvantaged individuals. 15 U.S.C. § 9501(15)(B); 15 C.F.R. § 1400.1(B). These presumptions reflect findings about the "unique challenges" that MBEs continue to face "in accessing capital, contracts, and other areas of business development."[6] Under the Act, the Under Secretary of Commerce for Minority Business Development "shall presume" that a "'socially or economically disadvantaged individual' includes any individual who is (i) Black or African American; (ii) Hispanic or Latino; (iii) American Indian or Alaska Native; (iv) Asian; (v) Native Hawaiian or other Pacific Islander; or (vi) a member of a group that the Agency determines under part 1400 of Title 15, CFR, as in effect on November 23, 1984, is a socially disadvantaged group eligible to receive assistance." 15 U.S.C. § 9501(15)(B). 15 C.F.R. § 1400.1(b) designates "Blacks, Puerto-Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts" as individuals who are socially or economically disadvantaged. 15 C.F.R. § 1400.1(c) also designates "Hasidic Jews, Asian-Pacific Americans, and Asian Indians" as socially or economically disadvantaged. Admission of an individual business owner to a Business

---

[5] *See* MBDA MSJ App. 00019-20 (MBDA Business Center Guidance, issued October 23, 2024. MBDA GUIDANCE DOCUMENTS, https://www.mbda.gov/sites/default/files/2023-10/MBDA%20Guidance%20Memo.pdf (last visited, Oct. 26, 2023)).

[6] MBDA MSJ App. 04507-4546, 4519 (Julie M. Lawhorn, Cong. Research Serv., R46816, The Minority Business Development Agency: An Overview of its History and Programs 9 (January 11, 2023), *citing* MBDA MSJ App. 000021-22 (MBDA, "The Minority Business Development Agency—Vital to Making America Great," *available at* https://www.mbda.gov/sites/default/files/migrated/files-attachments/MBDAVitaltoMakingAmericaGreat_170330.pdf (last visited Oct. 26, 2023))).

Center based on a presumption does not take away a slot from any other applicant. It is these presumptions that form the basis of the current action.

The current presumptions are not static. Rather, the Agency's regulations also provide for a process for the Under Secretary of Commerce for Minority Business Development to approve the application of a representative of any group not already presumed socially or economically disadvantaged. *See* 15 U.S.C. § 9501(15)(B)(vi); *see also* 15 C.F.R. § 1400.1(b), § 1400.3-5. After a positive determination, all business owners who identify as a member of the applicant's designated group are also presumptively considered to be socially or economically disadvantaged for purposes of MBDA benefits, such as access to Business Centers. *See* 15 U.S.C. § 9501(15)(B)(vi).

**B.    The Minority Business Development Agency and Business Centers**

The MBDA's mission is to expand the growth and global competitiveness of MBEs to ensure that socially or economically disadvantaged persons can fully participate in America's free enterprise system. While the Agency hosts many programs and maintains a research component for the collection of data to support guided policymaking, its flagship program to achieve its mission is the Business Center Program. *See* 15 U.S.C. § 9598(1). The Centers help MBEs to improve operational efficiencies, manage risk and liability thresholds, access capital, and increase profits for owners to close the wealth gap. 15 U.S.C. § 9522. MBDA's funding initiatives have resulted in hundreds of thousands of new jobs across the United States, and billions of dollars of new capital investment in MBEs.[7]

---

[7] MBDA MSJ App. 00007-15, 11-13 (Julie M. Lawhorn, Cong. Research Serv., R46816, *The Minority Business Development Agency: An Overview of its History and Programs* 20 (January 11, 2023)).

The MBDA Business Center Program offers programs and services across three categories: business development, capacity building, and navigation. In the business development category, Business Centers provide information and assistance to MBEs in contracting—pursuing federal, state, local, and private sector prime contract and subcontract opportunities—and in supply chains—pursuing opportunities to participate in global supply chains.[8] Additionally, Business Centers help MBEs identify and develop potential export markets, participate in trade shows, and connect with U.S. Export Assistance Centers. *Id.* In the capacity building category, Business Centers provide one-on-one business counseling, focusing on access to capital and management counseling. *Id.* Business Centers increase awareness of basic credit practices and credit requirements and assist in the development of business plans, financial packages, and credit applications. *Id.* Business Centers also provide assistance and resources relating to management, technological and technical assistance, financial, legal and marketing services, and services relating to workforce development. *Id.* Finally, in the navigation category, Business Centers facilitate referrals and connections to an ecosystem of organizations that can support MBE growth and competitiveness, such as federal, state and local governments, chambers of commerce and other local economic development organizations, and financial institutions. *Id.* MBDA supports MBEs as they grow their businesses, create jobs in their communities, and make America more globally competitive. *Id.*

The Orlando Business Center ("Orlando BC") aims to foster the growth, expansion, and competitiveness of MBEs by facilitating access to credit, capital, markets, and other resources,

---

[8] *See* MBDA MSJ App. 00023-27, 25-27 (*Notice of Federal Funding*, 3-5 2022 (*available at* MBDA Business Center Program NOFO - 2022.pdf) (last visited October 25, 2023)).

such as consulting and training for the business enterprise.[9] The Dallas-Fort Worth Business Center ("Dallas-Fort Worth BC") assists MBEs to retain and create jobs, obtain procurement contracts and financing for working capital and asset acquisition.[10] The Wisconsin Business Center ("Wisconsin BC") provides assistance centered on capacity building, business development, and developing, maintaining, and expanding strategic partnerships.[11] To focus the resources of the Centers on MBEs that will benefit most, and use them most effectively to further the aims of the MBDA Act, each Business Center has eligibility standards for businesses to qualify for services, such as minimum revenue and time-in-business requirements.

## III.   STATEMENT OF THE CASE

On March 20, 2023, Plaintiffs filed suit against the MBDA as well as President Joseph R. Biden, Secretary of Commerce Gina M. Raimondo, and Under Secretary of Commerce for Minority Business Development Donald. R. Cravins in their official capacities. (MBDA MSJ App. 00056-83 (Doc. 1 (Complaint)). In the Complaint, Plaintiffs challenge the general statutory mandate of the MBDA that requires it to help and promote "minority business enterprises." *Id*. ¶¶ 23-25. Plaintiffs claim that they were denied equal access to three MBDA Business Centers because they are not "minority business enterprises." *Id*. ¶¶ 25-31. Plaintiffs allege that the racial and ethnic presumptions of social or economic disadvantage deny them, as white business owners, equal access to the benefits of MBDA Business Centers. *Id.*

---

[9] ORLANDO MBDA BUSINESS CENTER, https://orlandombdacenter.com/ (last visited Oct. 26, 2023).
[10] DALLAS FORT WORTH MBDA BUSINESS CENTER, https://www.mbda.gov/business-center/dallas-mbda-business-center (last visited Oct. 26, 2023).
[11] WISCONSIN MBDA BUSINESS CENTER, https://wisconsinmbdabusinesscenter.com/ (last visited Oct. 26, 2023).

Plaintiffs seek a judgment declaring the MBDA unconstitutional and in violation of the APA to the extent that the MBDA limits Business Center Program services or other benefits to "minority business enterprises." *Id.* ¶ A. Plaintiffs also ask this Court to enjoin Defendants from using the term "minority" to advertise or reference their statutorily authorized programs and award attorney's fees to each Plaintiff. *Id.* ¶ B.

On April 3, 2023, Plaintiffs moved for a preliminary injunction to prohibit the MBDA from using the racial or ethnic presumptions defined in 15 U.S.C. § 9501 in operating its programs and services. (Doc. 14 (Pls.' Mot. For Prelim. Inj.).) On June 5, 2023, the Court found that, based on the pleadings, Jeffrey Nuziard had established standing, and granted Plaintiffs' motion, enjoining "Defendants, the Wisconsin MBDA Business Center, Orlando MBDA Business Center, Dallas-Fort Worth Business Center, and officers, agents, servants, and employees, and anyone acting in active concert or participation with them from imposing the racial-and-ethnic classifications defined in 15 U.S.C. § 9501 and implemented in 15 U.S.C. §§ 9511, 9512, 9522, 9523, 9524, and 15 C.F.R. § 1400.1 against Plaintiffs or otherwise considering or using Plaintiffs' race or ethnicity in determining whether they can receive access to the Center's services and benefits." (Doc. 27 (Order Granting Pls.' Mot. For Prelim. Inj.).)

On July 13, 2023, in compliance with the Court's Order, Defendants proposed to Plaintiffs an amended application process to apply for services from the Wisconsin, Orlando, and Dallas-Fort Worth Business Centers. (MBDA MSJ App. 00087-88.) The proposed application required Plaintiffs to state via email whether they were socially or economically disadvantaged as defined in 15 U.S.C. § 9501(9), with no reference to race or ethnicity, and whether they met the business center-specific eligibility requirements, such as time in business and revenue minimums. *Id.* On September 30, 2023, Defendants clarified the amended application process for Plaintiffs, and

verified that it did not require an explanation of social or economic disadvantage beyond an affirmative statement that Plaintiffs met the statutory definition. (MBDA MSJ App. 00084-86.) As of the date of this filing, Defendants have no record that any of the Plaintiffs have contacted the Business Centers following the injunction. *Id*.

## IV.   <u>LEGAL STANDARDS FOR SUMMARY JUDGMENT</u>

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). The moving party bears the initial burden of informing the court of all evidence demonstrating the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has discharged this initial burden, the burden shifts to the non-moving party to demonstrate there is a genuine issue of material fact. *Id*. at 322. "For any matter on which the non-movant would bear the burden of proof at trial...the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995).

To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). The non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials,

speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation….”
*TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2009).

## V.    PLAINTIFFS LACK STANDING TO CHALLENGE THE MBDA

This Court should grant summary judgment in favor of Defendants because a more fully developed record has established that all three Plaintiffs lack standing under Article III of the U.S. Constitution to challenge the presumptions of disadvantage in the MBDA Act. First, Plaintiff Piper has only a generalized grievance against the MBDA as shown by his statements, his failure to apply for services, and the fact that the Wisconsin Business Center, which he claims rejected him, was not even operating until well after the Complaint was filed. Piper also admits that he is not a socially or economically disadvantaged person even putting the presumptions aside. Second, Plaintiff Bruckner has not suffered an injury-in-fact that would be redressed by a favorable ruling because he did not qualify for access to the Orlando Business Center due to its time-in-business and revenue requirements, both of which are unrelated to his race or ethnicity. Finally, Plaintiff Nuziard lacks standing because he did not qualify for access to the Dallas-Fort Worth Business Center for reasons that have nothing to do with race or ethnicity--namely, that his business does not have “sustainable, stable and consistent” revenue.

### A.    Relevant Legal Principles—Article III Standing

To meet the “irreducible constitutional minimum” for Article III standing, plaintiffs bear the burden of showing that they have (1) suffered an injury-in-fact, (2) that is caused by the challenged conduct of the defendants, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The same arguments going to lack of redressability apply with respect to causation. *See McLemore v. Hosemann*, 414 F. Supp. 3d 876, 883 (S.D. Miss. 2019) (“Though distinct elements, causation and redressability overlap and

are often considered in tandem."). The "party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (cleaned up).

An injury-in-fact is a "concrete and particularized" harm that is "actual or imminent, not conjectural or hypothetical." *Stringer v. Whitley*, 942 F.3d 715, 720-721 (5th Cir. 2019). In the context of an equal protection challenge to racial classifications, a plaintiff may show injury-in-fact where he adequately pleads that he is "able and ready" to obtain the benefit, but a "discriminatory policy prevents him from doing so on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (hereinafter "*City of Jacksonville*"). In *City of Jacksonville*, for example, an association of general contractors established an injury-in-fact where many of its members "'regularly bid on and perform[ed] construction work for the City of Jacksonville,'" and "would have ...bid on ... designated set aside contracts but for the restrictions imposed" by a city ordinance which accorded certain minority-owned businesses preferences. *Id.* at 659.

To satisfy the redressability prong of Article III standing, a plaintiff must show that "it is likely, as opposed to merely speculative," that a favorable court decision will remedy his injury. *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). This requires a demonstration of a "substantial likelihood" that the relief sought will redress the injury. *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015). If the relief sought lies beyond the court's authority or does not have a substantial likelihood of redressing the injury, the plaintiff lacks standing to bring the claim. *Id.* In the equal protection context, when a nondiscriminatory classification "would disqualify [a plaintiff] from eligibility for the benefit even absent the

challenged discriminatory classification, he cannot show injury caused by the discrimination, nor can he show injury that would be redressed by a decision in his favor; he therefore lacks standing to bring his claim." *Day v. Bond*, 500 F.3d 1127, 1135 (10th Cir. 2007).

For example, in *Day v. Bond*, although the plaintiffs were able to establish an injury-in-fact because they were required to pay out-of-state tuition while certain undocumented immigrants could pay in-state tuition, the court found that they could not establish redressability because they failed to meet non-discriminatory residency requirements. *Id.*; *see also Hardre v. Markey*, No. 20-CV-03594-PAB-KMT, 2021 WL 1541714, at *3 (D. Colo. Apr. 19, 2021) ("While plaintiffs are not required to show that they would in fact receive a benefit but for the impermissible criteria, they still must show that the challenged discriminatory criterion was, in fact, the barrier that disadvantaged . . .[their] ability to obtain benefits. In other words, plaintiffs must show that, with the discriminatory criterion removed, they would then be eligible for benefits.") (cleaned up); *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1160 (8th Cir. 2008) (citing 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3531.5, at 452 (2d ed. 1984) ("Causation is most easily rejected when a plaintiff challenges the denial of a benefit on one ground, and it is shown that the plaintiff is in any event ineligible for the benefit on some other ground."); *SRS Technologies, Inc. v. U.S. Dept. of Defense*, No. 96–1484, 1997 WL 225979, 112 F.3d 510 (4th Cir.1997), *cert. denied* 522 U.S. 1046 (1998) (holding that the plaintiff lacked standing to challenge the racial presumption of disadvantaged status in a Small Business Administration contracting program because plaintiff was ineligible for that program for race-neutral reasons).

**B.** **Plaintiff Piper Does Not Have Article III Standing**

Plaintiff Matthew Piper does not have standing to bring this action because he could not access the Wisconsin BC for at least two race-neutral reasons. First, the Wisconsin BC was not accepting applications from *any* businesses prior to the time he filed his complaint. Second, by his own admission, he is not socially or economically disadvantaged.

**1.** **Statement of Undisputed Facts as to Plaintiff Piper and the Wisconsin Business Center**

Matthew Piper has owned and operated Piper Architects Inc. ("Piper Architects" or "the firm"), a small architectural firm based in Wisconsin, for the past eight years. (MBDA MSJ App. 00046 (Piper Dep. 74:13-19).) Since the firm's incorporation in 2015, Piper, a licensed architect, has remained the sole owner and employee of the firm, which earns revenue by drawing up plans for small commercial and residential projects. Piper Architects averages about $5,000 in fees per contract for these services. (MBDA MSJ App. 00047-49 (Piper Dep. 90:1-4; 82:4-6; 87:4-6).)

The Wisconsin BC is operated by the North Central Minority Supplier Development Counsel ("NCMSDC"). (MBDA MSJ App. 00054 (Wisconsin BC Decl., ¶¶ 2-3).) In 2022, after a competitive bidding process, the MBDA awarded NCMSDC a federal grant to operate the Wisconsin BC. (MBDA MSJ App. 00054 (Wisconsin BC Decl., ¶ 2).) The Wisconsin BC has only been up and running since May 26, 2023, (MBDA MSJ App. 00055 (Wisconsin BC Decl., ¶¶ 4-5)), and did not begin to provide business center services to business owners until that date. *Id*. Prior to early May of 2023, the Wisconsin BC did not have a public facing phone number, email, or website. (MBDA MSJ App. 00055 (Wisconsin BC Decl., ¶¶ 6-7).) Critically, the Wisconsin BC was not accepting or rejecting clients until May 26, 2023. (MBDA MSJ App. 00055 (Wisconsin BC Decl., ¶ 5).)

