**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JEFFREY NUZIARD, *et al.*, | Case No. 4:23-cv-00278-P |
| Plaintiff, | District Judge Mark T. Pittman |
| v. | |
| MINORITY BUSINESS DEVELOPMENT AGENCY, *et al.*, | |
| Defendants. | |

**APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

KAREN WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

*/s/      Vendarryl Jenkins*
VENDARRYL JENKINS (DC Bar No. 1724928)
CHRISTOPHER WOOLLEY (CA Bar No. 241888)
DAVID REESE (AL Bar No. ASB-0887-167R)

Trial Attorneys
United States Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street NE, 9th Floor
Washington, DC  20530
(202) 598-1671
vendarryl.jenkins@usdoj.gov

Attorneys for Defendants

## <u>CONTENTS</u>

1. Exec. Order No. 11458, 3 C.F.R. § 779 (1969).................................MBDA MSJ App. 00001

2. Exec. Order 11625, 3 C.F.R. § 616 (1971).........................................MBDA MSJ App. 00003

3. Julie M. Lawhorn, Cong. Research Serv., R46816,
   *The Minority Business Development Agency: An Overview*
   *of its History and Programs* (January 11, 2023).............................MBDA MSJ App. 00007

4. *Minority Business Development Act of 1988*: Hearing on H.R. 1769
   Before the H. Sub. Comm. On Procurement, Innovation, and Minority
   Enterprise Development of the Comm. On Small Bus., 100th Cong.
   (1988) (statement of Nicholas Mavroules, Congressman)..............MBDA MSJ App. 00016

5. MBDA Business Center Guidance, issued October 23, 2024..........MBDA MSJ App. 00019

6. MBDA, "The Minority Business Development Agency—Vital
   to Making America Great".................................................................MBDA MSJ App. 00021

7. *Notice of Federal Funding*, 3-5 2022 (available at MBDA Business Center
   Program NOFO - 2022.pdf) (last visited October 25, 2023)............MBDA MSJ App. 00023

8. Transcript of Deposition of Matthew Piper.......................................MBDA MSJ App. 00028

9. Exhibit 2 from Deposition of Mattew Piper......................................MBDA MSJ App. 00052

10. Exhibit 3 from Deposition of Mattew Piper.....................................MBDA MSJ App. 00053

11. Wisconsin Business Center Declaration...........................................MBDA MSJ App. 00054

12. Complaint (*Nuziard v. Minority Business Development Agency*,
    No. 4:23-cv-00278-P).........................................................................MBDA MSJ App. 00056

13. Email Exchange between Defendants' Counsel and Plaintiffs' Counsel
    Regarding Business Centers................................................................MBDA MSJ App. 00084

14. Transcript of Deposition of Christian Bruckner……………….......MBDA MSJ App. 00090

15. Exhibit 5 from Deposition of Christian Bruckner............................MBDA MSJ App. 00113

16. Orlando MBDA Business Center Contact Us Form – Christian
    Bruckner...............................................................................................MBDA MSJ App. 00117

17. Orlando MBDA Business Center Email to Christian Bruckner.......MBDA MSJ App. 00118

18. Christian Bruckner Email to Orlando MBDA Business Center.......MBDA MSJ App. 00120

19. Orlando MBDA Business Center Referral Email to
    Christian Bruckner..............................................................................MBDA MSJ App. 00121

20. Orlando MBDA Business Center Referral to Strategic Partner.......MBDA MSJ App. 00124

21. Orlando MBDA Business Center General Welcome Email to
    Christian Bruckner..............................................................................MBDA MSJ App. 00126

22. Orlando MBDA Business Center Welcome Email to
    Christian Bruckner..............................................................................MBDA MSJ App. 00129

23.  Orlando MBDA Business Center Small Business
Training Opportunity..................................................................MBDA MSJ App. 00131

24.  Orlando MBDA Business Center BBIF Financial Management
Webinar Email..........................................................................MBDA MSJ App. 00140

25.  Orlando MBDA Business Center EPA Pollution Prevention Grant
Information Email.......................................................................MBDA MSJ App. 00150

26.  Orlando MBDA Business Center EPA Grant Information Email....MBDA MSJ App. 00159

27.  Orlando MBDA Business Center WMBI Conference &
Pop-Up Bazaar.........................................................................MBDA MSJ App. 00162

28.  Transcript of Deposition of Jeffrey Nuziard – Day 1.......................MBDA MSJ App. 00165

29.  Exhibit 2 from Deposition of Jeffrey Nuziard – Day 1...................MBDA MSJ App. 00206

30.  Transcript of Deposition of Jeffrey Nuziard – Day 2.......................MBDA MSJ App. 00207

31.  Rosemary Harris, *School chief investigated again: Second Chance teen allegedly
struck by Nuziard*, Colo. Springs Gazette, Sept. 25, 1995, at 1.....MBDA MSJ App. 00218

32.  Teresa Owen-Cooper, *Nuziard is cited in assault: Summons alleges attack
on student*, Colo. Springs Gazette, Sept. 27, 1995, at A6..............MBDA MSJ App. 00220

33.  Dallas-Fort Worth Business Center Declaration............................MBDA MSJ App. 00223

34.  Plaintiff Nuziard 2020 Schedule K-1............................................MBDA MSJ App. 00226

35.  Plaintiff Nuziard 2021 Schedule K-1............................................MBDA MSJ App. 00228

36.  Plaintiff Nuziard 2022 Schedule K-1............................................MBDA MSJ App. 00230

37.  Cardin Lauds Final Passage of Legislation to Expand and Make
Permanent Minority Business Development Agency, Press
Releases (2021)........................................................................MBDA MSJ App. 00236

38.  H.R. Rep. No. 94-468 (1975).........................................................MBDA MSJ App. 00238

39.  H.R. Rep. No. 97-956 (1982).........................................................MBDA MSJ App. 00282

40.  H.R. Rep. No.100-460 (1987).........................................................MBDA MSJ App. 00344

41.  *Minority Business Development Act of 1988: Hearing on H.R. 1769
Before the H. Sub. Comm. on Procurement, Innovation, and
Minority Enterprise Development of the Comm. on Small Bus.*,
100th Cong. (1988).....................................................................MBDA MSJ App. 00460

42.  *The Compelling Interest for Affirmative Action in Federal Procurement:
A Preliminary Survey*, 61 Fed. Reg. 26042-01 (May 23, 1996)....MBDA MSJ App. 00534

43.  *Assessing Access: Obstacles and Opportunities for Minority Small
Business Owners in Today's Capital Markets: Hearing Before the Comm.
on Small Bus. and Entrepreneurship*, 111th Cong. (2010)...............MBDA MSJ App. 00556

44.  U.S. Dep't of Commerce, Minority Business Development Agency,
*Contracting Barriers and Factors Affecting Minority Business Enterprise:*

*A Review of Existing Disparity Studies* (Dec. 2016).......................MBDA MSJ App. 00738

45. Notice of Report on the Lawful Uses of Race or Sex in Federal Contracting
Programs, 87 Fed. Reg. 4955 (Jan. 31, 2022)...............................MBDA MSJ App. 00846

46. U.S. Dep't of Justice, *The Compelling Interest to Remedy the
Effects of Discrimination in Federal Contracting: A Survey of
Recent Evidence* (2022)................................................................MBDA MSJ App. 00847

47. 168 Cong. Rec. E619-20 (statement of Rep. Carolyn Maloney)...MBDA MSJ App. 00906

48. *How Invidious Discrimination Works and Hurts: An Examination of
Lending Discrimination and Its Long-term Economic Impacts on Borrowers
of Color: Hearing before Subcomm. on Oversight and Investigations
of the H. Comm. on Fin. Servs.*, 117th Cong. (2021).......................MBDA MSJ App. 00908

49. 61 Fed. Reg. 26042-01 (May 23, 1996), 1996 WL 271176 n. 12..MBDA MSJ App. 01131

50. *Closing the Gap: Exploring Minority Access to Capital and Contracting
Opportunities: Hearing Before the S. Comm. on Small Bus. and
Entrepreneurship*, 111th Cong. (2011)............................................MBDA MSJ App. 01172

51. *Disparities in Access to Capital: What the Federal Government
is Doing to Increase Support for Minority Owned Firms*,
Field Hearing Before the H. Committee on Small Business,
115th Cong. (2018)........................................................................MBDA MSJ App. 01388

52. *Hurdles for Business Start-Ups: Hearing Before the S. Comm. on
Small Bus. and Entrepreneurship*, 110th Cong. (2008)...................MBDA MSJ App. 01428

53. *Examining the Racial and Gender Wealth Gap in America: Hearing Before
Subcomm. on Diversity and Inclusion of the H. Comm. on Financial Servs.*,
116th Cong. 5, 105 (2019) (statement of Kilolo Kijakazi).............MBDA MSJ App. 01488

54. *Access Denied: Challenges for Women- and Minority-Owned Businesses
Accessing Capital and Financial Services: Hearing Before Subcomm.
on Diversity and Inclusion of the H. Comm. on Fin. Servs.*,
116th Cong. 2 (2020) (opening statement of Rep. Beatty)..............MBDA MSJ App. 01515

55. *Supporting Small and Minority-Owned Businesses Throughout
the Pandemic: Virtual Hearing Before the Subcomm. on National
Security, Int'l Dev. and Monetary Policy of the H. Comm. on Fin. Servs.*,
117th Cong. 70, 71, 78 (2021).......................................................MBDA MSJ App. 01524

56. *Capital Access for Minority Small Business: Covid-19 Resources for
an Equitable and Sustainable Recovery: Hearing Before the S. Comm.
on Small Bus. and Entrepreneurship*, 116th Cong. 5 (2020)............MBDA MSJ App. 01678

57. *Minority Access to Capital: Field Hearing Before the S. Comm. on
Small Bus. and Entrepreneurship*, 114th Cong. 17 (2015)...............MBDA MSJ App. 01688

58. Robert W. Fairlie, *Latino Business Ownership: Contributions and
Barriers for U.S.-born and Immigrant Latino Entrepreneurs*,
Prepared for the Office of Advocacy, U.S. Small Business

Administration, 15-16 (2018)..........................................................MBDA MSJ App. 01798

59.   *Accessing Capital in Indian Country*, Hearing Before the Senate Committee
      on Indian Affairs, 114th Cong., 5 (2015)......................................MBDA MSJ App. 01862

60.   William A. Clement, Jr., Decision: Application of Opportunity
      Development Association and Others for Designation of Hasidic Jews
      as a Socially and Economically Disadvantaged Group, Small Business
      Administration (Apr. 9, 1980).........................................................MBDA MSJ App. 01873

61.   *Strengthening Access to Capital for Minority-Owned Small Business*:
      *Field Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*,
      115th Cong. 78 (2018)....................................................................MBDA MSJ App. 01899

62.   *Business Disparities in the DCAMM Construction and Design
      Market Area*, Prepared by NERA Economic Consulting for the
      Commonwealth of Massachusetts Division of Capital Asset Management
      and Maintenance, at 9 (2017)..........................................................MBDA MSJ App. 02095

63.   *City of New Orleans Disparity Study*, Prepared by Keen Independent
      Research, at Appendix J, 37 (2018)................................................MBDA MSJ App. 02099

64.   *City of San Diego 2020 Disparity Study*, Prepared by BBC Research
      & Consulting, at Appendix D, 87 (2021)........................................MBDA MSJ App. 02101

65.   *Arizona Department of Transportation Disparity Study Report*,
      Prepared by Keen Independent Research, LLC,
      at Appendix J, 66 (2015).................................................................MBDA MSJ App. 02104

66.   *City of Cincinnati Disparity Study*, Prepared by Mason Tillman
      Associates, Ltd., at 10-6 (2015).......................................................MBDA MSJ App. 02106

67.   *Comprehensive Disparity Study for the City of Pensacola*, Prepared by
      MGT of America, Inc., at 7-12 (2012)..............................................MBDA MSJ App. 02108

68.   *Missouri Department of Transportation DBE Availability Study*, Prepared
      by Keen Independent Research, at Appendix F, 47 (2019)..............MBDA MSJ App. 02111

69.   Center on Budget and Policy Priorities, *Policy Basics: Federal Aid to State and Local
      Governments*, Policy Basics: Federal Aid to State and Local Governments | Center on
      Budget and Policy Priorities (cbpp.org) (Apr. 19, 2018)..................MBDA MSJ App. 02113

70.   *Building a Better America: President Biden's Bipartisan Infrastructure Law
      is Delivering in Texas*, Texas-Fact-Sheet-E3.pdf (whitehouse.gov)
      (accessed Oct. 18, 2023)..................................................................MBDA MSJ App. 02119

71.   *Closing the Wealth Gap: Empowering Minority-Owned Businesses to
      Reach Their Full Potential for Growth and Job Creation*,
      Hearing Before the Senate Committee on Small Business and Entrepreneurship,
      113th Cong. 246-247 (2013).............................................................MBDA MSJ App. 02126

72.   *Oversight of the Small Business Administration,* Hearing Before S. Comm.
      on Small Bus. and Entrepreneurship, 118th Cong. 5 (2023)
      (statement of Isabel Guzman, Small Business Administrator).........MBDA MSJ App. 02578

73. *Update to the Assessment of Contracting Outcomes for Small Disadvantaged Businesses*, prepared by Daniel Chow, MBDA (2022)....................MBDA MSJ App. 02583

74. Colette Holt, Report of Defendants' Expert, submitted in *Nuziard v. Minority Business Development Agency*, No. 4:23-cv-00278-P (N.D. Tex. August 25, 2023).........................MBDA MSJ App. 02604

75. 167 CONG. REC. H3505-07 (daily ed. June 30, 2021) (statement of Rep. DeFazio) (listing disparity studies)....................MBDA MSJ App. 02660

76. 167 CONG. REC. S5898-99 (daily ed. August 5, 2021) (statement of Sen. Tom Carper)........................................................MBDA MSJ App. 02663

77. H.R. Rep. No. 117-70, at 392-95 (2021)...........................................MBDA MSJ App. 02665

78. Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v. U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11....................................................................................MBDA MSJ App. 02681

79. Daniel Aaronson, Daniel Harley, and Bhashkar Mazumder, *The Effects of the 1930s HOLC "Redlining" Maps*," Federal Reserve Bank of Chicago, 2 (Revised Aug. 2020), https://www.chicagofed.org/publications/working-papers/2017/wp2017-12)....................................................................................MBDA MSJ App. 02904

80. Christopher J. Brooks, *Redlining's legacy: Maps are gone, but the problem hasn't disappeared*, CBS News, What is redlining and is it still happening across the U.S. - CBS News (Jun. 12, 2020)..................................................................MBDA MSJ App. 03104

81. Terry Gross, *A Forgotten History of How the U.S. Government Segregated America,* NPR, A 'Forgotten History' Of How The U.S. Government Segregated America : NPR (May 3, 2017).......................................MBDA MSJ App. 03107

82. La-Brina Almeida, *A History of Racist Federal Housing Policies,* Massachusetts Budget & Policy Center, https://massbudget.org/2021/08/06/a-history-of-racist-federal-housing-policies/ (Aug. 6, 2021)....................................................MBDA MSJ App. 03111

83. Erin Blakemore, *How the GI Bill's Promise Was Denied to A Million Black WWII Veterans*, History, https://www.history.com/news/gi-bill-black-wwii-veterans-benefits (updated Jun. 11, 2023).......................................MBDA MSJ App. 03115

84. Carolyn Schulman, *The Partnership for Lending in Underserved Markets: Increasing Minority Entrepreneurs Access to Capital*, Milken Institute, 10 (Nov. 2018)....................................................MBDA MSJ App. 03119

85. Pub. L. No. 83-163, § 202, 67 Stat. 282 (1953)...............................MBDA MSJ App. 03123

86. Pub. L. No. 95-507, §§ 201, 211, 92 Stat. 1760, 1767 (1978)...........MBDA MSJ App. 03134

87. Pub. L. No. 91-609, 84 Stat. 1813 (1970), *codified at* 15 U.S.C. §§ 694a..................................................................................MBDA MSJ App. 03139

88. Pub. L. No. 92-595, 86 Stat. 1314 (1972).......................................MBDA MSJ App. 03146

89. Pub. L. No. 93-386, 88 Stat. 742 (1974)..........................................MBDA MSJ App. 03150

90. Pub. L. No. 94-305, 90 Stat. 663 (1976)............................................MBDA MSJ App. 03159

91. Pub. L. No. 95-89, 91 Stat. 553 (1977)..............................................MBDA MSJ App. 03168

92. U.S. INTERNATIONAL TRADE ADMINISTRATION, Introductory Services – Plan and Assess, *available at* https://www.trade.gov/introductory-services-exporters-plan-and-assess (last visited October 24, 2023).....................................................MBDA MSJ App. 03179

93. APEX ACCELERATORS, What We Do, *available at* https://www.apexaccelerators.us/#/about-us (last visited October 24, 2023).........................................................MBDA MSJ App. 03183

94. Robert Jay Dilger, Adam G. Levin, R. Corrine Blackford, Cong. Research Serv., R41352, *Small Business Management and Technical Assistance Training Programs* (2023)......................MBDA MSJ App. 03185

95. U.S. SMALL BUSINESS ADMINISTRATION, Small Business Development Centers (SBDC), *available at* https://www.sba.gov/local-assistance/resource-partners/small-business-development-centers-sbdc (last visited October 11, 2023)..............MBDA MSJ App. 03200

96. MINORITY BUSINESS DEVELOPMENT AGENCY, Business Centers, *available at* https://www.mbda.gov/mbda-programs/business-centers (last visited October 11, 2023).........................................................MBDA MSJ App. 03203

97. Robert Jay Dilger, Anthony A. Cilluffo, R. Corrine Blackford, Cong. Research Serv., R43846, *Small Business Administration Funding: Overview and Recent Trends* 19 (2022)............................................MBDA MSJ App. 03212

98. SCORE, Find a Mentor, *available at* https://www.score.org/find-mentor (last visited October 11, 2023).........................................................MBDA MSJ App. 03218

99. SCORE, Find a Location, *available at* https://www.score.org/content/find-location (last visited October 11, 2023).........................................................MBDA MSJ App. 03223

100. SCORE, About SCORE, *available at* https://www.score.org/about-score (last visited October 11, 2023).........................................................MBDA MSJ App. 03225

101. U.S. Small Business Administration, *FY2023 Congressional Budget Justification FY2021 Annual Performance Report*, p. 84.................MBDA MSJ App. 03230

102. Robert Jay Dilger, Anthony A. Cilluffo, R. Corrine Blackford, Cong. Research Serv., RL33243, *Small Business Administration: A Primer on Programs and Funding* 24 (2022)................................MBDA MSJ App. 03232

103. U.S. SMALL BUSINESS ADMINISTRATION, Apply to be an SBIC, *available at* https://www.sba.gov/partners/sbics/apply-be-sbic#id-about-the-sbic-program (last visited October 11, 2023).........................................................MBDA MSJ App. 03241

104. Robert Jay Dilger, Anthony A. Cilluffo, Cong. Research Serv., R41456, *SBA Small Business Investment Company Program* 3 (2022)..........MBDA MSJ App. 03248

105. Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978)....................MBDA MSJ App. 03257

106. October 26, 2023 Declaration of Colette Holt..................................MBDA MSJ App. 03274

107. Federal Reserve History: Redlining,

https://www.federalreservehistory.org/essays/redlining
(June 2, 2023)......................................................................MBDA MSJ App. 04479

108. Pub. L. 96-302, 94 Stat. 833 (1980)................................................MBDA MSJ App. 04485

109. Julie M. Lawhorn, Cong. Research Serv., R46816,
*The Minority Business Development Agency: An Overview
of its History and Programs* (January 11, 2023)...............................MBDA MSJ App. 04507

Dated: October 27, 2023

Respectfully submitted,

KAREN WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

*/s/        Vendarryl Jenkins*
VENDARRYL JENKINS (DC Bar No. 1724928)
CHRISTOPHER WOOLLEY (CA Bar No. 241888)
DAVID REESE (AL Bar No. ASB-0887-167R)

Trial Attorneys
United States Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street NE, 9th Floor
Washington, DC  20530
(202) 598-1671
vendarryl.jenkins@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice to all attorneys of record.

*/s/ Vendarryl Jenkins*
Vendarryl Jenkins

## Executive Order 11458

### PRESCRIBING ARRANGEMENTS FOR DEVELOPING AND COORDINATING A NATIONAL PROGRAM FOR MINORITY BUSINESS ENTERPRISE

By virtue of the authority vested in me as President of the United States, it is ordered as follows:

SECTION 1. *Functions of the Secretary of Commerce.* (a) The Secretary of Commerce (hereinafter referred to as "the Secretary") shall—

(1) Coordinate as consistent with law the plans, programs, and operations of the Federal Government which affect or may contribute to the establishment, preservation and strengthening of minority business enterprise.

(2) Promote the mobilization of activities and resources of State and local governments, businesses and trade associations, universities, foundations, professional organizations and volunteer and other groups towards the growth of minority business enterprises and facilitate the coordination of the efforts of these groups with those of Federal departments and agencies.

(3) Establish a center for the development, collection, summarization and dissemination of information that will be helpful to persons and organizations throughout the nation in undertaking or promoting the establishment and successful operation of minority business enterprises.

(b) The Secretary, as he deems necessary or appropriate to enable him to better fulfill the responsibilities vested in him by subsection (a), may—

(1) Develop, with the participation of other Federal departments and agencies as appropriate, comprehensive plans of Federal action and propose such changes in Federal programs as may be required.

(2) Require the submission of information from such departments and agencies necessary for him to carry out the purposes of this order.

(3) Convene for purposes of coordination meetings of the heads of such departments and agencies, or their designees, whose programs and activities may affect or contribute to the purposes of this order.

(4) Convene business leaders, educators, and other representatives of the private sector engaged in assisting the development of minority business enterprise or who could contribute to its development to propose, evaluate, and coordinate governmental and private activities in furtherance of the objectives of this order.

(5) Confer with and advise officials of State and local governments.

(6) Provide the managerial and organizational framework through which joint or collaborative undertakings with Federal departments or agencies or private organizations can be planned and implemented.

(7) Recommend appropriate legislative or executive actions.

SEC. 2. *Establishment of the Advisory Council for Minority Enterprise.* (a) There is hereby established the Advisory Council for Minority Enterprise (hereinafter referred to as "the Council").

(b) The Council shall be composed of members appointed by the President from among persons, including members of minority groups and representatives from minority business enterprises, knowledgeable and dedicated to the purposes of this order. The members shall serve for a term of two years and may be reappointed.

(c) The President shall designate one of the members of the Council as the Chairman of the Council.

(d) The Council shall meet at the call of the Secretary.

(e) The Council shall be advisory to the Secretary in which capacity it shall—

MBDA MSJ App. 00001

(1) Serve as a source of knowledge and information on developments in different fields and segments of our economic and social life which affect minority business enterprise.

(2) Keep abreast of plans, programs and activities in the public and private sectors which relate to minority business enterprise, and advise the Secretary on any measures to better achieve the objectives of this order.

(3) Consider, and advise the Secretary and such officials as he may designate on, problems and matters referred to the Council.

(f) For the purposes of Executive Order No. 11007 of February 26, 1962, the Council shall be deemed to have been formed by the Secretary.

(g) Members of the Council shall be entitled to receive travel and expenses, including per diem in lieu of subsistence, as authorized by law (5 U.S.C. 5701–5708) for persons in the Government service employed intermittently.

(h) The Secretary shall arrange for administrative support of the Council to the extent necessary including use of any gifts or bequests accepted by the Department of Commerce pursuant to law.

SEC. 3. *Responsibilities of other Federal departments and agencies.*
(a) The head of each Federal department and agency, or a representative designated by him, when so requested by the Secretary, shall, to the extent permitted by law and funds available, furnish information and assistance, and participate in all ways appropriate to carry out the objectives of this order.

(b) The head of each Federal department or agency shall, when so requested by the Secretary, designate a senior official to have primary and continuing responsibility for the participation and cooperation of that department or agency in matters concerning minority business enterprise and activities as required by this order.

(c) The head of each Federal department or agency, or his designated representative, shall keep the Secretary informed of all proposed budgets, plans, and programs of his department or agency affecting minority business enterprise.

SEC. 4. *Construction.* Nothing in this order shall be construed as subjecting any function vested by law in, or assigned pursuant to law to, any Federal department or agency or head thereof to the authority of any other agency or officer, or as abrogating or restricting any such function in any manner.

Richard Nixon

THE WHITE HOUSE,
*March 5, 1969.*

[F.R. Doc. 69–2847; Filed, Mar. 5, 1969; 3:03 p.m.]

MBDA MSJ App. 00002

# EXECUTIVE ORDER 11625

### Prescribing Additional Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise

The opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic justice for such persons and improve the functioning of our national economy.

The Office of Minority Business Enterprise, established in 1969, greatly facilitated the strengthening and expansion of our minority enterprise program. In order to take full advantage of resources and opportunities in the minority enterprise field, we now must build on this foundation. One important way of improving our efforts is by clarifying the authority of the Secretary of Commerce (a) to implement Federal policy in support of the minority business enterprise program; (b) provide additional technical and management assistance to disadvantaged businesses; (c) to assist in demonstration projects; and (d) to coordinate the participation of all Federal departments and agencies in an increased minority enterprise effort.

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States, it is ordered as follows:

SECTION 1. *Functions of the Secretary of Commerce.* (a) The Secretary of Commerce (hereinafter referred to as "the Secretary") shall—

(1) Coordinate as consistent with law the plans, programs, and operations of the Federal Government which affect or may contribute to the establishment, preservation, and strengthening of minority business enterprise.

(2) Promote the mobilization of activities and resources of State and local governments, businesses and trade associations, universities, foundations, professional organizations, and volunteer and other groups towards the growth of minority business enterprises, and facilitate the coordination of the efforts of these groups with those of Federal departments and agencies.

(3) Establish a center for the development, collection, summarization, and dissemination of information that will be helpful to persons and organizations throughout the Nation in undertaking or promoting the establishment and successful operation of minority business enterprise.

(4) Within constraints of law and appropriations therefor, and according to his discretion, provide financial assistance to public and private organizations so that they may render technical and management assistance to minority business enterprises, and defray all or part of the costs of pilot or demonstration projects conducted by public or private agencies or organizations which are designed to overcome the special

MBDA MSJ App. 00003

problems of minority business enterprises or otherwise to further the purposes of this order.

(b) The Secretary, as he deems necessary or appropriate to enable him to better fulfill the responsibilities vested in him by subsection (a), may—

(1) With the participation of other Federal departments and agencies as appropriate, develop comprehensive plans and specific program goals for the minority enterprise program; establish regular performance monitoring and reporting systems to assure that goals are being achieved; and evaluate the impact of Federal support in achieving the objectives established by this order.

(2) Require a coordinated review of all proposed Federal training and technical assistance activities in direct support of the minority enterprise program to assure consistency with program goals and to avoid duplication.

(3) Convene, for purposes of coordination, meetings of the heads of such departments and agencies, or their designees, whose programs and activities may affect or contribute to the purposes of this order.

(4) Convene business leaders, educators, and other representatives of the private sector who are engaged in assisting the development of minority business enterprise or who could contribute to its development, for the purpose of proposing, evaluating and coordinating governmental and private activities in furtherance of the objectives of this order.

(5) Confer with and advise officials of State and local governments.

(6) Provide the managerial and organizational framework through which joint or collaborative undertakings with Federal departments or agencies or private organizations can be planned and implemented.

(7) Recommend appropriate legislative or executive actions.

Sec. 2. *Advisory Council for Minority Enterprise.* (a) The Advisory Council for Minority Enterprise (hereinafter referred to as "the Council"), established by Executive Order No. 11458 of March 5, 1969, shall continue in existence under the terms of this order.

(b) The Council shall be composed of members appointed by the President from among persons, including members of minority groups and representatives from minority business enterprises, who are knowledgeable in this field and who are dedicated to the purposes of this order. The members shall serve for a term of two years and may be reappointed.

(c) The President shall designate one of the members of the Council as the Chairman of the Council.

(d) The Council shall meet at the call of the Secretary.

(e) The Council shall be advisory to the Secretary in which capacity it shall—

(1) Serve as a source of knowledge and information on developments in different fields and segments of our economic and social life which affect minority business enterprise.

(2) Keep abreast of plans, programs, and activities in the public and private sectors which relate to minority business enterprise, and advise

MBDA MSJ App. 00004

the Secretary on any measures to better achieve the objectives of this order.

(3) Consider, and advise the Secretary, and such officials as he may designate, on problems and matters referred to the Council.

(f) For the purposes of Executive Order No. 11007 of February 26, 1962, the Council shall be deemed to have been formed by the Secretary.

(g) Members of the Council shall be entitled to receive travel and expenses, including per diem in lieu of subsistence, as authorized by law (5 U.S.C. 5701–5708) for persons in the Government service employed intermittently.

(h) The Secretary shall arrange for administrative support of the Council to the extent necessary, including use of any gifts or bequests accepted by the Department of Commerce pursuant to law.

SEC. 3. *Responsibilities of Other Federal Departments and Agencies.* (a) The head of each Federal department and agency, or a representative designated by him, when and in the manner so requested by the Secretary, shall furnish information, assistance, and reports to, and shall otherwise cooperate with, the Secretary in the performance of his functions hereunder.

(b) The head of each Federal department or agency shall, when so requested by the Secretary, designate his Under Secretary or such other similar official to have primary and continuing responsibility for the participation and cooperation of that department or agency in matters concerning minority business enterprise.

(c) The officials designated under the preceding paragraph, when so requested, shall review and report to the Secretary upon the policies and programs of the minority business enterprise program, and shall keep the Secretary informed of all proposed budgets, plans and programs of his department or agency affecting minority business enterprise.

(d) The head of each Federal department or agency, or a representative designated by him, shall, to the extent provided under regulations issued by the Secretary after consultation with the official designated in paragraph (b) above, report to the Secretary on any activity that falls within the scope of the minority business enterprise program as defined herein and in those regulations.

(e) Each Federal department or agency shall, within constraints of law and appropriations therefor, continue all current efforts to foster and promote minority business enterprises and to support the program herein set forth, and shall cooperate with the Secretary of Commerce in increasing the total Federal effort.

SEC. 4. *Reports.* The Secretary shall, not later than 120 days after the close of each fiscal year, submit to the President a full report of his activities hereunder during the previous fiscal year. Further, the Secretary shall, from time to time, submit to the President his recommendations for legislation or other action as he deems desirable to promote the purposes of this order. Each Federal department or agency shall report to the Secretary as hereinabove provided on a timely basis so that the Secretary may consider such reports for his report and recommendations to the

MBDA MSJ App. 00005

President. Each Federal department or agency shall develop and implement systematic data collection processes which will provide to the Office of Minority Business Enterprise Information Center current data helpful in evaluating and promoting the efforts herein described.

SEC. 5. *Policies and Standards.* The Secretary may establish such policies, standards, definitions, criteria, and procedures to govern the implementation, interpretation, and application of this order, and generally perform such functions and take such steps as he may deem to be necessary or appropriate to achieve the purposes and carry out the provisions hereof.

SEC. 6. *Definitions.* For purposes of this order, the following definitions shall apply:

(a) "Minority business enterprise" means a business enterprise that is owned or controlled by one or more socially or economically disadvantaged persons. Such disadvantage may arise from cultural, racial, chronic economic circumstances or background or other similar cause. Such persons include, but are not limited to, Negroes, Puerto Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts.

(b) "State" means the States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, and the Trust Territory of the Pacific Islands.

SEC. 7. *Construction.* Nothing in this order shall be construed as subjecting any function vested in, or assigned pursuant to law to, any Federal department or agency or head thereof to the authority of any other agency or office exclusively, or as abrogating or restricting any such function in any manner.

SEC. 8. *Prior Executive Order.* Executive Order No. 11458 of March 5, 1969, is hereby superseded.

*Richard Nixon*

THE WHITE HOUSE,
*October 13, 1971.*

[FR Doc.71–15127 Filed 10–13–71;12:28 pm]

MBDA MSJ App. 00006



Congressional
Research Service
Informing the legislative debate since 1914

# The Minority Business Development Agency: An Overview of Its History and Programs

Updated January 11, 2023

Congressional Research Service

https://crsreports.congress.gov

R46816

**CRS REPORT**
Prepared for Members and
Committees of Congress

**Congressional Research Service**
Informing the legislative debate since 1914

**SUMMARY**

R46816

January 11, 2023

**Julie M. Lawhorn**
Analyst in Economic
Development Policy

# The Minority Business Development Agency:
# An Overview of Its History and Programs

The Department of Commerce's Minority Business Development Agency (MBDA) is the lead
federal agency dedicated to assisting minority business enterprises (MBEs) in overcoming social
and economic disadvantages that have limited their participation in the nation's free enterprise
system. The MBDA's mission is to support the growth and global competitiveness of the
minority business community. Through a network of local business development centers and
other initiatives, the MBDA carries out this mission by providing technical and business
assistance, support, and resources, as well as advocacy and research on behalf of MBEs.

