### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| JEFFREY NUZIARD, *et al.*, | Case No. 4:23-cv-00278-P |
| Plaintiff, | District Judge Mark T. Pittman |
| v. | |
| MINORITY BUSINESS DEVELOPMENT AGENCY, *et al.*, | |
| Defendants. | |

### DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   EACH PLAINTIFF LACKS STANDING AS A MATTER OF LAW ............................. 2

    A.   Plaintiffs Have Not Established Injury-in-Fact........................................................ 3

        1.   The Able and Ready Standard Governs Standing....................................... 3

        2.   Plaintiffs Cannot Manufacture Injury By Mischaracterizing the MBDA
Act ……………………………………………………………………………...5

        3.   Plaintiffs Do Not Meet Their Business Centers' Race-Neutral
Requirements ................................................................................................ 8

            a.   Nuziard Did Not Meet the Race-Neutral Requirements of the
Dallas-Fort Worth Business Center .................................................. 8

            b.   Bruckner Did Not Meet the Race Neutral Requirements of the
Orlando Business Center.................................................................. 10

            c.   Piper Suffered No Injury-In-Fact................................................... 12

    B.   Plaintiffs Have Created No Factual Disputes On Lack of Causation and
Redressability.......................................................................................... 13

III.  THE MBDA ACT IS SUPPORTED BY A COMPELLING INTEREST AND IS
NARROWLY TAILORED ............................................................................... 18

    A.   The MBDA Act is Supported by a Compelling Interest......................................... 18

    B.   The MBDA Act And Regulations Are Narrowly Tailored................................. 25

IV.   A PERMANENT NATIONWIDE INJUNCTION IS INAPPROPRIATE .................... 27

V.    CONCLUSION................................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adarand Constructors, Inc. v. Slater*,
   228 F.3d 1147 (10th Cir. 2000) ............................................................................. 20

*Allen v. Wright*,
   468 U.S. 737 (1984) ............................................................................................... 13

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................... 14

*Bernabe v. Rosenbaum*,
   No. 21-10396, 2023 WL 181099 (5th Cir. Jan. 13, 2023) ...................................... 2

*Bruckner v. Biden*,
   No. 8:22-CV-1582-KKM-SPF, 2023 WL 2744026 (M.D. Fla. Mar. 31, 2023) ........ 4

*Builders Ass'n of Greater Chicago v. Cnty of Cook*,
   256 F.3d 642 (7th Cir. 2001) .................................................................................. 22

*Carr v. Alta Verde Industries, Inc.*,
   931 F.2d 1055 (5th Cir. 1991) ................................................................................ 11

*Carroll v. Nakatani*,
   342 F.3d 934 (9th Cir. 2003) .................................................................................. 12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................... 10

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ............................................................................... 18, 21, 22

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................... 12

*Concrete Works of Colo., Inc. v. Denver*,
   321 F.3d 950 (10th Cir. 1994) ................................................................................ 20

*Day v. Bond*,
   500 F.3d 1127 (10th Cir. 2007) ................................................................ 13, 15, 16

*Dean v. City of Shreveport*,
   438 F.3d 448 (5th Cir. 2006) ................................................................... 18, 25

*Ex parte Levitt*,
302 U.S. 633 (1937) .................................................................................... 5

*Frothingham v. Mellon*,
262 U.S. 447 (1923) .................................................................................... 5

*Greer's Ranch Cafe v. Guzman*,
540 F. Supp. 3d 638 (N.D. Tex. 2021) ...................................................... 4

*Hardre v. Markey*,
No. 20-CV-03594-PAB-KMT, 2021 WL 1541714 (D. Colo. Apr. 19, 2021) ........................ 13

*Inclusive Communities Project, Inc. v. Dep't of Treasury*,
946 F.3d 649 (5th Cir. 2019) ............................................................... 8, 14

*Kitty Hawk Aircargo, Inc. v. Chao*,
418 F.3d 453 (5th Cir. 2005) .................................................................. 15

*Kossman Contracting, Co. v. City of Houston*,
*H-14-1203*, 2016 WL 11473826 (S.D. Tex. Feb. 17, 2016) .................................... 21

*Liu v. Mayorkas*,
588 F. Supp. 3d 43 (D.D.C. 2022) ........................................................... 17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 3, 5, 12

*Marouf v. Azar*,
391 F. Supp. 3d 23 (D.D.C. 2021) ........................................................... 14

*McLemore v. Hosemann*,
414 F. Supp. 3d 876 (S.D. Miss. 2019) ..................................................... 14

*Mock v. Garland*,
2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) ............................................... 27

*Moore v. Bryant*,
853 F.3d 245 (5th Cir. 2017) ..................................................................... 5

*Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville*,
508 U.S. 656 (1993) .................................................................................... 4

*Nuziard v. Minority Bus. Dev. Agency*,
No. 4:23-CV-0278-P, 2023 WL 3869323 (N.D. Tex. June 5, 2023).................................. 2, 3

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*
653 F.3d 290 (3d Cir. 2011) ..................................................................... 11

*Richoux v. Armstrong Cork Corp.*,
    777 F.2d 296 (5th Cir. 1985) ................................................................................ 8, 10

*Rothe Dev., Inc. v. U.S. Dep't of,*
    *Def*., 836 F.3d 57 (D.C. Cir. 2016) ............................................................... 6, 7, 28

*Simon v. Eastern Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976) ..................................................................................... 8, 13, 14

*SRS Techs., Inc. v. U.S. Dept. of Defense*,
    112 F.3d 510 (4th Cir.1997) .................................................................................. 4

*Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 220CV00041DCLCCRW, WL 4633481
    (E.D. Tenn. July 19, 2023) ..................................................................................... 23

*United States v. Hays*,
    515 U.S. 737 (1995) ............................................................................................... 13

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
    412 U.S. 669 (1973) ................................................................................................. 4

*Vitolo v. Guzman.*,
    999 F.3d 353 (6th Cir. 2021) ................................................................................ 21

*W.H. Scott Constr. Co. v. City of Jackson*,
    199 F.3d 206 (5th Cir. 1999) ................................................................................ 18

*Western States Paving Co., Inc. v. Washington State Dept. of Transp.*,
    407 F.3d 983 (9th Cir. 2005) ................................................................................ 20

*Wilson v. Glenwood Intermountain Properties, Inc.*,
    98 F.3d 590 (10th Cir. 1996) ......................................................................... 12, 16


**Federal Statutes**

5 U.S.C. § 706(1), (2) ................................................................................................ 28

15 U.S.C.  9501(9)(A) ......................................................................................... 6, 17

15 U.S.C. § 9501(15)(A) ..................................................................................... 6, 16

15 U.S.C. § 9501(15)(B) ..................................................................................... 6, 27

15 U.S.C. § 9512 ......................................................................................................... 6

15 U.S.C. § 9513 ......................................................................................................... 5

15 U.S.C. § 9524 ...................................................................................................... 5, 6, 17

15 U.S.C. § 9561 ............................................................................................................ 6

**Federal Regulations**

15 C.F.R. § 1400 ............................................................................................................ 6

15 C.F.R. § 1400.4 ....................................................................................................... 16

15 C.F.R. §§ 1400.1-.2 ........................................................................................... 16, 28

15 C.F.R. § 1400.1(b) .................................................................................................. 27

**Miscellaneous:**

Colette Holt, Report of Defendants' Expert, submitted in *Nuziard v. Minority Business Development Agency*, No. 4:23-cv-00278-P (N.D. Tex. August 25, 2023)............................ 19

Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v.  U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11 .................................................... 22, 24, 26

## I.     <u>INTRODUCTION</u>

In their response to Defendants' motion for summary judgment, Plaintiffs fundamentally misinterpret the Minority Business Development Act ("MBDA Act") and its supporting regulations and mischaracterize the agency and program at issue in this case. MBDA Business Center Program services are available to any business owner, regardless of race, who is socially or economically disadvantaged and meets the local Business Center's eligibility requirements. Plaintiffs have neither pled nor established that they are socially or economically disadvantaged as defined in the MBDA Act.

