IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

JEFFREY NUZIARD, et al.,

      Plaintiffs,

      v.                                Case No. 4:23-cv-00278-P

MINORITY BUSINESS
DEVELOPMENT AGENCY, et al.,

      Defendants.

---

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

---

**TABLE OF CONTENTS**

ARGUMENT IN REPLY ............................................................................................... 1

   I.   This Court already determined that Plaintiffs have standing.............................. 1

        A.  Plaintiffs have established an injury in fact from the denial of equal treatment and racial stigmatization. ................................................................... 3

        B.  Plaintiffs' injuries are traceable to Defendants and redressable by this Court. ........... 9

   II.  Plaintiffs are entitled to favorable Summary Judgment because the MBDA Statute violates the Fifth Amendment's Equal Protection Guarantee........................................... 10

        A.  Defendants have not met their burden to demonstrate a compelling governmental interest for the MBDA Statute's purported racial remedy.................. 14

        B.  The MBDA Statute does not enact a narrowly tailored remedy. ............................... 20

  III.  Plaintiffs are entitled to favorable Summary Judgment because the MBDA Statute violates the Administrative Procedure Act. ................................................ 24

  IV.  The MBDA Statute is unconstitutional on its face, inflicts irreparable harms, and the APA and principles of equitable relief empower this Court to grant complete relief. ......................................................................................................... 26

        A.  Broad declaratory and injunctive relief is warranted. ................................................ 26

        B.  The APA vests this Court with broad authority to set aside the unconstitutional MBDA implementing regulations................................................. 34

CONCLUSION....................................................................................................... 34

CERTIFICATE OF SERVICE ............................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)....................................................... 11, 23

*Ayuthaya ex rel. Ayuthaya v. Dansby*, No. 1:06-cv-053-C ECF,
    2006 WL 8436677 (N.D. Tex. Aug. 16, 2006)................................................................... 1

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................... 1

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................................................. 29

*Carney v. Adams*, 141 S. Ct. 493 (2020) .............................................................. 2, 7, 8

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)................................. 29

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ........................................... 13, 18, 20

*Cooper v. Aaron*, 358 U.S. 1 (1958)........................................................................... 29

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006)................................. 12, 14, 20

*Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831 (5th Cir. 2004) ............................ 26

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*,
    122 F.3d 895 (11th Cir. 1997) ............................................................................. 17

*ESI/Employee Solutions, L.P. v. City of Dallas*, 531 F. Supp. 3d 1181 (E.D. Tex. 2021) ............. 8

*Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765 (5th Cir. 1978) ................................. 26

*Fund Texas Choice v. Paxton*, No. 1:22-CV-859-RP,
    2023 WL 2558143 (W.D. Tex. Feb. 24, 2023)................................................................. 29

*Gratz v. Bollinger*, 539 U.S. 244 (2003).................................................................... 3, 4, 14

*Griffin v. HM Florida-ORL, LLC*, 601 U.S. __, No. 23A366 (Nov. 16, 2023)........................... 34

*Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769 (W.D. Tex. 2013)................................ 8

*Heckler v. Mathews*, 465 U.S. 728 (1984)............................................................... 2, 33

*Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty., Fla.*,
    455 F.2d 818 (5th Cir. 1972) ........................................................................... 29, 30

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)................................... 3, 7

*James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977) ................................... 17

*Johnson v. California*, 543 U.S. 499 (2005) ............................................................. 11

*King v. Dogan*, 31 F.3d 344 (5th Cir. 1994) ............................................................. 2

*League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147 (W.D. Tex.).................... 27

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) ............................................................. 28, 30

*Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021)................................................... 30

*McNamara v. City of Chicago*, 138 F.3d 1219 (7th Cir. 1998) .................................... 17

*Milliken v. Bradley*, 418 U.S. 717 (1974) ................................................................. 28

*Milliken v. Bradley*, 433 U.S. 267 (1977) ........................................................... 28, 29

*Mitchell v. Pidcock*, 299 F.2d 281 (5th Cir. 1962) ................................................... 29

*Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*,
    993 F.2d 1222 (5th Cir. 1993) ............................................................................. 2

*N.E. Fla. Ch. of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
    508 U.S. 656 (1993) ........................................................................................... 2

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ................. 12, 20

*Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978) ................................. 12, 19

*Seigler v. Wal-Mart Stores Texas, LLC*, 30 F.4th 472 (5th Cir. 2022) ......................... 8

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................................... 12, 13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    143 S. Ct. 2141 (2023)................................................................................ passim

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ........................................................... 34

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)................................................ 1

*Ultima Servs. Corp. v. U.S. Dep't of Agric., No.* 220CV00041DCLCCRW,
    2023 WL 4633481 (E.D. Tenn. July 19, 2023) ...................................... passim

*Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021) ................................................. 26

*Washington v. Davis*, 426 U.S. 229 (1976)........................................................... 12

*Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958 (5th Cir. 2019) ............... 9

*Winzer v. Kaufman Cty.*, 916 F.3d 464 (5th Cir. 2019) ........................................... 9

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ....................................... 12, 14

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................... 11

**Statutes**

15 U.S.C. § 9501 ........................................................................................ 3, 10, 31

15 U.S.C. § 9502 ............................................................................................. 31

15 U.S.C. § 9511 ......................................................................................... 3, 31

15 U.S.C. § 9512 ......................................................................................... 3, 31

15 U.S.C. § 9522 ......................................................................................... 3, 31

15 U.S.C. § 9523 ......................................................................................... 3, 31

15 U.S.C. § 9524 ............................................................................................... 3

15 U.S.C. § 9526 ............................................................................................. 31

15 U.S.C. § 9551 ............................................................................................... 3, 31

15 U.S.C. § 9552 ............................................................................................... 3, 31

15 U.S.C. §§ 9501–9598 ................................................................................. 22, 31

Fed. R. Civ. P. 56 ..................................................................................................... 1

Fed. R. Civ. P. 8(a) ................................................................................................... 1

**Regulations**

15 C.F.R. § 1400.1 ......................................................................................... 10, 25

15 C.F.R. pt. 1400 .................................................................................................. 25

5 U.S.C. § 551 ........................................................................................................ 25

5 U.S.C. § 704 ........................................................................................................ 25

5 U.S.C. § 706 .................................................................................................. 25, 34

**ARGUMENT IN REPLY**

**I.      This Court already determined that Plaintiffs have standing.**

Defendants' standing arguments largely ignore this Court's prior consideration of, and ruling on, the issue. So long as one of the three plaintiffs has standing, the Court will consider the merits. ECF 27:4, 8; *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (citation omitted). At the preliminary injunction stage, this Court rejected many of the same precedents Defendants raise again here. *See* ECF 27:4-8. Defendants' arguments that Plaintiffs are relying solely on "bare" allegations from their complaint, or that the information provided by Plaintiffs in depositions or declarations should not be considered, are improper and should not alter this Court's prior, correct ruling that Plaintiffs have standing.

Defendants apparently take the position that if Plaintiffs did not rattle off every detail of their businesses and future plans in their Verified Complaint, they are restricted to only those allegations. *See* ECF 46:30–35. This is a fundamental misunderstanding of black letter law. Pleadings are "a short and plain statement" of the claim, while summary judgment is the "put up or shut up" stage of litigation following discovery. Fed. R. Civ. P. 8(a), 56; *cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (Fed. R. Civ. P. 8 "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation" of recovery); *Ayuthaya ex rel. Ayuthaya v. Dansby*, No. 1:06-cv-053-C ECF, 2006 WL 8436677 at *5 n. 1 (N.D. Tex. Aug. 16, 2006) (summary judgment is the "'put up or shut up'" phase) (citation omitted).

Defendants seem to argue that Plaintiffs cannot rely only on the Verified Complaint while simultaneously arguing (incorrectly) that Plaintiffs are attempting to "manufacture" standing after the fact because they provide further evidence of their harms and continued injuries following the date of their complaint. *See, e.g.*, ECF 46:20–21, 30–35. Defendants are wrong on both counts. All

1

three plaintiffs *verified* the complaint under penalty of perjury; the complaint is therefore competent summary judgment evidence, and the case law preventing a plaintiff from resting solely on the pleadings is inapposite. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citations omitted).

