UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**JEFFREY NUZIARD, ET AL.,**

    Plaintiffs,

v.                      **No. 4:23-cv-00278-P**

**MINORITY BUSINESS DEVELOPMENT
AGENCY, ET AL.,**

    Defendants.

## OPINION & ORDER

    Before the Court are cross-motions for summary judgment. ECF Nos. 37, 40. Having considered the Motions, evidence of record, and applicable law, the Court **DENIES** Defendants' Motion (ECF No. 40) and **GRANTS in part** Plaintiffs' Motion (ECF No. 37).

## BACKGROUND

    Three entrepreneurs wanted federal assistance for their businesses. The first is Plaintiff Jeffrey Nuziard, PhD. Dr. Nuziard is a veteran, a researcher, and an author on sexual wellness from Tarrant County, Texas. Nuziard's business is Sexual Wellness Centers of Texas ("SWT"), a sexual and lifestyle health clinic with locations in North Texas. When the COVID-19 pandemic interrupted SWT's expansion plans, Dr. Nuziard explored federal programs for help. The second is Plaintiff Christian Bruckner. Mr. Bruckner is a disabled immigrant who fled Communist Romania in the 1970s to seek a better life in America. Despite setbacks Bruckner faced because of his disability and immigrant status, he worked hard to pursue the American Dream. Bruckner's American Dream took the form of Project Management Corporation ("PMC"), the federal contracting business he owns in his home state of Florida. A startup in federal contracting can be difficult, so Bruckner sought federal assistance to help PMC compete for contracts with the big guys. The third entrepreneur is Plaintiff Matthew

Piper. Mr. Piper's story embodies the American Dream that beckons many like Bruckner: Piper grew up in extreme poverty in Colorado but escaped the indigence cycle. Defying the odds, Piper excelled academically and graduated with honors from UC-Boulder's distinguished environmental design program. After climbing the corporate ladder and starting a previous firm in Colorado, Mr. Piper founded PIPER Architects in his now-home state of Wisconsin.

Plaintiffs hail from different states and have different circumstances, backgrounds, and businesses. But they have much in common: they all worked hard to get where they are, they all overcame obstacles in pursuit of the American Dream, they all care deeply for their businesses, and they all wanted—but couldn't obtain—assistance from the same federal program. They're also all white, a salient detail in this case.

A few years ago, Plaintiffs heard about the Minority Business Development Agency ("MBDA" or "the Agency"), a federal agency that assists businesses like SWT, PMC, and PIPER Architects. While their business needs varied, each Plaintiff could use a helping hand in their pursuit of prosperity. The MBDA seemed perfect, as its vision statement says the Agency exists to catalyze "[e]conomic prosperity for all American business enterprises." But unbeknownst to Plaintiffs, there was a catch. As its name suggests, the MBDA doesn't serve "all American business enterprises," but rather "all American *minority* business enterprises." But even that's not the whole picture. The Agency uses a codified list of preferred races/ethnicities to determine who gets benefits and who doesn't. The Agency presumes anyone from the listed groups is "socially or economically disadvantaged" and is thus entitled to services. Anyone outside those groups—white or otherwise—is presumptively *not* disadvantaged and thus not entitled to benefits.

Of course, the Agency has secondary and tertiary effects that benefit non-minorities, as an economy is only as strong as its weakest link. But that was little comfort to Plaintiffs when the Agency wouldn't help them because of their skin color. While Plaintiffs interfaced with the Agency in different ways, all roads led to the same conclusion: the MBDA isn't for them because they aren't on its list of preferred races.

When Dr. Nuziard heard the MBDA offers "grant opportunities, financial sourcing assistance, strategic business consulting, and other resources," he reached out to see if the Agency could help with his plans to expand SWT. But when he accessed the Agency's website, he discovered these opportunities are only for "ethnic minority-owned businesses." Thinking surely this wasn't the whole picture, Nuziard perused the websites of multiple Agency offices and called the Agency's DFW location to inquire further. Yet his efforts were in vain, as Agency reps told him he didn't qualify for help because he "wasn't a minority."

Mr. Bruckner contacted the MBDA's Orlando office when he heard the Agency breaks down barriers to contract acquisition. While PMC had found success, it was only through exhausting bid wars with larger contractors—Bruckner knew PMC's work would speak for itself if he could find more equitable access to opportunity. But Bruckner couldn't complete the office's intake form because there was no accurate demographic in the dropdown box for "Ethnicity." When he emailed the Agency to ask how he might apply, he was informed he *couldn't* apply unless his ethnicity was listed. Thinking this was a fluke, Bruckner consulted other Agency offices in Florida and neighboring states. Yet, like Nuziard, Bruckner's efforts were in vain: he couldn't apply for services unless he met the Agency's ethnicity requirements.

Mr. Piper was navigating a business and life in flux when he heard of the MBDA. He was saving to build a nest egg for retirement but also needed to cover expenses related to his family's special needs considerations. Then COVID-19 threw a wrench in things, causing PIPER Architects' contracts to dip below the firm's capacity. Fortunately, Piper saw that the MBDA advertises "access to contracts, access to capital, training, and other services helpful for sustaining and growing business." After reading an article by Defendant Cravins and Wisconsin Senator Tammy Baldwin, Piper realized the Agency's programs "fit [his] precise business interests and goals." Unfortunately, Piper discovered Wisconsin's MBDA office wasn't slated to open for months. Never one to give up easily, Piper did his research and found other MBDA offices in neighboring Minnesota and Illinois. Piper's persistence paid off when he discovered the Illinois office was serving

Wisconsin residents until the Wisconsin location opened. But like Nuziard and Bruckner, Piper wasn't included on the "listing of racial groups that the agency serves." Dismayed, he consulted other MBDA websites but ran into the same dead-end: the Agency wouldn't serve his business because his race isn't listed.

Denied benefits because of their race, Plaintiffs sued the Agency[1] on March 30, 2023. That June, the Court entered a preliminary injunction against the local offices that turned them away, prohibiting continued denial of benefits based on Plaintiffs' skin color.[2] Plaintiffs now seek a declaratory judgment finding the MBDA unconstitutional and equitable relief prohibiting further unconstitutional conduct by the Agency.

The Parties moved for summary judgment in October 2023. Plaintiffs see this case as clear-cut, arguing the Agency's race-based programming is unlawful under the Constitution and the Administrative Procedure Act ("APA"). For their constitutional claim, Plaintiffs apply the Supreme Court's holding in *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) ("*SFFA*"), arguing the Agency's racial presumption violates the equal protection guarantees of the Fifth Amendment's Due Process Clause. Their APA claim doesn't articulate an independent theory. Rather, it asks the Court to "hold unlawful and

---

[1]The Complaint names four defendants: Defendant MBDA (the Agency), Defendant Joseph R. Biden, Jr. (the President), Defendant Gina M. Raimondo (the Secretary of Commerce), and Defendant Donald R. Cravins, Jr. (the Under Secretary of Commerce for Minority Business Development). But Plaintiffs really only have beef with the Agency—the other defendants are named because they're in charge. Thus, the Court broadly uses "Agency" or "MBDA" when referring to Defendants. This is meant to keep things simple, not detract from the other Defendants' executive responsibility vis-à-vis the MBDA.

[2]The Agency took steps to comply with the preliminary injunction last October by clarifying the pathway to benefits for applicants not on the Agency's racial listing. *See* MINORITY BUS. DEV. AGENCY, GUIDANCE TO MBDA BUSINESS CENTER OPERATORS 2 (Oct. 23, 2023) ("An individual does not need to identify as a member of one of [the listed groups] to be a socially or economically disadvantaged individual eligible to receive Business Center services under the MBDA Act. An individual may meet the definition if their membership in a group has resulted in their subjection to racial or ethnic prejudice or cultural bias or impaired their ability to compete in the free enterprise system."). As discussed later, this post-suit policy change has no bearing on the present dispute.

set aside" any unconstitutional agency actions under 5 U.S.C. § 706(2)(B). Defendants also think the case is straightforward. Leaning on *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), Defendants argue the MBDA is constitutional because it remedies past discrimination in which the government "passively participated." Defendants further contend summary judgment is warranted because, merits aside, Plaintiffs lack standing to bring this lawsuit.

As explained below, Plaintiffs' arguments win the day, warranting denial of the Agency's Motion. But only Nuziard and Bruckner conclusively establish standing. Because reasonable jurors could doubt Piper's standing, the Court grants summary judgment for Nuziard and Bruckner but denies it for Piper. *See infra* pp. 9–37. Next, the Court grants summary judgment on Plaintiffs' equal protection claim. *See infra* pp. 37–76. After that, the Court denies summary judgment on Plaintiffs' APA claim, favoring remedies more clearly established than vacatur. *See infra* pp. 76–81. Finally, the Court enters a permanent injunction prohibiting further implementation of the MBDA's unconstitutional statutory presumption. *See infra* pp. 81–91.

## LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it would affect a case's outcome. *Id.* Generally, the "substantive law will identify which facts are material" and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* In assessing if summary judgment is warranted, the Court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Cunningham v. Circle 8 Crane Servs., LLC*, 64 F.4th 597, 600 (5th Cir. 2023).

While the Court may consider any evidence of record, it need only consider materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting

summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law"). But the Court need not mine the record for evidence supporting the nonmovant; the burden falls on the movant to simply show a lack of evidence supporting the nonmovant's case. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003). In this regard, "[s]ummary judgment is appropriate when 'the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022) (quoting *Celotex*, 477 U.S. at 323).

## ANALYSIS

"The Department of Commerce's Minority Business Development Agency (MBDA) is the lead federal agency dedicated to assisting minority business enterprises (MBEs) in overcoming social and economic disadvantages that have limited their participation in the nation's free enterprise system."[3] Founded by President Richard Nixon as the Office of Minority Business Enterprise ("OMBE"),[4] the Agency has existed in several historical permutations—all dedicated to "the growth and global competitiveness of the minority business community."[5] Made permanent in 2021, the Agency now enjoys the authority and scope of a full executive agency under the leadership of

---

[3] JULIE M. LAWHORN, CONG. RSCH. SERV., R46816, THE MINORITY BUS. DEV. AGENCY: AN OVERVIEW OF ITS HISTORY AND PROGRAMS 1 (2023); *see generally* 15 U.S.C. §§ 9501–9598 (the "MBDA Statute").

[4] *See* Exec. Order No. 11458, 34 Fed. Reg. 4937 (Mar. 5, 1969) ("Prescribing Arrangements for Developing and Coordinating a National Program for Minority Business Enterprise").

[5] Lawhorn, *supra* n.3, at 1, 8. The Agency pivoted to its current form under the Carter Administration, which rebranded the OMBE as today's MBDA and shifted the Agency's focus to capital networks. *Id.* at 23. The Agency began working through local "Business Centers" in 1981, when the Reagan Administration implemented this model to disinsulate the concerns of local and regional minorities from the federal government's centralized bureaucratic machinery. *See* Exec. Order No. 12432, 48 Fed. Reg. 32551 (July 14, 1983).

Defendants Raimondo and Cravins, who report to Defendant Biden.[6] With a $550 million appropriation through fiscal year 2025, the Agency operates in over thirty-three states plus Puerto Rico, providing resources for MBEs and mobilizing business-development initiatives.[7]

The Agency works via a network of "Business Centers."[8] While the federal government provides the lion's share of Business Center funding, local Operators buy in by contributing a percentage of their operational budget.[9] After that, Operators have relative autonomy to

---

[6]*See* Minority Business Development Act of 2021, S. 2068, 117th Cong. (2021). Introduced as the "Minority Business Resiliency Act" (*see* Minority Business & Resiliency Act of 2021, S. 1255, 117th Cong. (2021)), the MBDA was enacted in the Infrastructure Investment & Jobs Act (*see* Infrastructure Investment & Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021)); *see also* Press Release, Minority Bus. Dev. Agency, The Minority Bus. Dev. Agency is Permanently Authorized in Bipartisan Infrastructure Deal (Nov. 15, 2021); Monica S. Skaggs, *MBDA Becomes Permanent Federal Agency*, MBN Tex.: Minority & Multicultural Bus. News (2022), https://mbntexas.biz/mbda-becomes-permanent-federal-agency-p1121-232.htm.

[7]*See* Consolidated Appropriations Act of 2022, Pub. L. No. 117-328, 136 Stat. 4512–13 (2022); *see also* Press Release, Senator Tammy Baldwin, Baldwin Works to Make Minority Business Development Agency Permanent (Nov. 30, 2021); Minority Bus. Dev. Agency, *Business Centers*, MBDA Programs (last visited Jan. 23, 2024), https://www.mbda.gov/mbda-programs/business-centers. As demonstrated in this case, the Agency's impact is felt far beyond states with a physical MBDA location.

[8]Third-party Operators have functional control of each Business Center location. *See generally* Lawhorn, *supra* n.3, at 12 ("Applicants eligible to compete to operate an MBDA Business Center include nonprofit organizations, for-profit firms, state and local governments, educational institutions, and Native American tribal entities."). Entities selected as an Operator "focus on business development and capacity building by assisting MBEs to: improve operational efficiencies; increase resources; build scale; manage risk and increase liability thresholds; strengthen management teams; access and secure financing, equity, and venture capital; raise online capital; increase profits and owner equity; and implement and integrate new technology and equipment." *Id.* So the point-of-contact between applicants and the Agency is a middleman (e.g., DFW's "Dallas-Fort Worth Minority Supplier Development Council," Orlando's "3D Strategic Management Consulting," and Milwaukee's "North Central Minority Supplier Development Council"), but the Operators act as the Agency's public-facing extension.

[9]*See* 15 U.S.C. § 9524(c)(2)(A) ("A Center shall match not less than 1/3 of the amount of the financial assistance awarded to the Center under the terms

engage local MBEs with community-tailored programming. When Plaintiffs sought benefits from their local Business Centers (and others), they were turned away because they aren't on the Agency's list of preferred races/ethnicities. *See* ECF No. 44 at 13–14, 20–21, 32.

That list is important. The MBDA Statute says the Agency serves "socially or economically disadvantaged individual[s]." 15 U.S.C. § 9501(9)(A). While that seems race-neutral, the Statute defines it in racial terms. *See id.* § 9501(15)(A) ("The term 'socially or economically disadvantaged individual' means an individual who has been subjected to racial or ethnic prejudice or cultural bias . . . because of the identity of the individual as a member of a group, without regard to any individual quality of the individual that is unrelated to that identity."). Certain groups are automatically included: (i) Blacks or African Americans; (ii) Hispanics or Latinos; (iii) American Indians or Alaska Natives; (iv) Asians; (v) Native Hawaiians or other Pacific Islanders; and (vi) other groups added by 15 C.F.R. § 1400.[10] *See id.* § 9501(15)(B). As

---

of the applicable MBDA Business Center agreement, unless the Under Secretary determines that a waiver of that requirement is necessary . . . .").

[10]Those additions comprise a bizarre amalgam that is often arbitrary and frequently redundant with 15 U.S.C. § 9501(15)(B). The additions embrace demographics first articulated by President Nixon for the MBDA's precursor, the OMBE. *See* 15 C.F.R. § 1400.1(b) (noting Nixon designated "Blacks, Puerto-Ricans, Spanish-speaking Americans, American Indians, Eskimos, and Aleuts" as presumptively disadvantaged and thus eligible for services); *see also* Exec. Order No. 11625, 3 C.F.R. 1971–1975 Comp., 616 (1971). They also include "Hasidic Jews, Asian Pacific Americans, and Asian Indians." *Id.* § 1400.1(c). When President Carter rebranded the OMBE as the MBDA, the Agency endorsed the 1977 "Race and Ethnic Standards for Federal Statistics and Administrative Reporting," despite the directive's clarity that it isn't "scientific or anthropological" and shouldn't be a "determinant[] for participation in any Federal program." Office of Management & Budget, Directive No. 15 ("Race & Ethnic Standards for Federal Statistics & Administrative Reporting"), 62 Fed. Reg. 58782 (1977); *see* David E. Bernstein, *Classified: The Untold Story of Racial Classification in America*, 8–24 (2022). On the whole, many federal agencies endorsed racial listings during this period with little forethought or critical dialogue. *See* Julian Mark, *Government Presumption of Racial Disadvantage Under Siege by White Plaintiffs*, WASH. POST. (Dec. 18, 2023), https://www.washingtonpost.com/business/2023/12/18/minority-business-programs-racial-disadvantage/ ("Experts say the federal programs may be uniquely vulnerable: The categories of disadvantaged minorities were drawn up in the early 1970s with little research or debate—and sometimes based on

Plaintiffs discovered, applicants not listed in 15 U.S.C. § 9501 or 15 C.F.R. § 1400 are presumptively ineligible for Agency services.

Plaintiffs say the MBDA is unconstitutional because it "accord[s] preferential treatment to certain racial and ethnic minorities" in granting "business-related benefits and services." ECF No. 38 at 8. The Agency disagrees, but it pushes back more foundationally by arguing Plaintiffs lack standing to assert their claims in the first place. *See* ECF No. 41 at 25–41. The Court must address standing before evaluating any argument on the merits. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992); *United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022) ("Standing is a matter of jurisdiction, and courts must assess their jurisdiction before turning to the merits.").

### A. Only Nuziard and Bruckner Establish Article III Standing.

The Constitution limits federal courts' jurisdiction to "cases" or "controversies." U.S. Const., art. III § 2. We're over two-hundred years in and debates still rage about what that means.[11] But this jurisdictional limitation is not an academic exercise; it's a bulwark for the separation of powers. By limiting what courts can hear, the Framers protected our popular government from unelected jurists wielding the power of a legislator: the life tenure that insulates from politics immunizes from democratic accountability.[12] Simply put, judges aren't policymakers in

---

naked politics—creating a patchwork in which some programs presume a minority group to be disadvantaged while others do not.").

[11]*See* ECF No. 27 at 4 n.1. While not for want of effort, most "clear" definitions fail because judges tend to explain the doctrine by reference to the doctrine itself. *See, e.g., Muskrat v. United States*, 219 U.S. 346, 356 (1911) ("A 'case' was defined by Mr. Chief Justice John Marshall as early as . . . *Marbury v. Madison* to be a suit instituted according to the regular course of judicial procedure."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (defining justiciable disputes as "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process"). So what's a justiciable case or controversy? It's a case or controversy that's justiciable. But nebulous definitions aside, "[n]o principle is more foundational to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

[12]In both its Article III and prudential permutations, standing protects against judicial overstepping by making judges stay in their lane. This is a

black robes and were never meant to be. To mitigate the risk that we might try our hand at legislating, the Framers limited our job description to "cases" and "controversies." Whatever the contours of those terms, they at least mean federal courts cannot issue advisory opinions—there must be a live dispute between real persons "on each side of the *v.*" This was a deliberate departure from precedent. At the founding, English law[13] and many state constitutions[14] allowed advisory opinions divorced from a live dispute. But those days ended when the Constitution was ratified, limiting federal judicial authority to "cases" and "controversies" alone.

---

vital protection for our tripartite system of governance considering the lack of extrinsic demarcations between interbranch power. As Madison opined in *Federalist No. 48*, "[i]t is not infrequently a question . . . in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," but "the executive power [is] restrained within a narrower compass and [is] more simple in its nature," while "the judiciary [is] described by landmarks still less certain." THE FEDERALIST No. 48 (James Madison), at 307 (Clinton Rossiter ed., 1961). And while the terms "case" and "controversy" share inherent ambiguity, standing precedents have clarified their meaning to provide metes and bounds for judicial power. *See Steel Co.*, 523 U.S. at 101 (noting "[m]uch more than legal niceties are at stake" when it comes to standing, which is "an essential ingredient of separation and equilibration of powers" and "restrain[s] the courts from acting at certain times, and even restrain[s] them from acting permanently regarding certain subjects"); *see generally* Laurence H. Tribe, *A Constitutional Republic Demands a Constrained Judiciary: Judicial Overreach in 'Vacating' Biden's Loan Forgiveness Program*, VERDICT (Nov. 14, 2022), https://verdict.justia.com/2022/11/14/a-constitutional-republic-demands-a-constrained-judiciary.

[13]*See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he power of English judges to deliver advisory opinions was well established [at the founding]." (citations omitted)); *see also* 3 WILLIAM BLACKSTONE, COMMENTARIES *162 (1765) (noting members of the House of Lords "have a right to be attended, and constantly are, by the judges of the court of the king's bench and commonpleas, and such of the barons of the exchequer as are of the degree of the coif, or have been made serjeants at law; as likewise by the masters of the court of chancery; for their advice in point of law, and for the greater dignity of their proceedings").

[14]*See, e.g.*, Mass. Const. ch. III, art II ("Each branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justice of the supreme judicial court, upon important questions of law, and upon solemn occasions."); N.H. Const. art. 74 (same).

The more politically charged the subject, the more important this becomes. Where, as here, plaintiffs challenge a program with considerable policy implications, the Framers wanted to ensure federal courts don't become the *de facto* forum to air political grievances.[15] Enter the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. Chief among justiciability doctrines, standing helps identify cases that are "appropriately resolved through the judicial process." *Whitmore v. Ark.*, 495 U.S. 149, 155 (1990); *see United States v. Texas*, 599 U.S. 670, 676 (2023) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)) ("By ensuring that a plaintiff has standing to sue, federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'"). Standing gets pedantic fast. But behind all the jargon, standing just means plaintiffs have skin in the game. *See Sierra Club v. Morton*, 405 U.S. 727, 731 (1972) (defining standing as "a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy"); *Umphress v. Hall*, 500 F. Supp. 3d 553, 559 (N.D. Tex. 2020) (Pittman, J.) (finding no standing where state judge's complaint "mentions neither a currently nor imminently pending judicial disciplinary proceeding or investigation against him").

To make this call, the Court asks three questions. *First*, were Plaintiffs wronged? In legal parlance, they must have an "injury in fact," which is the "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560 (citation omitted). *Second*, is Defendant the bad guy? There must be a "causal connection between the injury and the conduct complained of." *Id. Third*, can the Court do anything about it? "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

---

[15]*See* JAMES MADISON, *Madison's Notes of the Constitutional Convention, in* 1 RECORDS OF THE FEDERAL CONVENTION OF 1787, 88 (Max Farrand, ed., 1911) (noting it is "foreign from the nature of the [judicial] office to make them judges of the policy of public measures") (quoting Massachusetts delegate Elbridge Gerry); *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 881–84 (1983) (tracing the history of standing for politically contentious cases and noting—with prescience—that "disregard [of the doctrine] will inevitably produce . . . an overjudicialization of the processes of self-governance").

Because they invoke federal jurisdiction, Messrs. Nuziard, Bruckner, and Piper "bear[] the burden of establishing these elements." *See id.*

Plaintiffs begin their argument by emphasizing "this Court's prior consideration of and ruling on" standing "[a]t the preliminary injunction stage." ECF No. 56 at 6; *see* ECF No. 27 (finding Plaintiffs had standing to seek preliminary injunction). But "the standard used to establish [standing] is not constant." *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014). Rather, the inquiry "becomes gradually stricter as the parties proceed through 'the successive stages of the litigation.'" *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 358 (1996)). Simply put, plaintiffs can't stand on old standing. Thus, the Court must examine standing anew now that discovery has generated a more fulsome evidentiary record. *See Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 628 (5th Cir. 2021) (quoting *Texas v. Rettig*, 987 F.3d 518, 527–28 (5th Cir. 2021)) ("The plaintiff can establish standing at the summary judgment stage only by setting forth . . . specific facts which, taken as true, support each element of the standing analysis." (cleaned up)).

