IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

JEFFREY NUZIARD, et al.,

    Plaintiffs,

v.                                                                                      Case No. 4:23-cv-00278-P

MINORITY BUSINESS
DEVELOPMENT AGENCY, et al.,

    Defendants.

---

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
BILL FOR ATTORNEYS' FEES AND EXPENSES**

---

Plaintiffs Nuziard and Bruckner, through their undersigned counsel, submit their application for costs, including attorneys' fees and expenses, pursuant to the Court's Order dated March 12, 2024, ECF 63, and respectfully show the following:

**PROCEDURAL BACKGROUND**

On March 23, 2023, Plaintiffs Nuziard, Bruckner, and Piper filed this action, alleging Fifth Amendment equal protection violations in connection with Defendants' implementation of racially discriminatory business programming offered by the Minority Business Development Agency ("MBDA"). ECF 1. On April 3, 2023, Plaintiffs moved for a preliminary injunction to prevent Defendants continued racial discrimination while the case proceeded to final judgment. ECF 14. On June 5, 2023, the Court granted Plaintiffs' motion for preliminary relief as to Plaintiffs on their constitutional claims. ECF 27.

Following the parties cross-motions for summary judgment, on March 5, 2024, the Court issued summary judgment in favor of Plaintiffs Nuziard and Bruckner on their Fifth Amendment

claims and ordered a permanent injunction against Defendants, extending nationwide. ECF 60. On March 12, 2024, the Court indicated its intent to memorialize its adjudication of Plaintiffs Nuziard's and Bruckner's claims in a Final Judgment incorporating their attorneys' fees and expenses. ECF 63. The Court further directed Plaintiffs to submit evidence and briefing regarding the relevant fees incurred in prosecuting this action. *Id.*

Accordingly, Plaintiffs Nuziard and Bruckner submit this application for attorneys' fees and expenses pursuant to the Court's order regarding the inclusion of such costs, ECF 63, and in accordance with the fee-shifting provision of the Equal Access to Justice Act ("EAJA") at 28 U.S.C. § 2412.

**ARGUMENT**

Although litigants are generally responsible for their own attorneys' fees, the EAJA provides an exception in which the prevailing party in civil litigation can recover attorneys' fees and expenses from the government. *Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 559 (5th Cir. 2015). Under the exception at 28 U.S.C. § 2412(d), an applicant establishes its eligibility to receive an award of such costs according to several criteria: (1) the applicant must be a "prevailing party" in a suit against the government; (2) the party, if an individual, must not have had net worth exceeding $2,000,000 at the time the civil action was filed; and (3) a fee application must be made within 30 days of final judgment and supported by an itemized statement of the sought fees. 28 U.S.C. §§ 2412(d)(1)(A)–(B), (2)(A)–(B); *see also Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 158 (1990) (discussing § 2412(d) EAJA requirements). Once a party's eligibility has been established, "a court *shall* award to a prevailing party" reasonable attorney's fees and expenses "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. §§ 2412(d)(1)(A), (d)(2)(A) (emphasis added).

Because Plaintiffs meet each eligibility requirement and the government's position was not substantially justified, Plaintiffs are entitled to an appropriate award of attorneys' fees and expenses pursuant to 28 U.S.C. § 2412(d).

## I. Plaintiffs are entitled to an award of attorneys' fees and expenses.

### A. Plaintiffs are eligible to receive an award under 28 U.S.C. § 2412(d).

Plaintiffs Nuziard and Bruckner are eligible for an award of attorney fees and expenses under Section 2412(d) because they are "prevailing parties" in this action, meet the financial eligibility requirement, and have filed a timely application for costs pursuant to the Court's order, ECF 63.

"[A] plaintiff is a 'prevailing party' under the EAJA 'if [he] succeed[s] on any significant issue in litigation which achieves some of the benefit [he] sought in bringing suit.'" *Davidson v. Veneman*, 317 F.3d 503, 506 (5th Cir. 2003) (quoted source omitted). Here, the Court's opinion and order granting summary judgment on Plaintiffs' equal protection claim renders Plaintiffs the prevailing party in this action. *See* ECF 60. The Court's decision vindicates the fundamental constitutional right to equality guaranteed to Plaintiffs and countless other American business owners, which, in turn, qualifies them for consideration for MBDA assistance.