Piper claims he first learned of the MBDA and the Wisconsin BC through a story on the radio in November 2022. (MBDA MSJ App. 00036-37 (Piper Dep. 44:19-45:2).) Piper also claims to have visited the website for the Wisconsin BC before the Complaint was filed on March 20, 2023, (MBDA MSJ App. 00041-42 (Piper Dep. 67:19-68:4)), even though the Wisconsin BC website was not live until May 26, 2023.  (MBDA MSJ App. 00055 (Wisconsin BC Decl., ¶ 7).) Piper described MBDA's services as a "word salad." (MBDA MSJ App. 00045 (Piper Dep. 71:3-16).) After reviewing various websites and a news story about the planned Wisconsin BC, Piper felt it unjust that he might not be able to access Wisconsin BC services. (MBDA MSJ App. 00032-34, 36-37 (Piper Dep. 18:9-19:1; 19:15-20:2; 44:19-45:11)); (MBDA MSJ App. 00067 (Doc. 1, ¶ 35).) According to Piper, he was not actually interested in getting services from MBDA or the Wisconsin BC when he first heard of them. (MBDA MSJ App. 00036-37 (Piper Dep. 44:19-45:11).) Instead, he only became interested when "it became apparent…that [he] might be able to fight the injustice of racial discrimination." (MBDA MSJ App. 00037 (Piper Dep. 45:7-45:11).)

Piper made no attempt to call or email the Wisconsin BC. (MBDA MSJ App. 00042 (Piper Dep. 68:11-15).) Piper did not apply. (MBDA MSJ App. 00042 (Piper Dep. 68:5-7).) The record is bare of any attempts he made to visit the Wisconsin BC in person. (*See* MBDA MSJ App. 00067 (Doc. 1, ¶ 35).) He never submitted any intake form. (MBDA MSJ App. 00042 (Piper Dep. 68:8-10).) He never reached out to any other Business Centers. (MBDA MSJ App. 00042 (Piper Dep. 68:16-18).) He made no attempts to directly clarify with the Wisconsin BC: the services the Wisconsin BC could provide to business owners or whether they helped businesses such as his, or what their eligibility requirements were and whether he met those requirements. (MBDA MSJ App. 00042, 37 (Piper Dep. 68:11-18; 45:3-11).) Piper stated during his deposition that the only

way to understand what services the Wisconsin BC provided was to "open up access to these things." (MBDA MSJ App. 00045 (Piper Dep. 71:15).)

Piper identifies as a white male. (MBDA MSJ App. 00035 (Piper Dep. 39:13-18).) In his Complaint, Piper does not claim that he is a "socially or economically disadvantaged individual" within the meaning of the MBDA Act. (*See* MBDA MSJ App. 00056-83 (Doc. 1).) Piper denies that he meets the MBDA Act definitions of a "socially disadvantaged individual" or an "economically disadvantaged" individual. (MBDA MSJ App. 00038-41 (Piper Dep. 64:11-67:13).)

### 2. Piper Has Suffered No Injury-in-Fact Because the Wisconsin BC Was Not Accepting or Rejecting Clients Until Well After Piper Filed His Complaint

"Standing is determined as of the date of the filing of the complaint." *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.4 (1992) (explaining that acts after commencement of the suit cannot retroactively create jurisdiction); *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000) (holding that a plaintiff cannot rely on events after commencement of the suit to establish injury-in-fact); *Perry v. Arlington Heights*, 186 F.3d 826, 830 (7th Cir.1999) ("Because standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit.").

Piper filed his Complaint on March 20, 2023. (MBDA MSJ App. 00079 (Doc. 1).) However, the undisputed facts establish that the Wisconsin BC was not operational at that time. (MBDA MSJ App. 00055 (Wisconsin BC Decl., ¶¶ 4-7).) The Wisconsin BC had no public facing phone number or email address until early May of 2023. *Id.* The Wisconsin BC began accepting and rejecting clients on May 26, 2023. *Id.* Piper cannot establish standing considering these facts. He could not have suffered any "concrete" and "particularized" injury-in-fact on or before the

filing of the complaint on March 20, 2023, because the Wisconsin BC was not providing services to anyone, regardless of race, on or before that date. Nor can Piper argue that he was "able and ready" to access a benefit when he filed his complaint because that benefit did not exist at that time. *See City of Jacksonville*, 508 U.S. at 666.

### 3.     Piper Has Never Applied to the Wisconsin BC and Cannot Invoke the Futility Exception

Typically, a plaintiff cannot establish standing for a discrimination claim challenging a program for which the plaintiff failed to even apply. *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir. 1973) (Even where the alleged injury inhibits competing on equal footing, a plaintiff cannot establish standing if the "threat of injury" is only conjectural, hypothetical, or possible in the future.); *Bruckner v. Biden*, 2023 WL 2744026, at *4 (M.D. Fla. Mar. 31, 2023). However, as this Court explained in its preliminary injunction order, a plaintiff may establish standing even if he did not apply to a challenged program where the application would be a futile gesture. *See Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278-P, 2023 WL 3869323, at *3 (N.D. Tex. June 5, 2023) (hereinafter "*Nuziard*") (noting that an "application for a benefit is futile if the government has 'specifically stated' that it would not consider a plaintiff due to their race") (quoting *Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993)).

Here, it is undisputed that Piper has never submitted an application to the Wisconsin BC, meaning that he cannot establish standing under the "general rule that a plaintiff must submit to the challenged policy before pursuing an action to dispute it." *Nuziard*, 2023 WL 3869323, at *3 (citing *Ray Baillie Trash Hauling*, 477 F.2d at 709-10). Therefore, Piper must demonstrate that applying to the program would have been futile. He cannot do so. The MBDA Act permits any individual of any race or ethnicity to demonstrate social or economic disadvantage for purposes of

MBDA Business Center eligibility. 15 U.S.C. § 9501(15)(A). The MBDA has clarified this eligibility criteria in publicly available guidance to the Business Centers. (*See* MBDA MSJ App. 00019-20 (MBDA Business Center Guidance).) Separately, counsel for defendants has provided this clarification of eligibility criteria to counsel for Piper pursuant to the Court's preliminary injunction order. (*See* MBDA MSJ App. 00084-89.) Yet, Piper has still not applied to the program.

Further, Piper's initial failure to apply to the Wisconsin BC was not based on any specific statement by MBDA or the Wisconsin BC that he was ineligible for the Wisconsin BC's services. Indeed, Piper's undisputed testimony is that: (1) he was not sure what services the Wisconsin BC provided; (2) he was not sure, that he was ineligible for those services; and (3) he made no attempt to get answers from the Wisconsin BC on those questions before filing his complaint. (MBDA MSJ App. 00042-44, 37 (Piper Dep. 68:11-18; 68:19-70:5; 45:3-11).) Under these circumstances, Piper cannot credibly claim he believed that an application for a benefit was futile. The lack of an application and the lack of any attempt to interact with the Wisconsin BC to clarify eligibility requirements and services, all indicate that he had no genuine desire to access the benefit. *See, e.g.*, *Carroll v. Nakatani*, 342 F.3d 934, 942 (9th Cir. 2003) (noting the perfunctory application demonstrated lack of genuine intent).

### 4.    Piper Has Suffered No Injury-in-Fact Because He Had a Policy Grievance and No Genuine Interest in Wisconsin BC Services

A generalized policy grievance is insufficient to confer standing. *United States v. Hays*, 515 U.S. 737, 743 (1995) ("The rule against generalized grievances applies with as much force in the equal protection context as any other."). At bottom, Piper's failure to take even the most basic steps to learn about or access the services of the Wisconsin BC and its services demonstrates that he held nothing more than a policy grievance. Piper testified that he only became interested in trying to access MBDA services "[w]hen it became apparent to [him] that [he] might be able to

fight the injustice of racial discrimination."[12] His deposition testimony is consistent with the allegations in the Complaint that he felt compelled to file suit only after reading about the MBDA on the internet because he "[was] concerned for himself and the millions of other small business owners in America who are excluded from MBDA services because of the color of their skin." (MBDA MSJ App. 00058 (Doc. 1, ¶ 7).) Piper admitted in his deposition that the services offered by the Wisconsin BC were not of primary interest to him. (MBDA MSJ App. 00036-37 (Piper Dep. 44:19-45:11).) His contrary statements that he was in fact interested in services from the Wisconsin BC are belied by his actions and the record. *See, e.g.*, *Carney v. Adams*, 141 S. Ct. 493, 502 (2020) (holding that a litigant's "few words of general intent—without more and against all contrary evidence" failed to demonstrate a personal and individual injury beyond a generalized grievance and thus could not establish an injury-in-fact).

This record evidence establishes that Piper possessed nothing more than a generalized grievance at the time he filed his complaint rather than a concrete and particularized injury-in-fact. *Allen v. Wright*, 468 U.S. 737, 755 (1984). This type of generalized policy grievance does not confer standing. *Hays*, 515 U.S. at 743.

---

[12] "Q: When did you first learn about the Wisconsin Business Center?
 A: When I heard the story on the radio
 Q: Do you recall the date?
 A: I would guess November 2022
 Q: When you heard the story, were you interested in services from the Business Centers at that time?
 A: No.
 Q: When did you become interested in gaining services or securing services from the Business Center?
 A: When it became apparent to me that there (sic) might be able (sic) to fight the injustice of racial discrimination." (MBDA MSJ App. 00036-37 (Piper Dep. 44:19-45:11).)

### 5. Piper Cannot Establish that His Claim Meets Article III Redressability

Piper also cannot establish redressability. Even if the Court were to grant him the relief he seeks – removal of the racial and ethnic statutory presumptions – Piper still would remain ineligible and unqualified for Wisconsin BC services because the Act restricts access to individuals who are socially or economically disadvantaged, 15 U.S.C. § 9501(15)(A), and Piper has admitted that he is not a socially or economically disadvantaged person.

Under the MBDA Act, business owners—including those who qualify based on racial and ethnic presumptions—are only eligible for MBDA services if they are "socially or economically disadvantaged." *See* 15 U.S.C. § 9522.[13] The definition of a "socially or economically disadvantaged" individual is race-neutral, and thus only subject to rational basis review. *See Lewis v. Ascension Parish School Bd.,* 806 F.3d 344, 363 (5th Cir. 2015). A business owner of *any* racial, ethnic, or cultural group can qualify as socially disadvantaged under the definition if their identification as a member of a group has subjected them to racial or ethnic prejudice or cultural bias, or economically disadvantaged if their identification as a member of a group has impaired their ability to compete in the free enterprise system due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area. 15 U.S.C. § 9501(15)(A). A "member of a group" could include, for example, a member of a religious group, a geographically defined group, or some other group sharing a common characteristic. *See* MBDA MSJ App. 00019-20. For example, a white person who has experienced diminished capital and credit opportunities because of their identity may qualify as economically disadvantaged. *Id.*

_____

[13] 15 U.S.C. § 9501(9)(A) defines a minority business enterprise as a business enterprise that is not less than 51 percent owned and managed by one or more socially or economically disadvantaged individuals; *see also* 15 C.F.R. § 1400.1 *et seq.* (cataloguing various inquiries that bear on establishing social or economic advantage).

As such, that individual's business could qualify as a "minority business enterprise" under the MBDA Act, because the sole factors for qualifying as a "minority business enterprise" are (1) qualifying as a socially or economically disadvantaged individual and (2) having a sufficient control and ownership over said business. 15 U.S.C. § 9501(9)(A), (14), (15)(A). *Id*. at § 9524.

The decision in *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 61 (D.C. Cir. 2016), is illustrative because it distinguished the race-neutral program requirements of social and economic disadvantage from the race-conscious presumptions of disadvantage. There, the D.C. Circuit, reviewed a constitutional challenge to the Small Business Administration's 8(a) program and found that the statute at issue, which limited access to the program to individuals who were "socially and economically disadvantaged." The Section 8(a) program, unlike the MBDA Business Center program, involves qualifying small and disadvantaged business for set-aside contracts directly with federal government agencies. 15 U.S.C. § 637(a). Because the *Rothe* statute restricted admission to the program to "socially and economically disadvantaged" business owners, but contained no presumptions about which ethnic or racial groups met those definitions, the *Rothe* court subjected the statute itself to rational basis review.[14] The *Rothe* court found that the definition of "socially disadvantaged" included in the statute was not a race-conscious classification. *Id*. at 64. Consequently, in the absence of a presumption, a review of the statute did not use race in a way that would trigger strict scrutiny. *Id*. at 64, 67; *see also Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998); *Klaver Const. Co. v. Kansas Dep't*

---

[14] The definitions of "socially disadvantaged" and "economically disadvantaged" in the *Rothe* statute are identical to the definitions of "socially disadvantaged" and "economically disadvantaged" in the MBDA Act. *Compare* 15 U.S.C. § 637(a)(5) and (a)(6)(A), *with* 15 U.S.C. § 9501(15)(A). However, the standard for eligibility under the MBDA is more permissive because the MBDA Act participants need only show that they are either socially *or* economically disadvantaged as opposed to both, as is required under the Small Business Act. *Id.*

*of Transp.,* 211 F. Supp. 2d 1296 (D. Kan. 2002). More recently, in *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 2023 WL 4633481 (E.D. Tenn. 2023), a district court in reviewing the regulatory presumptions of social disadvantages in the Section 8(a) program found that those presumptions could not withstand strict scrutiny. *Id.* at *19 (holding that "Defendants' use of the rebuttable presumption violates Ultima's Fifth Amendment right to equal protection of the law."). Again, the narrow tailoring considerations for the SBA 8(a) program differ from this matter because the 8(a) program involves the direct award of contracts to small and disadvantaged businesses, 15 U.S.C. § 637(a), while the MBDA Business Center program does not. In *Ultima,* the court enjoined the use of the presumptions but did not enjoin the SBA 8(a) from using the social or economically disadvantaged standard to admit participants. *Ultima Servs. Corp.*, 2023 WL 4633481 at *19.

Consequently, even if this Court were to remove the presumptions in the statute and regulations, the requirement that Business Center participants be socially and economically disadvantaged would remain.[15] However, Piper has stated he is not socially or economically disadvantaged. (MBDA MSJ App. 00038-41 (Piper Dep. 64:11-67:13).) That fact is dispositive as to redressability. Even if he is granted the relief he seeks – the removal of the racial or ethnic presumptions that qualify certain races and ethnicities as socially or economically disadvantaged – he remains ineligible for Business Center services. And, as noted above, courts have held that when a plaintiff is disqualified or ineligible for a benefit because of a race neutral criterion, they do not have standing to challenge the program on equal protection grounds. *See Day*, 500 F.3d at 1135; *Black v. Pension Ben. Guar. Corp.*, 2011 WL 3875055, at *4 (E.D. Mich. 2011) (same).

---

[15] *See* 15 U.S.C. § 9596 (if a provision of the statute is held by this Court to be invalid, it shall not invalidate every other provision of the statute).

C.      **Plaintiff Bruckner Does Not Have Article III Standing**

Plaintiff Christian Bruckner does not have standing to bring this action because he is not eligible to receive assistance from the Orlando Business Center for race-neutral reasons--namely, that he is not able and ready to participate in the MBDA Business Center Program based on his company's relative newness and lack of receipts.

1.      **Statement of Undisputed Facts as to Plaintiff Bruckner and the Orlando Business Center**

Plaintiff Bruckner identifies as a white male (MBDA MSJ App. 00097 (Bruckner Dep. 19:10-14)), and is a full-time student at Strayer University, studying business administration with a concentration in acquisitions and contracts. (MBDA MSJ App. 00095-96 (Bruckner Dep. 17:19-18:9).) He is also the sole owner, officer, and employee of Project Management Corporation, Inc. ("PMC") (MBDA MSJ App. 00102, 110 (Bruckner Dep. 90:18-21; 99:5-8)), a Florida limited liability company, incorporated on March 25, 2021.[16] (MBDA MSJ App. 00103 (Bruckner Dep. 91:1-9).) Bruckner intends for PMC to operate as a prime contractor on government projects in the services and goods industry. (MBDA MSJ App. 00103, 105-106 (Bruckner Dep. 91:10-17; 94:11-95:15).)