MBDA's role and its services have shifted over time to address new and emerging challenges and opportunities. The agency
was originally established as the Office of Minority Business Enterprise (OMBE) by Executive Order 11458, signed by
President Richard Nixon in 1969. In 1979, the Carter Administration reorganized and renamed the OMBE as the Minority
Business Development Agency (MBDA). The Carter Administration also refocused the agency's efforts on helping
businesses of all sizes develop into medium and large-scale businesses, particularly in growth industries. The Reagan
Administration established the Minority Business Development Center program, which became the MBDA's primary method
for delivering technical and management services to minority businesses. The George H.W. Bush Administration proposed
eliminating the agency and transferring its mission to the Small Business Administration (SBA), but ultimately continued the
agency as an entity within the Department of Commerce. Successive Administrations have changed the agency's focus and
reorganized the delivery of its assistance and services.

The agency was provided statutory authorization by the Minority Business Development Act of 2021 (Division K—
Infrastructure Investment and Jobs Act, IIJA, P.L. 117-58), enacted on November 15, 2021. In August 2022, Donald R.
Cravins Jr. was confirmed by the Senate as the first Under Secretary of Commerce for Minority Business Development.

After fluctuating amounts of funding in its early years, the MBDA received annual appropriations of almost $60 million in
the early 1980s. Its funding then generally declined, including a 27% reduction in annual appropriation between FY1995 and
FY1996. By the late 1990s, MBDA's annual appropriations had fallen below $30 million, where it largely remained for more
than a decade. Since FY2013, MBDA's funding has more than doubled to a high of $73 million in FY2021 before dropping
to $55 million in FY2022. The Consolidated Appropriations Act, 2023 (P.L. 117-328) funded the MBDA at $70 million. In
FY2020 and FY2021, Congress provided supplemental appropriations to MBDA to assist MBEs in preventing, preparing for,
and responding to the COVID-19 pandemic.

Today, the agency's activities are designed to expand access to capital, markets, and contracts through public and private
sector programs, policy, and research. MBDA clients include MBEs that are not less than 51% owned by one or more
socially or economically disadvantaged individuals; and the management and daily business operations of which are
controlled by one or more socially or economically disadvantaged individuals. Technical and managerial assistance and other
services are principally provided to MBEs through a network of Business Centers, Specialty Centers, and other projects. The
MBDA also coordinates with other federal agencies, nongovernmental organizations, and private firms to expand contracting
and export opportunities for MBEs. In recent years, the MBDA has increased the number of access to capital initiatives and
expanded its entrepreneurship education programs in partnership with historically black colleges and universities (HBCUs),
minority-serving institutions (MSIs), and other institutions. In legislation authorizing the agency in statute in FY2022,
Congress directed the MBDA to also establish the Rural Business Center program and regional MBDA offices and to further
develop its research and data clearinghouse roles.

Current issues of congressional interest include the agency's implementation of new programs to reach MBEs, individuals,
and communities; the agency's funding; and the integration of existing activities. The MBDA may seek to hire additional
staff or otherwise increase its capacity to reestablish regional offices, administer existing and new programs, and activate
additional roles, such as coordination among federal agencies and the development of new areas of technical assistance and
research activities. Congress may be interested in the integration of MBDA activities with other agencies, such as the Small
Business Administration. Congress may also be interested in options for the MBDA to take on new or expanded roles,
services, and partnerships, or in reviewing additional coordination opportunities between MBDA and other federal agencies.

# Contents

Introduction ................................................................................................................................... 1

MBDA Origins and Authority ......................................................................................................... 2
    E.O. 11625—Expanding Agency Role ................................................................................... 3
    Agency Reorganization ........................................................................................................... 3
    Agency Establishment ............................................................................................................. 4
    Funding History ....................................................................................................................... 7
Agency Overview ........................................................................................................................... 8
    Mission and Structure ............................................................................................................. 8
    MBDA Clients ......................................................................................................................... 10
    Programs ................................................................................................................................. 11
        Business Centers ............................................................................................................... 11
        Specialty Centers ............................................................................................................... 13
        Rural Business Centers ...................................................................................................... 14
        Entrepreneurship Education Development Activities ......................................................... 14
        Related Initiatives, Events, and Partnerships ................................................................... 15
    Performance Metrics ............................................................................................................... 19
Considerations for Congress ......................................................................................................... 20
    Implementation of Enabling Legislation ................................................................................. 20
    Duplication of SBA Activities .................................................................................................. 21
    Additional Considerations ....................................................................................................... 21

## Figures

Figure 1. OMBE/MBDA Appropriations History: FY1970 to FY2023 ......................................... 7

## Tables

Table 1. MBDA Performance Metrics, FY2016–FY2021 ............................................................ 20

Table A-1. MBDA Appropriations, FY1970–FY2023 ................................................................. 27

## Appendixes

Appendix A. Additional Agency History ........................................................................................ 23
Appendix B. Assessments and Evaluations ................................................................................... 30
Appendix C. Legislative Proposals, 96th Congress-117[th] Congress ............................................ 33

## Contacts

Author Information ......................................................................................................................... 35

MBDA MSJ App. 00010

may have been rooted in a view of federalism which argues that these kinds of activities are the responsibilities of state and local governments and the private and nonprofit sectors, not the federal government. Supporters of the MBDA contend that the agency's mission is critical to the nation's economic future and that the agency's programs and services address a number of deficiencies and impediments faced by minority entrepreneurs.

As previously noted, Congress continued to provide the MBDA appropriations even as various Administrations and legislative proposals considered reorganizing the agency, defunding the agency's activities, or merging it into the SBA. Legislative proposals to transfer or establish the MBDA and its programs are included in **Appendix C**, and **Table A-1** provides a history of Administrations' annual budget requests and enacted appropriations for the agency since FY1970.

## MBDA Annual Budget Requests and Enacted Appropriations, FY1970–FY2022

**Table A-1** provides a history of annual budget requests and enacted appropriations for the MBDA since FY1970.

### Table A-1. MBDA Appropriations, FY1970–FY2023

(in millions of dollars)

| Fiscal Year | Admin. Request | Enacted |
|---|---|---|
| 1970 | 1.5 | 1.2 |
| 1971 | 1.8 | 2.1 |
| 1972 | 3.5 | 43.6 |
| 1972 supplemental | 40.0 | 40.0 |
| 1973 | 63.6 | 63.9 |
| 1974 | 74.5 | 35.6 |
| 1975 | 52.0 | 52.0 |
| 1976 | 52.6 | 49.8 |
| 1977 | 0.0 | 50.3 |
| 1978 | 50.3 | 49.4 |
| 1979 | 60.6 | 57.9 |
| 1980 | 58.8 | 58.9 |
| 1981 | 62.9 | 59.6 |
| 1982 | 65.4 | 56.6 |
| 1983 | 50.0 | 47.3 |
| 1984 | 54.0 | 53.9 |
| 1985 | 49.6 | 49.6 |
| 1986 | 44.8 | 43.0 |

federally chartered regional economic development agencies, including the Appalachian Regional Commission, the Delta Regional Authority, the Northern Border Regional Commission, and the Denali Commission; the Economic Development Administration and its programs; the rural development programs administered by the Rural Development Administration of the Department of Agriculture; and the Community Development Block Grant program administered by the Department of Housing and Urban Development. See CRS Report R46683, *Federal Resources for State and Local Economic Development*, by Julie M. Lawhorn.

| Fiscal Year | Admin. Request | Enacted |
|---|---|---|
| 1987 | 45.4 | 39.8 |
| 1988 | 4.6 | 39.7 |
| 1989 | 0.0 | 39.7 |
| 1990 | 0.0 | 39.7 |
| 1991 | 46.2 | 41.1 |
| 1992 | 0 | 42.6 |
| 1993 | 37.9 | 37.9 |
| 1994 | 46.0 | 44.1 |
| 1995 | 46.2 | 43.8 |
| 1996 | 47.9 | 32.0 |
| 1997 | 34.0 | 28.0 |
| 1998 | 28.0 | 25.0 |
| 1999 | 28.1 | 27.3 |
| 2000 | 27.6 | 27.3 |
| 2001 | 28.2 | 27.3 |
| 2002 | 28.4 | 28.3 |
| 2003 | 29.8 | 28.9 |
| 2004 | 29.5 | 28.9 |
| 2005 | 34.5 | 29.9 |
| 2006 | 30.7 | 30.0 |
| 2007 | 29.6 | 30.0 |
| 2008 | 28.7 | 28.6 |
| 2009 | 29.0 | 29.8 |
| 2010 | 31.0 | 31.5 |
| 2011 | 32.3 | 30.3 |
| 2012 | 32.3 | 30.3 |
| 2013 | 28.7 | 27.5 |
| 2014 | 29.3 | 28.0 |
| 2015 | 28.3 | 30.0 |
| 2016 | 30.0 | 32.0 |
| 2017 | 35.6 | 34.0 |
| 2018 | 6.0 | 39.0 |
| 2019 | 10.0 | 40.0 |
| 2020 | 10.0 | 52.0 |
| 2021 | 10.3 | 73.0 |
| 2022 | 70.0 | 55.0 |
| 2023 | 110.0 | 70.0 |

MBDA MSJ App. 00012

**Source:** Budget Appendices of the United States, FY1970-FY2023.

**Notes:** In FY2020, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act, P.L. 116-136) provided the MBDA an additional $10 million in supplemental funding in addition to $42 million in annual appropriations, for a total of $52 million. The supplemental funding was to assist MBEs with preventing, preparing for, and responding to the COVID-19 pandemic through education, training, and advising grants to minority business centers and minority chambers of commerce. In FY2021, the Consolidated Appropriations Act (P.L. 116-260) provided the MBDA with $25 million in supplemental funding, in addition to $48 million in annual appropriations.

MBDA MSJ App. 00013

- During the 114th and 115th Congresses, no bills were introduced to formally establish the agency and its duties by statute.

- During the 116th Congress, Representative Jerry McNerney introduced H.R. 1432, the Minority Business Development Act of 2019, to redesignate and establish the MBDA as the Minority Business Development Administration. Later in the 116th Congress, Representative Al Green introduced H.R. 6869 and Senator Benjamin Cardin introduced S. 4208, both titled the Minority Business Resiliency Act of 2020. Both bills were designed to codify the agency by providing it statutory authorization and provide additional funding to help MBEs recover from the COVID-19 pandemic, among other activities. Later in 2020, Senator Benjamin Cardin introduced the Heroes Small Business Lifeline Act (S. 4818), and it included the Minority Business Resiliency Act of 2020 as a subtitle of the larger bill. Representative Karen Bass introduced H.R. 8352 and Senator Charles Schumer introduced S. 5065, which both included the Minority Business Resiliency Act of 2020 as a subtitle of the larger bill. During the 116th Congress, versions of the Heroes Act (H.R. 925, S. 4800, H.R. 8406) included language to establish the agency and fund emergency grants for nonprofit organizations and MBEs impacted by the COVID-19 pandemic, among other activities. Also during the 116th Congress, Senator Kelly Loeffler introduced S. 5011 to codify the MBDA and establish an Office of African American Affairs within the agency.

- During the 117th Congress, Senator Benjamin Cardin introduced two versions of the Minority Business Resiliency Act of 2021 (S. 1255 in April 2021 and S. 2068 in June 2021) to make permanent and expand the activities of the MBDA. Representative Al Green introduced companion legislation in the House (H.R. 2689). Senator Roger Wicker also introduced the Reaching America's Rural Minority Businesses Act of 2021 (S. 1749). The Minority Business Development Act of 2021 (Division K—Infrastructure Investment and Jobs Act, P.L. 117-58), enacted on November 15, 2021, provided statutory authorization for the agency.

# Author Information

Julie M. Lawhorn
Analyst in Economic Development Policy

# Acknowledgments

Retired CRS Analyst Eugene Boyd was the original author of CRS Report R45015, *Minority Business Development Agency: An Overview of Its History and Current Issues*, which was published in November 2017. Several sections of Mr. Boyd's report are included in this report. Mr. Boyd received research support from Christina Miracle Finch in the preparation of R45015.

MBDA MSJ App. 00014

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

MBDA MSJ App. 00015

(*Legislative day of Thursday, October 6, 1988*)

The Senate met at 10 a.m., and was called to order by the Honorable HARRY REID, a Senator from the State of Nevada.

---

### PRAYER

The Chaplain, the Reverend Richard C. Halverson, D.D., offered the following prayer:

Let us pray.

*Thou wilt keep him in perfect peace, whose mind is stayed on thee: because he trusteth in thee. Trust ye in the Lord for ever: for in the Lord Jehovah is everlasting strength.*—Isaiah 26:3-4.

God of Abraham, Isaac, and Israel, as pressure and tension inevitably build this week, may the Senators and their staffs be reminded of this practical and relevant reality from the Prophet Isaiah—God's perfect peace for those who stay their mind on Him—the everlasting strength of the Lord Jehovah for those who trust Him. Help them to see the wisdom of stealing a quiet moment in the day to turn mind and heart God-ward. Amen.

---

### APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore [Mr. STENNIS].

The assistant legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, October 12, 1988.*
*To the Senate:*
Under the provisions of Rule I, Section 3, of the Standing Rules of the Senate, I hereby appoint the Honorable HARRY REID, a Senator from the State of Nevada, to perform the duties of the Chair.

JOHN C. STENNIS,
*President pro tempore.*

Mr. REID thereupon assumed the chair as Acting President pro tempore.

---

### RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. Under the standing order, the majority leader is recognized.

---

### THE JOURNAL

Mr. BYRD. Mr. President, I ask unanimous consent that the Journal of proceedings be approved to date.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

---

### SCHEDULE

Mr. BYRD. Mr. President, I hope that we can come to an agreement between the two sides, the Republicans and Democrats, and within each of the two sides pass the core drug bill and go home without amendments. This is a good bill. It has been developed over a period of quite a long time by a very talented and dedicated working group on each side, chosen by the two leaders, and the core bill has been introduced with the support of the two leaders; the leadership on both sides.

I know there is a proclivity on the part of Senators to try to load everything onto these last-minute trains that are leaving the station. We used to have a continuing resolution. Now we see an effort to tie riders onto important bills hoping that those horses will carry the riders to the President's desk.

I think that the need for statesmanship requires us to rise above that. We have an opportunity here to pass a good bill. The American people are deeply concerned about the pervasiveness of drugs that know no class lines, that saturate the back alleys, and make their way even into the living rooms of the affluent. The schools, the homes, even the churches of America are without guarantee from this awful enemy of our young people, and it does not strike just the young but it is a threat to the old as well. It is the enemy in our midst, and will continue to grow and threaten the lives of young people.

I was reading in the Post this morning about the number of young people who have been knifed, shot, and slain in this Capital City of ours as a result of violence that comes from drugs and the spreading of drugs.

So we have a responsibility to pass a drug bill, and we have a drug bill that is a good drug bill.

I hope we will not let this debate on the drug bill deteriorate into a political sideshow where we will all be taking political potshots, where we will be trying to indicate who can be the toughest, and who can be the John Wayne in the drug war. We can all be tough.

We have a good, tough bill. It carries the death penalty in it. But we can get bogged down worrying about who can be the toughest, and we can get into all kinds of trouble. We can have all kinds of amendments, and I think we ought to avoid that, and pass this drug bill. I am willing on this side to do everything I possibly can to keep down amendments. I believe that on this side we can—avoid offering amendments, any amendments except perhaps the one amendment to strike the death penalty. That will probably be bipartisan in its support, and there will certainly be bipartisan opposition to it, myself for one. We can defeat that motion to strike.

Then if we can avoid other amendments, include in the core bill the child pornography legislation that was recently passed—we did not pass it, but we adopted that amendment to the profamily package—include that, and the distinguished Republican leader may have an idea as to something he would also propose to be included as well. Then, say no more amendments, just debate this bill and go home, or at least send it over to the House. I have hopes and some reason to believe the House will accept our core bill. It might not. But I think it will.

In any event, we would have fulfilled our responsibility. We have a responsibility to do that, and to avoid getting down into the mud battles that are certainly possible and potential if we let our thirst for political potshots get the better of us.

I make that proposal. I am confident that the distinguished Republican leader wishes as much as I do to pass a good drug bill. I hope that we can do that.

I yield the floor.

---

### RECOGNITION OF THE REPUBLICAN LEADER

The ACTING PRESIDENT pro tempore. Under the standing order, the minority leader is now recognized.

---

### SCHEDULE

Mr. DOLE. Mr. President, I indicate to the majority leader that we are going to be meeting at 10:45 with the principal players on this side of the aisle. A couple of them are not available this morning, but we hope to have some information. I will meet with the majority leader later this morning.

There have been suggestions, and I think the core bill is a good bill. I think it was always perceived by some on this side as a starting point, not a completed product. We have Members on both sides with amendments they would like to add.

Also, there were Senators on both sides of the aisle meeting, and some of

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

Under $25,000 contracts.................. 2

Total Small Business Par-
ticipation............................. 37

To achieve the 40 percent, agency X, in accordance with section 713(b), may solicit contracts through set-asides pursuant to section 15(a). The set-asides should amount to 3 percent—that is, contracts worth approximately $30,000—in order to attain the overall goal of 40 percent.

If after further monitoring during the second year the small business participation has risen above 40 percent and review of the contracting reveals at least 40 percent is through means other than section 713(b) set-asides, then operation of 713(b) is canceled and no further contracting is set aside until further reviews establish the need to do so.

In this competitive world, I believe it is important that we place emphasis on the ability of our small business concerns to win work in the unrestricted market. The Small Business Competitiveness Demonstration Program does this, while at the same time ensuring small business a fair proportion of the Federal Government market by establishing a 40-percent goal that can be attained if need be through set-asides.

One section of the demonstration program that still causes me concern is the portion which deals with refuse systems and related services. Contrary to past precedent, and contrary to the language of the bill, the goals in this area will be achieved by segmenting the 4-digit SIC codes to find a class of small business refuse collectors small enough to ensure that large businesses will have no problem taking a large percentage of their business.

I think that this is a bad precedent, although in this case it is true that the SIC codes are hopelessly inadequate to describe the activities included in this category. Segmenting the category, in this case, will simply mean that refuse haulers will now be competing with companies that are large enough to simply bury their competition.

I hope that those agencies administering the program will watch the progress of the refuse haulers' contracts very closely to make sure they are being handled fairly and without inflicting permanent damage on the small businesses in this category. Under the provisions of this bill and the conference, they at least will be able to have a hand in how the segmentation is done or if it is even necessary. The agencies in charge should take great care and listen to the small refuse collectors to insure that these businesses are not damaged.

Mr. McDADE. Mr. Speaker, I yield such time as he may consume to the gentleman from New York [Mr. HORTON].

Mr. HORTON. Mr. Speaker, I support the conference report. I was one

of the conferees. It is a good conference report, and I urge its adoption.

Mr. Speaker, in July of this year the House passed H.R. 1807, the Small Business Competitiveness Demonstration Program. One of the most important purposes of this Small Business Competitiveness Program is to demonstrate whether the competitive capabilities of small business firms in certain industry categories will enable them to successfully compete on an unrestricted basis for Federal contracting opportunities. Federal agencies shall seek to achieve their small business goals through unrestricted competition, and shall resort to restrictions on competition only if they cannot achieve their goals in the first instance. Agencies will assess their performance on a quarterly basis for each of the designated industry groups—not for each standard industrial classification code [SIC] within those designated groups.

This bill is designed to assist small business in doing business with the Federal Government. It will help them compete in a competitive marketplace and not be totally dependent on the set-asides program. Once a small business graduates from that program—and they will eventually graduate, they will be equipped with the experience and the know how to effectively compete in the Federal marketplace.

Mr. LaFALCE. Mr. Speaker, I yield 3 minutes to the gentleman from Massachusetts [Mr. MAVROULES].

The success of this program will depend on its administrative workability. Measuring the dollar value in each industry category in each agency will enable the Congress to know just how competitive small businesses can be.

I want to commend all of the committees which have worked so long on this report for their efforts, their concern for the small business community, and for their interests in furthering competition in the Federal marketplace.

Mr. Speaker, I urge my colleagues to support this conference report.

Mr. LaFALCE. Mr. Speaker, I yield 3 minutes to the gentleman from Massachusetts [Mr. MAVROULES].

Mr. MAVROULES. Mr. Speaker, I thank the gentleman very much for yielding me this time.

Mr. Speaker, Mr. Speaker, I would like to echo the strong support of Chairman LaFALCE for the conference report on H.R. 1807—the Business Opportunity Development Reform Act of 1988.

As the original author of H.R. 1807, I believe it is appropriate that during this historic 100th Congress we take this action to strengthen an important small business program, the Minority Small Business and Capital Ownership Development, or 8(a) program. H.R. 1807 represents the first major reform of this program in over 10 years.

As originally established by Public Law 95-507, the purpose of the capital ownership development program is to promote the "competitive viability" of firms owned and controlled by socially and economically disadvantaged individuals. The section 8(a) authority allows agencies to award contracts

through the Small Business Administration [SBA] to these disadvantaged firms and is only one of many tools available to SBA to promote the competitiveness of disadvantaged business.

Unfortunately, the section 8(a) program has deviated from its congressional objective and has become a revolving door that randomly spins off firms that have completed an arbitrary participation period regardless of whether or not they indeed have become competitively viable. The 8(a) authority has been used merely to issue "hunting licenses" in the hopes that minority owned firms can capture a maximum amount of single source negotiated contracts during their term.

The system must be changed and must be changed now if we want to save this program.

That is why, when I served as chairman of the Subcommittee on Procurement, Innovation and Minority Enterprise Development, I introduced an 8(a) reform package, H.R. 1807.

During the six days of hearings that my subcommittee held on this proposal, we heard from several trade organizations and the 8(a) firms themselves. Certainly, those most affected are in the best position to give us a realistic and practical evaluation of this bill. I am also proud that our former chairman, Parren J. Mitchell, and the Reverend Jesse Jackson were able to take the time to testify at our hearings, bringing with them their extensive knowledge of the minority business community.

I am pleased that today, after more than a year of hard work we can present to you a strong bipartisan bill which will clarify the congressional intent that the 8(a) program is first and foremost a business development program.

I would like to commend the Chairman of the Small Business Committee, the gentleman from New York [Mr. LaFALCE], the ranking minority member, the gentleman from Pennsylvania [Mr. McDADE], and, of course, my friend, the gentleman from Massachusetts [Mr. CONTE], as well as all my fellow conferees, including members of the Black Caucus and the Hispanic Caucus, who contributed so greatly to this reform. And certainly all members of the staffs in both houses, particularly Tom Trimboll of the Small Business Committee of the House, who is the backbone of the staff, are to be thanked for the long hours they have put in to help us perfect this proposal.

Chairman LaFALCE already has outlined several of the major provisions of H.R. 1807—most important of which is the repeal of the current fixed program participation term, which we have extended out to 9 years. This term will be divided into a two-phase process of which 4 years

Case 4:23-cv-00278-P   Document 42   Filed 10/27/23   Page 27 of 244   PageID 713

will be in the developmental stage and 5 years in the transition stage. In each phase, we have provided development assistance, in addition to 8(a) contracts, that is aimed at providing the firm with what it needs to become competitive in its industry. This development assistance includes employee training, technology, and surplus property transfers, exemptions from the Walsh-Healy and Miller Acts and special loan programs.

Furthermore, everyone involved with the 8(a) Program has recognized that in order to assist minority firms to become competitive we must introduce competition into the 8(a) Program. The question has always been how much competition and at what level. For that reason, we would allow competition above thresholds of $5 and $3 million.

I would like to take this opportunity to comment on a couple of provisions about which I feel most strongly.

In the first phase of the program, we provided financial assistance for firms to train or upgrade the skills of their employees. I want to stress that this assistance is not a duplication of the jobs training partnership act or other Federal programs which train unemployed individuals.

I think the words in our committee's report accurately sums up the reason why this particular assistance is needed:

Labor, as any other factor of production, has a cost associated with it. Part of that cost is the training and upgrading of job skills. Small minority concerns, because of their relatively small capital base and generally lower incomes, are more disadvantaged when it comes to competing for labor than are other business. * * * It is necessary, therefore, that the program address this issue and, in some way assist 8(a) firms to secure the skilled workers they need to become successful.

Job training is as critical to success as capital and management yet until now this aspect of business development has been ignored. I am pleased that my fellow conferees ensured that this important training provision remained in the bill. The $2 million that we have authorized in this proposal will enable at least 800 employees of minority firms to receive training.

Another provision relates to the director of small and disadvantaged business utilization at the Department of Defense. This provision has important implications for all small and small disadvantaged businesses.

Until last Congress, the Sadbu directors in every agency reported directly to the head of any agency or that person's deputy. This director reporting requirement was intended to give the Sadbu director immediate access to top level policymakers and maximize his/her effectiveness as an advocate for small and disadvantaged businesses.

The National Defense Authorization Act for fiscal year 1987, Public Law 99-661, created a new position of Under Secretary of Defense for Acquisition who would direct all other offices in the Secretary of Defense's office who have acquisition responsibilities.

This has meant that the Sadbu director within DOD is in an inferior position—relative to other Sadbu Directors—relegated to the "remote corridors" of the Pentagon and denied a meaningful opportunity to affect policies and procedures affecting small business issues. I believe that it also is ineffectual to have the Sadbu Director report to the very person whose duties that director was intended to monitor.

I am pleased that we have reached a compromise on this matter—agreeing that the Sadbu Director for the Defense Department should report to the Secretary or his designee. With the critical importance of the Department's 5 percent program for minorities, and our desire to expand the military industrial base by reaching out to more small businesses, I am confident that the secretary will understand the necessity of having the Sadbu Director report directly to him. This position has become too critical to delegate the responsibilities or downgrade this position.

I also want to emphasize my support for a provision inserted by my colleague from California, Esteban Torres. As we all know, most Government contracts must contain subcontracting plans. However, investigations by the Small Business Committee found many instances of noncompliance by prime contractors. Congressman Torres, therefore, added a sanction calling for liquidated damages if a contractor fails in good faith to live up to his subcontracting agreement.

The Defense Department has argued that the use of incentives may ensure greater compliance. I must point out that such incentive clauses have been on the books for years yet contractors still fail to fulfull their obligations. I am hopeful that the use of liquidated damages will encourage contractors to comply with the terms of their subcontracting agreements. Maximum utilization of small and small disadvantaged small businesses as subcontractors is in our national interest.

Before concluding, there is one additional section that I must comment on, which was by the Senate Small Business Committee. There is no question in anyone's mind that small business nesses should receive a fair share of Federal contracts across all categories of items required by the Government. Agencies, however, have tended to use set-asides in industries where small businesses dominate, while ignoring small businesses that operate in other more high-tech areas.

Working together, the former chairman of the House Small Business

Committee and the chairman of the Armed Services Committee attempted to correct this problem in the last Congress. As part of the Department of Defense authorization bill, the Congress enacted section 921 of Public Law 99-661, which required SBA to reduce size standards in four pilot industries in which small businesses dominated in order to reduce the set-aside level to 30 percent of total purchases.

Unfortunately, the SBA has proposed size standard reductions that are extremely severe. In the construction industry, SBA used size standards which varied with each individual four digit SIC code. Congressmen Les Aspin, Dave McCurdy and I wrote to the SBA indicating that nothing precluded the establishment of the same size standard for several related SIC codes. This would have served the industry's concerns and still accomplished the purposes of Public Law 99-661. I might add that the SBA did not heed this advice.

Since then, the Senate expressed its intention to revisit the set-aside issue as a part of the 8(a) reform package. The original Senate proposal called for the suspension of set-asides in the four pilot industries, allowing them to be reinstated only if the small business share in open competition for those industries fell below 30 percent.

In order to reach a compromise, and not jeopardize the 8(a) reform package, I joined with my House conferees in accepting a modified Senate proposal. This compromise raises the set-aside trigger to 40 percent. Also, small businesses in the lower half of the size standard in the four pilot industries would be guaranteed 15 percent of total purchases for contracts that fell within the small business reserve amount. As with an earlier House proposal, this compromise requires agencies to take action to increase small business participation in underrepresented industries.

While I remain concerned over potential dislocation in the affected industries, I am hopeful that we have fashioned an approach that will meet our objective of increasing overall small business participation in the Federal marketplace. As with my program, we must carefully monitor these provisions and take corrective steps when necessary.

To return to the 8(a) Program reforms, I believe that the requirements in H.R. 1807 will ensure that the legitimate needs and concerns of the 8(a) population will be properly heard and served. More small disadvantaged businesses should be able to participate in not only this effort but all Federal procurement programs. Our entire economy will benefit.

Mr. Speaker, I urge my colleagues to support this important bill.

MBDA MSJ App. 00018



**UNITED STATES DEPARTMENT OF
COMMERCE**
**Minority Business Development Agency**
Washington, D.C. 20230

**Guidance to MBDA Business Center Operators**

To:      MBDA Business Center Operators

From:  Donald R. Cravins, Under Secretary for Minority Business Development

Re:      Guidance Regarding Eligibility

Date:   October 23, 2023

This memorandum provides guidance on the MBDA Act eligibility requirements for MBDA Business Center Program services.

The purpose of the MBDA Business Center Program is to create and fund a national network of centers that assist minority business enterprises in accessing capital, contracts, and grants and creating and maintaining jobs. 15 U.S.C. § 9522. These centers also provide counseling and mentoring to minority business enterprises and facilitate the growth of minority business enterprises by promoting trade. 15 U.S.C. § 9522.

The MBDA Act defines "minority business enterprise" as "a business enterprise--(i) that is not less than 51 percent-owned by 1 or more socially or economically disadvantaged individuals; and (ii) the management and daily business operations of which are controlled by 1 or more socially or economically disadvantaged individuals." 15 U.S.C. § 9501(9)(A).

The MBDA Act defines "socially or economically disadvantaged individual" as "an individual who has been subjected to racial or ethnic prejudice or cultural bias (or the ability of whom to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market areas) because of the identity of the individual as a member of a group, without regard to any individual quality of the individual that is unrelated to that identity." 15 U.S.C. § 9501(15)(A).

The MBDA Act explains that the Under Secretary of Commerce for Minority Business Development "shall presume" that "socially or economically disadvantaged individual" "includes any individual who is--(i) Black or African American; (ii) Hispanic or Latino; (iii) American Indian or Alaska Native; (iv) Asian; (v) Native Hawaiian or other Pacific Islander; or (vi) a member of a group that the Agency determines under part 1400 of title 15, CFR, as in effect on November 23, 1984, is a socially disadvantaged group eligible to receive assistance." 15 U.S.C. § 9501(15)(B). 15 C.F.R. 1400.1(b) codifies Executive Order 11625, which designates "Blacks, Puerto-Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts"

as individuals who are socially or economically disadvantaged. 15 CFR 1400.1(c) also designates "Hasidic Jews, Asian-Pacific Americans, and Asian Indians" as such.

**Under the MBDA Act, an individual may meet the definition of "socially or economically disadvantaged individual" and thus be eligible to receive Business Center services if**:

1. [Socially disadvantaged individual] The individual has been subjected to racial or ethnic prejudice or cultural bias because of the identity of the individual as a member of a group, without regard to any individual quality of the individual that is unrelated to that identity; *or*
2. [Economically disadvantaged individual] The individual's ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area . . . because of the identity of the individual as a member of a group, without regard to any individual quality of the individual that is unrelated to that identity.

Under the Act, an individual who identifies as a member of one or more of the groups listed in 15 U.S.C. § 9501(15)(B) is presumed to be socially or economically disadvantaged: Black or African American; Hispanic or Latino; American Indian or Alaska Native; Asian (including South Asian); Native Hawaiian or other Pacific Islander; Hasidic Jews.

An individual does not need to identify as a member of one of these groups to be a socially or economically disadvantaged individual eligible to receive Business Center services under the MBDA Act. An individual may meet the definition if their membership in a group has resulted in their subjection to racial or ethnic prejudice or cultural bias or impaired their ability to compete in the free enterprise system. A "member of a group" may include, but is not limited to, a member of a religious group, a geographically defined group, or some other group sharing a common characteristic.

Business Centers should ensure that their operations and communications, including promotional materials, websites, and intake processes, as well as reporting under performance metrics that employ the definition of MBE, align with the MBDA Act as described above and in the updated client engagement form, which MBDA expects to implement in the near future.



## The Minority Business Development Agency
# VITAL TO MAKING AMERICA GREAT

By 2044, the Nation's prosperity will rely even more on minorities, the fastest growing segment of the population. Entrepreneurship is a sure pathway to wealth creation and a thriving national economy. Today, U.S. minority business enterprises represent 29% of all firms but only 11% have paid employees. If MBEs were to obtain entrepreneurial parity, the U.S. economy would realize 13 million more jobs.

### BUILDING PROSPERITY FOR AMERICAN FAMILIES

- Create a new generation of minority-owned firms with $100M in annual revenue to **generate more jobs and help grow the U.S. economy** through targeted programs and services.
- **Increase wealth creation** that secures personal and family well-being, reduces dependence on government resources, and contributes to overall economic vitality.
- Cultivate successful minority-owned firms to **foster economic activity in local communities** and increase utilization of community benefits, such as transportation, infrastructure, housing and quality education.

### EXPANDING ECONOMIC INVESTMENTS

- MBDA secures an annual average of **$5.4B worth of contracts and financial investment** in minority-owned firms, increasing the number of businesses with revenues that exceed $1M and **create jobs for Americans**.
- **MBDA leverages public-private partnerships** whereby the private sector contributes nearly $5.5M annually in non-federal investments to the national network of MBDA programs.
- Minority-owned businesses **expand and diversify the tax base** creating sustainable communities with a steady rate of economic growth.