Nor do Plaintiffs meet additional, race-neutral requirements imposed by the Business Centers, such as having sustainable revenue or sufficient time-in-business. Plaintiffs repeatedly assert that these race-neutral criteria are irrelevant to standing because they are "neither imposed by the challenged MBDA Statute nor implemented by Defendants," and are "imposed only by a private third-party entity." (Doc. 44 p. 16; *see also id.* at pp. 3, 10, 38.) But these distinctions have no bearing on Plaintiffs' standing in their suit against federal government defendants, for there is no question that the Business Centers' requirements defeat Plaintiffs' ability to receive services, independent of the statutory presumptions that Plaintiffs have challenged. Indeed, Plaintiffs' admissions that the local MBDA Business Center requirements are "non-statutory" and "race-neutral," alongside the factual record demonstrating that Plaintiffs are not "able and ready" to meet those requirements, are fatal to their assertion of standing. Regardless of the outcome of this case, and any statutory or Agency-related changes the Court could order, the local Business Centers' race-neutral requirements will remain in place, and Plaintiffs will remain ineligible to receive their services.

Plaintiffs also misstate the governing law with respect to the merits of their claims and the

1

factual record supporting Congress's judgment. The evidence considered by Congress and presented to this Court establishes that members of certain groups have suffered, and continue to suffer, social or economic disadvantage that impedes their ability to participate in America's free market system due to intentional discrimination and its lingering effects, and that the federal government has itself participated directly and passively in this discrimination. Moreover, the MBDA Act is narrowly tailored to further the government's compelling interest in remedying that discrimination.

And yet, despite the overwhelming factual record, Plaintiffs profess to this Court that Defendants have not identified "any specific instances of discrimination" and that "there is no evidence of intentional discrimination" or federal participation in such discrimination. (Doc. 44 pp. 44-50.) Plaintiffs' factual assertions and their legal arguments are readily belied by the record and governing law. This Court should reject Plaintiffs' invitation to rewrite the MBDA Act and ignore uncontroverted facts to suit their claims.

## II.    <u>EACH PLAINTIFF LACKS STANDING AS A MATTER OF LAW</u>

Plaintiffs fail to identify any genuine and material factual disputes that would preclude this Court from granting Defendants' motion for summary judgment. *Bernabe v. Rosenbaum*, No. 21-10396, 2023 WL 181099, at *3 (5th Cir. Jan. 13, 2023) (noting that dispute must be material and genuine to preclude summary judgment).

As an initial matter, Plaintiffs' assertion that "[t]his Court has already found standing on Plaintiffs' claims" (Doc. 44 p. 3.) is incorrect. This Court, in its preliminary injunction order, found only that one plaintiff, Nuziard, had standing based on the ***pleadings***. *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278-P, 2023 WL 3869323, at *4 (N.D. Tex. June 5, 2023). Based on the limited record at the time, the Court determined that Nuziard sufficiently pled that he was "able

and ready" when, among other things, he asserted that he met the race-neutral requirements of the Business Center he sought to access. *Id*. at *3-4. The Court did "not analyze whether any other Individual Plaintiff has standing." *Id*. at *8 (internal quotation and citation omitted). More importantly, since the Court's ruling in June, the parties have conducted significant discovery, including on standing. At the summary judgment stage, Plaintiffs, as the party claiming federal jurisdiction and seeking a permanent injunction, cannot rest on "mere allegations," such as those contained in the pleadings, or speculation, but must bring forward specific facts establishing each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have not carried this burden.

Instead, they attempt to move the goalposts. First, Plaintiffs err in their efforts to minimize the "able and ready" standard to a mere "trifle" (Doc. 44 p. 4); next, they mischaracterize how the statute, agency, and Business Center Program operate (Doc. 44 pp. 6-7); and then attempt to shift mid-suit (indeed, mid-briefing) as to which Business Centers individual Plaintiffs sought to access (Doc. 44 pp. 13, 15, 26-27.) Finally, throughout their response, Plaintiffs admit that the relevant local Business Centers' participation requirements are "race-neutral," "non-statutory," and imposed by a "private third-party entity," but argue, without legal support, that none of that matters. (Doc. 44 pp. 9, 16, 22, 44.) It certainly does matter, however, and Plaintiffs' inability to meet these admittedly race-neutral requirements is fatal to their claims. Defendants address each of these flaws in turn below.

A.    <u>**Plaintiffs Have Not Established Injury-in-Fact**</u>

1.    **The Able and Ready Standard Governs Standing**

Plaintiffs urge this Court to find standing based solely on the MBDA Act's presumptions of social and economic disadvantage for certain racial and ethnic groups—that this "'identifiable

trifle' of harm" satisfies their burden. (Doc. 44 p. 4 (quoting *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973))). But *SCRAP* does not create a precedent that allows the mere awareness of a race-based presumption to constitute an injury-in-fact for standing purposes. Nothing in *SCRAP* or otherwise relieves Plaintiffs of their burden at the summary judgment stage to demonstrate that they were "able and ready" to qualify for the program at issue under the requirements of *Northeastern Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville,* 508 U.S. 656, 666 (1993) ("*City of Jacksonville*"). *See also SRS Techs., Inc. v. U.S. Dept. of Defense*, 112 F.3d 510 (4th Cir. 1997) (holding that the plaintiff lacked standing to challenge the racial presumption of disadvantaged status in a Small Business Administration contracting program because plaintiff was ineligible for that program for race-neutral reasons).

A plaintiff does not meet the requisite "able and ready" standard simply by "showing that [he] 'would have' sought a benefit but for the discriminatory barrier." (Doc. 44 p. 5.) Instead, to be deemed "able" under this standard, Plaintiffs must show, at the very least, that they meet the race-neutral requirements of the desired benefit. *SRS Techs.*, 112 F.3d at 510; *Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638, 646 (N.D. Tex. 2021). And to be deemed "ready," Plaintiffs must advance more than a "bare statement of intent" to access some benefit. *Bruckner v. Biden*, No. 8:22-CV-1582-KKM-SPF, 2023 WL 2744026, at *4 (M.D. Fla. Mar. 31, 2023).

Nothing in Plaintiffs' response (or their Complaint) establishes that they were "able and ready" to access the benefits offered through the MBDA Business Center Program. Plaintiffs complain that the MBDA and MBDA Act's presumptions impose on them a "badge of inequality and stigmatization" (Doc. 44 p. 4), and generally make them "discouraged" or "disgusted" (Doc. 44 pp. 23, 26)—arguing that this "is a cognizable harm in and of itself providing grounds for

4

standing." (Doc. 44 pp. 4-5 citing pre-*City of Jacksonville* case law.) But the Supreme Court has instructed that Article III courts may not entertain suits alleging generalized grievances that agencies have failed to adhere to the law. *See, e.g., Lujan*, 504 U.S. 555, 568; *Ex parte Levitt*, 302 U.S. 633 (1937); *Frothingham v. Mellon*, 262 U.S. 447, 488-89 (1923). Moreover, the Fifth Circuit has already clarified that "stigmatization" is not a sufficient basis to accord standing. *Moore v. Bryant*, 853 F.3d 245 (5th Cir. 2017) (rejecting, on standing grounds, plaintiff's equal protection challenge alleging stigmatic injury because it was unaccompanied by a corresponding denial of equal treatment).