Further, Plaintiffs have not attempted to retroactively confer standing. This Court *already determined* that Plaintiffs have standing to sue. All three Plaintiffs presented evidence that they were able and ready to apply for MBDA assistance; that they were denied that opportunity on the basis of race; and that, as a result, they suffered a denial of equal treatment and stigmatic injury. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the injury establishing standing is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *N.E. Fla. Ch. of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). In addition, "[t]he badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing." *Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) (citing cases); *e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (recognizing the Court's "repeated[] emphasi[s]" on the stigmatiz[ation] caused by racial discrimination as "serious non-economic injur[y]"); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2170 (2023) (race discrimination "demeans the dignity and worth of a person").

In the context of a benefit, a plaintiff must show he was "'able and ready' to apply" "in the reasonably foreseeable future" "and that a discriminatory policy prevents [him] from doing so on an equal basis." *Carney v. Adams*, 141 S. Ct. 493, 500 (2020); *Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 666. This showing, in which a plaintiff "would have" sought a

2

benefit but for the discriminatory barrier, is sufficient to confer standing; a "futile gesture" of submitting to a challenged policy is not required. *Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003) (collecting cases); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977).

A.    **Plaintiffs have established an injury in fact from the denial of equal treatment and racial stigmatization.**

Pursuant to 15 U.S.C. §§ 9501–9598 (the "MBDA Statute"), the MBDA administers nationwide and broad-scale business assistance, programs, and services (the "Program" or "Programming") on the basis of race. *See, e.g.*, 15 U.S.C. §§ 9501(9), (15), 9522, 9523, 9524(a), 9551(3), 9552(b)–(c), 9511, 9512.

Plaintiffs have each suffered an injury in fact because each is "able and ready" to apply to the Program but for the MBDA's racially discriminatory policy. Each Plaintiff owns and operates a small business and is "ready" to apply to the Program out of a personal desire for at least certain advertised MBDA Program services. Plaintiff Piper's desire for "access to contracts, access to capital, training, and other services helpful for sustaining and growing [his architectural] business" derives from his simple recognition that he is approaching retirement, and given his family's special needs considerations along with a downturn in work following the pandemic, he would like to take advantage of business growth opportunities that present. ECF 39:13 ¶¶ 12–16; 47:26–27. Likewise, both Plaintiffs Nuziard and Bruckner have sought business assistance and opportunities in response to current goals and past and ongoing business challenges they face. ECF 39:2 ¶¶ 2–19, 25–26; ECF 39:21 ¶¶ 7–21. Having opened offices in two locations for his business in the last few years, Nuziard has further expansion plans pending and sought MBDA's "grant opportunities, financial sourcing assistance, strategic business consulting, and other [] resources helpful to maintaining and growing a business." ECF 39:3 ¶ 13–19. Similarly, Bruckner sought

"contracting opportunities, business development services, training, and other free and low-cost services" for his public contracting business. ECF 39:23 ¶ 21.

Each Plaintiff sought the Programming through MBDA's various websites, and both Bruckner and Nuziard took further steps contacting MBDA offices. Unfortunately, each Plaintiff observed MBDA's website listing of specified races that the agency serves in administering its Programming and learned that the MBDA did not consider them eligible due to this race-based eligibility requirement. After Piper found that the Program's race-based criterion rendered him ineligible at any MBDA office, including the Wisconsin MBDA (at the time, slated to open in the foreseeable future), the nearby Illinois MBDA serving Wisconsin, and the Minnesota MBDA, he became discouraged from seeking further application or inquiry. ECF 39:15 ¶¶ 23–35. Bruckner's email to the Orlando MBDA regarding the required "Ethnicity" question on the client intake form was returned with a response confirming that the office could not help because he is white. ECF 39:23 ¶¶ 22–33. Nuziard experienced the same race-based rejections in accessing the Dallas Fort Worth MBDA's website and form and when phoning and visiting the office in person, with each encounter confirming that the office could not help "because [he] wasn't a minority." ECF 47:5– 9; ECF 39:4 ¶¶ 20–24; ECF 1 ¶ 34. Consistent with the Court's previous finding, these showings again confirm that Plaintiffs are "ready" to apply to the Program and "would have" proceeded but for the MBDA's racial eligibility requirement. *See* ECF 27:6; *e.g.*, *Gratz*, 539 U.S. at 261–62.

Each Plaintiff is also "able" to apply to Program for multiple independently sufficient reasons. *First*, all Plaintiffs are "able" to apply because regardless of any particular MBDA office, the Programming is provided pursuant to the MBDA Statute, which does *not* contain other race-neutral criteria and imposes only a race-based eligibility requirement that forecloses Programming availability to business owners on an equal basis. It is Defendants' race-based rejection that is at

issue and which Plaintiffs challenge; not the actions of any individual MBDA offices to *sometimes* impose additional *non-statutory* criteria. Thus, Plaintiffs would be eligible for Programming under the MBDA Statute, if there were no such race-based requirement. *Second*, although some MBDA offices impose additional, non-statutory criteria, each Plaintiff is "able" to apply because regardless of any particular MBDA office, the Programming is available through a number of MBDA offices that do *not* indicate any further criteria beyond the MBDA's racial criterion. Thus, if there were no such requirement, Piper would have been eligible for the Program at the time he sought assistance from the Illinois and Minnesota MBDA offices, which do not indicate inflexible criteria and simply "serve[/s] all MBEs." ECF 39:15 ¶¶ 23–35; ECF 42:46; ECF 44:32–33. *Third*, as Plaintiffs explained in their response brief to Defendants' motion for summary judgment, Nuziard and Bruckner are "able" to apply because they met all the race-neutral requirements of the Dallas Fort Worth and Orlando MBDA offices, respectively, at the time they sought assistance; and they would have continued with the application process they attempted to start via their contact inquires, but for the MBDA's explicit noticing of its exclusive racial eligibility requirement.[1] *See* ECF 44:15–16 (discussing Nuziard's satisfaction of the Dallas Fort Worth MBDA's non-statutory criteria, including durational, industry, and revenue requirements); ECF 44:21–22 (discussing Bruckner's satisfaction of the Orlando MBDA's durational requirement). Accordingly, consistent with the Court's prior finding of standing, these demonstrations show that Plaintiffs were "able and ready" to apply to the Program at the time they sought assistance through MBDA's websites and made follow-up inquiries (as was the case for Nuziard and Bruckner).

---

[1] Defendants cite several times to Bruckner's prior case out of Florida challenging his rejection on race grounds from another federal government program. But as Plaintiffs have thoroughly explained, the defect in that case is specific to a factual context that is incomparable to the case at bar. *See* ECF 44:23 n. 8.

In addition, Plaintiffs would be eligible for Programming at other offices but for the MBDA's racial eligibility requirement. *See, e.g.*, ECF 1: ¶¶ 42–51. Nuziard has encountered the MBDA's race-based barrier at other offices in Arizona, New Mexico, and Florida, even though he meets any additionally indicated non-statutory criteria. ECF 44:15–16; ECF 39:4 ¶¶ 14, 32–48; ECF 1 ¶¶ 43–45, 48. Similarly, Bruckner would have sought assistance from several other MBDA offices that do not appear to indicate additional non-statutory requirements, including the Miami, Alabama and Georgia offices, since he does business across the United States; but he remains subject to the MBDA's racial barrier. ECF 44:21–22; ECF 39:26 ¶¶ 34–38,[2] ECF 39:30 ¶¶ 53–57; ECF 1 ¶¶ 42–44, 50.

Defendants' attempts to pick apart each Plaintiff's standing fail as both a matter of fact and law and frequently rest on a fundamental misconception of Plaintiffs' injuries. For example, Defendants' only answer to disputing Nuziard's satisfaction of non-statutory race-neutral criteria is based entirely on defense counsel's newfound, *post hoc* interpretation of the Dallas Fort Worth MBDA's revenue requirement. But as Plaintiffs have thoroughly explained, these assertions in no way negate Nuziard's "ability" to apply. *See* ECF 44:15–19. Similarly, Defendants' retort to Bruckner's satisfaction of non-statutory race-neutral criteria is based on unknown and later-discovered requirements at the Orlando MBDA.[3] But as Plaintiffs have already explained, these

---

[2] Contrary to Defendants contentions, Bruckner has not asserted that he provided information about his race to the Miami MBDA in his later email inquiry. His declaration simply states that the website indicates a "minority business enterprise" requirement and that he emailed the office to confirm available assistance options—as the website does not indicate further eligibility information—but did not receive a response.

[3] The Orlando MBDA *still* does not appear to post a revenue requirement on its website. In fact, the intake form Mr. Bruckner attempted to complete offers a revenue selection from $0–450,000+. *See* Orlando MBDA Business Center Customer Intake Form (last visited Nov. 26, 2023). *See, e.g.*, ECF 1 ¶¶ 37–38.