The analysis differs for each Plaintiff here. Nuziard is easy because he met all posted criteria for the Agency's services except for race/ethnicity. Bruckner is more challenging because he didn't. At issue for both is whether any race-neutral criteria come from the MBDA or from third-party Operators. Piper is more challenging still, as he never contacted his local Business Center. For him, the issue is whether he sufficiently manifested intent to apply or if a "futility exception" excuses his inaction. The arguments for Nuziard and Bruckner differ in degree, the argument for Piper in kind. The Court thus addresses Nuziard and Bruckner in tandem, addressing Piper after that. As explained below, Nuziard and Bruckner establish standing; Piper does not.

1. <u>Dr. Nuziard and Mr. Bruckner have standing.</u>

The Agency says Nuziard and Bruckner lack standing because they wouldn't qualify for benefits even absent the Agency's presumption. *See* ECF No. 41 at 38. Nuziard and Bruckner disagree, suggesting they were eligible but were turned away because of their race. *See* ECF No. 44 at 13–14, 20. While these arguments mostly involve injury-in-fact and redressability, the Court touches each standing element below.

### a. Injury-in-Fact

As noted above, Nuziard and Bruckner must show the Agency invaded their "legally protected interest[s]," causing harm that is (1) "concrete and particularized" and (2) "actual or imminent." *See Lujan*, 504 U.S. at 560. The Agency doesn't contest Plaintiffs' legally protected interest in MBDA programming. Rather, at least for Nuziard and Bruckner, the Agency argues that interest's deprivation cannot confer standing because colorblind criteria made them ineligible for benefits. *See* ECF Nos. 41 at 36–37, 42–43; 54 at 9–13. As such, the Agency says Nuziard and Bruckner lack a concrete, particularized injury.[16]

For this argument, the Agency notes that equal-protection plaintiffs must be "able and ready" to obtain a benefit but for a challenged policy. *See id.* at 42 (citing *N.E. Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). The Agency briefs ostensible disqualifications ad nauseum—focusing on SWT's finances and PMC's nascency. *See* ECF No. 41 at 36–37, 42–43. As the Agency sees things, these issues rendered Nuziard and Bruckner unable/unready to receive benefits. Both men dispute the Agency's dysphemistic portrayal of their businesses. *See* ECF No. 44 at 15–22.

---

[16]The Court notes the Parties' loose usage of "concrete" and "particularized" makes those terms essentially meaningless at points in their briefs (a common trap when briefing jargon-heavy topics like standing). The Agency variously avers that each Plaintiff lacks an injury that is "concrete," "particularized," or both. *See, e.g.*, ECF No. 41 at 27, 30, 40, 43. But the Agency fails to explain *how* Plaintiffs' injuries are inconcrete or unparticularized. Litigants need not read tea leaves to divine these terms' meaning. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo v. Robbins*, 578 U.S. 330, 339 (2016) (internal citations omitted). Here, each Plaintiff was impeded in applying for benefits, which impacted each "in a personal and individual way." *Id.* That's a check for "particularized." And "a 'concrete' injury must be '*de facto*'; that is, it must actually exist . . . When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Id.* at 340. Plaintiffs don't own hypothetical businesses or need hypothetical help; they own real businesses and were denied real benefits because they didn't meet the MBDA's racial parameters. Other criteria aside, that's a "concrete" injury—especially considering the long line of precedent acknowledging that "'concrete' is not [ ] necessarily synonymous with 'tangible.'" *Id.* (collecting cases).

For Nuziard, the Agency emphasizes the DFW Business Center's "sustainable revenue" requirement. *See* ECF No. 41 at 41. The Agency doesn't articulate metrics used to make that determination, but the Center analyzes an applicant's "business model, revenue, and income" to ensure their business "can benefit from the services offered." *Id.* Given the Agency's mission, one would imagine this is a floor of viability, not a ceiling many MBEs would struggle to achieve; otherwise, the Center would reserve services for MBEs least in need of its help. This inference is supported by the criterion's ambiguity on the Business Center's website, which does not indicate financial metrics of any kind. The website merely requires "sustainable" revenue, with no other requirements to contextualize that criterion. *See* ECF No. 39 at 5. Nor does the Agency identify any public-facing documents (or internal operating procedures) that enumerate granular requirements SWT failed to meet. On this record, the Agency's current position looks a lot like a *post hoc* maneuver to evade standing.

While the record reflects no *specific* financial benchmarks SWT failed to meet, it reflects specific racial criteria Nuziard failed to meet. When Nuziard went to apply for programming from the DFW Business Center, he was confronted with three requirements SWT satisfied and a fourth racial requirement SWT could never hope to satisfy:

Does your business meet all of the following requirements: *

(check all that apply)

☐ Been in business for at least 2 years
☐ Represent high-growth industries
☐ Have sustainable, stable, & consistent revenue
☐ Are 51% owned and controlled by African Americans, Hispanic, Asian, or Native American entrepreneurs

If you did not check all the required boxes above, please explain.

[17]

---

[17]*See* ECF No. 39 at 7 (providing screenshot of the relevant intake form).

Without evidence that the Agency routinely posts or applies specific financial criteria to determine "sustainable, stable, and consistent revenue," the Court shares Nuziard's skepticism on this point.

Countering the Agency's depiction of his business, Nuziard points to SWT's annualized growth in patients and net revenue. *See id.* at 15 (noting "the Clinic continues to gain approximately 15–20 new patients each month and has had steadily increasing annual revenues since its inception"). This isn't just rose-colored glasses, either: the record shows SWT brought in revenues north of $500,000 in the relevant timeframe and had *adjusted* losses much smaller than the Agency suggests (i.e., operational costs + losses – wages and distributions). *See* ECF No. 42 at 201, 235–44. Under the Business Center's posted guidelines, a business like SWT would qualify with that revenue—unless it doesn't meet race-based criteria.[18] Moreover, while the Agency focuses on *losses*, the posted criteria speak only of *revenue*—a material distinction for early-stage businesses. In any event, the Agency's argument is a red-herring that distracts from the facially race-based fourth requirement.

The Agency's argument for Bruckner is a variation on this theme. The Agency argues PMC was "far below the Orlando [Business Center's] $500,000 annual revenue requirement" and didn't meet the Center's "3-year in business requirement." ECF No. 41 at 37. Like Nuziard, Bruckner pushes back on this point. *See* ECF No. 44 at 20–23, 25–26. Contra the Agency's stance regarding PMC's vitality, Bruckner furnishes evidence that he has operated in public contracting for over six years[19] and PMC has grown since inception. *Id.*; *see* ECF No. 39 at

---

[18]The Center's website makes this clear. *See Services*, MINORITY BUS. DEV. AGENCY, https://www.mbdadfw.com/services (last visited Jan. 23, 2024) (enumerating the four requirements reflected on the intake form above). The record shows SWT has operated for more than two years, represents a "high-growth" industry, and—notwithstanding the Agency's current interpretation of "sustainable"—has brought in consistent year-over-year revenues. *See* ECF Nos. 42 at 235–44; 44 at 13–18. Thus, while these arguments ultimately lack bearing on Nuziard's injury, the Court agrees that the Agency relies on a "*post hoc* interpretation" of this requirement. ECF No. 44 at 16.

[19]Bruckner tries to circumvent the Business Center's three-year durational requirement by pointing to his total federal-contracting tenure. *See* ECF No. 39 at 21 (adding PMC's duration to the lifespan of Bruckner's previous

20–32. But where Nuziard satisfied relevant criteria, Bruckner did not. *See* ECF No. 41 at 35.

There's a genuine dispute regarding when the Orlando Business Center told Bruckner about these requirements. *See, e.g.*, ECF Nos. 41 at 37; 44 at 27. At minimum, the record shows the Center told him before he sued. *See* ECF No. 42 at 133–34. If Bruckner had to prove PMC would get benefits to establish standing, this argument would kill his claim. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 170 (2000) (holding plaintiffs must have standing "at the time [an] action commences"). But as explained below, Bruckner need not prove the unprovable by showing PMC would certainly obtain benefits to establish standing. And regardless of the Agency's subsequent communications, the Agency relies on requirements that weren't on its website when accessed by Bruckner.  In this regard, Bruckner argues:

> A requirement that is not publicly advertised and available for consideration by *any* would-be applicant . . . [should not] inform an ultimate determination of a benefit. Under this line of reasoning, the government could conjure up almost any reason to disqualify a plaintiff and evade suit, once again turning the 'able and ready' inquiry on its head. Defendants' [argument] . . . on the basis of a requirement that was not publicly available and could not be known (to *any* would-be applicant) at the time Programming was sought, amounts only to [a] prohibited *post hoc* rationalization and does not negate Mr. Bruckner's ability to apply at the time he sought assistance.

ECF No. 44 at 27. The Court agrees. The Agency shouldn't say one thing on its website and do another down the road. Otherwise, the Court can't tell which reasons are valid and which are *post hoc* rationalizations.

Bruckner also notes that Business Centers without these criteria still turn away non-minority applicants. *See* ECF No. 44 at 29. Nothing stops Bruckner from seeking benefits from Centers not in Orlando. *See*

---

contracting business, "Car Squad, Inc."). But the requirement does not speak to a business owner's experience, it speaks to the applicant-business's timeline. Thus, this argument fails to meaningfully refute the Agency's position. Nonetheless, as explained below, this factual dispute does not inform the Court's analysis vis-à-vis Mr. Bruckner's injury.

*id.* at 27. Thus, Bruckner argues he "is hampered only by the MBDA's nationwide policy of racial discrimination."[20] *Id.* The Court understands why Bruckner makes this argument, as he sues the MBDA, not the Orlando Business Center. But he doesn't really have to. The Agency's arguments regarding Operator-specific criteria ignore the elephant in the room: those criteria aside, the Agency wouldn't help Bruckner because he isn't a minority. *See* ECF No. 39 at 33 (email telling Bruckner the Agency only serves minorities).

But this all leads to a predictable stalemate: a lender undervalues a business; a borrower overvalues it. A tale as old as time. Taking the briefs with a grain of salt, SWT and PMC probably aren't as bad as the Agency suggests and probably aren't as great at Nuziard and Bruckner believe. Fortunately, the Court need not parse the businesses' financials to determine whether Nuziard or Bruckner suffered an injury-in-fact. A "material fact" is one that changes a case's outcome. *See Liberty Lobby*, 477 U.S. at 248. Whether SWT and PMC met non-statutory requirements doesn't matter. Rather, the Court need only ask if Nuziard and Bruckner were able/ready to apply for benefits (they were) and if any race-blind criteria come from the MBDA (they don't).

### i. *Nuziard and Bruckner were able and ready to apply for MBDA programming.*

Business struggles aside, Nuziard and Bruckner could have applied for programming and worked to establish qualifications had they met

---

[20]Importantly, the record contains no evidence suggesting race-neutral criteria are enforced with equally demanding rigor for MBEs. As Plaintiffs observe: "Defendants have offered no evidence even suggesting that minority applicants for MBDA Programming are subjected to such an inflexible, rigorous, post hoc application of non-statutory requirements." ECF No. 44 at 18. This is unsurprising, as the Agency says its "open to serve *all* MBEs." *Id.* at 21. At first blush, this argument comes dangerously close to a "hypothetical" injury insufficient for standing. *See Lujan*, 504 U.S. at 560. It doesn't matter if Bruckner *could* be injured under a different set of facts had he gone to a different location, it matters only that he *was* injured, and that the Agency caused his injury. But as explained below, the MBDA's applicability across all Business Centers doesn't render Plaintiffs' injury hypothetical. Rather, because Plaintiffs sue for denied *equal treatment* and not denied *benefits*, this broad applicability solidifies a concrete injury, notwithstanding Operator-specific requirements not enumerated in the MBDA Statute.

the Agency's racial criteria. *See* ECF No. 44 at 26 (noting Bruckner wanted to apply anyway to "determine the parameters" and "any exceptions" to relevant criteria). Many MBEs may fail Center-specific requirements upon initially applying, but that doesn't stop (1) the Agency from working with them despite the non-mandatory requirement or (2) the MBEs from working to meet the requirement. Nuziard and Bruckner never had that chance because of their race—a "deficit" they could never work to change. *See id.* at 25.

Though they never formally applied, the record shows both intended to but for the MBDA's race-based barrier. *See* ECF Nos. 44 at 13, 20, 25; 39 at 4–5, 7, 30. They contacted multiple MBDA offices but met the same obstacle every time: their race precluded benefits. *See* ECF Nos. 39 at 5–7, 30; 44 at 13–14, 20. What else was Bruckner to think, for instance, when the Orlando Center's intake form listed only the following options:



[21]

Given the available demographics, Bruckner *couldn't* apply even if he wanted to. He got the message, as did Nuziard.

To remove all doubts that their race was determinative, the DFW and Orlando Business Centers explicitly told Nuziard and Bruckner they could not apply because they are not minorities. *See* ECF Nos. 47

---

[21]*See* ECF No. 39 at 24 (providing screenshot of the "Race/Ethnicity" dropdown box in the relevant intake form).

at 5 (noting the DFW Business Center told Nuziard he "wasn't qualified because [he] isn't a minority"); 39 at 33 (email from Orlando Business Center telling Bruckner "[t]he MBDA's focus is to help grow businesses owned by people of ethnic minorities"). It's hard to imagine either was surprised: the Agency's name seems pretty cut-and-dry, and its stated mission is to serve "ethnic minority-owned businesses" that are "owned and controlled by African Americans, Hispanic, Asian, or Native American entrepreneurs." ECF No. 39 at 5. Given both men were explicitly denied MBDA programming because of their race, no reasonable factfinder could doubt their injuries-in-fact.

The Agency's argument on this point is a bit of a head-scratcher. The Agency apparently conflates Plaintiffs' ability/readiness to *apply* with the likelihood that they would *obtain* benefits. The holding in *Jacksonville* is illustrative here. There, the petitioner challenged an ordinance that "accord[ed] preferential treatment to certain minority-owned businesses in the award of city contracts." *Jacksonville*, 508 U.S. at 659. The ordinance required "that 10% of the amount spent on city contracts be set aside each fiscal year" for MBEs. *Id.* (cleaned up). Petitioner was an alliance of general contractors, many of whom regularly bid on city contracts. *Id.* The city argued the alliance lacked standing because "petitioner's complaint did not refer to any specific contract or subcontract that would have been awarded to a nonminority bidder but for the set-aside ordinances." *Id.* (internal quotation marks and citation omitted). The Eleventh Circuit agreed, finding petitioner "lack[ed] standing to challenge the ordinance" because it couldn't prove "that, but for the program, any AGC member would have bid successfully for any of the[] contracts." *Id.* at 660.

The Agency argues the same thing here. *See* ECF No. 41 at 42 (arguing Plaintiffs lack standing because they wouldn't get services "for reasons having nothing to do with [ ] race"). While the Court addressed its hesitancy with this argument above, *Jacksonville* still undermines the Agency's point. Rejecting the city's argument that the petitioners must show a member-contractor would have received a bid, the Court walked through a line of precedent establishing that equal-protection

plaintiffs need not prove they would successfully obtain a benefit but for the contested policy. *See* 508 U.S. at 664–65.[22] As the Court explained:

> [T]hese cases stand for the following proposition: When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.* at 666. The same is true for Nuziard and Bruckner—it's not that they were denied benefits they would otherwise certainly get, but that they didn't really have a shot because of their skin color.[23]

To be sure, the Court in *Jacksonville* said petitioners must be "able and ready to bid on contracts." *Id.* But considering how the Court framed the question, the Agency's argument here isn't really about Nuziard and Bruckner's ability to apply. Rather, the Agency's argument concerns their chances of getting benefits if they did—though the Agency couches this in verbiage of "ability" and "readiness." *See, e.g.*, ECF No. 41 at 37 ("[T]he race-conscious presumptions do not create an injury for standing,

---

[22]In relevant part, the Court examined: *Turner v. Fouche*, 396 U.S. 346, 361 & n.23 (1970) (holding plaintiff who didn't own property had standing to challenge Georgia law limiting school board membership to property owners); *Quinn v. Millsap*, 491 U.S. 95, 103 (1989) (holding plaintiff who didn't own property had standing to challenge Missouri law requiring property ownership for board of freeholders); *Clements v. Fashing*, 457 U.S. 957, 962 (1982) (holding plaintiffs who didn't announce candidacy had standing to challenge Texas law requiring resignation of certain officeholders who announced candidacy for another position, reasoning that their injury was the "obstacle to *candidacy*"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 & n.14 (1978) (holding plaintiff had standing to challenge medical school policy reserving 16/100 spots for minority applicants, reasoning plaintiff's injury was an inability "to *compete* for all 100 places in the class, simply because of his race").

[23]The Agency's website makes this abundantly clear. *See* MINORITY BUS. DEV. AGENCY, WHO WE ARE, https://www.mbda.gov/who-we-are/overview (last visited Jan. 18, 2024) (saying the MBDA is "*solely dedicated* to the growth and global competitiveness of *minority business enterprises*" (emphasis added)).

because [Plaintiffs] cannot demonstrate that [they] stand[] 'able and ready' to access the service in the absence of the alleged barrier.").

But the Agency substitutes the word "access" where *Jacksonville* said "bid on contracts." Being able and ready to bid on something is different from being able and ready to "access" it. Absent clairvoyance, there's no way to know if Nuziard or Bruckner would *access* benefits if they applied. But that doesn't make their injuries "conjectural" or "hypothetical" because that's not the gravamen of their grievance. Rather, their grievance is the erection of an obstacle to benefits because they aren't the "right" race/ethnicity. Rightly understood, Nuziard and Bruckner have the same injury as the non-property-owner in *Fouche* who challenged Georgia's law limiting school board spots to property-owners. *See* 396 U.S. at 361 & n.23. Or the non-property-owner in *Quinn* who challenged Missouri's law limiting board of freeholder spots to property owners. *See* 491 U.S. at 103. Or the would-be candidates in *Clements* that challenged Texas's automatic-resignation rule despite never announcing a candidacy to trigger it. *See* 457 U.S. at 962. Here, as there, the injury is the "obstacle to *candidacy*." *Id.*

Turning finally to another race-based case, Nuziard and Bruckner have the same injury-in-fact as the med school applicant in *Bakke* who challenged the school's race-reserved spots despite strong evidence he wouldn't get in anyway. *See* 438 U.S. at 281. As the Court observed:

> [E]ven if Bakke had been unable to prove he would have been admitted in the absence of the special program [designating 16/100 spots for minorities], it would not follow that he lacked standing. The constitutional element of standing is plaintiff's demonstration of any injury to himself that is likely to be redressed by a favorable decision of his claim. The trial court found such an injury, apart from the failure to be admitted, in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race. Hence the constitutional requirements of Art. III were met. The question of Bakke's admission *vel non* is merely one of relief.

*Id.* at 281 n.14 (citations omitted). The same is true here, as Nuziard and Bruckner were ready and able to apply for programming but for the

Agency's presumption. The Court now assesses the relevance of Business Centers' nonracial criteria to Plaintiffs' injuries.

> ii.  *Operator-specific criteria are irrelevant to Plaintiffs' injuries-in-fact.*

So maybe Nuziard and Bruckner would get benefits if they applied, maybe they wouldn't. All told, the Parties devote over thirty pages to briefing this issue. But we're here to discuss the MBDA's race-conscious mandate, not extra requirements promulgated at Operators' discretion. That mandate requires the Agency to prioritize MBEs, which the Agency defines as: "a business enterprise (i) that is not less than 51 percent-owned by 1 or more socially or economically disadvantaged individuals and (ii) the management and daily business operations of which are controlled by 1 or more socially or economically disadvantaged individuals." 15 U.S.C. § 9501(9)(A). And the MBDA Statute presumes listed races/ethnicities are "socially or economically disadvantaged."

Nuziard and Bruckner aren't on the list, so the Agency assumes they aren't disadvantaged. Still, the Agency argues they lack standing because they failed to meet additional criteria set by the DFW and Orlando Business Centers. Such criteria are untethered to any requirements in the MBDA Statute or implementing regulations. Moreover, Nuziard and Bruckner faced the "exact same statutory and regulatory racial barrier everywhere" and thus could not "obtain help from any MBDA office." ECF No. 44 at 15–16. Non-statutory criteria vary, the MBDA's racial barrier does not. Non-statutory criteria can be changed by third parties, the MBDA's racial barrier cannot.

Considering Plaintiffs sue the Agency (not Business Centers) for denied equal treatment (not benefits), non-statutory criteria are irrelevant. *See* ECF No. 44 at 24 ("Plaintiffs have *not* asserted that they would have received any benefit and do *not* sue merely over a lost benefit that may have involved multiple criteria."). Such Operator-specific requirements have no bearing on Plaintiffs' request for prospective relief, which only concerns "racial discrimination commanded by the MBDA Statute." *Id.* As Plaintiffs note, the MBDA Statute is "a nationwide policy" that has "but one qualifier" for eligibility: race. *See*

*id.* The MBDA Statute references no other criteria. *See* 15 U.S.C. §§ 9521–9526 (establishing the Business Center program). And it makes clear that Business Centers must provide programming with the sole purpose of aiding businesses owned by the listed races. *See id.* § 9522.

The Agency's brief grasps for any Operator-specific disqualifiers it can mention to distract from this racial presumption. For instance, the Agency says revenue considerations rendered both Nuziard and Bruckner ineligible. *See* ECF No. 41 at 36–37, 42–43. But the MBDA Statute forecloses that argument. *See* 15 U.S.C. § 9501(9)(B) (noting "[n]othing in [the Statute] may be construed to exclude a business enterprise from qualifying as a 'minority business enterprise'" due to "the annual revenue of the business enterprise"). By its very terms, the MBDA Statute forces the Court's hand: applicants *cannot* be turned away because they fail to meet Operator-specific revenue requirements, their eligibility must hinge on race alone. Thus, at least half of the Agency's justifications for rejecting Nuziard and Bruckner contravene its own statute. Its other justifications fare no better.

As it must, the Agency acknowledges any race-blind criteria don't come from the MBDA Statute or associated regulations. *See* ECF No. 54 at 15. But the Agency argues "Plaintiffs do not explain (or cite any authority for) why that matters." *Id.* That's untrue. *See, e.g.*, ECF No. 44 at 23 & n.7. But to reiterate, that matters because Plaintiffs sue the Agency for its imposition of a race-based obstacle to benefits. *See* ECF No. 1. Extra-statutory requirements have no bearing on that obstacle's constitutionality, as noted in Plaintiffs' response:

> Defendants' [strategy] . . . seems to be allowing non-federal actors to impose non-statutory criteria upon program recipients. Plaintiffs are aware of no race-based program (from Jim Crow to affirmative action) that has ever been permitted to exist simply because a non-defendant took some action or imposed some requirement that could be perceived as non-racial, resulting in the barring of certain undesirable applicants. One would think segregation and Jim Crow would have persisted for many years had government actors been permitted to hide behind the actions of non-defendants. *Cf. Griffin v. School Board*, 377 U.S. 218 (1964); *Reitman v. Mulkey*, 387 U.S. 369 (1967).