Plaintiffs Nuziard and Bruckner also meet the net worth specifications under Section 2412(d) because each had a net worth far less than the EAJA's requisite $2,000,000 threshold "at the time the civil action was filed." 28 U.S.C. 2412(d)(2)(B). For example, as Plaintiff Bruckner confirms, he is "poor," has an annual income of less than $15,000, and estimates his net worth to be less than $50,000 in consideration of his assets and liabilities. Second Decl. of Christian Bruckner ¶¶ 2–4; *see also* ECF 47:20 (Bruckner deposition, dated Oct. 5, 2023). Likewise, as Plaintiff Nuziard has attested before, his decisions to start and maintain his business "imposed significant impacts to [his] personal financial health." Third Decl. of Jeffrey Nuziard ¶¶ 3–5; ECF

39:4 ¶¶ 15–19 (First Decl. of Jeffrey Nuziard). In pursuit of his dream, Dr. Nuziard "spen[t] down nearly every asset [he] had." Third Decl. of Jeffrey Nuziard ¶ 3. Indeed, his "persisting financial crisis was a basis for pursuing business assistance from the MBDA" in the first place. *Id.* at ¶ 5. In consideration of his total assets and liabilities, Dr. Nuziard estimates his net worth to be at or below $400,000 at the time he filed this action. *Id.* at ¶ 6.

> **B.   The Government's position is not "substantially justified," and there are no "special factors" counseling against an award to Plaintiffs.**

Under Section 2412(d), the government "has the burden of establishing that its position was substantially justified." *Sims v. Apfel*, 238 F.3d 597, 602 (5th Cir. 2001). "Whether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought." 28 U.S.C. § 2412(d)(1)(B). "The test of whether or not a government action is substantially justified is essentially one of reasonableness." *Knights of the Ku Klux Klan v. East Baton Rouge Parish Sch. Bd.*, 679 F.2d 64, 68 (5th Cir.1982). To meet its burden, the government must "show[] that its position in every stage of the proceedings was substantially justified by demonstrating that its actions had a reasonable basis both in law and fact." *Baker v. Bowen*, 839 F.2d 1075, 1080 (5th Cir.1988).

Having met the Section 2412 eligibility criteria, Plaintiffs are entitled to an award of attorneys' fees and expenses because the merits of the government's position were not substantially justified. Indeed, the government's position was poorly documented and legally dubious at the commencement of litigation—even despite Defendants' repeated acknowledgments that the MBDA's racial eligibility policy is subject to the "daunting" "rigors of strict scrutiny."

*See* ECF 20:23; 41:46; 60:45 (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023)), 46, 54.

Moreover, as the case evolved, the government's tenuous legal basis concerning the constitutionality of the MBDA's racial presumptions only eroded further. For example, in the Court's opinion and order granting Plaintiffs' preliminary injunction, the Court, drawing on well-established precedent, warned that generalized societal discrimination was an insufficient basis for establishing a compelling governmental interest in MBDA's broad race-based program. *See* ECF 27:9–10. The Court also identified the MBDA's racial classifications as problematically over- and under-inclusive and faulted Defendants because they had not explained why race-conscious action was required. *Id.* at 11–12. Additionally, following this Court's preliminary injunction order, another district court struck down the Small Business Administration's regulatory scheme imposing a highly similar race-based presumption of eligibility for awarding business-related benefits. *See generally Ultima Servs. Corp. v. U.S. Dep't of Agric.*, ___ Fed. Supp. 3d ___, 2023 WL 4633481 (E.D. Tenn. July 19, 2023). Shortly thereafter, the United States Supreme Court ruled against race-based government action, stressing (among other things) the importance of limited race-conscious action under the narrow-tailoring prong of the strict scrutiny analysis. *See generally SFFA*, 600 U.S. 181 (2023). Importantly, neither of these cases nor the Court's preliminary ruling created any new law; they merely apply longstanding precedent regarding the daunting rigors that all valid race-conscious government action must withstand.

Yet even after these varied pronouncements against broad race-based action that is untethered to specified discrimination and insufficiently tailored to remedying discrete violations, Defendants did not take heed of these warnings, reinforcing precedent. Instead, Defendants continued their endeavor to advance a far broader interest than they reasonably could support

against the vast scope of the MBDA's race-based policy in addition to asserting an *un*compelling interest in remedying societal discrimination. *E.g.*, ECF 41:49–70 (attempting to stretch an interest in remediating discrimination in public contracting across the entire American business context and pointing to societal disparities as a purported justification for the MBDA's race-conscious action).