Since opening in 2021, PMC has grossed about $6,000-$6,200 in total revenue, resulting from Bruckner's successful bids on three defense contracts. (MBDA MSJ App. 00106-110 (Bruckner Dep. 95:16-99:4; 99:15-20).) Those contracts had values of $5,800, $20, and $400. *Id*. Bruckner's total profit on those three contracts was roughly $500. *Id*.

---

[16] Bruckner incorporated PMC after closing Car Squad Inc., a mobile brake repair service he closed in 2021 because the business was generating no revenue and no income. (MBDA MSJ App. 00098-100 (Bruckner Dep. 77:9-14; 75:1-76:10).)

Bruckner's gross personal income since founding PMC is "nonexistent." (MBDA MSJ App. 00100-101 (Bruckner Dep. 77:17-78:14)), because he has been a full-time student for PMC's entire existence. *Id*. Bruckner draws no salary from PMC. (MBDA MSJ App. 00110 (Bruckner Dep. 99:9-12).) PMC has no lines of credit or sources of credit. (MBDA MSJ App. 00104 (Bruckner Dep. 93:10-12).) Nor does PMC have any working capital. (MBDA MSJ App. 00104 (Bruckner Dep. 93:13-17).) Bruckner admits that he does not currently have sufficient income or assets to secure loans for the business. (MBDA MSJ App. 00106-107, 101, 104 (Bruckner Dep. 95:16-96:18; 78:1-5; 93:4-6).) This limits the types of contracts he could reasonably be expected to fulfill. (MBDA MSJ App. 00104-105 (Bruckner Dep. 93:10-94:5).) Bruckner considers PMC a "micro" business. (MBDA MSJ App. 00104 (Bruckner Dep. 93:13-21).)

The Orlando Business Center is operated by 3D Strategic Management Consulting ("3D").[17] The Orlando BC requires that any business seeking services: (1) have been in business for 3 years or more; and (2) have an annual revenue of $500,000 or more.[18] (MBDA MSJ App. 00124 (Feb. 15 email from Orlando BC to Bruckner).)

On or around January 13, 2023, Bruckner accessed and reviewed the website for the Orlando BC. (MBDA MSJ App. 00068 (Doc. 1, ¶ 36).) Bruckner claims that he was interested in the Orlando Business Center because he thought it could provide him access to government contracts. (MBDA MSJ App. 00068 (Doc. 1, ¶ 36).) On the same day, Bruckner completed the "Contact Us" form on the website for the Orlando BC. (MBDA MSJ App. 00117.) He asked for any information the Orlando BC could provide to assist his business in "procuring state or federal

---

[17] *About Us*, ORLANDO MBDA BUSINESS CENTER, https://orlandombdacenter.com/about/ (last visited Oct. 25, 2023).
[18] *Services*, ORLANDO MBDA BUSINESS CENTER, https://orlandombdacenter.com/services/ (last visited Oct. 25, 2023).

contracts." *Id*.  On January 18, 2023, at 11:06 a.m., the Orlando BC contacted Bruckner via email. (MBDA MSJ App. 00118-119.) In the email, the Orlando BC asked Bruckner to fill out an intake form and a client engagement form. *Id*.

After several email exchanges between Bruckner and Orlando BC to clarify whether Bruckner was eligible for Orlando BC services, Orlando BC informed Bruckner that the "Orlando MBDA Business Center's requirements are at least three years in business and $500,000 in annual revenue." (MBDA MSJ App. 00124.). The Orlando BC suggested Bruckner reach out to 3D Strategic Management's Business Incubator program, which could provide services to less mature companies, who had not reached the years-in-business and revenue milestones. *Id*. That program, the email explained was "designed for businesses from start-up to scale up capacity." *Id*.

For the next several months, the Orlando BC included Bruckner in emails informing current and prospective clients of various programs that Bruckner could have accessed regardless of race or ethnicity—including small business training opportunities offered by SBA, EPA grant information sessions, and financial management webinars. (MBDA MSJ App. 00131-164.)

### 2. Bruckner Cannot Establish Injury-in-Fact Because He is Not "Able and Ready" to Obtain a Benefit From the Orlando BC

Bruckner has not established that he is either able or ready to receive Orlando BC services. To be considered "able and ready," a plaintiff must meet the race-neutral requirements of the desired benefit. *Carroll*, 342 F.3d at 942. In *Carroll*, for example, the Ninth Circuit denied standing to a plaintiff challenging the Office of Hawaiian Affairs' business loan program on equal protection grounds. The court found that the plaintiff was not "able and ready" to access the business loan program because he had not sought out alternative sources of financing as required by the Office of Hawaiian Affairs, a race-neutral requirement of the program. Similarly, a district court recently determined that Bruckner himself lacked standing to challenge the Department of

Transportation's Disadvantaged Business Enterprise ("DOT DBE") program because he likely could not satisfy "many of the local recipients' qualifications to bid, such as municipal permitting or the like." *Bruckner,* 2023 WL 2744026, at *5 (explaining that Bruckner did not have standing because he could not meet the race neutral criteria for participation in the program).[19] *See also Petit v. City of Chicago*, 352 F.3d 1111 (7th Cir.2003) (officers who would have been rejected for promotion even without allegedly discriminatory process lacked standing to bring equal protection claim against that process because they failed to suffer cognizable injury).

As in *Carroll* and *Bruckner*, there is no genuine dispute here that Bruckner is not able and ready to compete for the service that he has allegedly been denied. The record at summary judgment establishes that Bruckner does not meet the race-neutral requirements to access Orlando BC services. Bruckner's business, PMC, was (and remains) far below the Orlando BC's $500,000 annual revenue requirement, and PMC did not meet the Orlando BC's 3-year in business requirement when the Complaint was filed (and still does not meet that requirement). The Orlando BC directly communicated these requirements to Bruckner on February 15, 2023, a month before he filed suit. (MBDA MSJ App. 00124-125.) Bruckner's company, with revenue far below the Orlando BC's acceptable threshold and below the Orlando BC's years in business requirements, is in its infancy and not mature enough to benefit from Orlando BC services. *Id*. Consequently, the race-conscious presumptions do not create an injury for standing, because Bruckner cannot demonstrate that he stands "able and ready" to access the service in the absence of the alleged barrier.

---

[19] As noted, the Orlando BC informed Bruckner via email of the Orlando BC's minimum revenue and time-in-business requirements. (MBDA MSJ App. 00124.)

### 3. Bruckner Cannot Establish Redressability To Maintain Article III Standing

Even if Bruckner could establish an injury, he cannot establish that a favorable ruling would redress that injury. There is no genuine dispute that Bruckner does not meet the race-neutral requirements set by the Orlando BC for the reasons discussed above. He is thus "disqualified from competing" and ineligible for the benefit he seeks and lacks standing to pursue an equal protection claim against Defendants. *See Day*, 500 F.3d at 1135; *supra* IV.A.

### D. <u>Plaintiff Nuziard Does Not Have Article III Standing</u>

Plaintiff Jeffrey Nuziard does not have standing to bring this action because he is not eligible to receive assistance from the Dallas-Fort Worth Business Center for race-neutral reasons, including that he is not able and ready to participate in the Business Center Program based on his lack of a sustainable business and his desire for services not provided by the Business Center.

### 1. Statement of Undisputed Facts as to Plaintiff Nuziard and The Dallas-Fort Worth Business Center

Jeffrey Nuziard is a white male. (MBDA MSJ App. 00212 (Nuziard Dep. 112:12-13).) He is the founder, and current majority owner, of the Sexual Wellness Centers of Texas ("SWT"), a Texas limited liability company founded in February 2020. (MBDA MSJ App. 00185-186 (Nuziard Dep. 56:13-57:6).) As initial start-up capital, Nuziard used about $350,000 in cash from his savings to cover rent, building renovations, the purchase of lasers and other medical equipment, and to hire staff. (MBDA MSJ App. 00186-189 (Nuziard Dep. 57:7-16; 58:7-60:9).) Nuziard sustained the business with personal funds until he began seeing patients and generating revenue in July 2020. (MBDA MSJ App. 00189-190 (Nuziard Dep. 60:10-61:5).)

SWT offers a proprietary protocol to male patients seeking to reverse erectile dysfunction, and to female patients looking to improve sexual function. (MBDA MSJ App. 00172-174, 192-

193 (Nuziard Dep. 25:11-26:4; 27:7-15; 63:19-64:20).) Nuziard explained in his deposition that he developed this protocol over ten years by experimenting on cadavers provided by friends in the medical community and finalized the protocol in 2017. (MBDA MSJ App. 00172-174, 176 (Nuziard Dep. 25:18-26:4; 26:17-27:6; 30:5-11).) He claims that he recently patented his protocol (for use on men) in 2023. (MBDA MSJ App. 00172-174, 201 (Nuziard Dep. 25:21-27:6; 75:6-9).)[20] He claims that he is applying for a patent for the same protocol for use on women. (MBDA MSJ App. 00201 (Nuziard Dep. 75:8-9).) For his contribution to medicine (inventing the protocol), Nuziard claims that the University of North Texas "gifted" him an honorary Ph.D. in 2017. (MBDA MSJ App. 00172, 214-215 (Nuziard Dep. 25:4-7; 118:18-119:3).) Prior to founding SWT, Nuziard worked for 6 years as a laser sales representative for a medical laser company. (MBDA MSJ App. 00175, 177-178, 184 (Nuziard Dep. 29:6-8; 32:3-33:8; 51:6-10).)[21]

Nuziard has started several businesses over the course of his career. (MBDA MSJ App. 00170-171, 179-181 (Nuziard Dep. 22:19-23:11; 39:16-40:7; 41:12-13).) In the early 1990s, Nuziard founded and ran a church ministry, called Second Chance Ministries. (MBDA MSJ App. 00218-222; *see also* MBDA MSJ App. 00170-171 (Nuziard Dep. 22:19-23:11).) In 1993, he founded The Financial Group, a company providing insurance based financial advice and portfolio management. (MBDA MSJ App. 00179-181 (Nuziard Dep. 39:16-41:30).) Also in 1993, Nuziard founded and operated First Secured Mortgage Company, writing up mortgages for homeowners who wished to refinance and then selling those mortgages to individual investors in blocks that eventually reached $5 million each. (MBDA MSJ App. 00181-182 (Nuziard Dep. 41:12-42:17).)

---

[20] During his deposition, Nuziard declined to provide the patent number for this medical protocol.
[21] Nuziard declined to identify the name of his previous employer. A public record search reveals that Nuziard was linked to Aesthetic Lasers, Inc. as the National Sales Director. https://rocketreach.co/jeff-nuziard-email_8403251

He exited the company when he claims a "business partner had embezzled $7 million" and the "building had mysteriously burned down one day with all the paperwork in it while [he] was out of town." (MBDA MSJ App. 00183 (Nuziard Dep. 44:12-16).)

SWT currently operates out of two locations. (MBDA MSJ App. 00186-187 (Nuziard Dep. 57:20-58:6).) The first location, in Frisco, Texas, opened for business in July 2020. *Id.* The second location, in Colleyville, Texas, opened for business in or around April 2022. (MBDA MSJ App. 00187, 197 (Nuziard Dep. 58:1-6; 68:5-12).) Both locations provide bi-weekly treatments over the course of one year for a one-time flat fee of $10,000. (MBDA MSJ App. 00192-194 (Nuziard Dep. 63:19-65:6).)

Since inception, the SWT has struggled financially. The business posted a loss every year from 2020 until the present. (MBDA MSJ App. 00226-235.) According to Nuziard, he "was losing [his] butt fast" in 2020, and the business posted a loss of $257,807. (MBDA MSJ App. 00191-192 (Nuziard Dep. 62:14-63:4).) In need of capital, Nuziard talked to bankers about getting loan assistance, but "wasn't in much of a qualifying position" because he had "zero income and a business that could not bring in patients." (MBDA MSJ App. 00196 (Nuziard Dep. 67:4-15).) In 2021, he claims he was able to secure a line of credit for about $80,000 to "keep [him] afloat." (MBDA MSJ App. 00195-196 (Nuziard Dep. 66:18-67:3).) SWT posted a loss of $66,245 for 2021. (MBDA MSJ App. 00228-229.)

In need of more capital, Nuziard turned to his professional network. He sold equity in his business to three investors in 2021 and 2022 so the business could stay solvent. (MBDA MSJ App. 00197-198 (Nuziard Dep. 68:21-69:3; 69:12-15; 68:5-12).) Nuziard used a portion of the investments to fund the opening of SWT's Colleyville location. (MBDA MSJ App. 00197 (Nuziard Dep. 68:5-17).) Still, with two locations and new capital from investors, Nuziard stated

that in 2022 he had "zero business, [was] underwater, [and] drowning." (MBDA MSJ App. 00197 (Nuziard Dep. 68:13-17).) SWT posted a loss of $1,040,537 for 2022. (MBDA MSJ App. 00230-235.) According to Nuziard, SWT continues to operate at a loss in 2023. (MBDA MSJ App. 00213-214 (Nuziard Dep. 117:18-118:4).) The current "burn rate" of SWT is about $46,000-47,000 per month. *Id*. At that burn rate, Nuziard estimates that he will have to shut down in a year. (MBDA MSJ App. 00214 (Nuziard Dep. 118:11-17).)

The Dallas-Fort Worth Business Center ("Dallas-Fort Worth BC") is operated by the Dallas-Fort Worth Minority Supplier Development Council. (MBDA MSJ App. 00223 (Dallas-Fort Worth BC Decl., ¶ 3).) The Dallas-Fort Worth BC requires that a business seeking services: (1) have been in business for 2 years or more; (2) represent a high growth industry; and (3) have sustainable, stable, and consistent revenue. (MBDA MSJ App. 00066 (Doc. 1, ¶ 33).) Once the Dallas-Fort Worth BC determines that a business is a good fit for client services, staff members provide business consulting services. (MBDA MSJ App. 00224 (Dallas-Fort Worth BC Decl., ¶ 7).) These services include, for example, assistance with packaging financial documents for loan programs, international trade consulting, and contract bid preparation support. (MBDA MSJ App. 00224 (Dallas-Fort Worth BC Decl., ¶ 7).) For the initial assessment of the sustainable, stable, and consistent revenue of a business, the Dallas-Fort Worth BC evaluates the potential client's business model, revenue, and income to ensure that the client is a good fit and can benefit from the services offered. (MBDA MSJ App. 00223-224 (Dallas-Fort Worth BC Decl., at ¶¶ 4-5).)

Nuziard learned about the MBDA online in or around 2021 or 2022. (MBDA MSJ App. 00198-199 (Nuziard Dep. 69:21-70:3).)[22] Nuziard stated that he sought legal and business advice

---

[22] Nuziard's Complaint did not include the 2022 contacts with the Dallas-Fort Worth BC that he described in this deposition. (MBDA MSJ App. 00198-199 (Nuziard Dep. 69:21-70:5).) In his

from the Dallas-Fort Worth BC about a pending patent, about licensing or franchising, and federal and business grants from the Dallas-Fort Worth BC. (MBDA MSJ App. 00198-203, 212 (Nuziard Dep. 69:21-70:5; 74:6-75:9; 78:5-17; 79:2-79:13; 112:8-11).) The Dallas-Fort Worth BC does not provide either legal or business advice on patents, franchising, or licensing, and does not award direct grants to business center clients. (MBDA MSJ App. 00224 (Dallas-Fort Worth BC Decl., ¶ 7).)