### STRENGTHENING AMERICA'S COMPETITIVENESS

- **Position minority-owned firms to perform** in high growth industries, emerging markets, and corporate supply chains.
- **Reduce the trade deficit** by leveraging the unique assets of minority-owned firms in global markets.
- **Commission research reports and business analytics** that demonstrates the minority business community as a vibrant and growing business sector.

**RETURN ON INVESTMENT:** For every federal $1 spent MBDA gets one of the highest returns for business assistance in the Federal Government. Over the past 10 years the Agency's programs and services have secured more than $40B in contracts and capital, with accelerated performance averages and returns on investment.

*Elevate Your Success* with MBDA        www.MBDA.gov        @USMBDA    /USMBDA



MBDA MSJ App. 00021

### The Minority Business Development Agency
# VITAL TO MAKING AMERICA GREAT



**MINORITY BUSINESS DEVELOPMENT AGENCY**
U.S. DEPARTMENT OF COMMERCE

## UNIQUE CHALLENGES FACED BY MINORITY FIRMS

Overall, minority-owned firms are smaller in size and scale than their non-minority counterparts. The gap in combined gross receipts is 10:1, with only 2% of minority firms generating gross receipts of more than $1M and only 11% of minority-owned firms with paid employees.

**CAPITAL**
- Minority firms are more likely to be denied loans at a rate nearly 3x's higher than non-minority firms
- Minority firms are likely to pay higher interest rates; on average 7.8% while non-minority firms pay on average 6.4%
- Minority firms are less likely to receive loans; and when approved, receive lower loan amounts.

**CONTRACTS**
- Minority firms secure a lower number and dollar amount of contracts in proportion to the number of available minority firms in the relevant market.
- Pervasive barriers cited in contracting disparities studies include:
  - access to capital;
  - large contract sizes;
  - network access; and
  - marketplace inequities.

## MBDA – THE SOLUTION PROVIDER

The only Federal Government agency solely dedicated to the growth and global competetiveness of minority business enterprise.



**MBDA:**
- Provides access to market-based financing solutions.
- Facilitates teaming arrangements and mergers and acquisitions.
- Partners with private-sector Fortune 500 firms to provide access to global supply chains.
- Transitions minority 8(a) [SBA program] graduate firms to the private sector.
- Develops policy recommendations that address minority business inequities.

MBDA Business Center Program

## TABLE OF CONTENTS

I.  Funding Opportunity Description ....................................................................... 3
    A.  Program Objective ..................................................................................... 3
    B.  Program Priorities ..................................................................................... 3
    C.  Program Authority ..................................................................................... 7
II.  Award Information ....................................................................................... 7
    A.  Funding Availability ................................................................................... 7
    B.  Project/Award Period ................................................................................. 7
    C.  Type of Funding Instrument ........................................................................ 8
III.  Eligibility Information ................................................................................. 8
    A.  Eligible Applicants .................................................................................... 8
    B.  Cost Sharing or Matching Requirement ........................................................ 9
    C.  Other Criteria that Affect Eligibility .......................................................... 10
IV.  Application and Submission Information ......................................................... 10
    A.  Address to Request Application Package ...................................................... 10
    B.  Content and Form of Application ............................................................... 10
    C.  Unique Entity Identifier and System for Award Management (SAM) ................... 15
    D.  Submission Dates and Times ..................................................................... 15
    E.  Intergovernmental Review ........................................................................ 15
    F.  Funding Restrictions ................................................................................ 15
    G.  Other Submission Requirements ................................................................ 16
V.  Application Review Information ..................................................................... 18
    A.  Evaluation Criteria .................................................................................. 18
    B.  Review and Selection Process .................................................................... 19
    C.  Selection Factors .................................................................................... 20
    D.  Anticipated Announcement and Award Dates ............................................... 21
VI.  Award Administration Information ................................................................ 21
    A.  Award Notices ....................................................................................... 21
    B.  Administrative and National Policy Requirements .......................................... 21
    C.  Reporting .............................................................................................. 22
VII.  Agency Contacts ..................................................................................... 23
VIII.  Other Information ................................................................................... 23

NOTICE OF FUNDING OPPORTUNITY

EXECUTIVE SUMMARY

Federal Agency Name(s):  Minority Business Development Agency (MBDA), Minority Business Development Agency (MBDA), Department of Commerce

Funding Opportunity Title:  MBDA Business Center Program

Announcement Type:  Initial

Funding Opportunity Number:  MBDA-OBD-2022-2007282

Federal Assistance Listings Number:  11.805, MBDA Business Center (MBC)

Dates:  Complete applications will be accepted in Grants.gov up to 11:59 p.m. Eastern Time on June 6, 2022.  Applications received after this time will not be reviewed or considered.

Funding Opportunity Description:  This notice requests applications from qualified organizations to operate MBDA Business Centers in six states, Arkansas, Indiana, Oregon, South Carolina, Wisconsin and Utah. The Business Centers will facilitate the growth and job creation in minority business enterprises in their locales by providing expert technical assistance to minority business enterprises consistent with the terms of this Notice of Funding Opportunity. These programs align with the Minority Business Development Agency (MBDA) strategic mission goals to support minority business enterprises (MBEs) and the Administration's strategic priority to advance racial equity and support for underserved communities through the Federal government.

Pre-Application Teleconference: MBDA will conduct a series of pre-application teleconferences from 2:00-3:00pm Eastern time on the following dates with focus areas noted below:
•    April 28 – General competition information, key changes from previous competitions and key dates, live Question and Answer session
•    May 3 – Program priorities and objectives with examples, live Question and Answer session
•    May 10 – Budget pitfalls to avoid and best practices, live Question and Answer session
•    May 17 – Measuring success and performance, live Question and Answer session
Participants must register at least 24 hours in advance of the teleconference. Please visit the MBDA website at www.mbda.gov to register and view recordings of the teleconferences, as well as other additional information.

FULL ANNOUNCEMENT TEXT

I.  Funding Opportunity Description

   A.  Program Objective

   The Minority Business Development Agency (MBDA), a bureau of the U.S. Department of Commerce, assists minority business enterprises (MBEs) through its MBDA Business Center Program.

The Program supports a national network of Business Centers that provide high quality, technical assistance to MBEs. Business Centers provide counseling and mentoring to MBEs, assist MBEs to access capital, contracts and grants, facilitate the growth of MBEs by promoting trade, and support MBEs to create and retain jobs. The goal of these Business Centers is to further MBDA's core objective of promoting the growth and global competitiveness of America's MBE community.

MBDA is soliciting competitive applications from eligible entities to operate MBDA Business Centers as described in this Notice of Funding Opportunity (NOFO). MBDA anticipates awarding a total of approximately $2,100,000 pursuant to this NOFO for cooperative agreements issued for the operation of a business center in each of the following states:

Arkansas
Indiana
Oregon
South Carolina
Wisconsin
Utah

The states were selected as those states that do not currently have a Business Center or Specialty Center and also have the highest number of MBEs in rank order (Source: Census 2017 Non-Employer and Employer Classifiable Firms). MBDA will evaluate applications based on the applicant's demonstrated ability to serve the community and states in which they are located. However, a Business Center may provide services to minority business enterprises located in any U.S. state or territory.

**IMPORTANT:  You must have physical office space in the state for which you apply.**

   B.  Program Priorities

   Centers must offer a wide array of assistance. This can be accomplished through a mixture of direct services or referral to other qualified organizations. The Business Centers

must offer programming and services across three categories: business development, capacity-building and navigation, described below.

Business Development: The Business Center must assist clients to increase revenues and profits. The Business Center is encouraged to focus on opportunities that increase MBE participation in public and private large-scale investments and high-growth industries, specifically, infrastructure, advanced manufacturing, innovation and emerging technologies. Business Centers may support MBEs in activities including, but not limited to:

o    Contracting Assistance: providing information and assistance to MBEs pursuing federal, state, local, and private sector prime contract and subcontract opportunities.

o    Infrastructure Investment and Jobs Act Procurement: providing information and assistance to MBEs pursuing federal, state, local and private sector prime contract and sub-contract opportunities related to the 2021 Infrastructure Investment and Jobs Act.

o    Accessing supply chains: providing information and assistance to MBEs pursuing opportunities to participate in global supply chains.

o    Export promotion: helping MBEs identify and develop potential export markets, participate in trade shows, and connect with U.S. Export Assistance Centers.

Capacity Building: The Business Center is required to provide MBEs with one-on-one business counseling. The goals of these services may be to improve operational efficiencies, increase resources, build scale, manage risk, increase liability thresholds, strengthen management teams, facilitate access to financing, increase profits and owner equity, and integrate new technology and equipment. Business Centers may support MBEs in activities including, but not limited to:

o    Access to capital: increasing awareness of basic credit practices and credit requirements; assisting in the development of business plans, financial packages, and credit applications.

o    Management Counseling: assistance and resources relating to management, technological and technical assistance, financial, legal, and marketing services, and services related to workforce development.

Navigation: The Business Center must facilitate referrals and connections to an ecosystem of organizations that can support MBE growth and competitiveness. Referral organizations can include but need not be limited to: Federal agencies or programs, including those distributed through state, local, non-profit, and private sector entities; state and municipal governments; major employer firms; chambers of commerce and other local economic development organizations; financial institutions; and community-based organizations. Business Centers must develop, cultivate, and maintain a network of strategic partnerships that foster access by MBEs to economic markets, capital, contracts, or other resources that facilitate their

growth. As part of their network, Business Centers are required by law to establish or continue a referral relationship with at least one community-based organization. A community-based organization is a public or private nonprofit organization of demonstrated effectiveness that is representative of a community or significant segments of a community; and provides educational or related services to individuals in the community.

**Note: The Business Center must have at least one referral organization with a physical presence in the same state where the Business Center is located.**

Business Centers are expected to provide one-on-one technical assistance services to MBEs to support the broad goals of Business Development, Capacity Building and Navigation. They also should ensure that they are developing targeted programming and services specific to the needs of the MBEs in the Center's service area. A Business Center should therefore have a sophisticated knowledge of the needs of targeted MBEs and a plan for how the Business Center will provide programming and services to meet those needs.

For example: A Business Center may target services to construction firms seeking to scale operations. The Business Center might propose to focus business development services on state and local procurement opportunities, and provide technical assistance focused on bonding. Alternatively, a Business Center may target services to local MBEs in the service sector and may target technical assistance to operations and workforce development.

Performance Measures and Goals

MBDA will measure each Business Center's performance. MBDA has defined performance measures and minimum numerical goals that it expects each Business Center to meet. These goals are listed below. Because the awards are for three years and 10 months, the periods for achieving and reporting on the goals will begin with a 10-month period and then shift to an annual period.

Applicants should develop workplans that allow them to achieve and report on these minimum performance goals. Applicants may propose alternative numerical goals within each of the performance measures below, but any deviation below the numerical targets set below requires justification. MBDA is more likely to permit a deviation if it is grounded in facts and data about the specific needs of the MBEs in the region the applicant proposes to serve.

While applicants may propose different numerical targets for a given performance measure, applicants may not propose different measures. Section VII.B.(c).3 provides more detail on the process for proposing alternative numerical goals. Appendix A defines each performance measure.

Measures & minimum goals:

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF TEXAS

 2                   Fort Worth Division

 3

 4   JEFFREY NUZIARD, et al.         Case No.

 5                                   4:23-CV-00278-P

 6          Plaintiffs

 7   vs.                            District Judge

 8   MINORITY BUSINESS DEVELOPMENT    Mark T. Pittman

 9   AGENCY, et al.

10          Defendants

11   _____/

12

13

14          The Zoom teleconferenced deposition of

15   MATTHEW PIPER was held on Wednesday, October 4,

16   2023, commencing at 9:34 A.M., at virtual location

17   before Louisa B. McIntire-Brooks, Notary Public.

18

19

     Job No. CS6114833

20

21   REPORTED BY:  Louisa B. McIntire-Brooks
```

Matthew Piper                                                    October 4, 2023

```
 1   APPEARANCES:

 2              ON BEHALF OF THE PLAINTIFFS:
                DANIEL P. LENNINGTON, ESQUIRE
 3              CARA M. TOLLIVER, ESQUIRE
                    Wisconsin Institute for Law
 4                  & Liberty, Inc.
                    330 East Kilbourn Avenue
 5                  Milwaukee, Wisconsin 53202
                    Telephone:   410-727-4880
 6                  dan@will-law.org
                    cara@will-law.org

 7

 8              ON BEHALF OF DEPT. OF COMMERCE:
                SAPNA SHARMA, ESQUIRE
 9              SANDRA SODERSTROM, ESQUIRE
                    U.S. Department of Commerce
10                  Office of General Counsel
                    1401 Constitution Avenue, NW
11                  Washington, DC 20230
                    Telephone:   202-482-4772
12                  ssharma@doc.gov
                    ssoderstrom@doc.gov

13

14              ON BEHALF OF THE DEPT. OF JUSTICE
                VENDARRYL JENKINS, ESQUIRE
15              CHRISTOPHER WOOLLEY, ESQUIRE
                DAVID REESE, ESQUIRE
16                  United States Department of Justice
                    Civil Rights Division
17                  150 M Street, NE, 9th Floor
                    Washington, DC 20530
18                  Telephone:   202-598-1671
                    vendarryl.jenkins@usdoj.gov
19                  christopher.woolley@usdoj.gov
                    david.reese@usdoj.gov