## 2.   Plaintiffs Cannot Manufacture Injury By Mischaracterizing the MBDA Act

In an attempt to overcome City of Jacksonville's "able and ready" standard, Plaintiffs mischaracterize the nature of the MBDA, the MBDA Act, and the Business Center Program. Plaintiffs contend that the "sole criterion" for the receipt of Business Center Program services is "a race-based eligibility requirement that forecloses Programming availability to business owners on an equal basis" (Doc. 44 p. 7), and that "the MBDA Statute imposes a penalty against Plaintiffs because of their race, making them ineligible for MBDA business assistance. . ." (Doc. 44 p. 2.) But as discussed *supra* and explained in more detail below, eligibility for Business Center services is contingent on an individual's economic or social disadvantage, as required by the statute, and any other race-neutral requirements imposed by the local Business Centers. Further, to the extent that Plaintiffs argue that they are "ineligible" for MBDA business assistance "because of their race," they are simply wrong, and the factual record disproves this.

The MBDA, through the MBDA Act, provides funding to public or private entities to serve as Business Centers, 15 U.S.C. § 9524. The MBDA also has the authority to conduct research, 15 U.S.C. § 9513; provides grants to nonprofit organizations that support minority business

enterprises, 15 U.S.C. § 9561; and "consult[s] and cooperate[s] with public sector entities for the purpose of leveraging resources available in the jurisdictions of those public sector entities to promote the position of minority business enterprises in the local economies of those public sector entities." 15 U.S.C. § 9512. Business Centers, like the ones identified by Plaintiffs in their Complaint, provide technical and management assistance to Minority Business Enterprises, also known as "MBEs," which must be 51% owned and operated by a socially or economically disadvantaged individual. *See* 15 U.S.C. §§ 9501(9)(A), 9524.

Services provided by MBDA Business Centers are restricted to individuals that are socially or economically disadvantaged but are not limited by race or to a particular number of participants. *Id.*; *see also* 15 C.F.R. § 1400. In screening applicants, these Business Centers implement the MBDA Act's race-based presumptions of social or economic disadvantage. 15 U.S.C. § 9501(15)(B). But applicants not within those presumptions may demonstrate social or economic disadvantage without regard to the presumption. Indeed, the term "socially or economically disadvantaged individual" is not a racial classification. 15 U.S.C. § 9501(15)(A). It is statutorily defined as:

> an individual who has been subjected to racial or ethnic prejudice or cultural bias (or the ability of whom to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area) because of the identity of the individual as a member of a group, without regard to any individual quality of the individual that is unrelated to that identity.

15 U.S.C. § 9501(15)(A).[1] The experience of discrimination without reference to any particular race is not a racial classification, *see, e.g.*, *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 61-

_____

[1] MBDA's recent guidance to Business Centers and the public clarifies this eligibility requirement for all Business Centers. *See* MBDA MSJ App. 00019-20 (Minority Bus. Dev. Agency, Guidance to MBDA Business Center Operators (2023) https://www.mbda.gov/sites/default/files/2023-10/MBDA%20Guidance%20Memo.pdf (last visited, Nov. 17, 2023)).

62 (D.C. Cir. 2016), and thus the requirement of "social or economic disadvantage" is a race-neutral criterion for access to the Business Centers. *Id.* As the court observed in *Rothe* when addressing a virtually identical term in the Small Business Administration's Section 8(a) program, the definitions for social and economic disadvantage are "inclusive terms of eligibility that focus on an individual's experience of bias and aim to promote equal opportunity for entrepreneurs of all racial backgrounds." *Id.* at 62.

Second, to the extent that Plaintiffs argue that the only criteria that matter for standing purposes are those imposed by the MBDA Act or the MBDA and that other race-neutral requirements imposed by local Business Centers are irrelevant, that argument cannot be reconciled with *City of Jacksonville's* "able and ready" standard. *See supra* pp. 3-5. It also materially misconstrues how the Business Center Program operates. Business owners apply to individual Business Centers, which, as Plaintiffs admit, are "private, third-party entities" that may and do impose additional eligibility criteria. (Doc. 44 pp. 9, 16.) Thus, although Plaintiffs focus on applying for assistance from the Business Centers through the MBDA, that is not how the MBDA Act or the Business Center Program operates. Business owners cannot apply for MBDA Business Center Program services from the MBDA or the MBDA website. Nor does the Agency receive applications on behalf of Business Centers, provide Business Center services to participants, or accept or deny any business owners for Business Center services.[2] Indeed, the only thing that business owners can do through the MBDA website with regard to the MBDA Business Center Program is review general descriptions of the MBDA and a list of Business Centers.[3] Because

---

[2] *See* MINORITY BUS. DEV. AGENCY, https://www.mbda.gov/ (last visited Nov. 26, 2023).
[3] *Id.* at MINORITY BUS. DEV. AGENCY PROGRAMS, https://www.mbda.gov/mbda-programs (last visited Nov. 26, 2023); MINORITY BUS. DEV. AGENCY BUSINESS CENTERS, https://www.mbda.gov/mbda-programs/business-centers, (last visited Nov. 26, 2023).

there is no genuine dispute that Plaintiffs do not meet the identified Business Centers' race-neutral criteria, (and have neither pleaded nor established through evidence that they are socially or economically disadvantaged), Plaintiffs' injuries are insufficiently concrete to confer standing and no ruling in this matter will redress their injuries.

Defendants' arguments do not erect an insurmountable barrier to establishing standing. A business owner who can demonstrate that he or she is "socially or economically disadvantaged," owns 51% or more of his or her business, manages and controls the business, is not a member of a presumptive group, and could meet the specific race-neutral requirements of the relevant Business Center, would not confront the standing defects which undermine the Plaintiffs here. Such a business owner could at least articulate a redressable claim that would not be frustrated by his or her inability to meet numerous race-neutral eligibility criteria. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 28 (1976), although, as explained below, such a claim would fail for other reasons, including because the MBDA Act and Business Center Program are constitutional.

### 3. Plaintiffs Do Not Meet Their Business Centers' Race-Neutral Requirements

#### a. Nuziard Did Not Meet the Race-Neutral Requirements of the Dallas-Fort Worth Business Center

Plaintiffs argue that Nuziard is "able" to apply "because his business meets all the race-neutral requirements" of the Dallas-Fort Worth Business Center. (Doc. 44 p. 9.) But there can be no genuine dispute that his revenue was not "sustainable" as required by that Center, under any reasonable understanding of that term. *See Richoux v. Armstrong Cork Corp.*, 777 F.2d 296, 297 (5th Cir. 1985) ("inferences drawn from the record must be rational and reasonable") (cleaned up). *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019)

(holding that at the summary judgment stage a plaintiff cannot "rely on mere allegations" but "must set forth, by affidavit or other evidence, specific facts" supporting standing.) Plaintiffs point to Nuziard's increasing revenue from 2020 to 2022, (Doc. 44 p. 9), but as a matter of basic economics, the amount of revenue a business generates by itself does not make that revenue sustainable. Nuziard's revenue was not sustainable given his own testimony that his business will shut its doors in less than a year at its current burn rate.[4] Against this evidence, no factfinder could reasonably infer that Nuziard met the Dallas-Fort Worth Business Center's sustainable revenue requirement.[5]

Plaintiffs raise a host of peripheral concerns that equally have no merit. (Doc. 44 pp. 10-13.) They complain that these "non-statutory requirements are imposed by a private third-party entity." *Id.* This is true, but as discussed *supra,* Plaintiffs do not explain (or cite any authority for) why that matters. *Id*. Plaintiffs next complain that the sustainability requirement is a "newfound, *post hoc* interpretation" of the Dallas-Fort Worth Business Center's revenue requirement. (Doc. 44 p. 10.) In fact, revenue sustainability is not a "lawyer-created" standard at all (Doc. 44 p. 11), and the requirement has been posted on the website of the Dallas-Fort Worth Business Center since before this litigation began. *See* Doc. 1 ¶ 33 ("sustainable revenue").