6

assertions do not refute Bruckner's "ability" to apply. Indeed, Bruckner testified that but for the MBDA notice of the race-based requirement, communicated through multiple emails from the Orlando MBDA, he would have liked the option to proceed with an application anyway in order to determine the parameters of any requirements and exceptions thereto. *See* ECF 44:21–29.

Defendants' attacks on Piper's "readiness" to apply fare no better. *See* ECF 44:32–39. The fact that the Wisconsin MBDA was not open at the time Piper sought the Program does not close his case. The Program is national in scope, has been advertised since the passage of the MBDA Statute in 2021; and indeed, Piper sought access from nearby MBDA offices. *See* ECF 42:46. Moreover, the Wisconsin MBDA had been announced as soon-coming, and the case law is clear that Piper is entitled to seek benefits for the "reasonably foreseeable future." *Carney*, 141 S. Ct. at 500. Piper is not required to subject himself to the "futile gesture" of applying to a discriminatory benefit to establish standing. *Teamsters*, 431 U.S. at 365–66. Likewise, Defendants' contention that Piper may not vindicate his own constitutional rights while simultaneously advancing a broader principle is unfounded, particularly where, as here, the principle is one of immense public interest. *See* ECF 44:39–40. Nor do Defendants' nitpickings about Piper "work[ing] alone" in the absence of employees have anything to with Piper's desire to obtain additional work for his business. As Defendants are aware, Piper's "primary interest" is growth and he is "willing to work nights and weekends" to "ramp up" to his capacity to bring in $100,000 in fees. ECF 47:26–30. Conflicts he may encounter at times when receiving multiple requests for the same time frame do not undercut his desire to seek growth that fits his business model.

Thus, Plaintiffs have demonstrated an injury in fact. Providing additional information beyond the "identifiable trifle" that is required for the injury in fact analysis does not strip standing from a party that already has established it. *ESI/Employee Solutions, L.P. v. City of Dallas*, 531 F.

Supp. 3d 1181, 1190 (E.D. Tex. 2021) (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017)).

Defendants take issue with the additional information Plaintiffs provided in both their depositions and declarations, ranging from Plaintiffs' descriptions of their own businesses to their plans as to how they would have benefitted from the Programming. For example, Nuziard discussed his plans to further expand his clinics to states other than Texas, and Piper noted his desire to look for work in public contracting.[4] Defendants ask this Court to discount these and other similar statements as mere "someday intentions," (ECF 46:32), but "an injury in fact requires an *intent* that is concrete"—not precise dates, times, and locations—for standing purposes. *Carney*, 141 S. Ct. at 502 (emphasis added). Plaintiffs did not just *intend* to seek out the Program at some speculative point in the future. They tried to apply and were deemed ineligible (or were explicitly told they could not apply) because of their race.

In an effort to evade the earlier ruling, Defendants ask this Court to invoke the "sham affidavit" rule to exclude Plaintiffs' declarations stating they attempted to access multiple MBDA offices over time. *See* ECF 46:24. But that rule does not apply to an "affidavit that 'supplements rather than contradicts prior deposition testimony.'" *Seigler v. Wal-Mart Stores Texas*, *LLC*, 30 F.4th 472, 477 (5th Cir. 2022) (citation omitted). The sham affidavit rule "is applied sparingly" and used only for an "inherent inconsistency" between deposition testimony and the declaration. *Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 776 (W.D. Tex. 2013) (citations and

---

[4] Defendants take issue with the Piper's interest in the Illinois and Minnesota MBDA offices, while failing to recognize that the Illinois MBDA has long served Wisconsin, just like many MBDA offices serve broad geographical regions. *See* ECF 44:31–32, n. 14 (press release relied upon by Piper noting that Wisconsin is served by MBDA offices located elsewhere, including the Illinois MBDA in Chicago).

internal quotation marks omitted). But nothing in Plaintiffs' declarations is inconsistent with their deposition testimony or their sworn statements in the Verified Complaint. *See Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019) ("while the affidavit significantly supplements the complaint factually, it contradicts nothing" and the district court erred in excluding it). While Plaintiffs' prior submissions were *more than sufficient* to establish their entitlement to the relief they seek, they are not barred from providing evidence outside of the complaint at the summary judgment stage.[5]

**B.      Plaintiffs' injuries are traceable to Defendants and redressable by this Court.**

Plaintiffs have also established the second and third requirements of standing because the "denial of equal treatment" "is traceable to the race and ethnicity-based [P]rogram," and since "[t]he MBDA dictates what races and ethnicities [it] can help," "an injunction preventing enforcement of the Program's race-and ethnicity-requirement would redress" the injury. ECF 27:6–8. In response, Defendants recycle arguments about Plaintiffs' satisfaction of non-statutory, race-neutral criteria. However, as Plaintiffs have explained, this argument fails to refute

---

[5] To the extent Defendants do not believe, say, that a business owner like Nuziard could both be in need of resources and be seeking to expand his business beyond its two current locations, or that a sole proprietor like Piper would desire to seek out additional work (despite their sworn statements that they could and would), that is, *at most*, a credibility contest for trial and does not justify tossing their claims as a matter of law. *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) ("Credibility determinations have no place in summary judgment proceedings") (quoting citation omitted). Defendants even take issue with Bruckner's description of his prior, Florida business, Car Squad Inc., which "contain[ed] both a government sales division for government contracting and a commercial division for automotive reconditioning," and which Bruckner determined to dissolve, given his desire to continue his work solely in federal contracting, among other considerations. *See* ECF 39:21 ¶¶ 7–9. During discovery, Plaintiffs provided Defendants verified interrogatories regarding the same and a production document listing examples of federal contracting projects that Car Squad, Inc. performed. In the spirit of completeness, Plaintiffs have included the email and information as provided to Defendants in the attached Third Declaration of Cara Tolliver. MSJ Reply App. 13–19.

redressability for the same reasons it fails under the injury in fact prong. *See* ECF 44:44–49; *supra* Section I.A. In sum, the government's race-based rejection of those business owners it disfavors is *always on* as the government's *only* basis of rejection, since the MBDA Statute imposes no other requirements for any other basis of its rejection. *See* 15 U.S.C. §§ 9501(9), (15). Defendants cannot point to individual offices' non-statutory criteria, which Defendants do not administer, to save the Program. Moreover, Plaintiffs have sought the Programming from MBDA offices that do *not* impose any additional criteria (and could still do so). In any event, Plaintiffs met all relevant non-statutory race-neutral criteria.

Defendants' contention that Plaintiffs have not alleged that they are "socially or economically disadvantaged individuals" pulls no weight. ECF 46:36–37. These definitions are *not* race-neutral, 15 U.S.C. §§ 9501(9), (15); they are set forth on the basis of race—a race-based presumption of eligibility, which is what Plaintiffs challenge. Plaintiffs have alleged that they would be eligible for Programming but for the MBDA's race-based requirement. Yet throughout this case, Defendants have maintained that Plaintiffs must *prove* their entitlement to the presumption, whilst favored races need not do so. It is that position (the race-based presumption) that brought Plaintiffs to court in the first place.

## II.    Plaintiffs are entitled to favorable Summary Judgment because the MBDA Statute violates the Fifth Amendment's Equal Protection Guarantee.

Between the MBDA Statute and its implementing regulations, some dozen-plus racial and ethnic minorities (potentially overlapping) are selected for a presumption of eligibility for MBDA Programming. 15 U.S.C. § 9501(15)(B); 15 C.F.R. §§ 1400.1(b)–(c). Defendants agree, as they must, that "programs with racial classifications are subject to strict scrutiny" pursuant to the exacting standards of equal protection jurisprudence. *See* ECF 46:37; *Johnson v. California*, 543

U.S. 499, 505 (2005). Yet, despite the Supreme Court's decision in *SFFA*, in which the Court, took pains to reiterate, even emphatically, this body of law in great detail, Defendants begin with a narrow assertion that "*Croson* governs this case." ECF 46:39–41. Hoping to cabin *SFFA* for "diversity in the classroom" only, Defendants deliver the astonishing claim that this case does not involve "anything akin" to the issues in *SFFA*. ECF 46:40. That argument is like saying that cases from *Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978) and its predecessors to *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) do not apply and have nothing to say about equal protection jurisprudence. But of course, that is not the case. Nor can the commands of equal protection be selectively muted at the government's will.