ECF No. 44 at 23. This is an important point: federal actors can't excuse discrimination by hiding behind third parties' ostensibly race-neutral requirements. If they could, the government could implement blatantly unconstitutional programs so long as the core mandate was effectuated by third parties with one or more "extra" requirements.

Plaintiffs' brief cites *Griffin v. School Bd.*, 377 U.S. 218 (1964) on this point. *See id.* While distinguishable in several respects, *Griffin* illustrates the implications of the Agency's argument. "[W]hat was attacked in [*Griffin*] [was] not something which the State ha[d] commanded . . . but rather something which the county with state acquiescence ha[d] undertaken to do on its own volition, a decision not binding on any other county in Virginia." *Id.* at 228. The same is true of Operator-specific requirements: the criteria are discretionary and have no binding effect on other Business Centers. *See* ECF No. 44 at 24–25.

Yet the Prince Edward County school board abused its discretion by declining to fund an integrated school in compliance with *Brown v. Bd. of Educ.*, 349 U.S. 294 (1955). Though the board gave nonracial grounds for its action, the Court held that "[w]hatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional." *Griffin*, 377 U.S. at 231. The same is true here: whatever nonracial grounds might support a Business Center's rejection of non-minority applicants, the object must be constitutional.[24] And Plaintiffs have standing to challenge the

---

[24]This has many corollaries in other areas of law. Whatever nonracial considerations factored into the equation, the Agency can't divert attention from its facially race-based presumption. *See* 15 C.F.R. § 1400.1. For example, the Court's fourth-amendment jurisprudence does not countenance "selective enforcement of the law based on considerations such as race," even if nonracial considerations are present. *Whren v. United States*, 517 U.S. 806, 813 (1996). Or take employment discrimination, where race-based employment actions are prohibited "even though other factors also motivated the practice." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013) (citing 42 U.S.C. § 2000e). And in *SFFA*, Justice Thomas noted that Title VII-covered institutions cannot treat "*any* individual worse even *in part* because of race." 600 U.S. at 290 (Thomas, J., concurring).

24

allegedly unconstitutional object of Agency actions. That's true even if nonracial criteria played a part in their rejection. *See id.*

To support its argument, the Agency leans on several cases from other circuits which found that unmet third-party requirements undercut standing. *See* ECF No. 41 at 36–37; *see also Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003); *Petit v. City of Chi.*, 352 F.3d 1111 (7th Cir. 2003); *Bruckner v. Biden*, No. 8:22-cv-1582-KKM-SPF, 2023 WL 2744026 (M.D. Fla. Mar. 31, 2023). None persuade.

The only cases that *could* inform the analysis are *Carroll* and *Bruckner*; *Petit* is irrelevant. There, the Seventh Circuit found plaintiffs lacked standing to sue under 42 U.S.C. § 1983 because they would not be promoted by the Chicago Police Department even absent racial considerations. *See* 352 F.3d at 1113. But that doesn't apply to forward-looking relief. You cannot get retrospective relief if you would not get the benefit anyways, but you can certainly obtain prospective relief to remedy the obstacle going forward. This was established in *Texas v. Lesage*, 528 U.S. 18 (1999), a case that informed the decision in *Petit*:

> [W]here a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983. Of course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered. The relevant injury in such cases is "the inability to compete on an equal footing."

528 U.S. at 21 (citing *Jacksonville*, 508 U.S. at 666). Because *Petit* does not apply to claims for prospective relief, it is irrelevant here.

Turning to *Carroll* and *Bruckner*, the Agency draws a parallel where none exists. The plaintiffs in both lacked any colorable argument that they could apply for or benefit from the government programs—their ability to obtain benefits wasn't even a question. In *Carroll*, the plaintiff sought a federal business loan without owning a business. *See Carroll*, 342 F.3d at 942–43 (noting he had "no work history" or "any other entrepreneurial endeavors that might bolster his bona fides"). Further,

the plaintiff "failed to formulate even a basic business plan, ha[d] no work history for the past 25 years, ha[d] not researched necessary business expenses such as rent or equipment, and ha[d] only a vague sense about [the relevant industry]." *Id.* at 942. Plaintiffs here own businesses, and it is disingenuous to compare them to a plaintiff so categorically deficient. *See supra* pp. 1–3. Having no business of his own, the *Carroll* plaintiff lacked any ability to apply (with or without a race-based barrier). Thus, *Carroll* simply establishes that people who don't own a business can't sue if they're denied a federal business loan.

The same was true in *Bruckner*, where Mr. Bruckner challenged the Infrastructure Act's sex- and race-based presumptions for awarding government contracts. *See Bruckner*, 2023 WL 2744026, at *1. But he could not identify contracts of interest to PMC. *See id.* (reasoning that "because the Plaintiffs do not identify which contracts they intend to bid on," their "harm is speculative"). Plaintiffs all identify MBDA programming of interest here. *See, e.g.*, ECF Nos. 44 at 20, 30; 39 at 14, 16, 23. Thus, *Carroll* and *Bruckner* suffered from the same infirmity: the lack of an identifiable injury (*Bruckner*) or a conceivable injury (*Carroll*) undercut standing for reasons inapplicable in this case. *See United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688 (1973) ("[P]leadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has or will in fact be perceptibly harmed by the challenged agency action."). But what *Carroll* affirmed is true here: "[w]hen a plaintiff brings an equal protection challenge to a race-conscious program and seeks forward-looking relief, the injury is not the inability to obtain the benefit, but the inability to compete on an equal footing." 342 F.3d at 941 (collecting cases).

At the end of the day, the DFW and Orlando Business Centers told Nuziard and Bruckner one thing, while the Agency now says another. The Centers told them they were ineligible because they aren't minorities. ECF No. 47 at 5; 39 at 33. The Agency now backtracks, saying that wasn't *really* the reason. But Bruckner says the Centers "could tack on as many other criteria" as they like. ECF No. 39 at 30. He would feel no better because "preferred races only have to worry about

the other criteria; they do not have [to] scale the racial barrier, while I do." *Id.* And that's the core issue—it doesn't matter if Operators make applicants furnish financial documents, exist for three years, or dance in a circle. Those conditions don't change the MBDA's underlying policy.

So long as that policy is in effect, race is relevant. Extra requirements aside, all roads lead to the same race-based obstacle. *See* 15 U.S.C. § 9501(15)(B); *see also* ECF No. 44 at 47 (noting "the voluntary actions of any individual MBDA office to sometimes add non-statutory criteria" don't contribute to Plaintiffs' injury, because the MBDA Statute "imposes no other requirements" than race). That would still be true if Nuziard and Bruckner were highly qualified under an Operator's criteria—it's no use having the key to a door that's boarded shut because of your skin color. That establishes a particularized injury-in-fact, as the Court observed in *Adarand Constr., Inc. v. Pena*, 515 U.S. 200 (1995):

> Adarand's claim that the Government's use of [racial contracting preferences] denies it equal protection of the laws of course alleges an invasion of a legally protected interest, and it does so in a manner that is "particularized" as to Adarand. We note that . . . Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." The aggrieved party "need not allege that he would have obtained the benefit but for the barrier in order to establish standing."

515 U.S. at 211 (quoting *Jacksonville*, 508 U.S. at 665–67) (cleaned up). The Court now turns to causal-connection and redressability.

### b.  Causal Connection to Defendant

Nuziard and Bruckner must next show "a causal connection" between their injuries and the Agency. *Lujan*, 504 U.S. at 560. Such injuries must be "fairly traceable" to the Agency and not "the independent action of some third party not before the court." *See Simon*, 426 U.S. at 41–42. As discussed, third parties operate the DFW and Orlando Business Centers. *See* ECF No. 41 at 35, 41. If Nuziard and Bruckner sued for denied benefits, that would be a problem. But because they sue for denied equal treatment, that fact does not lessen the

Agency's culpability. Because the Agency's race-based barrier caused their injuries, the Agency cannot shift blame to its Operators.

Looking to the race-based barrier itself, the MBDA deems certain minorities presumptively eligible for benefits. *See* 15 U.S.C. § 9501(15)(B). This mandate is not unique to the DFW or Orlando Business Centers—as Plaintiffs discovered firsthand. *See, e.g.*, ECF No. 44 at 15–16. The MBDA Statute established Business Centers as a "nationwide network of public private partnerships" to effectuate its facially race-based statutory mandate. 15 U.S.C. § 9522. Acting for the Agency, representatives for the DFW and Orlando Business Centers explicitly told Nuziard and Bruckner they did not qualify because they are not minorities. Nuziard and Bruckner thus establish a causal connection between their injury (a race-based barrier to benefits) and the Agency (who constructed it). The Court now turns to redressability.

### c. *Redressability*

There may be cases where a would-be plaintiff is harmed by a would-be defendant, but a judgment would not right the wrong. To mitigate that risk, it must be "likely" that a favorable decision will redress a plaintiff's injury. *See Lujan*, 504 U.S. at 561. The strongest injury most easily traced to a defendant "cannot substitute for a demonstration of 'distinct and palpable injury' . . . that is likely to be redressed if the requested relief is granted." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quoting *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 100 (1979)).

Misconstruing their injury, the Agency says Plaintiffs lack redressability because they couldn't get benefits for race-neutral reasons. *See* ECF No. 41 at 38, 43. This basically repackages the Agency's injury-in-fact argument under the banner of "redressability." Here too, the argument fails. The relief Plaintiffs seek has nothing to do with benefits. This was the distinction drawn in *Jacksonville* between the petitioner's claim and the claims in *Warth v. Sedlin*, 422 U.S. 490 (1975). In *Jacksonville*, the injury was "the inability to compete on an equal footing in the bidding process, not the loss of a contract." 508 U.S. at 666. "In *Warth*, by contrast, there was no claim that the construction

28

association's members could not apply for variances and building permits on the same basis as other firms." *Id.* at 667. Rather, "what the association objected to" was the town's refusal "'to *grant* variances and permits.'" *Id.* at 668 (quoting *Warth*, 422 U.S. at 515).

Here, Plaintiffs "could not apply for [benefits] on the same basis as [MBEs]." *Id.* at 667; *see* 15 U.S.C. § 9501(15)(B). Thus, the Agency endorses the city's fallacy from *Jacksonville*. Plaintiffs don't seek damages for denied programming, they seek prospective relief so they can compete equally with those on the Agency's list. *See* ECF No. 44 at 47. Federal courts routinely redress such injuries. *See, e.g.*, *Fouche*, 396 U.S. at 362 ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be *considered* for public service without the burden of invidiously discriminatory disqualifications."). While the Court cannot redress denied benefits, it can redress unequal treatment. *See Jacksonville*, 508 U.S. at 666 n.5 ("It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged [] that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury."). Put differently, a favorable ruling would redress Nuziard and Bruckner's injuries even if the Agency denies their applications down the road.

\*   \*   \*

Dr. Nuziard and Mr. Bruckner suffered injuries-in-fact when they were denied an equal shot at MBDA benefits because of their race. The Agency caused their injuries. A favorable ruling would redress them. Based on the evidence, no reasonable factfinder could dispute those points. *See Liberty Lobby*, 477 U.S. at 248. Accordingly, Nuziard and Bruckner have Article III standing, and the Court **DENIES** the Agency's Motion (ECF No. 40) on this point.

2. Mr. Piper does not conclusively establish standing.

Having found Nuziard and Bruckner have standing, the Court turns to Piper. For causal-connection and redressability, the Parties' arguments (and the Court's analysis) are the same for Piper as for Nuziard/Bruckner. *See supra*, pp. 27–29. Piper's claim lives or dies with

injury-in-fact, a factor that helps "distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *SCRAP*, 412 U.S. at 689 n.14. Here, Piper has an interest in the problem—i.e., the Agency's allegedly unconstitutional race-based presumption. *See* ECF No. 42 at 46. But that does not establish an injury-in-fact. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–71 (1972).

In *Moose Lodge*, the Court held a Black man lacked standing to challenge a club's race-based membership criteria if he didn't apply for membership. *Id.* But he could sue for the club's refusal to serve him because of his race. *Id.* at 166 ("Any injury to appellee from the conduct of Moose Lodge stemmed, not from the lodge's membership requirements, but from its policies with respect to the serving of guests of members. Appellee has standing to seek redress for injuries done to him, but [he] may not seek redress for injuries done to others."). Applied here, Piper can't sue the Agency just because he thinks its presumption is unconstitutional; he can only sue if the Agency injured him in a *particularized* way. Any lesser rule would allow plaintiffs to sue over policies they don't like but weren't injured by.[25]

As explained below, a genuine dispute exists regarding Piper's injury. The Agency attacks his injury in two ways. *First*, the Agency says Piper wasn't "able and ready" to obtain benefits because "the Wisconsin [Business Center] was not operational" when he sued. *See* ECF No. 41 at 27. *Second*, the Agency says he lacks a particularized injury because he did not manifest an intent to apply for programming in the near future. *Id.* at 26. Piper counters that he did, but further argues that futility-exception precedents excuse any inaction. *See* ECF No. 44 at 30–38. As a question of law, the Court agrees that neither Piper nor Nuziard/Bruckner had to futilely apply for MBDA programming to have

---

[25]Justice Scalia recognized this long before his Supreme Court tenure. For him, standing was the antidote, as it keeps federal courts from becoming a theatre of the absurd where any politically grieved constituent can sue despite having no unique injury. *See* Scalia, *supra* n.15, at 882 ("I suggest that courts need to accord greater weight than they have in recent times to the traditional requirement that the plaintiff's alleged injury be a particularized one, which sets him apart from the citizenry at large.").

standing. As a question of fact, the Court concludes a reasonable factfinder could side with the Agency's second argument.

### a. Piper was ready and able to apply for programming through other Business Centers servicing Wisconsin.

"Typically, a plaintiff cannot establish standing for a discrimination claim challenging a program for which the plaintiff failed to even apply." ECF No. 41 at 28 (citing *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir. 1973)). That's because a denied application easily shows denied equal protection. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (holding that when the government withholds benefits based on race, the "resulting injury 'accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct'" (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)). Here, the Agency argues Piper *couldn't* apply because the Wisconsin Business Center hadn't yet opened when he sued. *See* ECF No. 41 at 28. This argument does not persuade.

The record shows the Milwaukee Center opened in May 2023—long after Piper allegedly sought benefits and after he sued the Agency. *See* ECF Nos. 41 at 27; 42 at 63; *see also* ECF No. 1 (reflecting Piper sued the Agency on March 20, 2023). When Piper first interfaced with the MBDA, the Wisconsin location "had no public facing phone number or email address." ECF No. 41 at 27. But Wisconsin was covered by the Illinois Business Center, which did. *See* ECF No. 42 at 46. Piper visited websites for the Wisconsin, Minnesota, and Illinois Business Centers, as well as the MBDA's national website (which linked to the forthcoming Wisconsin Center). *See id.* And he identified programming he sought in visiting those websites. *See id.* at 54–55 (noting "[t]he primary thing was access to contracts"). Because Piper had relevant benefits in mind and could apply via Business Centers in neighboring states, he has a foothold to establish standing. The Court now turns to his futility argument.

> ### b. *Piper did not have to apply for MBDA programming to establish standing.*

Litigants can't sue over denied benefits for which they never applied unless applying would be "futile." *See, e.g.*, *Fouche*, 396 U.S. at 361–62 & n.23 (finding "Georgia's contention that no appellant has standing to [challenge free-holder requirement for school board] is without merit" even though the record lacked evidence that the requirement "exclude[d] anyone from the Taliaferro County board of education"); *Davis v. Tarrant Cnty.*, 565 F.3d 214, 220 (5th Cir. 1993) (noting "strict adherence to this general rule may be excused when a policy's flat prohibition would render submission [of an application] futile"). This ensures no worthy claims are precluded simply because the plaintiff did not "engage in a futile gesture." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977). Piper says he didn't apply for MBDA programming because he thought doing so was futile. *See* ECF No. 44 at 35–38. The Agency doesn't buy it. *See* ECF No. 41 at 29. The Court does.

As discussed, Piper wanted federal assistance to increase PIPER Architects' access to contracts. *See* ECF No. 38 at 14. The firm's business dipped when COVID-19 hit, and Piper had too much month at the end of the money. After exploring his options, he visited several MBDA websites to gather information on programming. *See* ECF Nos. 39 at 15–17; 42 at 46; 44 at 31. He admits the Agency's service advertisements "looked like a bunch of word salad." ECF No. 42 at 54. But whatever the websites' communicative shortcomings, one thing was clear: Mr. Piper "wasn't welcome based on the color of [his] skin." *Id.* at 53. Looking to the relevant websites, it hardly requires Holmesian deduction to see why he thought that:

**WHO DO WE SERVE?** We serve minority business enterprises (MBEs) that are owned or controlled by the following persons or groups of persons: African-American, Hispanic-American, American Asian and Pacific Islander, Native American (including Alaska Natives, Alaska Native Corporations and Tribal entities), Asian Indian American, and Hasidic Jewish American. While we serve all MBEs, our target clients are businesses with annual revenues of at least $500,000.

[26]

We meet you at any point

Serving BIPOC-owned businesses exclusively, MEDA's accelerator services provide the tools and resources crucial for business scaling

[27]

**Our Mission**

The U.S. Department of Commerce, Minority Business Development Agency (MBDA) is the only federal agency solely dedicated to the growth and global competitiveness of minority business enterprises.

**Who We Serve**

Our clients are U.S. minority business enterprises (MBEs) owned and operated by African Americans, Asian Americans, Hasidic Jews, Hispanic Americans, Native Americans, and Pacific Islanders.

[28]

Most non-minority applicants who saw those websites would reach the same conclusion as Piper: *this program isn't for me, so I need not apply*.

But general pessimism about Piper's odds will not suffice. *See United Indus., Inc. v. Eimco Process Equip Co.*, 61 F.3d 445, 449 (5th Cir. 1995). Rather, Piper must identify communications from the Agency that

---

[26]*Id.* at 16 (screenshot of Illinois Center's posted requirements).

[27]*Id.* at 17 (screenshot of Minnesota Center's posted requirements, with "BIPOC" meaning "Black, Indigenous, or other People of Color").

[28]*Id.* at 15 (screenshot of MBDA national website's posted requirements).

would make an objective person think applying is futile. *See, e.g.*, *Moore v. U.S. Dep't of Agric. on Behalf of Farmers Home Admin.*, 993 F.2d 1222, 1224 (5th Cir. 1993) (holding it was futile for white farmers to apply for program after receiving letters saying it was closed to whites); *Ellison v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998) (holding it was futile for plaintiffs to apply for permits after receiving letters saying their applications would be denied). Those websites fit the bill.

The Agency argues the futility exception does not apply because "[t]he MBDA Act permits any individual of any race or ethnicity to demonstrate social or economic disadvantage." ECF No. 41 at 28–29. Even if that's true, it wasn't conveyed on the above websites. Confronted with such race-conscious messaging, Piper declined to futilely apply. Unlike the Agency, the law does not hold that against him. *See Int'l Bhd. of Teamsters*, 431 U.S. at 365–66 ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs . . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture, he is as much a victim of discrimination as he who goes through the motions of submitting an application.").

> ### c. *A reasonable factfinder could conclude Piper did not sufficiently manifest intent to apply for programming in the reasonably imminent future.*

So formally applying is optional in cases where it would be futile. Showing intent to obtain the relevant benefit is not. It would invite a surge of needless litigation if courts held that a website visit alone could confer standing, even if unaccompanied by an application or any other objective indicia of interest. As noted above, Piper points to programming of interest and his visits to MBDA websites to contend he was injured by the Agency. *See, e.g.*, ECF No. 42 at 46, 54–55. The Agency says that's not enough. *See* ECF No. 41 at 25–30. Nuziard and Bruckner had a "smoking gun" on this point because the Agency explicitly rejected them because of their race. *See* ECF Nos. 39 at 33; 47 at 5. Piper lacks a smoking gun, but he can still establish an injury if he

was positioned to access MBDA benefits in the "reasonably imminent future." *See Carney v. Adams*, 592 U.S. 53, 64 (2020). Therein lies the dispute of material fact. *See* ECF Nos. 44 at 36; 41 at 30.

Because the Agency's websites made an application seem futile, Piper can be excused in not applying for programming. But that doesn't extend to Plaintiffs who never manifest intent to obtain the denied benefit, as the Court explained in *Carney*:

> If we were to hold that [Plaintiff's] few words of general intent—without more and against all contrary evidence—were sufficient to show an "injury in fact," we would significantly weaken the longstanding legal doctrine preventing this Court from providing advisory opinions at the request of one who, without other concrete injury, believes that the government is not following the law. [Plaintiff] did not show that he was "able and ready" to apply for a vacancy in the reasonably imminent future. [Plaintiff] has not sufficiently differentiated himself from a general population of individuals affected in the abstract by the legal provision he attacks. We do not decide whether a statement of intent alone under other circumstances could be enough to show standing. But we are satisfied that [Plaintiff's] words alone are not enough here when placed in the context of this particular record.

592 U.S. at 64. Here, Piper has more than "a few words of general intent," but his summary judgment record is far from robust.

In *Carney*, the plaintiff challenged a provision in the Delaware Constitution requiring balanced political parties in the state's judiciary. *See id.* Because plaintiff would throw off the required balance, the Constitution precluded him from applying for a judgeship. *See id.* But except for a few sporadic lines in discovery, the record contained no evidence that the plaintiff was considering a judgeship. *See id.* at 61. As the Court noted, "[plaintiff's] words 'I would apply . . .' stand alone without any actual past injury, without reference to any anticipated timeframe, without prior judgeship applications, without prior relevant conversations, without efforts to determine likely openings, without other preparations or investigations, and without any other supporting evidence." *Id.* at 63. Piper's case is stronger.

The Court in *Carney* declined to articulate a quantitative threshold an evidentiary record must pass to establish an injury-in-fact. *See id.* Piper asserts interest in MBDA programming, which is relevant. *See id.* at 64 (noting the Court did "not decide whether a statement of intent alone under other circumstances could be enough to show standing"); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003) ("It is well established that intent may be relevant to standing in an equal protection challenge."). And the record shows more than a naked assertion of interest. While Piper has less than Nuziard and Bruckner, he identified specific programming of interest (ECF No. 42 at 46, 54), evaluated his business to determine its needs (*id.* at 45–46, 54–55), and accessed Agency websites to gather information (*id.* at 46). The Agency sees things differently, arguing Piper "fail[ed] to take even the most basic steps to learn about or access the services of the Wisconsin [Business Center]." ECF No. 41 at 39.

At this stage, Piper can establish standing by showing "specific facts which, taken as true, support each element of the standing analysis." *Ortiz*, 5 F.4th at 628 (quoting *Rettig*, 987 F.3d at 527–28). He fails to do so. While the record reflects more than a "naked assertion of interest," a genuine factual dispute exists regarding his manifestations of intent vis-à-vis MBDA programming. Accordingly, the Court **DENIES** both his and the Agency's Motions (ECF Nos. 37, 40) on this point.