Given the MBDA's expansive, national charter to implement race-based programming across the American business economy, the government needed an equally expansive constitutional justification for its broad race-conscious action. However, instead of supporting its claimed compelling interest in remediating discrimination with the "specifics" of the discrimination, "identify[ing] the who, what, when, where, why, and how," Defendants' approach from the preliminary to final stages of the case was largely to point, in generalized fashion, to purported "social ills and call it day." *See* ECF 60:48, 50–56; 24:9 (summarizing Defendants' legal analysis at the preliminary stages of the case as this: "because of 'redlining,' 'the G.I. Bill,' 'Jim Crow,' and persistent racial disparities among some races, Defendants [argue that they may] create an entire federal agency devoted to helping innumerable business enterprises belonging only to individuals of certain races (and even for those races and businesses for which Defendants' reports say nothing about)."); *compare* ECF 20:25–28 *with* ECF 41:50–59, 46:55–65.

To the contrary, it is *well-established* that a generalized "effort to alleviate the effects of societal discrimination is not a compelling interest." *See* ECF 60:47 (citing *Shaw v. Hunt*, 517 U.S. 899, 909 (1996)); *e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 226–28, (2023) ("[T]his Court has long rejected [societal discrimination as constituting a compelling governmental interest for a race-based measure].") (citing cases). Against this backdrop, there can be no reasonable expectation that simply pointing to an alleged

social "phenomenon"—such as purported disparities in access to credit—without any specifics linking the social ill to intentional government-sponsored discrimination, could ever (even possibly) carry the government's burden to establish a remedial interest in race-based action. *See* ECF 27:9–10; 60:45–50 (describing the elements establishing a compelling governmental interest in remediating discrimination) (citing cases).

Likewise, for any specifics the government did begin to provide as to the *single* industry of the American economy concerning procurement systems, "those specifics concern government contracting" only. ECF 60:56. Nevertheless, throughout the litigation, "the Agency trie[d] to take the ball and run with it" to justify a greater interest in contracting markets generally, hoping to further justify a compelling governmental interest in the MBDA's broad race-based programming, extending to various businesses wholly outside of the contracting area. *See id.*; *see generally* ECF 20; 41; 46. But such attempts and hopes do not diminish a fundamental problem plaguing Defendants from the outset: the record, while voluminous, was largely devoid of evidence capable of supporting a compelling governmental interest for the scope of MBDA's race-based business programming, extending to countless business contexts across the country. Despite this fatal problem however, the government repeatedly sought "to support a much broader interest than it feasibly [could]" and tendered its insufficient interest in remediating societal discrimination. *See* ECF 60:51, 56; *e.g.*, 20:24–28; 41:49–70. Such an approach cannot be said to be substantially justified because it is not reasonable under the demands of strict scrutiny.

Even more troubling is the merits of Defendants' position under the narrow tailoring prong of strict scrutiny. Once again, well-established case law makes clear that "a race-conscious remedy must be framed to address the exact effects and harms of the discrimination at issue." *Walker v. City of Mesquite*, 169 F.3d 973, 982–83 (5th Cir. 1999). "This fit must be so close that 'there is

little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'" ECF 60:61 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). Yet, here, there could never be a reasonable expectation of any such "fit"—much less a "close fit"—between the MBDA's racial classifications and any compelling interest to remediate discrimination. Operating since 1969, the MBDA's broad racial classifications immediately fail to display the hallmarks of narrow tailoring upon first blush. Among other significant failures, the MBDA's racial classifications are entirely under- and over-inclusive, use race as a negative and a stereotype, and lack a logical endpoint. *See, e.g.*, ECF 15:22–26; 27:11–12; 38:36–41; 60:62–69.

Between the MBDA's implementing statutes and regulations, the MBDA's presumption of eligibility purported to extend preferential treatment to "a bizarre amalgam" of some dozen-plus racial and ethnic minorities "that is often arbitrary and frequently redundant." ECF 60:8 & n.10; 15 U.S.C. § 9501(15)(B); 15 C.F.R. §§ 1400.1(b)–(c). These broad racial categories were hopelessly defenseless from the get-go, finding no support in law or in fact. For example, there was "no one-for-one" tracing of the selected racial groups to any concrete discrimination. ECF 60:64; *e.g.*, 38:31–34; 56:20, 26. There was no "regulatory framework for including or excluding certain groups." ECF 60:64; *e.g.*, 15:21–25; 27:11–12. There was otherwise no rationale for the MBDA's inclusion and exclusion of certain races. Even "when pressed in discovery," Defendants could not defend or even distinguish these racial classifications from one another, failing "to offer any rubric used for these determinations." ECF 60:64; 38:37; 39:54.