### 2.      Nuziard Cannot Establish Injury-in-Fact Because He Was Not "Able and Ready" to Obtain a Benefit From the Dallas-Fort Worth BC

Like Piper and Bruckner, the record evidence establishes that Nuziard is not "able and ready" to obtain the benefit at issue because he does not qualify for services from the Dallas-Fort Worth BC for reasons having nothing to do with his race. *See City of Jacksonville*, 508 U.S. at 666 (an equal protection plaintiff may show injury in fact where he adequately pleads that he is "able and ready" to obtain the benefit, but a "discriminatory policy prevents him from doing so on an equal basis").

The Dallas-Fort Worth BC requires that businesses "have sustainable, stable, and consistent revenue" to access its services, and applies this standard to every business seeking services. (MBDA MSJ App. 00223-224 (Dallas-Fort Worth BC Decl., ¶¶ 4-5); MBDA MSJ App. 00066 (Doc. 1, ¶ 33).) The Dallas-Fort Worth BC explains that if it determines that the business does not have a sustainable business model, it will not offer client services to that business. (MBDA MSJ App. 00224 (Dallas-Fort Worth BC Decl., ¶ 5).)

---

Complaint, Nuziard states only that on March 23, 2023, he visited the website for the Dallas-Fort Worth BC. (*See* MBDA MSJ App. 00065-66 (Doc. 1, ¶¶ 32-34).) The Dallas-Fort Worth BC has no record of having any contact with Nuziard. (MBDA MSJ App. 00224 (Dallas-Fort Worth BC Decl., ¶ 8).)

It is undisputed that SWT has never met this standard. Nuziard admitted that his business is not doing well and is on a failing trajectory—stating that in its current financial state the business had only a year left before it would have to shut its doors. (MBDA MSJ App. 00214 (Nuziard Dep. 118:11-17).) Nuziard also testified that the financial state of the business was even more dire in 2021. He testified that in 2020 and 2021, he could not qualify for loans because of SWT's poor financial health. (MBDA MSJ App. 00196-197 (Nuziard Dep. 67:2-68:15).) In explaining why he could not qualify for loans, Nuziard said that in 2022 he had "zero business. I'm underwater. I'm drowning." (MBDA MSJ App. 00197 (Nuziard Dep. 68:11-20).) SWT posted a loss of $1,040,537 for 2022. (MBDA MSJ App. 00230-235.) There is no genuine dispute that Nuziard's business model, at all relevant times, was not "sustainable." Thus, Nuziard's business was not qualified or eligible for Dallas-Fort Worth BC business center services. Because Nuziard did not meet this race-neutral requirement, he cannot establish a concrete injury based on the criteria for social or economic disadvantage. *See, e.g., Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 646 (N.D. Tex. 2021). *SRS Techs., Inc.*, 112 F.3d at 510 (finding plaintiff lacked standing where it did not meet race-neutral requirement for entry into program).

### 3. Nuziard Cannot Establish That His Claim Meets Article III Redressability

Much like Piper and Bruckner, *see supra*, the facts developed in discovery show that a favorable court decision would not redress Nuziard's alleged injury-in-fact. Applying well established redressability principles to Nuziard's claim, *see supra* at V.A, the record is clear that Nuziard is not and has never been "qualified" or "eligible" to access Dallas-Fort Worth BC services. He is "disqualified from competing" for business center services because there is no genuine dispute that SWT does not meet the race neutral requirement for sustainable, stable, and consistent revenue. Therefore, a favorable decision on his equal protection claim cannot redress

his alleged injury because there is no dispute that he was (and remains) ineligible for Dallas-Fort Worth BC services. Because he is ineligible to "compete on equal footing" (due to the race-neutral requirements), his claim fails Article III's redressability prong. *See, supra,* IV.A.

Moreover, Nuziard cannot establish redressability because the Dallas-Fort Worth BC does not provide the specific services he claims he sought. In his deposition, Nuziard stated that he sought federal or business grants, legal advice related to patents, and business advice regarding licensing and franchising from the Dallas-Fort Worth BC. (MBDA MSJ App. 00200-203, 212 (Nuziard Dep. 74:4-11; 74:20-75:9; 78:17-79:3; 112:8-11).) But it is undisputed that the Dallas-Fort Worth BC does not award federal or business grants to business center clients, does not have the expertise to provide patent legal advice to business center clients, and does not provide licensing or franchising advice to business center clients. (MBDA MSJ App. 00224 (Dallas-Fort Worth BC Decl., ¶ 7).) *See Day*, 500 F.3d at 1133 (noting that the plaintiff must show that the challenged discriminatory criterion was the barrier that disadvantaged his ability to obtain benefit.). Here the alleged discriminatory barrier is not the reason Nuziard cannot obtain the benefits he sought. Rather, he cannot access those benefits because the Dallas-Fort Worth BC does not provide them to anyone, regardless of race.

## VI.     THE MBDA ACT IS CONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE

The Minority Business Development Act was enacted to remedy specific and well-documented discriminatory practices that have prevented socially and economically disadvantaged business owners from competing equally in the free market of America.[23] As part of that program,

---

[23] MBDA MSJ App. 00236-237 (Cardin Lauds Final Passage of Legislation to Expand and Make Permanent Minority Business Development Agency, Press Releases (2021), https://www.sbc.senate.gov/public/index.cfm/2021/11/cardin-lauds-final-passage-of-legislation-to-expand-make-permanent-minority-business-development-agency (last visited Oct. 26, 2023)).

the MBDA Act defines a subset of racial minorities as presumptively socially and economically disadvantaged. 15 U.S.C. § 9501(15)(B). Supreme Court precedent makes clear that the government can employ such remedial race-based measures within constitutional constraints where, as here, it is necessary to further the compelling interest of remedying "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country" and where such action is narrowly tailored to meet that interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995). The presumptions in the MBDA program are both, and for this reason, Plaintiffs' facial challenge to the MBDA Act must fail.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Assoc. Builders and Contractors of Texas, Inc. v. National Labor Relations Board*, 826 F.3d 215, 220 (5th Cir. 2016). Facial challenges are disfavored by the Supreme Court "for several reasons," including that they "'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 206 (D.D.C. 2015) (*citing Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Plaintiffs cannot meet this heavy burden.

In facial challenges under the Equal Protection Clause, the government bears the initial burden of demonstrating that the program is constitutional. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 486-92, 500 (1989). Here, the presumptions of social or economic disadvantage in the MBDA Act survive strict scrutiny under a facial challenge because the government had, and

continues to have, a strong basis in evidence to support the presumptions and the program is narrowly tailored.[24]

### A.     The MBDA Act and Regulations Are Supported by a Compelling Interest

To the extent that the MBDA's statute and regulations include race conscious criteria, those criteria are subject to strict scrutiny. *Adarand*, 515 U.S. at 227. Although strict scrutiny is a demanding standard, it is not fatal. *Id.* at 237. Courts have recognized that in "order to remedy the effects of prior discrimination, it may be necessary to take race into account." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986). There is no question that remedying the effects of past discrimination constitutes a compelling governmental interest. *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). *See Nuziard,* No. 4:23-CV-0278-P, 2023 WL 3869323, at *9. Moreover, the body of case law in support of the government's use of race-conscious programs to remedy discrimination where it has been a passive participant is not undercut by the Court's recent decision in *SFFA v. President and Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2186 (2023) (Thomas, J. concurring) (noting that "nothing prevents the States from according an admissions preference to identified victims of discrimination.") (citing *J.A. Croson Co.*, 488 U.S. at 526).

As this Court has noted,[25] under *Vitolo*, the strict scrutiny analysis for race conscious government programs has three distinct elements. First the policy cannot rest on a generalized assertion that there has been past discrimination, but instead must target a "specific episode of past discrimination." *Vitolo*, 999 F.3d at 361 (citing *J.A. Croson Co.*, 488 U.S. at 498). Second, the *Vitolo* court explained that there must be evidence that supports an inference of intentional

---

[24] Because the other participation requirements of the MBDA Business Center program, including the limitation to socially or economically disadvantaged business owners, are race-neutral, those requirements are only subject to rational basis review. *Lewis,* 806 F.3d at 363.
[25] *See Nuziard*, 2023 WL 3869323, at *5.

discrimination. *Id*. And third, the government must have had either an active or passive hand in the discrimination. If "the government show[s] that it had essentially become a passive participant in a system of racial exclusion…then the government can act to undo the discrimination." *Id*. (citing *J.A. Croson Co.*, 488 U.S. at 492).[26]

Fifth Circuit jurisprudence largely follows the same rubric in analyzing equal protection claims based on race-conscious government programs. In *W.H. Scott Constr. Co. v. City of Jackson* the court held that "combating racial discrimination is a compelling government interest." 199 F.3d 206, 217 (5th Cir. 1999) (hereinafter *Scott*). And a governmental entity "has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *J.A. Croson Co.*, 488 U.S. at 492; *see also Scott*, 199 F.3d at 217 (citing *J.A. Croson Co.*, 488 U.S. at 492). The government must also identify the targeted discrimination with sufficient particularity to support race-conscious remedies. *See Scott,* 199 F.3d. at 217. But the Fifth Circuit makes clear that the discrimination need not be the work of the governmental entity itself, and evidence of passive participation in the discriminatory awarding of public contracts may establish a compelling interest in remedial action. *See id.* (citing *J.A. Croson Co.*, 488 U.S. at 492).

---

[26] Both *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021) and subsequently *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 2023 WL 4633481 (E.D. Tenn. 2023) rule that the Government's use of race conscious programs to combat evidence of prior discrimination did not survive strict scrutiny. However, each of those programs were markedly different than the program at issue in this case. Those cases involved the direct award of federal funds (either Restaurant Revitalization Funds under American Rescue Plan Act or Section 8(a) Program set-aside contracts) with race-conscious criteria. *See Vitolo*, 999 F.3d at 356-57 and *Ultima Servs. Corp.,* 2023 WL 4633481 at *3-4. In this case, the MBDA Business Center program does not involve the award of federal contracts or grants in a race-conscious method, or even the direct provision of services from MBDA to business owners in a race-conscious manner. Instead, through cooperative agreements awarded in a race-neutral manner, the MBDA and independent business centers provide business advice, planning and networking to socially or economically disadvantaged businesses.

Consequently, in response to Plaintiffs' constitutional challenge, Defendants must show that the government had a strong basis in evidence to conclude that race-conscious action was necessary to remedy the discrimination that has stunted the success of minority owned businesses. *J.A. Croson Co.,* 488 U.S. at 500. At the same time, courts do not require Defendants to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010); *see also Midwest Fence Corp. v. United States Dep't of Transp.,* 840 F.3d 932, 945 (7th Cir. 2016). Defendants can provide either direct or circumstantial evidence to satisfy the strong basis in evidence standard. *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999). And statistical evidence is one type of circumstantial evidence that may be used. *See Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) ("[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination'") (quoting *J.A. Croson Co.*, 488 U.S. at 501); *see also Kossman Contracting, Co. v. City of Houston*, 2016 WL 11473826 (S.D. Tex. Feb. 17, 2016). Furthermore, "[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that [a practice] bears more heavily on one race than another." *Vill. of Arlington Heights v. Metro. House. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Given *Croson's* emphasis on probative statistical evidence, other courts considering equal protection challenges to minority-participation programs have looked to disparity studies that "compare the percentage of MBEs in the relevant market that are qualified to undertake [public] contracting work with the percentage of total [public contracting] dollars that are presently awarded to [MBEs]" to test whether *Croson's* evidentiary burden for an inference of intentional discrimination is satisfied. *J.A. Croson Co.*, 488 U.S. at 470-71. *See, e.g., Midwest Fence Corp. v.*

*United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011). "[A] significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors would support a finding that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities and would justify remedial action by the government for its passive participation." *Scott,* 199 F.3d at 218*.* (emphasis omitted) (quoting *J.A. Croson Co.*, 488 U.S. at 509).

The statistical evidence in the disparity studies referenced below concerning federal and local contracting arenas provide specific proof that the federal government continues to be a passive participant in private discrimination towards MBEs. Substantial congressional evidence also documents how minority business owners face additional barriers in credit opportunities, business formation, and investment due to discrimination and its lingering effects. The Act seeks to remedy these issues through the Business Centers programs by providing guidance and services across in business development, capacity building, and business network navigation and is supported by a strong basis in evidence.

### 1.    The MBDA Act Remedies Discrimination That Affects Minority Business Formation, Growth, and Competition

Congress had a strong evidentiary basis to support the passage of the Minority Business Development Act in 2021 and through today.[27] In the time since Executive Order 11625 took effect in 1971, Congress has amassed a significant body of evidence related to the consequences of discrimination on minority business owners. A 1975 Congressional report found: "[t]he effects of

---

[27] "Congress' fact-finding process is generally entitled to a presumption of regularity and deferential review." *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 251 (D.D.C. 2012).

past inequities stemming from racial prejudice ha[d] not remained in the past . . .. The presumption must be made that past discriminatory systems have resulted in present economic inequities." H.R. Rep. No. 94-468 (1975). (MBDA MSJ App. 00246-247.) Congressional evidence from 1982[28], 1987[29], 1988[30], 1996[31], 2010[32], 2016[33], and most recently 2022[34], demonstrates that, unfortunately, discrimination and its lingering effects persist and continue to harm aspiring minority business owners.[35] In 2021, Congress received testimony that Black wealth accumulation had undergone a sustained process of asset underdevelopment due to federally sanctioned redlining, which reduced the credit available to Black households.[36] For this reason, in the capacity building category,

---

[28] MBDA MSJ App. 00282-343 (H.R. Rep. No. 97-956 (1982)).

[29] MBDA MSJ App. 00344-459 (H.R. Rep. No. 100-460 (1987)).

[30] MBDA MSJ App. 00460-533 (*Minority Business Development Act of 1988: Hearing on H.R. 1769 Before the H. Sub. Comm. on Procurement, Innovation, and Minority Enterprise Development of the Comm. on Small Bus.*, 100th Cong. (1988)).

[31] MBDA MSJ App. 00534-555 (*The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey,* 61 Fed. Reg. 26042-01 (May 23, 1996)).

[32] MBDA MSJ App. 00556-737 (*Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's Capital Markets: Hearing Before the Comm. on Small Bus. and Entrepreneurship*, 111th Cong. (2010)).

[33] MBDA MSJ App. 00738-845 (U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016)).

[34] MBDA MSJ App. 00846 (Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022)).

[35] MBDA MSJ App. 00847-905. The 2022 Compelling Interest Report has been considered by Congress. (*See* MBDA MSJ App. 00906-907 (168 Cong. Rec. E619-20 (statement of Rep. Carolyn Maloney)).) The 2022 report updated and expanded upon a 2010 DOJ Report on the same topic, which also was considered by Congress and cited in federal court as evidence of a compelling government interest in the use of race-conscious measures to support the ability of people of color to compete on an equal basis. *See Midwest Fence Corp. v. United States Dep't of Transp.*, No. 10 C 5627, 2011 WL 2551179, at *12 (N.D. Ill. June 27, 2011).

[36] MBDA MSJ App. 00908-1130, 918-920 (*See How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color: Hearing before Subcomm. on Oversight and Investigations of the H. Comm. on Fin. Servs.*, 117th Cong. 7 (2021) (testimony of Willian Darity Jr., Samuel DuBois Cook Professor of Public Policy, Duke University)(citations omitted)).