20

21
```

Page 3

1                           INDEX

2              Deposition of:   Matthew Piper

3                       October 4, 2023

4

5   Examination by:                              Page:

6   Mr. Jenkins                                     5

7

8   Exhibit No.                                  Marked:

9   Exhibit 1   MBDA 1 Notice of oral deposition     5

10  Exhibit 2   Senator Baldwin cuts ribbon         46

11  Exhibit 3   Definitions                         52

12

13

14

15

16

17

18

19

20

21

Matthew Piper                                    October 4, 2023

Page 4

 1                    STIPULATION

 2          It is stipulated and agreed by and

 3   between counsel for the respective parties that the

 4   witness may be remotely sworn.

 5                    PROCEEDINGS

 6   Whereupon,

 7                 MATTHEW PIPER,

 8   called as a witness, having been first duly sworn

 9   to tell the truth, the whole truth, and nothing but the

10   truth, was examined and testified as follows:

11          MR. JENKINS:  I'm Vendarryl Jenkins.  I'm

12   an attorney with the Department of Justice.

13          MR. REESE:  Good morning.  This is David

14   Reese also with the Department of Justice.

15          MR. WOOLLEY:  Good morning.  Chris Woolley

16   for the Department of Justice.

17          MS. SODERSTROM:  Sandra Soderstrom from the

18   Department of Commerce.

19          MS. SHARMA:  This is Sapna Sharma from the

20   Department of Commerce.

21          MR. LENNINGTON:  This is Dan Lennington,

Page 18

1          A.     Yes.

2          Q.     Okay.  Please go ahead and describe what

3     you discussed during that interview.

4          A.     We discussed the fact that I feel my civil

5     rights are being violated by the MBDA.

6          Q.     Did you speak to why you thought your

7     rights were being violated?

8          A.     Yes.

9          Q.     Could you tell me why you feel that your

10    rights are being violated?

11         A.     Yes.

12         Q.     Okay.  I'm just going to remind you, this

13    will go a lot quicker if you answer the question that I

14    ask as fully and completely as possible.  There's been

15    several times now where I followed up with please go

16    ahead and tell me.  So if I ask a question, I want the

17    answer versus just a yes.  So, will you tell me why you

18    felt your civil rights were violated?

19         A.     Yes.  It's my understanding in America that

20    all people are created equal and when I go to the MBDA

21    websites, I see that the government is providing

1   services to people, but not to people like me.

2        Q.    Do you know Mr. Christian Bruckner?

3        A.    No.

4        Q.    Are you familiar with him at all?

5        A.    Yes.

6        Q.    Could you tell me how you became familiar

7   with Mr. Christian Bruckner?

8        A.    I read a story about him online somewhere.

9        Q.    Do you recall about the date that you read

10   that story?

11        A.    Some time earlier this year.

12        Q.    What do you recall about his story?

13        A.    I recall that he feels his civil rights are

14   being violated by the MBDA.

15        Q.    Just a moment ago you said that you felt --

16   that you visited the website and you felt that services

17   were not being given to you.  Did you visit the

18   website, the MBDA, the Wisconsin MBDA website after you

19   read these stories?

20        A.    Yes.

21        Q.    And were you familiar with the Business

1   Centers before you read these stories?

2          A.    Yes.

3          Q.    Okay.  Thanks.  So now in your complaint,

4   you noted that you grew up in extreme poverty.  Would

5   you mind telling me a little bit about your upbringing?

6          A.    Yes.  My mother was divorced from my

7   alcoholic father who refused to pay child support for

8   the five children of which I was the oldest.

9          Q.    Would you say these were the reasons for

10  the financial hardship?

11         A.    Yes.

12         Q.    Is there any other reason for the financial

13  hardship that you experienced in your childhood?

14         A.    My mother was unable to work with five

15  young children.  So there was no income.

16         Q.    How were you able to overcome those

17  circumstances?

18         A.    Hard work and determination, education.

19         Q.    All right.  Can you tell me a little bit

20  about that hard work and determination?  What sort of

21  steps did you take?

Matthew Piper                                                    October 4, 2023

Page 39

1          A.     My home.  Insurance policies.  That's it.

2          Q.     Is your current business an asset, Piper

3     Architects?

4          A.     Yes.  I'm not sure how you define asset.

5     But probably.

6          Q.     Is the business profitable?

7          A.     Almost always.

8          Q.     Now, a few questions for you with how you

9     identify.  How would you identify your gender?

10         A.     I'm sorry?

11         Q.     How would you identify your gender?

12         A.     I am a man.

13         Q.     What race do you identify as?

14         A.     Caucasian.

15         Q.     When you say Caucasian, do you mean white?

16         A.     Yes.

17         Q.     How do you define your sexuality?

18         A.     I am a man.

19         Q.     How do you define your sexual preferences?

20         A.     I am a man.

21         Q.     Would you identify as straight or

Matthew Piper                                      October 4, 2023

Page 44

1          Q.     When did you first decide that you would

2    bring litigation against MBDA?

3          A.     Earlier this year.

4          Q.     When did the conversation with WILL about

5    MBDA come up with the unrelated matter?

6                 MR. LENNINGTON:  Objection.  Privilege.

7    Don't answer.

8                 MR. JENKINS:  Again, I'm not asking about

9    the details of the conversation.  I'm simply asking

10   about the date of a conversation that has already been

11   mentioned.  It has already been said that the

12   conversation occurred.  I'm simply asking for the date

13   of that conversation.

14                MR. LENNINGTON:  Objection, privilege.  You

15   already said -- you are asking him about the date of a

16   conversation that had a certain content and he's not

17   going to answer about conversations and content.

18                MR. JENKINS:  Okay.  That's fine.

19         Q.     When did you first learn about the

20   Wisconsin Business Center?

21         A.     When I heard a story on the radio.

Matthew Piper                                    October 4, 2023

Page 45

1        Q.    Do you recall the date?

2        A.    I would guess November 2022.

3        Q.    When you heard the story, were you

4   interested in services from the Business Centers at

5   that time?

6        A.    No.

7        Q.    When did you become interested in gaining

8   services or securing services from the Business Center?

9        A.    When it became apparent to me that there

10  might be able to fight the injustice of racial

11  discrimination.

12       Q.    Now, how did you discover that you were

13  ineligible for services from the Business Centers?

14       A.    By going on the websites and looking.

15       Q.    Did anyone tell you that you were

16  ineligible?

17       A.    No.

18       Q.    Which websites did you visit?

19       A.    A handful of MBDA sites, the national site,

20  the Wisconsin site.  I'm sure the Minnesota site, the

21  Illinois site, the Wisconsin site, the surrounding

1          Q.     Those clubs could be social, financial, any

2     form of club.

3          A.     I have no recollection of that.

4          Q.     So from what you're saying, Mr. Piper, I

5     believe I heard you to say that you do believe that you

6     have experienced economic disadvantages.  Is that what

7     I hear you to say?

8          A.     Yes.

9          Q.     So, are you a minority business owner?

10         A.     No.

11         Q.     I'd like to refer back to Exhibit 3 which

12    is the definition of a minority business owner there.

13    Have you had an opportunity to refresh yourself on the

14    definition of minority business owner?

15         A.     Yes.

16         Q.     Do you maintain that you are economically

17    disadvantaged?

18              MR. LENNINGTON:  Object to the form.

19    You're not showing him the definition of economically

20    disadvantage.

21              MR. JENKINS:  He has stated several times

Page 65

1    that he is economically disadvantaged.  I'm asking does

2    he maintain that same characterization that he has made

3    several times throughout this deposition?

4                    MR. LENNINGTON:  Object to the form.

5         Q.    Mr. Piper, have all of your answers been

6    true and correct thus far?

7         A.    To the best of my knowledge and belief,

8    yes.

9         Q.    Okay.  Do you consider yourself a minority

10   business owner?  Or excuse me, let me scratch that

11   question.  Are you a minority business owner by

12   definition of this statute?

13                   MR. LENNINGTON:  Object to the form.

14        Q.    If you read this statute, Mr. Piper, do you

15   believe that you are a minority business owner?

16                   MR. LENNINGTON:  Object to the form.

17   Counselor is not showing him the statute.  Counsel is

18   showing him one portion of one definition.

19        Q.    By the definition of minority business

20   enterprise that I have here as Exhibit 3, do you

21   believe that you are a minority business owner?

1          MR. LENNINGTON:  Objection.  This is not

2     the complete definition of minority business

3     enterprise.

4          Q.   Mr. Piper, you may still answer the

5     question.

6          A.   Sorry.  Can you repeat it one more time?

7          Q.   Sure.  Here we have a definition of a

8     minority business owner.  Are you a minority business

9     owner by the definition that you see here?

10          MR. LENNINGTON:  Same objection to the form

11     and this is not about minority business owners.  This

12     is minority business enterprise.  And this is only a

13     portion of the definition and it does not include the

14     definition of socially or economically disadvantaged or

15     the presumptions that are all in other statutes.

16          MR. JENKINS:  That's fine.

17          Q.   Mr. Piper, can you please answer the

18     question?

19          A.   I do not believe so.

20          Q.   You do not believe that you are a socially

21     disadvantaged person?

Page 67

1                    MR. LENNINGTON:   Object to the form.

2                    MR. JENKINS:   That's fine.

3          Q.    Mr. Piper, you can answer.

4          A.    Not at this time.

5          Q.    You do not believe that you are an

6    economically disadvantaged person?

7                    MR. LENNINGTON:   Object to the form.  Legal

8    conclusion.

9          Q.    Mr. Piper, do you believe that you are

10   economically disadvantaged?

11                   MR. LENNINGTON:   Same objection.  You can

12   answer if you know the answer, Matt.

13         A.    Not at this time.

14         Q.    Okay.  So you are not.  I have heard you

15   say, and I just want to be clear, you are not socially

16   or economically disadvantaged; is that correct?

17                   MR. LENNINGTON:  Objection, form, asked and

18   answered, vague, legal terms.

19         Q.    Okay.  Great.  Let's move on to the

20   application to the Business Centers that you made.  Did

21   you visit the Wisconsin Business Center website before

Matthew Piper                                                    October 4, 2023

Page 68

1    this litigation?

2         A.    Yes.

3         Q.    Do you remember the date?

4         A.    No.

5         Q.    How did you apply for services from the

6    Business Center?

7         A.    I did not.

8         Q.    Okay.  So did you ever submit an intake

9    form to the Wisconsin Business Center?

10        A.    No.

11        Q.    Did you ever call the Business Center?

12        A.    No.

13        Q.    The Wisconsin Business Center?  Did you

14   ever e-mail the Wisconsin Business Center?

15        A.    No.

16        Q.    Did you ever reach out to any other

17   Business Centers?

18        A.    No.

19        Q.    Did you ever confirm with anyone that you

20   were ineligible for services from the Wisconsin

21   Business Center?

Page 69

1          A.     Yes.

2          Q.     How did you confirm that?

3          A.     Conversation.

4          Q.     With who?

5          A.     My attorneys.

6          Q.     When you say your attorneys, you mean your

7    attorneys at WILL?

8          A.     Correct.

9          Q.     When did you confirm that you were

10   ineligible?

11         A.     Earlier this year.

12         Q.     Was that prior to the date that you visited

13   the Wisconsin website?

14         A.     Can you repeat the question?  I'm sorry.

15         Q.     Sure.  Was the date that you confirmed you

16   were ineligible prior to the date that you visited the

17   Wisconsin Business Center website?

18         A.     No.

19         Q.     So you visited the website first?

20         A.     Correct.

21         Q.     When you visited the website, you did not

Page 70

1   know that you were ineligible at the time?

2          A.     I suspected I was.

3          Q.     But at that time, you did not attempt to

4   apply?

5          A.     Correct.

6          Q.     At that time, you did not know that you

7   were -- did you know for a fact you were ineligible?

8                 MR. LENNINGTON:   Object to the form.

9          Q.     At that time, had you confirmed that you

10  were ineligible?

11                MR. LENNINGTON:   Object to the form.

12         A.     I saw enough on the website to know I

13  wasn't eligible.

14         Q.     So when you say you saw enough on the

15  website, did you make an assumption that you were

16  ineligible?

17         A.     I wouldn't say an assumption.

18         Q.     How would you characterize it?

19         A.     I made an objective evaluation that I

20  wasn't welcome here based on the color of my skin.

21         Q.     Then you later confirmed that with your

Case 4:23-cv-00278-P   Document 42   Filed 10/27/23   Page 54 of 244   PageID 740

1    attorneys?

2            A.    Correct.

3            Q.    Is that correct?   Okay.   Let's talk about

4    if you had applied to the Wisconsin Business Center.

5    Could you describe the sort of technical assistance

6    from the Wisconsin Business Center that you could have

7    benefited from?

8                    MR. LENNINGTON:   Object to the form.

9            Q.    Could you describe the sort of technical

10   assistance you were seeking from the Wisconsin Business

11   Center?

12           A.    From what I saw on the website, it just

13   looked like a bunch of word salad to me.   I assume the

14   way to find out what they really had to offer was to

15   sit down and have them open up the -- open up access to

16   these things.

17           Q.    So was there a specific service that you

18   saw on the website that you thought your business could

19   benefit from?

20           A.    Access to contracts was one.

21           Q.    What sort of contracts could the Wisconsin

Matthew Piper                                                                October 4, 2023

Page 74

1    business development ideas and efficiency ideas.  Yeah,

2    there are all kinds of things.  The primary thing was

3    access to contracts.

4        Q.   Okay.  All right.  What type of contracts

5    were you looking for?  I know you said construction,

6    but could you tell me about the size?

7        A.   I have 30 years of experience.  I am fully

8    licensed by the state to do any kind of building.  The

9    limitations are my manpower and the number of hours I'm

10   willing to work.  So, I was interested in seeing if

11   there was any good contracts that would work with my

12   business approach.

13       Q.   Okay.  All right.  Let's talk about your

14   business.  You have been in business for eight years;

15   is that correct?

16       A.   No, I started my own business in 2003.

17       Q.   Okay.  Sorry.  Let me specify.  How long

18   have you owned and operated Piper Architects?

19       A.   Very good.  Eight years.  Yes.

20       Q.   Which is quite impressive considering most

21   businesses fail after the first year.  So

Page 82

1     Architects.  Has business gotten better over the years

2     at Piper Architects?

3          A.    Yes.

4          Q.    Have you considered hiring additional

5     employees?

6          A.    No.

7          Q.    Has annual revenue of Piper Architects

8     increased since the first year?

9          A.    Yes.

10         Q.    What would you estimate your revenue was

11    during the first year of operation of Piper Architects?

12         A.    Zero.

13         Q.    What steps did you take to grow your

14    business?

15         A.    Started reaching out to people.

16         Q.    You found that people were receptive?

17         A.    Yes.

18         Q.    Could you tell me what the revenue of Piper

19    Architects is now?

20         A.    Last year --

21         Q.    Last year, yup.  Exactly.

Page 87

1  average contract price for yourself?

2        A.    The average contract price or the average

3  fees per contract?

4        Q.    Average fees per contact.

5        A.    I do a lot of little projects.  It's about

6  -- the average is $5,000 per contract.

7        Q.    About how many residential projects would

8  you say you have completed?

9        A.    Hundreds.

10       Q.    With Piper Architects?

11       A.    Dozens.

12       Q.    Dozens.  Then we've talked about some of

13  them, but can you describe some of the commercial

14  projects you've completed?

15       A.    As Piper Architects?

16       Q.    Yes, as Piper Architects.

17       A.    There's those two I already mentioned.

18  Then there's a rage room up in Green Bay.  That might

19  be it for the commercial projects.

20       Q.    I'm sorry.  You said a rage room?

21       A.    A rage room.

Page 90

1          Q.     Awesome.  Thank you so much for that.

2    Let's see here.  So you told us before that you work

3    alone at Piper Architects; is that correct?

4          A.     Correct.

5          Q.     Has that created any limitations to the

6    size of projects that you're able to complete?

7          A.     Yes.

8          Q.     Could you describe some of those

9    limitations for me?

10          A.     Well, there's only so much work I can do as

11   a single person.  And I don't want to take on

12   additional employees.  So it limits -- there's only so

13   many hours in the day.  It's all based on service hours

14   and depending on how full my schedule is, I determine

15   if I can take on additional workload or not.

16          Q.     Have you ever had to turn down potential

17   projects because of those limitations?

18          A.     Yes.

19          Q.     Tell me about some of the times you have

20   had to turn down projects.

21          A.     If I'm too busy and someone needs something

Page 99

1    concluded today and just give you an opportunity if you

2    wanted something else, or if you had something else to

3    say.

4            THE WITNESS:  Thank you.  I don't think I

5    have any additional comments.

6            MR. JENKINS:  All right.  Thank you,

7    everyone.  It's been a pleasure to meet you, Mr. Piper,

8    and engage with you today.  Thank you so much for

9    taking the time to talk to us and give us your honest

10   answers.  We really, really appreciate it.  So we can

11   get to the bottom of this.  Dan and Cara, thank you so

12   much for your time as always.  We'll sign off for now

13   and we'll see you guys tomorrow.

14           MR. LENNINGTON:  All right.  Just to be

15   clear, this deposition is adjourned then; right?

16           MR. JENKINS:  Yes.  We're all done.

17           (Deposition concluded at 12:35 p.m.)

18

19

20

21

Matthew Piper                                    October 4, 2023

Page 100

1    State of Maryland

2    City of Baltimore, to wit:

3              I, Louisa B. McIntire-Brooks, a Notary

4    Public of the State of Maryland, County of Anne

5    Arundel, do hereby certify that the within-named

6    witness personally appeared before me at the time

7    and place herein set out, and after having been duly

8    sworn by me, according to law, was examined by

9    counsel.

10             I further certify that the examination

11   was recorded stenographically by me and this

12   transcript is a true record of the proceedings.

13             I further certify that I am not of

14   counsel to any of the parties, nor in any way

15   interested in the outcome of this action.

16             As witness my hand and notarial seal

17   this 11th day of October, 2023.

18

19             *Louisa B. McIntire-Brooks*

                 Louisa B. McIntire-Brooks

20                    Notary Public

     My Commission Expires:

21   November 13, 2023

Case 4:23-cv-00278-P   Document 42   Filed 10/27/23   Page 61 of 244   PageID 747

**01.20.2023**

# Senator Baldwin Cuts Ribbon on Wisconsin MBDA Business Center to Support Minority-Owned Businesses

Baldwin helped bring home Wisconsin's first MBDA Business Center in the bipartisan Infrastructure Investment and Jobs Act

*MILWAUKEE* – Today, U.S. Senator Tammy Baldwin (D-WI) joined Under Secretary of Commerce for Minority Business Development Donald R. Cravins, Jr. in Milwaukee for a ribbon cutting at Wisconsin's new Minority Business Development Agency (MBDA) Business Center.

In September, the U.S. Department of Commerce Minority Business Development Agency (MBDA) awarded the Wisconsin North Central Minority Supplier Development Council (NCMSDC) a 4-year federal grant totaling $1.61 million through the MBDA's Business Center Program to operate Wisconsin's first Business Center to assist minority-owned business. MBDA Business Centers provide high quality, technical assistance to Minority Business Enterprises (MBEs) – including counseling and mentoring, assisting with access to capital and contracts, and supporting job creation and retention.

"Starting a business is a challenge for every entrepreneur. But too often, our minority entrepreneurs face additional obstacles to accessing capital, contracts and markets," **said Senator Baldwin.** "By investing in expanded access to the MBDA's Business Center Program, we can build a stronger and more diverse small business economy in Wisconsin."

"To give Wisconsin's minority-owned businesses the access they need to succeed, we need to meet people where they are," **said Under Secretary Cravins, Jr.** "The greatest obstacle facing minority-owned businesses is access: access to capital, access to contracts, and access to markets. Expanding MBDA's national network of business centers is critical to breaking down those barriers. The North Central Minority Supplier Development Council understands the unique challenges Wisconsin businesses and entrepreneurs of color face. We are ecstatic they will be operating the state's first MBDA business center, not only to strengthen Wisconsin businesses, but to further MBDA's evolution as a leader for America's 9.7 million minority-owned businesses. We are proud Wisconsin will now have an MBDA business center to call their own."

"There is untapped human and economic potential in Milwaukee, and I want our local businesses, including minority-owned businesses, to find opportunities.  This Minority Business Development Center will certainly help," **said Milwaukee Mayor Cavalier Johnson.** "I appreciate the work of the Minority Business Development Agency and Senator Tammy Baldwin's efforts to make sure Wisconsin's businesses have the support they need to grow and add jobs here."

"The Wisconsin Economic Development Corporation is proud to support the Minority Business Development Center," **said Missy Hughes, secretary and CEO of the Wisconsin Economic Development Corporation (WEDC).** "As WEDC continues to build an economy that works for everyone, we realize that diverse businesses can have big impacts in our communities. This center is another resource to help these small businesses thrive."

Senator Baldwin worked to include the bipartisan Minority Business Development Act of 2021 as an amendment to the Infrastructure Investment and Jobs Act, making the MBDA permanent and increasing its funding and reach. The goal of the MBDA's Business Center Program is to promote the growth and global competitiveness of America's MBEs. Wisconsin is currently served by offices in Detroit and Chicago.

MBDA MSJ App. 00052

**(B)** that establishes the terms by which the recipient described in subparagraph (A) shall operate an MBDA Business Center.

**(9) Minority business enterprise**

**(A) In general**

The term "minority business enterprise" means a business enterprise--

**(i)** that is not less than 51 percent-owned by 1 or more socially or economically disadvantaged individuals; and

**(ii)** the management and daily business operations of which are controlled by 1 or more socially or economically disadvantaged individuals.

**(B) Rule of construction**

Nothing in subparagraph (A) may be construed to exclude a business enterprise from qualifying as a "minority business enterprise" under that subparagraph because of--

**(i)** the status of the business enterprise as a for-profit or not-for-profit enterprise; or

**(ii)** the annual revenue of the business enterprise.

**(10) Native entity**

The term "Native entity" means--

**(A)** a Tribal Government;

**(B)** an Alaska Native village or Regional or Village Corporation, as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.);

**(C)** a Native Hawaiian organization, as that term is defined in section 7517 of Title 20;

**(D)** the Department of Hawaiian Home Lands; and

**(E)** the Office of Hawaiian Affairs.

**(11) Private sector entity**

**Exhibit Piper 0003** 10/4/2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JEFFREY NUZIARD, *et al.*, | Case No. 4:23-cv-00278-P |
| Plaintiff, | District Judge Mark T. Pittman |
| v. | |
| MINORITY BUSINESS DEVELOPMENT AGENCY, *et al.*, | |
| Defendants. | |

**DECLARATION OF BRANDON ADAMS**

I, BRANDON ADAMS, pursuant to 28 U.S.C. § 1746, hereby declare to my actual knowledge:

1.      From September 2022 to May 2023, I served as the Project Director for the Wisconsin Business Center funded by the Minority Business Development Agency.  From May 2023 to the present, I have served as Administrator for the Wisconsin Business Center.

2.      In 2022, after winning a competitive bid process, the North Central Minority Supplier Development Council entered into a cooperative agreement with the Minority Business Development Agency.

3.      Under this cooperative agreement the MBDA agreed to provide funding to the North Central Minority Supplier Development Council to operate the Wisconsin Business Center.  The North Central Minority Supplier Development Council appointed me as Director of the Wisconsin Business Center.

MBDA MSJ App. 00054

4.      Only since May 26, 2023, has the Wisconsin Business Center provided business center services to clients.

5.      The Wisconsin Business Center was not up and running and was not accepting or rejecting clients for the Business Center Program until May 26, 2023.

6.      The Wisconsin Business Center did not have a public facing phone number or email address until early May 2023.

7.      The Wisconsin Business Center did not have an operating, public facing website up and running until May 26, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

_____                    10 / 19/ 23
              Signature                                              _____
                                                                                          Date

MBDA MSJ App. 00055

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JEFFREY NUZIARD,
MATTHEW PIPER, and
CHRISTIAN BRUCKNER,

     Plaintiffs,

  v.

MINORITY BUSINESS DEVELOPMENT AGENCY,
JOSEPH R. BIDEN, JR.,
GINA M. RAIMONDO, and
DONALD R. CRAVINS, JR.,

     Defendants.

## VERIFIED COMPLAINT

Plaintiffs allege their complaint against Defendants as follows:

### INTRODUCTION

1.     The United States Constitution demands equal treatment under the law. The federal government, for example, cannot establish a separate agency dedicated to helping only some races, but not others. Yet that is exactly what Defendants have now done.

2.     On November 15, 2021, President Biden signed the Infrastructure Investment and Jobs Act ("Infrastructure Act"), creating the newest federal agency: the Minority Business Development Agency ("MBDA"). This agency is dedicated to helping only certain businesses based on race or ethnicity.

3. Because it relies on racial and ethnic classifications to help some individuals, but not others, the MBDA violates the Constitution's core requirement of equal treatment under the law.

4. Plaintiffs are three small business owners from Texas, Wisconsin, and Florida. They are all interested in finding new ways to grow their business and would value the advice, grants, consulting services, access to programs, and other benefits offered by the MBDA. But that agency won't help them because of their race. Plaintiff Bruckner, for example, emailed the MBDA in Orlando and was told that it could not help him because of his race. The MBDA's statutes, regulations, and website all speak a clear message of discrimination: Defendants refuse to help white business owners like Plaintiffs, as well as many other businesses owned by other non-favored ethnicities from North Africa, the Middle East, and North Asia.

5. Plaintiffs therefore seek an order declaring the MBDA to be unconstitutional and an injunction prohibiting Defendants from discriminating against business owners based on race or ethnicity.

## THE PARTIES

6. Plaintiff Jeffrey Nuziard is a white male who lives in Tarrant County, Texas. He is a veteran of the U.S. Armed Forces, and after a 20-year career in investment banking, Dr. Nuziard went back to school and earned a PhD. Dr. Nuziard now owns and operates his own business, Sexual Wellness Centers of Texas, which has two locations and will be expanding to additional locations in the future. Like many businesses, the COVID-19 pandemic impacted Dr. Nuziard's business,

MBDA MSJ App. 00057

requiring him to delay his grand opening by several months in 2020 and leading to staffing problems. Dr. Nuziard has sought assistance from the federal government in the past but has been denied grants. He is interested in the MBDA because it offers grants, training, access to contracts and networks, financial sourcing assistance, strategic business consulting, and other resources to businesses; however, Dr. Nuziard is not eligible for MBDA assistance because he is white.

7.     Plaintiff Matthew Piper is a white male who lives and works in northeast Wisconsin. Mr. Piper grew up in extreme financial poverty in Denver, Colorado, but through hard work and persistence, he eventually graduated with honors from the University of Colorado-Boulder's Environmental Design and Planning College. After college, Mr. Piper became a licensed architect and worked with distinguished design firms on Chicago's "Magnificent Mile" for 12 years. He also founded Piper Zenk Architecture in Denver, which he worked at for about a decade. In 2016, Mr. Piper moved to Wisconsin, where he now owns and operates PIPER Architects. As a small business owner, Mr. Piper could benefit from many of the services offered by the MBDA, but he is ineligible for those services because he is white. Mr. Piper is concerned for himself and the millions of other small business owners in America who are excluded from MBDA services because of the color of their skin.

8.     Plaintiff Christian Bruckner is a white male who lives and works in Tampa, Florida. He is an immigrant who came to America in the 1970s to escape the communist regime in Romania. His parents wanted a better life for him in a country

- 3 -

that values constitutional rights and the principle of equality under the law. In 1989, Mr. Bruckner was seriously injured in a car wreck. He is permanently disabled. Mr. Bruckner has over 20 years of experience in contracting and owns Project Management Corporation. He is seeking support to sustain and strengthen his business. Mr. Bruckner is interested in the MBDA because it offers assistance and resources to businesses that seek contracting opportunities.

9.      Defendant MBDA is a federal agency within the United States Department of Commerce. *See* 15 U.S.C. § 9502(a).

10.     Defendant Joseph R. Biden, Jr. is the President of the United States. Under U.S. Const., art. II, § 3, he must "take care that the laws be faithfully executed," including the provisions of the Infrastructure Act referenced in this Complaint. Defendant Biden, through one or more White House officials, oversees the implementation of the Infrastructure Act, including efforts to assist minority business enterprises.[1] He is sued in his official capacity.

11.     Defendant Gina M. Raimondo is the United States Secretary of Commerce. She is responsible for the agencies within the Department of Commerce, including the MBDA. She is sued in her official capacity.

---

[1] *See, e.g.,* White House Fact Sheet, *The New Small Business Boom Under the Biden-Harris Administration* (Jan. 25, 2022), available here; White House, Twitter Account (Jan. 10, 2021), available here ("Our priority will be Black, Latino, Asian, and Native American owned small businesses . . . .").

- 4 -

12.     Defendant Donald R. Cravins Jr. is the Under Secretary of Commerce for Minority Business Development. Defendant Cravins is responsible for the administration of the MBDA, including the race and ethnicity eligibility requirements for the MBDA Business Center Program and other MBDA programs. *See* 15 U.S.C. § 9502(b) and 15 C.F.R. pt. 1400. He is sued in his official capacity.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331 and 2201 and 5 U.S.C. § 702 because this case presents a substantial question of federal law—specifically whether the race and ethnicity eligibility requirements for the MBDA Business Center Program (and other MBDA programs and services), and Defendants' implementation thereof, violate the guarantees of equal protection under the United States Constitution and 5 U.S.C. § 706.

14.     This Court has authority to issue a declaratory judgment, to order injunctive relief, and to award attorneys' fees and costs and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201, 2202, and 2412 and 5 U.S.C. §§ 705 and 706.

15.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1): A substantial part of the events giving rise to this claim occurred in this district and a substantial part of the property subject to this action is situated in this district because Defendants maintain an active office within this district and provide services and benefits within this district. Additionally, a Plaintiff resides and conducts business in Tarrant County, which is within this district.

- 5 -

## FACTUAL BACKGROUND

16.    On January 20, 2021, Defendant Biden issued an executive order instructing federal agencies to adopt a "whole-of-government equity agenda" that must, in part, "allocate resources to address the historic failures to invest sufficiently, justly, and equally in underserved communities, as well as individuals from those communities."[2] This term, "underserved communities," includes only the following racial groups: "Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color." Other racial groups, such as whites, north Africans, Middle Eastern peoples, north Asians, and others who do not identify with the specified racial preferences, are excluded from special treatment. This executive order applies to Defendants Raimondo and Cravins.

17.    On November 15, 2021, President Biden signed into law the Infrastructure Act. As part of this legislation, Congress created the MBDA within the Department of Commerce and appropriated $550 million through fiscal year 2025 for the new agency to run operations and programs and to establish new offices.

18.    The MBDA's mission is to "promote the growth of minority owned businesses,"[3] and the Under Secretary must establish "regional offices" for "each of the regions of the United States, as determined by the Under Secretary" and any such other offices as are necessary. 15 U.S.C. § 9502(e)(2)(A).

---

[2] Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021), available here.

[3] U.S. Dept. of Commerce, https://www.commerce.gov/bureaus-and-offices/mbda.

- 6 -

19.    On February 16, 2023, Defendant Biden issued another executive order "advancing racial equity."[4] Pursuant thereto, Defendant Biden, among other things, ordered Defendants Raimondo and Cravins to "create equitable opportunity and advance projects that build community wealth." Building "community wealth," however, is limited to "the capacities of underserved communities," which again is focused on certain racial groups, but not others.

20.    Defendant Raimondo has described the MBDA as the "only Federal government agency dedicated **<u>solely</u>** to supporting minority-owned businesses, enterprises, and entrepreneurs" (emphasis added).[5]

21.    Defendant Cravins has explained that the MBDA is "**<u>solely</u>** dedicated to the growth and global competitiveness of minority-owned businesses" (emphasis added). He has also said, "If you are a minority entrepreneur, MBDA is your agency."[6]

22.    Federal law imposes upon the MBDA several responsibilities to assist minority businesses.

23.    The MBDA must provide federal assistance only to minority businesses through "resources relating to management," "technological and technical assistance," "financial, legal, and marketing services," and "services relating to workforce development." *See* 15 U.S.C. § 9511(1).

---

[4] Exec. Order No. 14091, 88 Fed. Reg. 10825 (Feb. 16, 2023), available here.

[5] U.S. Dept. of Commerce, *Remarks by U.S. Secretary of Commerce Gina Raimondo* (Sept. 21, 2022), available here.

[6] Forbes, *A Conversation with the first Under Secretary of Commerce for Minority Business Development* (Feb. 6, 2023), available here.

24. The MBDA must also "promote the position of minority business enterprises in [ ] local economies" through programs for minority businesses related to procurement, management, technology, law, financing, marketing, and workforce development. *See* 15 U.S.C. § 9512(1).

25. In addition to these general mandates, federal law requires the MBDA to establish a "Business Center Program" to: assist minority businesses in accessing capital, contracts, and grants, and creating and maintaining jobs; "provide counseling and mentoring to minority business enterprises"; and "facilitate the growth of minority business enterprises by promoting trade." 15 U.S.C. § 9522(1)–(3).

26. Under the Business Center Program, the MBDA must "make Federal assistance awards to eligible entities to operate MBDA Business Centers," which must then "provide technical assistance and business development services, or specialty services, to minority business enterprises." 15 U.S.C. § 9523.

27. These MBDA Business Centers may offer a variety of services to minority businesses under the law, including "referral services" and any "programs and services" necessary to accomplish the goals of MBDA (that is, helping minority businesses). 15 U.S.C. § 9524(a)(1).

28. MBDA Business Centers must be operated in accordance with the requirements imposed by the MBDA through written agreements. *See* 15 U.S.C. §§ 9501(8), 9524. Moreover, the MBDA must be "substantially involved" in the operations of MBDA Business Centers. *See* 15 U.S.C. § 9524(h).

- 8 -

29. Unsurprisingly, MBDA assistance is available only for select minority business enterprises owned by individuals of certain racial or ethnic backgrounds. To qualify as a "minority business enterprise," a business enterprise must be "not less than 51 percent-owned by 1 or more socially or economically disadvantaged individuals" and its management and daily business operations must be "controlled by 1 or more socially or economically disadvantaged individuals." 15 U.S.C. § 9501(9)(A). Likewise, the Infrastructure Act adopts similar provisions under the rules at 15 C.F.R. pt. 1400: "In order to be eligible to receive assistance from MBDA funded organizations, a concern must be a minority business enterprise. A minority business enterprise is a business enterprise that is owned or controlled by one or more socially or economically disadvantaged persons." 15 C.F.R. § 1400.1(b); 5 U.S.C. § 9501(15)(B).

30. Only individuals belonging to the following racial or ethnic groups are presumed to be "socially or economically disadvantaged individuals" and therefore presumed to own a qualifying minority business: Black or African American, Hispanic or Latino, American Indian or Alaska Native, Asian, Native Hawaiian or Pacific Islander, 15 U.S.C. § 9501(15); and pursuant to 15 C.F.R. pt. 1400, other racial or ethnic groups (potentially overlapping) to include "Puerto-Ricans," "Spanish-speaking Americans," "Eskimos," "Hasidic Jews," and "Asian Indians." 15 C.F.R. § 1400.1. Any other group wishing to obtain status as "socially or economically disadvantaged," must make an "adequate showing by representatives of the group" to the federal government. *Id*.

- 9 -

31.     Business owners, including minorities, who are not members of the government's preferred racial or ethnic groups are presumed ineligible for MBDA Business Center Program services and other MBDA programs, and denied equal access to these services based on their disfavored race or ethnicity. Thus, while it is theoretically possible for a non-minority owned business to receive services, such businesses must make additional showings and overcome obstacles not applicable to minority businesses. These businesses are treated less favorably based on the race of their owner.

32.     In or about March 2023, Plaintiff Nuziard visited the local MBDA website for Dallas Fort Worth at [www.mbdadfw.com](www.mbdadfw.com) and observed that the agency only serves "ethnic minority-owned businesses" owned and controlled by "African Americans, Hispanic, Asian, or Native American entrepreneurs." Dr. Nuziard is otherwise eligible for assistance, except that he is white.

MBDA MSJ App. 00065

33.     The following screenshot from the Dallas Fort Worth MBDA website
lists assistance requirements:



34.     On the page for "Contact Us," the Dallas Fort Worth MBDA office
further discriminates, demanding interested businesses to "explain" why they are not
"51% owned and controlled by African Americans, Hispanic, Asian, or Native
American entrepreneurs," as depicted below:

- 11 -

Does your business meet all of the following requirements: *

(check all that apply)

☐ Been in business for at least 2 years

☐ Represent high-growth industries

☐ Have sustainable, stable, & consistent revenue

☐ Are 51% owned and controlled by African Americans, Hispanic, Asian, or Native American entrepreneurs

If you did not check all the required boxes above, please explain.

35.     On January 20, 2023, United States Senator Tammy Baldwin joined Defendant Cravins in Milwaukee, Wisconsin, for a ribbon cutting ceremony celebrating the new Wisconsin MBDA Business Center. As a Wisconsin business owner, Plaintiff Piper is interested in the services offered by this MBDA office—counseling and mentoring, access to capital and contracts, and support for job creation and retention. But Mr. Piper read about the office and learned that because of his race, he is not eligible for assistance. This MBDA office, like all the others, is focused on "access" for "minority-owned businesses," as Defendant Cravins declared.[7]

---

[7] Office of Senator Baldwin, *Senator Baldwin Cuts Ribbon on Wisconsin MBDA Business Center to Support Minority-Owned Businesses* (Jan. 20, 2023), available here.

- 12 -

36.     On or about January 18, 2023, Plaintiff Bruckner accessed the MBDA website for the Orlando MBDA Business Center. Through the website, www.orlandombdacenter.com, Mr. Bruckner learned that the MBDA provides businesses with "access to capital," "access to contracts," and "access to markets." Given his business in government contracting, Mr. Bruckner was particularly interested in the "access to contracts" option.

37.     Mr. Bruckner then encountered the message prompt: "see if you qualify for no-cost business development services and trainings from the Orlando MBDA Business Center." Mr. Bruckner clicked on the link to "complete the intake form."

38.     In reviewing the MBDA client intake form, Mr. Bruckner observed a required question entitled, "Ethnicity." The inquiry appears as follows:

Ethnicity *

○ American Indian

○ Alaska Native

○ Asian

○ Asian Indian

○ Native American

○ Asian Pacific American

○ African American

○ Native Hawaiian or Other Pacific Islander

○ Hasidic Jew

○ Hispanic American

- 13 -

39.     Because the form did not include an option for "white" or "Caucasian," and he is not a Hasidic Jew, Mr. Bruckner contacted the MBDA by email on January 18, 2023, inquiring as follows: "Hello . . . I have a question. I do not see a box for disability, and I don't meet the other boxes on the intake form. What do I need to do?"

40.     In response, Kristi Jones, Office Manager for the Orlando MBDA Business Center wrote, "If you do not identify as one of the 'Ethnicity' dropdown options, we can refer you to one of our Strategic Partners for assistance with growing your business." Ms. Jones then sent another email stating, "Just to clarify, were you referring to the 'Ethnicity' dropdown options on the Intake Form?" Mr. Bruckner responded, "Yes." Ms. Jones then replied:

> The MBDA's focus is to help grow businesses owned by people of ethnic minorities, but we do partner with other companies that can assist all types of businesses. If none of the options in the "Ethnicity" dropdown on the MBDA Intake Form apply, we can refer you to our strategic partner 3D Strategic Management for assistance. I will have them reach out to you for further information. They will be sending you an email from info@3DStrategicManagement.com to follow-up by the end of next week.

41.     Ms. Jones's email signature line included a graphic referencing the MBDA and the Department of Commerce as follows:

- 14 -



42.     Orlando is not the only MBDA office in Florida: a second office is in Miami. But according to its website at www.miamimbdacenter.com, (and in compliance with federal law), the Miami MBDA similarly restricts its assistance to business owners of certain races.

43.     These are not the only MBDA Business Centers with racial qualifications. In fact, all MBDA Business Centers must provide resources and other benefits only to minority-owned businesses in compliance with federal law.

44.     Most, if not all, MBDA regional centers advertise that they will help businesses across the United States (though they may be located elsewhere), focusing attention on minority-owned businesses. Consequently, in addition to being excluded from MBDA assistance in their home states, Plaintiffs encounter barriers to equal

MBDA MSJ App. 00070

treatment nationwide due to the racially discriminatory nature of the MBDA's authorizing statutes and MBDA's policies.

45.     For example, like many MBDA regional offices, the New Mexico MBDA Business Center claims that it will help businesses "across the United States." But not all businesses. As shown in the screenshot below, the New Mexico MBDA website, http://www.nmmbda.com/about-us, explains that it won't help all races:



**Who We Serve**

We support mid-sized, minority-owned businesses with $500,000 or more in revenue that are pursuing growth throughout New Mexico and across the United States. Companies that are 51% owned or controlled by the following persons or groups of persons are eligible to receive technical business assistance services from the New Mexico MBDA Business Center: African American, Hispanic American, American Asian, Pacific Islander, Native American (including Alaska Natives, Alaska Native corporations, and Tribal entities), Asian Indian American, and Hasidic Jewish Americans. The Center will maximize its impact by focusing on high-growth sectors in which New Mexico excels: biosciences, aerospace and drone technology, energy, defense, construction, health care, optics and photonics, cybersecurity, and advanced manufacturing, and film and television.

- 16 -

46.     The Sacramento MBDA Business Center similarly requires business owners to "certify" that their business is minority-owned before even receiving any information from the MBDA. Below is a screenshot from its website, www.sacramentombda.com:



- 17 -

47. The Sacramento MBDA Business Center's certification requirement is authorized by 15 U.S.C. § 9524(i) in which the Under Secretary is directed to "issue and publish regulations that establish minimum standards regarding verification of minority business enterprise status" for the MBDA Business Center Program.

48. The Arizona MBDA Business Center, as another example, explains that it only serves members of certain minority racial groups. Below is a screenshot from its website at www.arizonambdacenter.com:

## Who We Serve

MBE Service Recipients - Organizations that are owned or controlled by persons or groups of persons who are members of the following demographics are the organizations that are considered MBEs for the purpose of our services:

African-American, Hispanic-American, American Asian and Pacific Islander, Native American (including Alaska Natives, Alaska Native Corporations and Tribal entities), Asian Indian American, and Hasidic Jewish American.

See 15 C.F.R. §§ 1400.1, 1400.2 and Executive Order 11625 (1969).

- 18 -

49.     Likewise, to even obtain a consult at the Denver MBDA, a business owner must check one of the boxes on this required intake form, available at www.denvermbdacenter.com:

MBE Eligibility Group *

☐ African American

☐ Asian American

☐ Hispanic American

☐ Native American

☐ Hasidic Jew

☐ Pacific Islander

50.     The Georgia MBDA Business Center similarly advertises help only for minority-owned businesses. As depicted below, the website, georgiambdabusinesscenter.org/how-we-help/securing-capital/, makes very clear "who we serve":



**Who We Serve**

Our clients are U.S. MBEs owned and operated by African Americans, Asian Americans, Hasidic Jews, Hispanic Americans, Native Americans, and Pacific Islanders.

Generally, we work with companies that have $500,000 or more in annual sales, but we are open to serve all MBEs. If you are not quite there yet, feel free to contact us for more information on the many resources available for small businesses.

- 19 -

51.     In sum, the MBDA does not assist any business owners falling outside the government's preferred racial and ethnic classifications. Plaintiffs are unable to obtain assistance from the MBDA (and MBDA offices providing MBDA programming) because of their race. This is a nationwide injury, stretching beyond the MBDA offices and centers in Texas, Wisconsin, and Florida. It is an injury stemming from the MBDA authorizing statutes and through Defendants' implementation of those statutes.

52.     Federal law does not contain any justification for the race or ethnicity discrimination in the statutes governing the MBDA. The Infrastructure Act establishing the MBDA contains no congressional findings or any other evidence indicating that the race and ethnicity classifications are narrowly tailored to support a compelling government interest.

53.     Accordingly, Defendants are administering a law authorizing a violation of the equal protection guarantees under the federal Constitution and 5 U.S.C. § 706.

54.     Unless Defendants are enjoined, Plaintiffs will lose out on the ability to be considered on equal footing for MBDA Business Center Program services and other services offered by the MBDA. Moreover, Plaintiffs will continue to suffer ongoing harm to their dignity because of the MBDA's unlawful race and ethnicity discrimination under the Infrastructure Act.

## COUNT 1 – EQUAL PROTECTION VIOLATION

55.     Plaintiffs reallege and incorporate the allegations set forth above as if fully set forth herein.

- 20 -

56. The Constitution forbids discrimination by the federal government against any citizen because of his race or ethnicity. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 216, 223 (1995) (citations omitted).

57. "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013).

58. "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 291 (1978). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted).

59. As codified at the definitions at 15 U.S.C. § 9501, including §§ 9501(9) and (15), the Infrastructure Act imposes race and ethnicity eligibility requirements for the MBDA Business Center Program and other MBDA programs and services.

60. Defendants are responsible for implementing the MBDA Business Center Program and other MBDA services and are imposing the statutory and regulatory race and ethnicity eligibility requirements.

61. Plaintiffs own and operate small businesses but because of their race, they are ineligible for services.

62. The race and ethnicity eligibility requirements for the MBDA Business Center Program, as defined at 15 U.S.C. § 9501, are unconstitutional because they

violate the equal protection guarantee of the United States Constitution. These race and ethnicity classifications are not narrowly tailored to serve a compelling governmental interest.

63.     Plaintiffs have sustained harms to their dignity by visiting MBDA websites (and in one case, emailing directly with MBDA staff) and learning that the United States government, through Defendants' actions, does not consider them equal based on their race. Plaintiffs are further injured by the term "minority" in the name, statutes and regulations relating to MBDA, which refers to certain, preferred racial groups and is a clear indication that Defendants only intend to help business owners of certain racial minorities. This public proclamation of racial preference is an injury to the dignity of each Plaintiff.

64.     Therefore, this Court should set aside all racial and ethnic classifications defined in 15 U.S.C. § 9501, and which are implemented through the racial and ethnic preferences found in 15 U.S.C. §§ 9511, 9512, 9522, 9523, and 9524 and/or otherwise applied to the MBDA Business Center Program and other MBDA services.

## COUNT 2 – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

65.     Plaintiffs reallege and incorporate the allegations set forth above as if fully set forth herein.

66.     Under the Administrative Procedure Act, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be—contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B).

- 22 -

67.     Pursuant to the rule at 15 C.F.R. § 1400.1, the Infrastructure Act imposes race and ethnicity eligibility requirements for the MBDA Business Center Program and other MBDA programs and services.

68.     Defendants are responsible for implementing the MBDA Business Center Program and other MBDA services and are imposing the regulatory race and ethnicity eligibility requirements in violation of equal protection guaranteed under the Fifth Amendment's Due Process Clause.

69.     These are unlawful racial and ethnic classifications because they are not narrowly tailored measures that support a compelling government interest.

70.     Therefore, the Court should set aside this regulation as unconstitutional.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court:

A.     Enter a judgment declaring that the Minority Business Development Agency is unconstitutional and in violation of 5 U.S.C. § 706(2)(B) to the extent it provides Business Center Program services or other benefits and services based on race or ethnicity;

B.     Enter a preliminary and then permanent injunction prohibiting Defendants from imposing the racial and ethnic classifications defined in 15 U.S.C. § 9501 and implemented in 15 U.S.C. §§ 9511, 9512, 9522, 9523, 9524, and 15 C.F.R. § 1400.1 and/or as otherwise applied to the MBDA Business Center Program and other MBDA programs and services, and additionally enjoining Defendants from using the

- 23 -

term "minority" to advertise or reference their statutorily authorized programs and

services;

     C.     Award Plaintiffs their attorney fees under 28 U.S.C. § 2412 or other

relevant laws; and

     D.     Grant Plaintiffs such other and further relief as the court deems

appropriate.

     Dated this 20th day of March 2023.

     Respectfully submitted,

     THE LAW OFFICE OF JASON NASH, P.L.L.C.

     s/ *Jason C. Nash*

     Jason C. Nash (Bar No. 24032894)
     601 Jameson Street
     Weatherford, TX 76086
     Telephone: (817) 757-7062
     jnash@jasonnashlaw.com

     WISCONSIN INSTITUTE FOR
     LAW & LIBERTY, INC.

     Richard M. Esenberg *(pro hac vice forthcoming)*
     Daniel P. Lennington *(pro hac vice forthcoming)*
     Cara M. Tolliver *(pro hac vice forthcoming)*
     330 East Kilbourn Avenue, Suite 725
     Milwaukee, WI 53202
     Telephone: (414) 727-9455
     Facsimile: (414) 727-6385
     Rick@will-law.org
     Dan@will-law.org
     Cara@will-law.org

     *Attorneys for Plaintiffs*

- 24 -

---

**VERIFICATION**

---

1.      I am a plaintiff in this case.

2.      I have personal knowledge of myself, my activities, my intentions, and my business, including those set out in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and my claims.

3.      I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning myself, my activities, my intentions, and my business are true and correct.


Dated: 13 March 2023          Signature _____

Printed Name: Jeffrey L Nuziard

---

## VERIFICATION

---

1.     I am a plaintiff in this case.

2.     I have personal knowledge of myself, my activities, my intentions, and my business, including those set out in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and my claims.

3.     I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning myself, my activities, my intentions, and my business are true and correct.

Dated: ___3/13/23___     Signature _____

Printed Name: __MATTHEW PIPER__

---

### VERIFICATION

---

1.     I am a plaintiff in this case.

2.     I have personal knowledge of myself, my activities, my intentions, and my business, including those set out in the foregoing Verified Complaint. If called upon to testify, I would competently testify as to the matters relevant to me and my claims.

3.     I verify under the penalty of perjury under the laws of the United States that the factual statements in this Verified Complaint concerning myself, my activities, my intentions, and my business are true and correct.

Dated: _3-13-2023_     Signature _____

Printed Name: ___Christian Bruckner___

JS 44 (Rev 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jeffrey Nuziard, Matthew Piper, and Christian Bruckner

**(b)** County of Residence of First Listed Plaintiff  Tarrant
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jason C. Nash, The Law Office of Jason Nash, P.L.L.C.,
601 Jameson Street, Weatherford, TX 76086,
817-757-7062

## DEFENDANTS

Minority Business Development Agency, Joseph R. Biden, Jr., Gina M. Raimondo, and Donald R. Cravins, Jr.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U S Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U S Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 870 Taxes (U S Plaintiff or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. 702

Brief description of cause:
Challenging the constitutionality of race and ethnicity eligibility requirements for the federal MBDA and its Business Center Program.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY

*(See Instructions):*

JUDGE

DOCKET NUMBER

DATE
03/20/2023

SIGNATURE OF ATTORNEY OF RECORD
s/ Jason C. Nash

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG JUDGE

| | |
|---|---|
| **From:** | Jenkins, Vendarryl (CRT) |
| **To:** | Cara Tolliver |
| **Cc:** | Braniff, Andrew (CRT); Woolley, Christopher (CRT); Reese, David (CRT); Jason Nash; Daniel Lennington; Rick; Stoltz, Brian (USATXN) |
| **Subject:** | RE: Application process for Plaintiffs to Business Centers in compliance with Court Order |
| **Date:** | Friday, October 6, 2023 4:02:31 PM |
| **Attachments:** | image001.png |
| | image002.png |

Counsel,

For the purposes of complying with the injunction, in this context, state means only that your clients need to make a positive affirmation that they are socially or economically disadvantaged, or both.

> VENDARRYL JENKINS
> Trial Attorney
> United States Department of Justice
> Civil Rights Division
> Employment Litigation Section

**From:** Cara Tolliver <Cara@will-law.org>
**Sent:** Monday, October 2, 2023 3:47 PM
**To:** Jenkins, Vendarryl (CRT) <Vendarryl.Jenkins@usdoj.gov>
**Cc:** Braniff, Andrew (CRT) <Andrew.Braniff@usdoj.gov>; Woolley, Christopher (CRT) <Christopher.Woolley@usdoj.gov>; Reese, David (CRT) <David.Reese@usdoj.gov>; Jason Nash <jnash@jasonnashlaw.com>; Daniel Lennington <Dan@will-law.org>; Rick <Rick@will-law.org>; Stoltz, Brian (USATXN) <BStoltz@usa.doj.gov>
**Subject:** [EXTERNAL] RE: Application process for Plaintiffs to Business Centers in compliance with Court Order

Counsel,

Thank you for your message.  Can you please clarify the requirement you propose for our clients "to state that they are a socially or economically disadvantaged individual"?  When you say "state," does that mean "prove" or to otherwise make some showing?

As you know, African Americans, Hispanics, Native Americans, and certain Asians are "presumed" socially or economically disadvantaged individuals under the MBDA statute and regulations. Our position is that our clients should likewise be afforded this identical presumption and that anything less than identical treatment is a violation of the preliminary injunction.

**Cara Tolliver** | Associate Counsel
Wisconsin Institute for Law & Liberty

330 E. Kilbourn Ave., Suite 725 | Milwaukee, WI 53202
(414) 727-WILL | Office



**From:** Jenkins, Vendarryl (CRT) <Vendarryl.Jenkins@usdoj.gov>
**Sent:** Saturday, September 30, 2023 12:37 PM
**To:** Cara Tolliver <Cara@will-law.org>
**Cc:** Braniff, Andrew (CRT) <Andrew.Braniff@usdoj.gov>; Woolley, Christopher (CRT)
<Christopher.Woolley@usdoj.gov>; Reese, David (CRT) <David.Reese@usdoj.gov>; Jason Nash
<jnash@jasonnashlaw.com>; Daniel Lennington <Dan@will-law.org>; Annalise Ehlenbach
<Annalise@will-law.org>; Stoltz, Brian (USATXN) <Brian.Stoltz@usdoj.gov>; Rick <Rick@will-law.org>
**Subject:** RE: Application process for Plaintiffs to Business Centers in compliance with Court Order

Counsel,

We are writing to follow up on prior communications concerning the process through which
Plaintiffs may apply for services from the appropriate Business Center pursuant to the Court's order.
Defendants are eager to clarify the process by which Plaintiffs may apply for Business Center services
absent any consideration of their race or ethnicity.

We understand that you proposed that Plaintiffs "simply apply via the regular process that every
other applicant must utilize, and be assessed according to race-neutral criteria." As a preliminary
matter, we would like to clarify that we hoped the process we initially proposed would not impose
additional barriers for Plaintiffs. By providing each Plaintiff with the option to directly email their
information to the relevant Business Center Director, Defendants sought to ensure a streamlined
and speedy process for Plaintiffs, with no consideration of Plaintiffs' race or ethnicity. Emailing the
Business Centers is a "regular process" and one of the multiple accepted intake methods.

Business Centers also accept emails through the contact information panel listed on their websites.
Additionally, the Business Centers conduct intake via their websites at
(https://www.mbdadfw.com/contact-us, https://orlandombdacenter.com/contact/, and
https://wisconsinmbdabusinesscenter.com/contact-us/).

Through whatever means the Plaintiffs choose to apply, please ensure that the Plaintiffs identify
themselves in that communication as a plaintiff in this lawsuit. We have instructed each Business
Center to which Plaintiffs may apply that, it' decision must not be based on that Plaintiff's race or
ethnicity in any way should the Center receive an application.

Once Plaintiffs have contacted the Business Centers indicating an interest in participating in Business
Center services, Plaintiffs will be required to state that they are a socially or economically
disadvantaged individual to be eligible for services under the MBDA Act. In addition to this statutory
requirement, the Plaintiffs will also need to demonstrate any other race neutral criteria that are
applicable to all applicants to the individual Business Center for participation. For example, the Fort

Worth Business Center considers race-neutral criteria such as whether a company has been in business for at least 2 years, represents high-growth industries, and has sustainable, stable, and consistent revenue.

To the best of our knowledge, the Business Centers have not received an application or contact from any Plaintiff since the injunction. If we are mistaken, please notify us of when each plaintiff applied for Business Center services.

> VENDARRYL JENKINS
> Trial Attorney
> United States Department of Justice
> Civil Rights Division
> Employment Litigation Section
> 150 M Street NE, 9th Floor
> Washington, DC  20530
> (202) 598-1671
> vendarryl.jenkins@usdoj.gov

---

**From:** Cara Tolliver <Cara@will-law.org>
**Sent:** Thursday, July 13, 2023 1:46 PM
**To:** Jenkins, Vendarryl (CRT) <Vendarryl.Jenkins@usdoj.gov>
**Cc:** Braniff, Andrew (CRT) <Andrew.Braniff@usdoj.gov>; Woolley, Christopher (CRT) <Christopher.Woolley@usdoj.gov>; Reese, David (CRT) <David.Reese@usdoj.gov>; Jason Nash <jnash@jasonnashlaw.com>; Daniel Lennington <Dan@will-law.org>; Annalise Ehlenbach <Annalise@will-law.org>; Stoltz, Brian (USATXN) <BStoltz@usa.doj.gov>; Rick <Rick@will-law.org>
**Subject:** [EXTERNAL] RE: Meet and confer re: injunction & settlement

Dear Counsel:

Thank you for your message regarding implementation of the Court's Order, dated June 5.

The suggested proposal is based in a process that would impose race-based hurdles for our clients to demonstrate social or economic disadvantage—burdens that are not imposed on the preferred, designated racial groups. However, herein lies the Equal Protection injury complained of, for which the Court awarded relief in granting Plaintiffs' preliminary injunction to enjoin Defendants from, among other things, "considering or using Plaintiffs' race or ethnicity in determining whether they can receive access to the Center's services and benefits."

Therefore, as an initial matter, please consider that we cannot agree to any proposal that would require Plaintiffs to make additional showings of social or economic disadvantage.

Thank you,

**Cara Tolliver** | Associate Counsel
Wisconsin Institute for Law & Liberty

330 E. Kilbourn Ave., Suite 725 | Milwaukee, WI 53202
(414) 727-WILL | Office



**From:** Jenkins, Vendarryl (CRT) <Vendarryl.Jenkins@usdoj.gov>
**Sent:** Thursday, July 13, 2023 10:40 AM
**To:** Cara Tolliver <Cara@will-law.org>
**Cc:** Braniff, Andrew (CRT) <Andrew.Braniff@usdoj.gov>; Woolley, Christopher (CRT) <Christopher.Woolley@usdoj.gov>; Reese, David (CRT) <David.Reese@usdoj.gov>; Jason Nash <jnash@jasonnashlaw.com>; Daniel Lennington <Dan@will-law.org>; Annalise Ehlenbach <Annalise@will-law.org>; Stoltz, Brian (USATXN) <Brian.Stoltz@usdoj.gov>; Rick <Rick@will-law.org>
**Subject:** Meet and confer re: injunction & settlement

Counsel,

In light of the Court's June 5 Order, Defendants seek to meet and confer over the process for Plaintiffs to apply for services from the Dallas Fort Worth, Orlando, and Wisconsin Business Centers. Attached is a proposal of Defendants' suggested process. Furthermore, Defendants are receptive to an offer of settlement, and will relay Plaintiffs' proposed terms and conditions to our clients post conference. Please acknowledge response and propose a convenient date and time to confer.

     1.   Application Submission for Plaintiffs:

          a.   If a plaintiff to this suit (Nuziard, Piper, and/or Bruckner) chooses to seek access to the services of the Dallas Fort Worth, Wisconsin, and/or Orlando Business Centers, the plaintiff will submit an individual application to the Business Center from which he seeks services. Any plaintiff who chooses to apply (hereinafter "applicant") will submit his application via email to the below-listed points of contact for the respective Business Centers:

             ▪ Dallas Fort Worth Business Center: Raymond Cervantes, Ray@mbdadallas.com

             ▪ Wisconsin Business Center: Heather Noel Olson, heather@wisconsinmbdacenter.com

             ▪ Orlando Business Center: Kimberly Rosier Jean-Louis, Kimberly@orlandombdacenter.com

b.    Each application will contain a statement that the applicant satisfies the statutory and Center-specific eligibility criteria with an explanation to that effect. **The application will not reference the racial and ethnic classifications defined in 15 U.S.C. § 9501 and implemented in 15 U.S.C. §§ 9511, 9512, 9522, 9523, 9524, and 15 C.F.R. § 1400.1.** Each application will also contain contact information for the applicant.

2.    Application Review:

a.    The Business Center that receives the application will determine whether the applicant can receive access to Business Center services.

b.    Specifically, each Business Center will determine whether the applicant meets the regulatory definition of a socially or economically disadvantaged individual, which is defined as:

▪ "Persons who have been subjected to cultural, racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities" (**race or ethnicity will not be considered, but cultural prejudice can be asserted to qualify**) or

▪ "Persons whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities because of their identity as a member of a group, without regard to their individual qualities, as compared to others in the same line of business and competitive market area."

c.    Each Business Center will also determine whether the requesting plaintiff's business meets any additional race-neutral criteria that the Business Center applies to all businesses that submit applications for services (such as type of industry, minimum revenue, time in business, or other applicable criteria).

If a Business Center determines that it needs additional information to make a determination on an application, it will contact the applicant directly, using the contact information in the application. Once an application is deemed complete, the Business Center will as soon as practicable provide a determination on the application in writing to the applicant at the contact information listed in the application.

Best,
VJ

MBDA MSJ App. 00089

Page 1

1           IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF TEXAS

2                   Fort Worth Division

3

4   JEFFREY NUZIARD, et al.          Case No.

5                                    4:23-CV-00278-P

6          Plaintiffs

7   vs.                              District Judge

8   MINORITY BUSINESS DEVELOPMENT    Mark T. Pittman

9   AGENCY, et al.

10         Defendants

11  _____/

12

13

14         The Zoom teleconferenced deposition of

15  CHRISTIAN BRUCKNER was held on Thursday, October 5,

16  2023, commencing at 9:33 A.M., at virtual location

17  before Louisa B. McIntire-Brooks, Notary Public.

18

19

20

    Job No. CS6114879

21  REPORTED BY:  Louisa B. McIntire-Brooks

Page 2