Finally, Nuziard complains that he did not have an "opportunity to submit to any actual application" for Business Center services. (Doc. 44 p. 12.) This is incorrect. Since July, Defendants have directed the Dallas Fort-Worth Business Center to consider any application from Nuziard in a race-neutral manner, and it is only now on the eve of the conclusion of briefing for summary judgment that Nuziard has reached out to the Dallas-Fort Worth Business Center to inquire as to

---

[4] MBDA MSJ App. 00214 (Nuziard Dep. 118:11-17).
[5] The Dallas-Fort Worth Business Center does not formally define sustainable revenue in its application materials, but states the obvious in this regard in its Declaration, which is that both income *and* losses determine whether a business has "sustainable" revenue. (MBDA MSJ App. 00223-224 (Dallas-Fort Worth BC Decl., at ¶¶ 4-5).)

how to apply. This is further evidence that Nuziard is not "able and ready" to apply for the Business Center's services, and instead is merely attempting to manufacture standing to challenge the program.

### b. Bruckner Did Not Meet the Race Neutral Requirements of the Orlando Business Center

Bruckner now claims his business "met all the race-neutral requirements of the [Orlando Business Center] at the time he sought assistance." (Doc. 44 p. 15.) But the record does not allow any reasonable inference to be drawn in Plaintiffs' favor on this point. *Richoux*, 777 F.2d at 297 (requiring inferences to be reasonable and rational to defeat summary judgment); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (noting that a principal purpose of Rule 56 is to screen out factually unsupported claims).

There can be no *genuine* dispute that Bruckner's business, PMC, had not been in business for three years or more as of the date of the Complaint. (Docs. 41 pp. 21-23; Doc. 44 fn. 11.) Bruckner attempts to avoid this indisputable fact by arguing that *he* personally "has been in business for over six years." (Doc. 44 p. 19 italics added.)[6] This attempt fails because he was seeking services for PMC, and the Orlando Business Center's website clearly states that the *enterprise* must have been in business for three years.[7] Plaintiffs provide no evidence sufficient to create a genuine dispute that the word "enterprise" means anything other than an individual company or business—and not an individual person. Indeed, if there were any doubt, the Orlando Business Center's exchange with Bruckner further clarifies that the Center's age-of-business and annual revenue requirements relate to the maturity of the *company* seeking services. (MBDA MSJ

---

[6] Bruckner's claim that he has been "looking for bids every single day" (Doc. 44 p. 19.) is irrelevant to the Orlando Business Center's requirement that PMC have existed for at least three years.
[7] ORLANDO MBDA BUSINESS CENTER, *Services*, https://orlandombdacenter.com/services/ (last visited, Nov. 17, 2023).

App. 00124.) In its February 15 email to Bruckner, the Orlando Business Center described the Business Incubator program run by 3D Strategic Management—the same entity that operates the Orlando Business Center). 3D Strategic Management's Business Incubator program engages with businesses that do not meet the Center's revenue and maturity requirements. *Id.* The Center suggested that Bruckner reach out to the Business Incubator program, which could provide services to less mature companies that had not reached the years-in-business and revenue milestones. *Id.* That program, the email explained was "designed for *businesses* from start-up to scale up capacity." *Id.* (emphasis added).

Bruckner also raises flawed objections to urge the Court to ignore this fundamental jurisdictional defect. For example, he complains that he was unaware of the requirements (Doc. 44 p. 20.), but the three-year requirement was posted on the website and both it and the revenue requirement were communicated to him directly. (Doc. 41 pp. 21-23.) Next, relying on *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, Bruckner claims that these requirements, and the Center's February 15 email notifying him of them, are a "*post-hoc*" rationalization. 653 F.3d 290, 294 (3d Cir. 2011). But in *Pittsburgh*, the government offered the rationale after litigation had already started. Here, the Business Center notified Bruckner of these requirements before litigation began or was even probable. Plaintiffs' suggestion that the February 15 email was some sort of ruse to cover discrimination is simply not reasonable. (*See also* Doc. 41.)

Finally, this Court should reject Plaintiffs' invitation to ignore that Bruckner indisputably did not have standing as of the date of the Complaint and to find that he is nevertheless entitled to prospective relief because "he is close to meeting the 3-year requirement." It is well-established that standing must exist as of the time of the filing of the Complaint. *Carr v. Alta Verde Industries,*

11

*Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991); *cf. Lujan*, 504 U.S. at 570 n.4 (explaining that acts after commencement of the suit cannot retroactively create jurisdiction).

### c.  Piper Suffered No Injury-In-Fact

Piper's claim of standing is defeated by the fact that the Wisconsin Business Center was not operational as of the date of the Complaint. Piper could not have suffered any personal denial of equal treatment because the Business Center was not accepting clients of any race when he filed his Complaint. (MBDA MSJ App. 00055 (Wisconsin BC Decl., ¶¶ 4-7).) Any injury as of the date of the Complaint was, therefore, not "concrete" and merely "hypothetical." *Lujan*, 504 U.S. at 560. Nor was any personal denial of equal protection "imminent" at the time of the Complaint, as any such claim to prospective injury would have rested on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Indeed, the Wisconsin Business Center states that, since opening in May 2023, it has never turned down a client on the basis of race, and it has accepted and served clients who identified as "Other" in response to the race/ethnicity data collection question.[8]

In response, Plaintiffs argue that "it is Defendants' race-based rejection that is at issue; not the action of any individual [Business Center]." (Doc. 44 p. 28.) Plaintiffs contend that Piper "sustained his injuries . . . during his encounter on the nation's MBDA website, because of the operation of the MBDA Statute. . . *not* due to any action by any individual MBDA office." (Doc. 44 p. 30) (emphasis in original). These allegations are insufficient to establish an injury-in-fact. Viewing racial classifications on a government website, and being outraged by them, does not amount to a personal denial of equal protection. *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 596 (10th Cir. 1996); *Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003). To

---

[8] MBDA MSJ Repl. App. 01582-1584, 1583 (Second Wisconsin BC Decl., at ¶ 5).).

allow standing on these grounds would allow plaintiffs who have no personal stake in the outcome, and only a generalized grievance, to invoke federal jurisdiction whenever a policy offends them, regardless of whether they have personally been affected by it. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (holding that the rule against finding standing for "generalized grievances applies with as much force in the equal protection context as in any other."). A rationale this open-ended would turn the injury-in-fact requirement into a nullity. *Allen v. Wright*, 468 U.S. 737, 754 (1984) (the "right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court").

**B.     Plaintiffs Have Created No Factual Disputes On Lack of Causation and Redressability**

Plaintiffs also have not met their burden to establish a genuine dispute on causation and redressability. Plaintiffs' response correctly notes that under the *City of Jacksonville* standard, the injury-in-fact is the "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." (Doc. 44 p. 6.) However, even if, under *City of Jacksonville*, Plaintiffs need not show that they *would have* obtained the benefit, they still must show that they *could have* obtained the benefit in order to establish causation and redressability. *Day v. Bond*, 500 F.3d 1127, 1133-35 (10th Cir. 2007) (explaining that the "causation and redressability requirements of Article III standing" are related to, but distinct from, the injury-in-fact analysis); *see Hardre v. Markey*, No. 20-CV-03594-PAB-KMT, 2021 WL 1541714, at *3 (D. Colo. Apr. 19, 2021) ("plaintiffs must show that, with the discriminatory criterion removed, they would then be eligible for benefits").