    *SFFA* did *not* regraft "the heart of the Constitution's guarantee of equal protection" but instead reaffirms "that the Government [] treat citizens as individuals, not as simply components of a racial [] or national class." *SFFA*, 143 S. Ct. at 2172 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). Indeed, these principles form "the twin commands of the Equal Protection Clause," which administers the "pledge of the protection of equal laws," by "*guard[ing] against two dangers that **all** race-based government action portends*"—the use of one's race against him as either as a 'negative' or as a stereotype. *See SFFA*, 143 S. Ct. at 2165, 68 (emphases added); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Likewise, the "twin commands" drive the strict scrutiny inquiry, which is designed to "'smoke out' illegitimate uses of race" so that there is virtually "no possibility" that a classification is the product of "illegitimate racial prejudice or stereotype," motivated by "illegitimate notions of racial inferiority or simple racial politics." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995) (citation omitted).

    Thus, based in substantial precedent, this Court correctly held that a government interest in remediating discrimination is compelling only if it targets (1) specifically identified instances

of past discrimination, for which there is evidence of (2) intentional discrimination, and (3) government participation. ECF 27:9 (citing *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021)); *see, e.g.*, *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 307–09 (1978); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 276 (1986); *Washington v. Davis*, 426 U.S. 229, 239–42 (1976); *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720, 731–32 (2007) (collectively requiring discrimination to be "identified" with "specificity" with a "showing of prior discrimination by the governmental unit involved").

Said differently, when the government identifies "specific [] instances of past discrimination that violated the Constitution or a statute," it may act to undo the discrimination with a narrowly tailored remedy. *SFFA*, 143 S. Ct. at 2162 (citing cases recognizing past intentional discrimination as a compelling interest, along with portions of Justice Thomas's concurring opinion, explaining that the injury to be remedied must be concrete and traceable to "de jure" segregation); *Ultima Servs. Corp. v. U.S. Dep't of Agric., No.* 220CV00041DCLCCRW, 2023 WL 4633481, at *11 (E.D. Tenn. July 19, 2023) (citing *SFFA*); *see also* ECF 38:20–22.

Indeed, until now, Defendants did not dispute this three-part test. In their opening brief, Defendants recognized that "Fifth Circuit jurisprudence largely follows the same rubric." ECF 41:46–47. But now, Defendants claim that "[n]either *SFFA* nor Fifth Circuit precedent supports [this test]," while curiously citing *SFFA*'s nearly identical articulation of this test elsewhere. *See* ECF 46:41, 45. Defendants thus appear to imply both that controlling Supreme Court precedent is void and that this Court simply ignored circuit precedent. Both arguments are unfounded.

Defendants point to *Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006), a case challenging a fire department's race-conscious hiring process, to contend that "[t]he Fifth Circuit explicitly rejected" this Court's three-part test, because "a formal finding of discrimination [need

not be made] prior to the use of a race-conscious remedy." ECF 46:46. But the court's statement means only what it says—that there does not have to be a formal finding; it does *not* mean that the three-part compelling interest test need not be satisfied. In fact, *Dean* actually confirms the test Defendants (now) reject. *See* 438 F.3d at 454–55 (a court must be able to ensure "that there was a strong basis in evidence for the conclusion that remedial action was necessary" and "the government must justify its action with a showing of past discrimination by the governmental unit seeking to use the race-conscious remedy.").[6]

Defendants also rely heavily on *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) to establish a compelling interest through an "inference of discrimination" using "statistical disparity studies and anecdotal evidence." ECF 46:41, 47–48. But Defendants both misconstrue and ignore the context of *Croson*, just as they ignore all other controlling precedent surrounding it. *Croson* did, indeed, discuss the use of statistical comparisons, but only in "a proper case"; the Court specifically referenced Title VII employment discrimination cases—a context confined by limited players, decisions and decision-makers. *See* 488 U.S. at 501–02. When the *Croson* Court discussed this framework in the context of a city's contracting program set-aside for minorities, it found that "low minority membership" was an insufficient interest and that the government lacked potentially "relevant" facts about the low participation it claimed to remedy. *Id.* at 503. However,

---

[6] Nor do *Dean*'s statements negate the fact that the strong basis in evidence must have existed "*before* [the government] embarks on an affirmative-action program." *Shaw*, 517 U.S. at 910 (citation omitted) (emphasis in original). Contrary to Defendants' contentions, Plaintiffs have not argued against the use of "post-enactment evidence." *See* ECF 46:55–58. Plaintiffs simply maintain, as did *Dean*, that any evidence must demonstrate that there was a strong basis before the government imposed a race-based remedy. Congress did not establish a compelling interest for the MBDA Statute, nor do Defendants now. *See infra* Section II.

*Croson* does not hold that just any demonstration of disparity and isolated anecdotes rise to an "inference of discrimination," let alone a constitutional justification for a race-based remedy. Nor does it suggest that there are not a multitude of varying factors "relevant" to a disparity study. Importantly, whatever *Croson* began to articulate in its limited discussion about statistical studies, it did not blunt all equal protection precedent, requiring a showing of intentional discrimination "by the governmental unit involved." *E.g.*, *Wygant*, 476 U.S. at 274; *Dean*, 438 F.3d at 454.

### A.  Defendants have not met their burden to demonstrate a compelling governmental interest for the MBDA Statute's purported racial remedy.

In support of the MBDA Statute's purported racial remedy to accord broad ranging business assistance nationwide on the basis of race, Defendants point to general concerns about minority business "start-up, growth, and development opportunities," given purported statistical disparities and anecdotes in "America's public procurement systems," wealth accumulation and private lending. *See* ECF 46:55–65. However, the only discrimination the government can address with a race-based remedy is that which it intentionally caused. The Constitution demands more than surveys of racial variations in society and conclusory and vague assertions about what those numbers might mean.

To meet their burden to provide "the most exact connection between justification and classification," Defendants must identify an alleged constitutional or statutory violation, demonstrating some specified wrong allegedly committed by a governmental wrongdoer against a victim. *E.g.*, *SFFA*, 143 S. Ct. at 2162; *Gratz*, 539 U.S. at 270. The discrimination to be remedied must have some definition: it cannot be an "amorphous" concept broadly "suggesting the existence of discrimination," *e.g.*, ECF 46:48, 68, far beyond the wrongdoing caused by intentional governmental discrimination. *See Wygant*, 476 U.S. at 276.

Defendants rely primarily on voluminous disparity studies in the government contracting context for certain minorities as a "sound method for evaluating the effects of discrimination on minority business enterprises" of *all* types across the entire country. *See, e.g.*, ECF 46:58–65. Yet, the MBDA is *not* a government contracting agency; it is a business assistance agency that provides wide-ranging support services without limitation to any industry or business context. Likewise, the MBDA Statute designates a dozen or so racial groups for a presumption of eligibility that do not consistently appear to be match-for-match to Defendants' government contracting studies. *See infra* p. 21. Thus, even limited to the government contracting context, Defendants studies come up short against the span of the MBDA Statute.

But even setting aside both Defendants' inartful characterization of the MBDA as a federal contracting agency and Defendants' unacceptable extrapolations across the American economy, Defendants' broad surveys in the limited procurement context do not identify specific episodes of discrimination, pointing to constitutional or statutory violations. Nor do they point to intentional governmental discrimination.[7] Defendants' own sources identify "non-discriminatory actions" underlying the disparities.[8] Yet Defendants continue to inaccurately describe these disparities as "suggesting the existence of discrimination" or as "consistent with the presence of discrimination" so as to justify the MBDA Statute's sweeping race-based remedy. *See, e.g.*, ECF 46:48, 68; 41:60. According to Defendants, they need only show that "an invidious discriminatory purpose" "was a

---

[7] The federal contracting cases Defendants cite for support do not conclude that the government has met the three-part compelling interest test.

[8] *See* ECF 20:27; 41:52; 46:64 (Defendants' oft-cited MBDA review of disparities in federal contracting, U.S. Dep't of Commerce, Minority Business Development Agency, Contracting Barriers and Factors Affecting Minority Business Enterprises (Dec. 2016), at ix). *See also* ECF 38:26, 28–30.

motivating factor in the disparities identified." *See* ECF 46:50–51. But Defendants cannot do that: their disparities do not identify any particular discriminator or that discriminator's discriminatory acts that could demonstrate a purpose, much less an "invidious purpose" to discriminate, attributable to the federal government. Nor do isolated and unverified anecdotes lend persuasive support for intentional discrimination when it cannot be determined to what conduct and to whom these accounts and perceptions specifically relate. *See* ECF 38:30–31.