\* \* \*

To end where we started, "the judicial Power" extends to "cases" and "controversies" alone. *See* U.S. Const., art. III § 2. Where those terms leave room for interpretation, standing doctrine steps in to fill the gap. Standing recognizes that the exercise of judicial power "is legitimate only in the last resort, and as a necessity in the determination of [a] real, earnest, and vital controversy." *Chi. & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). But despite its importance, standing has long been a moving target, as the Supreme Court recognized forty years ago:

> [T]he concept of "Article III standing" has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, [which] is probably proof that the concept cannot be reduced to a one-

> sentence or one-paragraph definition. But of one thing we
> may be sure: Those who do not possess Art. III standing
> may not litigate as suitors in courts of the United States.
> Article III, which is every bit as important in its
> circumscription of the judicial power of the United States
> as in its granting of that power, is not merely a troublesome
> hurdle to be overcome if possible so as to reach the "merits"
> of a lawsuit; . . . it is part of the basic charter promulgated
> by the Framers of the Constitution at Philadelphia.

*Valley Forge Christian Coll.*, 454 U.S. at 760–61 (cleaned up). Standing's opacity hasn't changed much since then, rendering the Court's words equally true today. *See Shepherd v. Regan*, No. 4:23-cv-00826-P, 2023 WL 8006413, at *4 n.2 (N.D. Tex. Nov. 27, 2023) (Pittman, J.) (discussing the "morass of imprecision" of modern standing precedents).

So divining a workable heuristic from Supreme Court standing precedents is like "looking through a glass, darkly." *See 1 Corinthians 13:12* (King James). The Court applied those precedents here, mindful that "a dismissal for lack of standing in this case [may have] particularly pernicious ramifications." *Moore*, 993 F.2d at 1223. As the Fifth Circuit has stressed: "Where there are allegations of direct, overt racial discrimination, as were made here, a court should think long and hard before dismissing a case for lack of 'justiciability.'" *Id.* This is because "[t]he badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing." *Id.* at 1224 (collecting cases). But even plaintiffs alleging racial discrimination must show sufficient skin in the game to sue. *See Sierra Club*, 405 U.S. at 731. Having evaluated the Parties' arguments and the evidence of record, Nuziard and Bruckner have sufficient skin in the game. Piper may too, but the record doesn't conclusively establish that. Accordingly, the Court **DENIES** the Agency's Motion (ECF No. 40) on this point. The Court now turns to the merits of Plaintiffs' claims.

## B. The MBDA Statute is Unconstitutional.

This is a case about presumptions. As discussed above, Plaintiffs all encountered the same obstacle when they sought MBDA programming. Because they aren't on the Agency's magic list, the Agency presumes they aren't disadvantaged. *See* 15 U.S.C. § 9501(15)(B); 15 C.F.R.

§ 1400.1. Nuziard and Bruckner were expressly turned away; Piper saw the writing on the wall and declined to contact the Agency. All found this ill-fitting for a country founded on the ideal that "all men are created equal."[29] Of course, groups not on the list may "apply for a designation as socially or economically disadvantaged." 15 C.F.R. § 1400.3. But that only reinforces the point: the issue is not that the Agency only serves listed groups, but that it forces those not on the list to overcome additional hurdles.

Our Constitution has a thing or two to say about that. Interpreted to include the same promise as the Fourteenth Amendment's Equal Protection Clause,[30] the Fifth Amendment's Due Process Clause is implicated any time the federal government treats people differently because of their race. *See United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."). But that's grounded in due process jurisprudence, not the Fifth Amendment's text. Thus, to understand the constitutional roots of equal protection, the Court must look to the Fourteenth Amendment, not the Fifth.

The Constitution first promised "equal protection of the laws" in 1868, not 1791. *See* U.S. Const. amend. XIV § 1. This case highlights the

---

[29] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness—That to secure these rights, Governments are instituted among Men, deriving their powers from the consent of the governed.").

[30] Courts have long read the Fourteenth Amendment's equal protection guarantees into the Fifth Amendment's Due Process Clause. *See Adarand*, 515 U.S. at 217–19 (collecting cases); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Thus, "Fifth Amendment equal protection claims against federal actors are analyzed under the same standards as Fourteenth Amendment equal protection claims against state actors." *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)). Here, the Court's inquiry primarily concerns the Fourteenth Amendment because it provides the historical genesis of equal protection guarantees and is explicated in more robust case law.

need for historical context when interpreting that promise.[31] The Parties appeal for mutually exclusive decisions, each applying the same Equal Protection Clause to the same MBDA.[32] But it doesn't matter what Plaintiffs or the Agency think the clause means—nor even what the Court believes. The only interpretation that matters is that of its drafters. And the Court cannot resolve the instant dispute without first considering what those drafters might have to say.

The apex "Reconstruction Amendment," the Fourteenth Amendment was ratified after the Civil War to enshrine the blood-bought liberties of over four million newly emancipated slaves.[33] Our country had just overcome the greatest challenge to a cohesive national identity since its inception and needed to ensure this hard-fought formative gain would not be for naught.[34] As Congress debated requirements for former

---

[31]This is an admittedly contentious endeavor, as "[t]he scope and operation of the fourteenth amendment have been fruitful sources of controversy in our constitutional history." *Chambers v. Florida*, 309 U.S. 227, 235 (1940). But the Court can ill afford to evaluate equal protection arguments without situating its interpretation historically. *See Shelley v. Kraemer*, 334 U.S. 1, 23 (1948) ("The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color.").

[32]*Compare, e.g.*, ECF No. 38 at 18 ("Nor could Defendants *ever hope* to satisfy the demands of equal protection doctrine . . . ."), *with* ECF No. 41 at 44 ("The MBDA Act is Constitutional under the Equal Protection Clause.").

[33]The Amendment cannot be properly understood without considering how it conferred rights on this population and established structures to protect those rights. "For the framers, the three clauses of the Amendment were a trinity, three facets of one and the same purpose . . . In lawyer's parlance, the privileges and immunities clause conferred substantive rights which were to be secured through the medium of two adjective rights: the equal protection clause outlawed statutory, the due process clause judicial, discrimination with respect to those substantive rights." Raoul Berger, *Government by the Judiciary: The Transformation of the Fourteenth Amendment* 235 (2d ed. 1997); *see also* Mark A. Graber, *Subtraction by Addition?: The Thirteenth and Fourteenth Amendments*, 112 COLUM. L. REV. 1501 (2012).

[34] Professor James McPherson well captures the war's formative dynamic for the American zeitgeist of the time: "Northern victory in the war also resolved two fundamental, festering problems that had been left unresolved by

confederate states to re-enter the Union, it knew challenges to the rule of law loomed close at hand. While common belief holds that the Civil War ended at Appomattox in April 1865, General Lee did not surrender the Confederacy, only the Army of Northern Virginia.[35] The Confederacy did not go gently into the night after that. On the contrary, battles raged and Southern strongholds held out for much of the next year, with the Confederacy's presence extending from Texas to North Carolina, and from Alabama to Liverpool, England.[36] The war did not formally end until August 20, 1866—more than a year after Appomattox.[37]

─────────────

that other formative experience—the Revolution. First there was the question that preoccupied Americans from 1783 to 1865: Would this fragile experiment in republican government survive in a world bestrode by kings, emperors, czars, and dictators? Most republics throughout history had been overthrown from without or had collapsed from within. Some Americans still alive in 1861 had seen French republics succumb twice to emperors and once to the restoration of the Bourbon monarchy. Republics in Latin America came and went with bewildering rapidity. Would the United States suffer the same fate? . . . The other problem left unresolved by the Revolution was slavery. Founded on a declaration that all people were endowed with the unalienable right of liberty, the United States became the largest slaveholding country in the world . . . As Lincoln put it in 1854, 'The monstrous injustice of slavery deprives our republican example of its just influence in the world [and] enables the enemies of free institutions, with plausibility, to taunt us as hypocrites.'" James McPherson, *Introduction, in Images of the Civil War* 9–10 (1992).

[35]*See* ULYSSES S. GRANT & ROBERT E. LEE, ARTICLES OF AGREEMENT RELATING TO THE SURRENDER OF THE ARMY OF NORTHERN VIRGINIA (1865).

[36]*See* Gregory P. Downs, *After Appomattox: Military Occupation & the Ends of War* 1–38 (2015) (detailing subsequent military engagements before other southern armies were apprised of Lee's surrender at Appomattox); Shelby Foote, *The Civil War, A Narrative: Red River to Appomattox,* 996–1048 (1974) (detailing the tumultuous winding down process for the Confederacy's military, government, and political institutions); *see also* Chuck Hamilton, *Surrenders After Appomattox,* ESSENTIAL CIVIL WAR CURRICULUM (2010), https://www.essentialcivilwarcurriculum.com/surrenders-after-appomattox.html.

[37]Even declarations of the war's end demonstrate the fragility of post-war peace. With the situation largely under control by Spring 1866, President Andrew Johnson issued a proclamation ending the war in every Confederate state but Texas. *See* Proclamation No. 153, Declaring the Insurrection at an End in Certain States of the Union (Apr. 2, 1866). It would take several more months to resolve tensions out west, with Johnson's final proclamation coming on August 20, 1866. *See* Proclamation No. 157, Declaring that Peace, Order,

The Fourteenth Amendment was deliberated against this backdrop.[38] It's almost impossible for modern Americans to imagine the tension—when the Thirty-Ninth Congress convened on Capitol Hill in December 1865, it looked east across the Potomac to land previously owned by the leader of a self-declared foreign nation's military. Who today can imagine sharing an intimate border with over *one million* former enemy combatants? With the Confederacy's last vestiges dying slowly and tension between a South-sympathetic president and more punitive-minded Radical Republicans, Congress had its work cut out for it.[39] As if constitutional amendments weren't hard enough.

Congress needed a plan. Particularly in the reconstructing South, the federal government had to ensure law and order would prevail as confederate soldiers returned home to live alongside freed slaves.[40] The situation was a powder keg, and one wrong move could mean renewed violence in a nation that just buried over half a million young men. On the other hand, their sacrifice would be meaningless if slaves were "emancipated" but denied basic liberties. Congress's plan materialized in several pieces of proposed legislation, most importantly the Civil Rights Act of 1866.[41] When the Act's legality was quickly questioned, the Fourteenth Amendment was proposed to back it with the force of a

---

Tranquility, and Civil Authority Now Exists in and Throughout the Whole of the United States of America (Aug. 20, 1866).

[38]*See* Cong. Globe, 39th Cong., 1st Sess., at 2542 (noting the Amendment's necessity was "one of the lessons that have been taught . . . by the history of the past four years of terrific conflict"); *see also* Lisset Marie Pino & John Fabian Witt, *The Fourteenth Amendment as an Ending*, 10 J. Civ. War Era 5, 5–28 (2020) (tracing the Fourteenth Amendment "as part of the complicated denouement of the wartime experience").

[39]*Id.*; *see also* Ilan Wurman, *The Second Founding: An Introduction to the Fourteenth Amendment*, 71–92 (2020).

[40]*Id.*

[41]*Id.*; *see generally* The Civil Rights Act of 1866, ch. 31 § 1, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981–1982 (2012)).

constitutional mandate.[42] The Amendment was passed through extraordinary bipartisan compromise aimed at that goal.[43]

The Fourteenth Amendment drew upon a gradual expansion of rights guaranteed to the South's population of freedmen. The Civil Rights Act of 1866 framed such rights by reference to rights enjoyed by white citizens.[44] That quickly proved unworkable.[45] Thus, proponents of the Fourteenth Amendment advocated a race-neutral approach that would increase administrability of the newly conferred rights.[46] Indeed, Congress recognized only a rigid prohibition of race-based preferences—

---

[42] *See* Wurman, *supra* n.39, at 93–101; *see also* Joseph P. James, *The Framing of the Fourteenth Amendment* 50 (1956); Jacobus TenBroek, *Equal Under Law* 201–03 (1965); Philip Hamburger, *Privileges or Immunities*, 105 NW. L. REV. 61, 117 (2011).

[43] These compromises are catalogued in Benedict's *A Compromise of Principle*, a history of the highs and lows representatives experienced in debating the Amendment's early drafts. *See* Michael Les Benedict, *A Compromise of Principle: Congressional Republicans and Reconstruction: 1863–1869* (1974). Even at ratification, many in Congress remained dissatisfied with the Fourteenth Amendment's guarantees of freedmen's rights. *See id.* at 14 (noting "[R]adical Republicans knew that their conservative allies were not as committed as they to the racially egalitarian principles of the Republican party, and they were continually frustrated in their attempts to win what they conceived to be true security for the Union"); Letter from Senator James Grimes to Mrs. Grimes (Apr. 30, 1866), *in* WILLIAM SALTER, THE LIFE OF JAMES W. GRIMES 292 (1876) (noting the Amendment "is not exactly what any of us wanted; but we were each compelled to surrender some of our individual preferences in order to secure anything").

[44] *See* Civil Rights Act of 1866, ch. 31 § 1, 14 Stat. 27 (1866) (requiring that citizens "of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall *have the same right*, in every State and Territory in the United States . . . *as is enjoyed by white citizens*" (emphasis added)).

[45] *See* Wurman, *supra* n.39, at 91–103.

[46] *Id.*; *see also* Melissa L. Saunders, *Equal Protection, Class Litigation, and Colorblindness*, 26 MICH. L. REV. 245, 247–48 (1997) (arguing from the Amendment's historical context that the drafters "understood the Equal Protection Clause to nationalize a constitutional limitation on state action developed by the state courts in the first half of the nineteenth century: the doctrine against 'partial' or 'special' laws, which forbade the state to single out any person or group of persons for special benefits or burdens without an adequate 'public purpose'").

divorced from race itself—would work.[47] To this end, the Amendment states, in no uncertain terms, that no State can deny "any person" in its jurisdiction "the equal protection of the laws."[48] Considered in this historical context, the Equal Protection Clause has a single "core purpose": "do[ing] away with all governmentally imposed discrimination based on race." *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984). This is the constitutional imperative at the heart of the Fourteenth Amendment.[49]

This ideal had a long way to go in 1868. The next century in our nation's story witnessed many race-based civil iniquities—most obviously the sordid segregation laws of the Jim Crow Era. Yet the country moved forward, going from "separate but equal" to "separate . . . [is] inherently unequal." *See Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954). That march of progress hit a critical milestone with the Civil

---

[47]*See id.* Scholars debate whether, at the time, "equal protection of the laws" encompassed uniform availability of public benefits. *See* Wurman, *supra* n.39, at 36–47. The phrase itself appears in writings dating back to the founding, but it gained popularity in legal/political parlance when Andrew Jackson famously remarked: "Distinctions in society will always exist under every just government. Equality of talents, of education, or of wealth can not be produced by human institutions. In the full enjoyment of the gifts of Heaven and the fruits of superior industry, economy, and virtue, every man is *equally entitled to protection by law*." ANDREW JACKSON, MESSAGE OF PRESIDENT JACKSON TO THE UNITED STATES SENATE, ON RETURNING THE BANK BILL WITH HIS OBJECTIONS (1832), *reprinted in* JOHN STILLWELL JENKINS, LIFE AND PUBLIC SERVICES OF GENERAL ANDREW JACKSON 262 (1845) (emphasis added). Jackson's remark illustrates the interpretive tension. Taken in isolation, that use seems to suggest "equal protection of the laws" only concerns "protective" laws. But in the very same message, Jackson decried laws that "add to these natural and just advantages artificial distinctions [and] grant titles, gratuities, and exclusive privileges, to make the rich richer and the potent more powerful" and noted "equal protection" mandates that the government "shower its favors alike on the high and the low, the rich and the poor." *Id.*

[48]*See* U.S. Const. amend. XIV § 1.

[49]Whatever else the Amendment provides, its sponsors knew its promises were a house of cards if nothing stopped states from applying certain rules to one race (e.g., whites, given the Amendment's historical context) and other rules to another (e.g., freed Black slaves). *See* Wurman, *supra* n.39, at 100–03. For them, the Equal Protection Clause was based on a "foundation[al] principle" underlying the entire Amendment: "the absolute equality of all citizens of the United States politically and civilly before their own laws." Cong. Globe, 39th Cong., 1st Sess., 431 (1866) (statement of Rep. Bingham).

Rights Act of 1964. Among other things, the Act prohibits "exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color or national origin." 42 U.S.C. § 2000d. As President Lyndon Johnson stated regarding efforts behind the Act, "[u]ntil justice is blind to color, until education is unaware of race, until opportunity is unconcerned with the color of men's skins, emancipation will be a proclamation but not a fact."[50] Still, sins in a nation's past can haunt it today. Accordingly, courts have long noted that "in order to remedy the effects of prior discrimination, it may be necessary to take race into account." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986).

But any reader of English will see tension between Clause and case law: the Equal Protection Clause says *no* State shall deny *any* person equal protection; case law routinely endorses programs that do just that. *See SFFA*, 600 U.S. at 212 (noting "the Court [has been] willing to dispense temporarily with the Constitution's unambiguous guarantee of equal protection"). There is no escaping this tension, there are only attempts to explain it away or justify deviations.[51] Given its drafters'

---

[50]Lyndon Baines Johnson, *The Vantage Point: Perspectives of the Presidency, 1963–1969*, 156 (1971).

[51]Many modern scholars reject reading the Equal Protection Clause as a categorical imperative, suggesting its drafters could not foresee a turning of the societal tables whereby race-based classifications would favor marginalized minorities. *See, e.g.*, Eric Schnapper, *Affirmative Action and the Legislative History of the Fourteenth Amendment*, 71 VA. L. REV. 753 (1985). History refutes this position. Soon after the Fourteenth Amendment's ratification, Congress debated whether race-conscious programs complied with the Equal Protection Clause. *See* Saunders, *supra* n.46. Indeed, Congress struck many "Black Codes" not merely because they were *wrong*, but because they afforded unequal legal protections to different races. *See, e.g.*, Civil Rights Act of 1875, ch. 114, 18 Stat. 335–37; *see also* 42d Cong., 2d Sess., at 819 (noting the Fourteenth Amendment "ma[de] illegal all distinctions on account of color" because "there should be no distinction recognized by the laws of the land"). In doing so, Congress endorsed a categorical reading of the Equal Protection Clause, noting it "demands the abolition of all distinctions founded on color and race." 2 Cong. Rec. 4083 (1874). Congress also drafted legislation to comply with the Clause. *See* Michael Rappaport, *Originalism & The Colorblind Constitution*, 89 NOTRE DAME L. REV. 71, 98 (2013) (observing that because "not all blacks in the United States were former slaves," the term "'freedman' was a decidedly underinclusive proxy for race"); *see also* Stephen Siegel, *The*

desire to eschew race-based distinctions, even benign discrimination cannot be squared with the Equal Protection Clause—it can only be an "exception." *See id.* at 206 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)) ("Eliminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies 'without regard to any differences of race, of color, or of nationality'—it is 'universal in [its] application.'"); *see also Adarand*, 515 U.S. at 227 (noting courts "tolerate no retreat from the principle that government may treat people differently because of their race *only for the most compelling reasons*" (emphasis added)).

"[A]ny exceptions" to the Equal Protection Clause "must survive a daunting two-step examination known as strict scrutiny." *SFFA*, 600 U.S. at 206; *see Adarand*, 515 U.S. at 227 (noting "all racial classifications" must pass "strict scrutiny" by being "narrowly tailored measures that further compelling governmental interests"). As noted in *Adarand*, the rubric has two parts. *First*, the Court asks if the racial classification "further[s] compelling governmental interests." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). *Second*, the Court asks if the classification is "narrowly tailored" to achieve those interests. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013). The burden to establish both rests with the government. *Id.*

It's hornbook law that strict scrutiny applies to race-based classifications. But permutations of this formula are expansive. A compelling governmental interest is something that's really important.[52] An action is narrowly tailored if its "necessary" to achieve

---

*Federal Government's Power to Enact Color-Conscious Laws: An Originalist Inquiry*, 92 Nw. L. Rev. 477, 548–52 (1998) (tracing race-based laws after 1868 and explaining how loosened equal-protection concerns catalyzed Jim Crow).

[52]But apparently nobody knows what that means. If they do, it isn't obvious from disparate cases applying strict scrutiny. *See* R. George Wright, *The Scope of Compelling Government Interests*, 98 Notre Dame L. Rev. Reflection 146, 147 (2023) (noting the compelling-interest analysis "typically involves what we might call problems of aggregation, and a variety of fallacies of composition. The rough idea here is that . . . the logic of any one single case, or of a few such cases, cannot be translated into some further succession of apparently similar cases."). Relevant here, courts "have identified only two compelling interests that permit resort to race-based government action. One is remediating

the interest. *Id.* at 312. For racial classifications to be narrowly tailored, they must be "sufficiently focused" on obtaining "measurable objectives warranting the use of race." *SFFA*, 600 U.S. at 230. And the "twin commands of the Equal Protection Clause" dictate that "race may never be used as a 'negative' and . . . may not operate as a stereotype." *Id.* at 218. Finally, the contested classification must have a "logical endpoint." *Id.* at 212 (quoting *Grutter*, 539 U.S. at 342).

The Parties here agree strict scrutiny applies. *See* ECF Nos. 38 at 18; 41 at 46. The MBDA Statute lists certain races[53] that are presumptively entitled to benefits. *See* 15 U.S.C. § 9501(15)(B). Those not on the list can make an "adequate showing" of disadvantage. 15 C.F.R. § 1400.1(b). Those on the list don't have to. Thus, in presuming listed groups are "socially or economically disadvantaged," the MBDA Statute presumes *un*listed groups are *not* "socially or economically disadvantaged." While they can take steps to show they are, that's their burden to bear—the Agency assumes otherwise. The Agency says this presumption helps "remedy[] '[t]he unhappy persistence . . . of racial discrimination against minority groups in this country.'" ECF No. 41 at 45 (quoting *Adarand*, 515 U.S. at 237). Plaintiffs say that's too vague, applying considerations from *SFFA*.[54] *See* ECF No. 38 at 19–36. Plaintiffs further argue the

---

specific, identified instances of past discrimination that violated the Constitution or a statute [and] [t]he second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." *SFFA*, 600 U.S. at 207.

[53]Case law uses "race" at times almost synonymous with "ethnicity." This isn't intended to suggest the two are interchangeable or that race is more important. "Race" refers to one's phenotypic constitution, while "ethnicity" refers to one's anthropological and cultural identity. Both are protected classes the consideration of which merits strict scrutiny. *See Bakke*, 438 U.S. at 299 ("When [the government] touch[es] upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest. The Constitution guarantees that right to every person regardless of his background."). The Court defaults to "race" simply because precedents use that verbiage more.

[54]Plaintiffs propose a tripartite framework for the inquiry. *See* ECF No. 38 at 20 ("[T]he government establishes a compelling interest in remedying race discrimination only if three criteria are met: the policy must target (1) specifically identified instances of past discrimination, for which there is evidence of (2) intentional discrimination, and (3) government participation.").

presumption is "*not tailored at all*." *Id.* at 36. The Agency disagrees, arguing the presumption is narrowly tailored because it is (1) necessary, (2) flexible, (3) neither over- nor under-inclusive, and (4) minimally impactful to third parties. ECF No. 41 at 72.