Likewise, given the ever-expanding scope of the MBDA's race-based policy since its start in 1969, there could be no reasonable characterization of the MBDA's race-conscious action as "a temporary matter," having "a termination point," a "reasonable durational limit[]," and "a logical end point"—as the Constitution has long-since demanded. *SFFA*, 600 U.S. at 212 (citing *Grutter*

*v. Bollinger*, 539 U.S. 306, 342–43 (2003)). What remains after these critical failures (among various other deficiencies under narrow tailoring) is endless, impermissible race-based stereotyping and exclusion. Defendants' position under narrow tailoring was not substantially justified because there is no reasonable answer that evades the fundamental problems of a broad and arbitrary "scattershot approach," bestowing and withholding preferential treatment based on nothing more than race. *See, e.g.*, ECF 27:12; 60:64. Plaintiffs are unaware of any court that has ever sanctioned such boundlessly broad racial classifications wholly untethered to any remedial goal.

At bottom, the MBDA's racial presumption of eligibility applying to business programming and assistance attempted to cover expansive ground—both with respect to its broad racial categories and in consideration of its span across all contexts of American business. That is a tall, perhaps insurmountable order; and the record, though voluminous, is largely irrelevant to the constitutional demand and does even come close to addressing the MBDA's purported scope. Indeed, Defendants do not even attempt to defend all of the racial classifications singled out for preferential treatment, and they do not offer any serious argumentation against under- or over-inclusivity or the ongoing and endless durational application of the MBDA's racial classifications. *See, e.g.*, ECF 60:62 (characterizing Defendants' arguments as "circular" and unexplained). Consequently, Defendants' position in this litigation cannot be said to be substantially justified

because it was not reasonable under the rigors of strict scrutiny.[1] Nor can the government point to any such "special circumstance"—such as the government's "good faith" advancement of "a credible, though novel, rule of law"—that would counsel against an award to Plaintiffs. 28 U.S.C. § 2412(d)(1)(A); *Knights*, 679 F.2d at 68 (discussing a "special circumstance" "safety value" for novel questions of law). Because Defendants cannot meet their burden to establish that their

---

[1] Even now, after the Court's ruling for Plaintiffs and against Defendants on the parties cross-motions for summary judgment, ECF 60, Defendants' position remains largely unjustified in relation to public-facing compliance with this Court's instruction. At two weeks following the Court's permanent injunction order, Defendants appear to have listed a single, inconspicuous notice regarding the Court's decision, among MBDA's various other "NEWS AND ANNOUNCEMENTS." *See* MBDA website, available here, https://www.mbda.gov/ (Mar. 18, 2024). The MBDA's brief statement would appear confusing and conflicting against the agency's other statements (both on the agency's general website and various other MBDA websites). For example, the MBDA's general website still proclaims that the agency is "solely dedicated to the growth and global competitiveness of minority business enterprises." MBDA website, "Our Mission," available here, https://www.mbda.gov/who-we-are/overview (Mar. 18, 2024). And as for "Who [the agency] Serve[s]," Defendants continue to list the irrational and arbitrary racial categories that this Court struck down: "African Americans, Asian Americans, Hasidic Jews, Hispanic Americans, Native Americans, and Pacific Islanders." *Id.* (MBDA general website, "Who We Serve"); *see also* MBDA Dallas Fort Worth, "Services," available here, https://www.mbdadfw.com/services (Mar. 18, 2024) (same). Despite emails from Plaintiffs' counsel to Defendants' counsel alerting them to these issues, which persist across various MBDA platforms, not even this fundamental service statement on MBDA's "Who We Are" page has been altered in response. Unfortunately, Plaintiffs may be forced to seek supplemental relief from this Court, just as the plaintiffs did in *Ultima*. *See* 2:20-cv-41 (E.D. Tenn.), ECF. 93 (Motion for Permanent Injunction and Additional Equitable Relief, Sept. 15, 2023) (explaining history of dispute over the government's compliance with the court's order).

position on the merits was substantially justified, Plaintiffs are entitled to an award of attorneys' fees and expenses.[2]

## II. Plaintiffs Nuziard and Bruckner seek reasonable fees and expenses pursuant to the EAJA.

Attorneys' fees and expenses awarded under the EAJA must be reasonable. *E.g.*, 28 U.S.C. § 2412(d)(2)(A). While Section 2412(d) instructs that reasonable fees and expenses "be based upon prevailing market rates for the kind and quality of the services furnished," it also limits attorney compensation to $125 per hour, subject to the court's determination regarding increases to the cost of living and/or other special factors. *Id.*