Business Centers provide one-on-one business counseling, focusing on access to capital and management counseling.[37]

Also, in 1996, the Department of Justice ("DOJ") produced an overview of Congressional hearings, disparity studies, reports, and evidence from 1980 to 1995.[38] (MBDA MSJ App. 00534-555 (*The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey,* 61 Fed. Reg. 26042 (May 23, 1996)).) DOJ found "over and over again, studies show that minority applicants for business loans are more likely to be rejected, and when accepted, receive smaller loan amounts than nonminority applicants with identical collateral and borrowing credentials." (MBDA MSJ App. 00549-50 (*Id.*).) Specifically, the report found that Black applicants were three times more likely to be rejected for business loans than whites, and that disparities remained statistically significant after controlling for other factors. Statistical analysis also supported the contention that minorities were shut out of business networks, which denied them the benefit of competitive supply chain pricing. *Id.* Courts have relied on the DOJ report to find a compelling interest to support race-conscious federal government programs. *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1167-1176 (10th Cir. 2000) (holding that "the evidence cited by the government and its amici, particularly that contained in [the DOJ compelling interest report], more than satisfies the government's burden of production regarding the compelling interest for a race-conscious remedy); *Sherbrooke Turf, Inc. v. Minnesota Dept. of Transp.*, 345 F.3d 964, 970 (8th Cir. 2003) (adopting 10th Circuit's analysis in *Adarand*, 228 F.3d at 1167-1176, which cited the DOJ report, and holding that "Congress had a strong basis in the evidence to

---

[37] *See* MBDA MSJ App. 00023-27 (*Notice of Federal Funding*, 3-5 2022 (*available at* MBDA Business Center Program NOFO - 2022.pdf)(last visited October 25, 2023)).
[38] *See* MBDA MSJ App. 01131-1171, 1156 (61 Fed. Reg. 26042-01 (May 23, 1996), 1996 WL 271176 n. 12).

support its conclusion that race-based measures were necessary . . . ."); *N. Contracting, Inc. v. State of Illinois*, 2004 WL 422704, at *27-34 (N.D. Ill. Mar. 3, 2004) ("This court agrees with the *Adarand VII* and *Sherbrooke Turf* courts that [the government's] evidence is sufficient to establish a compelling governmental interest.").

Furthermore, in 2016, the MBDA produced an overview of nationwide disparity studies to demonstrate the ongoing effects of discrimination on minority business owners. MBDA's review of more than 100 disparity studies found that minority businesses in every major industry sector throughout the Country experienced substantial contracting disparities, which could not be explained by factors outside of discriminatory behaviors towards racial and ethnic minorities.[39] A disparity study of a Texas jurisdiction included in the MBDA report has been found to provide clear evidence to support the government's compelling interest to remedy discrimination against minority business owners. *See Kossman Contracting, Co.*, 2016 WL 11473826 at *21-22.

Finally, in 2022, DOJ produced a follow-up report for Congress that surveyed more than 200 disparity studies and summaries that had been submitted to Congress. The report was entered into the Federal Register on January 31, 2022.[40] The report details the common race-based barriers to free enterprise expressed above and the negative effects they have on minority groups presumed to be socially or economically disadvantaged by the MBDA. The report identified significant continuing disparities in business formation and success between minority-owned businesses relative to their white counterparts, and reemphasized that the lack of access to capital among

---

[39] MBDA MSJ App. 00738-845 (U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016)).

[40] MBDA MSJ App. 00846 (Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022)); MBDA MSJ App. 00847-905 (U.S. Dep't of Justice, *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (2022)).

minority business owners is directly traceable to intentional governmental action.[41] The MBDA Business Center Program seeks to address these issues by providing information and assistance to MBEs in contracting—pursuing federal, state, local, and private sector prime contract and subcontract opportunities—and in supply chains—pursuing opportunities to participate in global supply chains.[42]

> ### a. Minority Business Owners Face Discrimination in Access to Credit

Evidence before Congress has consistently shown that minority business owners have far less access to capital and credit for business formation and sustainment than non-minority business owners due to "racial discrimination in lending markets."[43] The private discrimination of banks has an outsized effect on minority businesses because access to capital is one of the singular most

---

[41] Courts routinely consider evidence submitted to Congress following the enactment of race-conscious policies like the presumptions in the MBDA Act. "[F]ormal findings by a government entity "need neither precede nor accompany the adoption of affirmative action." *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1565 (11th Cir. 1994). *See also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 286 (1986) (rejecting any formal findings requirement). In reaching that conclusion in the affirmative action context, the Eleventh Circuit allowed the Government to justify its affirmative action plans post-hoc using any evidence available to it. *Ensley Branch, NAACP*, 31 F.3d at 1568 ("If the City and Board can now show strong evidence of the need for affirmative action in a department, then future affirmative action in that department is justified."); *see also Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992) ("The law is plain that the constitutional sufficiency of a state's proffered reasons necessitating an affirmative action plan should be assessed on whatever evidence is presented, whether prior to or subsequent to the program's enactment."); *Contractors Ass'n v. City of Philadelphia,* 6 F.3d 990, 1004 (3d Cir. 1993) (observing that "[b]ecause injunctions are prospective only, it makes sense to consider all available evidence . . . including prospective evidence.").

[42] *See* MBDA MSJ App. 00023-27 (*Notice of Federal Funding*, 3-5 2022 (*available at* MBDA Business Center Program NOFO - 2022.pdf)(last visited October 25, 2023)).

[43] *See, e.g.*, MBDA MSJ App. 00556-737, 730-737 (*Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's Capital Markets: Hearing before S. Comm. on Small Bus. and Entrepreneurship*, 111th Cong. 170-71 (2010) (statement of Robert Fairlie); *Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 111th Cong. 24-31 (2011) (testimony of Robert Fairlie)).

important factors responsible for disparities in business formation and growth.[44] The former vice president of the Business Diversity and Development Department at the Dallas/Fort Worth International Airport testified to Congress that he routinely sees "minority owned businesses [that] are starved for capital and are repeatedly forced, by discrimination and lack of access, to forego opportunities …."[45]

Minority business owners are disadvantaged at the outset due to the enormous wealth gap between white and non-white families, making it difficult to access the necessary capital to start and grow a business.[46] This gap is not solely the result of broad and generalized discrimination in society. In a 2020 hearing, Congress examined the "historical and systemic challenges" faced by minority-owned businesses, including "a lack of access to capital and systemic racism."[47] And in 2021, Congress received testimony that this wealth gap is at least partially attributable to historical discriminatory government practices, including federally-sanctioned redlining, denial of the benefits of the G.I. Bill to Black veterans, racial zoning practices, and the long-term effects of Jim Crow-era tax policies.[48] Congress heard similar testimony in a February 2021 hearing that detailed

---

[44] MBDA MSJ App. 01172-1387, 1196-1204 (*Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities: Hearing Before the Senate Committee on Small Business and Entrepreneurship,* 112th Cong. 22 (2011)); MBDA MSJ App. 01388-1427 (*Disparities in Access to Capital: What the Federal Government is Doing to Increase Support for Minority Owned Firms: Field Hearing Before the H. Comm. on Small Bus.*, 115th Cong. 2 (2018)).

[45] MBDA MSJ App. 01428-1487, 1437 (*Hurdles for Business Start-Ups: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 110th Cong. 10 (2008)).

[46] *See, e.g.*, MBDA MSJ App. 01488-1514, 1498-1499, 1503 (*Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Servs.*, 116th Cong. 5, 105 (2019) (statement of Kilolo Kijakazi)).

[47] MBDA MSJ App. 01515-1523 (*Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Fin. Servs.*, 116th Cong. 2 (2020) (opening statement of Rep. Beatty)).

[48] MBDA MSJ App. 00908-1130, 918-920 (*How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-term Economic Impacts on Borrowers of Color: Hearing before Subcomm. on Oversight and Investigations of the H. Comm. on Fin. Servs.*,

the discriminatory barriers facing minority business owners, including: (1) overtly discriminatory practices by lenders; (2) discrimination in capital markets; and (3) structural barriers built into the Paycheck Protection Program, including its reliance on mainstream financial institutions that have long excluded minority business owners.[49]

As a result of the wealth gap caused in part by discrimination, minority business owners are especially reliant on loans—but they are far less likely than White male business owners to obtain them. Nationwide, "minority businesses are two to three times more likely to be denied a loan than non-minority business owners and are more likely to receive less funding and pay higher interest rates on loans they do receive."[50] Even after controlling for individual creditworthiness, the discriminatory pattern remains undisturbed.[51] And the finding is consistent across multiple studies.[52] The average loan amount for high sales minority firms is $149,000 compared to $310,000 for non-minority firms.[53] And "Native people," including Alaska Natives and Native

---

117th Cong. 5 (2021) (testimony of William Darity Jr., Samuel DuBois Cook Professor of Public Policy, Duke University) (citations omitted)).

[49] MBDA MSJ App. 01524-1677, 1602-1625 (*Supporting Small and Minority-Owned Businesses Throughout the Pandemic: Virtual Hearing Before the Subcomm. on National Security, Int'l Dev. and Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 70, 71, 78 (2021) (statement of Center for Responsible Lending and testimony of Ashley C. Harrington, Federal Advocacy Director and Senior Counsel, Center for Responsible Lending)).

[50] MBDA MSJ App. 01678-1687, 1686 (*Capital Access for Minority Small Business: Covid-19 Resources for an Equitable and Sustainable Recovery*: *Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 116th Cong. 5 (2020)).

[51] MBDA MSJ App. 01688-1797, 1723 (*Minority Access to Capital: Field Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 114th Cong. 32 (2015); MBDA MSJ App. 01798-01861, 1812-1813 (Robert W. Fairlie, *Latino Business Ownership: Contributions and Barriers for U.S.-born and Immigrant Latino Entrepreneurs*, Prepared for the Office of Advocacy, U.S. Small Business Administration, 15-16 (2018)).

[52] MBDA MSJ App. 01428-1487, 1431 (*Hurdles for Business Start-Ups: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 110th Cong. 4 (2008)).

[53] MBDA MSJ App. 01688-1797, 1708 (*Minority Access to Capital: Field Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 114th Cong. 17 (2015)).

Hawaiians, "are the most underserved demographic in terms of access to capital."[54] Hasidic Jews are also widely reported to suffer the ails of lending discrimination.[55] Moreover, MBEs are two to three times more likely to be denied credit and more likely to receive smaller loans and pay higher interest rates on the loans they do receive.[56] A 2017 disparity study found that discrimination against African American-owned small businesses was "particularly acute," as loan denial rates remained substantially higher than for nonminority male-owned small businesses, even after adjusting for differences in assets, liabilities, and creditworthiness.[57]

### b. Minority Businesses Face Discrimination in Private Contracting Markets

In 2018, Congress heard testimony describing the explicit discrimination faced by minority-owned businesses in contracting, including the lack of timely bid notification, higher and double standards, and the refusal to use minorities except when they are required in a contract."[58] One of the barriers to equal participation by MBEs arises from "outright prejudicial treatment,

---

[54] MBDA MSJ App. 01862-1872, 1870 (*Accessing Capital in Indian Country: Hearing Before the Senate Committee on Indian Affairs*, 114th Cong. 5 (2015)).

[55] MBDA MSJ App. 01873-1898 (William A. Clement, Jr., Decision: Application of Opportunity Development Association and Others for Designation of Hasidic Jews as a Socially and Economically Disadvantaged Group, Small Business Administration (Apr. 9, 1980)).

[56] MBDA MSJ App. 01899-2094, 1980 (*Strengthening Access to Capital for Minority-Owned Small Business: Field Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 115th Cong. 78 (2018)).

[57] MBDA MSJ App. 02095-2098, 2098 (*Business Disparities in the DCAMM Construction and Design Market Area*, Prepared by NERA Economic Consulting for the Commonwealth of Massachusetts Division of Capital Asset Management and Maintenance, at 9 (2017)).

[58] MBDA MSJ App. 01899-2094, 1942-1947 (*Strengthening Access to Capital for Minority-Owned Small Businesses: Field Hearing Before S. Comm. on Small Bus. and Entrepreneurship*, 115th Cong. 44-45 (2018) (statement of Kenneth E. Clark, Business Consultant, MBDA Business Center-Capital Region)).

attitudes [and] stereotypes" by procurement agencies and prime contractors.[59] Disparity studies are replete with examples of such discriminatory treatment.[60] For instance:

- In a 2018 disparity study commissioned by the City of New Orleans, a business owner reported an instance of a federal agency revoking his contract once it was discovered he was a minority, directly saying to him that they did not want an "'n-word' to have the job."[61]

- In a 2020 disparity study conducted for the City of San Diego, a Black owner of a towing service firm explained: "Is there language that is used that's saying 'I'm not using a ["n-word"] tow company?' Yes, that happens. I'm told, but I don't go. I don't do it because I need the work, I need to earn money. If I'm going to earn any money, I've got to send an ambassador to represent our company."[62]

- In a 2015 disparity study conducted in Arizona, a Black business owner explained: "I have seen everything from looks to gestures, hearing the 'n-word' and different things from Hispanics to whites. . . . Getting your truck sprayed, different things like tearing checks open [to] see what you make, or you are blocked off a job because you are the only woman or African American out there.'"[63]

Similarly, examples of double standards to which MBEs are held abound:

---

[59] MBDA MSJ App. 00738-845, 811 (U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016)).

[60] *Id*. at 00820 ("Instances of outright discrimination permeated the anecdotal summaries of the disparity studies reviewed in this research.")

[61] MBDA MSJ App. 02099-2100, 2100 (*City of New Orleans Disparity Study*, Prepared by Keen Independent Research (2018)).

[62] MBDA MSJ App. 02101-2103, 2103 (*City of San Diego 2020 Disparity Study*, Prepared by BBC Research & Consulting (2021)).

[63] MBDA MSJ App. 02104-2105, 2105 (*Arizona Department of Transportation Disparity Study Report*, Prepared by Keen Independent Research, LLC, at Appendix J, 66 (2015)).

- In one study, a minority business owner reported that "[s]ome City managers will require me as a minority-owned business to do work that was not required of others doing similar work. . . . I have seen other jobs where the work was not nearly as professional as mine but they did not have to redo it."[64]

- In a 2012 disparity study for the City of Pensacola, a Black specialty contractor relayed a situation in which he was the low bidder for a contract and was required to provide bonding, but while he was acquiring a bond, he learned that another contractor received the contract and was not required to have bonding on the project.[65]

And exclusionary networks frequently deprive MBEs of contracting opportunities. The 2016 MBDA Report found that networking barriers are the most frequently cited barriers identified by MBEs.[66] While it sometimes can be difficult to identify direct evidence that ties instances of exclusionary networks to discrimination, "considering many of these longstanding business and social connections have developed in environments that have historically excluded minorities and women, it is difficult to ignore the discriminatory foundation for such networks."[67] For this reason, Business Centers facilitate referrals and connections to an ecosystem of organizations that can support MBE growth and competitiveness, such as federal, state and local governments, chambers of commerce and other local economic development organizations, and financial institutions.[68]

---

[64] MBDA MSJ App. 02106-2107, 2107 (*City of Cincinnati Disparity Study*, Prepared by Mason Tillman Associates, Ltd. (2015)).
[65] MBDA MSJ App. 02108-2110, 2110 (*Comprehensive Disparity Study for the City of Pensacola*, Prepared by MGT of America, Inc. (2012)).
[66] MBDA MSJ App. 00738-845, 811-812 (U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016)).
[67] MBDA MSJ App. 00847-905, 870 (U.S. Dep't of Justice, *The Compelling Interest to Remedy the Effects of Discrimination in Federal Contracting: A Survey of Recent Evidence* (2022)).
[68] MBDA MSJ App. 00023, 25-27 (*Notice of Federal Funding*, 3-5 2022 (*available at* MBDA Business Center Program NOFO - 2022.pdf) (last visited October 25, 2023)).

The lingering effects of these discriminatory practices from the not-so-distant past continue to have enormous impact on the ability of MBEs to compete equally for government contracts. As the Black co-owner of a professional services firm noted in a 2019 disparity study, he is from the generation that "sat at the back of the bus" and some of his White peers are in charge now and still have that old mentality.[69]

### c.   The Federal Government Is a Passive Participant in this Discrimination

Each year the federal government makes grants to state and local governments, which provides roughly 23% of state and local budgets combined.[70] With respect to the claims brought by Nuziard implicating the Dallas-Fort Worth BC here in Texas, the Infrastructure Investment and Jobs Act signed into law on November 15, 2021, allocates more than $14 billion to Texas for 328 state projects.[71] With billions of federal dollars allocated for Texas each year, the federal government has a compelling interest in ensuring that it does not become a passive participant in the racial exclusion of minorities from the State's public contracting system, which is persistent, pervasive, and long documented.[72] *See J.A. Croson Co.*, 488 U.S. at 492.