```
 1   APPEARANCES:
 2              ON BEHALF OF THE PLAINTIFFS:
                DANIEL P. LENNINGTON, ESQUIRE
 3              CARA M. TOLLIVER, ESQUIRE
                    Wisconsin Institute for Law
 4                  & Liberty, Inc.
                    330 East Kilbourn Avenue
 5                  Milwaukee, Wisconsin 53202
                    Telephone:   410-727-4880
 6                  dan@will-law.org
                    cara@will-law.org
 7
 8              ON BEHALF OF DEPT. OF COMMERCE:
                SAPNA SHARMA, ESQUIRE
 9              SANDRA SODERSTROM, ESQUIRE
                    U.S. Department of Commerce
10                  Office of General Counsel
                    1401 Constitution Avenue, NW
11                  Washington, DC 20230
                    Telephone:   202-482-4772
12                  ssharma@doc.gov
                    ssoderstrom@doc.gov
13
14              ON BEHALF OF THE DEPT. OF JUSTICE
                VENDARRYL JENKINS, ESQUIRE
15              CHRISTOPHER WOOLLEY, ESQUIRE
                DAVID REESE, ESQUIRE
16              MILLER FINA, ESQUIRE
                    United States Department of Justice
17                  Civil Rights Division
                    150 M Street, NE, 9th Floor
18                  Washington, DC 20530
                    Telephone:   202-598-1671
19                  vendarryl.jenkins@usdoj.gov
                    christopher.woolley@usdoj.gov
20                  david.reese@usdoj.gov
21
```

Page 3