Once again, because Plaintiffs cannot satisfy the Business Centers' independent, race-neutral requirements for eligibility, they cannot establish standing for their suit against the MBDA and other federal Defendants. In *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 28

13

(1976), for example, a group of indigent patients challenged an IRS Revenue Ruling that afforded favorable tax treatment to nonprofit hospitals that offered indigent patients emergency treatment only. The plaintiffs claimed that the IRS Revenue Ruling "encouraged" hospitals to deny services to indigent patients. *See id.* at 42. The Supreme Court held that the plaintiffs lacked standing, explaining that:

> [i]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications. It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services.

*Id.* at 42–43.[9]

Here, the years-in-business and revenue requirements of the individual Business Centers, which Plaintiffs admit are "non-statutory" and "race-neutral," would remain regardless of the outcome of this case. Therefore, as in *Simon*, it is "purely speculative" whether the "desired exercise" of the court's remedial powers in this suit would result in qualifying the Plaintiffs for MBDA Business Centers' services. Even where courts have found standing (on facts materially different from those here) for plaintiffs challenging the acts of third-party recipients of federal funding, *see, e.g., Marouf v. Azar,* 391 F. Supp. 3d 23 (D.D.C. 2021), courts caution that standing is established only when a ruling will "make plaintiffs whole." *Id.* at 37. In this case, the "desired exercise" of this Court's remedial powers—removing the allegedly unconstitutional presumptions—will not make Plaintiffs whole as they still could not qualify for access to the

---

[9] To satisfy the causation or traceability prong of Article III standing, a plaintiff must show a causal connection between the alleged injury and the defendant's challenged conduct. *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). A plaintiff's injuries cannot be "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). "Though distinct elements, causation and redressability overlap and are often considered in tandem." *McLemore v. Hosemann*, 414 F. Supp. 3d 876, 883 (S.D. Miss. 2019).

Business Centers' services.

In attempting to avoid these barriers, Plaintiffs first claim that Nuziard and Bruckner met the race-neutral requirements of their home Business Centers. (Doc. 44 p. 40.) But, as already discussed, Nuziard does not meet the revenue requirement (Doc. 46 pp. 7-9), and Bruckner did not meet the revenue or age of business requirement, (Doc. 46 pp. 10-12.)

Next, Plaintiffs argue that the local requirements should not matter because the Business Center Program is national, (Doc. 44 p. 8), stating "Dr. Nuziard would be eligible for *MBDA's nationwide Programming* under the MBDA Statute, if there were no such requirement." (emphasis added). This is not how the MBDA or Business Centers function. Each Business Center operates under an individual funding agreement based on a Notice of Funding Opportunity and each Business Center may impose distinct requirements for participation.[10] Plaintiffs' counterfactual hypothetical is irrelevant.

Plaintiffs then assert that they are now interested in Business Centers far from their homes and so the local Business Center requirements should not matter. (Doc. 40 p.13.) But this claim is not reflected in their Complaint. (Doc. 46 pp.15-20.) Since "standing is determined as of the date of the complaint," these facts concerning interests that Plaintiffs may have developed after filing their Complaint cannot support federal jurisdiction. *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005) ("The party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing.").

Plaintiffs next attempt to distinguish *Day v. Bond*, 500 F.3d 1127, 1135 (10th Cir. 2007), but this attempt fails. Plaintiffs argue that *Day* "dealt with a state law regarding tuition rates and

---

[10] MBDA MSJ Resp. App. 01113-1117 (Notices of Funding Opportunity for the MBDA Business Center Program).

15

containing several criteria that the state was required to impose," while this case involves "federal law that creates an agency solely on the basis of race and imposes only this single requirement for nationwide business assistance." (Doc. 44 p. 40.) Aside from their factual inaccuracy, Plaintiffs' observations do not call into question the legal reasoning underpinning *Day* and do not materially distinguish its holding from this case. Quite the opposite. Like the present case, *Day* involved an equal protection challenge to a statute. *Day* then explained that even where a statute's challengers can establish injury-in-fact, those same challengers fail to establish both causation and redressability if they are otherwise ineligible for the benefit sought. 500 F.3d at 1134. "'Discrimination cannot be the cause of injury to an applicant who could not have obtained the benefit even in the absence of the discrimination,' and such an applicant lacks the requisite personal stake in the outcome because he would still not qualify for the benefit following a decision in his favor." *Id.* (citing *Wilson v. Glenwood Intermountain Properties*, 98 F.3d 590, 594 (10th Cir. 1996)).

Finally, with regard to the redressability of Piper's claim, Plaintiffs complain that the Court should not credit Piper's admission that he is not socially or economically disadvantaged. (Doc. 44 p. 39.) They contend that "Piper grew up in extreme financial poverty" and that the phrase "socially or economically disadvantaged" is "vague and standardless" (Doc. 44 fn. 26.) These arguments miss the mark. First, the phrase is clearly defined in the statute and regulations. *See* 15 U.S.C. § 9501(15)(A); 15 C.F.R. §§ 1400.1-.2, .4; *supra* at 6. The regulations also offer additional guidance, setting out numerous explicit ways by which applicants for a group presumption can demonstrate social or economic disadvantage.[11] Based on those criteria and methods of

---

[11] *See* 15 C.F.R. § 1400.4 (noting that any social or economic disadvantage "must be chronic, long standing, and substantial, not fleeting or insignificant." Showings of social or economic disadvantage can be made by statistical evidence outlining disparities in national income level and

demonstration, Piper has not established that he is "socially or economically disadvantaged." Although his testimony described an impoverished upbringing, he did not tie "his identity. . . as a member of a group" to either social disadvantage ("racial or ethnic prejudice or cultural bias") or economic disadvantage (whether his ability to "compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, as compared to others in the same line of business and competitive market area") as required by the statute. *Id*. Nothing prevented him from doing that here, but he has not done so. Indeed, he has introduced no evidence or arguments on this point. Further, regarding redressability for all three Plaintiffs, each plaintiff bears the burden of establishing each element of standing, including causation and redressability. *Liu v. Mayorkas*, 588 F. Supp. 3d 43, 50 (D.D.C. 2022). Here, even absent the MBDA Act's presumptions or the local Business Center requirements, eligibility for MBDA Business Center services requires an applicant to be socially or economically disadvantaged. 15 U.S.C.§§ 9501 (9)(A), 9524. Because none of the plaintiffs have pled, or argued, or advanced any facts establishing that they meet the MBDA Act's definition of socially or economically disadvantaged individual, they cannot establish that even absent the presumptions or the local Business Center requirements, they qualify for MBDA Business Center services. *Id.* ("At the summary judgment stage, if the court determines that the plaintiff has not introduced sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing, the court has no power to proceed and must dismiss the case."). All three Plaintiffs' claims therefore lack redressability, because even if this Court were to rule that the presumptions were unconstitutional, and that the individual Business Center requirements were immaterial, the social or economic disadvantage

---

standards of living, employment discrimination, educational discrimination, denial of access to organizations, professional societies, capital, and technical and managerial resources).

requirement would remain, and Plaintiffs would still fail to qualify for the MBDA Business Center Program.