Notably, Defendants' assertions about their disparities studies frequently rely on imported principles from cases involving *confined contexts*, of limited actors and decisions, and in which the allegedly responsible discriminator has been identified in specific acts of discrimination against identified victims. *See, e.g.*, ECF 46:48–51 (citing *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999 (6th Cir. 1992) (public employer); *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325 (5th Cir. 1994) (private employer/Title VII); *Furnco Const. Corp. v. Waters*, 438 U.S. 567 (1978) (private employer/Title VII); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) (local zoning board)). In contrast, here, there are numerous decision-makers and actors (both government and private) and countless decisions, involved in a business's opportunities and success—not the least of which include individual interests, market and industry conditions, legitimate stakeholder needs and preferences, and various other factors that could account for disparities in the relative success or failure.

Thus, Plaintiffs do not need to "perform [] competing regression analyses that include the various factors." *See* ECF 46:52. Indeed, "there are simply too many" unknowns—"too many variables to support inferences of intentional discrimination" by the federal government in the public contracting arena, much less intentional discrimination by the federal government across all business contexts across America. *See* ECF 27:10 (citing *Vitolo*, 999 F.3d at 362); *accord Eng'g*

16

*Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 922 (11th Cir. 1997) ("[T]he disproportionate attraction of a minority group to [an] industr[y] does not mean that discrimination in the [] industry is the reason."); *McNamara v. City of Chicago*, 138 F.3d 1219, 1223 (7th Cir. 1998) ("statistical disparities prove little; they certainly do not prove intentional discrimination.").

Even Defendants' expert acknowledges the "possibly dozens of factors [that] might influence the ability of any individual to succeed," though discounts these as "subjection descriptions" that are irrelevant and cannot be controlled. *See* ECF 39:74. Further, Defendants' expert claims that "capacity factors"—such as a contracting firm's age, size, revenues, bonding limits, and expertise—must never be considered or controlled because they themselves are always infected by discrimination. ECF 39:72–73. But this notion itself would seem to be a broad generalization in and of itself that Defendants' expert did not specifically address. Given this, it is unsurprising that Defendants' expert report and various other sources do not employ the term "intentional discrimination" even once. *See* ECF 38:29–30. Moreover, many courts have raised concerns regarding relevant factor control. *E.g., Eng'g Contractors*, 122 F.3d at 917, 922 (describing the importance of accounting for known non-discriminatory factors in proving intentional discrimination, but nevertheless rejecting the contention "that any significant disparities that exist after[wards] [] must [necessarily] be due to the ongoing effects of [] discrimination"); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977) (relevant factor control important to determining study results). *See also* ECF 44:52–56. Indeed, the "Wainwright" and "Chow" reports Defendants rely on here, *e.g.*, ECF 46:62, were recently held insufficient for demonstrating intentional governmental discrimination in justifying a nearly identical race-based presumption applying to SBA's Section 8(a) program. *Ultima*, 2023 WL 4633481 at *2, 13 ("Defendants cannot affirmatively link those disparities to intentional

17

discrimination because they also cannot eliminate all variables that could account for the disparities.").

Nor does Defendants' alarming notion of "government participation"—in which the government is "a passive participant in private discrimination" simply by existing in a market of "barriers" that negatively affect business formation or competition— pass muster. ECF 46:66–67. While the government has a compelling interest in ensuring that tax dollars are lawfully spent, Defendants' theory of "passive government participation" amounts only to another "amorphous" concept with no boundaries or limitations for the government's imposition of a race-based remedy. But as this Court stated, for the government "to be a passive participant, it must be a participant." ECF 27:10; *accord e.g., Croson*, 488 U.S. 469, 492–93, 503–04 (government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") (quoting citation omitted).

To be sure, the use of circumstantial evidence is *not* the problem.[9] The problem is that Defendants' assertions lack all the essential elements of a claim of intentional government discrimination: there is no indication of what specified discriminatory violations occurred; government involvement is wholly unclear; and given the broad and unverified assertions conferred by Defendants' anecdotal evidence, victims cannot be distinguished either. This is a far cry from the required, specific instances of intentional discrimination in which the government participated. In short, Defendants' studies focusing on "America's public procurement systems" claim to point to *systemic* discrimination, and the government endeavors to lay claim to such

---

[9] Defendants devote much attention to discussing direct versus circumstantial evidence. *See* ECF 46:47–54. But this lesson in distinction misses the point. The requirement is that Defendants identify specific instances of intentional governmental discrimination that violated the Constitution or a statute.

purported discrimination far beyond any of its own, much less that discrimination it *intentionally* caused. However, outside of "constitutional or statutory violations," "the government has no compelling justification for inflicting [the] harm" of "helping one individual" over "refraining from harming another." *Bakke*, 438 U.S. at 308–09.

Likewise, "racial discrimination in lending markets" allegedly caused by an "enormous wealth gap between white and non-white families" and "private discrimination from banks" fail to point to any specific episodes of discrimination that is either intentional or involves government participation. *See* ECF 46:57–61. Although, disparities in "wealth accumulation" point again to societal discrimination (necessarily derived from numerous factors), Defendants also explain the "wealth gap" as resulting, "at least partially [from] the fruit of discriminatory government practices," dating from sixty to ninety years ago. ECF 46:61; 41:50.[10] No one denies the atrocity of past racial segregation, particularly with respect to African Americans. But the examples provided do not focus on each of the numerous minorities included under MBDA Statute; rather, they involve primarily Blacks. Further, the MBDA Statute "does not target black wealth accumulation"; the Program "targets some minority business owners." ECF 27:9. And even absent the issues with creating a causal chain between "wealth accumulation" and access to credit against a backdrop of various societal factors, the types of examples provided are not the type of relevant instances of intentional discrimination instances supporting a compelling governmental interest that justifies the MBDA and its race-based Programming *today*. Moreover, as discussed in

_____

[10] Citing, past "federally-sanctioned redlining" (occurring from 1934 until the 1960s), a "denial of the benefits of the G.I. Bill to Black veterans," (legislation formally known as the Servicemen's Readjustment Act of 1944) and "Jim Crow" (ending around 1965). *See also* ECF 42-7:1358; National Geographic, https://education.nationalgeographic.org/resource/who-was-jim-crow/ (last accessed Nov. 25, 2023).

19

Plaintiffs' responsive briefing, Defendants' also overlook other government remedies enacted to address these instances of past discrimination. *See* 44:58–59.

Defendants also continue to highlight old sources dating back to the 1970s and 80s that they claim supports the government's compelling interest in the MBDA Statute's broad race-based remedy. *See, e.g.*, ECF 46:65–66. However, past governmental interests, even if once compelling, do not equate to compelling interests today. *E.g.*, *Dean*, 438 F.3d at 456–57. Thus, racial classifications listed under 15 C.F.R. pt. 1400 at the time they were designated between 1971 and 1984 may not be summarily incorporated into the MBDA Statute without a justification relevant to this decade. ECF 38:24, 33 (citing regulatory authorities).

A construct, like Defendants, that claims to identify discrimination but does not specify the discriminatory violations or the responsible invidious discriminator, might show "a dearth of minority participation," *Croson*, 488 U.S. at 503, but it does *not* give rise to any "inference of discrimination," pointing to a specific episode of *intentional government* discrimination that can be remediated with race-based government action. Rather, it is the very definition of societal discrimination. *Parents Involved*, 551 U.S. at 731–32 (plurality) ("[A] governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster") (citation and internal brackets omitted). The MBDA Statute, accordingly, fails strict scrutiny.

### B.      The MBDA Statute does not enact a narrowly tailored remedy.

"Even if the Government had shown a compelling state interest in remedying some specific episode of discrimination, the Program is not narrowly tailored to further that interest." ECF 27:11. There is no reason for this Court to reverse that conclusion here. Defendants' have no persuasive response against the weight of the narrow tailoring standard because the MBDA Statute's racial

classifications are *not tailored at all*. Plaintiffs will not repeat the entirety of their arguments on this point here, but prior briefing confirms that the MBDA Statute's racial classifications fail on every requirement under the inquiry—from necessity to flexibility and duration to third party harm and beyond. *See* ECF 38:36–41; 44:59–62; 15:21–27; 24:10. At bottom, Defendants cannot demonstrate necessity for the MBDA Statute's racial classifications because their evidence does not address the scope of the statute's authorization in relation to the benefits the agency provides and the racial classifications purportedly designated for remedy.