Before addressing these arguments, one thing should be clear: This case is not about MBE disenfranchisement—that's beyond dispute.[55] Plaintiffs don't deny that discrimination is observable in society writ large (including for minorities not on the Agency's list). But racial presumptions are a disfavored solution. *See Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."). As such, the Agency's presumption must pass strict scrutiny. *SFFA*, 600 U.S. at 206; *Adarand*, 515 U.S. at 227. A failure on either prong is terminal.

1. The Agency's only compelling interest concerns discrimination in government contracting.

The Agency argues its presumption remedies myriad effects of discrimination. *See* ECF No. 41 at 46–70. But "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996). If it was, the Equal Protection Clause "would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." *Croson*, 488 U.S. at 505–06. Thus,

---

They lean on several cases to support this framework, primarily drawing from *SFFA* and *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021). *See id.* As the Court previously noted, *Vitolo* and *SFFA* don't articulate a paradigm as succinctly as Plaintiffs suggest, but their framework accurately distills precedent. *See* ECF No. 27 at 9–10; *see also Miller v. Vilsack*, No. 4:21-cv-0595-O, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (O'Connor, J.) (collecting cases). Because the first two typically arise together, the Court addresses them as a single inquiry here. The third prong isn't necessary in every case. But where, as here, the government uses race to remedy private-sector discrimination untethered to discrete historic incidents, it must satisfy the third prong with evidence of either active or "passive" participation. *Id.*; *see also Croson*, 488 U.S. at 492; *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

[55]*See Closing the Wealth Gap: Empowering Minority-Owned Businesses to Reach Their Full Potential for Growth and Job Creation: Hearing Before the S. Comm. on Small Bus. & Entrepreneurship*, 113th Cong. 246–47 (2013); *see also* ECF No. 42-4 at 25–70 (the "Holt Report").

the Agency's brief posits two specific examples: discrimination in access to credit and discrimination in private contracting markets. *See* ECF No. 41 at 53–59. To determine if either is compelling, the Court asks two questions. *First*, did specific acts of historic discrimination cause these problems? *See SFFA*, 600 U.S. at 207. *Second*, if the problems arise in private-sector contexts and are not tied to discrete incidents of historic discrimination, did the government "passively participate" in causing them? *Croson*, 488 U.S. at 492.

Both questions call for specifics. The Agency cannot point to general social ills and call it a day. Rather, it must identify the "who, what, when, where, why, and how" of relevant discrimination. *See id.*; *see also Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 650 (N.D. Tex. 2021) (O'Connor, J.) (noting an "industry-specific inquiry [is] needed to support a compelling interest for a government-imposed racial classification"). Otherwise, any race-based program could be justified considering our country's history of race-based discrimination. "[S]uch a result would be contrary to both the letter and spirit of a constitutional provision whose central command is equality." *Croson*, 488 U.S. at 506. While our society may not be colorblind, our Constitution is.

But discrimination is good at hiding. Accordingly, "significant statistical disparit[ies]" can support "an inference of discrimination." *Id.* at 509 (collecting cases); *see also Int'l Bhd. of Teamsters*, 431 U.S. at 339. Yet without more, "statistical disparities don't cut it." *Vitolo*, 999 F.3d at 361; *see Croson*, 488 U.S. at 499, 500–02. Moreover, not all disparity studies are created equal. As Plaintiffs note, "[s]tatistical studies that do not control for . . . capacity factors [] do not prove intentional discrimination." ECF No. 44 at 54. And even the best empirics can only do so much. Statistical disparities support an *inference* of discrimination. *Croson*, 488 U.S. at 509. Without concrete examples, an inference alone will not pass strict scrutiny. *See id.*

The Parties disagree on the scope of government participation the Agency must show. Plaintiffs argue it's a required element of the compelling-interest inquiry. *See* ECF No. 44 at 50 (collecting cases). The Agency disagrees, arguing the government need not "incriminate itself" by furnishing evidence of government participation. *See* ECF No. 46 at

88 (citing *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006)). But *Dean* simply noted that the government need not produce a "formal finding of discrimination" before using a "race-conscious remedy." 438 F.3d at 455; *see also Wygant*, 476 U.S. at 277 (O'Connor, J., concurring) (noting "a contemporaneous or antecedent finding of past discrimination . . . is not a constitutional prerequisite . . . to an affirmative action plan"). The court in *Dean* noted such evidence becomes relevant "when a remedial program is challenged" and a trial court must thus find the program has "a strong basis in evidence." 438 F.3d at 455.

The Court's discussion of *Wygant* in *Croson* demonstrates when a party must show government participation. *See* 488 U.S. at 485–88, 491–92. The Court rejected two extremes. On one hand, it rejected the Fourth Circuit's reading of *Wygant* that required "prior discrimination by the government" for a program to pass strict scrutiny. *See id.* at 485. On the other, it rejected the appellant's argument that the city of Richmond could "define and attack the effects of prior discrimination" wherever they exist. *See id.* at 486. Rather, *Croson* framed the analysis around specificity. If the government actively participated in past discrimination, it can use race to remedy the effects. *Id.* at 486, 491–92. But to remedy private sector disparities, the government must identify discrimination with pinpoint accuracy. *See id.*; *see also Hunt*, 517 U.S. at 909. This is satisfied by showing government participation in the relevant discrimination. *Croson*, 438 F.3d at 492.

So government participation isn't always necessary, but it is sufficient. If the Agency identifies specific historic incidents it seeks to redress, it need not show government participation. But without evidence of government participation, the Agency cannot use race to remedy broad statistical disparities in private-sector contexts. *Id.* The common theme is clear: "a generalized assertion of past discrimination" won't suffice "because it 'provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.'" *Hunt*, 517 U.S. at 909 (quoting *Croson*, 488 U.S. at 498). While the government need not furnish formal findings of discrimination at the start, it must "when a remedial program is challenged." *Dean*, 438 F.3d at 455. The MBDA has been challenged, so the Agency must now establish a "strong

basis in evidence" for its presumption. *Id.* And if it seeks to remedy private-sector structural disparities rather than particular historic discrimination, it must furnish evidence of government participation. *See Croson*, 488 U.S. at 492, 503; *Wygant*, 476 U.S. at 274; *SFFA*, 600 U.S. at 260 (Thomas, J., concurring); *Dean*, 438 F.3d at 455; *Vitolo*, 999 F.3d at 361. Anything less fails strict scrutiny.

### a. Discrimination in Credit Access

For its first interest, the Agency observes that "evidence before Congress" shows MBEs "have far less access to capital and credit" than white-owned business "due to racial discrimination in lending markets." ECF No. 41 at 53. The record shows that's true.[56] But the question isn't whether its hard for MBEs to get credit. Rather, the question is (1) did specific incidents of historic discrimination cause this problem, and (2) if the problem is instead rooted in private-sector disparities, did the government participate in causing it? Based on these questions, the Agency's first interest isn't compelling.

### i. Specific, Identified Instances of Past Discrimination

To show a compelling interest, the Agency must identify "specific, identified instances of past discrimination that violated the Constitution or a statute." *See SFFA*, 600 U.S. at 207. It fails to do so. The evidence shows "[n]ationwide, 'minority businesses are two to three times more likely to be denied a loan'" and "'receive less funding and pay higher interest rates on loans they do receive.'" ECF No. 41 at 55 (quoting *Capital Access for Minority Small Business: COVID-19 Resources for an Equitable and Sustainable Recovery: Hearing Before the S. Comm. on*

---

[56]*See* Holt Report at 26–28; ECF No. 42-4 at 50–52. The report of economist Dr. Jon Wainwright also provides a disturbing overview of MBEs' credit struggles. As an expert for 2013 litigation in the District of Columbia, Wainwright was "asked to review [MBE] disparity and availability studies submitted to Congress." ECF No. 42-3 at 639; *see* ECF No. 42-3 at 634–729 (the "Wainwright Report"). As the Agency notes, the Wainwright Report shows "large, adverse, and statistically significant disparities facing [MBEs] in the United States . . . cannot be adequately explained by differences between the relevant populations in factors untainted by . . . discrimination." ECF No. 41 at 64–65; *see* ECF No. 42-3 at 725. The Report includes a helpful précis of relevant literature and disparity studies. *See id.* at 725–28.

*Small Bus. & Entrepreneurship*, 116th Cong. 5 (2020)). And that doesn't change "[e]ven after controlling for individual creditworthiness." *Id.* So minorities have less access to loans, get less money when they apply, and have to pay more for it. *See* ECF No. 42-4 at 64. It's little wonder "[d]isproportionate difficulty accessing commercial capital and credit is among the primary concerns voiced by minority entrepreneurs." Wainwright Report at 87 n.80; ECF No. 42-3 at 725.

Nobody can deny that's a problem. But it cannot be a compelling government interest unless the Agency identifies concrete acts of past discrimination that caused it. *SFFA*, 600 U.S. at 207. And the Agency's cited studies speak only to the phenomenon itself, not contributing factors. *See, e.g.*, Holt Report at 26–28; ECF No. 42-4 at 50–52. For instance, in a section entitled *Barriers to Access to Financing*, the Holt Report lists seventeen bullet points describing MBEs' credit struggles. *See id.* Not even one addresses causal factors, much less "specific, identified instances of past discrimination that violated the Constitution or a statute." *SFFA*, 600 U.S. at 207.

Rather than specific examples, the Holt Report catalogues findings like "[b]ecause we are not Anglo, we do not get fair and equal pricing" or "[b]ecause I'm Black I have had difficulty in obtaining loans or financing." *See* Holt Report at 28; ECF No. 42-44 at 52. Without more granularity, the Agency cannot establish a compelling interest. *See Croson*, 488 U.S. at 499, 500–02; *Vitolo*, 999 F.3d at 361; *Greer's Ranch Café*, 540 F. Supp. 3d at 650. Further, the Agency extrapolates too much from the data, as nothing shows the studies controlled for other variables that stymie MBEs seeking credit. *See* Holt Report at 26–28; ECF No. 42-4 at 50–52. The Holt Report notes that "identifiable indicators of capacity are themselves impacted by and reflect discrimination." *See* Holt Report at 6–7; ECF No. 42-4 at 30–31. But that doesn't give the Agency carte blanche to justify its presumption from generalized findings without explaining the causal nexus.

No court decision could harmonize the Parties' divergent readings of data on this interest. There are many variables and the Agency's evidence has varying persuasive merit. *See id.* While the Agency identifies a few concrete examples of past discrimination, most of the

cited studies do not. *See* ECF Nos. 41 at 53–56; 42-3 at 725–28; 42-4 at 50–52. And the record fails to trace those few examples to specific disparities *today*.[57] That's a tall order, as past discrimination may cause modern disparities without longitudinal studies to reflect causation. But the Agency must accomplish that task to justify its presumption, and it cannot rely on "various decades-old sources or rationale[s] for supporting a compelling interest *today*." ECF No. 38 at 33.

If the record contains more specifics, the Agency fails to identify them. While the Court expended hundreds of man-hours reviewing the record, it isn't the Court's job to mine a 4,456-page record to find better evidence for the Agency. *Malacara*, 353 F.3d at 404–05. Assuming the Agency put its best foot forward in the briefing, the cited evidence is wholly insufficient to pass strict scrutiny. Moreover, as explained below, the Agency's first interest is not compelling because it concerns private-sector credit disparities, and the record does not show government participation contributed to such disparities.

### ii. Government Participation

As noted above, the government must identify relevant government participation to use race in remedying private-sector disparities. *Croson*, 488 U.S. at 492. The record does not establish this element for the Agency's first interest. In many respects, the Agency conflates quantitative and qualitative merit: the record overflows with evidence of MBEs' credit struggles, but it contains no evidence tying this problem to specified government participation.

Take, for instance, the Agency's discussions of mortgage discrimination and subprime lending (*see* ECF No. 46 at 59–60), small business and car loans (*id.* at 61), and general predatory lending toward Blacks, Latinos, Native Americans, Hawaiians, and Hasidic Jews (ECF

---

[57]*See, e.g.*, ECF No. 42-2 at 84–92; *How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and its Long-term Impacts on Borrowers of Color: Hearing before H. Comm. on Fin. Servs.*, 117th Cong. 5 (2021) (testimony of William Darity, Jr.). While the record passingly touches "federally sanctioned redlining, denial of the benefits of the G.I. Bill to Black veterans, racial zoning practices, and . . . Jim Crow-era tax policies," *see* ECF No. 41 at 54, it doesn't trace those examples to modern credit disparities.

No. 41 at 55–56). Not a single cited source identifies government participation in the discrimination detailed.[58] As the Court said previously, "to be a passive participant, [the government] must be a participant." ECF No. 27 at 10. Precedent requires specifics to prove even passive participation. "It is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *See Norwood*, 413 U.S. at 465. But the record here contains no concrete evidence of government "induction, encouragement, or promotion" of credit discrimination.

While the Court doesn't have to prospect the record for evidence favoring the Agency, *see Malacara*, 353 F.3d at 404–05, it did anyway. Excepting the first 320 pages of Appendix 42-1 (the MBDA Statute and implementing regulations) and Appendix 42-7 (background information on the MBDA and supplement to Holt Report), the rest of the summary judgment record contains the word "government" 1,206 times and the word "federal" 1,308 times. While the Court also examined the excepted sections, none of the uses of "government" or "federal" therein identify government participation in discrimination. For the rest of the record, only *sixteen* references specifically identify the government's participation in discrimination.[59] The overwhelming majority of references to "federal" or "government" concern programs designed to help, not hurt, MBEs. Most of the rest concern failed federal policies, rather than participation in discrimination. Thus, only .06% of the

---

[58]*See, e.g.*, ECF No. 42-3 at 111–32 (attributing Latinos' credit struggles to deficits in human capital, language barriers, cultural considerations, and generational poverty); *id.* at 175–85 (only mentioning "the government" when discussing programs aimed at alleviating Native American poverty, but never as a cause thereof); *id.* at 187–94 (attributing Hasidic Jews' credit problems to antisemitism and the hangover of generational poverty from Eastern Europe and Russia); *id.* at 472 (attributing credit problems for various Pacific Islander groups to poverty and limited English proficiency, not the government).

[59]*See* ECF No. 42-1 at 390 (government contracting), 408 (government contracting), 425 (government contracting); 42-2 at 18 (government contracting), 22 (government contracting), 62 (government contracting), 82 (credit access), 87 (credit access), 490 (government contracting); 42-3 at 455 (credit access), 570 (government contracting), 674–93 (government contracting); 42-4 at 31–32 (government contracting), 78–82 (government contracting), 42-5 at 29 (government contracting), 42-6 at 150 (credit access).

relevant record identifies anything close to government participation. For strict scrutiny purposes, that dog won't hunt.

Some may protest that the rigors of strict scrutiny seem harsh considering the discrimination evidenced in the record. But race-based classifications are "by their very nature odious" in a country "founded upon the doctrine of equality." *Hirabayashi*, 320 U.S. at 214. Thus, even "commendable goals" must be "sufficiently coherent for purposes of strict scrutiny." *SFFA*, 600 U.S. at 214. While the Agency's first interest may be commendable, it is not coherent. And no amount of evidence showing the problem can substitute for evidence showing government participation. *See Croson*, 488 U.S. at 492. If courts held otherwise, federal programs could be justified based on amorphous notions of societal/structural discrimination that could never be measured or judicially reviewed. *See Hunt*, 517 U.S. at 909. Accordingly, "[e]videntiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority [litigants]." *Wygant*, 476 U.S. at 278.

Not only does the record fail to reflect government participation for this interest, it affirmatively suggests other causal factors are relevant. *See, e.g. supra* n.57. Take, for instance, the findings of a 2021 study by the Philadelphia Federal Reserve:

> loan officers' subjective decision-making explains at least half of the overall different in approval rates between Black and white applicants even after controlling for observable characteristics. In terms of aggregate magnitudes, if the approval gap for every day of the month was as small as the last day of the month, about 1.4 million Black applications would have been approved rather than denied between 1994 and 2018, which corresponds to a total loan size of about $213 billion in 2018 dollars.[60]

The gravity of those figures cannot be ignored. However, the very first line contributes this phenomenon not to the government, but to *private*

---

[60]Marco Giacoletti, Rawley Z. Heimer, & Edison G. Yu, *Using High-Frequency Evaluations to Estimate Discrimination: Evidence from Mortgage Loan Officers* 5 (Fed. Rsrv. Working Paper No. 21-04, 2021).

*loan officers*. The whole study mentions the government twice—on pages 8 and 25—and neither concerns participation in discrimination. *See id.*

Other evidence similarly identifies non-government factors. *See, e.g.*, Holt Report at 26–27; ECF No. 42-4 at 50–51 (pointing the finger at large commercial lenders); *see also supra* n.58 (collecting examples). The problem is not that non-government players were involved. As explained in *Croson*, the government can use race if it was "a 'passive participant' in a system of racial exclusion practices" in the private sector. 488 U.S. at 492. The problem is that the record identifies other causes *and* fails to show government participation. And the evidence that purports to show passive participation concerns failed federal policy, not actual participation in discrimination. *See, e.g.*, ECF No. 42-2 at 82 ("And so, for me, it is not necessarily what the Federal Government is doing; it is what the Federal Government is not doing."), 94 ("[S]ince the 1960s, the entire emphasis of Federal policy has been on income supports rather than wealth building or asset building. And so, if we are really concerned about improving opportunities for all Americans . . . there needs to be a shift back towards asset-building opportunities."), 148 (noting that despite federal programs "designed to help struggling businesses, . . . discrimination in lending is still a significant problem"). There is a big difference between participating in discrimination and simply taking actions that make life harder for MBEs. The two are not synonymous.

Remedying "what the Federal Government is not doing" is not a compelling interest. *See id.* at 82. To pass strict scrutiny, the Agency must show government participation "with the particularity required by the Fourteenth Amendment." *W.H. Scott Constr. Co., Inc. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999). If it can't, it lacks "a strong basis in evidence for its conclusion that [race-based] remedial action was necessary." *Id.* While the government may have a role in remedying MBEs' credit problems, the evidence doesn't show it had a role in causing them—at least not as a participant. Accordingly, any policies aimed at fixing these issues may not use race-based classifications. *See id.*; *Croson*, 488 U.S. at 492. As Plaintiffs observe, the Agency fails to identify "who was the discriminator, who was the victim, when [ ] the event happened, what exactly happened, or the degree of discrimination

that occurred." ECF No. 44 at 52. Without such evidence, the Agency's first interest is not compelling. The Court now turns to the second.

### b. *Discrimination in Private Contracting Markets*

The Agency's second interest concerns discrimination in private contracting markets. *See* ECF No. 41 at 56–58. That's a broad interest, but much of the Agency's evidence concerns the more granular issue of discrimination in government procurement/prime contracting. *See id.* at 57–58; *supra* n.59. Asking the same two questions here, the Court finds the Agency's second interest is not compelling. However, evidence specific to government contracting reveals that "sub-interest" is.

### i. *Specific, Identified Instances of Past Discrimination*

Because the Agency's second interest includes examples from numerous contexts, the Court identifies the compelling interest (discrimination in government contracting) by first identifying the uncompelling interests (everything else). Briefly tabling evidence on government contracting, the Agency's other evidence fails to support a compelling interest because the cited sources are either (1) too generalized or (2) too limited in temporal or geographic scope. To the extent they contain specifics, those specifics concern government contracting. But the Agency tries to take the ball and run with it, using highly contextual evidence to support a much broader interest than it feasibly can. Three expert reports illustrate this issue.

The report of economist Daniel Chow features prominently in the Agency's briefing. *See* ECF No. 41 at 60. Analyzing "small, disadvantaged businesses" ("SDBs") for the Small Business Administration's 8(a) program,[61] Mr. Chow found "SDBs not participating in the SBA 8(a) program had 37 percent lower odds of winning a federal prime contract." *Id.* While that finding is relevant for the "sub-interest" discussed below, the Agency cannot justify its broader asserted interest from a study constrained to one context. And even for

---

[61]*See 8(a) Business Development Program*, U.S. SMALL BUS. ADMIN. (Jan. 25, 2024), https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program (providing an overview of the 8(a) program and the benefits it provides for SDBs in prime contracting).

the government contracting sub-interest, Mr. Chow's findings leave much to be desired. As one district court observed: "Mr. Chow's expert report provides a useful description of the landscape for SDBs but cannot definitively link the failure of SDBs not participating in the 8(a) program to intentional discrimination." *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, No. 2:20-cv-00041-DCLC-CRW, 2023 WL 4633481, at *13 (E.D. Tenn. July 19, 2023). Moreover, the court in *Ultima* found such evidence did not justify race-based programming because it "did not eliminate other variables that could explain the disparities." *Id.*

The Holt Report has similar defects. With respect to discrimination in private contracting, the Holt Report discusses studies conducted by entities like Travis, Dallas, and Harris Counties (*see, e.g.*, ECF No. 42-4 at 43–45, 56), the cities of Austin, Dallas, Fort Worth, San Antonio, and Arlington (*id.* at 43–44, 46, 48, 59–60), and the Texas Department of Transportation (*id.* at 48, 56). But the Agency cannot rely on studies from three counties and five cities in one state to justify a sweeping race-based presumption that applies to various industries nationwide. *See Croson*, 488 U.S. at 505–06 (explaining even stronger evidence failed to justify a single program in the city of Richmond alone).

The Wainwright Report is less persuasive still—at least for the interest of remedying "discriminatory barriers" that hinder MBEs' "ability to fairly compete for contracts where private discrimination occurs." ECF No. 41 at 62. The Report details examples of discrimination in various contexts. Wainwright Report at 87–91; ECF No. 42-3 at 725–29. The Agency leans on these findings to justify its broad second interest. *See* ECF No. 41 at 63–65. But Wainwright never analyzed government participation in contexts beyond prime contracting. *See* Wainwright Report at 87–91; ECF No. 42-3 at 725–29. His report is thus irrelevant for the Agency's interest beyond that context.

The common theme in these examples is clear: the Agency takes evidence probative for a specific context and uses it to justify more than it can. To be sure, the reports touch on other contexts, but they do so in a generalized way. As Plaintiffs note: "The reports simply claim discrimination in an 'entire industry,' and that 'the government' participates in this 'industry.'" ECF No. 44 at 57–58. They are correct,

and the Court must reject the Agency's simplistic syllogism that "discrimination exists in the American economy, and the government participates in the American economy, therefore, the government participates in discrimination." *See Croson*, 488 U.S. at 500–01 ("A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists.").

These problems only implicate the Agency's wider interest regarding ill-defined "exclusionary networks." *See* ECF No. 41 at 58. There are barriers to entry in any field, but the evidence shows they're steeper for MBEs. *See id.*; *see also* Holt Report at 28–32; ECF No. 42-4 at 52–56. Many private contracting sectors operate under the "good ol' boys club" where what a business does it less important than who its owner knows. The record shows MBEs underperform in these situations due to biases of those in the "in-group." *See id.* This is a prime example of a compelling societal interest that is not, as a matter of law, a compelling *governmental* interest. But many such exclusionary networks arise in government contracting. If constrained to that context, the Agency's evidence supports a compelling interest.[62] *See* ECF No. 41 at 56–59.