---

[2] Moreover, "special circumstances" in *Plaintiffs'* favor only further support Plaintiffs' entitlement to an award. From the early stages of this case to present, the Defendants in this case have displayed a pattern of dilatory compliance or even noncompliance with this Court's straightforward opinions and orders. Upon this Court's granting of Plaintiffs' preliminary injunction, Defendants delayed for months in permitting Plaintiffs to apply for MBDA assistance without the burdens of the agency's racially discriminatory eligibility policy. *See* ECF 57:4–12. In the end, Matthew Piper was never able to secure any help even to apply to the Wisconsin MBDA under the Court's preliminary order. Third Declaration of Matthew Piper ¶¶ 4–8. Indeed, while Mr. Piper noted his initial hesitancy under the Wisconsin MBDA's instructions to submit an application form mandating that he indicate his race when no option for his race was provided, ECF 47:41–43 (Second Decl. of Matthew Piper), following Defendants' report that the Wisconsin MBDA had updated its form to include "Caucasians," Mr. Piper submitted his application. Third Declaration of Matthew Piper ¶¶ 4–5; ECF 55-3 ¶ 7. However, after Mr. Piper submitted his application indicating his race as "Caucasian," he never received any response at all—even after inquiring with the Wisconsin MBDA on the status of his submission. Third Declaration of Matthew Piper ¶¶ 6–8. Consequently, Defendants' implementation of the Court's preliminary order was completely ineffective, further leaving Mr. Piper to wonder whether indicating his race played any role in the lack of response. *Id.* at ¶ 8. Although Mr. Piper is scheduled to be dismissed from this case without prejudice, ECF 62–63, the fact remains that he was certainly a Plaintiff throughout the preliminary stages of this case and following the Court's preliminary order. Moreover, at two weeks following this Court's permanent injunction order, broadly enjoining any further implementations of the MBDA's race-based policy, Mr. Piper *still* has not received any response from the MBDA. This Court's nationwide order benefits Mr. Piper, whether he remains a Plaintiff or not; and Defendants' dilatory conduct or outright noncompliance is disconcerting. *See supra*, n.1. Federal courts have inherent power to award reasonable attorneys' fees and costs to the prevailing party for the "willful disobedience of a court order," as signs point to here. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258 (1975).

In evaluating the reasonableness of an award under Section 2412, the "lodestar" fee is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Prince v. Colvin*, 94 F. Supp. 3d 787, 794 (N.D. Tex. 2015) (citing *Sandoval v. Apfel*, 86 F. Supp. 2d 601, 615 (N.D. Tex. 2000) (citing *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir.1999)). The resulting lodestar calculation is used as a benchmark from which time that is "excessive, duplicative, unnecessary, or inadequately documented" should be excluded. *See Prince*, 94 F. Supp. 3d at 794 (citing *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). The remaining hours are presumed to be reasonable and "should be modified only in exceptional cases." *Watkins*, 7 F.3d at 457 (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)).[3]

### A.  The hours incurred by Plaintiffs' attorneys to prosecute this case are necessary and reasonable.

In considering the reasonableness of the hours billed, an "applicant should exercise 'billing judgment' with respect to hours worked." *Hensley*, 461 U.S. 424, 437 (1983). "Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time

---

[3] While a court may either accept the lodestar figure, or adjust up or down based on the circumstances of the case, according to the Fifth Circuit's 12 "lodestar" factors, the Supreme Court and Fifth Circuit have cautioned that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate, *Hensley v. Eckerhart*, 461 U.S. 424, 434 n.9 (1983), and "should not be double-counted." *Jason D.W. by Douglas W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998). Thus, there is a "strong presumption" that the lodestar figure, without adjustment, is the reasonable fee award. *See Dague*, 505 U.S. 557, 562 (1992).

The 12 "lodestar" factors include: (1) the time and labor required; (2) the novelty and difficulty of the legal issues; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney as a result of taking the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the monetary amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and duration of the professional relationship with the client; and (12) awards in similar cases. *See Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 718 (5th Cir.1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).

required in the usual case and therefore, it must appear that the time claimed is obviously and convincingly excessive under the circumstances." *Perkins v. Mobile Hous. Bd.*, 847 F.2d 735, 738 (11th Cir. 1988).