Although the government need not have actively participated in discrimination to justify the use of remedial measures, Defendants also provide evidence of disparities in federal

---

[69] MBDA MSJ App. 02111-2112, 2112 (*Missouri Department of Transportation DBE Availability Study*, Prepared by Keen Independent Research, at Appendix F, 47 (2019)).

[70] MBDA MSJ App. for 02113-2118, 2113 (Center on Budget and Policy Priorities, *Policy Basics: Federal Aid to State and Local Governments*, Policy Basics: Federal Aid to State and Local Governments | Center on Budget and Policy Priorities (cbpp.org) (Apr. 19, 2018)).

[71] MBDA MSJ App. 02119-2125 (*Building a Better America: President Biden's Bipartisan Infrastructure Law is Delivering in Texas*, Texas-Fact-Sheet-E3.pdf (whitehouse.gov) (accessed Oct. 18, 2023)).

[72] MBDA MSJ App. 02126-2577, 2377-2378 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 246-247 (2013) (detailing the vast underutilization of MBEs in many business sectors throughout Texas)).

contracting consistent with discrimination, further justifying the use of race-conscious remedial measures through the MBDA Act. For example, on March 23, 2023, Congress received a report by economist Daniel Chow of the Department of Commerce demonstrating a statistically significant disparity in federal contracting that was consistent with the presence of discrimination in the marketplace.[73] Using federal contracting data from April 2019 to August 2020, Mr. Chow utilized statistical analyses to determine whether small disadvantaged businesses (SDBs) were more or less likely to win federal contracts relative to other small businesses.[74] Modeled after a similar study conducted by Dr. Robert Rubinovitz in 2012, Mr. Chow's analysis shows that SDBs not participating in the SBA 8(a) program had 37 percent lower odds of winning a contract with the federal government compared to firms not identified as SDBs, a difference that is statistically significant.[75] Mr. Chow also found that MBEs had roughly 15 percent lower odds of winning a federal prime contract than other small firms.[76] These disparities persist despite controlling for all other factors that might increase a firm's odds for success, including firm size, level of security clearance of the firm, and the firm's age.[77] In fact, the study concludes that SDBs had a statistically significant lower chance of winning a contract in over 93% of contract actions all else being equal.[78] As a result, Mr. Chow concluded that the disparities in his study were consistent with the presence of discrimination.[79]

---

[73] MBDA MSJ App. 02578-2582 (*Oversight of the Small Business Administration: Hearing Before S. Comm. on Small Bus. and Entrepreneurship*, 118th Cong. 5 (2023) (statement of Isabel Guzman, Small Business Administrator)).

[74] MBDA MSJ App. 02583-2603, 2586 (*Update to the Assessment of Contracting Outcomes for Small Disadvantaged Businesses*, prepared by Daniel Chow, MBDA (2022)).

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.* at 2591.

[79] *Id.*

### d.      Disparity Studies Document the Extent of the Government's Passive Participation in Discrimination

Disparity studies conducted by economic consultants can quantify the effect of discrimination in America's public procurement systems using three methodologies.[80] First, the studies evaluate the number of available MBEs and the relative use of those business enterprises in different industry sectors of a locality.[81] Assuming a fair and equitable system of contracting, the proportion of contracts and contract dollars awarded to MBEs would be close to the corresponding proportion of MBEs available to perform the work in the relevant market area.[82] But, a utilization index less than .80 indicates a substantial disparity in the use of available MBEs.[83] Consultants also evaluate whether the utilization index is statistically significant, which if found, invites an inference of discriminatory exclusion from contracting for the specified racial group. *See J.A. Croson Co.*, 488 U.S. at 470-71 (explaining that disparity studies that employ this method are the proper statistical evaluation to provide a basis for a prima facie case of discrimination against minority business enterprises); *see also Kossman Contracting Co.*, at *21 ([disparity studies] "defined the relevant market at a sufficient level of particularity to produce evidence of passive discrimination…")

Second, the studies evaluate economy-wide outcome disparities for minority businesses in business formation rates, business earnings, and access to capital.[84] Through regression analysis, the studies show whether race is a statistically significant predictor of the disparate outcome at a

---

[80]  MBDA MSJ App. 02604-2659, 2608-2614 (Colette Holt, Report of Defendants' Expert, submitted in *Nuziard v. Minority Business Development Agency*, No. 4:23-cv-00278-P (N.D. Tex. August 25, 2023)).

[81]  *Id.*

[82]  *Id.*

[83]  *Id.; see also Uniform Guidelines on Employee Selection Procedures,* 29 C.F.R. § 1607.4 (D); *Connecticut v. Teal,* 457 U.S. 440, 443 n.4 (1982).

[84]  *Id.*

95% confidence level, and therefore, whether the disparate outcomes between racial/ethnic minorities and white male business owners could have occurred by chance or were because of discrimination. *See Kossman Contracting Co.*, at \*21 ("Regression analysis is not intended to point to specific sources of discrimination but to eliminate factors other than discrimination that might explain disparities … Discrimination is not revealed through evidence of explicit discrimination but is revealed through unexplainable disparity."). This type of evidence demonstrates the existence of discriminatory barriers to the formation of MBEs and their ability to fairly compete for contracts where private discrimination occurs.

And third, disparity studies include large sets of systematically collected anecdotal evidence that help explain why underutilization occurs.[85] Taken together, the three methodologies provide a statistically sound tactic to evaluate the effects of discrimination on minority business enterprises.[86]

In June 2021, Congress received over 100 disparity studies published from 2015-2021 as evidence in support of the reauthorization of the DOT DBE Program.[87] Congress made specific findings as to the value of such studies: "[D]isparity studies contain myriad analyses aimed at

---

[85] *Id.*

[86] MBDA MSJ App. 02126-2577, 2202 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 71 (2013) ("The persistent underutilization, low wages, and credit market and other business-related discrimination experienced by minorities results in minorities being significantly less likely to own their own business and derive the wealth that stems from entrepreurship [sic]") (statement of Zenita Wickman-Hurley, Special Secretary of Minority Affairs, Maryland Governor's Office)).

[87] MBDA MSJ App. 02660-2662 (167 CONG. REC. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies)); MBDA MSJ App. 02663-2664 (167 CONG. REC. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper) (same)).

answering the question: 'Does business discrimination based on race or gender continue to exist?' Even a cursory review of the studies reveals that the answer is resoundingly 'yes.'"[88]

### i. Wainwright Report on Disparity Studies Demonstrates Evidence of Discrimination

On March 23, 2023, Congress received a report by Dr Jon Wainwright cataloguing and analyzing the evidence of discrimination in disparity studies that was consistent with the presence of discrimination in the marketplace.[89] Dr. Wainwright reviewed and analyzed 205 disparity studies produced by state and local government agencies between 2010 and 2021, covering 32 states and the District of Columbia, which combined account for approximately $710 billion in public spending.[90] The studies examine procurement representing practically every industry segment in the United States economy.[91] The similarities across the results are striking: in the overwhelming number of procurement markets, MBEs are significantly underutilized compared to their availability. In sum, out of 4,327 disparity indexes analyzed, 80% were adverse (i.e., MBEs were utilized at less than their availability, or 100), 74% were large and adverse (i.e., less than 80), and, of these, the median disparity index was just 18.[92] Significantly, these disparities exist even though many of the studies test for disparities on contracts already subject to race-conscious

---

[88] MBDA MSJ App. 02665-02680, 2676-2679 (H.R. Rep. No. 117-70, at 392-95 (2021)).

[89] MBDA MSJ App. 02578-2582 (*Oversight of the Small Business Administration: Hearing Before S. Comm. on Small Bus. and Entrepreneurship*, 118th Cong. 5 (2023) (statement of Isabella Guzman, Small Business Administrator)).

[90] MBDA MSJ App. 02681-2903 (Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v. U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11).

[91] *Id.* at 02701-2702.

[92] *Id.* at 02709-2710.

contracting goals or requirements.[93] Similar findings resulted across all major industries[94] and for every minority group.[95]

The 2016 MBDA report reached similar conclusions: an analysis of 100 disparity studies found that over 78% of the observed disparity ratios fell below the .80 threshold signifying a "substantial" disparity, and the median value for the observed disparities was just .19.[96] The report further found that the disparity studies reviewed "provided specific, verifiable instances of discrimination which were recorded, catalogued, and analyzed using content analysis."[97]

Dr. Wainwright also analyzed how MBEs fare in the overall U.S. economy, to determine whether the federal government is passively participating in private sector discrimination.[98] Using data from the two national surveys dedicated to MBEs, he found "a consistent pattern of large, adverse, and statistically significant disparities in the performance of MBEs across all major industry sectors and for every minority group."[99] Next, Dr. Wainwright tested the likelihood that race-neutral factors could account for the substantial disparities observed in his other analyses using regression analysis to control for numerous independent variables that are indicators of qualifications and capacity.[100] He concluded that the "large, adverse, and statistically significant disparities facing [MBEs] in the United States . . . cannot be adequately explained by differences

---

[93] *Id.* at 02697-2698.

[94] *Id*. at 02709, 02761.

[95] *Id.* at 02710-2712; *see* Table 2.2.

[96] MBDA MSJ App. 00738-845, 792-794 (U.S. Dep't of Commerce, Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprise: A Review of Existing Disparity Studies* (Dec. 2016)).

[97] *Id*. at 00748.

[98] MBDA MSJ App. 02681-2903, 2719-2720 (Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v. U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11).

[99] *Id*. at 02719-2720.

[100] *Id*. at 02738-2739.

between the relevant populations in factors untainted by the effects of discrimination."[101] Plaintiffs cannot provide specific, credible evidence to dispute this conclusion or the overwhelming evidence on which it is based. Moreover, Dr. Wainwright's analysis of the quantitative findings of the disparity studies are corroborated by significant qualitative evidence of discrimination, making these findings much more than simply broad statistical disparities.

### ii.    Findings of Disparity Studies Conducted in Texas

With regard to Plaintiff Nuziard's claim, there is also significant evidence that in Texas public contracting, like many other state and local governments throughout the United States, racial and ethnic minority groups face substantial disparities in contracting consistent with the presence of discrimination which Congress has the power to remedy.[102] A review of twelve disparity studies conducted in the state of Texas revealed that: there is significant underutilization of MBEs in the State's public contracting; evidence of private discrimination exists as a barrier to formation and fair competition for MBEs; and there is significant anecdotal evidence replete with instances of overt discrimination concerning MBEs in multiple business industries throughout the State.[103] This is clear evidence that the government is a passive participant in the discrimination that the Dallas-Fort Worth Business center was designed to remedy.

The Harris County Disparity Study, which covered Harris, Fort Bend, Montgomery, Brazoria, and Galveston Counties was conducted in 2020.[104] It found that, of the 1,911 public

---

[101] *Id.* at 02761.

[102] MDBA MSJ App. 02126-2577, 2361-2380 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 230-249 (2013) (detailing the vast underutilization of MBEs in many business sectors throughout the United States)).

[103] MDBA MSJ App. 02604-2659, 2642-2643 (Colette Holt, Report of Defendants' Expert, submitted in *Nuziard v. Minority Business Development Agency*, No. 4:23-cv-00278-P (N.D. Tex. August 25, 2023)).

[104] *Id.* at 02644.

contracts that totaled $1,541,212,349, more than 90% were awarded to white male business owners.[105] The study reported severe underutilization of minority owned businesses.[106] The same study also found that after controlling for every predictive factor other than race, average earnings of minority owned businesses were as much as 53.1% lower than businesses owned by white men, average minority salaries were as much as 40.1% less than white men, average bank loan denials rates for minorities were three times the denial rates for white men, and business loan interest rates for minorities were as much as 2.2% higher than interest rates for white men.[107] Along with the quantitative data, the study captured the general business environment for minority owners by incorporating a significant number of anecdotal stories.[108] One Native American business owner commented that: "we are a Native American-owned firm…The prime contractor was so bold as to say that "[you] guys just need to go back to the reservation and focus on casinos." [109]

The quantitative findings of the 2020 Harris County Disparity study are representative of the general business climate for MBEs in the State of Texas as shown by eleven more disparity studies.[110] Furthermore, the sentiment of exclusion expressed by the Native American business owner in the Harris County study was expressed by hundreds of other minority business owners throughout the state.[111] In concert, the studies provide a strong basis in evidence that the State of Texas and its local counties have engaged as a passive participant in discrimination against minority business owners in public contracting in part because banking institutions have engaged

---

[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.* at 02644-2647.
[111] *Id.* at 02625-2642.

in lending practices consistent with discrimination against minorities. The government has a compelling interest in remedying both.

### 2.    The MBDA Act Remedies Instances of Discrimination by the Federal Government

The Minority Business Development Act was enacted following well-documented intentional discriminatory practices by the federal government that have prevented minorities from closing the wealth gap through entrepreneurial enterprise. Specifically, the discrimination of the federal government in the housing market against minorities has played a part in creating a persistent wealth gap, which Congress has recognized can be remedied by increasing minority entrepreneurship opportunities.[112]

Redlining is one type of identified instance of governmental discrimination that can support race-based relief. *J.A. Croson Co.*, at 497. The Federal Housing Administration ("FHA"), which was tasked with insuring economically sound mortgage loans, operated under the standard that no loan could be economically sound in a neighborhood populated by Black people or other "inharmonious racial groups."[113] Maps were drawn by the federal governments' Home Owners' Loan Corporation ("HOLC") for every metropolitan area in the country and adopted by the

---

[112] MBDA MSJ App. 01678-1687, 1685 (*Capital Access for Minority Small Businesses: Covid-19 Resources For an Equitable and Sustainable Recovery: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 116th Cong. 4 (2020) (noting that any plan to shrink wealth gap for minorities in America must include entrepreneurship)). *See also* MBDA MSJ App. 01899-2094, 1906 (*Strengthening Access to Capital for Minority-Owned Small Business: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 115th Cong. 4 (2018) (finding that entrepreneurship is one way to chip away at the minority wealth gap); MBDA MSJ App. 01488-1514, 1500 (*Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion on the House Committee*, 116th Cong. 7 (2019) ("the two largest assets in Americans' wealth portfolio [are] business ownership and home ownership")).
[113]      MBDA      MSJ     App.    04479-4484     (Federal    Reserve    History:    Redlining, https://www.federalreservehistory.org/essays/redlining (June 2, 2023)).

FHA.[114] The color-coded maps identified high risk loan areas with red ink that could not be federally insured by the FHA. The red ink directly correlated with higher concentrations of minorities. In one instance, the HOLC area description of Tacoma, Washington read: "[t]his might be classed as a low yellow area if not for the presence of the number of Negroes and low-class Foreign families who reside in the area."[115]

Without federal insurance, banks did not extend mortgage credit to minority homebuyers.[116] Therefore, despite their creditworthiness, minorities were denied the opportunity to purchase homes in their communities, which resulted in the loss of at least $212,000 of personal wealth over the last 40 years for minority families.[117] At the same time, the FHA program subsidized builders who mass produced large subdivisions for white homebuyers, with an explicit requirement that none of the homes be sold to minority homebuyers.[118] Only 2% of the $120 billion in new housing subsidized by the federal government between 1934-1962 went to non-whites.[119]

---

[114]  MBDA MSJ App. 02904-3003, 2906 (Daniel Aaronson, Daniel Harley, and Bhashkar Mazumder, *The Effects of the 1930s HOLC "Redlining" Maps*," Federal Reserve Bank of Chicago, 2 (Revised Aug. 2020), https://www.chicagofed.org/publications/working-papers/2017/wp2017-12)).

[115]  *Id.* at 02911, n.10.