```
 1                        INDEX

 2         Deposition of:   Christian Bruckner

 3                    October 5, 2023

 4

 5   Examination by:                          Page:

 6   Mr. Reese                                   5

 7

 8   Exhibit No.                              Marked:

 9   Exhibit 4   Notice of deposition            6

10   Exhibit 5   E-mail                         110

11   Exhibit 6   LinkedIn                       130

12

13

14

15

16

17

18

19

20

21
```

Page 4

1                        STIPULATION

2               It is stipulated and agreed by and

3      between counsel for the respective parties that the

4      witness may be remotely sworn.

5                       PROCEEDINGS

6      Whereupon,

7                  CHRISTIAN BRUCKNER,

8      called as a witness, having been first duly sworn

9      to tell the truth, the whole truth, and nothing but the

10     truth, was examined and testified as follows:

11              EXAMINATION BY MR. REESE:

12         Q.   Good morning.  This is the deposition of

13     Christian Bruckner in case number 4:23-CV-00278,

14     Jeffrey Nuziard, et al versus MBDA, et al.  Counsel, if

15     you could, please state your appearances on the record.

16     I'll just go ahead and start.

17              MR. REESE:  I'm David Reese on behalf of

18     the United States with Department of Justice.

19     Government counsel first, if you could.

20              MR. WOOLLEY:  Chris Woolley, Department of

21     Justice.

Page 5

1          MR. JENKINS:  Vendarrly Jenkins, Department

2   of Justice.

3          MS. SODERSTROM:  Sandra Soderstrom,

4   Department of Commerce.

5          MS. SHARMA:  Sapna Sharma, Department of

6   Commerce.

7          MR. REESE:  Counsel for plaintiffs, if you

8   could, just state your appearances on the record.

9          MR. LENNINGTON:  This is Dan Lennington.

10   I'm the attorney for Mr. Bruckner and will be defending

11   the deposition.

12          MS. TOLLIVER:  Cara Tolliver, attorney for

13   Plaintiff Bruckner.

14          MR. REESE:  Counsel all objections except

15   form and privileges I understand are reserved.

16          EXAMINATION BY MR. REESE:

17      Q.    Mr. Bruckner, good morning.  Good to see

18   you.

19      A.    How are you?

20      Q.    Good.  Please, sir, just state and spell

21   your name for purposes of the record.

Mr. Christian Bruckner                                    October 5, 2023

Page 17

1          A.    ████████████████████, ███████████████,

2    ███████████████

3          Q.    That's in Tampa?

4          A.    Yes, sir.

5          Q.    Mr. Bruckner, how long have you lived at

6    that address?

7          A.    Three years now.

8          Q.    Three years?

9          A.    Yes, sir.

10         Q.    Have you got any plans to move in the next

11    12 months?

12         A.    The way housing is and the way the prices

13    are, with a nine year old boy, not too much.  No, not

14    at this time, anyway.

15         Q.    I got it.  Same.  Who lives with you there

16    at the ████████████████ house that you live now?

17         A.    My son's mom and my nine year old son,

18    Noah.

19         Q.    Let's talk a little bit about your

20    educational background?  What is the highest level of

21    formal education that you received, sir?

Page 18

1          A.     Officially a GED.  I'm currently a

2     full-time student, going to graduate with my bachelor's

3     degree this December.

4          Q.     What are you studying?

5          A.     Business administration, acquisitions with

6     a concentration in acquisitions and contracts

7     towards -- geared towards federal contracts.

8          Q.     Where are you going to school?

9          A.     Strayer University online.

10         Q.     You graduate this summer you anticipate?

11    Congratulations.

12         A.     This December, yes, sir.  Thank you.

13         Q.     Have you had any college attendance between

14    high school and now when you're at Strayer?

15         A.     No.

16         Q.     Any specialized training or certifications?

17         A.     No.  I mean, I don't, but that's in the

18    plans if that's what you're asking.  But, you know, a

19    bachelor's --

20         Q.     Yes, sir.  Tell me what kind of specialized

21    training you're looking to get after you get your

Page 19

1    bachelor's.

2         A.    I am looking to take my test to become a

3    certified federal contract manager, whether it's

4    private sector or government position.

5         Q.    There is a specific occupational

6    certification that you can get for managing federal

7    contracts?

8         A.    Yes, sir.  Certified Federal Contract

9    Manager, CFCM.

10        Q.    All right.  We may swing back and talk a

11   little bit about that later on.  We'll talk a little

12   bit more just about your background.  Mr. Bruckner, is

13   it correct you identify as a white male?

14        A.    Yes, sir.

15        Q.    Do you identify as a member of any other

16   groups or classifications?

17        A.    Do I -- are you asking me if I, my myself,

18   consider myself part of a social group?

19        Q.    Yes, sir.

20        A.    Yes, I would consider myself as a member of

21   the disability community, yes.

1          Q.     After you moved to Florida, what did you do

2   then?

3          A.     Well, I went to Florida because my dad got

4   diagnosed with dementia and my parents had moved from

5   Texas to Florida.   My dad got diagnosed with the first

6   phase of dementia.   So I kind of felt that my mom

7   needed some help.   Believe it or not, it's a nasty

8   disease, you know.   So I kind of, you know, my son and

9   my son's mom, we just all picked up and decided to go

10  help my mom take care of my dad.   So for the first six

11  months, really didn't do anything besides that.   Then I

12  formed a commercial company for obviously seeing how

13  the federal contracts were going, when they were taking

14  bids.   As long as I'm stuck in a small business

15  category competing against, again, like I mentioned,

16  companies with 500 to a thousand employees and

17  $10 million in sales, there just really weren't bids

18  for someone of my financial condition and probably many

19  others, you know, that are micro businesses.   So, I

20  wanted to try the commercial area out.   So I started at

21  -- tried to start a brake replacement -- mobile brake

1    replacement service.  Which in theory probably would be

2    a good business.  I'm sure there's probably a lot of

3    people that would love to have someone come out to

4    their house and do their brakes.  Problem is, around

5    that time, what, late '19, '20, Covid was just starting

6    to come out.  So wrong time to, you know, to get that

7    going.  And Florida's vehicle insurance is very high

8    here, you know, so with no income, no revenue being

9    generated, you know, from that, eventually I closed it

10   down in 2021, I believe, and went back to what I know,

11   you know, it's -- I've always been involved with

12   federal contracts.  You know, it's what I learned.

13   It's what I do.  So going to the commercial market

14   where it's very unorganized, you know, no quality

15   assurance, I just said, no, I don't want to do that.  I

16   want to go and try and, you know -- because of my

17   disability and remote jobs are very important for

18   people like myself, I said, you know, I saw a

19   requirement that the Department of Defense was coming

20   out with cyber security requirements.  No longer could

21   subcontractors not be certified to get drawings to work

1    on goods and services -- goods primarily.  So, I

2    thought, hey, I am going to get back into federal

3    contracts because I think maybe, you know, there might

4    be some opportunities there with the new cyber security

5    requirements where you have to have a cyber -- a system

6    security plan basically to even do business with the

7    Department of Defense.  So, I started Project

8    Management Corporation.  And then --

9           Q.    Let me stop you right there, Mr. Bruckner.

10   Just for housekeeping purposes, the name of your mobile

11   brake replacement company, what was that called?

12          A.    Car Squad.

13          Q.    Tire Squad?

14          A.    Car Squad.

15          Q.    Then you started PMC after that?

16          A.    Yes, sir.

17          Q.    How would you describe, to the best of your

18   recollection, your gross income on an annual basis

19   since 2021, since you started PMC?

20          A.    Repeat that last part.  You were breaking

21   up.  The annual income?

1       Q.    Yes, sir, your annual gross income,

2   adjusted gross income.

3       A.    Personally?

4       Q.    Yes, sir.

5       A.    Nonexistent.   I'm a full-time student.

6       Q.    Again, these are due diligence questions

7   and they may seem a little silly.

8       A.    That's okay.

9       Q.    Do you have any stocks, any bonds, any

10  assets?

11      A.    No, sir.

12      Q.    No IRA or anything like that sitting out

13  there?

14      A.    No, sir.

15      Q.    A quick question with respect to your

16  disability and then I want to talk about your

17  residential history although we mostly covered it.

18  Have you received a rating as permanently disabled?

19      A.    From who?

20      Q.    From a doctor, from any government agency?

21      A.    Yes.  From a doctor, yes.

1                    (A discussion was held off the record.)

2          Q.    Mr. Bruckner, quick question, I forgot to

3     this ask this.  It's a pretty straightforward question

4     and I recalled when we were on break, a colleague

5     reminded me.  How long have you been a student at

6     Strayer?

7          A.    Four years.  This will be my -- well, since

8     2019.

9          Q.    You are in the home stretch?

10         A.    Yes, sir.  Two more months left.

11         Q.    So I'd like to talk about PMC a little bit

12    and I think this probably will be pretty quick and then

13    we'll talk about I guess the MBDA and your contact with

14    the MBDA and so we're moving along pretty well.  We

15    represented earlier to counsel that we would be able to

16    have you wrapped up by 2:00 and I think, barring some

17    unforeseen circumstances, I think we are definitely on

18    our way to meeting that deadline.  So let's talk about

19    PMC.  Your business is called Project Management

20    Corporation.  That's your current business?

21         A.    Yes, sir.

Page 91

1          Q.    It was in incorporated, as I understand it,

2    on March 25 of 2021?

3          A.    I believe so.  I think -- yeah.  Somewhere

4    around that date range, yes.

5          Q.    But I guess just for big picture purposes,

6    you know it was incorporated in 2021, that year?

7          A.    Yes, sir.

8          Q.    And it was incorporated in what state?

9          A.    State of Florida.

10         Q.    I think you already talked about this, so

11   just briefly, why did you start PMC?

12         A.    I wanted to go back to what I had been

13   doing my whole career which was a prime contractor, a

14   federal contractor.  It's kind of hard to start a new

15   career at 51.  So you kind of want to stick with what

16   you, you know, think you're good at, hope you're good

17   at and go from there.

18         Q.    Did anybody help you set up PMC?

19         A.    No, sir.

20         Q.    What start-up costs did you have in setting

21   PMC up?

1    question.  Did you retain any consultants as you

2    started up PMC?

3          A.    No, sir.

4          Q.    Again, I think we know the answer to this,

5    did you apply for any loans to start the business?

6          A.    No, sir.

7          Q.    Did you receive any government grants or

8    loans to starts the business?

9          A.    No, sir.

10         Q.    Do you currently have any lines of credit

11   anywhere, any sources of credit?

12         A.    Nothing.

13         Q.    Do you presently have any working capital?

14         A.    No, sir.  Like I said, the only working

15   capital that we would use on contracts are, you know,

16   tax refunds that my son's mom gets.  Stuff like that.

17   Just savings.  Get $200 or whatever.  We just save it.

18   It's not much, but it's enough to -- for a micro

19   business like myself who's getting started, especially

20   with federal contracts because it's so competitive, to

21   at least sit under the simplified acquisition

1    threshold, micro purchases basically, under $10,000

2    contracts, to get some of those and build and then you

3    can go to the next block, you know.   Might I require

4    financing at some point?   Sure.   But I'm just not at

5    that level yet, no.

6          Q.    Cross that bridge when you get to it?

7          A.    Yeah or get a contract that required me to

8    take it to a bank and say, hey, I have this federal

9    contract, you know, I need a loan to do the job.   But I

10   haven't got to that point yet.

11         Q.    Just for purposes of the record, can you

12   just briefly describe, you know, in a paragraph or so,

13   what it is PMC does?

14         A.    My background is in manufacturing.   My

15   father was a manufacturing engineer who manufactured

16   brake shoes for the military trucks.   So I kind of

17   stuck to manufacturing those types of items that

18   included rubber, plastic, steel.   And then my degree is

19   tailored towards acquisition and contract management.

20   However, for my electives, I have taken three project

21   management courses.   So, it made me realize that that's

Page 95

1    kind of what I do, project management.  Doesn't matter

2    if it's an item that requires steel or if it's a

3    service contract or, you know, any type of managing

4    project is kind of what my vision was for Project

5    Management Corporation, just to manage the projects.

6    Whatever they are.  You know, assembling resources, you

7    know, subcontractors, all that good stuff.  So, for

8    example, today I can make a bushing sleeve, you know,

9    like I did when I worked with the service disabled

10   small business.  One day we made valves that go on

11   trucks.  The next day we manufactured shafts that went

12   on Ohio class 11 submarine, nuclear submarine.  Five

13   months later we would do backpacks for the forestry

14   service.  And that was me opening them up to some

15   diversification as managing projects.

16        Q.    Are you happy with how PMC is doing up to

17   this point?

18        A.    No.

19        Q.    Tell me about that if you could.

20        A.    Well, as I mentioned earlier, with no

21   disability business enterprise program for myself, for

Page 96

1    starters, it's just even me being a white male who

2    doesn't meet any economic standards of, you know,

3    having sufficient income or assets to go out and get

4    loans, I'm thrown into the general small business

5    category where you are dealing with, again, companies

6    with 500 to a thousand employees depending on what the

7    basics code is.  They could have 12 to $15 million in

8    sales a year and I can't compete with those people.  So

9    that's why I'm answering no, that it's very hard to,

10   you know, to be happy with that.  Now, last year at the

11   end of 2022, because of my zone with the hurricane, I

12   was classified under the SBA HUBZone program and the

13   three contracts that I did get towards the end of last

14   year, they were all HUBZone contracts.  And this past

15   July, the SBA HUB -- the new redesigned SBA HUBZone map

16   doesn't include my address anymore.  So the contracts

17   went from three to looking at more and bidding on more

18   to going back to where I started at square one without

19   any program for me.  Which is --

20        Q.    So the HUBZone it's a geographically

21   defined area.  It sounds like that geographically

Mr. Christian Bruckner                          October 5, 2023

                                                        Page 97

1    defined area has kind of changed over time?

2          A.    For hurricanes.   Other zip codes that they

3    have, they don't change.   It's been like that for a

4    long time.

5          Q.    In those three contracts that you got for

6    HUBZone, can you just tell us briefly what they were?

7          A.    All three were for the defense -- the DLA.

8    One went to Columbus which is Active Devices Unit, one

9    went to DLA Aviation which handles all aircraft stuff.

10   Two of the contracts, they were awarded on approved

11   source meaning that I would have to buy from a Lockheed

12   or a Boeing or one of those distributors and that's

13   what I did.   So obviously there wasn't very much money

14   in that.   The last contract was actually a manufactured

15   or printed contract meaning I would have to order

16   materials and stuff like that.   It wasn't a big

17   contract.   It was like $5,800.   So those are the three

18   that I've gotten.   I have bid on other stuff that I

19   didn't get, but that's happens, you know, when you're

20   competing against these -- I guess what I am trying to

21   say is I don't believe that a company with 500

1    employees and $10 million in sales classified as a

2    small business should be bidding on small items that

3    are meant for economically disadvantaged people or

4    businesses is what I am saying.  I say economically

5    disadvantaged going on your financial condition.

6           Q.   It has to.  In terms of these contracts,

7    the contract value, for the one that went to Columbus

8    to the Active Device Unit, what was the approximate

9    value of that contract?  Just to the best of your

10   recollection.

11          A.   I don't remember.  I know one of them -- I

12   can't remember which it was.  Again, I don't memorize

13   them, I just keep files of them.  I have to keep

14   records and stuff like that.  I know that one was

15   5,800.  One was a $20 contract.  One was maybe three or

16   $400.  Those are contracts -- the first two were

17   contracts to establish history, you know.  That's one

18   of the main problems facing micro businesses and people

19   that start with federal contracting is they check your

20   history and if you don't have any history of supplying

21   anything, you're probably not going to have a good

Page 99

1    chance of getting the contract, you know.  So that's

2    the system they use.  So I would say probably in total,

3    6,000 to $6,200 would be my gross sales, you know, that

4    we're looking at.

5         Q.    Just based on your interrogatory responses

6    and what we have talked about, you are PMC's sole

7    officer and the sole employee right now?

8         A.    Yes, sir.

9         Q.    Right now, because you mentioned you're

10   back to square one, you're probably not drawing any

11   kind of a salary at the moment from PMC?

12        A.    No, sir.  No, sir.

13        Q.    Principal place of business is in Tampa?

14        A.    Yes, sir.

15        Q.    These are just due diligence background

16   questions.  We already talked about your annual

17   revenue.  I guess that's in line with your gross sales

18   of approximately 6.2 thousand, 6.2k.  Is that fair to

19   say?

20        A.    Yes, sir.

21        Q.    Again, a due diligence question:  Is there

Page 142

1    from you guys, Dan will let me know.

2                    MR. REESE:  Counsel, I think, let me just

3    check, your indulgence please, very good.  Counsel, I

4    think this concludes our questioning.  If you have any

5    follow-up questions for Mr. Bruckner you want to ask on

6    the record, feel free.  But I think that's it from the

7    government.

8                    MR. LENNINGTON:  No.  That's it for us.

9                    MR. REESE:  Thank you all very much.  Have

10   a lovely day.

11                   (Deposition concluded at 1:07 p.m.)

12

13

14

15

16

17

18

19

20

21

Mr. Christian Bruckner                                    October 5, 2023

Page 143

1    State of Maryland

2    City of Baltimore, to wit:

3              I, Louisa B. McIntire-Brooks, a Notary

4    Public of the State of Maryland, County of Anne

5    Arundel, do hereby certify that the within-named

6    witness personally appeared before me at the time

7    and place herein set out, and after having been duly

8    sworn by me, according to law, was examined by

9    counsel.

10             I further certify that the examination

11   was recorded stenographically by me and this

12   transcript is a true record of the proceedings.

13             I further certify that I am not of

14   counsel to any of the parties, nor in any way

15   interested in the outcome of this action.

               As witness my hand and notarial seal

16   this 12TH day of October, 2023.

17

18   *Louisa B. McIntire-Brooks* (signature)

19   Louisa B. McIntire-Brooks

     Notary Public

20   My Commission Expires:

21   November 13, 2023

**Daniel Lennington**

**To:**                                 Christian Bruckner
**Subject:**                        RE: Orlando MBDA Business Center - Action Needed

---------- Forwarded message ---------
From: **Info@orlandombdacenter.com** <info@orlandombdacenter.com>
Date: Thu, Jan 19, 2023 at 12:35 PM
Subject: Re: Orlando MBDA Business Center - Action Needed
To: Christian Bruckner ███████████████████████

Good afternoon Christian,

The MBDA's focus is to help grow businesses owned by people of ethnic minorities, but we do partner with other companies that can assist all types of businesses. If none of the options in the "Ethnicity" dropdown on the MBDA Intake Form apply, we can refer you to our strategic partner 3D Strategic Management for assistance. I will have them reach out to you for further information. They will be sending you an email from info@3DStrategicManagement.com to follow-up by the end of next week.

Sincerely,

████████

Office Manager

Orlando MBDA Business Center

1314 E. Robinson Street

Orlando, FL 32801
██████████████████
████ j@orlandombdacenter.com
www.OrlandoMBDACenter.com

Exhibit
0005

**From:** Christian Bruckner <⬛⬛⬛⬛⬛⬛⬛⬛⬛>
**Sent:** Wednesday, January 18, 2023 12:42 PM

**To:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Yes

On Wed, Jan 18, 2023 at 12:38 PM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

Hi Christian,

Just to clarify, were you referring to the "Ethnicity" dropdown options on the Intake Form?

---

**From:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Sent:** Wednesday, January 18, 2023 11:30 AM
**To:** Christian Bruckner <⬛⬛⬛⬛⬛⬛⬛⬛⬛>

**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hi Christian,

If you do not identify as one of the "Ethnicity" dropdown options, we can refer you to one of our Strategic Partners for assistance with growing your business.

Sincerely,

⬛⬛⬛⬛

Office Manager

2

Orlando MBDA Business Center

1314 E. Robinson Street

Orlando, FL 32801

██████████████████████

█████@orlandombdacenter.com
www.OrlandoMBDACenter.com

---

**From:** Christian Bruckner <███████████████████████>
**Sent:** Wednesday, January 18, 2023 11:10 AM
**To:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hello, thank you for your email response. I have a question. I do not see a box for disability and I don't meet the other boxes on the intake form. What do I need to do ?

Christian

On Wed, Jan 18, 2023 at 11:06 AM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

Good Morning,

We appreciate your interest in our services at The Orlando MBDA Business Center.  We are currently onboarding our clients for the new year. In order to become a client, we will need you to complete our Intake Form and Client Engagement Form. I have attached the links to these forms within this email. Once you have completed the attached Client Engagement form, please send it back to us so we can review. If you have any further questions, please feel free to reach out to me.

Intake form - Orlando MBDA Business Center Customer Application and Intake Form (google.com)
Client engagement form – see attachment (Please remember the **"client"** is your company name)

3

Please note that if you do not qualify for our services through the MBDA Business Center, we will gladly refer you to a program that can assist you further.

We look forward to providing you with services and resources that will help you grow your business!

Sincerely,

███████

Office Manager



Orlando MBDA Business Center

1314 E. Robinson Street

Orlando, FL 32801

████████████████████

██ @orlandombdacenter.com
www.OrlandoMBDACenter.com

4

**Contact Us Form submitted on Orlando MBDA Business Center**

Orlando MBDA Business Center <info@3dstrategicmanagement.com>
Fri 1/13/2023 8:50 AM
To:Info@orlandombdacenter.com <info@orlandombdacenter.com>

Name: Christian Bruckner
Last: Bruckner
Email: ██████████████████
Registered Business Name: Project Management Corporation
Best Number to Reach You: ████████████
Areas of Need: Contracts and Procurement
Please share anything that will help the Orlando MBDA Business Center be of service to you. : Hello I am a small buisness in Tampa Florida. I would like more information that you can provide in reference to assisiting my small buisness in procuring state or federal contracts.

Thank you

## Orlando MBDA Business Center - Action Needed

Info@orlandombdacenter.com <info@orlandombdacenter.com>

Wed 1/18/2023 11:06 AM



📎 1 attachments (205 KB)

Orlando MBDA Business Center Client Engagement Form.pdf;

Good Morning,

We appreciate your interest in our services at The Orlando MBDA Business Center.  We are currently onboarding our clients for the new year. In order to become a client, we will need you to complete our Intake Form and Client Engagement Form. I have attached the links to these forms within this email. Once you have completed the attached Client Engagement form, please send it back to us so we can review. If you have any further questions, please feel free to reach out to me.

Intake form - <u>Orlando MBDA Business Center Customer Application and Intake Form (google.com)</u>
Client engagement form – see attachment (Please remember the **"client"** is your company name)

Please note that if you do not qualify for our services through the MBDA Business Center, we will gladly refer you to a program that can assist you further.

We look forward to providing you with services and resources that will help you grow your business!

Sincerely,



Office Manager



Orlando MBDA Business Center
1314 E. Robinson Street
Orlando, FL 32801

@orlandombdacenter.com
www.OrlandoMBDACenter.com

Re: Orlando MBDA Business Center - Action Needed

Christian Bruckner <███████████████████>
Wed 1/18/2023 12:42 PM
To:Info@orlandombdacenter.com <info@orlandombdacenter.com>

Yes

On Wed, Jan 18, 2023 at 12:38 PM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

Hi Christian,

Just to clarify, were you referring to the "Ethnicity" dropdown options on the Intake Form?

**From:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Sent:** Wednesday, January 18, 2023 11:30 AM
**To:** Christian Bruckner <███████████████████>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hi Christian,

If you do not identify as one of the "Ethnicity" dropdown options, we can refer you to one of our Strategic Partners for assistance with growing your business.

Sincerely,

████████
Office Manager

Orlando MBDA Business Center



www.OrlandoMBDACenter.com

**From:** Christian Bruckner <███████████████████>
**Sent:** Wednesday, January 18, 2023 11:10 AM
**To:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hello, thank you for your email response. I have a question. I do not see a box for disability and I don't meet the other boxes on the intake form. What do I need to do ?

Christian

On Wed, Jan 18, 2023 at 11:06 AM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

Good Morning,

We appreciate your interest in our services at The Orlando MBDA Business Center.  We are currently onboarding our clients for the new year. In order to become a client, we will need you to complete our Intake Form and Client Engagement Form. I have attached the links to these forms within this email. Once you have completed the attached Client Engagement form, please send it back to us so we can review. If you have any further questions, please feel free to reach out to me.

Intake form – Orlando MBDA Business Center Customer Application and Intake Form (google.com)
Client engagement form – see attachment (Please remember the **"client"** is your company name)

Please note that if you do not qualify for our services through the MBDA Business Center, we will gladly refer you to a program that can assist you further.

We look forward to providing you with services and resources that will help you grow your business!

Sincerely,

Kristi Jones

████████████



Orlando MBDA Business Center

██████████ .com
www.OrlandoMBDACenter.com

## Re: Orlando MBDA Business Center – Action Needed

Info@orlandombdacenter.com <info@orlandombdacenter.com>
Thu 1/19/2023 12:35 PM
To:Christian Bruckner ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Good afternoon Christian,

The MBDA's focus is to help grow businesses owned by people of ethnic minorities, but we do partner with other companies that can assist all types of businesses. If none of the options in the "Ethnicity" dropdown on the MBDA Intake Form apply, we can refer you to our strategic partner 3D Strategic Management for assistance. I will have them reach out to you for further information. They will be sending you an email from info@3DStrategicManagement.com to follow-up by the end of next week.

Sincerely,

▮▮▮▮▮▮
Office Manager



Orlando MBDA Business Center
1314 E. Robinson Street
Orlando, FL 32801
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮dacenter.com
www.OrlandoMBDACenter.com

---

**From:** Christian Bruckner <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, January 18, 2023 12:42 PM
**To:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Yes

On Wed, Jan 18, 2023 at 12:38 PM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

> Hi Christian,
>
> Just to clarify, were you referring to the "Ethnicity" dropdown options on the Intake Form?

**From:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Sent:** Wednesday, January 18, 2023 11:30 AM
**To:** Christian Bruckner ██████████████████████████

**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hi Christian,

If you do not identify as one of the "Ethnicity" dropdown options, we can refer you to one of our Strategic Partners for assistance with growing your business.

Sincerely,

████████████████

Office Manager

Orlando MBDA Business Center
1314 E. Robinson Street
Orlando, FL 32801
██████████████████
████████@orlandombdacenter.com
www.OrlandoMBDACenter.com

---

**From:** Christian Bruckner ██████████████████████████
**Sent:** Wednesday, January 18, 2023 11:10 AM
**To:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hello, thank you for your email response. I have a question. I do not see a box for disability and I don't meet the other boxes on the intake form. What do I need to do ?

Christian

On Wed, Jan 18, 2023 at 11:06 AM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

Good Morning,

We appreciate your interest in our services at The Orlando MBDA Business Center. We are currently onboarding our clients for the new year. In order to become a client, we will need you to complete our Intake Form and Client Engagement Form. I have attached the links to these forms within this email. Once you have completed the attached Client Engagement form, please send it back to us so we can review. If you have any further questions, please feel free to reach out to me.

Intake form - Orlando MBDA Business Center Customer Application and Intake Form (google.com)
Client engagement form – see attachment (Please remember the **"client"** is your company name)

Please note that if you do not qualify for our services through the MBDA Business Center, we will gladly refer you to a program that can assist you further.

We look forward to providing you with services and resources that will help you grow your business!


Sincerely,

███████████

Office Manager



Orlando MBDA Business Center
1314 E. Robinson Street
Orlando, FL 32801

████████████████████████

███    @orlandombdacenter.com
www.OrlandoMBDACenter.com

Re: Orlando MBDA Business Center - Action Needed

Info@orlandombdacenter.com
Wed 2/15/2023 1:09 PM
To:Christian Bruckner ▮▮▮▮▮▮▮▮▮▮

Hi Christian,

Thank you for reaching out to the Orlando MBDA Business Center with your inquiry. The Orlando MBDA Business Center's requirements are at least three years in business and $500,000 in annual revenue. We would, however, like to refer you to our other program through 3D Strategic Management - The Business Incubator. The 3D Strategic Management Business Incubator is designed for businesses from start-up to scale up capacity  They provide one-on-one business technical assistance, virtual office space,  outreach resource referrals, and more  Are you interested in earning your business development certifications? They can assist you in growing your holistic business knowledge  Here is their website so that you can explore the different Services and Membership options.

3dstrategicmanagement.com/incubator



### 3DSM Incubator – 3D Strategic Management, Inc.

3DSM Business Incubator more about our hub 3D Strategic Management's Business Incubator is your one stop shop for office space, mailing address, business development trainings, outreach meeting assistance, conference meeting space and business coaching. We are conveniently located in downtown Orlando with ample complimentary parking, security and access to

3dstrategicmanagement.com

We wish you and your business much success!

*Best Regards,*

▮▮▮▮▮▮▮▮▮▮

**The Orlando MBDA Business Center**
▮▮▮▮▮▮▮▮ @OrlandoMBDACenter.com
W: www.OrlandoMBDACenter.com

*3D Strategic Management, Inc.*
Operator
▮▮▮▮▮▮▮▮ 3DStrategicManagement,com
W: www.3DStrategicManagement.com
-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U. S. Department of Commerce's MBDA Infrastructure Initiative
-United States President Biden's African American/Rural Stakeholder- Office of Public Engagement
-Orlando Business Journal's Diversity in Business Honoree
- Host/ Creator of Women Empowerment Wednesday- Global Women's Empowerment Enterprise Platform

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

**From:** Christian Bruckne ▮▮▮▮▮▮▮▮
**Sent:** Wednesday, January 18, 2023 12:42 PM
**To:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Yes

On Wed, Jan 18, 2023 at 12:38 PM Info@orlandombdacenter.com <info@orlandombdacenter.com> wrote:

Hi Christian,

Just to clarify, were you referring to the "Ethnicity" dropdown options on the Intake Form?

**From:** Info@orlandombdacenter.com <info@orlandombdacenter.com>
**Sent:** Wednesday, January 18, 2023 11:30 AM
**To:** Christian Bruckne ▮▮▮▮▮▮▮

**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hi Christian,

If you do not identify as one of the "Ethnicity" dropdown options, we can refer you to one of our Strategic Partners for assistance with growing your business.

Sincerely,

MBDA MSJ App. 00124

Office Manager



[www.OrlandoMBDACenter.com](www.OrlandoMBDACenter.com)

---

**From:** Christian Bruckner
**Sent:** Wednesday, January 18, 2023 11:10 AM
**To:** [Info@orlandombdacenter.com](Info@orlandombdacenter.com) <[info@orlandombdacenter.com](info@orlandombdacenter.com)>
**Subject:** Re: Orlando MBDA Business Center - Action Needed

Hello, thank you for your email response. I have a question. I do not see a box for disability and I don't meet the other boxes on the intake form. What do I need to do ?

Christian

On Wed, Jan 18, 2023 at 11:06 AM [Info@orlandombdacenter.com](Info@orlandombdacenter.com) <[info@orlandombdacenter.com](info@orlandombdacenter.com)> wrote:

Good Morning,

We appreciate your interest in our services at The Orlando MBDA Business Center.  We are currently onboarding our clients for the new year. In order to become a client, we will need you to complete our Intake Form and Client Engagement Form. I have attached the links to these forms within this email. Once you have completed the attached Client Engagement form, please send it back to us so we can review. If you have any further questions, please feel free to reach out to me.

Intake form - [Orlando MBDA Business Center Customer Application and Intake Form (google.com)](Orlando MBDA Business Center Customer Application and Intake Form (google.com))
Client engagement form – see attachment (**Please remember the "client" is your company name**)

Please note that if you do not qualify for our services through the MBDA Business Center, we will gladly refer you to a program that can assist you further.

We look forward to providing you with services and resources that will help you grow your business!

Sincerely,



**Orlando MBDA Business Center**
[1314 E. Robinson Street](1314 E. Robinson Street)

[www.OrlandoMBDACenter.com](www.OrlandoMBDACenter.com)

**Orlando MBDA Business Center**

Info@orlandombdacenter.com <info@orlandombdacenter.com>
Tue 1/31/2023 2:08 PM

Bcc:



;Christian Bruckner                                          il.com

📎 4 attachments (5 MB)
Orlando MBDA Business Center Brochure 2022-2023.pdf; Orlando MBDA Business Center Client Engagement Form_Fillable.pdf; USDOC-EWOC Orlando MBDA BC-HOST.jpg; Orlando MBDA _ACCESS_CAPITAL_June28th.jpg;

Good Afternoon,

Thank you for reaching out to the Orlando MBDA Business Center! We would love to share with you some exciting opportunities and program resources that could change the trajectory of your business. Have you thought about scaling your business up but didn't know where to start? You can stop looking, we are here to help you reach your business goals.

I've attached The Orlando MBDA Business Center's brochure for your review, and samples from some of our outreach last year.

Below you will see instructions on how to become a member of the Orlando MBDA Business Center.

How do you sign-up?

- If you have not already completed the client intake form, please do so at the following link. https://docs.google.com/forms/d/e/1FAIpQLSfpRmDmp9bCLJYbrQBNWoCedIUr7eUOkg6zKw0h 49PUAX7cOw/viewform

> ### Orlando MBDA Business Center Customer Application and Intake Form
>
> The Orlando MBDA Business Center is federally funded by the U.S. Department of Commerce, Minority Business Development Agency (MBDA), and operated by 3D Strategic Management, Inc. Our clients are U.S. minority business enterprises (MBEs) owned and operated by African Americans, Asian Americans, Hasidic Jews, Hispanic / Latin
>
> docs.google.com

- Complete the attached client engagement form. Please remember the **"client"** is your company name.
- Sign and return to our office. Please feel free to upload the forms into DocuSign if you do not have access to a printer. https://www.docusign.com/

We will schedule a consultation with you once we hear back from you, which will take about 30 minutes to discuss your company needs.

What are the programs that we offer to help your business grow?

- **Boots2Business-**Comprehensive business development trainings by experts in the field via our E-Learning Center
  - 42 current trainings are available
  - New trainings including Advanced Technology, Marketing, Public Relations, Manufacturing, Exporting and Federal Contracting

- **Power2Profit-**Access to Capital
  - Individual Financial readiness assessments
  - Assistance with loan documents preparation
  - Assistance with business credit and personal credit
  - Assess to financial lenders and advisors

- **Connect2Contract-** Access to Contracts
  - Advocacy and contract sourcing assistance
  - Access to 4 Committees- Finance, Government, Construction and Tourism/Manufacturing (32 members)
  - Supplier Diversity Expos/ Outreach Initiatives
  - Dodge Reports (Dodge: Data & Analytics)

**Please note that if you do not qualify for our membership, we will gladly refer you to a program that can assist you further.**

Have a great evening!

Sincerely,

███████

Office Manager



Orlando MBDA Business Center
1314 E. Robinson Street
Orlando, FL 32801

████████████

███orlandombdacenter.com
www.OrlandoMBDACenter.com

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U.S. Department of Commerce's MBDA Federal Procurement Supplement

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

**Hello From the Orlando MBDA Business Center**

Info@orlandombdacenter.com <info@orlandombdacenter.com>

Fri 2/3/2023 4:28 PM

To:Christian Bruckner < ▮▮▮▮▮▮▮▮▮▮▮▮ >

📎 4 attachments (5 MB)

Orlando MBDA Business Center Brochure 2022-2023.pdf; Orlando MBDA Business Center Client Engagement Form_Fillable.pdf; USDOC-EWOC Orlando MBDA BC-HOST.jpg; Orlando MBDA _ACCESS_CAPITAL_June28th.jpg;

Good Afternoon Christian,

Thank you for reaching out to the Orlando MBDA Business Center! We would love to share with you some exciting opportunities and program resources that could change the trajectory of your business. Have you thought about scaling your business up but didn't know where to start? You can stop looking, we are here to help you reach your business goals.

I've attached The Orlando MBDA Business Center's brochure for your review, and samples from some of our outreach last year.

Below you will see instructions on how to become a member of the Orlando MBDA Business Center.

How do you sign-up?

- If you have not already completed the client intake form, please do so at the following link. https://docs.google.com/forms/d/e/1FAIpQLSfpRmDmp9bCLIYbrQBNWoCedIUr7eUOkg6zKw0h49PUAX7cOw/viewform

> ### Orlando MBDA Business Center Customer Application and Intake Form
>
> The Orlando MBDA Business Center is federally funded by the U.S. Department of Commerce, Minority Business Development Agency (MBDA), and operated by 3D Strategic Management, Inc. Our clients are U.S. minority business enterprises (MBEs) owned and operated by African Americans, Asian Americans, Hasidic Jews, Hispanic / Latin
>
> docs.google.com

- Complete the attached client engagement form. Please remember the **"client"** is your company name.
- Sign and return to our office. Please feel free to upload the forms into DocuSign if you do not have access to a printer. https://www.docusign.com/

We will schedule a consultation with you once we hear back from you, which will take about 30 minutes to discuss your company needs.

What are the programs that we offer to help your business grow?

- **Boots2Business-**Comprehensive business development trainings by experts in the field via our E-Learning Center
    - 42 current trainings are available
    - New trainings including Advanced Technology, Marketing, Public Relations, Manufacturing, Exporting and Federal Contracting

- **Power2Profit-**Access to Capital
  - Individual Financial readiness assessments
  - Assistance with loan documents preparation
  - Assistance with business credit and personal credit
  - Assess to financial lenders and advisors

- **Connect2Contract-** Access to Contracts
  - Advocacy and contract sourcing assistance
  - Access to 4 Committees**-** Finance, Government, Construction and Tourism/Manufacturing (32 members)
  - Supplier Diversity Expos/ Outreach Initiatives
  - Dodge Reports (Dodge: Data & Analytics)

**Please note that if you do not qualify for our membership, we will gladly refer you to a program that can assist you further.**

Have a great evening!

Sincerely,

████████

Office Manager



Orlando MBDA Business Center
1314 E. Robinson Street
Orlando, FL 32801
████████
████████orlandombdacenter.com
www.OrlandoMBDACenter.com

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U.S. Department of Commerce's MBDA Federal Procurement Supplement

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

## Small Business Training Opportunity - Upcoming Event

Info@orlandombdacenter.com <info@orlandombdacenter.com>

Thu 2/23/2023 6:19 PM

Bcc:





MBDA MSJ App. 00132









al.com



Services of Winter Haven <ereecounselingwh@gmail.com>

<@orlandombdacenter.com>
<@3dstrategicmanagement.com>
<@orlandombdacenter.com>    <@orlandombdacenter.com>
<@orlandombdacenter.com>    DeSue    @orlandombdacenter.com>
<@orlandombdacenter.com>

Hello Business Owner!

We are excited to share this upcoming Small Business Training opportunity with you in hopes that you will be able to join the event hosted by The Small Business Administration in partnership with Dunbar Community leaders. Please see the flyer below for details as well as the topics that will be discussed at the event.

# SMALL BUSINESS
## TRAINING OPPORTUNITY

**Date**: Saturday, February 25, 2023
**Time**: 9 a.m. – Noon
**Location**: Quality of Life Center
**Address**: 3210 Dr. Martin Luther King, Jr. Blvd,
Fort Myers, FL 33916
*(Main Entrance & Parking located
on Quality Life Center Way)*

The Small Business Administration (SBA) in
partnership with Dunbar Community leaders, is
providing training on the following topics:

- Small Business Contracting Assistance Programs
- Introduction to the **HUBZone Program**
- Understanding Government Contracting During Disaster Relief Efforts

Best,

███████████████████████
Owner and CEO
**3D Strategic Management, Inc.**

████████████ @3DStrategicManagement.com
W: www.3DStrategicManagement.com
W: www.OrlandoMBDACenter.com



STRATEGIC
MANAGEMENT, INC.
Design. Develop. Deliver.

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-United States President Biden's African American Stakeholder
-Orlando Business Journal's Diversity in Business Honoree (2021)

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

MBDA MSJ App. 00139

**Upcoming BBIF Financial Management Webinar**

Info@orlandombdacenter.com <info@orlandombdacenter.com>

Thu 3/23/2023 9:21 AM

Bcc:



;christianb

<christianb

<nic@qualitytrucking.org>lewisscouture@yahoo.com



@orlandombdacenter.com>
@orlandombdacenter.com>
@orlandombdacenter.com>
@orlandombdacenter.com>
@orlandombdacenter.com>;
@3dstrategicmanagement.com>
@orlandombdacenter.com>

Hello Business Owner,

As part of our Power2Profit program, we are excited to share our strategic partner BBIF's upcoming Financial Management Essentials: Financial Analysis, Software, & Capital Event with you in hopes that you will be able to attend. This will be a great opportunity to learn more about understanding financial statements, different accounting software, and lending requirements. Please see below for additional details on this event.



**Best Regards,**

████████████████

Director
**The Orlando MBDA Business Center**
████████████

████████ y@OrlandoMBDACenter.com
W: www.OrlandoMBDACenter.com

***3D Strategic Management, Inc.***
Operator

DStrategicManagement,com
W: www.3DStrategicManagement.com

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U. S. Department of Commerce's MBDA Infrastructure Initiative
-United States President Biden's African American/Rural Stakeholder- Office of Public Engagement
-Orlando Business Journal's Diversity in Business Honoree
- Host/ Creator of Women Empowerment Wednesday- Global Women's Empowerment Enterprise Platform

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

## New Pollution Prevention (P2) Grant Opportunities Focused on Environmental Justice are Coming Soon!

Info@orlandombdacenter.com <info@orlandombdacenter.com>

Tue 3/21/2023 11:09 AM

Bcc:









@orlandombdacenter.com>; @orlandombdacenter.com;
@orlandombdacenter.com> @orlandombdacenter.com;
< @orlandombdacenter.com;
@orlandombdacenter.com>; @3dstrategicmanagement.com>

Good morning Business Owner,

As part of our Power2Profit program, the Orlando MBDA Business Center would like to share the below information regarding these New Pollution Prevention Grant Opportunities in hopes that this may be beneficial to your business growth. Please see below for more information.

The U.S. Environmental Protection Agency (EPA) will soon announce two new grant opportunities funded by the Bipartisan Infrastructure Law, which President Biden signed in November 2021. These grants will provide funding for states and tribes to provide businesses with technical assistance to help them adopt pollution prevention (P2) practices to advance environmental justice in disadvantaged communities across the country. These new grant opportunities are expected to be posted on Grants.gov in the coming weeks, and applicants will have 90 days to apply.  EPA is providing notice of these grant opportunities in advance so potential applicants can make the necessary preparations to submit a high-quality application to the Agency.
The two grant opportunities are:

- **Pollution Prevention Grant: Environmental Justice in Communities –** Providing P2 technical assistance to businesses to improve human health and the environment in disadvantaged communities
- **Pollution Prevention Grant: Environmental Justice Through Safer and More Sustainable Products –** Providing P2 technical assistance to business to improve human health and the environment in disadvantaged communities by increasing the supply, demand and/or use of safer and more sustainable products, such as those that are certified by EPA's Safer Choice label, or those that conform to EPA's Recommendations for Specifications, Standards and Ecolabels for Federal Purchasing

Eligible applicants include states, state entities such as universities, U.S. territories and possessions, and federally recognized Tribes and intertribal consortia. Applicants are encouraged to consider partnering with other P2 stakeholders and with community organizations to strengthen their ability to jointly develop and provide P2 technical assistance to businesses and facilitate the development, adoption, and dissemination of P2 solutions. For these grants, selected grantees will not be required to focus their technical assistance on the National Emphasis Areas (NEAs) and will not be required to provide matching funds.
Prior to applying for an EPA grant, applicants must:

- Have an active account on the System for Award Management (SAM)

- Be registered on Grants.gov

Please note that it may take up to a month to complete registration on these systems.
For help with grant-related questions, e-mail p2hub@epa.gov.
To receive a notification when the grants are available, sign up to receive EPA's P2 listserv.

This information is from The U.S. Environmental Protection Agency's Pollution Prevention Program. This information is being shared by the Orlando MBDA Business Center in order to provide assistance options to our clients and their businesses. For questions, please email the address mentioned above.

*Best Regards,*

███████████████████████

Director
**The Orlando MBDA Business Center**
██████████████████
███████@OrlandoMBDACenter.com
W: www.OrlandoMBDACenter.com

*3D Strategic Management, Inc.*
**Operator**
████████████████████████
███████@3DStrategicManagement,com
W: www.3DStrategicManagement.com

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U. S. Department of Commerce's MBDA Infrastructure Initiative
-United States President Biden's African American/Rural Stakeholder- Office of Public Engagement
-Orlando Business Journal's Diversity in Business Honoree
- Host/ Creator of Women Empowerment Wednesday- Global Women's Empowerment Enterprise Platform

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

Register to Learn More About New $16 Million Pollution Prevention Grant Opportunities

Info@orlandombdacenter.com
Tue 3/21/2023 11:15 AM
Bcc





Christian Bruckner <christianbnoah2019@gmail.com>

orlandombdacenter.com>   @orlandombdacenter.com>   @3dstrategicmanagement.com>;
@orlandombdacenter.com>

Good Morning Business Owner,

As part of our Power2Profit program, the Orlando MBDA Business Center would like to share the below information regarding these New Pollution Prevention Grant Opportunities and the upcoming informative webinars in hopes that this may be beneficial to your business growth. Please see below for more information.

Join U.S. Environmental Protection Agency (EPA) in March for one of the four webinars to learn more about two new grant opportunities to advance environmental justice in underserved communities. These grants are made possible by President Biden's Bipartisan Infrastructure Law and are a critical component of the Biden-Harris Administration's Justice40 Initiative, which aims to deliver 40% of the overall benefits of climate, clean energy and other investments to disadvantaged communities.

Individual grant awards may range from $100,000 to $800,000 for the funding period, or up to $1.2 million for multi-state or multi-Tribal projects:

- **The Pollution Prevention Grant: Environmental Justice in Communities** will support technical assistance for businesses to specifically target and improve human health and the environment in disadvantaged communities. Applications for this grant are due by **June 6, 2023**. Additional information is available at grants.gov under Funding Opportunity Announcement EPA-I-OCSPP-OPPT-FY2023-001.

- **The Pollution Prevention Grant: Environmental Justice Through Safer and More Sustainable Products** will support P2 technical assistance to businesses to improve human health and the environment in disadvantaged communities by increasing the supply, demand and use of safer and more sustainable products, such as those that are certified by EPA's Safer Choice program, or those that conform to EPA's Recommendations for Specifications, Standards and Ecolabels for Federal Purchasing. Applications for this grant are due by **June 20, 2023**. Additional information is available at grants.gov under Funding Opportunity Announcement EPA-I-OCSPP-OPPT-FY2023-002.

The webinars will provide information on the P2 grant programs, the application process and the P2 Grant Partner Connection List, a new resource to help facilitate partnerships among potential applicants and P2 stakeholders including community organizations. A question and answer session and Spanish interpretation will be provided for each webinar.

- **March 21, 2023, 2 – 3:30 p.m. ET -** Register here
- **March 23, 2023, 2 – 3:30 p.m. ET (for Tribal entities) -** Register here
- **March 28, 2023, 2 – 3:30 p.m. ET -** Register here
- **March 30, 2023, 2 – 3:30 p.m. ET -** Register here

Tools and resources for prospective grantees, including pre-recorded webinars, writing guidance, networking tools, and helpful templates, can be found online. Contact the P2 Hub Helpline for additional information or assistance: p2hub@epa.gov or (202) 566-0799.

This information is from EPA's Pollution Prevention Program. This information is being shared by the Orlando MBDA Business Center in order to provide assistance options and information to our clients and their businesses. For questions, please email the address above.

*Best Regards,*

Director
**The Orlando MBDA Business Center**

OrlandoMBDACenter.com
W: www.OrlandoMBDACenter.com

*3D Strategic Management, Inc.*
Operator

W: www.3DStrategicManagement.com

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U. S. Department of Commerce's MBDA Infrastructure Initiative
-United States President Biden's African American/Rural Stakeholder- Office of Public Engagement
-Orlando Business Journal's Diversity in Business Honoree
- Host/ Creator of Women Empowerment Wednesday- Global Women's Empowerment Enterprise Platform

*3D Strategic Management, Inc. is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

Upcoming Event - WMBI Conference & Pop-Up Bazaar

Info@orlandombdacenter.com
Fri 3/17/2023 5:06 PM
Bcc





@orlandombdacenter.com | @strategicmanagement.com | @orlandombdacenter.com | @orlandombdacenter.com

📎 1 attachments (135 KB)
WMBI Conference & Pop-Up Bazaar JPG;

Good Afternoon Business Owner,

As part of our Boots2Business program, the Orlando MBDA Business Center is excited to share the upcoming 13th Annual Women Mean Business International Conference and Pop-Up Bazaar with you in hopes that you may be able to attend. This event is hosted by fellow MBDA Business Center Operator, Marie Gill of M. Gill & Associates, and will be an excellent networking opportunity.  Please see the flyer below (also attached) for more information.



**Best Regards,**

Director
**The Orlando MBDA Business Center**

@OrlandoMBDACenter.com
W: www.OrlandoMBDACenter.com

**3D Strategic Management, Inc.**
Operator

3DStrategicManagement.com
W: www.3DStrategicManagement.com

-U.S. Department of Commerce's Orlando MBDA Business Center (Operator)
-U. S. Department of Commerce's MBDA Infrastructure Initiative
-United States President Biden's African American/Rural Stakeholder- Office of Public Engagement
-Orlando Business Journal's Diversity in Business Honoree
- Host/ Creator of Women Empowerment Wednesday- Global Women's Empowerment Enterprise Platform

*3D Strategic Management, Inc.  is dedicated to your company's growth by providing strategic business development services and customized training solutions.*

*Follow us on Twitter, Facebook, Instagram and LinkedIn*

Page 1

1                IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF TEXAS

2                      Fort Worth Division

3

4    JEFFREY NUZIARD, et al.          Case No.

5                                     4:23-CV-00278-P

6            Plaintiffs

7    vs.                              District Judge

8    MINORITY BUSINESS DEVELOPMENT    Mark T. Pittman

9    AGENCY, et al.

10           Defendants

11   _____/

12

13

14           Volume I of the Zoom teleconferenced

15   deposition of JEFFREY NUZIARD was held on Tuesday,

16   October 3, 2023, commencing at 9:33 A.M., at virtual

17   location before Louisa B. McIntire-Brooks, Notary

18   Public.

19

20

     Job No. CS6114803

21   REPORTED BY:  Louisa B. McIntire-Brooks