## III.   THE MBDA ACT IS SUPPORTED BY A COMPELLING INTEREST AND IS NARROWLY TAILORED

### A.   The MBDA Act is Supported by a Compelling Interest

"[C]ombating racial discrimination is a compelling government interest." *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999) [hereinafter *Scott*] (explaining that *Croson* made this point "clear"). A governmental entity "has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989); *see also Scott*, 199 F.3d at 217 (citing *Croson*, 488 U.S. at 492). Both parties agree that to establish a "compelling government interest," the government must offer a "strong basis in evidence" proving "specific, identified instances of past discrimination that violated the Constitution or a statute." (Doc. 44 p. 44 (citing *Croson*, 488 U.S. at 500).) *See also Scott*, 199 F.3d at 217 (quoting *Croson*, 488 U.S. at 500); *Dean v. City of Shreveport*, 438 F.3d 448, 455 (5th Cir. 2006). Defendants easily satisfy this standard, and Plaintiffs' arguments to the contrary fail on the facts and the law.

Defendants' submissions to this Court are replete with "specific, identified instances of past discrimination." *Croson,* 488 U.S. at 500. These include instances of active and passive governmental discrimination that have created and continue to create barriers to business formation and success rates. (Doc. 38 pp. 26-57; Doc. 44 pp. 46-66.) And thousands of pages of unrefuted evidence illustrate a persistent racial wealth gap caused by, *inter alia*, historical redlining practices by the federal government; federal, state, and local governmental discrimination in public contracting; and incidents of private discrimination that impede business formation and growth throughout the United States. *Id.* In sum, the evidence plainly demonstrates that, despite

governmental efforts, discrimination and its effects have not disappeared.

Discrimination, past and present, continues to deny individuals who are members of racial and ethnic minority groups equal access to the business marketplace as catalogued by the evidence before Congress and this Court, including business owners' recounting of specific instances of discrimination. (Doc. 41 pp. 43-46.) In a disparity study presented to Congress of DOT contracting in Indiana, for example, the study's statistical findings were complemented by anecdotal evidence, such as an African American business owner sharing that he had been told that people did not want to hire minority firms because "they are not as competent" and that "they are surprised when they find [a minority owned firm] that's professional and does things right."[12] In a study of the Atlanta Housing Authority presented to Congress, a Native American business owner explained that his company had lost several opportunities based on their skin color and race.[13] And in unrefuted expert testimony, Colette Holt provides accounts from Texas of white prime contractors refusing to work with racial minority-owned businesses unless there is a MBE goal on a project;[14] white prime contractors working only with white employees of racial minority-owned businesses;[15] blatant pricing discrimination based on race;[16] and racial slurs used by public contracting officers.[17] In addition, and highlighting the direct need for government programs to ameliorate

---

[12] MBDA MSJ Repl. App. 00001-553, 476-477 (*2015-16 State of Indiana Disparity Study*, Prepared by BBC Research & Consulting (2016)).

[13] *See* MBDA MSJ Repl. App. 00554-1057, 1030 (*2017 Atlanta Housing Authority Disparity Study*, Prepared by Keen Independent Research (2017)).

[14] MBDA MSJ Repl. App. 01058-1113, 1091-1095 (Colette Holt, Report of Defendants' Expert, submitted in *Nuziard v. Minority Business Development Agency*, No. 4:23-cv-00278-P (N.D. Tex. August 25, 2023 p. 31) ("Holt Report")).

[15] *Id.* at 1082 (citing MBDA MSJ Repl. App. 01114-1363, 1311 (*The City of San Antonio Disparity Study*, Prepared by Colette Holt & Associates (2023) ("San Antonio Disparity Study") p. 186)).

[16] *Id.* at 1096 (citing MBDA MSJ Repl. App. 01114-1363, 1324 (San Antonio Disparity Study p. 199)).

[17] *Id.* at 1080 (citing MBDA MSJ Repl. App. 01114-1363, 1295 (San Antonio Disparity Study p. 170).

discrimination, a disparity study reported that one of the biggest general contractors in the Harris County area said, "I don't want to do business with [minorities]. . .The only reason why I'm here is because I got a contract and the State is paying for it, or else I wouldn't be doing business with you."[18] Holt concludes that in the disparity studies she reviewed, which demonstrated significant statistical disparities in public contracting:

> [t]here is also extensive qualitative data that supports the findings that minority business owners continue to face barriers to their success, including biased perceptions of their competencies and qualifications; barriers to obtaining critical financing; lack of access to important professional networks and relationships; inability to obtain work on an equal basis; and discrimination in pricing.[19]

Plaintiffs characterize these accounts, and presumably the similar testimony of thousands of other minority business owners, as "isolated anecdotal evidence" "pointing to some past stories of racism in America." (Doc. 44 p. 52.) But nothing in *Croson* or its progeny permits Plaintiffs to summarily discount Defendants' proffered and unrefuted evidence of specific incidents of discrimination that is plainly relevant to and supports the government's compelling interest in remedying discrimination. *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. 2000) ("Adarand VII") ("[b]oth statistical and anecdotal evidence are appropriate in the strict scrutiny calculus"); *Western States Paving Co., Inc. v. Washington State Dept. of Transp.*, 407 F.3d 983, 992 (9th Cir. 2005) (same discussing anecdotal evidence); *Concrete Works of Colo., Inc. v. Denver*, 321 F.3d 950, 958 (10th Cir. 1994) ("Concrete Works VI") ("Denver may supplement the statistical evidence with anecdotal evidence of public and private discrimination.").

---

[18] *Id.* at 1080 (citing MBDA MSJ Repl. App. 01364-1546, 1467 (*Harris County Disparity Study*, Prepared by Colette Holt & Associates (2020) p. 95)).
[19] *Id.* at 1096-1097.

Plaintiffs also continue to assert that the hundreds of disparity studies submitted by Defendants demonstrate only general societal racial disparities. (Doc. 44 p. 45.)[20] *Croson* says otherwise: "If the statistical disparity between eligible MBE's and MBE membership were great enough, an inference of discriminatory exclusion could arise. In such a case, the city would have a compelling interest in preventing its tax dollars from assisting these organizations in maintaining a racially segregated construction market." *Croson*, 488 U.S. at 503-04; *Kossman Contracting, Co. v. City of Houston, H-14-1203*, 2016 WL 11473826, at *21 (S.D. Tex. Feb. 17, 2016) ([disparity studies] "defined the relevant market at a sufficient level of particularity to produce evidence of passive discrimination. . .").

Defendants' disparity studies satisfy the *Croson* requirements for defined markets and significant disparities at the local, state, and national level. (Doc. 41 pp. 48-54.) The studies document the utilization and availability of minority business enterprises in particular industries, in particular geographic locations, and for particular racial groups. *Id.* In unrefuted expert testimony presented to Congress, Dr. Jon Wainwright reviewed and analyzed 205 disparity studies produced by state and local government agencies between 2010 and 2021, and concluded that "taken as a whole, they provide strong evidence of large, adverse, and statistically significant disparities facing minority-owned business enterprises in the United States" and that "these disparities cannot be adequately explained by differences between the relevant populations in factors untainted by the effects of discrimination and are therefore consistent with the presence of

---

[20] Citing to an out-of-circuit, anomalous opinion (*Vitolo v. Guzman*. 999 F.3d 353, 361 (6th Cir. 2021)), Plaintiffs conflate disparity studies with general "statistical disparities [that] don't cut it when establishing a compelling governmental interest for a racial classification," and invite this Court to do the same. (Doc. 44 p. 45.) In so doing, Plaintiffs selectively quote from and misconstrue the nonbinding holding in *Vitolo*. More fundamentally, however, Plaintiffs' argument cannot be reconciled with *Croson*, which governs this case.