Defendants have relied primarily on disparity studies in government contracting, but the MBDA provides broad ranging business assistance far beyond federal procurement. Even if contracting were the relevant metric, the racial classifications at play under the MBDA Statute and 15 C.F.R. § 1400.1 do not compare match-for-match to the government's disparity studies. That is the problem with a "scattershot approach," calling out broad and numerous racial groups as the MBDA Statute does. *See* ECF 27:12. What is the difference between "Asian," "other Pacific Islander," "Asian Pacific American[]" and "Asian Indian[]"? The MBDA Statute does not say, and Defendants do not know, just as the government did not know in *SFFA*. *Compare SFFA*, 143 S. Ct. at 2168 (University of North Carolina's answer: "[I] do not know the answer to that question.") *with* ECF 39:54 (Defendants' response here: "Defendants object to [Plaintiffs' request to describe how Defendants discern who is 'Asian'] because it is argumentative and requires the adoption of an assumption that is improper."). Nor do Defendants' disparity studies address these various differences. Thus, the point of Plaintiffs' "truism," noticing that the "Asian" classification covers a lot of ground, was *not necessarily* that every business owner in Asia will be today entitled to the Programming under the MBDA's Statute's racial presumption of eligibility (although they certainly *could be*, if they moved their businesses here, tomorrow). *See* ECF 38:37; 46:71. Rather,

21

Plaintiffs' point it is that the MBDA Statute employs numerous racial classifications that are "imprecise," "arbitrary," "undefined," "overbroad," and "underinclusive." *SFFA*, 143 S. Ct. at 2167–68. This Court did not find otherwise, explaining that the Program is underinclusive—both because it "arbitrarily excludes many minority-owned business owners" without justification, and "because it excludes every minority business owner who owns less than 51% of their business"— and overinclusive because "it helps individuals who may have never been discriminated against." ECF 27:11–12.

In addition, the MBDA Statute is in no way limited in duration. Indeed, Defendants explain that "[f]or more than a half-century, [the MBDA] has dedicated itself to supporting socially and economically disadvantaged business owners across America." ECF 41:14. At 54 years and running, narrow tailoring dictates that the MBDA should be sunsetting. But instead, "no end is in sight," and the MBDA Statute has only expanded government-sponsored discrimination through a fully integrated nationwide network of "widely publicize[d]" offices. *See* 15 U.S.C. §§ 9501– 9598; *SFFA* 143 S. Ct. at 2166. Defendants' claim that a design for congressional reauthorization after 2025 or that a generalized congressional reporting requirement regarding "activit[ies] of the Agency" can somehow satisfy durational limiting against this backdrop are incredible. ECF 46:73. Even more so, where, as here, Defendants have repeatedly emphasized their need for this race- based remedy because "the needle [has] not move[d]" in balancing out "stubborn disparities." ECF 20:22; 46:70. A remedy that has been tried (and has, by Defendant's own account, failed) for five decades cannot be narrowly tailored.

Finally, Defendants' assertion that the MBDA Statute's racial presumptions do not "have any meaningful effect on third parties" is absurd. "[I]t is not even theoretically possible to 'help' a certain racial group without causing harm to members of other racial groups." *E.g.*, *SFFA*, 143

22

S. Ct. at 2199 (Thomas, J., concurring). Defendants argue that the MBDA Statute imposes a racial presumption of disadvantage for eligibility but does not foreclose individuals from hurdling the presumption and "showing" their "social or economic disadvantage based on their identification as a member of a group." ECF 46:74. That is true, but it only reveals the inequality at play. *See* ECF 1: ¶ 31. Moreover, Defendants appear to have allowed the presumption to operate as the exclusive definition of eligibility for almost two years following the passage of the statute, and failed to take any action to course correct until just days before dispositive motions were due. *See infra* p. 31–33 (as discussed further); ECF 38:46–48; 44:40–41 (discussing MBDA's recent policy update). Even if Defendants' comply with the MBDA Statute now, this solves nothing; the statute continues to impose burdens and benefits on the basis of race. *See Ultima*, 2023 WL 4633481 at *15 ("individuals who do not receive the presumption must put forth double the effort to qualify") (recognizing that the difficulty of proving one's own disadvantage in the face of an automatic presumption for others ensures that the presumption is "dispositive" of whether applicants receive the government benefit). The MBDA Statute is *not* lacking in "meaningful effect." Rather, its widespread harm is yet another indication that the MBDA Statute fails narrow tailoring.

* * *

In sum, Defendants' "extensive record of more than 22,000 pages" justifies exactly nothing. ECF 46:43. The MBDA Statute's racial remedy outright fails both prongs of strict scrutiny. These failures mean that the MBDA Statute does not enact legitimate uses of race but is instead the product of "illegitimate notions of racial inferiority," "illegitimate racial prejudice or stereotype," and even "racial politics," and further violates the "twin commands." *E.g., Adarand*, 515 U.S. at 226; *see* ECF 38:42–45. Indeed, the MBDA Statute's presumptions rely on "stereotypes," assuming that business owners entitled to the racial presumption "always (or even

23

consistently)" require it for success; and that business owners of other races "always (or even consistently)" do not require such assistance for success. *See SFFA*, 143 S. Ct. at 2169–70. Likewise, the statute's racial presumption necessarily operates as a "negative" or "zero-sum" game because "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 2168–69. That is what happens in the absence of narrow tailoring whereby individuals are not treated as individuals and are instead called out on the broad basis of race and race alone.

Finally, despite Defendants' assertions, the government is *not* "powerless" to address either discrimination or disadvantage simply because it must work within constitutional safeguards to do so. ECF 46:43. However, if there was any doubt about how the principles of equal protection must be applied, *SFFA* cleared the air when it forcefully struck down race-based admissions programs, reconciling the issue in conformity with the already well-established principles of equal protection. As the *SFFA* Court concluded:

> In other words, [individuals] must be treated based on his or her experiences as an individual—not on the basis of race. Many [] have for too long done just the opposite. And in doing so, [the government has] concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin. Our constitutional history does not tolerate that choice. 143 S. Ct. at 2176.

Accordingly, summary judgment for Plaintiffs on their equal protection claim is in order.

## III. Plaintiffs are entitled to favorable Summary Judgment because the MBDA Statute violates the Administrative Procedure Act.

The MBDA's implementing regulations at 15 C.F.R. pt. 1400, as incorporated into the MBDA Statute at 15 U.S.C. § 9501(15)(B)(vi), violate the Administrative Procedure Act ("APA"). For all the reasons discussed *supra* Section II., these regulations designate constitutionally indefensible racial and ethnic groups for presumptive disadvantage and further create a process by

24

which "representatives of [a] group" may "show" their disadvantage to designate "as a whole" the group and its members as "socially or economically disadvantaged" in violation of the Fifth Amendment's Equal Protection Guarantee. *See* 15 C.F.R. §§ 1400.1, pt. 1400.

The APA requires courts to "hold unlawful and set aside" final "agency action," including "an agency rule," "found to be contrary to constitutional right." 5 U.S.C. §§ 706(2)(B), 704, 551(13). Thus, a determination of a constitutional violation in this case simultaneously results in a finding that the MBDA implementing regulations also violate the APA.

Up to this point, Defendants have not argued otherwise. Indeed, Defendants have specifically agreed with Plaintiffs on this point, indicating, multiple times, that if Plaintiffs succeed on their constitutional claim, then they also must succeed on their APA claim. *See* ECF 20:15 n. 16 ("Plaintiffs' APA claim is consequently subsumed by their Constitutional claim."); 41:84–85 (same). However, now, in another sudden change of position, Defendants say that if the MBDA Statute "permanently den[ies] the presumption of social or economic disadvantage to certain groups or races," then the "separate process of approval" under MBDA implementing regulations, requiring "groups" to prove their entitlement to the presumption of eligibility cannot simultaneously violate the APA. They claim that "Plaintiffs position"—that both the statute and regulations are unconstitutional—"is fundamentally flawed" because "Plaintiffs' challenge to the regulations, if successful, would delete the group admission process and thus eliminate the constitutional underpinning of narrow tailoring from the operation of the program."

Defendants' argument is simply untenable, demonstrating only a misconstruction of the constitutional injuries at play and the law that applies. The presumption of eligibility, extending across the MBDA Statute and its implementing regulations and by which various racial and ethnic groups may be designated, imposes burdens unequally on the basis of race. For *multiple*,

*independently* sufficient reasons it is unjustified and unconstitutional under each prong of strict scrutiny and the twin commands. Accordingly, summary judgment for Plaintiffs on their APA claim is in order, and the APA *requires* that these unconstitutional regulations—designating unjustified racial classes and mandating a process imposing unequal burdens on the basis of race—be set aside. *See infra* Section IV.B. (further discussing remedy under the APA).