The record contains "evidence of disparities in federal contracting consistent with discrimination." *Id.* at 59; *see* ECF No. 42-4 at 9 (showing MBEs have a lower chance at government contracts in ***93% of bids***, even controlling for other variables). The Agency says these findings "justify the use of race-conscious remedial measures through the MBDA Act." ECF No. 41 at 60. The above reports identify instances of discrimination in this context. *See supra*, pp. 56–57. The record as a

---

[62]The Agency's brief bites off more than it can chew for this sub-interest too, as it tries to reframe the standard as prophylactic rather than ameliorative. *See* ECF No. 41 at 59 ("With billions of federal dollars allocated [to states] each year, the federal government has a compelling interest in ensuring that it does not become a passive participant in the racial exclusion of minorities from [state] public contracting system[s], which is persistent, pervasive, and long documented."). But preventative measures to keep the government from "becoming a passive participant" won't work; the Agency must show examples where the government *was* a passive participant. *Croson*, 488 U.S. at 492. The Court cannot imagine a race-conscious program that would *fail* strict scrutiny if preemptive measures sufficed. The Court thus disregards this component of the Agency's asserted interest.

whole does too. *See supra* n.58. Thus, carving away the Agency's broader interest, the record shows remedying historic discrimination in public procurement/prime contracting is a compelling government interest.

### ii. Government Participation

To reinforce the record's scattered examples, the Agency attempts to show relevant government participation. This is easy for active participation, but it gets tricky when the government's participation was "passive." But passive participation is every bit as important: deplorable forms of discrimination are often caused when the government plays a helping hand or simply looks the other way. The fact that someone else was in the driver's seat is no defense to racial discrimination by the government. *See Vitolo*, 999 F.3d at 361 (citing *Croson*, 488 U.S. at 492). Whether active or passive, the Agency must show government participation "with the particularity required by the Fourteenth Amendment." *W.H. Scott Constr. Co.*, 199 F.3d at 217.

The record lacks a smoking gun for the Agency's second interest. There is no cited study that says: "the federal government participated in _____, which caused MBEs to struggle in prime contracting." However, the Agency points to three categories of empirical evidence to support an inference of government-linked discrimination: (1) utilization indices, (2) regression analyses, and (3) aggregations of anecdotal evidence. *See* ECF No. 41 at 61–62. Given their prominence in the Agency's briefing, one would think these are a methodological triumvirate for establishing race-based discrimination. That isn't so.[63] Indeed, the Court is dubious that "aggregations of anecdotal evidence" are reliable at all. But "[i]t is well established that disparities between a locality's utilization of . . . MBEs and their availability in the relevant marketplace [can] provide evidence for the consideration of race-conscious remedies." ECF No. 42-4 at 26. Thus, the Court takes up the

---

[63]For an assessment of the strengths/weaknesses of these and other statistical methodologies in litigation, *see* David W. Barnes & John Conley, *Statistical Evidence in Litigation* 31–34 (1986); Franklin M. Fisher, *Multiple Regression in Legal Proceedings*, 80 COLUM. L. REV. 702, 704–726 (1980).

first two categories here, as they represent symbiotic methodologies for interpreting disparity-related data.

Disparity studies analyze differences "between the opportunities and experiences of [MBEs] and their actual utilization compared to White male owned businesses in a given locality." *Id.* The results can then be mapped on an index reflecting such utilization as compared to relevant marketplace availability:

> First, the studies evaluate the number of available MBEs and the relative use of those business enterprises in different sectors of a locality. Assuming a fair and equitable system of contracting, the proportion of contracts and contract dollars awarded to MBEs would be close to the corresponding proportion of MBEs available to perform work in the relevant market area. But[] a utilization index less than .80 indicates a substantial disparity in the use of available MBEs.

ECF No. 41 at 61. Plaintiffs critique the Agency's evidence but don't explain how it is critically deficient. *See* ECF No. 44 at 51. With so much on the line, the Court understands Plaintiffs' hesitancy with statistics, recalling Mark Twain's timeless warning that there are "lies, damn lies, and statistics." But the stats don't lie here, and the cited studies show significant disparity ratios for MBEs in prime contracting. *See, e.g.*, ECF No. 42-4 at 31, 63, 65–66. Such disparities support an "inference of discriminatory exclusion." *See Croson*, 488 U.S. at 509.[64] And because the government itself is the bidder on such contracts, that inference implicates government participation.

---

[64]To be fair, *Croson* emphasized utilization indices as evidence in employment-discrimination cases. *See* 488 U.S. at 501–02. As Plaintiffs note, that context is "confined by limited players, decisions[,] and decision-makers." ECF No. 56 at 18. But the Court's hypothetical discussion of prime contractors in *Croson* indicates it envisioned use of such evidence in other contexts. *See* 488 U.S. at 509. Here, the Agency's utilization indices show statistically significant disparity ratios for MBEs in government contracting. *See, e.g.*, ECF No. 42-4 at 31, 63, 65–66. While certain studies implicate non-governmental entities—e.g., the DFW Airport (*id.* at 65) or the Parkland Hospital System (*id.* at 64)—many are traceable to local, state, and federal governments.

Next the Agency points to regression analyses. *See* ECF No. 41 at 61–62. "Through regression analysis, [ ] studies show whether race is a statistically significant predictor of the disparate outcome at a 95% confidence level" and thus indicate "whether the disparate outcomes between racial/ethnic minorities and white male business owners could have occurred by chance." *Id.* Pooling data from various sources, the studies of record produced logit models showing MBE exclusion in prime contracting nationwide. *See, e.g.*, ECF No. 42-4 at 9. Simply put, the math doesn't add up unless race was considered. *See id.* While the studies' clarity obviates the need to discuss them at length, the Agency's précis cleanly summarizes their findings. *See id.* at 9–10. The Agency's regression analyses support an "inference of discriminatory exclusion" in government procurement/prime contracting, which necessarily suggests government participation. *See Croson*, 488 U.S. at 509.

In sum, the record shows several examples of historic discrimination in which the government participated. Taken alone, that wouldn't be enough. The record also shows statistical analyses and disparity studies that raise an inference of government-linked discrimination. Taken alone, that wouldn't be enough, either. But combining the concrete examples with the robust empirics, the Court finds remedying past discrimination in government contracting is a compelling governmental interest. The Court now turns to narrow tailoring.

2. The MBDA's racial presumption is not narrowly tailored.

Having established a compelling sub-interest, the Agency must show its race-based presumption is narrowly tailored to further that interest. *Fisher*, 570 U.S. at 312. To do so, the Agency must show a "close fit" between the means (its presumption) and the end (remedying historic discrimination in government contracting). *See Croson*, 488 U.S. at 493. This fit must be so close that "there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* As explained below, this is the Agency's downfall.

Several considerations frame the narrow-tailoring inquiry. *First*, a racial classification isn't narrowly tailored if its under- or over-inclusive. *See SFFA*, 600 U.S. at 216. *Second*, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *Id.* at 218. *Third*,

"at some point [the presumption] must end." *Id.* But every case is different, and the analysis is always holistic. Thus, cases beyond *SFFA* have identified other potentially relevant factors. *See, e.g., United States v. Paradise*, 480 U.S. 149, 171 (1987) ("In determining whether race-conscious remedies are appropriate, [courts] look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the [stated] goals to the relevant [ ] market; and the impact of the relief on the rights of third parties."). The MBDA Statute fails under these considerations.

### a. Under- and Over-Inclusivity

The MBDA's race-based presumption is both under- and over-inclusive. An underinclusive presumption excludes groups necessary to further the identified interest; an overinclusive presumption includes groups unnecessary for that interest. *See Croson*, 488 U.S. at 507–08; *Gratz*, 539 U.S. at 273–75. The Agency's presumption is both. *See generally* 15 U.S.C. § 9501(15)(B); 15 C.F.R. § 1400.1(b)–(c). The Agency suggests otherwise, but its argument is circular. The Agency observes that "Congress has found that 'many [socially or economically disadvantaged] persons are socially disadvantaged because of their identification as members of certain groups.'" ECF No. 41 at 81. From that congressional finding, the Agency concludes its presumption is justified and somehow extrapolates that the presumption is neither under- nor over-inclusive. *Id.* at 81–82.

Courts have long reviewed legislative and administrative findings with deference. *See Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 488–89 (1955). But "blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." *Croson*, 488 U.S. at 501 (citing *Korematsu v. United States*, 323 U.S. 214, 235–40 (1944) (Murphy, J., dissenting)). Here, the Agency advocates a form of congressional fiat, essentially suggesting that "Congress said it, that settles it." *See* ECF No. 41 at 81. But its no secret that Congress's

findings behind late-1970s racial classifications were ill-considered—if considered at all.[65] It shows.

As the Court previously observed, the Agency's presumption is underinclusive because it "arbitrarily excludes" many MBEs, including those owned by individuals from "the Middle East, North Africa, and North Asia." ECF No. 27 at 11. Such inconsistencies come with the territory of racial taxonomies in a multiracial nation.[66] For instance, insofar as "Black or African American" are grouped together in the MBDA Statute, *see* 15 U.S.C. § 9501(15)(B)(i), a more accurate reading would be "Black or Sub-Saharan African American." Or take the term "Asia" in 15 U.S.C. § 9501(15)(B)(iv). Depending on how the Agency interprets that nomenclature, persons from Western Russia, Turkey, or Afghanistan won't make the cut. *See* ECF No. 15 at 24. Persons from those demographics are every bit as disadvantaged as someone from, say, Japan, South Korea, or Singapore. Yet the MBDA presumes persons from the latter (more affluent) nations are disadvantaged, while those from the former nations are not. *See* 15 U.S.C. § 9501(15)(B).

Such inconsistencies are baked into the very fabric of the Agency's regulatory framework. *See id.* Examples abound. For instance, nothing in the MBDA's history provides a rationale for including people from "China, Japan, Pakistan, and India," but excluding those from "Afghanistan, Iran, Iraq, and Libya." ECF Nos. 27 at 11–12; 15 at 24.

---

[65]*See* Mark, *supra* n.10 ("There was 'never really any logic to it,' said John Skrentny, a sociology professor at the University of California at San Diego who has researched the origins of the federal government's presumptions. 'It's a lot of important policy built on a house of cards.'"). For more on the problem of overinclusiveness vis-à-vis race-based classifications in government programs in a modern multiracial society, *see* George R. LaNoue & John C. Sullivan, *Deconstructing the Affirmative Action Categories*, 41 AM. BEHAVIORAL SCIENTIST 913 (1998) (noting many such categories "reflect bureaucratic convenience more than demographic realities").

[66]*See generally* Bernstein, *supra* n.10, at 1–57 (detailing these and other issues vis-à-vis the rise of race-based classifications in federal bureaucracy, including the difficulty of workable taxonomies for the millions of Americans who fall into a "mixed-race" category); Joseph D. G. Castro, *Not White Enough, Not Black Enough: Reimagining Affirmative Action Jurisprudence in Law School Admissions Through a Filipino-American Paradigm*, 49 PEPP. L. REV. 195, 226–27 (2022) (same).

The absence of a clear regulatory framework for including or excluding certain groups means the MBDA Statute is immune from meaningful judicial review. *See SFFA*, 600 U.S. at 217. And when pressed in discovery, the Agency was unable to offer any rubric used for these determinations. *See* ECF Nos. 38 at 37; 39 at 54. Clearly, "[t]his scattershot approach does not conform to the narrow tailoring strict scrutiny requires." *Vitolo*, 999 F.3d at 364. The Agency can hardly be faulted for its failure to explain these distinctions, as "[t]he categories are socially constructed and historically contingent."[67] Thus, even if members of the above groups could apply for recognition of their disadvantage, *see* 15 C.F.R. § 1400.1(a), the presumption itself is underinclusive because it excludes them at the start.

Notably, the Agency fails to explain why its presumption is necessary to remedy the effects of discrimination in public contracting—the sole compelling interest identified in the briefs. As discussed above, the record contains no evidence of systemic exclusion from public contracting for many groups entitled to presumptive disability under the MBDA Statute. *See supra* pp. 54–61. Without clear evidence tracing one-for-one the groups in 15 U.S.C. § 9501(15)(B) to concrete discrimination in this context, the Agency's presumption is not narrowly tailored. The Court faced this issue in *Croson* and opined:

> If a 30% set-aside was 'narrowly tailored' to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this 'remedial relief' with an Aleut citizen who moves to Richmond tomorrow? . . . 'Such programs leave one with the sense that the racial and ethnic groups favored by the set-aside

---

[67]*Id.* at vii. Yet the Agency's job isn't getting any easier. America's racial/ethnic makeup has changed significantly since 1979. With ever-evolving demographics, states today are infinitely more multicultural than at the MBDA's infancy. In Texas, for instance, the "Hispanic or Latino" category is no longer a minority at all. *See* Alexa Ura, *Hispanics Officially Make Up the Biggest Share of Texas' Population, New Census Numbers Show*, TEX. TRIBUNE (June 21, 2023), https://www.texastribune.org/2023/06/21/census-texas-hispanic-population-demographics/. The rigidity of the Agency's racial listing belies the reality that states are "increasingly becoming a multicultural society in ways that make it harder to track [their] population through precise racial and ethnic categories." *Id.*

> were added without attention to whether their inclusion
> was justified by evidence of past discrimination.'

488 U.S. at 506 (citing Drew Days, III, *Fullilove*, 96 YALE L. J. 453, 482 (1987)). The same is true here, as the Agency seeks to justify a ramshackle presumption without concrete evidence establishing why certain groups make the list and others don't.

Narrow tailoring is not impossible to pass. For instance, Justice Stevens' hypothetical of a program for victims of sickle cell anemia in *Bush v. Vera*, 517 U.S. 952 (1996) shows an agency could consider race but only include groups necessary to achieving an identified compelling interest. *See* 517 U.S. at 984, 1032. But as noted, the Agency's arbitrary groupings are not traced to the interest here. Rather, the Agency's overinclusive presumption "joins many other federal statutes which have become law with equally barren empirical justification and without close scrutiny."[68] And because the Agency includes large swaths of individuals without ever asking if individual applicants belonging to those groups have experienced discrimination, it is facially overinclusive and thus fails strict scrutiny. *See Black Fire Fighters Ass'n of Dall. v. City of Dall., Tex.*, 19 F.3d 992, 995 (5th Cir. 1994).

Under 15 U.S.C. § 9501(15)(B), Oprah Winfrey is presumptively disadvantaged, while Plaintiffs and even more disadvantaged Americans are not. While illogical, this wouldn't be a problem if the presumption wasn't based on race. If a non-suspect classification has a reasonable basis, "it does not offend the Constitution simply because [it] is not made with mathematical nicety or because in practice it results in some inequality." *City of Dall. v. Stanglin*, 490 U.S. 19, 26 (1989) (internal citation marks omitted). But everything changes when the government considers race. *See Croson*, 488 U.S. at 486 (noting "even if the city had demonstrated a compelling interest in the use of a race-

---

[68]*See* Drew Days, *Fullilove*, at 465. Days' work was discussed extensively in *Croson* for good reason: the *Fullilove* article comprehensively analyzed legislative efforts similar to the program in *Croson* and the Agency's presumption here. After an exhaustive study of minority set-aside programs, Days—the first Black American to head the DOJ's Civil Rights Department— advocated for a "principled approach" to such programs that could comply with strict scrutiny where others do not.

based quota" it must prove the program is "narrowly tailored to accomplish a remedial purpose"). The MBDA's presumption in 15 U.S.C. § 9501(15)(B) is both under- and over-inclusive. As such, it is not narrowly tailored and does not pass strict scrutiny.

### b. Stereotyping

Most of the above issues stem from stereotypes underlying the Agency's presumption. There isn't anything inherently race-conscious about serving "socially or economically disadvantaged individual[s]." 15 U.S.C. § 9501(15). But the MBDA Statute defines "social or economic disadvantage" in racial terms. *Id.* Nor does a business owner's race inherently suggest anything about disadvantage. But the MBDA Statute defines "minority owned business enterprise" in terms of "social or economic disadvantage." *See* 15 U.S.C. § 9501(9). Indeed, as far as the Agency is concerned, race is a reliable proxy for disadvantage, at least with respect to the listed groups. Thus, if a business owner belongs to an enumerated group, he or she is entitled to services without regard to their life circumstances, financial performance, or any social or economic metrics of "disadvantage." *See* 15 C.F.R. § 1400.1(b) ("Designation establishes eligibility status [ ] for MBDA funded programs."). The inverse is true, too. No matter how disadvantaged an entrepreneur may be, the Agency presumes otherwise if they aren't on the list. *Id.* The illogic is absolutely radiant.

Federal courts have long rejected such illogical stereotypes. *See SFFA*, 600 U.S. at 220 (quoting *Shaw*, 509 U.S. at 647) ("We have time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'"). The record shows correlations between certain groups on the Agency's list and determinants of "social or economic disadvantage." *See supra* n.55. To say it supports causation wouldn't be a huge leap. But "Fourteenth Amendment jurisprudence evinces a commitment to eliminate unnecessary and excessive government use and reinforcement of racial stereotypes." *Vera*, 517 U.S. at 985 (collecting cases). And the Court can't "accept as a defense to racial discrimination the very stereotype[s] the law condemns." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

Try as it might, the Agency cannot escape this issue. Indeed, its eighty-six-page summary judgment brief mentions the word "stereotype" twice in two disparate quotations. *See* ECF No. 41 at 57, 71. It isn't worth belaboring the point, but it's worth noting this precise issue was Harvard's hamartia in *SFFA*: "[B]y accepting race-based admissions programs in which some students may obtain preferences on the basis of race alone, respondents' programs tolerate the very thing that *Grutter* foreswore: stereotyping. The point of respondents' admissions programs is that there is an inherent benefit in race *qua* race—race for race's sake." 600 U.S. at 220. So too here.

Though *SFFA* concerned college admissions, nothing in the decision indicates the Court's holding should be constrained to that context. Even if that's what the Court intended, *SFFA*'s stereotyping analysis is far from novel. On the contrary, ill-advised stereotypes have counted against race-based classifications in many other contexts.[69] As Plaintiffs note: "Nothing says 'stereotype' quite like assuming that all members of certain racial groups are disadvantaged." ECF No. 44 at 62. And the Agency's stereotypes defy logical explanation. For instance, Mr. Bruckner is a permanently disabled immigrant who fled to America from an impoverished Soviet State. *See* ECF No. 1 at 3–4. By any traditional metrics, such an individual is "socially or economically disadvantaged." But not by the Agency's metrics. As far as the Agency is concerned, race presumptively determines disadvantage—but only for those listed in 15 U.S.C. § 9501(15)(B).

Because the MBDA's stereotypes hinder applicants not from a listed minority, they necessarily use race "as a negative." *SFFA*, 600 U.S. at 218–19. The Agency argues otherwise, for two reasons: (1) MBDA programming is allegedly not "zero-sum" like college admissions, and (2) regulations "provide an avenue" for unlisted applicants "to qualify for the presumption of social or economic disadvantage." ECF No. 46 at 43–44. Neither persuades. The latter fails because, as discussed throughout

---

[69]*See, e.g.*, *Croson*, 488 U.S. at 493 (public contracting); *Miller*, 515 U.S. at 900 (voting districts); *Palmore*, 466 U.S. at 432 (child custody); *Powers*, 499 U.S. at 410 (juror selection); *Batson v. Kentucky*, 476 U.S. 79, 104 (1986) (peremptory strikes).

the standing section, Plaintiffs' harm isn't outright rejection, but the imposition of additional obstacles because of their race. The former fails because it's wrong.

Absent a theoretical program with boundless coffers, most federal benefits are "zero sum" to a degree. "A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218–19. MBDA Business Centers have finite resources and offer finite services. A Black man or a Hawaiian woman automatically gets in the door; a Romanian man or a Libyan woman does not. *See* 15 U.S.C. § 9501(15)(B). Say a Center gets six hypothetical applicants: two are Black, one is Latino, one is a Hasidic Jew, one is Albanian, and one is a Sephardic Jew. The Black, Latino, and Hasidic Jewish applicants get the benefit of the Agency's presumption; the Albanian and Sephardic Jewish applicants don't. And the fact that the latter applicants have a backdoor to benefits doesn't change the initial disadvantage conferred by the stereotype. As the Court queried in *SFFA*: "How else but 'negative' can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?" 600 U.S. at 219.

At base, the Agency "treat[s] individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Miller v. Johnson*, 515 U.S. 900, 911–12 (1995). And "[i]f our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630–31 (1991). The MBDA's presumption in 15 U.S.C. § 9501(15)(B) is based on racial stereotypes. As such, it is not narrowly tailored and does not pass strict scrutiny.

### c.  Logical Endpoint

The *SFFA* factor most tied to higher education is that of a "logical endpoint." This factor comes from *Grutter* and its progeny, as the Supreme Court has wrestled with the constitutionality of race-based affirmative action in college admissions for decades. *See SFFA*, 600 U.S.

at 212 (discussing the factor's genesis in *Grutter*); *Grutter*, 539 U.S. at 343 ("We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today."). While *Grutter* mandated sunsetting affirmative action in higher education, courts apply this factor in other contexts. *See, e.g.*, *Paradise*, 480 U.S. at 171, 183; *Dean*, 438 F.3d at 460. The "central theme" in such cases "is that the shorter the remedy, the more likely it is narrowly tailored." *Dean*, 438 F.3d at 460. This weighs against the Agency.

The Agency has grown by orders of magnitude since its inception in 1979. *See supra* pp. 6–7. The once-diminutive program became a full-fledged federal agency in 2021 and has an appropriation that exceeds $500 million over five years, with a $70 million budget last year alone. *See* Minority Business Development Act of 2021, S. 2068, 117th Cong. (2021); Consolidated Appropriations Act of 2022, Pub. L. No. 117-328, 136 Stat. 4512–13 (2022). If race-based programs require a "logical endpoint," the MBDA is headed the wrong way. *See* ECF No. 56 at 27 ("At 54 years and running, narrow tailoring dictates that the MBDA should be sunsetting. But instead, 'no end is in sight,' and the MBDA Statute has only expanded government-sponsored discrimination through a fully integrated network of 'widely publicized' offices."). The MBDA's presumption in 15 U.S.C. § 9501(15)(B) has no logical endpoint. Thus, it is not narrowly tailored and does not pass strict scrutiny.

### d.  Other Relevant Factors

Having addressed the main factors from *SFFA*, the Court turns to factors from *Paradise v. United States*, 480 U.S. 149 (1987) addressed in the Parties' briefs. Two weigh against the Agency; one does not.

### i.  Necessity & Available Alternatives

*First*, as noted above, a narrowly tailored remedy must be necessary to achieve the government's interest. *Fisher*, 570 U.S. at 312. It doesn't matter if it's the easiest, most administrable, most well-intentioned program in the world—it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest. *See id.* Simply put, "necessary" means "necessary" for strict scrutiny purposes—it does not merely mean "a good idea." The Agency says "the presumptions in

the [MBDA] program are necessary and, despite alternative remedies, disparities exist." ECF No. 41 at 72 (cleaned up). That admission seems to undercut the Agency's assertion of necessity, or at very least its efficacy vis-à-vis the stated interest. In any event, the Agency is wrong. The MBDA's racial presumption is unnecessary for the stated interest and was not crafted after first considering alternatives.