Here, Plaintiffs' attorneys' fees relate to work performed in this case, including research, analysis, and drafting of the complaint, briefs, and other papers filed in this Court or necessary to prosecuting this action, as well as other tasks related to the litigation in this case, including but not limited to hearings, conferences, and discovery. In particular, Defendants produced voluminous materials throughout discovery and during submissions on dispositive motions. As Defendants note, "Defendants . . . produced an extensive record of more than 22,000 pages," which they said supported a compelling governmental interest in the MBDA's race-based programming. ECF 46:43. However, given Defendants' general failure to pinpoint its purported evidence with specificity and particularity, the burden fell largely to others to sort the record out. Thus, just as "the Court expended hundreds of man-hours reviewing the record" in deciding the parties cross-motions for summary judgment, ECF 60:52, Plaintiffs' attorneys were forced to similarly "prospect the record," *Id.* at 53, in the preliminary, discovery, and final stages of this case.

Since the inception of the case, just prior to the filing of the Complaint, to the time of this submission for attorney fees and expenses, Plaintiffs' attorneys have recorded a total of 1,497.6 hours, as detailed in the below chart and described in Plaintiffs' declarations and supporting materials. *See* Decl. of Daniel Lennington ¶¶ 10–13; Decl. of Jason Nash ¶¶ 8–11.

| Plaintiffs' Hours Billed in Prosecuting this Action | |
|---|---|
| Wisconsin Institute for Law & Liberty | 1,454.7 |
| The Law Office of Jason Nash | 42.9 |
| **TOTAL** | **1,497.6** |

Plaintiffs' attorneys have excluded unnecessary time and eliminated time spent as specifically related to Matthew Piper, who is scheduled to be dismissed from this case without prejudice. *See* ECF 60–63; Decl. of Daniel Lennington ¶ 13; Decl. of Jason Nash ¶ 16 n.3. In addition, Plaintiffs' records reflect various instances in which time that may be fairly billed and included in a request for fees was written off or written down. *See* Decl. of Dan Lennington ¶ 13, (noting eliminations of travel time); Decl. of Jason Nash ¶ 16 n.3 (noting "write downs" as to time incurred). Moreover, although a paralegal and legal assistant performed work on this case, and these costs are recoverable, Plaintiffs have omitted these hours from their reimbursement request, so that the time spent reflects only those hours spent by Plaintiffs' attorneys to litigate this case. Decl. of Daniel Lennington ¶¶ 13, 15; *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 590 (2008) ("[A] prevailing party that satisfies EAJA's other requirements may recover its paralegal fees); *see also* Exhibit A to Decl. of Jason Nash (detailing work performed by a legal assistant). Given the limited resources of Plaintiffs' counsel owing to small legal practices, every effort is made to litigate efficiently and keep time and costs down. *See* Decl. of Daniel Lennington ¶¶ 10–11; Decl. of Jason Nash ¶ 10. All hours billed reflect Plaintiffs' attorneys' sound billing judgment and are necessary to the effective prosecution of this case. Decl. of Daniel Lennington ¶¶ 10–13; Exhibit A to Decl. of Daniel Lennington; Decl. of Jason Nash ¶¶ 8–11, 14–15; Exhibit A to Decl. of Jason Nash.

**B.     Plaintiffs request an hourly rate of $241.91, reflecting adjustment for inflation.**

As for the reasonableness of the hourly rate, Section 2412(d) provides that attorneys' fees "shall be based upon prevailing market rates for the kind and quality of the services furnished," but "shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A).

Here, the declarations of Plaintiffs' counsel explain their customary billing rates for civil rights and appellate litigation. As to Plaintiffs' counsel, the Wisconsin Institute for Law & Liberty, the 2023 billing rate was $400 per hour for Associate Counsel, Ms. Tolliver, and $500 per hour for Deputy Counsel, Mr. Lennington. Decl. of Dan Lennington ¶¶ 5–8. As to Plaintiffs' local counsel, The Law Office of Jason Nash, in 2023, the billing rate generally ranges between $375.00 and $400.00 for matters of this nature. Decl. of Jason Nash ¶ 12.

The billing rates by Plaintiffs' attorneys in this case are at or below the prevailing market rate. *See* Decl. of Jason Nash ¶¶ 12–16 (discussing comparable rates to the North Texas area and in the Fort Worth legal community); Decl. of Dan Lennington ¶ 9 (discussing comparable rates to the Milwaukee, Wisconsin market). In fact, The Law Office of Jason Nash made its services available to the Wisconsin Institute for Law & Liberty at a reduced rate in consideration of the organization's status as a small, public interest firm. Decl. of Jason Nash ¶ 12. Additionally, although billing rates increased for the Wisconsin Institute for Law & Liberty in 2024, Plaintiffs seek only recovery under Section 2412(d) limitations. *See* Decl. of Dan Lennington ¶ 14.