[116]  MBDA MSJ App. 4479-4484 (Federal Reserve History: Redlining, https://www.federalreservehistory.org/essays/redlining (June 2, 2023)).

[117]  *Id.*; MBDA MSJ App. 03104-3106 (Christopher J. Brooks, *Redlining's legacy: Maps are gone, but the problem hasn't disappeared*, CBS News, What is redlining and is it still happening across the U.S. - CBS News (Jun. 12, 2020)).

[118]  MBDA MSJ App. 03107-3110 (Terry Gross, *A Forgotten History of How the U.S. Government Segregated America,* NPR, A 'Forgotten History' Of How The U.S. Government Segregated America : NPR (May 3, 2017)); MBDA MSJ App. 01488-1514, 1501 *Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion on the House Committee,* 116th Congr. 19 (2019)).

[119]  MBDA MSJ App. 03111-3114 (La-Brina Almeida, *A History of Racist Federal Housing Policies,* Massachusetts Budget & Policy Center, https://massbudget.org/2021/08/06/a-history-of-racist-federal-housing-policies/ (Aug. 6, 2021)).

The Veterans Administration, which provided home loan assistance to veterans, also adopted the redlined maps of the HOLC. Therefore, despite $33 billion of home loans being federally secured for veterans to purchase 4.3 million homes across the United States by 1956, the benefit largely excluded minorities. In 1946, fewer than 100 of the 67,000 VA-secured loans in New York and the New Jersey suburbs went to non-whites.[120]

Many American families create wealth through home equity,[121] and in 2019, the average accumulated wealth for non-minority families was $130,800, yet it was only $9,590 for Black families, and $17,530 for Hispanic families.[122] The FHA's policies directly contributed to the large wealth disparity between minorities and non-minorities,[123] which has had a demonstrable

---

[120] MBDA MSJ App. 03115-3118, 3117 (Erin Blakemore, *How the GI Bill's Promise Was Denied to A Million Black WWII Veterans*, History, https://www.history.com/news/gi-bill-black-wwii-veterans-benefits (updated Jun. 11, 2023)).

[121] MBDA MSJ App. 02126-2577, 2159 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 28 (2013)).

[122] MBDA MSJ App. 01488-1514, 1496 (*Examining the Racial and Gender Wealth Gap in America: Hearing Before Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Services*, 116th Cong. 1 (2019)).

[123] MBDA MSJ App. 02126-2577, 2173 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 42 (2013) (the home is the most valuable asset for most Americans)). *See also* MBDA MSJ App. 00908-1130, 920 (*How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-Term Economic Impacts on Borrowers of Color: Hearing Before the Subcomm. on Oversight and Investigations of H. Comm. on Financial Services*, 117th Cong. 7 (2021) (housing discrimination created the racial wealth gap)).

effect on minorities' ability to start businesses.[124] Home equity is often used to invest directly in businesses, and is the most common collateral used to obtain business loans.[125]

The federal policy of redlining that limited minority homeownership is inextricably linked to lower business formation rates for racial and ethnic minorities[126], a point underscored by the fact that a 10 percent increase in housing equity increases the mean probability of entrepreneurship by 17 percent.[127] In fact, the "largest single factor explaining racial disparities in business creation rates are differences in asset levels."[128]

---

[124] MBDA MSJ App. 03119-03122, 3122 (Carolyn Schulman, *The Partnership for Lending in Underserved Markets: Increasing Minority Entrepreneurs Access to Capital*, Milken Institute, 10 (Nov. 2018) ("Lower homeownership rates translate to lower eligibility for secured small business loans as real estate assets and home equity are the most common type of collateral used by borrowers")).

[125] *Id.* See also MBDA MSJ App. 02126-2577, 2143 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 12 (2013) ("The reason I think it is so critical is because we have found that because of the starting low wealth of individuals, it literally is serving as a main barrier for them being able to access the capital and services they need to go into business ownership. If people do not have collateral and assets, unfortunately they are not able to access not only capital but some of the business services that one needs to actually be successful in managing [their] business]") (statement of Connie Evans, President & CEO, Association for Enterprise Opportunity)).

[126] MBDA MSJ App. 01172-1387, 1197 (*Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 112th Cong. 22 (2011) (the wealth gap is one of the major causes for the lack of access to capital for minorities, which is one of the most important factors responsible for the disparities in business formation and growth rates for minorities as compared to non-minorities)).

[127] MBDA MSJ App. 02126-2577, 2173 (*Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 113th Cong. 42 (2013)).

[128] MBDA MSJ App. 01798-1861, 1807 (Robert W. Fairlie, *Latino Business Ownership: Contributions and Barriers for U.S.-born and Immigrant Latino Entrepreneurs*, Prepared for the Office of Advocacy, U.S. Small Business Administration, 10 (2018) (largest single factor explaining racial disparities in business creation rates is the difference in home-ownership rates)).

B.        **The MBDA Act and Regulations Are Narrowly Tailored**

The MBDA Act is narrowly tailored to further the federal government's compelling interest in eliminating race discrimination and expanding equal opportunity for American businesses. "If a racial classification is used to 'further compelling governmental interests,'" the "government's use of race" must be "'narrowly tailored' – meaning 'necessary' – to achieve that interest." *SFFA*, 143 S. Ct. at 2162 (quoting *Fisher v. Univ. of Tex. At Austin*, 570 U.S. 297, 311-12 (2013)); *see also Shaw v. Hunt*, 517 U.S. 899, 908 (1996) ("[T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." (internal quotation marks and citation omitted)); *Walker v. City of Mesquite*, 169 F.3d 973, 982 (5th Cir. 1999) ("Strict scrutiny requires that a racial classification be (1) justified by a compelling government interest and (2) narrowly tailored to further that interest.").

This narrow tailoring requirement ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *J.A. Croson Co*., 488 U.S., at 493 (plurality opinion). To determine whether a race-conscious measure is narrowly tailored, courts consider several factors: (1) the necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief; (3) the relationship of the numerical goals to the relevant labor market (which is not relevant to the statute or regulations in question); and (4) the impact of the relief on third parties. *United States v. Paradise*, 480 U.S. 149, 171, 187 (1987); *see also Dean*, 438 F.3d at 458 (setting forth *Paradise* factors); *Walker*, 169 F.3d at 982 (prescribing substantially similar five-factor *Paradise* test separating "the necessity for the relief and the efficacy of alternative remedies" into two factors). "[T]he party defending the [race-conscious] remedial measure bears

the burden of producing evidence that the remedial measure is constitutional." *Walker*, 169 F.3d at 982 (citing *Wygant*, 476 U.S. at 277-78.).

Here, the presumptions applicable to participation in the MBDA Business Center Program are narrowly tailored, because (1) historical and statistical data show that the presumptions are necessary, and that race-neutral remedies have not worked to remedy race-based disparities in business formation and development; (2) the Program's presumptions are appropriately flexible, allowing non-minorities to participate upon a race-neutral showing of disadvantage, and the Program is of limited duration; (3) the program is not over- or under-inclusive; and (4) the impact to third parties is minimal.

### 1.    The Presumptions in the Business Center Program Are Necessary and Despite Alternative Remedies Disparities Persist

First, quantitative and qualitative data make clear that the presumptions implemented in the Business Center Program are "necessary" to remedy persistent discrimination against minorities in business formation and development because decades of race-neutral "alternative remedies" have not worked.

The Equal Protection Clause requires that "[i]n the context of remedying past discrimination, a narrowly tailored measure requires that the state actor consider the use of other race-neutral means." *Cavalier ex rel. Cavalier v. Caddo Parish Sch. Bd.*, 403 F.3d 246, 260 (5th Cir. 2005); *see also Walker*, 169 F.3d at 982 ("[A]rriving at an exact fit between harm and remedy requires consideration of whether a race-neutral or less restrictive remedy could be used."). It must also be shown that the race-conscious measure in question is needed *in the present*, and not just at the time of the original harm. *See Dean*, 438 F.3d at 459 (holding that respondent must show that race-conscious hiring relief in consent decree was necessary not just at time decree was entered, but also at the time appellants were denied employment). Here, the MBDA Business Center

Program is a necessary remedy given that race-neutral "less-sweeping alternatives" have been "considered," tried, and found wanting.

"Congress attempted to use race-neutral measures to assist MBEs for at least twenty-five years . . . and these race-neutral measures failed to remedy the effects of discrimination on minority small business owners." *See DynaLantic*, 885 F. Supp. 2d at 283. These efforts began with the Small Business Act of 1953, which authorized programs to aid small businesses without reference to race until the 1978 amendments codifying the 8(a) program.[129] Between 1953 and 1978, Congress utilized numerous race-neutral measures including: (1) the creation of a surety bond guarantee program;[130] (2) the creation of a new class of small business investment companies to provide debt and equity capital to socially and economically disadvantaged individuals;[131] (3) increased authority for the SBA to assist small businesses, particularly those owned by low-income individuals or located in areas of high unemployment;[132] (4) additional financial assistance for small businesses;[133] and (5) improved disaster assistance.[134] *See DynaLantic*, 885 F. Supp. 2d at 284. Yet, the evidence before Congress when it codified the MBDA program in 2021 demonstrated continuing discriminatory barriers to minority businesses notwithstanding all of the race-neutral measures it had already enacted.

The Federal Government has offered – and continues to offer – several programs that provide services similar to MBDA Business Center services, including export assistance, federal

---

[129] MBDA MSJ App. 03123-3133 (Pub. L. No. 83-163, § 202, 67 Stat. 282 (1953)); MBDA MSJ App. 03134-3138 (Pub. L. No. 95-507, §§ 201, 211, 92 Stat. 1760, 1767 (1978)).
[130] MBDA MSJ App. 03139-3145 (Pub. L. No. 91-609, 84 Stat. 1813 (1970), *codified at* 15 U.S.C. § 694a).
[131] MBDA MSJ App. 03146-3149 (Pub. L. No. 92-595, 86 Stat. 1314 (1972)).
[132] MBDA MSJ App. 03150-3158 (Pub. L. No. 93-386, 88 Stat. 742 (1974)).
[133] MBDA MSJ App. 03159-3167 (Pub. L. No. 94-305, 90 Stat. 663 (1976)).
[134] MBDA MSJ App. 03168-3178 (Pub. L. No. 95-89, 91 Stat. 553 (1977)).

procurement assistance, and business development assistance, and yet racial disparities in outcomes persist, highlighting the continued need for MBDA's programs. For example, the International Trade Administration within the Department of Commerce offers a range of one-on-one export assistance services for companies new to exporting and for companies seeking to scale their exporting through its U.S. Commercial Service and other technical assistance programs.[135] Similarly, the Department of Defense's Apex Accelerators provide businesses with the tools and skills to participate in federal procurement.[136] Additionally, the SBA continues to offer services on a race-neutral basis like those afforded by the MBDA Business Center Program.[137] Indeed, because the SBA focuses its efforts on small businesses, many of these programs are more appropriate for business owners like Bruckner than the MBDA BC program. Specifically, since 1980, SBA's grant-funded Small Business Development Centers ("SBDCs") have offered, without regard to race, gender, or ethnicity, "counseling and training to small businesses including working with SBA to develop and provide informational tools to support business start-ups and existing business expansion."[138] The services offered by SBDCs mirror those offered by the MBDA

---

[135] MBDA MSJ App. 03179-3182 (U.S. INTERNATIONAL TRADE ADMINISTRATION, Introductory Services – Plan and Assess, *available at* https://www.trade.gov/introductory-services-exporters-plan-and-assess (last visited October 24, 2023); U.S. INTERNATIONAL TRADE ADMINISTRATION, Services for Current Exporters – Promote & Expand, *available at* https://www.trade.gov/services-current-exporters (last visited October 24, 2023)).

[136] MBDA MSJ App. 03183-3184 (APEX ACCELERATORS, What We Do, *available at* https://www.apexaccelerators.us/#/about-us (last visited October 24, 2023)).

[137] MBDA MSJ App. 03185-3199, 3189 (Robert Jay Dilger, Adam G. Levin, R. Corrine Blackford, Cong. Research Serv., R41352, *Small Business Management and Technical Assistance Training Programs* 1 (2022)).

[138] MBDA MSJ App. 03200-3202 (U.S. SMALL BUSINESS ADMINISTRATION, Small Business Development Centers (SBDC), *available at* https://www.sba.gov/local-assistance/resource-partners/small-business-development-centers-sbdc (last visited October 11, 2023); *see also* MBDA MSJ App. 04485-4506 (Small Business Development Center Act of 1980, Pub. L. 96-302 (1980) (authorizing the SBDC program)).

Business Center Program.[139] The SBDC's entrepreneurial-development services "are delivered, in most instances, on a nonfee, one-on-one confidential counseling basis . . . ."[140] In 2021, "SBDCs provided training or counseling to 643,144 unique SBDC clients, and 22,589 new businesses were started largely as a result of SBDC training or counseling."[141] Moreover, the SBA's SBDC program is more expansive than the MBDA's: the SBA presently funds *62 lead SBDCs* and *nearly 900* SBDC local outreach locations.[142] In comparison, MBDA supports just 41 Business Centers.[143]

The SBA also offers a small-business mentoring program, Service Corps of Retired Executives ("SCORE"), which, like the SBDC program, is offered without regard to race,

---

[139] *Compare* MBDA MSJ App. 03200-3202 (U.S. SMALL BUSINESS ADMINISTRATION, Small Business Development Centers (SBDC), *available at* https://www.sba.gov/local-assistance/resource-partners/small-business-development-centers-sbdc (last visited October 11, 2023) ("SBDC Programs deliver . . . individualized business advising and technical assistance . . . [and] help small businesses access capital, develop and exchange new technologies, and improve business planning, strategy, operations, financial management, personnel administration, marketing, export assistance, sales and other areas . . .")) *with* MBDA MSJ App. 03203-3211, 3203 (MINORITY BUSINESS DEVELOPMENT AGENCY, Business Centers, *available at* https://www.mbda.gov/mbda-programs/business-centers (last visited October 11, 2023)("Minority-owned firms seeking to expand into new markets — domestic & global — and grow in size and scale, can access business experts at a MBDA Business Center. Whether it's securing capital, competing for a contract, identifying a strategic partner or becoming export-ready, your success is our priority.")). *See also* 15 U.S.C. § 9522 (goals of the MBDA Business Center program are to: (1) assist minority business enterprises in accessing capital, contracts, and grants, and creating and maintaining jobs; (2) provide counseling and mentoring to minority business enterprises; and (3) facilitate the growth of minority business enterprises by promoting trade).

[140] MBDA MSJ App. 03185-3199, 3196 (Robert Jay Dilger, Adam G. Levin, R. Corrine Blackford, Cong. Research Serv., R41352, *Small Business Management and Technical Assistance Training Programs* 8 (2022)).

[141] *Id.*

[142] MBDA MSJ App. 03212-3217, 3215 (Robert Jay Dilger, Anthony A. Cilluffo, R. Corrine Blackford, Cong. Research Serv., R43846, *Small Business Administration Funding: Overview and Recent Trends* 19 (2022)).

[143] *See* MBDA MSJ App. 03203-3211 (MINORITY BUSINESS DEVELOPMENT AGENCY, Business Centers, *available at* https://www.mbda.gov/mbda-programs/business-centers (last visited October 11, 2023)).

ethnicity, or gender.[144] SCORE, a national volunteer organization established in 1964 that operates

under the SBAs imprimatur, has more than 250 chapters across the United States.[145] These chapters

"partner with more than 10,000 volunteer counselors" – current or former "business owners,

executives, and corporate leaders, to provide management and training assistance to small

businesses."[146] SBA "provide[s] financial assistance to SCORE to provide training to small

business owners and prospective owners."[147] In 2021, "SCORE provided training or counseling to

145,838 unique SCORE clients, and 3,064 new businesses were started largely as a result of

SCORE training or counseling."[148]

The SBA also oversees the Small Business Investment Company Program (SBIC), which

was established in 1958, and through which the SBA provides small businesses with SBIC-raised

private capital and with funds the SBIC borrows at favorable rates.[149] The SBIC program has

operated on a race-, ethnicity-, and gender-neutral basis since 1997.[150] At the end of 2021, "there

were 298 privately owned and managed SBA-licensed SBICs providing small businesses with

---

[144] *See* MBDA MSJ App. 03218-3222 (SCORE, Find a Mentor, *available at* https://www.score.org/find-mentor (last visited October 11, 2023)).