```
1    APPEARANCES:
2              ON BEHALF OF THE PLAINTIFFS:
              DANIEL P. LENNINGTON, ESQUIRE
3              CARA M. TOLLIVER, ESQUIRE
                  Wisconsin Institute for Law
4                  & Liberty, Inc.
                  330 East Kilbourn Avenue
5                  Milwaukee, Wisconsin 53202
                  Telephone:   410-727-4880
6                  dan@will-law.org
                  cara@will-law.org
7
8              ON BEHALF OF DEPT. OF COMMERCE:
              SAPNA SHARMA, ESQUIRE
9                  U.S. Department of Commerce
                  Office of General Counsel
10                  1401 Constitution Avenue, NW
                  Washington, DC 20230
11                  Telephone:   202-482-4772
12              ON BEHALF OF THE DEPT. OF JUSTICE
              VENDARRYL JENKINS, ESQUIRE
13              CHRISTOPHER WOOLLEY, ESQUIRE
              DAVID REESE, ESQUIRE
14              ANDREW BRANIFF, ESQUIRE
              MILLER FINA, ESQUIRE
15                  United States Department of Justice
                  Civil Rights Division
16                  150 M Street, NE, 9th Floor
                  Washington, DC 20530
17                  Telephone:   202-598-1671
                  vendarryl.jenkins@usdoj.gov
18                  christopher.woolley@usdoj.gov
                  david.reese@usdoj.gov
19
20
21
```

1                        INDEX

2              Deposition of:   Jeffrey Nuziard

3                     October 3, 2023

4


5    Examination by:                          Page:

6    Mr. Woolley                                 5

7


8    Exhibit No.                            Marked:

9    Exhibit 1   MBDA 1 Notice of oral deposition      5

10   Exhibit 2   MBDA 2 certificate of filing         56

11

12

13

14

15

16

17

18

19

20

21

1                         STIPULATION

2              It is stipulated and agreed by and

3    between counsel for the respective parties that the

4    witness may be remotely sworn.

5                         PROCEEDINGS

6    Whereupon,

7                    JEFFREY NUZIARD,

8    called as a witness, having been first duly sworn

9    to tell the truth, the whole truth, and nothing but the

10   truth, was examined and testified as follows:

11            MR. LENNINGTON:  This is Dan Lennington.

12   I'm the attorney for Dr. Nuziard.  I'll be defending

13   the deposition.

14            MS. TOLLIVER:  Cara Tolliver, attorney for

15   Dr. Nuziard.

16            MR. JENKINS:  Vendarryl Jenkins from the

17   Department of Justice.

18            MR. REESE:  Good morning.  This is David

19   Reese with Department of Justice.

20            MS. SHARMA:  Good morning.  This is Sapna

21   Sharma.  I'm with the Department of Commerce, General

 1    Counsel's Office.

 2              (Deposition Exhibit 1 was marked for

 3    purposes of identification.)

 4              EXAMINATION BY MR. WOOLLEY:

 5         Q.    You're here pursuant to a notice of

 6    deposition that's been introduced as Exhibit 1.  You

 7    have had a chance to read that; correct?

 8         A.    Yes.

 9         Q.    Have you been deposed before?

10         A.    I'm sorry?

11         Q.    Have you been deposed before?

12         A.    Yes.

13         Q.    How many times?

14         A.    Twice.

15         Q.    When was the first time?

16         A.    1993, I guess, '94.

17         Q.    Do you remember what type of case it was?

18         A.    I don't think it matters.  An investigatory

19    case.

20         Q.    What kind of investigatory case?

21         A.    Business investigatory case.

 1        Q.     So you're eligible for veterans' benefits?

 2        A.     Yes, I am.

 3        Q.     When you were on active duty, what rank did

 4   you hold when you left?

 5        A.     E-4.  Promotable -- I was -- I turned down

 6   my E-5 promotion to get out.

 7        Q.     Is that Navy?

 8        A.     Please.  Army.

 9        Q.     Army.  Okay.  When you left the Reserves,

10   were you in the same rank?

11        A.     Yes, I was.  Yes.

12        Q.     You mentioned you gave a deposition in a

13   lawsuit back in 1993 when you said you were -- were you

14   a defendant in that case?

15        A.     Yes, I was.

16        Q.     Any other lawsuits where you have been a

17   plaintiff or a defendant that you have been part of?

18        A.     No.

19        Q.     Just tell me about this 1993 case where you

20   were a defendant.  You mentioned it was a business

21   dispute.  What kind of business dispute was that?

1          A.     I'd rather not discuss all that because I

2    have been told by my previous attorneys with that case

3    to never discuss it.   It was with government officials.

4          Q.     Was it county?   County government?

5          A.     Yes.

6          Q.     Were you running a business at that time?

7          A.     Yes, I was.

8          Q.     What was the business that you were

9    running?

10         A.     It was a church ministry at a church.   A

11   parachurch ministry.

12         Q.     You say it was a church ministry.   How is

13   that a business for you?

14                MR. LENNINGTON:   Objection.   I'm going to

15   instruct the witness not to answer to the extent he's

16   been told by law enforcement officials not to disclose

17   investigatory information or leads or grand jury

18   proceedings.   Also, I'm going to object that this is an

19   unduly waste of time, overly burdensome, it's meant to

20   harass and annoy the witness.   What we stated on the

21   record that we have only a certain amount of time here

1          MR. WOOLLEY:  Okay.  I'll just say for the

2     record that his business experience is relevant to the

3     case.  But we'll move on.

4          Q.    My understanding is you have a Ph.D.; is

5     that right?

6          A.    It's an honorary Ph.D.  I invented a

7     protocol and was gifted that.  And it was patented.

8          Q.    You told me about --

9          A.    That was breaking up really bad.  I heard

10    about two words there.  Can you say it again?

11         Q.    When you say you invented a protocol, what

12    do you mean?

13         A.    Invented a medical protocol to reverse

14    erectile dysfunction.  I have been issued a patent on

15    it and was gifted an honorary Ph.D. for that work.  Not

16    that that means anything because it's just a piece of

17    paper.

18         Q.    Can you tell me when you invented the

19    protocol?

20         A.    When?

21         Q.    When did you invent and patent this?

1        A.    Over a period of ten years.  I finalized it

2    in -- I finalized it in 2017, '18, end of '17, the end

3    of '18 area and went to work on testing and more

4    research and development of it.

5        Q.    Will you tell me about that process?

6        A.    Can I tell you about the process?

7        Q.    Yeah.  Tell me about how you came up with

8    this idea, the steps you went through to implement the

9    idea and to start up this business.

10        A.    So I'm 40 -- I'm 58 next week.  When I was

11    40 years old, I started experiencing some erectile

12    dysfunction issues myself, was completely beside

13    myself, embarrassed and blown away and all that any

14    medical doctor had to tell me was I needed to be on

15    pills or have surgery and I was like, no, that's

16    unacceptable.

17                So, I had some -- a lot of doctor friends

18    and contacts.  I went to every conference I could go

19    to.  Went to -- I audited a couple classes.  I had use,

20    full range use of a medical laboratory.  I bought

21    cadavers.  I did everything I could do to figure out

1   how to fix the problem in a regenerative fashion more

2   than a medical, pharmaceutical or surgical fashion.  I

3   was able to take countless other Ph.Ds' and MDs'

4   research and connect the dots and figure out how to put

5   it all together and make it all work and today we enjoy

6   a 97 percent success rate.

7          Q.    Can you tell me what's involved in the

8   protocol?

9          A.    It's a multi modality protocol.  There's

10  laser energy used, there's acoustic shock wave energy

11  used, there is a fluid that was compounded in a recipe

12  that I had worked up and came up with of exosomes and

13  amniotic fluid and different highly concentrated growth

14  factors involved, hormone replacement.  It's multi

15  modality.  There's several things involved.

16         Q.    You mentioned that -- is that accurate?

17         A.    Sorry.  I got half of that.

18         Q.    What?

19         A.    I got half of that.

20         Q.    I'm sorry.  You cut out.

21         A.    Am I cutting out?  I'm sorry.

Mr. Jeffrey Nuziard                October 3, 2023

Page 29

1       A.    Just consultive.

2       Q.    Did you bounce ideas off of them?

3       A.    Correct.  That's correct.

4       Q.    How did you know them?

5       A.    Just through business ventures, business

6    things.  I was in the medical laser world for a while

7    and had a lot of -- a whole lot of friends that are

8    doctors.

9       Q.    How many friends would you say you have

10   that are doctors?

11      A.    I don't know.  A lot.

12      Q.    Dozens?

13      A.    Yes.  Yes.  A lot.

14      Q.    You mentioned that you also were able to

15   get access to cadavers?

16      A.    That's correct.

17      Q.    Was there any other kind of medical

18   equipment that you were able to get access to through

19   your friends?

20      A.    Just research equipment, lasers and shock

21   waves and things that are available on the open market.

Page 30

1        Q.    Did you pay for the cadavers?  How does

2   that work?

3             MR. LENNINGTON:  Object to the form.

4   Compound question.

5        Q.    How does it work accessing cadavers?

6        A.    You have friends, you pay money, you get

7   cadavers.  I don't know.  I don't know where they came

8   from.  I don't know where they got them from.  I have a

9   lot of research friends.  I have got a lot of scientist

10  friends and was able to -- be able to do investigatory

11  things.

12       Q.    In terms of medical equipment, you

13  mentioned lasers.  Is that correct?

14       A.    Correct.

15       Q.    You were able to access lasers?

16       A.    Yes.

17       Q.    Did you pay for access to those or was that

18  given to you?  How did that -- how do you get access to

19  those?

20       A.    You have friends and you ask and you

21  have -- yes.  I had doctors doing experiments for me

1    background when you started --

2         A.    I mentioned what?

3         Q.    You mentioned that you had some medical

4    background; is that right?

5         A.    No.   I said I was in the medical laser

6    field.

7         Q.    The medical laser field.   What were you

8    doing in the medical laser field?

9         A.    Selling lasers, working with doctors to

10   develop new protocols with those lasers.

11        Q.    Were you on your own or were you working

12   with -- were you an employee?

13        A.    I was an employee.

14        Q.    What is the name of the company that you

15   worked for?

16        A.    My comfort level of answering some of these

17   questions is I don't want to stir up any -- I know how

18   you attorneys are.   When I say that, I don't mean that

19   in a derogatory fashion.   I understand you guys got to

20   investigate.   I get that.   At the same time.   I'm not

21   under investigation or under trial for anything.   And

1  so I'm wondering why you need to have the specifics --

2  I'm not comfortable giving out businesses, names, phone

3  numbers, people I've worked with.  I've got a lot on

4  the line right now with my patent being issued, and the

5  company, where it's at, and I've got a lot on the line

6  and I'm just not comfortable with any of this.  If you

7  want to talk about why the case was brought against

8  MBDA, I would love to answer those questions.

9              MR. LENNINGTON:  Perhaps I can help here,

10  Chris.

11              MR. WOOLLEY:  Sure.

12              MR. LENNINGTON:  To the extent there are

13  trade secrets that you have, Jeff, or agreements that

14  are confidential that would prohibit you from answering

15  certain questions because of the confidentiality of the

16  business relationship, if that is the case, then you

17  don't have to answer.  But otherwise --

18              THE WITNESS:  Just being in a lawsuit with

19  the government would affect the relationship with the

20  company.

21              MR. LENNINGTON:  Chris, I think he's

Page 39

1        A.    On overall portfolio management.

2        Q.    Did that involve learning financial

3    analysis and that type of thing?

4        A.    Involved what?

5        Q.    Financial analysis of companies?

6        A.    Yes.  Uh-huh.

7        Q.    Talk to me about that.

8        A.    About what?

9        Q.    About your background in financial

10   analysis.

11       A.    I just -- I can read a prospectus.  I can

12   read track records.

13       Q.    How long were you at New York Life?

14       A.    Three years, maybe.  Three.  Let's see.

15   Three to four years.  I don't remember.

16       Q.    Then you went from there to what company?

17       A.    Started -- I started my own, The Financial

18   Group it was called.

19       Q.    What was the name of the business?

20       A.    The Financial Group.

21       Q.    What did you do?

1        A.      Same thing.

2        Q.      When you say same thing --

3        A.      Mainly insurance portfolios, but I was -- I

4   had some -- I had some mutual funds under the

5   management at that time, but it was way overweighted

6   with insurances, wasn't -- it wasn't until way later

7   that I got into just doing securities and no insurance.

8        Q.      When you say you were handling insurance

9   portfolios, what exactly do you mean by that?

10       A.      Whole life insurance, universal life

11  insurance, disability insurance.  Insurance.

12       Q.      You were selling --

13       A.      I didn't do P&C, property and casualty, but

14  I did life, health, disability, universal, whole life.

15       Q.      You were selling insurance?

16       A.      If needed.  If that's what they needed,

17  yes.  If not, they paid a fee just for consultation

18  purposes of their insurance portfolios.  Back in that

19  day, everybody was selling whole life and universal

20  life as a secure safe investment.  It really wasn't,

21  but that's what it was being sold as.

1          Q.      When you say they, was it individuals or

2    was it businesses?   Who was consulting with you?

3          A.      Individuals.

4          Q.      Were you providing business advice as part

5    of --

6          A.      On how to run their business?   No.

7          Q.      You were providing financial advice to

8    individuals?

9          A.      Insurance based financial advice, yes.

10         Q.      What years did this business operate?   The

11   Financial Group I'm talking about.

12         A.      '93 to 2001.   While at the same time, I

13   owned First Secured Mortgage Company.

14         Q.      So explain to me what the business, First

15   Secured Mortgage, was in.   What was that business

16   doing?

17         A.      I'm sorry.   The question is?

18         Q.      What business were you in for First Secured

19   Mortgage?   Explain to me what you were doing in that

20   business.

21         A.      Selling mortgages, writing up mortgages for

Page 42

1    individual home buyers and refinances.  It was an

2    accidental business that did really well.

3         Q.    How did you get into it?

4         A.    By pure accident.  I was referring people

5    that had too much debt to a guy across town to

6    refinance their house, to liquidate their debt and then

7    take that amount of -- what they were paying in debt

8    and put into the market for a retirement plan, and

9    after one year of doing -- referring and realizing he

10   didn't even say thank you, much less give me a ten cent

11   gift card, I was like, it can't be that hard to get

12   into the mortgage business.  So I looked into it and

13   became a broker.  First I became a correspondent, then

14   I became a broker, then I became an actual lender with

15   my own line of credit, funded mortgages with my own

16   underwriters and sold them and -- sold my mortgages in

17   $5 million blocks.

18        Q.    You say you sold you mortgages in $5

19   million blocks.  Can you explain that a bit?

20        A.    Well, write the mortgages, you fund the

21   mortgages on your credit line and then you put a $5

Page 44

1    it again, pay it off and do it again and I kept getting

2    more and more -- and they kept extending my line of

3    credit more and more when I finally got 5 million on 90

4    days.

5          Q.    When you said that business went from '93

6    to 2001, do you remember roughly when you got to that

7    $5 million line of credit?

8          A.    No, I don't.  About '98, '99, maybe.  I

9    don't remember.

10         Q.    That business did pretty well for you?

11         A.    It did okay.

12         Q.    Why did you exit that business?

13         A.    Because a partner that I had embezzled

14   $7 million and the building mysteriously burned down

15   one day with all the paperwork in it while I was out of

16   town.

17         Q.    How much money would you say you made from

18   that business?

19         A.    How much money was I making through that

20   business?

21         Q.    Did you make in total from that business

Page 51

1    money I saved in the bank so I didn't work very much at

2    all.  I was trying to save a marriage at that time.

3    And I just -- obviously I lived my life in there.

4    Wunderlich Securities was a couple years.  It wasn't

5    more than two.

6         Q.    So after your FINRA designation expires in

7    around 2014; is that correct?

8         A.    I started with the laser company in 2014.

9         Q.    You were doing that up until when?

10        A.    2020.

11        Q.    Then you went into business for yourself?

12        A.    At the best time possible, February 27th of

13   2020.  Boy, I wish I knew different.

14        Q.    Prior to starting at the medical laser

15   company, were there any professional organizations that

16   you were a part of?

17        A.    No.

18        Q.    No organizations that involved finance?

19        A.    FINRA.

20        Q.    After you began working at the medical

21   laser company through to the present, are there any

Page 56

1    again, Mr. Nuziard, after I think it was a ten minute

2    break.  Did you talk to anybody about your testimony

3    during the break?

4         A.   No.

5         Q.   So let's continue.  I'm going to introduce

6    this exhibit.  We'll mark it MBDA 2.

7              (Deposition Exhibit 2 was marked for

8    purposes of identification.)

9              MR. LENNINGTON:  I see it up there now

10   because I refreshed.  So, Jeff, you may have to refresh

11   your screen.  It just came up.

12             THE WITNESS:  I have it.

13        Q.   It's document Bates numbered NUZ1?

14        A.   I have it.

15        Q.   Do you see that?  Do you recognize this

16   document?  Do you recognize this document?

17        A.   Yes, I do.  Uh-huh.

18        Q.   What is it?

19        A.   It's a filing.

20        Q.   For the Sexual Wellness Centers of Texas,

21   LLC?

1        A.    Correct.

2        Q.    Is that the business that you opened in

3   2020?

4        A.    That is correct.  See, I told you not to

5   use my dates.  I said February 27th and it's

6   February 26th.

7        Q.    So tell me about the start-up process for

8   this business.

9        A.    First you buy a building, not buy, you have

10   to lease a building, finish out work, buy your

11   equipment, spend about $350,000, give or take, between

12   January and March 1st, hiring people and then I got

13   shut down and then I started January -- July 7th was my

14   first day open.

15        Q.    July 7th, that was July 7th, 2020?

16        A.    Yes.

17        Q.    You mentioned getting a building.  You

18   rent?  You have two locations?

19        A.    I do now.  I didn't then.  I do now.

20        Q.    When did your first location open?

21        A.    I just -- July 7th, 2020.

1          Q.     Okay.  July 7th, 2020.  When did your

2    second location open?

3          A.     April 10th, 2022.

4          Q.     The July 7th, 2020 location, that was --

5    which one was that?

6          A.     Frisco.

7          Q.     You mentioned 350,000 in start-up cost.  Is

8    that for the Frisco location?

9          A.     I didn't say 360.  I said approximately

10   350,000.  I don't know how much.  I don't have my books

11   in front of me and my accountant is not reachable.  So

12   I don't know.  It was roughly around that much and then

13   I had to rent the location, yes.

14         Q.     How much was the rent that you were paying

15   for that location?

16         A.     Like right at 6,000, give or take.  6,300

17   now, so I think it started at 6,000 for the first year,

18   per month.  6,000 a month.

19         Q.     What medical equipment did you have to

20   purchase as part of the start-up?

21         A.     Laser, shock wave machine, exam tables,

Page 59

1   beds, lab equipment, computers, phones, needles,

2   syringes, gauze, tape, all kinds.

3         Q.    In terms of employees, how many employees

4   did you hire at start-up?

5         A.    One nurse practitioner and I did the

6   consultations and she did the medical -- all the

7   medical stuff and my wife at the time handled the front

8   desk.

9         Q.    Did you have to pay anything for licenses?

10        A.    Well, yeah.  I don't -- yeah, I had to get

11  -- I had to be licensed -- pay to get set up as an LLC,

12  number one, then I had to get a city license, and a

13  state license, my nurse practitioner's license, her E&O

14  insurance, her DEA number.

15        Q.    In terms of state license, is this a

16  medical clinic?

17        A.    It is.

18        Q.    What kind of licenses are required by the

19  state for a medical clinic?

20        A.    None for me because I'm not a medical

21  doctor.  The license by the nurse practitioner has to

Page 60

1    be a license in good standing and has to be board

2    certified and be under a medical director which we are,

3    we have -- who is actually on staff now.

4          Q.    How did you finance the start-up costs?

5          A.    How did I what?

6          Q.    Where did the money come from for the

7    start-up costs?

8          A.    My pocket.  My bank account.  Money I

9    saved.  Money I made.

10         Q.    You didn't take any out loans?

11         A.    I think I had a $50,000 line of credit --

12   no, I did not have a $50,000 line of credit at that

13   time.  I ended up getting that because of Covid.  I

14   needed help.  But I didn't qualify for anything because

15   I was 15 days late getting my date -- I had to be

16   incorporated by February 15th and I was February 26th.

17   So, I didn't qualify for any help.  I just paid bills

18   for seven months or whatever it was.  It darn near

19   broke me.

20         Q.    You paid those for seven months and then

21   what happened?

Page 61

1      A.     Yeah, seven months from January when I

2   started buying equipment and paying the lease on the

3   building until July 7th.  I paid bills and bought

4   equipment and had zero revenue, zero dollars coming in

5   and no help.  None.

6          Q.     At the time of incorporation in

7   February 2020, did you look for any technical help in

8   starting up your business?

9          A.     Define technical help.

10         Q.     Did you rely on any -- did you retain

11  anyone to help you incorporate your business?

12         A.     No.

13         Q.     Did you retain anyone to provide you any

14  advice in starting your business?

15         A.     Yes.

16         Q.     Who?

17         A.     An attorney.

18         Q.     Anyone else?

19         A.     No.

20         Q.     How did you find this attorney?

21         A.     Referral from a friend of mine who said he

Mr. Jeffrey Nuziard                    October 3, 2023

                                        Page 62

1    was a great business attorney.

2          Q.    Did you get any entrepreneurial assistance

3    in the start-up phase of your business?

4          A.    What do you mean entrepreneurial

5    assistance?

6          Q.    Business consulting.

7          A.    No, I did not.  Wasn't made available to

8    me.

9          Q.    Management consulting?

10         A.    Wasn't available.

11         Q.    When you say it wasn't available to you --

12         A.    The country was closed down.  The country

13   was closed down.  There was nobody to talk to.

14         Q.    Then in July when you started -- well, did

15   you start seeing patients in July of 2020?

16         A.    I think we had six patients that first

17   month, yeah.  So we started seeing patients in July of

18   2020.

19         Q.    What about for the rest of the year?  Do

20   you have a rough sense of how many patients, customers

21   you had?

1        A.    No, I do not.  You have my books.  I don't

2    know.  I sent them to you -- or to my attorney who I

3    guess sent them to you.  I don't know how many patients

4    I had.  But it wasn't much.  I was losing my butt fast.

5        Q.    How many customers do you typically have

6    per day?

7        A.    When?

8        Q.    At your clinics.

9        A.    When?  Now?

10       Q.    Yeah.

11       A.    I think it varies.  I have had good months

12   and bad months.  I get probably 15 patients to 20

13   patients -- 15 patients a month between both clinics,

14   new patients.

15       Q.    What is your patient fee arrangement?

16             MR. LENNINGTON:  Objection, vague.

17       Q.    Do you understand the question?

18       A.    No.

19       Q.    Okay.  If I go to your clinic for a

20   consultation, how much do you charge?

21       A.    I don't charge anything for consultation.

Mr. Jeffrey Nuziard                    October 3, 2023

Page 64

1         Q.     After a consultation, what happens?

2         A.     If they decide they want the treatment,

3    they pay.  If they decide they do not want treatment,

4    they leave.

5         Q.     What if they decide they want the

6    treatment?  How much do you charge for that?

7         A.     $10,000.

8         Q.     Is that a flat fee?

9         A.     Yes.

10        Q.     Whether you're a man or woman?

11        A.     Whether you're a man or a woman.

12        Q.     What is involved in the treatment?

13        A.     I already explained that.  You asked about

14   the protocol.

15        Q.     So it's the protocol?

16        A.     Yes.

17        Q.     So the protocol, that's the lasers,

18   hormones; is that correct?

19        A.     Yes, that's correct.  Uh-huh.  Shock wave.

20   It's a year-long treatment.

21        Q.     So once you pay that $10,000, you get a

Page 65

1    year-long treatment?

2            A.    Correct.

3            Q.    Of the protocol?

4            A.    That's correct.

5            Q.    Do you come in every month?

6            A.    Every other week.   Every other week.

7            Q.    So what led to the opening of a second

8    location?  Why did you open a second location?

9            A.    Because I wanted to grow.  I wanted to have

10   another spot in that demographic because the

11   demographics were great.  And when I couldn't get help

12   from MBDA, I went and raised some money on my own from

13   some people that I have known, and the contingency was,

14   well, let's make it more than one office and I'm in.

15   So, I raised money to do that.

16           Q.    In terms of start-up costs for that

17   location, how much were the start up costs?

18           A.    Just under 500,000.

19           Q.    The Colleyville location, do you own the

20   building in that location or do you rent?

21           A.    I don't own any real estate at this time.

1      Q.    So that 500,000 in start-up costs, what

2   categories, what did that involve?  What was --

3      A.    Equipment, build-out, the same.

4      Q.    Why was it more than the original start-up

5   costs for the Frisco location?

6      A.    Because the laser costs more money.  I was

7   an employee when I bought the other one.  I got it

8   cheaper.

9      Q.    When you say you were an employee, that's

10   an employee at the medical laser company?

11      A.    Correct.

12      Q.    Did you get any other equipment from the

13   medical laser company to start up your business?

14      A.    No.

15      Q.    The laser for the Colleyville location, did

16   you get that from the medical laser company as well?

17      A.    No, I did not.

18      Q.    When you opened this Colleyville location,

19   did you apply for loans?

20      A.    No, I did not.  In '21, I had secured a

21   line of credit to keep me afloat.

1          Q.     How much was that line of credit you

2     secured in 2021?

3          A.     I think it was 80,000.

4          Q.     Did you apply for any loans in 2020 besides

5     that line of credit?

6          A.     No.  I talked to some bankers, but I wasn't

7     in much of a qualifying position at that point with

8     zero income and a business that could not bring

9     patients in.  A little hard to lend money to that.

10         Q.     Do you remember when you talked to these

11    bankers?

12         A.     No, I do not.

13         Q.     It was after the Frisco location was open

14    though?

15         A.     If it was '21, then obviously, yes.

16         Q.     In 2022, before you opened or in the lead

17    up to opening the Colleyville location, tell me about

18    all the efforts you made to find financing.

19         A.     I'm sorry.  There is an emergency going on

20    in my office.  My phone is blowing up.

21                MR. LENNINGTON:  Do we need to go off the

Page 68

1    record, Jeff?

2                    THE WITNESS:  No.  I just returned the

3    text.

4          A.    Can you repeat the question please?

5          Q.    So in the lead up to the opening of the

6    Colleyville location, talk to me about all the efforts

7    that you made to secure financing for the start-up

8    costs.

9          A.    I raised money through private investors.

10         Q.    Any other efforts?

11         A.    No.  I didn't qualify for any more loans.

12   And I sold my house.

13         Q.    You say you didn't qualify for loans in

14   2022.  What was the reason for that?

15         A.    I have a zero business.  I'm under water.

16   I'm drowning.  I have got an 800 credit score but I'm

17   drowning.

18         Q.    Were you getting a salary from the LLC in

19   2020?

20         A.    No.

21         Q.    At any time in 2021, did you receive a

1    salary from the LLC?

2         A.    Second half of the year when I brought on

3    my first investor.

4         Q.    What was that salary?

5         A.    Like 60,000.

6         Q.    Is that 60,000 a year?

7         A.    Yes, it was set up as 60,000 for six months

8    but it was set up for 60,000 annually.

9         Q.    So approximately $5,000 a month over the

10   course of six months?

11        A.    Yeah.

12        Q.    What about in 2022?

13        A.    When I brought on my other two investors

14   and we expanded the business plan, I am now at 160.

15   After giving away 40 percent of my company.

16        Q.    Didn't you tell me your business is doing

17   well now?

18        A.    No.  I didn't say that at all.  We're

19   losing about 44 -- we're about a $46,000 a month burn

20   rate.

21        Q.    When did you first approach MBDA for

1    assistance of your business?

2         A.    I don't have the exact dates.  It was in --

3    first I looked it up online in -- at the end of '21,

4    beginning of '22, and I don't remember if it was the

5    end of '21 or the beginning of '22.  I kind of feel

6    like it was the -- I don't remember.  I really don't

7    remember.  And I called and I was told that I don't

8    qualify because it's for minorities only.  I'm like,

9    geez, every government place tells me I don't qualify.

10   I'm 15 days late, now you're the wrong color.

11   Physically walked in the office in Fort Worth in --

12   again, I don't have the exact date, it was in '22.  I

13   went like early spring -- I mean, late spring, early

14   summer, somewhere along that line, and was told by the

15   woman at the desk there that I don't qualify either.

16        Q.    Do you have the name of the woman at the

17   desk who told you that?

18        A.    I'm sorry?

19        Q.    Do you have the name of the woman at the

20   desk who told you that?

21        A.    I do not.

1          A.      Charles Jordon.

2          Q.      Can you spell that?

3          A.      C-H-A-R-L-E-S J-O-R-D-A-N -- D-O-N.  Sorry.

4          Q.      In 2022, what were you seeking from the

5    MBDA?  Let me specify.  Let me ask the question

6    differently.  In 2022, what were you seeking from the

7    Dallas Fort Worth Business Center?

8          A.      I was looking for grant opportunities.  I

9    was also looking for some legal advice and business

10   advice on the patent that has -- was taking very, very,

11   very, very, very long time.  And I didn't get anything.

12         Q.      Is this patent pending or has it been

13   issued?

14         A.      Issued now.

15         Q.      When was it issued?

16         A.      About two, three weeks ago at the most.

17   Actually, I think it's going to be issued today.  It

18   was allowed -- everything was allowed three weeks ago.

19   They said it takes two to three weeks for the issuance.

20         Q.      What grant opportunities were you looking

21   for from the Dallas Fort Worth Business Center?

Page 75

1        A.    I'm sorry?  What opportunities?

2        Q.    You mentioned you were looking for grant

3    opportunities.

4        A.    Any research grants or any business grants

5    that could help me because of all the making up I'm

6    trying to do from -- through this whole process.  I

7    wanted to expand and I want to continue to do more

8    research.  I do not have a patent on women yet and that

9    was next.

10        Q.    What do you mean?

11        A.    I only have the patent on erectile

12    dysfunction.  I do not have --

13        Q.    Okay.  Got it.  Did you have any written

14    correspondence with the Dallas Fort Worth Business

15    Center in 2022?

16        A.    Written?  No, never even got -- never even

17    got to put an application in.  They asked me some

18    questions on the phone and I wasn't qualified, because

19    I wasn't a minority, and when I walked in, they asked

20    me some questions and that was even shorter.  They

21    asked me some questions when I walked in and told me I

1        Q.      Did they ask you what industry you were in?

2        A.      They did.

3        Q.      What was your response?

4        A.      Medical.

5        Q.      At the time that you spoke with the Dallas

6   Fort Worth Business Center in 2022, did you mention

7   that you needed help with a patent?

8        A.      When I called or when I walked in?

9        Q.      How about both?  How about when you called?

10       A.      When I called, I said I want some business

11  advice, some legal advice, and I want some

12  opportunities to apply for grants is what I said.  They

13  said, what does the legal advice pertain to?  We don't

14  do criminal.  I said it's business and laughed at them,

15  it's business advice and it's toward the patent that

16  we're trying to get finished that had been in

17  application for quite some time at that point.

18       Q.      Did you mention that in person when you

19  visited?

20       A.      Not to that detail, no.  I said I'm looking

21  -- what I said, I'm looking for legal advice, business

Page 79

1    advice, business growth advice.

2           Q.    What business advice were you looking for

3    in 2022?

4           A.    Growth advice.   Business growth advice.

5    Franchise model.   No franchise model.   I had a lot of

6    questions.   I was looking for a lot of advice.

7           Q.    Tell me some of the questions that you had.

8           A.    The attorney is very expensive.   What?

9           Q.    Tell me some of the questions that you had.

10          A.    I just did.   Should I do a franchise model?

11   Should I just do a license model?   What is a healthy

12   growth status?   Or growth trajectory, I should say.   I

13   had a lot of questions.   My God.   A lot.   I wasn't

14   trying to actively seek out this place because I wanted

15   to go ask them how the weather was.   I had a lot of

16   questions.   A lot of business questions.

17          Q.    After you visited in person, what did you

18   do in terms of getting that business advice?   What

19   actions did you take?

20          A.    I joined a business group called Business

21   Owners Education, BOE, called Business Owners

Mr. Jeffrey Nuziard                                    October 3, 2023

Page 87

1    for any reason to reopen the deposition with the

2    remaining time that we have.  We will do our best to

3    get him wrapped up by 2:00 p.m.

4                    THE WITNESS:  Will I be on the same link

5    that I just clicked on?

6                    MS. TOLLIVER:  Just to clarify, are we

7    scheduling Jeff's follow-up for 3:00 p.m. eastern time?

8                    MR. WOOLLEY:  3:00 p.m. eastern time on

9    Thursday, the 5th.

10                    THE WITNESS:  Thank you.  Appreciate you

11   doing that.

12                    MR. WOOLLEY:  Yes.  So unless there's

13   anything anyone else has to say, we can go off the

14   record and plan on meeting October 5th at 3:00 p.m.

15   eastern and you will get a link.

16                    THE WITNESS:  Perfect.  Okay.

17                    MR. WOOLLEY:  Thank you.

18                    (Deposition suspended at 12:07 p.m.)

19

20

21

1    State of Maryland

2    City of Baltimore, to wit:

3            I, Louisa B. McIntire-Brooks, a Notary

4    Public of the State of Maryland, County of Anne

5    Arundel, do hereby certify that the within-named

6    witness personally appeared before me at the time

7    and place herein set out, and after having been duly

8    sworn by me, according to law, was examined by

9    counsel.

10           I further certify that the examination

11   was recorded stenographically by me and this

12   transcript is a true record of the proceedings.

13           I further certify that I am not of

14   counsel to any of the parties, nor in any way

15   interested in the outcome of this action.

16           As witness my hand and notarial seal

     this 10th day of October, 2023.

17

18

19   *Louisa B. McIntire-Brooks* (signature)

     Louisa B. McIntire-Brooks

20   Notary Public

     My Commission Expires:

21   November 13, 2023

NUZ000001

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Ruth R. Hughs
Secretary of State

## Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

Sexual Wellness Centers of Texas LLC
File Number: 803556066

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Limited Liability Company (LLC) has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 02/25/2020

Effective: 02/26/2020



Ruth R. Hughs
Secretary of State

**Exhibit
MBDA 0002**
Nuziard

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555            Fax: (512) 463-5709            MBDA MSD App. 000206
Prepared by: Elizabeth "Annie" Denton        TID: 10306                    Document: 949912890006

Page 89

1              IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF TEXAS

2                  Fort Worth Division

3

4    JEFFREY NUZIARD, et al.        Case No.

5                                   4:23-CV-00278-P

6            Plaintiffs

7    vs.                            District Judge

8    MINORITY BUSINESS DEVELOPMENT    Mark T. Pittman

9    AGENCY, et al.

10           Defendants

11   _____/

12

13

14           Volume II of the Zoom teleconferenced

15   deposition of JEFFREY NUZIARD was held on Thursday,

16   October 5, 2023, commencing at 3:02 P.M., at virtual

17   location before Louisa B. McIntire-Brooks, Notary

18   Public.

19

20

     Job No. CS6143496

21   REPORTED BY:  Louisa B. McIntire-Brooks

Page 90