discrimination in the business market."[21]

Plaintiffs' argument that Defendants' evidence does not demonstrate "government participation in discrimination," as required by *Croson*, equally fails. (Doc. 44 p. 50.) Defendants' expert report and disparity studies provide an overwhelming basis in evidence to establish that state and local governments funded by the federal government underutilize MBEs in nearly every industry, in nearly every state, and in a significant number of local counties because of discrimination. (Doc. 46 pp 43-48.) The studies also demonstrate that private markets are tainted by discrimination, and that, through federal contracting, the government passively contributes to that private discrimination. *See Croson*, 488 U.S. 492-93 (plurality opinion) (discussing passive participation and noting that government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish"). The federal government also passively contributes to private discrimination in lending. The Office of the Comptroller of the Currency issues bank charters. The Federal Deposit Insurance Corporation insures deposits.[22] And banks often borrow money directly from the Federal Reserve.[23] The institutional and financial resources provided by the federal government to banks makes it a passive participant in their private discriminatory lending. *See Builders Ass'n of Greater Chicago v. Cnty of Cook*, 256 F.3d 642, 645-46 (7th Cir. 2001) ( "If prime contractors on County projects were discriminating against minorities and this was known to the County, whose funding of the contracts thus knowingly

---

[21] MBDA MSJ App. 02681-2903 (Jon Wainwright, Report of Defendants' Expert, submitted in *Ultima Services Corporation v. U.S. Department of Agriculture*, No. 2:20-cv-00041-DCLC-CRW (E.D. Tenn. June 21, 2022), Doc. 61-11 ("Wainwright Report")).

[22] History of the FDIC, About the FDIC (Jun. 16, 2023), https://www.fdic.gov/about/history/ (last visited Nov. 28, 2023).

[23] *See* MBDA MSJ Repl. App. 01547-1551 (Federal Reserve Statistical Release, Factors Affecting Reserve Balances (Mar. 23, 2023), https://www.federalreserve.gov/releases/h41/20230323/ (last visited Nov. 28, 2023)).

perpetuated the discrimination, the County might be deemed sufficiently complicit (a kind of joint tortfeasor, coconspirator, or aider and abettor) to be entitled to take remedial action.").

As Plaintiffs note, many of these same reports were recently reviewed by the Eastern District of Tennessee which held that, based on that evidence, "the Court does not doubt the persistence of racial barriers to the formation and success of MBEs. . ." *See Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 220CV00041DCLCCRW, WL 4633481, at *11-14 (E.D. Tenn. July 19, 2023). *Ultima* involved a facial and as-applied challenge to the use of race-based presumptions in the Section 8(a) program for federal government contracting in the plaintiff's industry—office services. *Id.* at 1-3. The Section 8(a) program is a federal government contracting where contracting officers may remove contracts from full and open government contracting and set them aside for Section 8(a) program participants. *Id.* at 2-3. By contrast, the MBDA Business Center Program is a business services and assistance program. In *Ultima*, several contracts, under which the plaintiff had previously provided office services, were set aside into the Section 8(a) program and the court determined, in ruling for plaintiff, that the "evidence does not show that the government was a passive participant in such discrimination *in the relevant industries in which Ultima operates*." *Id.* at 14. The court thus limited its finding to whether the evidence showed that the government was a passive participant in the office services industries; it did not need to decide, and did not decide, whether that evidence would support a finding that the government was a passive participant to the documented "racial barriers to the formation and success of MBEs." *Id.* at 14. And because none of the Plaintiffs in this case operate in the office services industry, and this Court should reject Plaintiffs' attempts to expand the court's explicitly cabined holding in *Ultima*.

In addition, Plaintiffs assert without evidence that Defendants "remain focused on the government contracting context, while leaving the rest of the business world[24] to which the MBDA Statute applies largely unaccounted for." (Doc. 44 p. 45.) But Defendants' evidence shows the contrary.[25] Defendants have presented evidence to demonstrate effects of discrimination and the government's role as a passive participant in a vast array of business industries. The Chow report found that for federal government contracting, holding equal business size, age, legal organization, and level of government clearance, "[i]n about 90% of industries, accounting for over 99% of contracts, non-8(a) SDB firms' odds of winning contracts are lower, all else equal, than other firms."[26] In the three digit NAICS code encompassing Dr. Nuziard's industry, the Chow report found that small disadvantaged firms, where the definition of disadvantaged was virtually identical to the MBDA standard, had only a 57.6% chance of winning a federal government contract as compared to a firm like Dr. Nuziard's, all other factors being equal.[27]

Plaintiffs finally suggest that even if the specific instances of discrimination identified by Defendants could have once supported a compelling governmental interest, they no longer support "a serious argument," because the government already passed "the Fair Housing Act, Home Mortgage Disclosure Act, and the Community Reinvestment Act." (Doc. 44 p. 53.) But Defendants

---

[24] Plaintiffs earlier asserted without evidence that "countless business entities, including minority-owned businesses that are the beneficiaries of broad MBDA Programming, do not aspire to contract with the federal government or any government—to name a few, a local bakery, a pet store, a hair salon, or a small medical clinic (like Plaintiff Nuziard's)." (Doc. 38 pp. 32-33.) But, the federal government does contract with bakery cafes (NAICS 722515), pet supply retailers and shops (NAICS 459910), beauty salons including hairdressing salons or shops (NAICS 812112), reproductive health services centers (NAICS 621410), and offices of physicians (NAICS 621111). See Spending by Prime Award, https://www.usaspending.gov (last visited Nov. 30, 2023).
[25] Wainwright Report at pp. 45-49.
[26] MBDA MSJ App. 02583-2603, 25890 (*Update to the Assessment of Contracting Outcomes for Small Disadvantaged Businesses*, prepared by Daniel Chow, MBDA (2022)).
[27] *Id.* at 2600 (Table 5, Industry Specific Regression Results, NAICS Code 621)

have presented uncontroverted evidence of the persistent racial wealth gap created by the racial gap in homeownership, which "is larger today than it was in 1960, before the passage of the Fair Housing Act of 1968,"[28] and of the private lending discrimination against racial minorities caused in-part through redlining.[29] These realities continue to negatively affect business formation and success rates for some racial and ethnic minority groups, because "most people start their businesses using equity in their homes. . ."[30] The federal government may appropriately and constitutionally conclude that a continuing harm requires a continuing remedy.

### B.    The MBDA Act And Regulations Are Narrowly Tailored

With respect to narrow tailoring, Plaintiffs' response mostly treads familiar ground, revisiting arguments that Defendants already have addressed in their prior filings. (*See* Doc. 41 pp. 58-71; Doc. 46 pp. 53-60.) However, certain of Plaintiffs' arguments require further response.