## IV.    The MBDA Statute is unconstitutional on its face, inflicts irreparable harms, and the APA and principles of equitable relief empower this Court to grant complete relief.

### A.    Broad declaratory and injunctive relief is warranted.

It is "the power and the duty of federal courts to declare federal statutes unconstitutional," and because Plaintiffs have, again, satisfied the standard for injunctive relief, Plaintiffs have asked this Court to declare the MBDA Statute's racial presumption unconstitutional in violation of the Fifth Amendment's equal protection guarantee and 5 U.S.C. § 706(2)(B) and enjoin its enforcement. ECF 37; *Finch v. Mississippi State Med. Ass'n, Inc.*, 585 F.2d 765, 776 (5th Cir. 1978) (citing *Marbury v. Madison*, 5 U.S. 137 (1803)); *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004) (the standards for permanent and preliminary injunctions are essentially the same); *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021) (a plaintiff must demonstrate success on the merits, irreparable injury, and that the public interest and balance of harms favor an injunction).

Defendants do not dispute that either the denial of equal treatment or stigmatic injury constitute irreparable harms as a matter of law. Instead Defendants merely restate their assertion that Plaintiffs have not established injury under the standing inquiry, and then further allege that the "more than four month[]" delay following the Court's entry of the preliminary injunction was caused by Plaintiffs in an attempt to "manufacture a possible harm of rejection" from the MBDA.

26

ECF 46:78–79; 41:20–21. However, in the first place, it was not until October 6, 2023, that Plaintiffs became aware of Defendants' willingness to implement the Court's preliminary injunction order.[11] Moreover, the facts and the law are the same as they were when this Court found that Defendants were likely in violation of the Fifth Amendment, given their implementation of the MBDA Statute in denial of Plaintiffs' equal protection rights. *See* ECF 27. Plaintiffs have not, and do not need to, "manufacture" any additional rejections. The irreparable harm of the constitutional violation is already manifest. *See, e.g.*, ECF 27:12–13; *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 182 (W.D. Tex. 2022) ("Violations of [constitutional equal protection] inflict irreparable injuries because the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury.") (citing 5th Circuit and Supreme Court cases) (cleaned up). Any abatement of injunctive relief to "prevent[] Defendants from denying Plaintiffs equal access to the Program" would only allow the constitutional violations to continue, reinstating the irreparable harms. *See* ECF 27:13.

Defendants also assert that the balance of hardships and public interest favors them because they will be unable to continue their unconstitutional Program if they are enjoined. ECF 46:79–81. Defendants' argument appears to be that they must be allowed to continue the Program (even if this Court declares it to be unconstitutional) because there are benefits derived from its unconstitutional provisions. *Id*. That argument simply carries no water. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." ECF 27:13 (citing *Jackson*

---

[11] Because Defendants have now twice falsely asserted that Plaintiffs were responsible for delaying the implementation of the Court's preliminary injunction, Plaintiffs submit the Third Declaration of Cara Tolliver, containing the full communications between counsel on this issue, which Defendants partially omitted. MSJ Reply App. 4–12.

*Women's Health Org. v. Currier*, 760 F.3d 448, 458 n. 9 (5th Cir. 2014)). If Congress wants any benefit to continue, it must re-tool the Program to benefit all Americans or otherwise comport with the Constitution in enacting a race-based remedy. There is no public or governmental interest in allowing Defendants to continue implementing an unconstitutional program. Thus, the balancing of harms and public interest consideration weigh in favor of *granting* the injunction. *See also* ECF 38:53; 15:29. Accordingly, Plaintiffs have demonstrated that the MBDA Statute's racial presumption is unconstitutional and that an injunction, prohibiting Defendants' implementation therefore, is warranted.

Here, the scope of that relief must necessarily be broad "to cure the *condition* that offends the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (emphasis added). It is "the nature and extent of the constitutional violation" that determines "the scope of the remedy." *Milliken v. Bradley*, 418 U.S. 717, 744 (1974). Here, the "nature" of the violation concerns the constitutional guarantee to be free of race discrimination, which is a right of all people of all races, spanning the public interest across the nation. Likewise, the "extent" of the MBDA Statute's invalidity has been established *in toto*: The MBDA Statute discriminates entirely on the basis of race without justification, and that is true whether a business owner is a member of a favored or disfavored racial or ethnic group.

Defendants assert that broad relief is premised merely upon protecting Plaintiffs from future harm in which "their businesses relocate" and they must seek MBDA's Programming "in another state." ECF 46:82. And while, it is true that the "workability" of a narrower injunction is a concern, given at least two Plaintiffs' interstate operations considerations, this argument is only part of the equation. *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (injunctions must be "workable"); *see also* ECF 38:51–53. More fundamentally however, injunctive relief must address

"the condition that offends the Constitution," and "[t]he 'condition' offending the Constitution is [MBDA]'s de jure [discrimination]." *Milliken*, 433 U.S. at 282.

Defendants explain *Califano v. Yamasaki* as recognizing that "injunctive relief should be no more burdensome to the defendant than necessary." 442 U.S. 682, 702 (1979). And indeed, that is correct. But "an injunction [] is not a burdensome thing" when "it simply requires the [government] to obey the law." *Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty., Fla.*, 455 F.2d 818, 826 (5th Cir. 1972). "The aim of an injunction [of general applicability] is remedial, not punitive." *Id.* There is no legal justification in compartmentalizing the operation of the MBDA Statute in order to preserve its unconstitutional race discrimination elsewhere.[12] Nor can the Court easily address Plaintiffs' injuries "without assuming a premise"—the constitutionality of the MBDA Statute—"that is itself in doubt." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). Indeed, Plaintiffs' case is premised entirely upon the broader unconstitutionality of

---

[12] Defendants are wrong that the class action in *Califano* serves as any point of relevant distinction here. There, the Court simply assured that "a nationwide class [is not] inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." 442 U.S. at 702. These principles are thus relevant in *this case* and *every* equity case, as also explained *supra* p. 28. Defendants' proposal that Plaintiffs must certify a class action to afford "members of the public" who "may not agree with Plaintiffs' efforts" "an opportunity [] to opt out," before this Court can issue broad relief is similarly misplaced. "Where constitutional rights are concerned, enforcement of an unconstitutional law is always contrary to the public interest." *Fund Texas Choice v. Paxton*, No. 1:22-CV-859-RP, 2023 WL 2558143, at *27 (W.D. Tex. Feb. 24, 2023) (citation and internal quotations omitted) (collecting cases).

Similarly, Defendants do not help themselves in trying to distinguish *Mitchell v. Pidcock* as cited in Plaintiffs' opening brief for the proposition that "a suit in equity for an injunction to protect interests jeopardized in a private controversy" may extend far beyond the parties when "[t]he public interest is jeopardized." 299 F.2d 281, 287 (5th Cir. 1962); ECF 38:50. Defendants point to the fact that "the *Mitchell* Court was *enforcing* [the law]"—an "injunction [that] amounted to ordering the defendants not to break the law again." ECF 46:84 n. 63 (emphasis in original). But indeed, this is exactly what Plaintiffs have asked the Court to do in this case—the "supreme Law of the Land" must be enforced. *E.g.*, *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("Article VI of the Constitution makes the Constitution the 'supreme Law of the Land.'").

the MBDA Statute, and the Court must pass upon that issue in order to determine Plaintiffs' case. *See Ultima*, 2023 WL 4633481 at *18 n. 10 (determining the constitutionality of a regulation and reasoning that the court may issue broad relief, "enjoin[ing] Defendants from using the rebuttable presumption because that remedy is 'necessary to resolve a claim[.]'") (citing, *inter alia*, *Citizens United*, 558 U.S. at 331).

As the Fifth Circuit declared, "the injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out–actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium." *Hodgson*, 455 F.2d at 826 (citation and internal quotation marks omitted). What could be more important than "effectuating" the government's "general compliance" with this nation's Constitution?