The only surviving interest from the briefs is remedying past discrimination in government procurement/prime contracting. *See supra*, pp. 58–61; *see also Fisher*, 570 U.S. at 314 (noting the government must prove "its plan is narrowly tailored to achieve *the only interest that the Court has approved*") (emphasis added). The record does not show the Agency's presumption is necessary for that interest. But even if the Agency's broader interests were compelling, nothing suggests the race-based presumption in 15 U.S.C. § 9501(15)(B) is necessary to fix the credit struggles and exclusionary networks documented in the record. Rather than picking winners and losers based on skin pigmentation, if a "rising tide lifts all boats," a holistic, race-neutral approach to assisting marginalized businesses would serve those interests just as well.[70]

This naturally segues to the related inquiry of alternatives. Despite the Agency's asserted necessity, "[a] race-conscious remedy will not be deemed narrowly tailored until less sweeping alternatives—particularly race neutral ones—have been considered and tried." *Walker v. City of Mesquite*, 169 F.3d 973, 983 (5th Cir. 1999); *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007) (citing *Grutter*, 539 U.S. at 339) ("Narrow tailoring requires 'serious, good faith consideration of workable race-neutral alternatives.'"). Nothing in the

---

[70]*See generally* L. Darnell Weeden, *Creating Race-Neutral Diversity in Federal Procurement in a Post-Adarand World*, 23 WHITTIER L. REV. 951 (2001) (examining race-neutral alternatives in federal procurement after *Adarand*); George LaNoue & John Sullivan, *Race Neutral Programs in Public Contracting*, 55 PUB. ADMIN. REV. 348 (1995) (examining race-neutral alternatives in government contracting after *Croson*); Y. Lisa Colon Heron & Brian Anthony Williams, *Government Contracting Preference Programs After Schuette: What's Next? Achieving Parity Through Race-Neutral Methods*, 35 CONSTR. L. J. 29 (2015) (examining race-neutral alternatives in government construction contracts and providing case studies of effective practices).

record indicates the MBDA considered race-neutral alternatives before endorsing the presumption in 15 U.S.C. § 9501(15)(B).

In *Parents Involved in Cmty. Schs.*, the Court found a school district's race-based program unconstitutional because the district "failed to present any evidence that it considered [race-neutral] alternatives." 551 U.S. at 735. So too here. The Agency argues "race-neutral 'less-sweeping alternatives' have been 'considered,' tried, and found wanting." ECF No. 41 at 72–73. But the Agency's brief identifies examples from other contexts, like the Small Business Administration's 8(a) program. *Id.* at 73. The Agency thus attempts to side-step this inquiry, noting merely that "the federal government has operated race-neutral business-assistance programs for decades—yet racial disparities exist." *Id.* at 69. But evidence that other agencies tried other solutions to other problems will not carry the Agency's burden. *See Parents Involved in Cmty. Schs.*, 551 U.S. at 744 ("The dissent suggests that some combination of the development of these plans over time, the difficulty of the endeavor, and the good faith of the [government] suffices to demonstrate that these stark and controlling racial classifications are constitutional. The Constitution and our precedents require more."). And the Agency alone bears the burden of showing race-neutral alternatives were considered. *Id.* at 719; *see also Gratz*, 539 U.S. at 244; *Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 348 (5th Cir. 2011).

The Agency's presumption only makes sense if the Agency wants to help listed minorities *without* helping unlisted persons. Like Harvard's program in *SFFA*, the MBDA sees "an inherent benefit in race *qua* race—race for race's sake." 600 U.S. at 220. Such disregard for the necessity of race or for race-neutral alternatives is unconstitutional. *See id.*; *see also Parents Involved in Cmty Schs.*, 551 U.S. at 735. Moreover, the Agency notes that other federal programs seek to fight discrimination in contexts like credit and government contracting via race-neutral programming. *See* ECF No. 46 at 69–70. In addition to other policies aimed at the same goal, the Agency fails to explain how ramped-up enforcement of existing federal antidiscrimination laws would not ameliorate the problems addressed in its briefing—a solution that would not require the government to treat people differently based

on race. *See Croson*, 488 U.S. at 509–10 ("Nor is [ ] the government powerless to deal with individual instances of racially motivated [contracting decisions]. Where such discrimination occurs, [the government] would be justified in penalizing the discriminator and providing appropriate relief to the victim of such discrimination."). This suggests the MBDA's presumption was adopted with an "ask forgiveness, not permission" approach to available alternatives.

To be fair, considering alternatives implicates extraordinarily complex public policy issues. But as noted above, the Agency's problem isn't merely that race-neutral alternatives would suffice. Rather, the MBDA's fatal flaw is that no evidence suggests it considered such alternatives before resorting to its race-based presumption. Without such evidence, the Agency fails to show the meticulous "connection between justification and classification" required for its presumption to survive. *See Gratz*, 539 U.S. at 270. The Court is not unsympathetic to the Agency's argument that racial disparities continue in the American economy despite ostensible alternatives. *See* ECF No. 41 at 69–73. However, "[s]imply because the [government] may seek a worthy goal does not mean [it is] free to discriminate on the basis of race to achieve it, or that [its] racial classifications should be subjected to less exacting scrutiny." *Parents Involved in Cmty. Schs.*, 551 U.S. at 743. The MBDA's presumption in 15 U.S.C. § 9501(15)(B) is unnecessary and was created without first considering race-neutral alternatives. Thus, it is not narrowly tailored and does not pass strict scrutiny.

### ii.    Flexibility & Duration

*Second*, a narrowly tailored program is flexible and durationally limited. *See Paradise*, 480 U.S. at 177. The Agency says its presumption is both. *See* ECF No. 41 at 79. "The primary question when analyzing a remedy's flexibility is whether its requirements may be waived." *Dean*, 438 F.3d at 459. The Agency says its presumption is flexible because "no one is automatically excluded from the Business Center program just because of their race." ECF No. 41 at 79. That misses the point. The crux of Plaintiffs' equal-protection claim isn't that they were "automatically excluded," but that the Agency presumes they should be.

In *Dean*, the court examined a Shreveport decree requiring the fire department to hire Black and women applicants in proportion to their numbers in the municipal workforce. 438 F.3d at 459. The court determined the decree was sufficiently flexible because it pursued that goal "subject to the availability of qualified candidates." *Id*. Plaintiffs are proof that the MBDA's presumption is not "subject to the availability of qualified candidates." Nothing in the MBDA Statute says its presumption is waivable or otherwise elastic. While applicants not on the Agency's list can attempt to demonstrate disadvantage, *see* 15 C.F.R. § 1400.1(a), the underlying presumption cannot be waived. Indeed, the racial presumption is baked into countless facets of MBDA programming. *See* 15 U.S.C. §§ 9501, 9511, 9512, 9522, 9523, 9524. Thus, the Agency points to the very thing that establishes inflexibility as proof that the program is flexible.

In any event, *Dean* involved an aspirational objective for the city's fire department, not a codified listing of preferred races who may receive government benefits. *See* 438 F.3d at 452. And the court in *Dean* found the city's decree may violate the Equal Protection Clause nonetheless. *See id*. at 465. There is no way for an applicant who isn't listed in 15 U.S.C. § 9501(15) to access MBDA programming without first undertaking additional steps inapplicable for those listed. In both *Dean* and *Paradise*, the contested racial policies were flexible because they were "contingent on the availability of qualified applicants." *Dean*, 438 F.3d at 460 (discussing *Paradise*, 480 U.S. at 153). Put differently, the government could relax its minority preferences vis-à-vis a finite good (namely, a job) if there weren't enough minority applicants to go around. Here, the Agency cannot relax its preferences in granting a finite good (MBDA benefits) because (1) the statute itself contains no waiver provision and thus precludes that option, and (2) the "applicant pool" is not geographically constrained and is thus effectively limitless.

The Agency's presumption is also unlimited in duration. In *Dean*, Shreveport adopted an "interim goal" for hiring Black and female candidates "until the long-term goal is achieved and maintained for one year." 438 F.3d at 460. As the court noted: "[t]he central theme of a duration analysis is that the shorter the remedy, the more likely it is

narrowly tailored." *Id.* (citing *Paradise*, 480 U.S. at 178). Where Shreveport's goal had an endpoint, the MBDA does not. Rather, as discussed above, the Agency continues to grow and offers increasingly expansive programming pursuant to its racial presumption. If the current trend continues, the MBDA's presumption appears to have limitless shelf life. The MBDA's presumption in 15 U.S.C. § 9501(15)(B) is neither flexible nor durationally limited. Thus, it is not narrowly tailored and does not pass strict scrutiny.

### iii.    Impact on Third Parties

*Third*, a narrowly tailored program minimally impacts third parties. *See Paradise*, 480 U.S. at 171. With a straight face, the Agency says "any impact of the Program's race-conscious presumptions on third parties is minimal." ECF No. 41 at 83. Considering the presumption prevents third parties from obtaining MBDA programming, that's not exactly a glowing endorsement of the Agency's services. Yet the Agency points to "a plethora of race-neutral business assistance options available to the public." *Id.* Indeed, the Agency contends "[t]here are no federal funds flowing directly to MBEs that are unavailable to non-minority business owners." *Id.* The obvious exception, pretermitted in that argument, are the millions of dollars flowing through the MBDA itself.

The MBDA presumes certain races are entitled to benefits, giving them an effective monopoly on its services. *See* 15 U.S.C. § 9501(15)(B). Precedent has long recognized that "[t]he badge of inequality and stigmatization conferred by racial discrimination" is itself an impactful harm. *Moore*, 993 F.2d at 1224. Those not covered by 15 U.S.C. § 9501(15)(B) are not invited to the party unless they make an "adequate showing" that they should be. *See* 15 C.F.R. § 1400.1(b). Even if they can access business-development services from other programs, that presumption is per se impactful to third parties. *See Moore*, 993 F.2d at 1224. But a generous factfinder could determine available alternatives reduce that impact. *See* ECF No. 41 at 83. This factor notwithstanding, the Agency's presumption in 15 U.S.C. § 9501(15)(B) fails the other narrow-tailoring factors and thus fails strict scrutiny.

\*    \*    \*

The Equal Protection Clause safeguards Americans against unequal laws. *See* U.S. Const. amend. XIV § 1. That guarantee applies to the federal government via the Fifth Amendment's Due Process Clause. *Sharpe*, 347 U.S. at 499. Accordingly, government programs that afford preferential treatment to certain races "must comply with strict scrutiny." *SFFA*, 600 U.S. at 213. This "long been central" to equal protection jurisprudence, and "holding 'benign' . . . racial classifications to different standards does not square with [it]." *Adarand*, 515 U.S. at 227. This is true "however well intentioned and implemented in good faith" the program may be. *SFFA*, 600 U.S. at 213. Simply put, the Constitution requires "more than good motives" whenever the government "seeks to allocate its resources by way of an explicit racial classification system." Days, *Fullilove*, at 485.

The MBDA has been judged and found wanting. Its statutory presumption, codified at 15 U.S.C. § 9501, is unconstitutional. The presumption reflects "bureaucratic convenience more than demographic realities." LaNoue & Sullivan, *supra* n.64. Bureaucratic convenience does not hold a flame to the rigors of strict scrutiny. This unjustified presumption is baked into the very fabric of the MBDA's Business Center program. The Agency grants or withholds programming based upon a threshold satisfaction of 15 U.S.C. § 9501(15)(B), or alternatively, an "adequate showing" that an unlisted group is "socially or economically disadvantaged" under 15 C.F.R. § 1400.1(b). All roads to MBDA programming must pass that racial barrier.

Any provision of the MBDA Statute that is contingent on the presumption in 15 U.S.C. § 9501(15)(B) is also unconstitutional. Plaintiffs ask the Court to declare the entire statute unconstitutional because the Agency "has been purposed for a race-based mission, down to its very name." ECF No. 56 at 38. But it is not unconstitutional for a federal program to serve minorities. What offends the Equal Protection Clause is doing so by granting or withholding benefits via race-based classifications that fail strict scrutiny. Moreover, the MBDA Statute clearly contemplates severability of any provisions found "by a court of competent jurisdiction to be invalid." 15 U.S.C. § 9596. Accordingly, the Court **GRANTS** summary judgment on Plaintiffs' equal protection

claim and finds the following provisions of the MBDA Statute unconstitutional: 15 U.S.C. §§ 9501, 9511, 9512, 9522, 9523, 9524. The Court now turns to their APA claim.

### C. The Court exercises its equitable discretion to decline vacatur under 5 U.S.C. § 706.

Having found the MBDA Statute unconstitutional, the Court must now ask if that finding warrants equitable relief under the APA. Broadly speaking, Plaintiffs' equal protection claim concerns the MBDA Statute; their APA claim concerns Agency actions pursuant thereto—including regulations promulgated to effectuate the Statute's race-based mandate. The first inquiry guides the second, as the APA requires courts to "hold unlawful and set aside any agency action . . . contrary to a constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(1)–(2)(B). As the Agency notes, "Plaintiffs allege no independent injuries that flow solely from their APA claim." ECF No. 41 at 84. Thus, if the Court found Plaintiffs lack standing or the MBDA Statute survives strict scrutiny, "summary judgment is due on the APA claim as well." *Id.* at 85. All else equal, one would think the reverse is true too. But as explained below, all else isn't equal, and the Court hesitates to endorse Plaintiffs' expansive reading of relevant APA provisions.

### 1. The APA does not explicitly authorize vacatur.

Federal courts have long recognized within the APA a "basic presumption of judicial review" for "one 'suffering legal wrong because of agency action.'" *Abbott Laby's v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The APA defines "agency" as "each authority of the Government of the United States," 5 U.S.C. § 551(1), and "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). An aggrieved party may challenge an agency's action if (1) the action was unlawful or (2) the action was lawful but was promulgated under an unlawful statute. The latter is the case here. *See* ECF No. 38 at 45–50.

Pointing to 5 U.S.C. § 706, Plaintiffs say "[t]he APA authorizes this Court to vacate the unconstitutional MBDA implementing regulations."

*Id.* at 54. That's a big statement. The APA itself doesn't say that. In fact, the APA text provides more questions than answers. *See* 5 U.S.C. § 706. While "compel agency action" and "hold unlawful" seem simple, what does it mean to "set aside" agency actions? Does that mean vacatur as Plaintiffs suggest, or something else entirely? Does the language "the reviewing court *shall*" imply a mandatory obligation? How does this relate to Plaintiffs' separate requests for declaratory judgment and injunctive relief? The Court is disinclined to play fast and loose with the APA and let the chips fall where they may. As explained below, the Court sees intuitive merit in Plaintiff's claim but declines to vacate the MBDA's implementing regulations at this juncture. Insofar as the Court is clearly authorized to grant other remedies that would serve the same function, the Court sees no need to grant a remedy built on sand when alternative remedies built on stone will suffice.

To be sure, the APA "explicitly authorizes the court to set aside any agency action 'contrary to [a] constitutional right.'" ECF No. 38 at 54 (citing *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979)). That isn't contested here. Nor is Plaintiffs' contention that "the APA contemplates nationwide relief from invalid agency action." *Id.* What's contested is Plaintiffs' assertion that such relief means "vacatur" under 5 U.S.C. § 706. The Fifth Circuit and others endorse Plaintiffs' view.[71] Others disagree.[72] Without throwing its hat in the ring of this nationwide debate, the Court declines to categorically adopt Plaintiffs' view here. It does so out of equitable discretion, not because it disagrees with the Fifth Circuit's standard practice.

---

[71] *See, e.g.*, *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021); *Harman v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Griffin v. HM Fla.-ORL, LLC*, 601 U.S. ___, 144 S. Ct. 1, No. 23A366, at 3 n.1 (2023) (statement of Kavanaugh, J.) ("This statutory power to 'set aside' agency action is more than a mere non-enforcement remedy . . . In these situations, the courts *do* hold the power to 'strike down' an agency's work, and the disapproved agency action is treated as though it never happened.").

[72] *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 695–98 (2023) (Alito, J., concurring); *see also infra* n.74.

Historical context suggests the APA's use of "set aside" was not intended to authorize vacatur. For instance, nobody writing about the APA discussed this apparently textual remedy for years after its passage.[73] But maybe it was hiding in plain sight. If that were true, it seems odd that the Supreme Court jurisprudence of the time used "set aside" to mean a judicial finding of invalidity.[74] If anything, that would be more akin to a declaratory judgment, not vacatur. This isn't an exercise in semantics, either: "When a court finds a statutory rule unconstitutional, it does not issue an order purporting to reverse or vacate the statute. Instead, the court decides the case on the assumption that the unconstitutional statutory rule is not binding and is to be disregarded."[75] Consequently, "[a]ny remedy the court gives runs to the defendant, not to the legislature."[76] Federal courts have been authorized to do that from the founding. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137 (1803) (holding laws that do not comport with the Constitution are invalid and should be treated as legally ineffective).

---

[73]*See* John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 YALE J. REG. BULL. 119, 127–28 (2023) (discussing scholarship of Professors Kenneth Culp Davis and Louis Jaffe).

[74]*See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 87 (1938) (Butler, J., dissenting) (lamenting the "grave consequences liable to result from erroneous exertion of [the Court's] power to set aside legislation" and cautioning that "legislation [should] not be *held invalid*" without clear constitutional reasons); *Home Bldg. & Loan v. Blaisdell*, 290 U.S. 398, 432 (1934) (using similar language to suggest "set aside" was synonymous with "a state law [being] *found to be invalid*"). The trend of using "set aside" in this way continued uninterrupted in the immediate wake of the APA. *See, e.g.*, *Dennis v. United States*, 341 U.S. 494, 525 (1951) (noting the Court must "set aside the judgment of those whose duty it is to legislate" only if the Constitution requires such a result). And "Justice Frankfurter hardly meant to suggest the Court had the power to erase statutes from the books. Instead, he used the phrase to mean that a court should disregard—refuse to apply—an unconstitutional law." *Texas*, 599 U.S. at 695–96 (Alito, J., concurring).

[75]*See* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 YALE J. REG. BULL. 37, 43 (2020).

[76]*Id.*

So the orthodox use of "set aside" when the APA was passed suggests "invalidity is found, not made."[77] This reading lends internal cohesiveness to § 706, which calls for courts to "set aside" not just agency actions, but also "findings" and "conclusions." *See* 5 U.S.C. § 706. If Plaintiffs' reading controlled, the Court would have the head-scratching task of "vacating" an agency's findings or conclusions. Other textual considerations support this conclusion, the most obvious being that 5 U.S.C. § 706 doesn't concern remedies. *See id.*; *see also United States v. Texas*, 599 U.S. at 695–98 (Alito, J., concurring) (tracing the contours of the debate and reasoning that "[t]here are many reasons to think § 706(2) uses 'set aside' to mean 'disregard' rather than 'vacate'"). If the APA's drafters wanted those terms to convey certain remedies, it's unclear why those terms are in § 706, not § 703. *See* 5 U.S.C. § 703 (noting "applicable form[s] of legal action" may include "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus"). And if "hold unlawful" means a declaratory judgment, why the surplusage between § 703 and § 706? Moreover, the simplest objection is the strongest: if the APA's drafters wanted "set aside" to mean "vacate," why didn't they just say so?

It's hard to believe Congress wanted to authorize an extraordinary remedy with such inexplicit language. But this view is contested by jurists and academics of all stripes.[78] Indeed, in the Fifth Circuit, "the ordinary practice is to vacate unlawful agency action." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (2022). This Court has done so before. *See Brown v. U.S. Dep't of Educ.*, 640 F. Supp. 3d 644 (N.D. Tex. 2022) (Pittman, J.), *rev'd on other grounds by Dep't of Educ. v. Brown*, 600 U.S. 551 (2023). Without rejecting that approach here, the

---

[77] *Id.* at 44.

[78] *See supra* n.71; *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 951 (2018) ("Section 706 of the APA authorizes and requires a court to 'set aside' agency rules and orders that it deems unlawful or unconstitutional. This extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to 'set aside'—i.e., formally nullify and revoke—an unlawful agency action."); Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1173 (2020) ("The term 'set aside' means invalidation—and an invalid rule may not be applied to anyone.").

Court exercises its equitable discretion to decline a remedy with nebulous authority in favor of remedies with clear authority.

"[E]quity practice with a background of several hundred years of history" grants federal courts significant discretion in granting or denying equitable remedies. *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1943). Plaintiffs argue 5 U.S.C. § 706 requires vacatur wherever "an agency action is unconstitutional." ECF No. 56 at 39 (citing *Texas v. EPA*, 829 F.3d 405, 426 (5th Cir. 2016)). But the Court's equitable discretion is overridden only by an "unequivocal statement of [legislative] purpose." *Bowles*, 321 U.S. at 330. And the APA has none.

2. Vacatur is unnecessary to remedy Plaintiffs' injury.

Plaintiffs contend the APA is a "separate but additional tool for addressing the unconstitutional MBDA implementing regulations." ECF No. 56 at 39. While true, the Court has discretion to decide if it wants to use that tool. *See Bowles*, 321 U.S. at 329 (noting "[t]he essence of equity jurisdiction has been the power . . . to do equity and to mould each decree to the necessities of the particular case"). This discretion includes denying remedies even where a right has been violated. *See Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J., concurring) ("Although courts of equity exercised remedial 'discretion,' that discretion allowed them to deny or tailor a remedy despite a demonstrated violation of a right, not to expand a remedy beyond its traditional scope."). Indeed, discretion is the hallmark of federal equity jurisprudence—especially in administrative law.[79]

Federal courts have several rules of thumb for exercising this discretion. The most important is that extraordinary remedies are for extraordinary circumstances. *United States v. Texas*, 599 U.S. at 702 (Gorsuch, J., concurring). Accordingly, courts are slow to grant equitable remedies and won't if they don't have to. *Id.* Here, the Court is loath to

---

[79] *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 17 (2023) ("[A]utomatic vacatur flouts the requirement of an individualized, circumstance-driven fairness evaluation, which, as I have explained, is the hallmark of an equitable remedy."); *see also* Ronald M. Levin, *'Vacation' At Sea: Judicial Remedies & Equitable Discretion in Administrative Law*, 53 DUKE L. J. 291 (2003) (providing an overview of equitable discretion in administrative disputes).

grant an ill-defined and arguably unauthorized remedy under the APA when alternative remedies serve the same basic function. In vacating an agency action, the Court renders the action itself a nullity, meaning "the rule shall no longer have legal effect."[80] Simply put, the contested action (1) is declared unlawful, meaning (2) the government must stop enforcing it. Here, the Court's declaratory judgment (*supra*, pp. 75–76) and permanent injunction (*infra*, pp. 91–92) serve the same purpose. While vacatur operates on the law itself and is thus a theoretically stronger remedy, its ostensible superiority has no practical effect vis-à-vis the Parties here. Moreover, Plaintiffs' dual requests for vacatur and a permanent injunction are at least redundant and at most inconsistent. If the Court enjoins enforcement of the MBDA's implementing regulations, what more than a moral victory is vacatur? If the Court vacates them, how can it then enjoin enforcement of legally void regulations? The Court declines to invite such chaotic implementation of its orders here.