Thus, "based upon prevailing market rates for the kind and quality of the services furnished," Plaintiffs' standard billing rates are reasonable. 28 U.S.C. § 2412(d)(2)(A). And, although these billing rates are subject to the EAJA's statutory cap of $125 per hour, given the high stakes nature of this public interest lawsuit—which was hotly contested by the government—and the level of success achieved to secure broad vindication of the fundamental constitutional guarantee to equality, there are no indications here that would support an award at an hourly rate *below* this established ceiling. *See City of Riverside v. Rivera*, 477 U.S. 561, 572 (1986) (affirming district court's fee award, which paid "particular attention" to the nature of the litigation to "advance the public interest" and "the significance of the overall relief" or "excellent results" that

"counsel for plaintiffs achieved."); *see also* Decl. of Jason Nash ¶¶ 12–16, 18 (discussing the reasonableness of Plaintiffs' rates and fees in the context of the lodestar factors *before* the EAJA's statutory cap is applied); Decl. of Decl. of Dan Lennington ¶ 11 (discussing this federal civil-rights lawsuit having nationwide ramifications in which Plaintiffs were able to complete this litigation with only two attorneys and a local counsel as compared to how the federal government litigated this case with at least four attorneys).

Importantly, a court may exceed the $125 per hour cap, calculating fees using a higher rate, based on "an increase in the cost of living." 28 U.S.C. § 2412(d)(2)(A); *see also Hall v. Shalala*, 50 F.3d 367, 369–70 (5th Cir. 1995); *Baker*, 839 F.2d at 1084 ("Clearly, by mentioning it in the statute, Congress intended that the cost of living be seriously considered by the fee-awarding court."). "Except in unusual circumstances," "if there is a significant difference in the cost of living" since the enactment of the EAJA's statutory cap in a particular locale, justifying an increase in the fee, "then an increase should be granted." *Baker*, 839 F.2d at 1084.

"The Consumer Price Index (CPI), as furnished by the U.S. Bureau of Labor Statistics (BLS), has been used to determine the appropriate amount for cost-of-living increases under the EAJA." *Henline v. Kijakazi*, No. 3:20-CV-1944-D-BH, 2022 WL 2975326, at *2 (N.D. Tex. July 5, 2022), report and recommendation adopted sub nom. *Henline v. Comm'r, Soc. Sec. Admin.*, No. 3:20-CV-1944-D, 2022 WL 2972585 (N.D. Tex. July 27, 2022); *see also, e.g.*, *Johnson v. Sullivan*, 919 F.2d 503, 504 (8th Cir.1990) ("We believe that the Consumer Price Index constitutes 'proper proof' of the increased cost of living since the EAJA's enactment and justifies an award of attorney's fees greater than [the then-current cap] per hour in these cases."); *Allen v. Bowen*, 821 F.2d 963, 967 (3d Cir.1987) (approving the use of the Consumer Price Index in determining EAJA cost-of-living adjustment).

"Courts in [the Dallas] division have routinely used the CPI for the Dallas-Fort Worth area (DFW CPI) to calculate the appropriate hourly rate for attorneys under the EAJA." *Id.* (citing *Hamblen v. Colvin*, 14 F. Supp. 3d 801, 807 (N.D. Tex. 2014) (collecting cases)). Here, Plaintiffs believe that the CPI-adjusted rate for Dallas-Fort Worth is appropriate.

According to the BLS website, in 2023, the CPI for Dallas-Fort Worth was 287.974.[4] In 1996, the CPI for that same region was 148.8. The percentage difference between the 1996 rate and the 2023 rate is 193.53% (287.974/148.8).[5] Therefore, the statutory rate of $125, adjusted upward by the CPI increase is $241.91 for 2023.[6] Plaintiffs respectfully request this Court to use this inflation-adjusted rate when calculating the fee award, as depicted in the below chart.[7]

| Plaintiffs' Attorneys' Fees - Capped by EAJA § 2412(d), Adjusted for Inflation | | | |
|---|---|---|---|
| Firm | Rate | Hours | Total |
| Wisconsin Institute for Law & Liberty | $241.91 | 1,454.7 | $351,906.48 |
| The Law Office of Jason Nash | $241.91 | 42.9 | $10,377.94 |
| **TOTAL** | **$241.91** | **1,497.6** | **$362,284.42** |

C.   **Plaintiffs are entitled to recover expenses incurred.**

The EAJA's cost shifting provisions also authorizes an award to include expenses incurred. *See* 28 U.S.C. § 2412(a) (permitting non-attorneys' fees and expense costs pursuant to Section

---

[4] The Dallas annual data from 1963 to 2024 is available here: https://www.bls.gov/cpi/regional-resources.htm (select "Dallas" under "METRO AREA").