[145] MBDA MSJ App. 03223-3224 (SCORE, Find a Location, *available at* https://www.score.org/content/find-location (last visited October 11, 2023)); MBDA MSJ App. 03225-3229 (SCORE, About SCORE, *available at* https://www.score.org/about-score (last visited October 11, 2023)); MBDA MSJ App. 3230-3231 (U.S. Small Business Administration, *FY2023 Congressional Budget Justification FY2021 Annual Performance Report*, p. 84).

[146] MBDA MSJ App. 03232-3240, 3237 (Robert Jay Dilger, Anthony A. Cilluffo, R. Corrine Blackford, Cong. Research Serv., RL33243, Small Business Administration: A Primer on Programs and Funding 24 (2022)).

[147] MBDA MSJ App. 03185-3199, 3197 (Robert Jay Dilger, Adam G. Levin, R. Corrine Blackford, Cong. Research Serv., R41352, Small Business Management and Technical Assistance Training Programs 20 (2022)).

[148] *Id.* at 3198.

[149] *See* MBDA MSJ App. 03241-3247 (U.S. SMALL BUSINESS ADMINISTRATION, Apply to be an SBIC, *available at* https://www.sba.gov/partners/sbics/apply-be-sbic#id-about-the-sbic-program (last visited October 11, 2023)); 15 U.S.C. §§ 681 *et seq.*

[150] MBDA MSJ App. 03248-3256, 3254 (Robert Jay Dilger, Anthony A. Cilluffo, Cong. Research Serv., R41456, *SBA Small Business Investment Company Program* 3 (2022)).

private capital . . . ."[151] SBICs "pursue investments in a broad range of industries, geographic areas, and stages of investment."[152]

Together, the programs offered by the federal government, including the International Trade Association's export assistance, the Defense Department's Apex Accelerators, and SBA's SBDC, SCORE, and SBIC programs, represent decades of race-neutral, lift-all-boats efforts by the federal government to foster small business development. Nonetheless, research confirms in discouraging detail that minority business owners still face vast discriminatory headwinds. As noted previously, minority business owners remain unable to access capital on the same terms as their white counterparts. *See supra* at VI.A.1. And private discrimination continues to impede minority business formation and fair competition. *See id*. Indeed, there persist significant disparities in business formation and success between minority-owned businesses and their white counterparts.[153] U.S. Census data shows that "on average across all industries during the 2014-2018 time period, the odds of a minority becoming self-employed are only 58.8 percent of the odds of a non-minority male becoming self-employed" – a statistically significant finding.[154] The same data shows that "annual business earnings were 29.9 percent lower for minorities than for non-minority males."[155] Overall, U.S. Census data demonstrates "adverse racial and ethnic disparities that exist in salaries and wages, business formation rates, and business owner earnings—for minorities as a group and among each presumptively disadvantaged group."[156] Moreover, "in the

---

[151] *Id.* at pp. 3249, 3252-3253.
[152] *Id.* at 3249.
[153] MBDA MSJ App. 02681-2903, 2719-2720 (Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v. U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11).
[154] *Id.* at 2742.
[155] *Id.* at 2744.
[156] *Id.* at 2745.

vast majority of cases, these adverse disparities are large and statistically significant."[157] These disparities remain statistically significant "even when other non-discriminatory factors are held constant . . . ."[158]

The government has considered and implemented generally accessible, race-neutral business-development programs, but they have not flattened the hurdles of discrimination and disparate treatment. Indeed, many years of experience confirm that, without the use of race-conscious measures, minority-owned firms continue to be excluded from opportunities available to other firms. Research has shown that minority utilization rates in state and local contracting plummet without the use of race-conscious set-asides.[159]

For instance, a 2017 study of Washington State Department of Transportation contracting data found that for state-funding contracts for which no DBE contract goals had been set, the disparity ratio for minority- and woman-owned businesses dropped from 92.5% to 33.5%.[160] Similarly, a 2021 study of California Department of Transportation contracting data found that, without DBE contract goals, the disparity ratio for minority- and women-owned businesses dropped from 74% to 46%.[161] Such episodes confirm that, absent targeted federal intervention, discriminatory forces will lock in racial disparities for decades to come. And the discriminatory market behaviors that inhibit minority contracting opportunities also impede minority business development.

---

[157] *Id.*
[158] *Id.* at 2760.
[159] *See* MBDA MSJ App. 03274-04478, 3274-3275 (October 26, 2023 Declaration of Colette Holt).
[160] *Id.* at 3274-3275.
[161] *Id.* at 3275.

The federal government's long history with generally accessible, race-neutral business-development programs demonstrate serious, good faith consideration of workable race-neutral alternatives. Other remedies cited by Plaintiffs – e.g., "the various longstanding strata of criminal and civil laws prohibiting racial discrimination as well as private legal and administrative remedies"[162] have not sufficed to remedy the growing racial wealth gap and disparate business formation and growth rates for minority-owned businesses that have spanned decades. The United States can therefore constitutionally continue to offer carefully targeted asset-development assistance to socially and economically disadvantaged individuals to ensure that they may fully and fairly participate in the American marketplace. The MBDA's Business Center Program is necessary.

## 2.    The Business Center Program Is Flexible and of Limited Duration

The MBDA's Business Center Program and the presumptions included therein are also narrowly tailored because the "relief" afforded by the Program is flexible and of limited duration. *See Walker,* 169 F.3d at 982. As for "flexibility," "[t]he primary question . . . is whether its requirements may be waived." *Dean*, 438 F.3d at 459 (citing *Paradise*, 480 U.S. at 177). "If they may, the remedy is adequately flexible." *Id.* Here, while it is undisputed that the Business Center Program includes race- and ethnicity-based presumptions of social and economic disadvantage, no one is automatically excluded from the Business Center Program just because of their race. Rather, both individuals and groups who are not already presumptively disadvantaged may participate in the program. Simply put, anyone of any race may qualify for the Program, because the MBDA Act defines "socially or economically disadvantaged individual" in a race-neutral way. Individuals may be eligible to receive Business Center services if they can show that their membership in a

---

[162] *See* (Doc. 15, at 17 (Pls.' Mot. For Prelim. Inj.).)

group – whether religious, geographic, or some other group sharing a common characteristic – has resulted in their subjection to racial or ethnic prejudice or cultural bias or impaired their ability to compete in the free enterprise system. *See* 15 U.S.C. § 9501(15)(B) (defining "socially or economically disadvantaged individual"). And while a group presumption is not necessary to qualify for Business Center services, if a group not listed in the statute seeks such a presumption, MBDA's preexisting regulations make clear that groups not listed in the statute may "apply for a designation as socially or economically disadvantaged . . . ," 15 C.F.R. § 1400.3, and may be designated as such upon a preponderant showing of "chronic, long standing, and substantial" social or economic disadvantage. *See* 15 C.F.R. § 1400.4.

In addition to being "flexible," the relief afforded by the Business Center Program is of limited duration. "The central theme of a duration analysis is that the shorter the life-span of the remedy, the more likely it is narrowly tailored." *Dean*, 438 F.3d at 460 (citing *Paradise* 480 U.S. at 178). Here, the authority for MBDA to receive funding is limited by statute and will, barring Congressional reauthorization, expire in 2025. *See* Pub. L. 117-58, 135 Stat. 429, 1467; 15 U.S.C. § 9598. This means that active review (both by the Legislative and Executive Branches) will necessarily occur, and that MBDA's programs will continue to be subject to scrutiny by knowledgeable policy and legislative officials. Moreover, the MBDA Act requires regular reports to Congress, as well as periodic recommendations to Congress and the President "for legislation or other actions that the Under Secretary determines to be necessary or appropriate to promote the purposes of this chapter." 15 U.S.C. § 9595; *see also* 15 U.S.C. §§ 9541, 9581, 9582, 9594. The Act's report-and-recommendation schedule permits the Under Secretary to periodically review the need for the race-conscious program and recommend to Congress whether additional groups should be presumed to be disadvantaged – or, conversely, whether certain groups should no longer

be afforded the presumption. This statutory scheme will amply provide the requisite policy review to ensure MBDA's Business Center Program remains narrowly-tailored to its intended purpose.

### 3.    The MBDA Act Is Neither Overinclusive nor Underinclusive

The MBDA Act is not overinclusive. Only members of designated groups who own and control businesses and who meet a number of race-neutral criteria are entitled to the presumption of social or economic disadvantage. 15 U.S.C. § 9501(15)(B)(vi); 15 C.F.R. § 1400.1(b), §1400.3-5. Congress has found that "many [socially or economically disadvantaged] persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control."[163] As a result of that finding, Congress determined that several groups were presumptively socially and economically disadvantaged based on evidence of discrimination including but not limited to "Black Americans, Hispanic Americans, Native Americans, and other minorities." [164] Subsequent to this, based on substantial evidence, codified at 15 C.F.R. § 1400.1, MBDA's regulations designated "Blacks, Puerto-Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts" as well as "Hasidic Jews, Asian-Pacific Americans, and Asian Indians" as individuals who are socially or economically disadvantaged. 15 C.F.R. § 1400.1(b) & (c).

A finding that the program is not over-inclusive also is consistent with *Vitolo.* There, the court was troubled by what it perceived as seemingly arbitrary classifications between races, which it termed "racial gerrymandering," because the limited evidence available on the emergency motion for preliminary injunction did not show discrimination for each of the presumptively

---

[163] MDBA MSJ App. 03134-3138, 3135 (Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978)).
[164] *Id.*

disadvantaged groups. *See* 999 F.3d at 364. Here, by contrast, congressional and federal-record evidence shows that members of each of the designated groups have experienced discrimination affecting their advancement in the business world, through the time the MBDA Act was codified in 2021 and today. *See supra* at VI.A. The Program is also not overinclusive because it provides a remedy for groups only where discrimination has been shown through strong evidence. *See* 15 C.F.R. §§ 1400.1(b), 1400.3-1400.4 (requiring a showing, by a preponderance of evidence, of "chronic, long standing, and substantial" social or economic disadvantage).

The program is not underinclusive because the regulations also provide a process for the Under Secretary of Commerce for Minority Business Development to approve the application of a representative of any group not already presumed socially or economically disadvantaged. *See* 15 U.S.C. § 9501(15)(B)(vi); *see also* 15 C.F.R. § 1400.1(b), § 1400.3-5. After a positive determination, all business owners who identify as a member of the designated group of the successful applicant are also presumptively considered to be socially or economically disadvantaged for purposes of Business Center services. *See* 15 U.S.C. § 9501(15)(B)(vi). However, as noted above, any individual of any race that otherwise demonstrates social or economic disadvantage may be eligible for MBDA services regardless of whether they fall within a presumptive group. 15 U.S.C. § 9501(15)(A). In other words, an individual need not identify as a member of one of the groups presumed to be a socially or economically disadvantaged individual eligible to receive Business Center services under the MBDA Act. *Id.* Rather, an individual may meet the definition if their membership in a group has resulted in their subjection to racial or ethnic prejudice or cultural bias or impaired their ability to compete in the free enterprise system. *Id.*

### 4. The Business Center Program Has Minimal Impact on Third Parties

Finally, any impact of the Program's race-conscious presumptions on third parties is minimal. The MBDA Business Center program is not a set-aside program or a direct contracting program. There are no federal funds flowing directly to MBEs that are unavailable to non-minority business owners. In addition, as noted above, there is a plethora of race-neutral business assistance options available to the public. Even if an individual were ineligible to receive MBDA Business Center services, they are in no way barred from access to the SBA's more-widely-available SBDC, SCORE, and SBIC programs. The MBDA's Business Center Program represents a small subset of the business assistance provided by the United States and, given the broader availability and scope of the government's and the Program's race-neutral measures, the Program's existence imposes little-to-no burden on nonminority third parties. Moreover, as noted *supra*, nonminority third parties – both individuals and groups – who are not already presumptively disadvantaged may still participate in the Program through a showing of social or economic disadvantage. *See* 15 U.S.C. § 9501(15)(B) (defining "socially or economically disadvantaged individual" in a race-neutral manner); 15 C.F.R. § 1400.3-4 (providing that groups not listed as presumptively disadvantaged in the statute may apply for a designation of social or economic disadvantage).

Furthermore, participation in the MBDA Business Center Program is not a "zero-sum" game. *See SFFA*, 143 S. Ct. at 2162 (noting that college admissions are "zero-sum"). In *SFFA*, the Court included in its analysis of the injury caused by race-conscious admissions policies that a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* But in this matter, the presumptions provided to certain minority applicants take nothing away from the Plaintiffs. There is no cap on the number of businesses that

a business center may serve, and the admittance of one business to a business center does not take away a slot from another applicant.

Additionally, the Program's race-conscious presumptions have had no impact whatsoever on the Plaintiffs. As discussed above, race-neutral factors, and not the Program's presumptions, prevented the Plaintiffs from accessing Business Center services. Plaintiff Nuziard did not meet the Dallas-Fort Worth Business Center's requirement that a business seeking services must "have sustainable, consistent revenue," among other issues. *See supra* at V.D.2. Plaintiff Bruckner had not been in business long enough, and lacked enough annual revenue, to access services from the Orlando Business Center. *See supra* at V.C.2. And Plaintiff Piper sought to obtain services from the Wisconsin Business Center before that Center was open and accepting clients. *See supra* at V.B.2. Though Plaintiffs have blamed the Program's race-conscious presumptions for their inability to access Business Center services, they in fact were disqualified because of entirely independent, race-neutral considerations. Thus, the Business Center Program is narrowly tailored and satisfies strict scrutiny.

## VII.   THE MBDA STATUTE AND REGULATIONS DO NOT VIOLATE THE ADMINISTRATIVE PROCEDURES ACT

Plaintiffs also bring a claim under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(B), asserting that because the alleged racial and ethnic presumptions in the statute are "contrary to a constitutional right," the Court should set aside the MBDA's implementing regulations found at 15 C.F.R. § 1400.1. (MBDA MSJ App. 00056-83 (Doc. 1, ¶¶ 65-70).) Plaintiffs' APA claim is entirely premised on the argument that the racial and ethnic presumptions in the Regulations violate the Fifth Amendment's guarantee of equal protection and are, thus, "contrary to a constitutional right." *Id*. Plaintiffs allege no independent injuries that flow solely from their APA claim. Therefore, to the extent this Court finds either that Plaintiffs lack standing

to bring their claims or that the race conscious presumptions in the MBDA Business Center program survive strict scrutiny, summary judgment is due on the APA claim as well. *See, e.g.*, *Asante v. Azar*, No. 20-CV-601 (TSC), 2023 WL 1991642, at *9 (D.D.C. Feb. 14, 2023) ("the APA also provides for the courts to make an independent assessment of constitutional issues, and the court's role is the same whether the plaintiff sues directly under the Constitution or under the APA.") (cleaned up).

## VIII.   CONCLUSION

For all the reasons herein, Defendants request that the Court grant Defendants' Motion for Summary Judgment.


Dated: October 27, 2023

Respectfully submitted,

KAREN WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

*/s/        Vendarryl Jenkins*
VENDARRYL JENKINS (DC Bar No. 1724928)
CHRISTOPHER WOOLLEY (CA Bar No. 241888)
DAVID REESE (AL Bar No. ASB-0887-167R)

Trial Attorneys
United States Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street NE, 9th Floor
Washington, DC  20530
(202) 598-1671
vendarryl.jenkins@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 27, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice to all attorneys of record.

*/s/ Vendarryl Jenkins*
Vendarryl Jenkins