```
 1   APPEARANCES:
 2              ON BEHALF OF THE PLAINTIFFS:
                DANIEL P. LENNINGTON, ESQUIRE
 3              CARA M. TOLLIVER, ESQUIRE
                   Wisconsin Institute for Law
 4                 & Liberty, Inc.
                   330 East Kilbourn Avenue
 5                 Milwaukee, Wisconsin 53202
                   Telephone:   410-727-4880
 6                 dan@will-law.org
                   cara@will-law.org
 7
 8              ON BEHALF OF DEPT. OF COMMERCE:
                SAPNA SHARMA, ESQUIRE
 9              SANDRA SODERSTROM, ESQUIRE
                   U.S. Department of Commerce
10                 Office of General Counsel
                   1401 Constitution Avenue, NW
11                 Washington, DC 20230
                   Telephone:  202-482-4772
12                 ssharma@doc.gov
                   ssoderstrom@doc.gov
13
14
15              ON BEHALF OF THE DEPT. OF JUSTICE
                VENDARRYL JENKINS, ESQUIRE
16              CHRISTOPHER WOOLLEY, ESQUIRE
                DAVID REESE, ESQUIRE
17              MILLER FINA, ESQUIRE
                   United States Department of Justice
18                 Civil Rights Division
                   150 M Street, NE, 9th Floor
19                 Washington, DC 20530
                   Telephone:   202-598-1671
20                 vendarryl.jenkins@usdoj.gov
                   christopher.woolley@usdoj.gov
21                 david.reese@usdoj.gov
```

Page 91

1                              INDEX

2                Deposition of:    Jeffrey Nuziard

3                        October 5, 2023

4

5     Examination by:                              Page:

6     Mr. Woolley                                     93

7

8     Exhibit No.                                 Marked:

9     NUZ 2    Equity purchase agreement             104

10

11

12

13

14

15

16

17

18

19

20

21

Page 92

1                           STIPULATION

2              It is stipulated and agreed by and

3    between counsel for the respective parties that the

4    witness may be remotely sworn.

5                           PROCEEDINGS

6    Whereupon,

7                       JEFFREY NUZIARD,

8    called as a witness, having been first duly sworn

9    to tell the truth, the whole truth, and nothing but the

10   truth, was examined and testified as follows:

11             MR. WOOLLEY:  Good morning -- afternoon Mr.

12   Nuziard.  This is Chris Woolley, trial attorney at the

13   Department of Justice.

14             MR. JENKINS:  Vendarryl Jenkins, also trial

15   attorney at the Department of Justice.

16             MR. REESE:  David Reese, also trial

17   attorney at the Department of Justice.

18             MS. SODERSTROM:  Sandra Soderstrom of the

19   Department of Commerce.

20             MS. SHARMA:  Sapna Sharma with the

21   Department of Commerce.

 1          MR. LENNINGTON:  This is Dan Lennington.

 2     I'm attorney for Jeff Nuziard.

 3          EXAMINATION BY MR. WOOLLEY:

 4     Q.    Okay.  Great.  Good to see you again, Mr.

 5     Nuziard.  Since we're conducting the deposition via

 6     Zoom again, I'd like to get an agreement from you on

 7     the same things we agreed on last time.  So, can you

 8     agree not to make a recording of today's deposition?

 9     A.    Yes.

10     Q.    Can you agree to remain on camera whenever

11     we're on the record?

12     A.    Yes.

13     Q.    Where are you located right now?

14     A.    My house in Colleyville, Texas.

15     Q.    Is there anyone else there with you?

16     A.    No.

17     Q.    Can you make sure and let us know

18     immediately if anyone enters the room during the

19     deposition?

20     A.    That would be freaky because nobody is

21     home.

Page 112

1    But please go on.  What we could do is we could order

2    the transcript and then we could start over and you

3    could go take three hours next week because you have

4    already asked all these questions.

5              MR. WOOLLEY:  Dan, I asked about 2022

6    because he said he reached out in 2022.  So, if the

7    questions are repetitive, let him repeat.

8         Q.   What were you seeking in 2023?  Was it the

9    same?  Why don't you just tell me.  What were you

10   seeking in 2023?  What services were you seeking?

11        A.   Same thing I was seeking in 2022.

12        Q.   How do you identify racially?

13        A.   Caucasian.

14        Q.   Do you identify as any other or any ethnic

15   group?

16        A.   No.

17        Q.   Do you identify as any other cultural

18   group?

19        A.   No.

20        Q.   How do you identify in terms of gender?

21        A.   Male.

Page 117

1    giving you detail on it.  I take it with a grain of

2    salt now.  It's the time and age we're living in.

3           Q.     What about in terms of cultural prejudice?

4           A.     In terms of cultural, what do you mean?

5    What's the question?

6           Q.     Have you experienced cultural prejudice at

7    all?

8           A.     Cultural, that's a very vague question.  I

9    don't understand.  I have many friends of all races.

10   So, I don't know.  I don't understand the question.

11          Q.     Okay.  Do you identify with any cultural

12   group other than white?

13          A.     No.  I identify as a strong American and

14   that's mainly what I identify as.  You're the first

15   time somebody has ever asked me how I identify as a

16   race.  Actually that's the very first time I have ever

17   been asked that.

18          Q.     I think you mentioned on Tuesday that your

19   monthly burn rate was, in the business was

20   approximately 47,000 a month.  Is that accurate?

21          A.     That's correct.

Page 118

1      Q.    Is your business losing money currently?

2      A.    Yes.

3      Q.    Was it losing money in 2023 when you

4   reached out to the Dallas Fort Worth Business Center?

5      A.    Yes.

6      Q.    So in terms of the burn rate, what was it

7   back then, if you remember?

8      A.    It was a lot higher of a burn rate.  I

9   don't remember, but -- specifically, but we have come

10  down.  The burn rate has dropped quite a bit.

11     Q.    So in terms of the current burn rate of

12  47,000 a month, how long is that sustainable would you

13  say?

14     A.    Probably another year.

15     Q.    And then what will happen if that burn rate

16  doesn't go down in a year?

17     A.    I'll have to shut the door.

18     Q.    You mentioned on Tuesday you got an

19  honorary Ph.D.  Do you remember that?

20     A.    Yes.

21     Q.    When was it awarded to you?

1          A.     2017.

2          Q.     From what institution?

3          A.     University of North Texas.

4          Q.     Where did you get your BA from?

5          A.     Liberty University.

6          Q.     What was the year that degree was awarded

7      to you?

8          A.     That was awarded in May of 2017 as well.

9          Q.     In terms of your military service, you said

10     you left your service as an E-4; is that right?

11         A.     I left the service -- oh, yes.  Yes.

12         Q.     Is that the rank that's stated on your

13     DD214?

14         A.     I don't know.  I have my DD214 right here.

15         Q.     Okay.

16         A.     I lists E-4.

17         Q.     In terms of all the businesses that you

18     started, I just want to make sure I have the complete

19     list.  The Financial Group, that was a business you

20     started; is that right?

21         A.     That's correct.

1   of your colleagues, it will be readily apparent that

2   this question and the answer is completely irrelevant

3   and a waste of the government's time, and frankly

4   describes and manifests the government's treatment of

5   this witness in a deposition the same way that they're

6   treating him with regard to his race.  It's completely

7   inappropriate, it has nothing to do with qualifications

8   at the MBDA in 2023 and all of my objections have been

9   stated on the record.

10          MR. WOOLLEY:  Thank you.

11      Q.   Mr. Nuziard, is there anything you want to

12  change about your testimony today?

13      A.   No.

14          MR. WOOLLEY:  Well, that's it.  Unless you

15  guys have any questions.

16          MR. LENNINGTON:  No.  We're concluded.

17  Thank you.

18          (Deposition concluded at 4:06 p.m.)

19

20

21

Page 126

1   State of Maryland

2   City of Baltimore, to wit:

3           I, Louisa B. McIntire-Brooks, a Notary

4   Public of the State of Maryland, County of Anne

5   Arundel, do hereby certify that the within-named

6   witness personally appeared before me at the time

7   and place herein set out, and after having been duly

8   sworn by me, according to law, was examined by

9   counsel.

10           I further certify that the examination

11   was recorded stenographically by me and this

12   transcript is a true record of the proceedings.

13           I further certify that I am not of

14   counsel to any of the parties, nor in any way

15   interested in the outcome of this action.

             As witness my hand and notarial seal

16   this 12TH day of October, 2023.

17

18

19   *Louisa B. McIntire-Brooks*

     Louisa B. McIntire-Brooks

20   Notary Public

     My Commission Expires:

21   November 13, 2023

Publication: Colo Spgs Gazette; Date: Sep 25, 1995; Section: CITY/STATE; Page: 1



# School chief investigated again/ Second Chance teen allegedly struck by Nuziard

**Rosemary Harris; Gazette Telegraph**

El Paso County sheriff's officials are investigating new complaints of child abuse and assault against Jeff Nuziard, the founder/director of Second Chance Ministries, a Christian school for troubled boys.

Sheriff's Sgt. William Claspell said witnesses reported to deputies that Nuziard punched a 16-year-old student from Denver last Wednesday, blackening his eye, swelling his face and bruising his ear.

Formal charges of misdemeanor child abuse, third-degree assault and misdemeanor menacing are pending a 4th Judicial District Attorney's Office review, Claspell said.

The boy, whose name was not released, was treated at a local hospital Saturday.

Nuziard, who on Sunday said he had returned from vacationing in New Mexico to address the complaints, had little comment. "There have been many, many complaints," he said. "I have no comment on this one."

A year ago, state and local authorities raided and then closed the small, rural school near Calhan, saying it was unlicensed and that the staff had physically abused some of the 12 boys enrolled there and had detained others in handcuffs.

None of those charges was ever proven, however, and the Colorado Attorney General's Office later said the raid should not have occurred.

District Attorney John Suthers eventually charged Nuziard with misdemeanor child abuse in connection with the paddling of a student in December. Nuziard was given deferred prosecution in an agreement that put the case on hold for two years. The agreement mandates that the case could be reopened if Nuziard is convicted of any criminal wrongdoing during that time, with the exception of minor traffic offenses.

If the District Attorney's Office decides to pursue the new charges, it could also reopen prosecution on the old charge, a Sheriff's Office spokesman said.

Law enforcement officials would not reveal the events leading up to the latest allegation against Nuziard.

The alleged incident came to light when the parents of one student visited the school Saturday and found the Denver boy injured. The parents, Susie and Kenneth McCoy of Colorado Springs, notified sheriff's deputies, who arrived at the school about 5:30 p.m. Saturday. As they neared the 194-acre school site, deputies said they spotted a school van carrying nine students - including the alleged victim - driving away.

They stopped the van, and the injured boy was taken into protective custody by the Department of Social Services. He was treated at Memorial Hospital and released, Claspell said. Late Sunday, he

was reportedly back in Denver with his father.

Other students told deputies they had witnessed the beating and later took pictures of the injured boy. The film was turned over to deputies.

On Sunday, Nuziard said the school was still open, but he would not say how many students were still enrolled.

Just last month, the school reopened with 13 students and hosted a celebration attended by 250 people.

Nuziard said then that the school would continue to mix physical labor, tough discipline and a rigorous, Christian-based curriculum.

@CUTLINE: Gazette Telegraph - Second Chance Ministries, a school for troubled boys near Calhan, describes its Christian-based curriculum as mixing physical labor and tough discipline.

@CUTLINE: Nuziard: Given deferred prosecution last year.

Print

MBDA MSJ App. 00219

Publication: Colo Spgs Gazette; Date: Sep 27, 1995; Section: A SECTION; Page: 6



## Nuziard is cited in assault/ Summons alleges attack on student

**Teresa Owen-Cooper; Gazette Telegraph**

The founder and former director of a Christian school for troubled boys was cited Tuesday with third-degree misdemeanor assault in connection with the beating and kicking of a 16-year-old student last week, officials said.

The legal action came a day after the board members of Second Chance Ministries accepted the resignation of school director Jeff Nuziard and closed down the Calhan-based boarding school. Board members said Tuesday they took the action because they had lost faith in Nuziard.

Nuziard was cited in October 1994 for misdemeanor child abuse in connection with a December 1993 paddling of a 15-year-old boy that left welts and bruises on his body.

"There was a concern that there is even an issue again," said board member Mike Ewoldt, who is a pastor of Storehouse Church in Hattiesburg, Miss. "I think, obviously, there were concerns or the allegations never would have been brought. The sad part of it is it creates suspicion. From the ministry side, it does the same thing. It puts everyone on edge."

The summons served Tuesday on Nuziard - through his attorney Greg Walta - alleges the school director punched and kicked a 16-year-old student in the face Sept. 20, officials said.

On Saturday, El Paso County sheriff's deputies were called to the school when a visiting parent discovered a boy with a black eye and swollen face. Later, other students told deputies they saw Nuziard assault the boy and took pictures of his injuries. The injured boy was taken into protective custody Saturday, treated at Memorial Hospital and released to his father.

If convicted of the latest charge, Nuziard faces from six months to two years in jail. His first appearance in county court is 9 a.m. Oct. 19.

The latest legal action also means that the previous case against Nuziard will be reopened, District Attorney John Suthers said Tuesday. The school's founder had agreed to a deferred prosecution in the 1994 child-abuse case. That agreement put the case on hold for two years, provided that Nuziard avoided other criminal charges.

Second Chance became a cause celebre among some people in El Paso County when it was raided and closed by authorities in August 1994 after allegations of physical abuse against some of the students. The state also said the school needed to be licensed. The raid sparked outrage among the school's supporters, who saw it as government intrusion on religion and accused local officials of overreacting.

The licensing issue was resolved in an agreement with the state. And although the District Attorney's Office said it had substantiated many of the child-abuse allegations, only Nuziard was charged in the paddling incident.

Since then, Second Chance officials have filed a lawsuit against county officials, claiming they were harassed and their rights violated. And in April, Second Chance reopened, combining Christian-

based curriculum, physical labor, Bible study, a tough exercise regimen and paddling as punishment. Officials said the approach was successful in reaching the troubled students. Many of the 13 students attending the school at the time of the latest closure are former gang members with criminal records, school officials have said.

Nuziard didn't return telephone calls Tuesday, and his attorney declined comment.

Board members said they were not sure whether they would open another school.

"I'm sure it's pretty far down the road," said board member Russ Walker, who also works at New Life Church in Colorado Springs, where Second Chance students worshiped. "It's a concept we believe in, but the reality of it - I'm not sure if it would work."

Walker said the board's decision to accept Nuziard's resignation and immediately close the school was "heart-grueling."

"I think there is a definite need for that type of ministry," he said. "The boys were very successful in turning their lives around. My regrets are that the reputation and integrity of the ministry have been tarnished."

When the allegations arose last year, board members said, they stood behind Nuziard because they believed he had done nothing wrong.

"Allegations can be made against anyone," board member Ewoldt said.

But now that similar allegations have arisen, board members said, it's too difficult to trust Nuziard.

"We need someone who has the maturity and expertise to handle the special kind of program," said board member and local psychologist John Rodwick, adding that the school had other troubles but declining to elaborate.

"Right now, we don't see anyone available. There is no question there has to be a toughness, someone who has the loving concern and at the same time the ability to control their own frustrations. That was a real concern to us."

Board members also pointed out that an agreement reached with the Colorado Attorney General's Office last year prohibits anyone, including Nuziard, from working at Second Chance if convicted of child abuse.

"If, in fact, the allegations are true, then he could no longer be director," Walker said.

The 194-acre ranch where the school was located is owned by Nuziard and was leased to the school's nonprofit parent organization, Second Chance Ministries, run by seven board members. The nonprofit organization will remain intact, as board member try to help students find programs to continue their education and rehabilitation. Also, board members will be responsible for dealing with any financial or legal issues after the school's closing.

CHRONOLOGY

Key dates in the controversy over Second Chance Ministries:

November 1993: Second Chance opens four miles southeast of Calhan on a 194-acre ranch.

Early 1994: Second Chance founder Jeff Nuziard notifies officials that three students had beaten another student. The attackers are convicted of third-degree assault and sentenced to jail. Authorities claim child neglect because of the incident.

April 12, 1994: The Colorado Department of Human Services orders the school to close because it isn't licensed. Second Chance responds April 18, saying it is a religious school and therefore exempt from state-licensing guidelines.

Aug. 29, 1994: Twenty-two law enforcement and social services authorities raid and close Second Chance amid allegations that the students were being physically abused and the school wasn't licensed.

October 1994: The Colorado Attorney General's Office withdraws its contention that Second Chance must be licensed and reaches an agreement that requires, among other things, that Second Chance develop a disciplinary policy.

Also, the District Attorney's Office substantiates many of the child abuse allegations but files only one criminal charge - against director Nuziard. The District Attorney's Office said the alleged victims, their parents and witnesses refused to cooperate with authorities. The one charge: misdemeanor child abuse, stemming from a December 1993 paddling of a student that left the boy with welts and bruises.

December 1994: Nuziard agrees to a deferred prosecution, meaning that the case would be put on hold for two years provided that Nuziard avoided other criminal charges.

April 1995: Second Chance reopens.

Sept. 20: A 16-year-old student reportedly is beaten and kicked in the face.

Sept. 25: Nuziard resigns, and Second Chance's board of directors close the school immediately.

Sept. 26: Nuziard is served a summons alleging third-degree misdemeanor assault.

@QUOTE: "My regrets are that the reputation and integrity of the ministry have been tarnished." Second Chance Ministries' Russ Walker

Print

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JEFFREY NUZIARD, *et al.*, | Case No. 4:23-cv-00278-P |
| Plaintiff, | District Judge Mark T. Pittman |
| v. | |
| MINORITY BUSINESS DEVELOPMENT AGENCY, *et al.*, | |
| Defendants. | |

**DECLARATION OF MARGO POSEY**
_____

I, MARGO POSEY, pursuant to 28 U.S.C. § 1746, hereby declare:

1.      I am the President and CEO of the Dallas Fort Worth Minority Supplier Development Council.  I have been President and CEO of the Dallas Fort Worth Minority Supplier Development Council since December 1, 1992.

2.      In 2021, after winning a competitive bid process, the Dallas Fort Worth Minority Supplier Development Council entered into a cooperative agreement with the Minority Business Development Agency.

3.      Under this cooperative agreement the MBDA agreed to provide funding to the Dallas Fort Worth Minority Supplier Development Council to operate the MBDA Business Center Dallas Fort Worth.

4.      In determining whether to accept a business as a client, one of the MBDA Business Center Dallas Fort Worth  requirements, posted on our website, is that the business

have "sustainable, stable & consistent revenue." The Center established this requirement in accordance with guidance from the Notice of Funding Opportunity issued by MBDA for the Business Center Program.  In looking at whether a client meets this factor, Center staff evaluates the potential client's business model, revenue, losses and income to ensure that the client is a good fit and can benefit from the services offered.

5.     If the Center determines that the business does not have a sustainable business model, the Center will not offer client services to that business. The inability of a business to meet the financial requirements to qualify for business loans or financing is a factor showing the business does not have a sustainable business model.

6.     The Business Center reserves the right to deny service to an applicant if, in the Business Center's reasonable judgment, the applicant appears it may pose a danger to Business Center staff, employees or the community at-large based upon past or present criminal activities discovered by the Business Center.

7.     If the Business Center determines that the business is a good fit for client services, the MBDA Business Center Dallas Fort Worth staff members provide business consulting services. Such services include assistance with packaging financial documents for loan programs, international trade consulting, and contract bid preparation support. However, the MBDA Business Center Dallas Fort Worth staff does not provide legal advice on patents, nor do we provide advice on business franchising or licensing.  The MBDA Business Center Dallas Fort Worth does not provide direct grants or loans or any direct transfer of money to clients.

8.     After reviewing the MBDA Business Center Dallas Fort Worth records, to the best of my knowledge and belief, Jeffrey Nuziard never contacted the MBDA Business Center Dallas Fort Worth.

MBDA MSJ App. 00224

I declare under penalty of perjury that the foregoing is true and correct.


_____                         10/24/2023
              Signature                                   _____
                                                                      Date

MBDA MSJ App. 00225

JEFFREY L. NUZIARD

# Schedule K-1 (Form 1120-S)

**2020**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0123

☐ Final K-1   ☐ Amended K-1

For calendar year 2020, or tax
year beginning **FEBRUARY 25, 2020**
ending **DECEMBER 31, 2020**

**Shareholder's Share of Income, Deductions, Credits, etc.** ▶ See separate instructions.

## Part I — Information About the Corporation

**A** Corporation's employer identification number

**B** Corporation's name, address, city, state, and ZIP code

**SEXUAL WELLNESS CENTERS OF TEXAS LLC**

**C** IRS Center where corporation filed return
**E-FILE**

## Part II — Information About the Shareholder

**D** Shareholder's identifying number

**E** Shareholder's name, address, city, state, and ZIP code

**JEFFREY L. NUZIARD**

**F** Current year allocation percentage ... **100.000000** %

**G** Shareholder's number of shares
Beginning of tax year ............... **100.00**
End of tax year ..................... **100.00**

**H** Loans from shareholder
Beginning of tax year ........... $ _____
End of tax year .................. $ _____

**For IRS Use Only**

## Part III — Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items

| | | |
|---|---|---|
| 1 Ordinary business income (loss) **-257,807.** | 13 | Credits |
| 2 Net rental real estate inc (loss) | | |
| 3 Other net rental income (loss) | | |
| 4 Interest income | | |
| 5a Ordinary dividends | | |
| 5b Qualified dividends | 14 | Foreign transactions |
| 6 Royalties | | |
| 7 Net short-term capital gain (loss) | | |
| 8a Net long-term capital gain (loss) | | |
| 8b Collectibles (28%) gain (loss) | | |
| 8c Unrecaptured sec 1250 gain | | |
| 9 Net section 1231 gain (loss) | | |
| 10 Other income (loss) | 15 | Alternative min tax (AMT) items |
| 11 Section 179 deduction | 16 Items affecting shareholder basis **C\*** **4,558.** | |
| 12 Other deductions | | |
| | 17 Other information **V \*** STMT | |
| | **AC\*** STMT | |

18 ☐ More than one activity for at-risk purposes*
19 ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

011271 11-19-20   LHA   For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.   www.irs.gov/Form1120S   Schedule K-1 (Form 1120-S) 2020

1

MBDA MSJ App. 00226   1
2020.06000 SEXUAL WELLNESS O NUZIARD1

## SCHEDULE K-1           NONDEDUCTIBLE EXPENSES, BOX 16, CODE C

| DESCRIPTION | AMOUNT | SHAREHOLDER FILING INSTRUCTIONS |
|---|---|---|
| EXCLUDED MEALS EXPENSES | 4,558. | SEE SHAREHOLDERS INSTRUCTIONS |
| TOTAL | 4,558. | |

## SCHEDULE K-1       SECTION 199A ADDITIONAL INFORMATION

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF THE QUALIFIED
BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 17,
UNDER CODE V. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF
QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND
LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL
DISCLOSURE STATEMENT.

## SCHEDULE K-1                SECTION 199A ITEMS, BOX 17
### CODE V

| DESCRIPTION | AMOUNT |
|---|---|
| TRADE OR BUSINESS | |
| ORDINARY INCOME(LOSS) | -257,807. |
| W-2 WAGES | 25,900. |
| UNADJUSTED BASIS | 80,283. |

## SCHEDULE K-1 GROSS RECEIPTS FOR SECTION 448(C), BOX 17, CODE AC

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS - CURRENT YEAR | 131,000. |

**Schedule K-1**
**(Form 1120-S)**

**2021**

Department of the Treasury
Internal Revenue Service

For calendar year 2021, or tax
year beginning _____
ending _____

| | Final K-1 | Amended K-1 | OMB No. 1545-0123 |

**Shareholder's Share of Income, Deductions,
Credits, etc.** ► See separate instructions.

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| **Part I** | **Information About the Corporation** |
|---|---|

**A** Corporation's employer identification number

**B** Corporation's name, address, city, state, and ZIP code

SEXUAL WELLNESS CENTERS OF TEXAS LLC

**C** IRS Center where corporation filed return
E-FILE

**D** Corporation's total number of shares
Beginning of tax year ............... 100.00
End of tax year ............... 100.00

| **Part II** | **Information About the Shareholder** |
|---|---|

**E** Shareholder's identifying number

**F** Shareholder's name, address, city, state, and ZIP code

JEFFREY NUZIARD

**G** Current year allocation percentage       100.000000 %

**H** Shareholder's number of shares
Beginning of tax year ............... 100.00
End of tax year ............... 100.00

**I** Loans from shareholder
Beginning of tax year ............ $ _____
End of tax year ............... $ _____

| 1 | Ordinary business income (loss) -66,245. | 13 | Credits |
|---|---|---|---|
| 2 | Net rental real estate inc (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Schedule K-3 is attached if checked ► |
| 6 | Royalties | 15 | Alternative min tax (AMT) items |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) -6,000. | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured sec 1250 gain | | |
| 9 | Net section 1231 gain (loss) | 16 | Items affecting shareholder basis |
| 10 | Other income (loss) | | |
| | | 17 V | Other information * STMT |
| 11 | Section 179 deduction | AC | * STMT |
| 12 | Other deductions | | |
| | | 18 | More than one activity for at-risk purposes* |
| | | 19 | More than one activity for passive activity purposes* |
| | | | *See attached statement for additional information. |

For IRS Use Only

111271
11-18-21    **LHA   For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.**    www.irs.gov/Form1120S    **Schedule K-1 (Form 1120-S) 2021**

1

---

SCHEDULE K-1          SECTION 199A ADDITIONAL INFORMATION

---

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF THE QUALIFIED
BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 17,
UNDER CODE V. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF
QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND
LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL
DISCLOSURE STATEMENT.

---

SCHEDULE K-1                    SECTION 199A ITEMS, BOX 17
                                        CODE V

---

| DESCRIPTION | AMOUNT |
|---|---|
| TRADE OR BUSINESS | |
| ORDINARY INCOME(LOSS) | -66,245. |
| W-2 WAGES | 121,312. |
| UNADJUSTED BASIS | 80,283. |

---

SCHEDULE K-1 GROSS RECEIPTS FOR SECTION 448(C), BOX 17, CODE AC

---

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS - CURRENT YEAR | 712,276. |

JEFFREY NUZIARD

## Schedule K-1
## (Form 1120-S)

Department of the Treasury
Internal Revenue Service

# 2022

☐ Final K-1     ☐ Amended K-1     OMB No. 1545-0123

For calendar year 2022, or tax

year beginning _____

ending _____

## Shareholder's Share of Income, Deductions, Credits, etc.  See separate instructions.

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| **1** | Ordinary business income (loss) −676,349. | **13** | Credits |
| **2** | Net rental real estate inc (loss) | | |
| **3** | Other net rental income (loss) | | |
| **4** | Interest income 3,084. | | |
| **5a** | Ordinary dividends | | |
| **5b** | Qualified dividends | **14** | Schedule K-3 is attached if checked .......... ☐ |
| **6** | Royalties | **15** | Alternative min tax (AMT) items |
| **7** | Net short-term capital gain (loss) | | |
| **8a** | Net long-term capital gain (loss) | | |
| **8b** | Collectibles (28%) gain (loss) | | |
| **8c** | Unrecaptured sec 1250 gain | | |
| **9** | Net section 1231 gain (loss) | **16** | Items affecting shareholder basis |
| **10** | Other income (loss) | | |

### Part I    Information About the Corporation

**A** Corporation's employer identification number

▮▮▮▮▮▮▮▮▮

**B** Corporation's name, address, city, state, and ZIP code

SEXUAL WELLNESS CENTERS OF TEXAS LLC

▮▮▮▮▮▮▮▮▮     ▮▮▮▮▮▮

**C** IRS Center where corporation filed return
E-FILE

**D** Corporation's total number of shares

Beginning of tax year ............... 100.00

End of tax year ..................... 100.00

### Part II    Information About the Shareholder

**E** Shareholder's identifying number

▮▮▮▮▮▮▮▮

**F** Shareholder's name, address, city, state, and ZIP code

JEFFREY NUZIARD

▮▮▮▮▮▮▮▮▮▮▮

**G** Current year allocation percentage ...... 65.000000 %

**H** Shareholder's number of shares

Beginning of tax year ................ 65.00

End of tax year ...................... 65.00

**I** Loans from shareholder

Beginning of tax year ........... $ _____

End of tax year .................. $ _____

| | | | |
|---|---|---|---|
| | | **17 A** | Other information 3,084. |
| **11** | Section 179 deduction | **V** | *          STMT |
| **12 A** | Other deductions 113. | **AC** | *          STMT |

| | |
|---|---|
| **18** | More than one activity for at-risk purposes* |
| **19** | More than one activity for passive activity purposes* |
| | *See attached statement for additional information. |

For IRS Use Only

MBDA MSJ App. 00235          1

2022.03000 SEXUAL WELLNESS CENTERS O NUZIARD1

SCHEDULE K-1          SECTION 199A ADDITIONAL INFORMATION

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF THE QUALIFIED
BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 17,
UNDER CODE V. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF
QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND
LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL
DISCLOSURE STATEMENT.

SCHEDULE K-1          SECTION 199A ITEMS, BOX 17
                                  CODE V

| DESCRIPTION | AMOUNT |
|---|---|
| TRADE OR BUSINESS | |
| ORDINARY INCOME(LOSS) | -676,349. |
| W-2 WAGES | 309,302. |
| UNADJUSTED BASIS | 325,906. |

SCHEDULE K-1 GROSS RECEIPTS FOR SECTION 448(C), BOX 17, CODE AC

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS - CURRENT YEAR | 612,502. |

SCHEDULE K-1          SCHEDULE K-3 NOTIFICATION

THE SCHEDULE K-3 HAS NOT BEEN PREPARED FOR YOU. YOU WILL NOT
RECEIVE A COPY OF THE SCHEDULE UNLESS YOU REQUEST ONE.

**Schedule K-1
(Form 1120-S)**

**2022**

Department of the Treasury
Internal Revenue Service

For calendar year 2022, or tax
year beginning _____
ending _____

Final K-1 ☐    Amended K-1 ☐    OMB No. 1545-0123

**Part III    Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items**

| | | |
|---|---|---|
| **1** Ordinary business income (loss)  −208,107. | **13** Credits | |
| **2** Net rental real estate inc (loss) | | |
| **3** Other net rental income (loss) | | |
| **4** Interest income  948. | | |
| **5a** Ordinary dividends | | |
| **5b** Qualified dividends | **14** Schedule K-3 is attached if checked ☐ | |
| **6** Royalties | **15** Alternative min tax (AMT) items | |
| **7** Net short-term capital gain (loss) | | |
| **8a** Net long-term capital gain (loss) | | |
| **8b** Collectibles (28%) gain (loss) | | |
| **8c** Unrecaptured sec 1250 gain | | |
| **9** Net section 1231 gain (loss) | **16** Items affecting shareholder basis | |
| **10** Other income (loss) | | |

**Shareholder's Share of Income, Deductions, Credits, etc.**    See separate instructions.

**Part I    Information About the Corporation**

**A** Corporation's employer identification number

███████████

**B** Corporation's name, address, city, state, and ZIP code

**SEXUAL WELLNESS CENTERS OF TEXAS LLC**

███████████

**C** IRS Center where corporation filed return
**E-FILE**

**D** Corporation's total number of shares
Beginning of tax year ............ 100.00
End of tax year ............ 100.00

**Part II    Information About the Shareholder**

**E** Shareholder's identifying number
███████████

**F** Shareholder's name, address, city, state, and ZIP code

**JOHNETTE VAN EEDEN**
███████████

**G** Current year allocation percentage  20.000000 %

**H** Shareholder's number of shares
Beginning of tax year ............ 20.00
End of tax year ............ 20.00

**I** Loans from shareholder
Beginning of tax year ...... $ _____
End of tax year ............ $ _____

| | | |
|---|---|---|
| **17** Other information | | |
| A  948. | | |
| **11** Section 179 deduction | V  *    STMT | |
| **12** Other deductions  A  35. | AC  *    STMT | |
| **18** More than one activity for at-risk purposes* | | |
| **19** More than one activity for passive activity purposes* | | |

*See attached statement for additional information.

For IRS Use Only

211271
12-07-22    **LHA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.**    www.irs.gov/Form1120S    **Schedule K-1 (Form 1120-S) 2022**

SCHEDULE K-1            SECTION 199A ADDITIONAL INFORMATION

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF THE QUALIFIED
BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 17,
UNDER CODE V. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF
QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND
LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL
DISCLOSURE STATEMENT.

SCHEDULE K-1                    SECTION 199A ITEMS, BOX 17
                                         CODE V

| DESCRIPTION | AMOUNT |
|---|---|
| TRADE OR BUSINESS | |
| ORDINARY INCOME(LOSS) | -208,107. |
| W-2 WAGES | 95,170. |
| UNADJUSTED BASIS | 100,279. |

SCHEDULE K-1 GROSS RECEIPTS FOR SECTION 448(C), BOX 17, CODE AC

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS - CURRENT YEAR | 188,462. |

SCHEDULE K-1                    SCHEDULE K-3 NOTIFICATION

THE SCHEDULE K-3 HAS NOT BEEN PREPARED FOR YOU. YOU WILL NOT
RECEIVE A COPY OF THE SCHEDULE UNLESS YOU REQUEST ONE.

**Schedule K-1**
**(Form 1120-S)**
Department of the Treasury
Internal Revenue Service

For calendar year 2022, or tax
year beginning _____
ending _____

# 2022

Final K-1 ☐   Amended K-1 ☐   OMB No. 1545-0123

**Shareholder's Share of Income, Deductions, Credits, etc.** See separate instructions.

| Part III | Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) −156,081. | 13 | Credits |
| 2 | Net rental real estate inc (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income 712. | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Schedule K-3 is attached if checked ☐ |
| 6 | Royalties | 15 | Alternative min tax (AMT) items |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured sec 1250 gain | | |
| 9 | Net section 1231 gain (loss) | 16 | Items affecting shareholder basis |
| 10 | Other income (loss) | | |

| Part I | Information About the Corporation |
|---|---|

**A** Corporation's employer identification number

**B** Corporation's name, address, city, state, and ZIP code

SEXUAL WELLNESS CENTERS OF TEXAS LLC

**C** IRS Center where corporation filed return
E-FILE

**D** Corporation's total number of shares
Beginning of tax year .............. 100.00
End of tax year ....................... 100.00

| Part II | Information About the Shareholder |
|---|---|

**E** Shareholder's identifying number

**F** Shareholder's name, address, city, state, and ZIP code

THOMAS COUTURE

**G** Current year allocation percentage 15.000000 %

**H** Shareholder's number of shares
Beginning of tax year 15.00
End of tax year ....................... 15.00

**I** Loans from shareholder
Beginning of tax year ............. $ _____
End of tax year ................... $ _____

| | | | |
|---|---|---|---|
| | | 17 A | Other information 712. |
| 11 | Section 179 deduction | V | * STMT |
| 12 A | Other deductions 26. | AC | * STMT |

For IRS Use Only

| | |
|---|---|
| 18 | More than one activity for at-risk purposes* |
| 19 | More than one activity for passive activity purposes* |

*See attached statement for additional information.

211271
12-07-22   LHA   **For Paperwork Reduction Act Notice, see the Instructions for Form 1120-S.**   www.irs.gov/Form1120S   **Schedule K-1 (Form 1120-S) 2022**

---

SCHEDULE K-1          SECTION 199A ADDITIONAL INFORMATION

---

THE SECTION 199A AMOUNTS TO BE USED IN THE CALCULATION OF THE QUALIFIED
BUSINESS INCOME DEDUCTION ON YOUR 1040/1041 RETURN ARE REPORTED ON LINE 17,
UNDER CODE V. PLEASE CONSULT YOUR TAX ADVISOR REGARDING THE CALCULATION OF
QUALIFIED BUSINESS INCOME DEDUCTION, INCLUDING THE POSSIBLE AGGREGATIONS AND
LIMITATIONS THAT MAY APPLY AND THE FILING OF THE 1.199A-4(C)(2)(I) ANNUAL
DISCLOSURE STATEMENT.

---

SCHEDULE K-1                    SECTION 199A ITEMS, BOX 17
                                       CODE V

---

| DESCRIPTION | AMOUNT |
|---|---|
| | |
| TRADE OR BUSINESS | |
| | |
|    ORDINARY INCOME(LOSS) | -156,081. |
|    W-2 WAGES | 71,377. |
|    UNADJUSTED BASIS | 75,209. |

---

SCHEDULE K-1 GROSS RECEIPTS FOR SECTION 448(C), BOX 17, CODE AC

---

| DESCRIPTION | AMOUNT |
|---|---|
| GROSS RECEIPTS - CURRENT YEAR | 141,346. |

---

SCHEDULE K-1                    SCHEDULE K-3 NOTIFICATION

---

THE SCHEDULE K-3 HAS NOT BEEN PREPARED FOR YOU. YOU WILL NOT
RECEIVE A COPY OF THE SCHEDULE UNLESS YOU REQUEST ONE.