First, Plaintiffs contend, without legal support, that if the MBDA "has not worked, it cannot be said to be narrowly tailored." (Doc. 44 p. 60.) In so doing, Plaintiffs misstate the constitutional criteria. When, as here, a race-conscious measure has yet to accomplish its designated end, and the problem at which the measure is aimed is still happening, the pertinent test is the "necessity of the . . . relief and the efficacy of alternative remedies," *not* whether the measure has met its target in the near term. *See Dean*, 438 F.3d at 458 (setting forth *Paradise* factors); (Doc. 41 p. 58.) And Defendants have already established through extensive evidence that the presumptions

---

[28] *See* MBDA MSJ Repl. App. 01553-1558, 1554 (Press Release, U.S. Dept. of Justice, Justice Department Announces New Initiative to Combat Redlining (Oct. 22, 2021), https://www.justice.gov/opa/pr/justice-department-announces-new-initiative-combat-redlining (last visited Nov. 27, 2023)).
[29] *See* MBDA MSJ Repl. App. 01559-1581 (Rashawn Ray et al., *Homeownership, racial segregation, and policy solutions to racial wealth equity*, BROOKINGS INSTITUTION (Sept. 1, 2021), https://www.brookings.edu/articles/homeownership-racial-segregation-and-policies-for-racial-wealth-equity/ (last visited Nov. 27, 2023)).
[30] *Id*.

implemented in the Business Center Program remain "necessary": discrimination against minorities in business formation stubbornly persists, and the "alternatives"—decades of race-neutral business-development programs—have failed to remedy disparate business formation and growth rates for minority-owned businesses.[31] (Doc. 41 pp. 59-66; Doc. 46 pp. 54-55.)

Second, Plaintiffs complain that the MBDA statute enshrines into perpetuity its race-conscious presumptions. (*See* Doc. 44 p. 60.) Not so. As Defendants previously explained, the MBDA Act's report-and-recommendation requirement ensures *ongoing* review by both the legislative and executive branches, so that the Act's presumptions may regularly be revisited by Congress. (*See* Doc. 41 pp. 67-68; Doc. 46 pp. 58-59.)

Third, Plaintiffs argue that the presumptions are underinclusive because, for instance, they do not as of yet encompass "business owners from the Middle East, North Africa, and North Asia." (*See* Doc. 44 p. 55 (emphasis original).) But, as explained above, the presumption is not limited to the groups that Congress specified by statute. To the contrary, the regulations provide that members of *any* group may apply to the Secretary to establish eligibility for the presumption, even if Congress has not specifically focused on discrimination against those groups. (*See* Doc. 41 pp. 2-4, 70-71; Doc. 46 pp. 4-5, 59-60.) Further, the Act permits the groups in the presumptions to be expanded or contracted. (*See* Doc. 41 pp. 2-4, 70-71; Doc. 46 pp. 4-5, 59-60.) Other groups, including religious groups, may also qualify to be presumed to be socially or economically disadvantaged. (*See* Doc. 46 pp. 58-60.) And individuals of any race or ethnicity may receive

---

[31] *See, e.g.,* MBDA MSJ App. 02681-2903, 2760 (Wainwright Report p. 80 (finding that, even controlling for non-discriminatory factors, "disparities in salaries and wages, business formation rates, and business owner earnings" persist for Asian and other minority groups, and that such disparities are "large, adverse, and statistically significant in the vast majority of cases," both "for the nation and throughout the states," in "the economy as a whole," and in "all major procurement categories and industry sectors. . .")).

Business Center services upon a showing that, due to their membership in a group, they have been subjected to racial or ethnic prejudice or cultural bias, or been impaired in their ability to compete in the free enterprise system. (*See* Doc. 41 pp. 2-3; Doc. 46 pp. 4-5.) Indeed, the touchstone for the Act's presumptions is not racial or ethnic identity; rather, it is social or economic disadvantage. (Doc. 46 pp. 21-22.)

## IV.     A PERMANENT NATIONWIDE INJUNCTION IS INAPPROPRIATE

There is no dispute that the MBDA Act, 15 U.S.C. § 9501(15)(B) and related regulations, 15 C.F.R. § 1400.1(b), deem individuals of certain races and ethnicities presumptively socially or economically disadvantaged. There is similarly no dispute that in providing grant funds to MBDA Business Centers, the MBDA states explicitly in the Notice of Funding Opportunity that "[i]t is presumed that the term "socially or economically disadvantaged individual" includes an individual who is Black or African-American, Hispanic or Latino, American Indian, Alaska Native, Asian, Native Hawaiian or other Pacific Islander, Asian Indians, and Hasidic Jews.[32] Finally it is undisputed that the MBDA does not provide or deny services to business owners directly, but rather provides funding to independent businesses, and public and private organizations, through the Notice of Federal Funding Opportunity.[33] In turn, the Business Centers provide business services to applicants, or deny them.

Even assuming that Plaintiffs could establish standing, and that Plaintiffs succeeded on the merits, an appropriate remedy in this case would address the claims and allegations made in the Complaint but go no further. *Mock v. Garland*, 2023 WL 6457920, at *5 (N.D. Tex. Oct. 2, 2023) (discussed in Defendants' prior briefing, (Doc. 46 pp. 62-71)). In granting Plaintiffs' motion for

---

[32] *See, e.g.,* MBDA MSJ Resp. App. 01113-1117, 1117 (*Notice of Federal Funding*, 5 (2021).
[33] *See, e.g.*, MBDA MSJ App. 00023-27 (*Notice of Federal Funding*, 3-5 2022).

preliminary injunction, this Court found that based on the Complaint, "Plaintiffs' injuries can be remedied by an injunction tailored to the three MBDA Centers." (Doc. 27 p. 14.) Plaintiffs' Complaint has not been amended, and the scope of this Court's relief should remain limited. Were the Court to determine relief was appropriate, making its preliminary injunction a permanent one, the Court would fully remedy Plaintiffs' alleged injuries.

If this Court were to enter a nationwide injunction, the appropriate injunctive remedy would apply to MBDA only to the extent the injunction requires any or all of the statutory or regulatory presumptions to be enforced by Business Centers going forward. Such relief would be limited to any presumptions that the Court finds unconstitutional but go no further in striking race-neutral statutory or regulatory language. In particular, as explained above, *see supra* pp. 6-7, the definition of social or economic disadvantage is race-neutral because it differentiates among people based "on an individual's experience of bias and aim[s] to promote equal opportunity for entrepreneurs of all racial backgrounds." *Rothe,* 836 F.3d at 62.

Finally, should this Court hold unconstitutional any of the race-based presumptions in the MBDA Act, it should similarly limit any regulatory remedy to only the presumptions in 15 C.F.R. § 1400.1 that contravene the Constitution, and go no further in striking any other portion of the regulations.[34] Plaintiffs' requests to strike all of the regulatory language interpreting the scope of "socially or economically disadvantaged," (Doc. 44 pp. 58-9), is excessive and would extend this Courts' ruling into the race-neutral aspects of the MBDA Business Center Program and other Agency operations. More limited relief would grant complete relief from any alleged constitutional or administrative injury to Plaintiffs.

---

[34] The Administrative Procedures Act states that a "reviewing court shall. . . hold unlawful and set aside agency action. . . found to be contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(1), (2).

## V.    <u>CONCLUSION</u>

Plaintiffs cannot establish standing to bring this matter and, even if they could, cannot establish that the MBDA Act violates the Equal Protection Clause or Administrative Procedure Act. For the reasons above, and as established in Defendants memorandum in support of their motion for summary judgment, this Court should rule in favor of Defendants and dismiss Plaintiffs' suit.

Dated: December 1, 2023

<div style="margin-left:40%">

Respectfully submitted,
KAREN WOODARD
Chief
Employment Litigation Section
Civil Rights Division
United States Department of Justice

ANDREW BRANIFF (IN Bar No. 23430-71)
Deputy Chief

<u>/s/ Vendarryl Jenkins</u>
VENDARRYL JENKINS (DC Bar No. 1724928)
CHRISTOPHER WOOLLEY (CA Bar No. 241888)
DAVID REESE (AL Bar No. ASB-0887-I67R)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street NE, 9th Floor
Washington, DC 20530
(202) 598-1671 vendarryl.jenkins@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice to all attorneys of record.

*/s/ Vendarryl Jenkins*

Vendarryl Jenkins