Similarly, in *Louisiana v. Becerra*, 20 F.4th 260 (5th Cir. 2021), the Fifth Circuit again noted that a constitutional command for a consistent national policy may be an appropriate consideration in crafting injunctive relief. That case did not invoke constitutional concerns, but instead "the [HHS] Secretary's decision to enter the vaccine regulatory space for the first time—a novel assertion[] of authority" in which "[o]ther courts [were simultaneously] considering the[] same issue[]." *Louisiana*, 20 F.4th at 262–64. Under those circumstances, the Court found that there was no "constitutional command for a 'uniform'" vaccine rule, warranting a nationwide injunction. *Id.* In contrast, here, there is a firm and deeply-rooted constitutional command for a consistent national policy of equal treatment. It is black letter law that the government must consistently comply with the constitutional policy not to discriminate on the basis of race. The Court "is vested with broad discretionary power," *Lemon*, 411 U.S. at 200, and the issuance of a broad injunction under these circumstances of a facially unconstitutional statute is reinforced by

30

Fifth Circuit and Supreme Court precedent. *Ultima*, 2023 WL 4633481 at *18 (declaring a similar racial presumption unconstitutional in violation of the Fifth Amendment and issuing a nationwide injunction, preventing Defendants from using the presumption in program administration).

Plaintiffs have also asked this Court to enjoin Defendants' use of the term "minority" to advertise the agency and its Programming. ECF 37. The MBDA Statute's racial eligibility requirements for "minority business enterprises" are implemented through the agency's designation as the "Minority Business Development Agency," 15 U.S.C. §§ 9501(1) (9), (15), 9502(a), and permeate the entirety of available Programming under the statute without constitutional justification. Consequently, the term "minority," as used in the designation of the agency as the "Minority Business Development Agency," is based in the MBDA Statute's definitions and structure and directly implements the statute's preference for the designated racial minority groups. *See* 15 U.S.C. §§ 9501–9598 (employing the term "minority" countless times).

Moreover, there can be *no doubt* as to the meaning Defendants have accorded to that term. For the past two years following the enactment of the MBDA Statute, Defendants have committed the MBDA's nationwide focus entirely to the designated racial minorities—"widely publiciz[ing]" an exclusive listing of preferred racial and ethnic groups on its websites and through various other means of information dissemination. *See, e.g.*, ECF 39:53–54 (attesting that Defendants disseminate Program information through various methods, ranging from targeted efforts to broadcasting through various social media); 15 U.S.C. §§ 9501(15)(B), 9522, 9523(b), 9551(3), 9552(b)(1), 9502(d)–(e), 9526, 9511, 9512.

Indeed, MBDA websites across the country have reflected exactly who the MBDA serves, and consequently, which racial groups the agency does not serve. The MBDA's central website has stated: "Our clients are U.S. minority business enterprises (MBEs) owned and operated by

African Americans, Asian Americans, Hasidic Jews, Hispanic Americans, Native Americans, and Pacific Islanders." ECF 47:34–35 (MBDA website current to Aug. 17, 2023). And MBDA websites throughout the country have reflected identical statements, and *still* do.[13] The MBDA has presented its exclusive racial listing *with no alternative path to eligibility*; and Plaintiffs were, in turn, presented with this outright exclusion. Contrary to Defendants' contentions about the MBDA Statute's otherwise race-neutrality, considering the statute's terms for "social or economic disadvantage," the reality is that Defendants have not ascribed any race-neutrality to the MBDA Statute—nothing in any of the agency's public communications that Plaintiffs have ever encountered makes any mention to anything race-neutral within the scope of the MBDA, "disadvantage" or otherwise.

There can be no doubt that an unjustified federal statute dedicated, named, and enforced as the "Caucasian Business Development Agency" would be immediately struck down because, when a racial preference is patently unconstitutional, so is such a designation in which an agency has held itself out upon. Is America really to believe, and more importantly to *understand*, that now, after two years of public dedication and information dissemination regarding which racial groups the MBDA serves (and those it does not), the term "minority" has some other meaning?

Defendants only prove the point that something is awry when they have to make a policy update to MBDA offices nationwide to explain that the term "minority" does *not* say what it means,

---

[13] *See, e.g.*, Dallas Fort Worth MBDA website, *Services*, https://www.mbdadfw.com/services; New Mexico MBDA website, *About Us*, https://www.nmmbda.com/about-us; Orlando MBDA website, *Services*, https://orlandombdacenter.com/services/; Illinois MBDA website, https://strategic exceptions.com/illinois-mbda/ (each, last visited Nov. 28, 2023).

and what it has meant. Likewise, as explained previously, Defendants' eleventh hour "guidance"—issued on October 23, 2023, at two years post-enactment of the MBDA Statute, following this lawsuit challenging the statute's racial classifications, and only days before dispositive motions are due—solves nothing because it continues to elevate certain racial groups over others, imposing burdens and benefits unequally on the basis of race. ECF 39:129–30.[14] The MBDA Statute is dedicated to a race-based mission, and Defendants have hung a sign "No Whites" or any other disfavored race allowed (and even if allowed, begrudgingly allowed, and not preferred).[15] Indeed, following Defendants' claimed agreement to instruct MBDA offices to implement this Court's preliminary injunction, Piper still has not been able to apply for Programming at the Wisconsin MBDA without encountering a race-based inquiry. *See* ECF 44:42–43. "It is obvious that the "M" in "MBDA" truly means that the MBDA prefers particular "minorities" on the basis of race." ECF 39:10 ¶ 47. That sign must now come down.

---

[14] Following Defendants' late October policy update, the MBDA's central website was updated to state: "Our clients are U.S. minority business enterprises (MBEs) as defined in the MBDA Act. This includes businesses owned and operated by socially or economically disadvantaged individuals, including African Americans, Asian Americans, Hasidic Jews, Hispanic Americans, Native Americans, and Pacific Islanders." ECF 47:38 (MBDA website as of Nov. 1, 2023); MBDA website, *Who We Are*, https://www.mbda.gov/who-we-are/overview (last visited Nov. 28, 2023). And while these efforts, of course, fail to cure the constitutional defects at issue, Defendants do not even pretend to explain these efforts to the public in a manner inviting, equally, business owners of all races to apply. That is because the agency must keep with its name and dedication to "minorities."

[15] Defendants argue that this Court should "sever" the MBDA Statute's unconstitutional provisions pursuant to the statute's severability clause. ECF 46:84–86. But given the context here and the meanings ascribed to the term "minority," it cannot truly be said that MBDA Statute "Operates Independently of the Racial/Ethnic Presumptions." *Id.* The agency, has been purposed for a race-based mission, down to its very name. This Court would have to re-write the entire statute to excise the taint of the racially discriminatory mission and purpose of this agency. *See also Heckler*, 465 U.S. at 738 ("a court sustaining such a claim faces 'two remedial alternatives: [it] may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion.'") (citation omitted).

**B.      The APA vests this Court with broad authority to set aside the unconstitutional MBDA implementing regulations.**

As Plaintiffs have explained, the APA provides a separate but additional tool for addressing the unconstitutional MBDA implementing regulations and contemplates nationwide relief from invalid agency action. Defendants have not disputed this Court's authority to set aside unconstitutional regulations. That is because there is no answer that refutes this Court's plenary power and duty to take such action. The case law on this is clear and abundant. *See* ECF 38:54–55 (collecting cases). In sum, pursuant to APA section 706(2), if an agency action is unconstitutional, a court "must overturn the action." *Texas v. EPA*, 829 F.3d 405, 426 (5th Cir. 2016); 5 U.S.C. § 706(2)(B) ("[T]he reviewing court *shall* … hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right.") (parenthetical emphasis added). *See also Griffin v. HM Florida-ORL, LLC,* 601 U.S. __, No. 23A366 p. 3, n. 1 (Nov. 16, 2023) (Statement of J. Kavanaugh) ("courts *do* hold the power to" "act directly against the challenged agency action," "strike [it] down," and "treat[] [it] as though it had never happened.") (emphasis in original) (citation omitted).

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' opening summary judgment brief and response brief to Defendants' motion for summary judgment, as well as Plaintiffs' preliminary injunction briefings, Plaintiffs respectfully request this Court to grant Plaintiffs' motion for summary judgment.

Dated December 1, 2023

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Cara Tolliver*

Richard M. Esenberg (WI Bar No. 1005622)
Cara M. Tolliver (WI Bar No. 1112818)
Daniel P. Lennington (WI Bar No. 1088694)

330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Cara@will-law.org
Dan@will-law.org

THE LAW OFFICE OF
JASON NASH, P.L.L.C.
Jason C. Nash (Bar No. 24032894)
601 Jameson Street
Weatherford, TX 76086
Telephone: (817) 757-7062
jnash@jasonnashlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, sending notice to all attorneys of record.

*s/ Cara Tolliver*

Cara Tolliver