*    *    *

Under the APA or not, the Court must "hold unlawful and set aside" unconstitutional agency actions. *See* 5 U.S.C. § 706(1)–(2)(B). That duty dates to 1788, not 1946. *See* U.S. Const. art III § 2. Because a declaratory judgment and an injunction are more clearly authorized than vacatur and will remedy Plaintiffs' injuries, the Court **DENIES** summary judgment on Plaintiffs' APA claim. The Court now turns to their request for a permanent injunction.

### D. The MBDA must be permanently enjoined from using its racial presumption in Business Center programming.

Turning last to Plaintiffs' request for injunctive relief, the Court notes that Plaintiffs don't get a permanent injunction just because they got a declaratory judgment. An injunction "is not a remedy which issues as of course." *See Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–38 (1933). Declaratory judgments and injunctions involve separate inquiries and standards. *See Weinberger v. Romero-Barcelo*,

---

[80]Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving EPA*, 98 NOTRE DAME L. REV. 1997, 1999 (2023) (collecting cases).

456 U.S. 305, 312 (1982) (collecting cases) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."). And even the smallest injunction is a "drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). If courts are loath to issue injunctions for small, geographically isolated cases, this hesitancy is rightly magnified for nationwide permanent injunctions like Plaintiffs seek here.

When the Court preliminarily enjoined the DFW, Orlando, and Milwaukee Business Centers last June, it reiterated that injunctive relief should be "narrowly tailored to the injury it is remedying." ECF No. 27 at 10 (citing *O'Donnell v. Harris Cnty.*, 892 F.3d 147, 155 (5th Cir. 2018)). Accordingly, the Court declined Plaintiffs request to enjoin MBDA operations nationwide on a nascent evidentiary record. *See id.* The Court now evaluates Plaintiffs' request on a full record, looking to the familiar requirements for injunctive relief:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs have the burden to establish each element. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 374 (2008).

### 1. Plaintiffs suffered an irreparable injury.

The first element for injunctive relief is an irreparable injury. *Id.* If traditional remedies (e.g., damages) will suffice, courts will not entertain equitable ones. *See Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989). As noted in the Court's preliminary injunction, constitutional violations are irreparable.[81] Such

---

[81] *See* ECF No. 27 at 12–13 (collecting cases); *BST Holdings, LLC v. OSHA, U.S. Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) ("[T]he loss of constitutional freedoms, 'for even

rights are sacrosanct and must be vindicated if infringed.[82] While critiques can be made over blind "presumptive irreparability,"[83] the inquiry is satisfied by bona fide constitutional violations. Nevertheless, the Court "is not mechanically obligated to grant an injunction for every violation of law." *Romero-Barcelo*, 456 U.S. at 313. Thus, the Court must ask *how* a plaintiff's injury is irreparable—if at all. *See id.*

Plaintiffs' injury is irreparable here because racial classifications cause "stigmatic harm." *Croson*, 488 U.S. at 722. Damages don't remedy stigmatic harms. The issue isn't that damages could *never* work— everyone has their price. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is *irreparable*. Mere injuries, however substantial, . . . are not enough. The possibility that adequate compensatory or other relief will be available at a later date . . . weighs heavily against a claim of irreparable harm."). Rather, an "irreparable" injury lacks clear metrics to compute damages. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011); *see Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (noting irreparable injuries "cannot be undone by money damages" or are "especially difficult" to compute). And no standards could compute Plaintiffs' damages here. *See Janvey*, 647 F.3d at 600; *Deerfield Med. Ctr.*, 661 F.2d at 338.

---

minimal periods of time . . . unquestionably constitutes irreparable injury."); *Guzman*, 540 F. Supp. 3d at 651 (finding "Plaintiffs will suffer irreparable harm absent [injunctive relief] because Plaintiffs are experiencing race . . . discrimination at the hand of government officials."); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

[82]*See Def. Distrib. v. U.S. Dep't of State*, 838 F.3d 451, 460 (2016) ("Ordinarily, of course, the protection of constitutional rights *would be the highest public interest at issue in a case.*" (emphasis added)).

[83]Columbia's Anthony DiSarro makes a compelling case for courts to examine this approach to irreparability and to reverse course where practicable. *See* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 HARV. J. L. & PUB. POL'Y 2, 743–95 (2011).

2.  <u>Legal remedies are inadequate.</u>

The second element for injunctive relief is inadequate legal remedies. *eBay*, 547 U.S. at 391. This is the flip side of "irreparable harm," as a harm is irreparable where legal remedies are inadequate. *Janvey*, 647 F.3d at 600. Courts have long analyzed the two together because "equity has always acted *only* when legal remedies are inadequate." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959). Because no legal remedy would redress Plaintiffs' injury, this element is satisfied here.

3.  <u>The balance of hardships and the interests of the public warrant an injunction against MBDA Business Centers nationwide.</u>

The last two elements consider the litigants' hardships and the public's interests. *eBay*, 547 U.S. at 391. These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).[84] The importance of these factors grows in lockstep with the injunction's proposed scope.[85] For balance-of-hardships, the Court "looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distrib.*, 838 F.3d at 460. For public interests, it's unclear whether an injunction must further public interests or preserve the status quo.[86] The Fifth Circuit has endorsed both formulations at times.

---

[84]Though the factors merge, the Court should not assume hardships to the government are synonymous with disservice to the public. *See* M. Devon Moore, *The Preliminary Injunction Standard: Understanding the Public Interest Factor*, 117 MICH. L. REV. 939, 952 (2019) (noting "[t]he presumption that the government speaks [for] the public leads to a 'house always wins' scenario, stacking the deck in the government's favor" (cleaned up)).

[85]*See id.* 954 ("[W]hen determining the weight of the public interest factor, courts primarily consider the nonparties that would be directly affected by the injunction. The public interest factor is likely to be more influential when the government is a party to the litigation . . . In addition, courts should consider the basis of the plaintiff's cause of action in weighing the public interest factor. Relative to other types of claims, constitutional challenges suggest that the public interest factor will have a relatively heavy weight in the [] injunction analysis. Finally, the scope of the requested injunction necessarily drives the public interest weight, with broader injunctions requiring a more careful consideration of public interest consequences.").

[86]The Court's holding in *Winter* "seems to support an affirmative, pro-public interest impact." *Id.* at 949; *see also Winter*, 555 U.S. at 20 (holding that plaintiffs seeking an injunction "must establish . . . that an injunction is in the public interest"); *but see eBay*, 547 U.S. at 391 (holding that plaintiffs seeking

Here, the Court goes with the "do-no-harm" approach because its more popular.[87] Relevant public interests are expansive and include at least: national security, public health, government efficiency, avoidance of unconstitutional laws, administrability of remedies, and public confidence in the judiciary.[88] Based on these factors, the Court reluctantly concludes a nationwide injunction is appropriate here.

### a.  Balance of Hardships

To warrant injunctive relief, Plaintiffs must show "the balance of equities tips in [their] favor." *Winter*, 555 U.S. at 374. To this end, the Court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Direct Biologics, LLC v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023) (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). If an injunction is denied, Plaintiffs will be subject to the same race-based obstacle that brought them to court in the first place. But that injury will only be magnified considering the Court's ruling on their equal protection claim. A denied injunction would communicate to Plaintiffs that their "stigmatic injury" simply doesn't matter as much as more tangible, economic harms, as the Agency will have judicial imprimatur to continue operations affirmatively declared unconstitutional. *See supra*, pp. 74–75.

On the other hand, if an injunction is granted, the Agency will have to change its approach to Business Center programming. That change

---

an injunction must show "the public interest would not be disserved by a permanent injunction").

[87] *Cf. eBay*, 547 U.S. at 391 (holding plaintiff must show "the public interest would not be disserved by a permanent injunction"); *Defense Distrib.*, 838 F.3d at 457 (same); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (same); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998) (same); *but see Winter*, 555 U.S. at 20 (holding plaintiff must show "an injunction is in the public interest"); *see also Becerra*, 20 F.4th at 262 (reflecting a more ambiguous approach that simply considers "where the public interest lies").

[88] *See generally Winter*, 555 U.S. at 24 (national security); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19–20 (2020) (public health and avoidance of unconstitutional laws); *Ramirez v. Collier*, 595 U.S. 411, 433–34 (2022) (avoidance of unconstitutional laws and administrability of remedies); *Trump*, 585 U.S. at 703–11 (all of the above).

will be substantial, as the presumption in 15 U.S.C. § 9501 underlies the entire Business Center program, which is integral to the Agency. But nothing in the record suggests the presumption is of "utmost importance" to the MBDA's broader operations. *See Winter*, 555 U.S. at 376. And an injunction tailored only to Business Centers will not cost the MBDA a dime. *See Amoco*, 480 U.S. at 545. The Agency would be free to honor any commitments to programming previously made pursuant to its racial presumption; it would merely be estopped from using that presumption to provide services in the future.

At base, the Court is called upon to determine if an executive agency's efficiency trumps a citizen's constitutional right. The protection of constitutional rights is of paramount importance. *Def. Distrib.*, 838 F.3d at 460. As explained in the next section on public interests, that doesn't mean the balance always disfavors the government in constitutional litigation. For instance, if the Agency was a branch of the armed forces or was essential for national security/government functioning, significant disruption of its operations would outweigh Plaintiffs' harm. *See Winter*, 555 U.S. at 376. But that's not the case here. While the MBDA's work is important, disrupting its operations will not cause chaos on our nation's borders, will not jeopardize national security, will not cripple the economy, and will not have ripple effects that threaten the entire government. And unlike vacatur or a more sweeping injunction against the MBDA broadly, enjoining only the use of racial presumptions in Business Center programming will not fundamentally jeopardize the Agency's mission.

The Agency argues that a request to "enjoin the entire MBDA Act nationwide . . . goes too far." ECF No. 46 at 81. On this, the Court agrees. But that does not mean an injunction of race-based presumptions in Business Center programming similarly goes too far. The Agency suggests otherwise because Plaintiffs could seek business-development assistance via other federal programs. *See, e.g.*, ECF No. 41 at 74–75. But Plaintiffs' injury is not the denial of MBDA programming, it's the denial of equal treatment because of their race. Thus, the cornucopia of alternatives that could assist Plaintiffs' businesses has no bearing on the balance-of-harms analysis. The harm to the government of

disrupting one facet of programming provided by a non-essential agency does not outweigh the harm to Plaintiffs of denied constitutional rights. The Court now turns to public interests.

### b. *Public Interests*

When "exercising their sound discretion," federal courts sitting in equity must "pay particular regard for the public consequences" of an injunction. *Romero-Barcelo*, 456 U.S. at 312. While such considerations are expansive, four are salient here: avoidance of unconstitutional laws, government efficiency, administrability of remedies, and public confidence in the judiciary. As explained below, the first three support a nationwide injunction, the last does not.

### i. *Avoidance of Unconstitutional Laws*

Avoiding unconstitutional laws is ordinarily "the highest public interest at issue in a case." *Def. Distrib.*, 838 F.3d at 460; *see Jackson Women's Health*, 760 F.3d at 458 n.9 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (cleaned up)). The MBDA's race-based presumption is unconstitutional. *See supra*, pp. 74–75. Thus, the strongest public interest favors an injunction here. To determine if the injunction should be nationwide or limited to the DFW, Orlando, and Milwaukee Business Centers, the Court must ask which remedy would provide Plaintiffs "complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). To remedy Plaintiffs' injuries *before* their equal protection claim was proven, the Court tailored its preliminary injunction to the above three Centers. *See* ECF No. 27 at 13–14. That changes now that a constitutional violation has been established.

Plaintiffs' stigmatic injury will not be redressed if the Court only enjoins three Business Centers from applying the MBDA's race-based presumption. In such a situation, Plaintiffs would be keenly aware that their race counts against them everywhere else in the nation except those three municipalities. A stigma with three localized exceptions is still a stigma. Thus, a broader injunction is required to provide complete relief. *See Califano*, 442 U.S. at 702. But insofar as Plaintiffs' injury was caused by MBDA Business Centers, a broader injunction against all MBDA operations is unnecessary to redress their injury. The Agency

can still operate its Business Centers, it must simply do so without vetting applicants based on race—the issue isn't what the MBDA does, but *how* it does it. And considering an injunction's consequences for the public at large, the Court concludes the public's strong interest in avoiding unconstitutional laws would be disserved by allowing known constitutional violations to continue unchecked. *See Jackson Women's Health*, 760 F.3d at 458 n.9. Accordingly, the first public interest favors a nationwide injunction against the use of racial presumptions by MBDA Business Centers.

### ii.   *Government Efficiency*

Considerations of government efficiency have also long framed the Court's equitable analysis. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 629 (1952) (Douglas, J., concurring). However, while important, government efficiency does not automatically override the interest of avoiding unconstitutional laws. The north star of our constitutional republic is popular sovereignty, not efficiency.[89] That said, federal courts must consider the practical consequences of equitable relief, including for the efficient administration of affected government programs. *Romero-Barcelo*, 456 U.S. at 312.

Injunctions are always inefficient for the enjoined. Thus, this factor would preclude injunctive relief every time if given dispositive weight. But assuming the public has a strong interest in avoiding unconstitutional laws, and that that interest warrants some form of relief, the Court finds government efficiency tips in favor of an injunction vis-à-vis alternative remedies. Here, the efficiency analysis does not compare an injunction versus no injunction, but an injunction versus other remedies that could redress the violation of Plaintiffs'

---

[89]In this regard, efficiency must be counterbalanced against the Constitution's text. For instance, the most efficient forms of government eschew legislative/executive distinctions. But under those circumstances, "there can be no liberty." BARON DE MONTESQUIEU, THE SPIRIT OF THE LAWS 151 (Hafner Classics ed., 1959) (1748). Accordingly, the Court must consider how a given remedy could result in inefficiencies, but it must not give efficiency more say than the Constitution. *See Myers v. United States*, 272 U.S. 52, 85 (1926) (noting the Constitution "was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power").

rights. For example, where vacatur would nullify the Agency's entire legal framework, an injunction merely requires the Agency to provide programming via constitutional means. *See supra*, pp. 76–80.

An injunction against the Agency's presumption for Business Centers nationwide would result in net efficiency for the Agency. A broader injunction against the MBDA as a whole would drastically undermine the Agency's efficiency. That isn't warranted here. And an injunction as to three unique Business Centers would force the Agency to alter programming for certain locations but not others. It would have to do the same thing again if and when other Business Centers are challenged. A nationwide injunction vis-à-vis racial presumptions in Business Center programming would halt continued constitutional violations and give the Agency a clear rubric for required change: it need not worry about different standards for different locations, it need only alter how its Business Centers vet applicants. Accordingly, this public interest also favors injunctive relief.

### iii.  *Administrability of Remedies*

The administrability of remedies strongly favors an injunction against the MBDA's use of racial presumptions in Business Center programming. If the injunction is too wide (e.g., applicable to the MBDA as a whole), the resulting remedy will be onerous to administer. If the injunction is too narrow (e.g., applicable to the DFW, Orlando, and Milwaukee Business Centers), the resulting remedy will also be onerous to administer. The first injunction would require a sweeping nationwide overhaul of the entire Agency; the second would require the Agency to adopt one set of rules for certain locations and another for all others. Both circumstances should be avoided.

The Court only meaningfully considered two alternatives for this interest. Rejecting Plaintiffs' broader proposed injunction, the Court compared a permanent injunction as to the above three Centers versus a nationwide injunction for all Business Centers. As noted in its preliminary injunction, the Court's default assumption is that the more geographically constrained, the better. *See* ECF No. 27 at 13. But because the Agency's presumption applies equally to Business Centers

nationwide, "a patchwork of traditional, parties-only injunctions may be more disruptive than even an injunction that halts enforcement in full."[90] The Court is disinclined to revert to a system where "1600 injunctions had to issue against a single provision of a New Deal statute" to stop it.[91] And it doubts the Agency wishes to relitigate this issue for every Business Center individually.[92] Accordingly, the administrability of remedies favors a golden mean: the injunction need not apply to the MBDA as a whole, but it should not apply piecemeal to the DFW, Orlando, and Milwaukee Business Centers alone.

### iv.   Public Confidence in the Judiciary

A final weighty consideration is public confidence in the judiciary. "Few exercises of judicial power are more likely to undermine public confidence in the neutrality and integrity of the Judiciary than one which casts [courts] in the role of a Council of Revision, conferring on [themselves] the power to invalidate laws at the behest of anyone who disagrees with them." *Az. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145–46 (2011). This risk is magnified in our current politically polarized milieu.[93] And it weighs against an injunction here.

---

[90]For an insightful discussion of potential solutions, *see* Gregg Costa, *An Old Solution to the Nationwide Injunction Problem*, HARV. L. REV. BLOG (Jan. 25, 2018), https://harvardlawreview.org/blog/2018/01/an-old-solution-to-the-nationwide-injunction-problem/.

[91]*Id.*

[92]*See City of Chi. v. Sessions*, 888 F.3d 272, 292–93 (7th Cir. 2018) (noting "public interest would be ill-served" by "requiring simultaneous litigation of [] narrow questions of law in countless jurisdictions").

[93]*See* Costa, *supra* n.90 ("Most troubling, the forum shopping [nationwide injunctions] incentivize[] on issues of substantial public importance feeds the growing perception that the courts are politicized."). Notably, however, the very existence of stereotypes like those in the MBDA's presumption commit more violence to national unity than a nationwide injunction. As President Lincoln observed: "'A house divided against itself cannot stand.' . . . Either the opponents of slavery will arrest the further spread of it . . . or its advocates will push it forward till it shall become alike lawful in all states, old as well as new, North as well as South." Abraham Lincoln, *A House Divided*, in THE PATRIOT'S HANDBOOK 299 (1996). Human institutions both reflect and form social mores; if the federal government continues to favor certain races over others, such disparate treatment—however well intentioned—will metastasize for embittered subsets of the populace. The status quo will not be maintained; the

The Court generally agrees that "universal injunctions are legally and historically dubious." *Trump*, 585 U.S. at 721 (Thomas, J., concurring). While some legal and historical arguments support them,[94] few founding documents seem to contemplate such extraordinary power at the hands of a single district judge. *See id.* And wielding such expansive power necessarily undermines confidence in the judiciary for at least some portion of the populace. *See* Costa, *supra* n.90. But the Court struggles under prevailing precedent to see a workable alternative.[95] If a federal agency violates the Constitution nationwide, and its violations are ongoing, a decree should issue preventing further violations. Afterall, "the scope of the injunction must be justified based on the circumstances," and it is "dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Becerra*, 20 F.4th at 263–64.

Because all other public interests support injunctive relief here, this interest alone does not win the day. If courts mean what they say when they ascribe supreme importance to constitutional rights, *see, e.g.*, *Def. Distrib.*, 838 F.3d at 460, the federal government may not flagrantly violate such rights with impunity. The MBDA has done so for years. Time's up.

\*     \*     \*

Plaintiffs satisfy the requirements for injunctive relief, though not for the broader injunction sought. *See* ECF No. 56 at 31–35. Accordingly,

---

nation will trend toward increased or decreased polarity based in large part on perceptions of the federal government. When the government imposes distinctions between citizens based on race, it creates fault lines between the "haves" and the "have nots." And those fault lines threaten our nation at its very core. "Every Kingdom divided against itself is brought to desolation; and a house divided falleth." *Luke* 11:17 (King James).

[94]*See, e.g.*, Costa, *supra* n.90; Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065 (2018); Alan Trammell, *The Constitutionality of Nationwide Injunctions*, 91 COLO. L. REV. 977 (2020).

[95]In this regard, at least one Supreme Court justice has suggested that "[i]f federal courts continue to issue" nationwide injunctions, the Court is "dutybound to adjudicate their authority to do so." *Trump*, 585 U.S. at 721 (Thomas, J., concurring). Given the complexity of crafting administrable remedies in cases like this, the Court would welcome their doing so.

the Court **ORDERS** that the MBDA, along with its officers, agents, servants, and employees, and/or anyone acting in active concert therewith, be **PERMANENTLY ENJOINED** from imposing the racial and ethnic classifications defined in 15 U.S.C. § 9501 and implemented in 15 U.S.C. §§ 9511, 9512, 9522, 9523, 9524, and 15 C.F.R. § 1400.1, or otherwise considering or using an applicant's race or ethnicity in determining whether they can receive Business Center programming.

## CONCLUSION

In the mid-19th Century, Irish immigrants faced a common roadblock when seeking jobs after their trans-Atlantic voyage: motivated by rising populism and anti-Irish animus, many employers hung signs explaining "Irish Need Not Apply." Black Americans faced similar "Blacks Need Not Apply" signs during the Jim Crow Era. For its standing arguments, the Agency contends Plaintiffs cannot challenge the MBDA because they never formally applied for services and/or were ineligible for race-neutral reasons. These arguments miss the mark. The first is tantamount to a 19th-Century shopkeeper saying an Irishman lacks standing because he lacked other job qualifications. Those criteria aside, it would still be true that the "No Irish" sign precluded any chance of landing the job. The second argument is tantamount to a factory owner in the Jim Crow South saying a Black woman lacks standing because she didn't formally apply—it would defy logic to require a formal application when a "No Blacks" sign hangs prominently over the door. Plaintiffs have standing to challenge that sign.

The MBDA advertises services exclusively for some races but not others. *See* 15 U.S.C. § 9501. While not widely advertised, applicants not on the Agency's list of preferred races can attempt to "adequately show" their "social or economic disadvantage." 15 C.F.R. § 1400.1(b). To do so, they must overcome the Agency's presumption that they are not disadvantaged because their race is not listed. That racial presumption fails strict scrutiny and thus violates the Fifth Amendment's equal protection guarantees. While the Agency's work may help alleviate opportunity gaps faced by MBEs, two wrongs do not make a right. And the MBDA's racial presumption is a wrong. "Legislation should never be

designed to punish anyone."[96] While the Agency may intend to serve listed groups, not punish unlisted groups, the very design of its presumption punishes those who are not presumptively entitled to MBDA benefits. Accordingly, the Court **GRANTS** summary judgment on Nuziard and Bruckner's equal protection claim. Because an injunction is better than vacatur under the circumstances, the Court **DENIES** their APA claim but **GRANTS** a permanent injunction as set forth above. *See supra*, p. 91.

What became the modern MBDA was set in motion this very day fifty-five years ago. *See supra* n.4. To the extent the MBDA offers services pursuant to an unconstitutional presumption, that's fifty-five years too many. Today the clock runs out. "Yesterday is not ours to recover, but tomorrow is ours to win or lose."[97]

**SO ORDERED** on this **5th day** of **March 2024**.

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

[96]*Speaker Sam Rayburn, quoted in* D.B. Hardeman & Donald C. Bacon, *Rayburn: A Biography* 428 (1987).

[97]LYNDON JOHNSON, THE PRESIDENT'S THANKSGIVING DAY ADDRESS TO THE NATION (Nov. 28, 1963).