[5] In *Henline*, *supra*, the opinion walks through the specifics of calculating this rate at footnotes 8, 9, and 10.

[6] This math can be cross-checked using the BLS CPI inflation calculator. Although this calculation uses the national CPI rate (and not the Dallas-Fort Worth CPI rate), one can see that $125 in March 1996 has the same buying power as $242.32 in March 2023. If anything, the national BLS CPI inflation calculator reaches a higher hourly rate than the local inflation calculation Plaintiffs based their request on, as presented above. *See* BLS CPI Calculator available here: https://data.bls.gov/cgi-bin/cpicalc.pl.

[7] Plaintiffs recognize that they are also asking for reimbursement for attorney work in 2024. Because almost all hours recorded were from 2023, and the hours recorded for 2024 are relatively small, Plaintiffs request that a uniform rate of $241.91 be applied to all hours worked.

1920 for fees of the clerk and marshal, fees for electronically recorded transcripts, printing fees, and docket fees); 28 U.S.C. § 2412(d)(2)(A) (permitting recovery for "the reasonable expenses of expert witnesses," among other things); *see also Richlin*, 553 U.S. at 590 (paralegal fees recoverable under the EAJA); *Gate Guard Servs. L.P. v. Perez*, 14 F. Supp. 3d 825, 841 (S.D. Tex. 2014) (noting that 2412(d) "provides for the recovery of 'other expenses,' which includes paralegal fees and travel expenses."); *Aston v. Sec'y of Health & Hum. Servs.*, 808 F.2d 9, 12 (2d Cir. 1986) (holding that "telephone, postage, travel and photocopying costs" "are reimbursable under the EAJA as reasonable 'fees and other expenses.'"); *Int'l Woodworkers of Am., AFL-CIO, Loc. 3-98 v. Donovan*, 769 F.2d 1388, 1392 (9th Cir.) (noting that awards of "costs that are ordinarily billed to a client" are "routine under all other fee statutes" and that "the expenses enumerated in Section 2412(d)(2)(A) are set forth as examples, not as an exclusive list.").

Here, as set forth in Plaintiffs' declarations and supporting materials, Plaintiffs have chosen *not* to seek reimbursement for a number of expenses that would be typically recoverable, including expert fees, paralegal fees, and travel expenses. Decl. of Decl. of Dan Lennington ¶¶ 13, 15. As such, Plaintiffs' reimbursement request is limited only to those expenses pertaining to fees for filing, service, docketing, and deposition transcripts—a total expense request in the amount of $2,749.50. *See* Decl. of Decl. of Dan Lennington ¶ 15.

\* \* \*

In sum, Plaintiffs are entitled to an award of attorneys' fees and expenses because they meet the eligibility criteria under Section 2412(d) of the EAJA and government's position was neither substantially justified nor are there any "special circumstances" counseling against an award to Plaintiffs. In addition, consistent with the provisions of the EAJA and precedent, Plaintiffs request the Court to apply an inflationary adjustment to the EAJA's statutory cap under

Section 2412(d) in calculating their attorneys' fees. The hours Plaintiffs' attorneys incurred in broadly vindicating the fundamental constitutional guarantee were necessary and reasonable given circumstances of this case. In total, Plaintiffs request an award for their attorneys' fees and expenses in the amount of **$365,033.92**, as depicted in the below chart.

| Plaintiffs' Total Award Sought for Attorneys' Fees & Expenses | |
|---|---|
| Total Attorney Fees at EAJA Cap, Adjusted for Inflation | $362,284.42 |
| Total Expenses | $2,749.50 |
| **GRAND TOTAL** | **$365,033.92** |

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to order that Plaintiffs be awarded the full amount sought for their Bill for Costs, including their Attorneys' Fees and Expenses, in the amount of **$365,033.92.**

Dated: March 19, 2024

Respectfully submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Cara Tolliver*

Richard M. Esenberg *(admitted pro hac vice)*
Cara M. Tolliver *(admitted pro hac vice)*
Daniel P. Lennington *(admitted pro hac vice)*
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Cara@will-law.org
Dan@will-law.org

THE LAW OFFICE OF
JASON NASH, P.L.L.C.

Jason C. Nash (Bar No. 24032894)
601 Jameson Street
Weatherford, TX 76086
Telephone: (817) 757-7062
jnash@jasonnashlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2024, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, sending notice to all attorneys of record.

*s/ Cara Tolliver*
Cara M. Tolliver